# EXHIBIT A

David L. LeBas, SBN 12098600
dlebas@namanhowell.com
Michael S. Duncan, SBN 24097628
mduncan@namanhowell.com
NAMAN HOWELL SMITH & LEE PLLC
8310 N. Capital of Texas Highway, Ste. 490
Austin, Texas 78731
Ph. (512) 479-0300
Fax (512) 474-1901

*ATTORNEYS FOR AGTEXAS FARM CREDIT SERVICES AGTEXAS, PCA
AND THORLAKSON DIAMOND T FEEDERS, LP*

John Massouh, SBN 24026866
John.massouh@sprouselaw.com
Josh Kundert, SBN 24143877
Josh.kundert@sprouselaw.com
SPROUSE SHRADER SMITH PLLC
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas 79105-5008
(806) 468-3300; (806) 373-3454 FAX

--and--

Abel A. Leal, SBN 24026989
abel@leal.law
LEAL LAW FIRM, LLC
14180 N. Dallas Parkway, Suite 300
Dallas, Texas 75254
(214) 395-5325

*Attorneys For Dennis Buss, Buss Family Trust, Eddie Bryant, Robert E.
Gray, Ronnie Gray, Gray Brothers, Craig Sutton, Amy Sutton, Steve Ryan,
Janice Lawhon, AJ Jacques Living Trust, Gungoll Cattle, LLC, Leah
Gungoll, Morrison Café, LLC, Gary Lesh, Jan Lesh, Lesh Family Trust,
Jared Lesh, Jordan Lesh, LLC, Joel Brookshire, Gene Brookshire Family,
LP, Douglas Finley, Scarlet And Black Cattle, LLC, Bryan Blackman, Steve
T Scott Farm, Inc., Scott Livestock Company, Inc., Arnold Braun Trust,
Robert Braun, Jim Rininger, Robert Spring, Michael Evans, Miranda Evans,
Charles Lockwood, Cole Lockwood, Sherle Lockwood, Nikki Lockwood,
Lyndal Van Buskirk, Janet Van Buskirk, Colby Van Buskirk, Susan Van
Buskirk, Jimmy Greer, Dustin Johnson And Dora Blackman*

Amber S. Miller, SBN 24050320
amiller@cdmlaw.com
CRENSHAW, DUPREE & MILAM, L.L.P.
4411 98th Street, Suite 400
Lubbock TX 79424
(806) 762-5281
(806) 762-3510 (fax)

*Attorney for Ridgefield Capital Group, Drew Phillips, Carraway Cattle,
Robert Ellis, Barry Phillips, Big Seven Capital Partners, Richard Carraway*

James D. Bradbury, SBN 02814500
jim@bradburycounsel.com
Kyle K. Weldon, SBN 24097192
kyle@bradburycounsel.com
JAMES D. BRADBURY, PLLC
201 Main Street, Suite 600
Fort Worth, Texas 76102
Telephone: 817-339-1105
Fax: 817-886-3495

*Attorneys for Priest Cattle Company, Ltd, Priest Victory Investment LLC, W.
Robbie Russell Living Trust, and Eddie Stewart*

**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE NORTHERN DISTRICT OF
TEXAS AMARILLO DIVISION**

| | |
|---|---|
| IN RE:<br><br>McCLAIN FEED YARD, INC., McCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br><br>     Debtors. | Case No. 23-20084-rlj<br>               Chapter No. 7<br><br>Jointly Administered |
| IN RE:<br><br>2B FARMS, a Texas General Partnership, et al.,<br><br>     Debtors. | Case No. 23-50096-rlj<br>               Chapter No. 12<br><br>Jointly Administered |

| | |
|---|---|
| IN RE:<br><br>AGTEXAS FARM CREDIT SERVICES; AGTEXAS, PCA; AND THORLAKSON DIAMOND T FEEDERS, LP<br><br>  Plaintiffs,<br><br>and<br><br>EDWARD DUFURRENA et al.,<br>  Intervenor-Plaintiffs<br>v.<br><br>RABO AGRIFINANCE, LLC et al.,<br><br>  Defendants | ADV. PROC. NO. 24-02007-rlj<br><br>(Consolidated Adversary Proceeding) |
| IN RE:<br><br>HTLF BANK, as successor to FIRST BANK & TRUST,<br><br>  Plaintiffs, Counter-Defendant, and Cross-Claim Defendant,<br><br>v.<br><br>2B FARMS, a Texas General Partnership, et al., TERRY M. ROBINSON, and REBECCA A. ROBINSON,<br><br>  Defendants, Counterclaim-Plaintiffs, Third-Party Plaintiffs and Third-Party Counterclaim Defendants,<br><br>v.<br><br>RABO AGRIFINANCE LLC and MECHANICS BANK,<br><br>  Third-Party Defendants, and as to Rabo AgriFinance LLC only, Third-Party | ADV. PROC. NO. 24-02007-rlj<br><br>(Consolidated Adversary Proceeding) |

| Counterclaim Plaintiff and Cross-Claim Plaintiff. | |

## PLAINTIFFS' AND INTERVENORS' ORIGINAL FEDERAL COMPLAINT AMENDING AND CONSOLIDATING THEIR STATE COURT PETITIONS[1]

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiffs AgTexas Farm Credit Services, AgTexas, PCA (collectively with AgTexas Farm Credit Services, "AgTexas"), Thorlakson Diamond T Feeders, LP ("Thorlakson"), and Intervenors identified in in Paragraphs 4 through 57 below, file their Original Federal Complaint Amending and Consolidating their State Court Petitions, complaining of Rabo AgriFinance LLC, Rabo Diversified Services LLC (collectively with Rabo AgriFinance, LLC "Rabo"), Mechanics Bank ("Mechanics"),  HTLF Bank, as successor to First Bank & Trust ("HTLF"), Shawn Ragland, and Meagan Goad (collectively, "Defendants"), and in support of same would unto the Court as follows:

## I.
## PARTIES

1.     Plaintiff AgTexas Farm Credit Services, is a federally chartered agricultural credit association formed under the Farm Credit Act of 1933.  It does business in various locations in Texas, including Deaf Smith County, Texas.

---

[1] This Original Complaint amends the pleadings filed in the 222nd Judicial District of Texas, Deaf Smith County, Cause No. CI-2023D-025 before Rabo Agrifinance, LLC's removal to federal court.  Specifically, this Original Complaint amends AgTexas Farm Credit Services, AgTexas, PCA, and Thorlakson Diamond T Feeders, LP,'s Third Amended Petition and Intervenor's (listed in Exhibit "1") Original Plea in Intervention.  This Original Complaint also amends the Petition in Intervention filed by the Intervenors represented by Crenshaw Dupree & Milam, L.L.P. and James D. Bradbury, PLLC.  *See* Adversary Proceeding No. 24-02007-rlj, Doc. No. 9.

2.      Plaintiff AgTexas, PCA, is a federally chartered production credit association formed under the Farm Credit Act of 1933.  It does business in various locations in Texas, including Deaf Smith County, Texas.

3.      Plaintiff Thorlakson Diamond T Feeders, LP, is a Texas limited partnership.  It does business in various locations in Texas, including Deaf Smith County, Texas.

4.      Intervenor Dennis Buss is an individual with citizenship in Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

5.      Intervenor Buss Family Trust is an entity formed under the laws of Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants

6.      Intervenor Eddie Bryant is an individual with citizenship in Texas. Intervenor entered into an agreement with one or more of McClain Defendants.

7.      Intervenor Robert Gray is an individual with citizenship in Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants.

8.      Intervenor Ronnie Gray is an individual with citizenship in Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants.

9.      Intervenor Gray Brothers is a partnership formed in Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

10.     Intervenor Craig Sutton is an individual with citizenship in Texas. Intervenor entered into an agreement with one or more of McClain Defendants.

11.     Intervenor Amy Sutton is an individual with citizenship in Texas. Intervenor entered into an agreement with one or more of McClain Defendants.

12.     Intervenor Steve Ryan is an individual with citizenship in Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants.

13.     Intervenor AJ Jacques Living Trust is entity formed under the laws of Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants.

14.     Intervenor Gungoll Cattle, LLC is a Oklahoma limited liability company. Intervenor entered into an agreement with one or more of McClain Defendants.

15.     Intervenor Leah Gungoll is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

16.     Intervenor Morrison Café, LLC is an Oklahoma limited liability company. Intervenor entered into an agreement with one or more of McClain Defendants.

17.     Intervenor Lesh Family Trust is an Oklahoma entity.  Intervenor entered into an agreement with one or more of McClain Defendants.

18.     Intervenor Gary Lesh is a citizen of Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants.

19.     Intervenor Jan Lesh is a citizen of Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants.

20.     Intervenor Jared Lesh is an individual with citizenship in Texas.  Intervenor entered into an agreement with one or more of McClain Defendants.

21.     Intervenor Joel Brookshire is an individual with citizenship in Texas.  Intervenor entered into an agreement with one or more of McClain Defendants.

22.     Intervenor Gene Brookshire Family Limited Partnership is a Texas entity. Intervenor entered into an agreement with one or more of McClain Defendants.

23.     Intervenor Douglas Finley is a citizen of Texas.  Intervenor entered into an agreement with one or more of McClain Defendants.

24.     Intervenor Scarlet and Black Cattle, LLC is an entity formed under the laws of Texas. Intervenor entered into an agreement with one or more of McClain Defendants.

25.     Intervenor Janice Lawhon is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

26.     Intervenor Jordan Lesh, LLC is an Oklahoma entity.  Intervenor entered into an agreement with one or more of McClain Defendants.

27.     Intervenor Bryan Blackman is a citizen of Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants.

28.     Intervenor Steve T Scott Farm, Inc. is a Mississippi entity.  Intervenor entered into an agreement with one or more of McClain Defendants.

29.     Intervenor Scott Livestock Company, Inc. is a Mississippi entity.  Intervenor entered into an agreement with one or more of McClain Defendants.

30.     Intervenor Arnold Braun Trust is an Indiana entity.  Intervenor entered into an agreement with one or more of McClain Defendants.

31.     Intervenor Robert Braun is a citizen of Indiana.  Intervenor entered into an agreement with one or more of McClain Defendants.

32.     Intervenor Jim Rininger is a citizen of Indiana.  Intervenor entered into an agreement with one or more of McClain Defendants.

33.     Intervenor Robert Spring is a citizen of Oklahoma.   Intervenor entered into an agreement with one or more of McClain Defendants.

34.     Intervenor Michael Evans is a citizen of Kentucky.  Intervenor entered into an agreement with one or more of McClain Defendants.

35.     Intervenor Miranda Evans is a citizen of Kentucky.  Intervenor entered into an agreement with one or more of McClain Defendants.

36.     Intervenor Charles Lockwood is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

37.     Intervenor Cole Lockwood is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

38.     Intervenor Sherle Lockwood is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

39.     Intervenor Nikki Lockwood is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

40.     Intervenor Lyndal Van Buskirk is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

41.     Intervenor Janet Van Buskirk is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants

42.     Intervenor Colby Van Buskirk is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

43.     Intervenor Susan Van Buskirk is a citizen of Oklahoma.  Intervenor entered into an agreement with one or more of McClain Defendants.

44.     Intervenor Jimmy Greer is a citizen of Kentucky.  Intervenor entered into an agreement with one or more of McClain Defendants.

45.     Intervenor Dustin Johnson is a citizen of Mississippi.  Intervenor entered into an agreement with one or more of McClain Defendants.

46.     Intervenor Dora Blackman is a citizen of Oklahoma. Intervenor entered into an agreement with one or more of McClain Defendants.

47.     Intervenor Ridgefield Capital Asset Management, LP is a limited partnership located in Ridgefield, CT, which during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

48.     Intervenor Robert Ellis is an individual, who is a resident of Easton, MD, who during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

49.     Intervenor Big Seven Capital Partners, LLC, is an Ohio limited liability company authorized to do business in Texas, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

50.     Intervenor Carraway Cattle, LLC is a Texas limited liability company, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

51.     Intervenor Richard Carraway is an individual residing in Tennessee, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

52.     Intervenor Drew Phillips is an individual residing in Jackson, TN, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

53.     Intervenor Barry Philips is an individual residing in Ridgeland, MS, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

54.     Intervenor Priest Cattle Company, Ltd is a Texas limited partnership, which, during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

55.     Intervenor Priest Victory Investment LLC is a Texas limited liability company, which, during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

56.     Intervenor W. Robbie Russell Living Trust is an entity formed under the laws of Tennessee, which, during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

57.     Intervenor Eddie Stewart is an individual who resides in Brownsville, Tennessee, who during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County.

58.     Defendant Rabo AgriFinance LLC is a limited liability company that does business in various locations in Texas, including Deaf Smith County.  Rabo has appeared in this lawsuit and will be served through its attorneys of record.

59.     Rabo Diversified Services, LLC, is a Delaware limited liability company.  It may be served by serving its agent for service in Texas, Corporate Creations Network, Inc., 5444 Westhimer Rd., Suite 1000, Houston, Texas 77056.  Issuance of citation is requested at this time.

60.     Defendant Mechanics Bank is a California stock corporation that does business in Texas.  Mechanics Bank has appeared in this lawsuit and will be served through its attorneys of record.

61.     Defendant HTLF Bank, as successor to First Bank & Trust ("HTLF") is a Colorado corporation, that does business in various locations in Texas.  HTLF has appeared and answered in this lawsuit and will be served through its attorneys of record.

62.     Defendant Shawn Ragland is an individual who resides in the State of Texas.  Mr. Ragland has appeared in this lawsuit and will be served through his attorneys of record.

63.     Defendant Meagan Goad is an individual who resides in the State of Kentucky.  Ms. Goad has appeared in this lawsuit and will be served through her attorneys of record.

## II.
## JURISDICTION AND VENUE

64.     This case was originally filed by AgTexas and Thorlakson and intervened in by Intervenors in Texas state District Court for Deaf Smith County, Texas.  Rabo Agrifinanice, LLC removed the case to this Court asserting "related-to" jurisdiction to be heard as an adversary proceeding pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

65.     In response to AgTexas and Thorlakson's motion to remand, in which numerous Intervenors joined, this Court concluded it has "related-to" jurisdiction over this case as an adversary proceeding.

66.     To the extent this Court has jurisdiction, venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

67.     Plaintiffs and Intervenors disclaim that this suit is an effort to recover from McClain Farms, Inc. ("MFI"), McClain Feedyard, Inc. ("MFY"), and 7M Cattle Feeders, Inc. ("7M") (collectively referred to herein as "McClain").

## III.
## FACTUAL BACKGROUND SUPPORTING PLAINTIFFS' AND INTERVENORS' CLAIMS

**A.    Plaintiffs and Intervenors Entered Into Business Transactions with McClain Without Knowing That a Massive Fraud Scheme Was Taking Place.**

68.    Plaintiffs and Intervenors had business transactions with McClain.  These business dealings included cattle owned by Plaintiffs and Intervenors that were delivered to one or more of McClain's facilities for growing and health care before they were ready for shipment to a finishing feedyard.  Details of specific arrangements concerning these dealings are too voluminous for description herein and will be or have been provided in discovery and in claims made by Plaintiffs and Intervenors in the bankruptcy proceedings.

69.    The Trustee in the bankruptcy proceedings confirmed that McClain engaged in a massive fraud involving cattle and that over $120,000,000.00 in claims have been filed by over 100 parties.

**B.    Rabo Continuously Extended Credit to McClain Despite Knowing Its Operations Posed High Risk and Significant Exposure.**

70.    Rabo[2] is one of the largest lenders in the agricultural industry in the United States and has over 100 years of experience in the agriculture lending industry. Rabo touts its robust understanding of all segments of the agricultural industry, including cattle feeding, with a nationwide team of agricultural lenders, financial analysts, and other leading professionals in the agricultural finance space. Rabo's own website explains that its "Relationship Managers are

---

[2] Rabo AgriFinance, LLC provides financing to agribusiness in North America.  Rabo Diversified Services LLC is a related entity that, on information and belief, provides operations support and other support services to Rabo AgriFiance LLC.  Employees of both entities were engaged in Rabo's action that are the basis of this litigation, and some employees are at time identified as associated with both entities.

agricultural specialists with global networks and local knowledge, on-farm experience and financial expertise…."

71.     Starting in about 2018, Rabo allowed Brian McClain to expand his cattle-feeding operations from Kentucky into the Texas Panhandle—the cattle-feeding capital of the world. However, this expansion followed an earlier period of significant concern regarding McClain's financial practices.

72.     In October 2017, MFY, operated by Brian McClain, sought credit from Rabo but was initially denied based on "red flags" contained in a Pre-Funding Collateral Inspection Report prepared by its lead inspector. The report raised numerous red flags, including inadequate accounting records, unreliable borrowing base reports, and a high risk of inaccurate financial reporting.  The inspection revealed that MFY lacked proper accounting systems, with books maintained manually and no accurate general ledger or trial balance available. The company's financial records were disorganized, and even the external bookkeeper admitted the books had never been set up correctly.  Rabo initially reported that MFY was using two sets of books, and although it appears this report was later retracted, MFY could not produce balanced financial statements or provide accurate data for key financial metrics.

73.     Additionally, MFY's borrowing base documentation was incomplete and inconsistent, with no standardized method to value cattle accurately. MFY's borrowing base calculations relied on overly simplistic and unsupported pricing methods, which lacked the rigor Rabo's credit standards required. Rabo's lead inspector's report indicated that MFY did not have an adequate system in place to maintain financial records, requiring extensive oversight and coaching to meet even the most basic reporting standards. The inspector noted that MFY's operations posed a "high information risk", as the company failed to maintain proper

documentation for intercompany transactions, accounts payable, and key financial activities. The lack of internal controls and MFY's inability to provide basic financial reports or reconcile key accounts led Rabo to conclude that MFY was not creditworthy.  In December 2018, Rabo declined credit to MFY.

74.    However, a mere few months later, in May 2018, Rabo reversed its initial decision and approved a $6.5 million revolving line of credit in favor of MFY despite the unresolved risks documented in the initial 2017 Pre-Funding Collateral Inspection Report.  The same red flags identified by Rabo's lead inspector in late 2017 still existed in May 2018, yet inexplicably Rabo made the decision to extend credit to MFY, enabling McClain to begin to fund his fraudulent scheme.

75.    Over the next three years or so following the initial approval, Rabo, a self-described sophisticated and experienced agricultural lender with established policies and procedures designed to mitigate risk, extended nearly $2 million in real estate loans and approximately $50 million in operating capital to McClain. During this time, the information risk was still high, the red flags still existed, yet the credit extended to McClain increased almost 10-fold. Despite the substantial credit exposure, Rabo simply relied on McClain's limited, self-reported submissions and borrowing base reports to assess the financial health of McClain's operations. These reports were based primarily on McClain's representations regarding the number of cattle purportedly owned, which served as the primary collateral securing the multi-million-dollar credit facilities.

76.    Instead of exercising the rigorous oversight required by industry standards and its policies and procedures, Rabo regularly failed to verify the accuracy of McClain's claims through independent audits, comprehensive collateral verifications, or consistent financial reviews of McClain's operations. Remarkably, Rabo continued to increase its loans to McClain even though

(1) McClain's loans with Rabo were repeatedly overdrawn, and (2) Rabo was fully aware of the significant financial and operational problems identified in 2017, including McClain's inadequate accounting systems, unreliable financial reporting, and high information risk, all of which remained unresolved as his credit exposure grew exponentially.

77.     In approximately May 2018, Mechanics Bank began to operate McClain's depository banking functions.  McClain had three separate bank accounts at Mechanics Bank. Rabo's pleadings in Bankruptcy Court allege that it had control over the Mechanics Bank accounts used by McClain through "deposit account control agreements" (DACAs).[3]  These accounts were "sweep" accounts in which all funds were "swept" to Rabo to pay down McClain's line of credit extended by Rabo. Items presented that exceeded the funds available in the account were paid in one of the following ways 1) if available, an extension by Rabo on McClain's line of credit, 2) if the line was maxed out, by an "overline" extension to that line of credit, 3) by the intercompany transfer of funds from one McClain entity's account another, or 4) by the wiring or other deposit of funds into the overdrawn account by third parties.  Because overdrafts in the millions of dollars were routinely presented (if not daily, weekly), Mechanics and Rabo communicated about how to handle these transactions regularly.  One of the solutions to cure the consistent overdraft problem was to continue to extend credit, either on a temporary basis or a permanent basis, further enabling McClain to fund his fraudulent scheme.

78.     Rabo's Internal Agricultural Field and Collateral Inspection Department's standards required at least biennial inspections for high rated loans over $3 million. Loans with higher risk characteristics required bi-annual inspections. Such inspections were "expected to

---

[3] These allegations may be found in Rabo's Amended Complaint was filed in Cause No. 23-02005-rlj, in the U.S. Bankruptcy Court for the Northern District of Texas, Amarillo Division.

provide an assessment on current assets, including asset quality, disposition, quantity, and valuation method, as well as validate information such as budgets, projections, accounting records, and various management or business strategies."

79.    Despite its own standards, Rabo periodically (but never regularly), conducted collateral inspections and prepared reports for Rabo's credit department and finance team as part of its risk management procedures. On multiple occasions, these internal reports identified significant concerns regarding McClain's operations. Despite the known risks, Rabo and Mechanics Bank continued approving overdrafts and increasing the credit exposure for McClain without proper due diligence. The financial institutions facilitated the extension of credit even though McClain clearly violated the financial reporting requirements set by Rabo. Like putting lipstick on a pig, Rabo and its employees appeared focused on the profits of McClain, not the stability or validity of McClain's operations. In the words of Rabo's Senior Relationship Manager, in an email dated October 15, 2020- he saw no issues or reasons to downgrade the accounts as they "made like $12mln in profits last year…."

80.    Around this time (if not earlier), Rabo knew that at least 30% of the cattle fed in the McClain yards were owned by third parties, known as "customer feeders."

81.    Despite the consistent concerns with and red flags concerning McClain's operations, as well as the ever-increasing line of credit extended to MFY, in or around August 2019, Rabo extended nearly $5 million in additional credit to 7M for the expansion of McClain's operations with an additional feedyard in the Texas panhandle, and within the next twelve months was already extending total credit to McClain of approximately $24 million.  Continuing increases in credit to both MFY and 7M continued apace from there.

82.     In 2021, Rabo worked to lump in MFI with MFY and 7M into one combined loan package that, once approved, would increase the total credit for McClain to $45 million. The 2021 Pre-Funding Collateral Inspection Report documented that while McClain was responsible for preparing monthly non-restrictive Borrowing Base Certificates (BBCs), there were pervasive issues with the accuracy of the submitted financial information. The report highlighted that McClain's financial reporting relied heavily on self-reported data with minimal supporting documentation, raising concerns about the reliability of the cattle inventory counts, the valuation of assets, and the accuracy of accounts receivable. The inspector noted that McClain's use of the upper average price for cattle valuation lacked conservatism, potentially inflating the value of the collateral. Moreover, errors were identified in the reporting of cash accounts, with an input error of over $1.6 million in misreported negative balances, suggesting a lack of internal controls and oversight over financial reconciliations. Nonetheless, Rabo approved this large credit increase, thereby increasing McClain's total line of credit to $45 million.

83.     Sometime prior to May 2022, McClain's business model changed significantly because it was no longer feeding cattle for Friona Industries.  Rabo, which had previously been aware of McClain's heavy reliance on Friona, learned of this change in approximately May 2022, when it conducted a collateral inspection.

84.     The May 2022 Collateral Inspection Report revealed that McClain's accounting issues had not only persisted but had worsened with the growth of his operations. The report explicitly stated that McClain's operations had outgrown their bookkeeping support staff, and the information risk had increased substantially. During the inspection, Rabo identified a material understatement of outstanding checks by more than $3.4 million, discrepancies in accounts payable related to feed purchases, and an additional $250,000 in unreported liabilities. The

inspector emphasized that McClain's accounting staff struggled to maintain accurate records, with errors stemming from handwritten checks being omitted from reconciliations and the reliance on an external accountant who was unaware of key transactions.

85.    In Rabo's May 11, 2022 Collateral Inspection Report, Rabo's inspector noted that all cattle inventory were "claimed as owned by [McClain] and viewed on the date of inspection . . . ."  The inspector noted that the change in McClain' business operations "has caused McClain to own more cattle personally . . ." and that would be a "temptation for McClain to grow more so that he can fill the hole left in his capacity which occurred once [Friona Industries] quit feeding/growing cattle on a regular basis."  The inspector noted that it would take McClain great discipline not to expand his "personal" headcount and recommended that McClain not expand its operations any further until its accounting processes and procedures are up the standard needed for his current alleged headcount of 70,000 cattle

86.    The inspector further noted that McClain had a large account receivable for feed relating to cattle that were owned by various customers.  The account receivable noted in the inspection report reflected that the account receivable for feed was approximately 1/3 of the value of the feed and grain inventory accounted for in the inspection report—thus confirming that a substantial amount of cattle at McClain facilities were not "company owned" as McClain represented.

87.    Moreover, Rabo's inspector openly acknowledged reviewing all McClain's bank statements for March 2022, in collaboration with Mechanics Bank. These statements unveiled numerous substantial transactions from third parties, supposedly for cattle purchases. Additionally, these statements showed several perplexing intercompany transactions, and Rabo's collateral

inspection reports have always noted that McClain's record-keeping and accounting procedures consistently fell short of Rabo's standards.

88.    Despite repeated recommendations from Rabo and Lawson to hire an in-house Chief Financial Officer (CFO) and improve financial controls, McClain failed to implement these changes. The inspector concluded that the lack of proper accounting processes, insufficient staffing, and weak internal controls posed a significant financial risk, yet Rabo management did not enforce corrective actions.

89.    These red flags pointed to fundamental risks in McClain's business model and creditworthiness. Despite these documented concerns, Rabo's management disregarded the warnings, failing to initiate corrective measures or conduct deeper investigations. Instead, the credit facilities were routinely increased, exposing third parties who provided funds for cattle purchases and fed cattle in the yards owned by the McClain to even greater financial risk. Rabo's willful neglect of these internal warnings underscores a systemic failure to adhere to its lending policies, contributing directly to the unchecked expansion of McClain's fraudulent activities.

90.    Finally, in February 2023, Rabo initiated an emergency collateral inspection, that, in the words of one of its inspectors, resulted in the "house of cards [being] pretty well crashed" and substantiated what Rabo had known from the beginning – McClain was high risk and not credit worthy.  This was the first time in over four years that Rabo looked at, counted and inspected actual cattle.[4] The investigation revealed that McClain had been providing false reports regarding the number of cattle the companies purportedly owned. Despite McClain's claims that they possessed approximately 80,000 head of cattle (far above what the yards could sustain because of

_____

[4] On March 4, 2023, Rabo's Executive Vice President of Rural Banking, North America  was informed by another Rabo representative that "[i]t has come to my attention that a full headcount/inspection has not been done for over 4 yrs."

state regulatory rules and limited water availability), the collateral inspection uncovered a stark reality: only around 8,000 cattle were present at the two facilities in Texas. Furthermore, the inspection revealed and confirmed that McClain did not even own the cattle in these yards; therefore, they were not financed by Rabo and were not subject to its security interest. Rather, third-party feed yard customers owned the cattle that were actually present—not McClain.

91.     In the words of one of Rabo's inspectors:

> "This is basically a worst-case scenario" and a "Possible Fraud Case. Recommendation to downgrade immediately and take control of cattle as soon as possible due to concerns related to cattle being owned by other parties."

92.     It quickly became apparent to Rabo that it had to act swiftly and discreetly to deal with a $70 million operating line not secured by any cattle assets owned by McClain. Lawson, who testified that he was "distraught" in learning the inspection results, stated that Rabo had no idea who owned the cattle in McClain's feed yards. After years of avoiding the hard questions related to McClain's business operations, Rabo took rapid action to protect its own interests. Rabo presented a Forbearance Agreement to McClain to keep the operation afloat and then – after taking control of McClain – installed its own "fixer" to serve as the Chief Restructuring Officer. Plans were quickly arranged for Rabo to take possession of and auction off the cattle in McClain's yards, despite knowing that third parties owned these cattle and not subject to Rabo's lending or security agreements with McClain.

93.     While Rabo was busy taking action to collapse the fraud it had enabled—coordinating the bankruptcy filing of McClain, seizing McClain's business records from his Kentucky headquarters, and shipping them to its investigators in Chicago—Plaintiffs and Intervenors, the cattle producers who had live animals on feed at McClain's yards, continued to unknowingly pay for feed, purchase cattle, and expected McClain to send them payments for cattle

purchased and/or sold on their behalf. Millions of dollars flowed into McClain's Mechanics Bank accounts, which Rabo now controlled.

94.     The February 2023 investigation was not the first red flag concerning McClain's operations and creditworthiness. Instead, it was the culmination of years of overlooked warnings, ignored financial discrepancies, and systemic failures within Rabo's risk management protocols that had allowed McClain's fraudulent activities to persist and expand.

**C.   Rabo's Willful Disregard of Borrowing Base Red Flags and McClain's Capacity Limits.**

95.     In addition to the red flags raised during Rabo's intermittent collateral inspections, another source of information that raised serious questions and concerns about whether McClain had legitimate operations was McClain's Borrowing Base Certificates ("BBC").  McClain's monthly BBCs submitted were critical in supporting the multi-million-dollar credit facilities extended by Rabo. The BBC's reported the number of cattle McClain purportedly owned, the primary collateral for Rabo's loans. However, Rabo systematically ignored discrepancies between the reported cattle numbers and McClain's actual operational capacity, demonstrating a reckless disregard for basic risk management practices.

96.     McClain operated two feedlots in Texas, and one he allegedly leased from a third party, with a combined maximum capacity of approximately 59000 head of cattle.[5] Despite this clear, physical limitation, in its January 2022 BBC, McClain reported ownership of 75,529 head of cattle, **exceeding the feedlots' capacity by more than 16,000 head**. This discrepancy should have been an immediate red flag for Rabo, especially given its role as a sophisticated agricultural

---

[5] However, Rabo knew as of June 21, 2019, that McClain only intended there to be 10,000 head at the 7M facility. Internal communications between Rabo representatives reveal that "Brian told Matt that he didn't expect to have over 10k head at one time [at the 7M facility]".  Nonetheless, Rabo was pushing for a 40,000 head limit at the facility no matter what.  This would reduce the capacity of the Texas facilities to between 19,000-49,000 head.

lender with established procedures for monitoring collateral. The number was an even bigger red flag considering that Rabo knew McClain was also feeding third-party cattle at the feedlots and, according to Rabo's own employees, McClain's BBCs reported only company-owned cattle, omitting third-party cattle. Similar discrepancies at the individual feed yard level had begun years before. *See* Table 1 below. Yet, Rabo failed to conduct routine physical inspections to verify the accuracy of McClain's reports, relying instead on self-reported data without any meaningful verification.

| BBC Date | Head Claimed at McClain Feed Yard | % Capacity |
|---|---|---|
| 4/30/2018 | 8,651 | 288% |
| 7/31/2018 | 9,971 | 332% |
| 7/31/2019 | 15,514 | 517% |
| 7/31/2020 | 21,191 | 706% |
| 7/31/2021 | 25,219 | 841% |
| 7/31/2022 | 31,927 | 1064% |
| 12/31/2022 | 37,924 | 1264% |

*Table 1: McClain Feed Yard had a permitted capacity of 3,000 head according to its Texas Commission on Environmental Quality permit, of which Rabo had knowledge. Purportedly, additional pens leased nearby brought that capacity up to 9,800, but even if the additional capacity existed, over-capacity BBCs were submitted by summer 2018.*

97.    In January 2023, McClain submitted another BBC dated 12-31-22 which claimed ownership of over 87,000 head of cattle. This was logistically impossible because the feedlots could not hold that many cattle. In early January 2023, Rabo's upper management finally became concerned that McClain reported more cattle than he could hold.  Despite this, Rabo approved an increase in McClain's line of credit from $48 million to $55 million, as documented in a January 10, 2023, communication from Rabo's Vice President. This approval was granted even though McClain's quarterly financials were past due, and internal reports acknowledged concerns about McClain's cash flow management and lack of internal financial controls.

98.    Rabo's former Senior Relationship Manager testified that McClain's cattle were the most important collateral for Rabo by far (real estate was only approximately 3% of the collateral

base).  However, Rabo did not conduct standard industry inspections to verify the existence of cattle serving as collateral for McClain's line of credit.  Despite its reputation as a leading agricultural lender, Rabo's Executive Vice President-Head of Rural Banking, North America, admitted in a March 4, 2023 email—sent after discovering McClain's fraudulent scheme but weeks before declaring a default and publicly disclosing the issue—that **"it has come to my attention that a full headcount/inspection has not been done for over 4 years."**

99.     The failure to question the inflated cattle numbers was not due to oversight but rather a deliberate choice by Rabo to ignore obvious red flags. The motivation was clear: Rabo earned a 43% profit margin on McClain's account, providing a strong financial incentive to keep the account afloat despite the growing signs of fraud. Had Rabo conducted even basic but essential due diligence—such as physical cattle counts or reconciling inventory with feed capacity—it would have discovered McClain's fraudulent activity much earlier.  Instead, Rabo prioritized short-term financial gains over prudent risk management, enabling McClain's scheme to continue unchecked.

100.     Ultimately, Rabo's actions demonstrate a systemic failure to adhere to its lending policies. The decision to ignore discrepancies in borrowing base reports and the refusal to perform fundamental collateral verification directly facilitated McClain's fraudulent activities. This pattern of willful blindness and financial self-interest caused devastating harm to Plaintiffs and Intervenors.

**D.     Rabo and Mechanics Bank's Knew of the McClain Insolvency and Involvement in Check Kiting**

101.     From as early as 2018, Rabo and Mechanics Bank (Rabobank, N.A. until it was acquired by Mechanics Bank in September 2019) were fully aware of McClain's precarious financial condition, as evidenced by a persistent pattern of overdrafts, maxed-out credit lines, and

questionable cash flow activities. Despite clear and repeated red flags, both institutions failed to intervene meaningfully and actively facilitated and concealed the McClain insolvency, enabling behavior consistent with check-kiting schemes to maintain the illusion of financial stability.

102.    An early significant sign of trouble surfaced in October 2018, when MFY was overdrawn by $216,000. MFY arranged last-minute wire transfers to cover the deficit at Rabo's instruction.

103.    By January 2019, the problem had not only persisted but also worsened. This time, MFY was overdrawn by $96,284.97, with no available credit left. Rabo's Senior Relationship Manager casually noted that MFY would wire funds to cover the shortfall, treating the overdraft as a routine event rather than a more profound financial distress symptom.

104.    The situation escalated dramatically in late 2019, exposing the full extent of the McClain financial instability. On October 23, 2019, MFY was overdrawn by an alarming $2.5 million. Internal emails reflect disbelief and concern, with Rabo's Financial Analyst responding with shock: "$2.5 million!? WTF…". Despite acknowledging the severity of the overdraft, Rabo approved funding to cover it, effectively enabling MFY to continue operations without addressing the root cause of the financial collapse.

105.    Just days later, on October 28, 2019, MFY was again overdrawn, this time by $2.1 million. Rabo's Regional Credit Officer formally approved covering the overdraft, acknowledging that this represented a "significant cash management issue" and that MFY's financial situation was a "growing concern." Nevertheless, no action was taken to curtail MFY's credit or investigate the causes of the ongoing liquidity crisis.

106.    The overdrafts grew even larger. On November 1, 2019, MFY faced an overdraft of $4.3 million, followed by an overdraft of $5.2 million on November 22, 2019. Despite the

staggering amounts, Rabo and Mechanics Bank continued to approve transactions and cover deficits. Internal emails reveal staff members expressing frustration and disbelief but taking no corrective action beyond ensuring funds were shifted between accounts to prevent returned checks.

107.    In December 2019, when an overdraft of $4.8 million for 7M was reported, Rabo's Regional Credit Officer informed Rabo leadership that he and Rabo's Senior Relationship Manager had declined a request for $5.8 million to cover the overdraft just the day before. Rabo's Regional Credit Officer filed a Suspicious Activity Report (SAR) related to check-kiting, explicitly acknowledging fraudulent financial activity.

108.    Further evidence of collaboration between Rabo and Mechanics Bank to manage McClain's worsening financial condition is found in an email exchange between Mechanic Bank's representatives and several Rabo representatives.  On December 20, 2019, Rabo Diversified Services Transaction Monitoring Analyst alerted Mechanics Bank representatives and Rabo that 7M was overdrawn by approximately $4.8 million, outlining urgent options such as wiring funds, securing credit approval, returning checks, or transferring funds from other accounts.  Mechanics Bank representatives responded shortly after, providing account details and proposing to apply MFY's available funds from MFY's line of credit and checking account balance to reduce 7M's overdraft to approximately $3.1 million, and another option to return three checks.  Later that morning, Rabo's Senior Relationship Manager detailed a plan to cover the remaining overdraft with expected deposits. He proposed a 60-day temporary increase in MFY's line of credit to prevent future issues, attributing the significant overdraft to "a miscalculation (some would say gross miscalculation) by Mr. McClain . . .".

109.    An email chain dated December 23, 2019, shows coordination between Rabo and Mechanics Bank to arrange a joint meeting with Brian McClain at his farm in Benton, Kentucky,

scheduled for January 8, 2020. The agenda for the meeting included discussions about McClain's checking account activities, remote deposit capture processes, sweep account mechanics, the handling of overdrafts, cash flows between McClain entities, cattle logistics, and the structure and timing of upcoming credit facility renewals. Both Rabo and Mechanics Bank representatives were expected to attend, with a specific focus on understanding the mechanics of McClain's accounts and financial operations and whether an extension or increase in credit should be provided to McClain. This level of involvement from Mechanics Bank, a depository institution, in credit-related matters typically managed by the lending bank is unusual and serves as further evidence of collusion between Rabo and Mechanics Bank to address and manage McClain's financial problems.

110.    When Rabo and Mechanics Bank planned to visit McClain in Kentucky, Rabo and Mechanics Bank knew that 7M was overdrawn by over $3 million and there were significant problems with McClain's account, including frequent overdrafts without adequate explanation from McClain.  Again, this level of involvement is unusual for a depository bank like Mechanics Bank, further confirming Mechanics Bank's complicity in enabling McClain's misconduct and propping up an insolvent enterprise.

111.    Furthermore, an email chain dated February 18, 2021, reveals significant concerns within Rabo regarding the financial health and operations of McClain's entities. The discussion highlights multiple red flags, including confusion over more than 3,400 head of cattle ownership, unclear intercompany debts, and a lack of transparency regarding cash flows between McClain's various entities. There were also discrepancies in the reported livestock inventories and financial statements, with analysts unable to reconcile cattle purchases and sales with the year-end profit and loss statements. Notably, according to Rabo's analyst, MFY showed a gross loss of over $3

million and a net loss exceeding $4.5 million for 2020, raising serious concerns about the operation's sustainability. Additionally, internal concerns were raised about the reliability of borrowing base reports, herd reconciliations, and the possibility that intercompany transactions were being used to obscure the true financial performance of McClain's businesses. Despite acknowledging these financial irregularities and losses, Rabo continued extending credit.

112.    Despite recognizing the severity of the situation, both Rabo and Mechanics Bank chose to facilitate temporary fixes rather than confront the underlying insolvency, actively working together to conceal McClain's financial instability and keep the credit facility afloat.

113.    In the fall of 2022, Rabo's Senior Relationship Manager and the Senior Vice President of Mechanics Bank, had conversations wherein phrases such as "kite" and "unusual activity" were used when addressing concerns raised by the huge number, size, and frequency of checks going in and out the various McClain accounts. Rabo's Senior Relationship Manager testified that in response to Mechanics Bank's Senior Vice President's request for advice, he told her that Mechanics could not go wrong by following Mechanics' "protocols and procedures" for handling and investigating such questionable activities.  No actions to stop these activities was taken at the time and there is no evidence that Mechanics Bank properly followed the protocols and procedures when learning of a possible check kite.

114.    Meanwhile Rabo's Financial Analyst recognized the issues noting that it was "very likely" that wires McClain had assured Rabo would be used to pay down his prior overdrafts were used to cover other checks that had been written, and that "I think Brian is in more cash trouble than we think."

115.    Mechanics had been monitoring the activity in McClain accounts.  For example, in February of 2023, before Rabo declared a default, Mechanics Bank's Senior Vice President sent

an email to Rabo's Senior Relationship Manager expressing concern that a party who was depositing millions into McClain's account to cover an overdraft of approximately $3 million, because the checks submitted for deposit "don't appear to have anything to do with cattle." Rabo's Senior Relationship Manager responded by telling her the party was "wealthy," that "their money should be good" and that McClain told him this party was buying cattle from him and re-investing the proceeds. Mechanics Bank's Senior Vice President said she needed to check with her Credit Administrators for approval. The beat went on.

116.    The overdrafts and check-kiting activities associated with the McClain persisted into 2023, reflecting a continued pattern of financial misconduct that Rabo and Mechanics Bank had been aware of for years. Despite the escalating severity of McClain's financial instability—marked by repeated overdrafts, maxed-out credit lines, and the constant shifting of funds between accounts to cover shortfalls—both Rabo and Mechanics Bank continued to facilitate these activities without implementing meaningful corrective measures.

117.    As mentioned previously, Rabo had established control agreements (DACA's) with Mechanics Bank regarding the management of these accounts. The bank statements provided by Mechanics Bank prominently display the designation "Rabo AgriFinance Powered by Mechanics Bank," signifying the collaborative nature of the financial arrangements.

118.    In the months leading up to April 2023, a substantial volume of funds, totaling hundreds of millions of dollars, flowed in and out of McClain's three accounts with Mechanics Bank with remarkable frequency. Notably, transactions involving sums in the millions occurred almost daily from January 2023 through to the point when the accounts were eventually frozen. This recurrent cycle of substantial transactions, was another glaring indicator to Rabo and Mechanics Bank that McClain was perpetrating a massive fraud.

119.    As of April 2023, McClain bank accounts reached a deposit amount in excess of $22,000,000.00.  The accounts were frozen early April 2023 because of a demand made by Rabo.

120.    Rabo alleged in the bankruptcy cases that after the accounts were frozen, an entity known as MAP Enterprises allegedly wired just over $3 million into the Mechanics Bank account to bring it up to a zero balance.

121.    Rabo and Mechanics Bank's internal communications, approvals of massive overdrafts, and documentation of suspicious transactions undeniably demonstrate that they had full knowledge of McClain's massive fraud, insolvency, and financial misconduct yet deliberately chose to allow it to continue to protect their own economic interest.  These events also demonstrate that Rabo and Mechanics Bank were actively complicit in covering up McClain's massive fraud. They knowingly facilitated a pattern of transactions designed to create the illusion of liquidity, while McClain's financial position deteriorated further. By continuously approving overdrafts, transferring funds between accounts, and failing to address systemic financial mismanagement, both Rabo and Mechanics Bank enabled McClain to continue its fraud, inclusive of a check-kiting scheme.

122.    Rabo and its representatives acted in concert with Mechanics Bank and McClain to conceal McClain's true financial condition and made concerted efforts to allow McClain to sustain fraudulent operations.  These concerted efforts to sustain a fraudulent operation resulted in millions of dollars in damages to Plaintiffs and Intervenors that provided funds for cattle purchases, expecting a legitimate return.

123.    A cursory examination of the financial records and bank accounts associated with McClain would have revealed the fraudulent nature of McClain operation. Yet, Rabo and Mechanics Bank failed to take any action to stop McClain's fraud.

124.     Applicable banking industry standards required Rabo and Mechanics Bank to review these transactions to detect illicit activity.  Despite repeated alerts, Mechanics Bank did not take any affirmative action to determine if McClain was using its banking services for purposes of perpetuating fraud and causing substantial damages to Plaintiffs and Intervenors.  Mechanics Bank, knowing of the improper activity in the accounts, did nothing to stop the fraud and allowed it to perpetuate. In fact, a McClain entity consistently and repeatedly showed up on the Mechanics Bank kiting reports but conducted no action or verification to confirm or deny the existence of check kiting.  A simple review and analysis of the bank statements and account activity would have shown the existence of kiting. If Mechanics Bank would have fulfilled its obligation to verify activity in accounts, this "house of cards" would not have grown like it did and Plaintiffs and Intervenors damages would have been limited or non-existent.

125.     Thorlakson alone paid McClain more than $2,800,000.00 to purchase cattle between March 12 and March 18, 2023, long after Rabo's inspection of February 28, 2023, proved that McClain had reported at least 60,000 cattle that he did not have.  This money went straight to Rabo's controlled account.  After Thorlakson discovered the problem, the cattle were long gone. Intervenors also continued to pay and send hundreds of thousands, if not millions of dollars, for deposit into McClain's bank accounts from 2018 – through May 2023.

**E.     HTLF's and Ragland's Role in Facilitating McClain's Fraudulent Financial Scheme**

126.     In addition, as described more fully below, HTLF, a bank that facilitated multiple transactions and millions of dollars exchanged between its customer, 2B Farms, and McClain, was intimately involved and knew about the McClain's business operations.  The banking procedures HTLF utilized were unorthodox and, upon information and belief, in violation of industry banking standards. HTLF's branch president, Shawn Ragland, who had no prior experience in financing

cattle operations, was involved in daily transactions and completed or authorized bank employees to complete blank, pre-signed checks drawn on McClain's account, deposit those checks for immediate credit, then send the resulting uncollected funds directly back to McClain, a classic check kite.  At times, the check kite through HTLF alone involved more than $50,000,000 per month in funds movement.  HTLF's banking methods aided and assisted McClain to further their fraud.

127.    McClain did business with 2B Farms, a partnership with its principal place of business in Lubbock County, Texas.  2B Farms filed a Chapter 12 Bankruptcy after McClain was allegedly unable to repay it approximately $16 million dollars.[6]  This loss was documented in part by checks drawn on McClain's Mechanics Bank accounts, controlled by Rabo, which were returned non-sufficient funds (NSF) after the McClain crisis hit its stride in February 2023.

128.    After 2B Farms filed its bankruptcy case, Terry and Rebecca Robinson ("the Robinsons") testified at their meeting of creditors.  They testified that 2B Farms often bought cattle (usually from McClain), delivered them to McClain's grow yards, and McClain would provide the feed and care.  After the cattle reached 725-750 lbs, McClain would sell them to a finishing feedyard buyer for 2B Farms, McClain would be paid his feed bill, the parties would account for their other inputs, and divide the profits, if any. At no time did McClain own the cattle.

129.    But, starkly different from Plaintiffs' and Intervenors' business relationship and transactions with McClain, Mr. Robinson also testified that McClain, or Megan McClain, also known as Megan Goad (Brian McClain's daughter), would send blank, pre-signed checks written on McClain accounts at Mechanics Bank to HTLF.  Those checks were kept by an employee (or multiple employees) at HTLF until it was time to "close out" a transaction for the sale of a lot of

---

[6] *See* Case No. 23-50096-rlj-12, pending in the U.S. Bankruptcy Court, Northern District of Texas, Lubbock Division.

cattle.  McClain told Robinson the information needed to fill out the checks, such as head counts and amounts, and 2B Farms relayed this information to Ragland and/or another HTLF employee. The HTLF employee would then fill out the blank, pre-signed checks for the amounts given to them by the Robinsons.  The checks were then deposited into 2B Farms' HTLF account and HTLF provided immediate credit for the deposit.  Often on the same day, 2B Farms would write a check or wire funds back to McClain, using funds that HTLF had given it immediate credit, thus enabling a check kite.

130.    According to documents provided as a part of the 2B Farms bankruptcy proceeding, 2B Farms transferred more than $231,000,000.00 from its account at HTLF to McClain's Mechanics Bank accounts between January 30, 2023, and April 6, 2023.  The same source describes transfers over $246,000,000.00 from McClain accounts into 2B Farm's accounts, much of it in the same time period.  The Robinsons also testified that during this timeframe, the transactions with McClain went from approximately $1.4 million to $1.5 million and then on approximately February 7, 2023, those transactions nearly doubled to $2.5 million and upwards of $3.5 million.  The Robinsons acknowledged that they were involved in either a cattle sale and/or a purchase of cattle on their part almost every single day other than weekends or holidays during this timeframe.  At approximately $1000 per head, this would account for approximately 246,000 head of cattle, an astronomical number that HTLF ignored.

131.    The Robinsons testified that Shawn Ragland was their loan officer and that they knew Ragland for all their lives. However, Ragland had no prior experience in financing cattle operations and could not independently evaluate any problems that might arise with a cattle customer.

132.     In fact, on occasion, according to testimony from Johnny Earp, retired loan officer with HTLF, Ragland would be so over his head on dealing with a loan file that financed cattle that he assigned the file to another loan officer. Ragland had no fundamental understanding of how to analyze the financial condition of a cattle feeding operation or how to adequately analyze and protect against well-known financial risks involved with cattle feeding. The Robinsons testified that neither HTLF nor Ragland verified that the funds represented real cattle transactions.

**F.      Meagan Goad**

133.     Goad exercised direction and control over McClain, including but not limited to signing McClain checks and wire requests, instructing third parties such as 2B Farms on behalf of McClain Entities on how to fill in the blank McClain checks she signed and provided, signing borrowing base reports, and executing cattle feeding agreements for McClain.  She also helped determine how much money McClain needed on a daily basis from individual third parties.

134.     As Goad elaborates in her testimony, she had a total target number of deposits she needed to collect for the day and, because of limits the bank placed on check deposits but not on wire transfers, she needed to go to Bo Robinson of 2B Farms for a higher number because he wired money to McClain Entities rather than remitting by check.  Appx. B at 115-16 (Goad Tr. 154 ln. 12 – 158 ln. 1).

135.     As described above, Goad actively participated in the McClain check-kiting scheme.  Goad would send HTLF a batch of signed blank checks from the McClain Mechanics Bank accounts, and subsequently would provide an invoice to 2B Farms' Robinson, who in turn would wire funds to Mechanics Bank and instruct Ragland and/or other representatives of HTLF of the amount of a cattle sale transaction based on the invoice.  HTLF would then fill out the signed

blank checks for the money McClain owed 2B Farms for the purported sale of cattle and would deposit the check in 2B Farm's bank account at HTLF.

136.    Goad's own testimony supports Robinson's testimony.  "Q:  So all the checks that were filled out, to your knowledge, were filled out according to the instructions that you transmitted to Bo Robinson, right?  A:  Yes."

137.    Goad also provided blank checks drawn on McClain Entities' accounts to other parties besides 2B, and then instructed the counterparties as to the amount of the check in approximately the same amount as McClain invoices to the counterparties.

138.    Likewise, Goad's text messages with Brian McClain reflect an awareness of and willing participation in McClain's backdating of invoices and the attempts to match check amounts with incoming payments, including identifying how much to try to get from different parties each day in order to cover McClain's expenses, and whether to backdate invoices in doing so.  At one point, as the wheels began to come off, Goad texted Brian "Stop back dating stuff . . . if they look into anything it's going to look suspicious as shut [sic]."

139.    Likewise, Goad either knew or should have known of the falsity of the information or was recklessly turning a blind eye.  At a minimum she would guide McClain as to how much invoices needed to be based on what they were bringing in from other third parties on given days. This scheme was done to secure future agreements with McClain.

**G.    General Allegations**

140.    Plaintiffs and Intervenors have or will present their claims more than 30 days before Judgment can be rendered in this case.  All payments, offsets, and credits due have or will be provided.

141.    Plaintiffs and Intervenors have engaged the services of the undersigned attorneys to assist them in pursuing this cause of action and have agreed to pay reasonable attorneys' fees.

142.    Pursuant to Rule 9(c) of the Federal Rules of Civil Procedure, Plaintiffs and Intervenors plead that all conditions precedent to their recovery have been performed or have occurred.

143.    Throughout this Complaint, where it is alleged that any opposing party performed or failed to perform any acts or activities, or made any representations, it is meant that such party's agents, officers, servants, employees or representatives performed or failed to perform such acts or activities and at the time such acts or activities were done, they were with full authorization or ratification of said party, or were in the normal or routine course of business.

## IV.
## CAUSES OF ACTION

### A.    COUNT ONE: CONVERSION AND COMMON LAW FRAUD

144.    The allegations stated above and below are incorporated by reference.

145.    Plaintiffs and Intervenors are entitled to and seek recovery of judgment for conversion against Defendants to the extent that Rabo acquired cattle or proceeds belonging to Plaintiffs and Intervenors.

146.    To succeed on a claim for conversion under Texas law, a plaintiff must prove: (1) it owned or had legal possession of the property or entitlement to possession; (2) defendants unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendants refused to return the property.

147.    In every instance, Plaintiffs' and Intervenors' agreements with McClain for the care of cattle was for the care of the cattle that belonged to Plaintiffs and Intervenors. Plaintiffs and

Intervenors purchased the cattle. Plaintiffs and Intervenors received confirmation from McClain that the cattle had been purchased, received regular updates on the health condition and status of the cattle that had been purchased, and received sales revenue when the cattle were sold, save and except any amounts paid to McClain for the care and feeding of the cattle. As described herein, it was no secret to Defendants that McClain kept "customer cattle." But, after the February 2023 collateral inspection revealed the massive cattle shortage, Defendants unlawfully and without authorization took control of, seized, and sold, destroyed, or otherwise disposed of the remaining cattle that were left on McClain feedyards. Despite Plaintiffs' and Intervenors' demands to return the cattle, and then to return the sales proceeds to them, Defendants have refused. In addition, Rabo seized funds in the Mechanics Bank accounts that represent funds delivered to McClain for the purchase of cattle, when Defendants knew McClain failed to purchase new cattle with those funds.

148.    The Defendants made misrepresentations to Plaintiffs and Intervenors recklessly without any knowledge of the truth and as a positive assertion.  Moreover, the misrepresentations were made with the intention that they should be acted on by Plaintiffs and Intervenors, and Plaintiffs and Intervenors in fact relied upon those misrepresentations, suffering injury and damage as a result thereof.  Thus, the misrepresentations and reliance so described were a proximate cause of injury and damage to Plaintiffs and Intervenors for which they now sue in a sum within the jurisdictional limits of the Court.

149.    Plaintiffs and Intervenors seek judgment for their reasonable attorney fees at trial and through all applicable appellate levels, pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(b)(6).

**B.    COUNT TWO: NEGLIGENCE OF DEFENDANTS IN LENDING AND HIRING OR SUPERVISION OR MANAGEMENT PERSONNEL**

150.    The allegations stated above and below are incorporated by reference.

151.    Defendants were negligent in their banking and lending practices, including, but not limited to, their underwriting, investigative, and assessment of customers, and in the hiring or supervision of their management personnel. Defendants failed to properly monitor and manage their lending relationships with McClain. Defendants are, therefore, liable for the losses Plaintiffs and Intervenors suffered because of their actions and omissions. Their actions and omissions are described above.

152.    The losses incurred by Plaintiffs and Intervenors were a proximate result of Defendant's negligent actions exceeding the minimum jurisdictional limits of this Court. Plaintiffs and Intervenors seek judgment against Defendants for these damages.

**C.    COUNT THREE: NEGLIGENT UNDERTAKING**

153.    The allegations stated above and below are incorporated by reference.

154.    Defendants undertook to perform services for Plaintiffs and Intervenors that it knew or should have known were necessary for Plaintiffs and Intervenors protection. Defendants did not exercise reasonable care in performing those services. Plaintiffs and Intervenors relied on Defendants' performance or Defendants' performance increased Plaintiffs' and Intervenors' risk of harm. As a proximate result of the Defendants' failure to use reasonable care, Plaintiffs and Intervenors suffered damages exceeding the minimum jurisdictional limits of this Court. Plaintiffs and Intervenors seek judgment against Defendants for these damages

**D.    COUNT FOUR: CLAIMS UNDER THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT**

155.    The allegations stated above and below are incorporated herein by reference.

156.    Plaintiffs and Intervenors allege that transfers made by McClain to Defendants were fraudulent under Sections 24.005 (a)(1), (a)(2)(A) and (a)(2)(B), and Section 24.006(a), and

24.006(b) of Chapter 24 of the Texas Business & Commerce Code, commonly known as the Texas Uniform Fraudulent Transfers Act ("TUFTA").

157.    Plaintiffs and Intervenors seek all remedies against Defendants afforded under Section 24.008, et. seq. of TUFTA.

158.    Plaintiffs and Intervenors also seek the recovery of costs and attorneys' fees against Defendants under Section 24.013 of TUFTA.

**E.    COUNT FIVE: CONVERSION AND FRAUD AGAINST DEFENDANT GOAD**

159.    The allegations stated above and below are incorporated by reference.

160.    Goad was intimately involved in McClain's cattle operation and was much more than a mere record-keeping clerk, despite her attempts to appear otherwise. An April 2020 collateral Inspection Report from Rabo reveals that Rabo knew that Goad helped to prepare the monthly borrowing base reports. The monthly borrowing base reports and certificates were often submitted and signed by Goad. Goad signed the litany of daily million dollar-plus checks on behalf of all of McClain. Company QuickBooks reports show that Goad transferred money into and out of Company bank accounts and her personal account. In 2022, when Brian McClain was reeling from injuries suffered after a rodeo accident, Goad was responsible for the Company's financial management – and during that time, multiple overlines and overdrawn notices were issued.

161.    Goad directed and controlled the actions and omissions of McClain in a manner that was tortious in at least the following ways:

    a.    They misrepresented the existence of cattle in their possession;

    b.    They promised and agreed to purchase individual lots of cattle for customers, but sent false yard sheets to the customers for whom they promised and agreed to purchase cattle, although there were far fewer lots of cattle than were represented, such that multiple customers were being informed they were owners if the same cattle;

    c.    They used the yard sheets, and other means, such as verbal reports and inspections, to report to Plaintiffs and Intervenors that cattle delivered to Defendants were in their possession and under their control when in fact they were not;

    d.    They directed and allowed the Defendant-entities to keep and use the proceeds of their wrongdoing for their own purposes.

162.    Goad is therefore personally liable for all damages, both actual and punitive, that Plaintiffs and Intervenors suffered because of McClain actions and omissions.

## F.    COUNT SIX: TORTIOUS INTERFERENCE WITH CONTRACT AGAINST RABO AND MECHANICS BANK

163.    The allegations stated above and below are incorporated by reference.

164.    Plaintiffs and Intervenors entered into valid contracts with McClain for the purchase and sale of cattle.  Defendants Rabo and Mechanics Bank willfully and intentionally interfered with Plaintiffs' and Intervenors' contracts by, among other things, taking proceeds from McClain (that belonged to Plaintiffs or Intervenors), applying those proceeds against debts owed to Rabo or Mechanics Bank, and thus, interfering with Plaintiffs' and Intervenors' contractual rights to be paid under the contracts.  Defendants Rabo and Mechanics Banks interference proximately caused Plaintiffs' and Intervenors' injury, and caused them to suffer actual damage or loss.  Plaintiffs and Intervenors seek damages against Defendants Rabo and Mechanics Bank in excess of the jurisdiction limits of the Court.

## G.    COUNT SEVEN: AIDING AND ABETTING AND/OR KNOWING PARTICIPATION OF FRAUD

165.    The allegations stated above and below are incorporated by reference.

166.    Plaintiffs and Intervenors were each victimized by the McClain fraud.  Through McClain, Brian McClain solicited and accepted payment from Plaintiffs and Intervenors for the purchase of cattle with the intent to defraud Plaintiffs and Intervenors.  McClain did not tell

Plaintiffs and Intervenors that their purchase money was being used to make payments other than for the purchase of cattle.

167.     Defendants Rabo, Mechanics, HTLF, Ragland, and Goad actively facilitated, enabled and supported the fraud orchestrated by McClain. With significantly greater access to the inner workings of McClain's operations, Defendants were in a prime position to identify the numerous red flags and glaring inconsistencies in the books and records, yet they chose to turn a blind eye to the unmistakable signs of illegitimacy. Rabo was aware of the staggering, unsustainable growth trajectory of McClain and the evident lack of operational capabilities on McClain's part to support such rapid expansion. Despite conducting inspections that revealed glaring deficiencies in McClain's accounting procedures and overall business operations, Rabo failed to take decisive action. They were cognizant of irregularities such as McClain's unorthodox practice of receiving purchase orders via text, particularly given the significant scale of cattle purchases involved. Moreover, Rabo was aware of discrepancies between McClain claiming ownership of all cattle in their feedyard and the conflicting information in accounting and banking records, which indicated that Rabo was feeding cattle owned by others.

168.     Internal communications within Rabo further confirmed their awareness that, despite outward appearances of financial health and profitability, McClain was perpetually strapped for cash to sustain operations. Additionally, Rabo's scrutiny of McClain's bank statements revealed information that directly contradicted representations made by McClain. Rather than launching a thorough investigation into these glaring issues, Defendants allowed the fraud to continue.

169.     Goad, HTLF and Mechanics Bank aided and abetted and/or knowingly participated in McClain's fraud.  Shawn Ragland was 2B Farms loan officer for several years, including when

2B Farms was banking with Aim Bank.  2B Farms continued its relationship with Ragland when Aim Bank was purchased by HTLF.

170.    2B Farm's representative, Bo Robinson, testified that Goad would send HTLF a batch of signed blank checks from the McClain Mechanics Bank accounts.  2B Farms would wire funds to Mechanics Bank for the alleged purchase of cattle in an amount provided by Goad.  At or around the same time, Robinson would advise Ragland and/or other representatives of HTLF of the amount of a cattle sale transaction based on an invoice Robinson received from Goad or another McClain Entity representative.  HTLF would then fill out the signed blank checks for the money McClain owed 2B Farms for the purported sale of cattle and would deposit the check in 2B Farm's bank account at HTLF.

171.    Mr. Robinson testified that HTLF relied on a simple invoice from McClain to effectuate the banking transaction between 2B Farms and McClain.  The McClain invoice was often prepared by Goad, who was involved in determining how much was needed from different entities.  Goad often turned to 2B Farms to fill in gaps because, while Mechanics had daily limits for check deposits, it had no limits for wire transactions such as 2B and HTLF were utilizing. HTLF did not ask for any additional documents, such as a bill of sale or close out sheets, to confirm that cattle were being purchased and sold.  Mr. Robinson testified that he rarely saw the actual check HTLF completed and deposited in 2B Farm's bank account.

172.    The average transactions between 2B Farms and McClain and the frequency of those transactions spiked significantly, leading to a transaction of approximately $2.5 - $3 million daily from January 2023 until mid-April 2023.  The sum of these transactions for the alleged purchase and sale of cattle amounted to approximately $240 million from January 2023 – mid-April 2023.

173.    Mechanics Bank was on the receiving side of these large transactions between 2B Farms and McClain.  The McClain bank account statements confirm that Mechanics Bank knew there were multiple transactions involving millions of dollars being transferred on almost a daily basis between 2B Farms and McClain.  These transactions were unusual, but Mechanics Bank did not stop them from happening.

174.    Upon information and belief, as part of banking industry standards, client monitoring is particularly important when large amounts of money are involved, which creates a greater risk that the bank's services are being used for illicit purposes.  HTLF and Mechanics Bank knew a lot about the McClain business and accounts.  According to Mr. Robinson, Ragland and other HTLF representatives were intimately involved in 2B Farm's business with McClain. Ragland and other HTLF representatives worked closely with Mr. Robinson regarding 2B Farms banking transactions with McClain.  The spike in the amount and frequency of transactions, among other things, should have raised red flags for HTLF and Mechanics Bank that McClain was involved in illicit activity.

175.    Defendants Goad, Ragland, HTLF and Mechanics Bank aided and abetted the McClain fraud and are accordingly liable for the damage caused to Plaintiffs and Intervenors. Defendants Ragland, HTLF and Mechanics Bank gave assistance to the illicit schemes, which was a substantial factor in causing fraud against Plaintiffs and Intervenors.

176.    As a result of Defendants abetting of fraud, Plaintiffs and Intervenors have been damaged in an amount to be determined at trial.

**H.    COUNT EIGHT: CIVIL CONSPIRACY**

177.    The allegations stated above and below are incorporated by reference.

178.    Additionally, and/or in the alternative and based on information and belief, the Defendants, and their agents or employees had an agreement with and/or understanding among them to commit and to cover up the wrongs and damages inflicted on Plaintiffs and Intervenors. To this end, Defendants and their agents, employees and/or representatives had a meeting of the minds and committed unlawful and overt acts and/or lawful acts committed for an unlawful purpose which proximately caused further and additional damages to Plaintiffs and Intervenors. Therefore, Defendants and their agents, employees and/or representatives are directly and vicariously liable for the actions of each other in furtherance of this conspiracy.

179.    Plaintiffs and Intervenors seek judgment for all damages, both actual and punitive, that they suffered as a result of the actions of any of them.

180.    Plaintiffs and Intervenors seek judgment for their reasonable and necessary attorney's fees at trial and through all applicable appellate levels

## I.    COUNT NINE: AIDING AND ABETTING AND/OR KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY

181.    The allegations stated above and below are incorporated herein by reference.

182.    Plaintiffs and Intervenors had a fiduciary relationship with McClain.  McClains breached its fiduciary duties owed to Plaintiffs and Intervenors.  McClains breach either: (1) proximately caused injuries to Plaintiffs and Intervenors or (2) resulted in a benefit to McClain. As a proximate result of McClain's breach of fiduciary duties, Plaintiffs and Intervenors were damaged.

183.    Plaintiffs and Intervenors seek actual damages.

184.    Rabo and Mechanics Bank knowingly provided substantial assistance to McClain in breaching its fiduciary duties owed to Plaintiffs and Intervenors. Both institutions were fully aware that McClain had contractual obligations with Plaintiffs and Intervenors to feed cattle that

did not belong to McClain and that he was responsible for managing and selling these cattle for

the benefit of Plaintiffs and Intervenors. Rabo and Mechanics Bank knew that the proceeds from

these cattle sales were to be held in trust for Plaintiffs and Intervenors, reflecting McClain's

fiduciary obligation to safeguard and adequately account for these funds. Despite this knowledge,

Rabo and Mechanics Bank continued to extend credit, approve overdrafts, and facilitate financial

transactions that enabled McClain to misappropriate these funds, directly aiding and abetting his

breaches of fiduciary duty.

185.    Internal communications between Rabo and Mechanics Bank reveal that both

institutions had detailed insight into McClain's operations, including the fact that he was selling

cattle owned by third parties and that the proceeds from these sales were not McClain's to use

freely. They were aware of the significant discrepancies in McClain's borrowing base reports, the

impossibility of his reported cattle inventory given his feedlot capacity, and the manipulation of

financial records. Despite these red flags, Rabo and Mechanics Bank actively worked together to

conceal McClain's financial mismanagement, allowing it to divert funds that should have been

held in trust for Plaintiffs and Intervenors to cover personal and business debts. Their involvement

included approving overdrafts funded by these misappropriated proceeds, coordinating credit

extensions despite McClain's insolvency, and failing to enforce basic financial controls that would

have exposed the misuse of trust funds.

186.    Mechanics Bank's role extended beyond that of a typical depository institution, as

it directly engaged in discussions about McClain's creditworthiness and financial operations.

Rabo, motivated by the substantial profit margins it earned from McClain's account, repeatedly

ignored internal warnings and risk assessments to keep the credit lines active. This conduct reflects

more than negligence; it demonstrates a deliberate decision to support McClain's fraudulent

activities, knowing that such actions would harm Plaintiffs and Intervenors. By enabling McClain to continue accessing and misusing funds that were held in trust, Rabo and Mechanics Bank substantially assisted him in breaching his fiduciary duties.

187.    As a direct and proximate result of Rabo and Mechanics Bank's actions, Plaintiffs and Intervenors suffered significant financial damages. The banks' conduct not only facilitated McClain's ability to misappropriate trust funds but also provided him with the financial credibility necessary to continue his fraudulent operations. Their substantial assistance in these breaches of fiduciary duty makes them jointly and severally liable for the resulting harm to Plaintiffs and Intervenors.

## J.    COUNT TEN: CLAIMS OF THORLAKSON AND AGTEXAS BASED ON INTERCREDITOR AGREEMENT

188.    The allegations stated above and below are incorporated by reference.

189.    Effective as of January 27, 2021, Rabo, Brian McClain DBA McClain Feed Yard, and AgTexas, joined by Thorlakson, entered into a written agreement "to set forth the relative priority of the security interests, lien and other interests relating to cattle and related assets subject to the Cattle Feeding Agreements and the underlying transactions between McClain and Thorlakson LP."

190.    Among other provisions, the Intercreditor Agreement provided:

A.      ¶1(i) Disclaimer of partnership between McClain and Thorlakson

B.      ¶1(ii) Agreement that McClain has no ownership of cattle subject to a Cattle Feeding Agreement ("CFA")

C.      ¶1(iii) Agreement that all cattle subject to a CFA are owned by Thorlakson

D.      ¶1(iv) Agreement that the AgTexas lien on Thorlakson cattle is subject to McClain's agister's lien

E.      ¶1(v) Agreement that RAF and McClain disclaim a lien on cattle of Thorlakson, except for McClain's agister's lien

F.      ¶1(vi) Agreement that AgTexas disclaims a lien on cattle owned by McClain

        ***

G.      ¶3 Agreement that the proceeds of cattle subject to CFA held by a party contrary to the Intercreditor Agreement are held in trust and must be delivered to the other party or parties.

191.    Rabo induced AgTexas and Thorlakson to enter into the Intercreditor Agreement with representations that it knew that Thorlakson would "purchase from McClain and/or place cattle owned by Thorlakson with McClain" and that AgTexas, not Rabo, would have a security interest in these cattle, except to the extent an agister's lien existed. Rabo also represented that if it acquired possession of proceeds from cattle sales of Thorlakson, it would hold those proceeds in trust for the benefit of the other parties to the Agreement and pay them to the party entitled to receive them.

192.    AgTexas and Thorlakson were also induced by representations by Lawson that McClain was an outstanding cattle caretaker and a successful businessman who know how to take care of his business. Lawson assured Ag Texas that McClain's feedyards would be a reliable place for its loan customer, Thorlakson, to place cattle for feeding and care. Although the Intercreditor Agreement was signed in late January, and business did not get under way immediately, on February 18, 2021, Rabo employee and financial analyst, Rabo's Financial Analyst, wrote a highly critical report that said McClain Farms had lost $4.5 million in 2020, that he had "major concerns," that the sales prices reported by McClain made "zero sense to me," and that because McClain was transferring so much money between his entities, "we have no idea who owes who and how much."

Rabo did not relay this concern to AgTexas and Thorlakson. Had they known what Rabo did, they would not have suffered their $9.8 million loss.

193.    AgTexas and Thorlakson reasonably relied on these representations. Thorlakson relied by shipping and/or buying thousands of cattle to or from McClain operations and AgTexas relied by providing financing for these operations to Thorlakson.

194.    Despite these assurances to Thorlakson and AgTexas, Rabo conducted collateral inspections, and received borrowing base reports, to the effect that all cattle in McClain's possession were subject to its interest. Rabo made no effort to segregate or hold Thorlakson proceeds in trust.

195.    Even after its February 2023 collateral inspection report described noted: "**Possible Fraud Case**. Recommendation to Downgrade immediately and take control of cattle as soon as possible due to **concerns related to cattle being owned by other parties**" (emphasis added) Rabo took no action to notify Thorlakson or AgTexas that it considered its borrower to have committed fraud and that the fraud related to the very subject of the Intercreditor Agreement. Instead, Rabo permitted McClain to accept payment from Thorlakson more than $2.8 million for cattle purchases, which funds were deposited into bank account controlled by Rabo. These funds were held in trust for the benefit of Thorlakson and AgTexas, and Rabo's failure to return the funds constitutes conversion and breach of trust.

196.    AgTexas and Thorlakson are therefore entitled to and seek recovery of judgment for fraud, conversion, and breach of contract, against Rabo to the extent that Rabo acquired cattle or proceeds belonging to Plaintiffs.

197.    Plaintiffs further seek judgment for their reasonable attorney fees at trial and through all applicable appellate levels, pursuant to agreement and/or Tex. Civ. Prac. & Rem. Code § 38.001(b)(8).

**K.    COUNT ELEVEN: CLAIMS OF PRIEST CATTLE COMPANY LTD. BASED ON LETTER OF UNDERSTANDING AGREEMENT WITH RABO**

198.    The allegations stated above and below are incorporated by reference.

199.    Effective as of January 4, 2022, Priest Cattle Company, Ltd. ("Priest"), Rabo, McClain, and National Finance Credit Corporation of Texas ("National") entered into a written agreement (the "Letter of Understanding") by which it was acknowledged that Priest "owns cattle placed on feed at or with [McClain]." Among other provisions, the Agreement provides:

A. An acknowledgement by all parties that McClain "has an existing borrowing relationship with Rabo" and the Priest "has an existing borrowing relationship with [National]."

B. McClain represented and warranted that all of Priest's cattle in McClain's possession or control would "always be permanently identified by [Priest's] brand and not commingled with other cattle."

C. McClain also acknowledged that it would be subject to the security interest of National unless any check issues to [Priest] as full or partial payment from any sale of [Priest's] farm products is made."

200.    Rabo induced Priest to enter into the Letter of Understanding with representations that Rabo acknowledged and knew that the cattle owned by Priest would be fed by McClain but that those cattle were not owned by McClain. Priest reasonably relied on those representations by shipping hundreds of head of cattle to be held and fed by McClain.

201.    Despite its written agreement with Priest, Rabo took possession of all cattle at McClain's yard and sold those cattle at auction, claiming those cattle were subject to Rabo's purported security interest with McClain. Priest is entitled to and seeks recovery of judgment for

breach of contract and conversion against Rabo for its acquiring and sale of cattle belonging to Priest.

## L.   ATTORNEYS' FEES

202.   By reason of the wrongful acts and conduct of the Defendants, Plaintiffs and Intervenors have been required to employ attorneys to bring and prosecute this action.  Plaintiffs and Intervenors seek to recover the reasonable and necessary costs and attorneys' fees and legal expenses, including expert witness fees.

203.   Under all claims asserted herein, Plaintiffs and Intervenors seek recovery of their reasonable and necessary costs and attorneys' fees at trial and all appellate levels, in equity or at law, to the extent provided by agreement, pursuant to Texas common law, or as described in Texas Civil Practice and Remedies Code chapters 37 and 38, Texas Business and Commerce Code chapter 24, and pursuant to analogous provisions of other state or federal statutory and common law as the Court may find applies to the claims set forth herein.

## M.   DAMAGES

204.   The facts and allegations stated above are incorporated herein by reference.

205.   The Defendants' acts, omissions, conduct, and breaches were, and continue to be, a proximate and/or producing cause of damages to Plaintiffs and Intervenors, and the Defendants have been unjustly enriched by their actions.

206.   To the extent that Defendants have received funds or property in which the Plaintiffs and Intervenors have superior rights, Plaintiffs and Intervenors seek recovery of their damages from Defendants, either directly or by way of disgorgement.

207.   Plaintiffs and Intervenors will respectfully request the Court to determine the amount of Plaintiffs' and Intervenors' damages.  Plaintiffs and Intervenors seek recovery of their

damages proximately caused by any responsible party, including, without limitation, all damages caused by the Defendants, both actual and punitive.

## N.    EXEMPLARY DAMAGES.

208.    The conduct of the Defendants as described above, was done in bad faith and in violation of the law and public policy of the State of Texas, was done willfully, knowingly and maliciously, was intentional and/or committed with conscious indifference to the rights of Plaintiffs and Intervenors such as to warrant the imposition of punitive and/or exemplary damages under Chapter 41 of the Texas Civil Practices & Remedies Code, Section 41.001, et. seq.

209.    Plaintiffs and Intervenors seek the recovery of exemplary damages against Defendants.

## O.    REQUEST FOR DECLARATORY JUDGMENT

210.    The facts and allegations stated above are incorporated herein by reference.

211.    Plaintiffs and Intervenors seek declaratory judgment as to priority of their claims to cattle and sales proceeds.

## <u>CONCLUSION</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs and Intervenors respectfully pray that all Defendants be cited to appear and to answer this Petition and that upon final hearing hereof, Plaintiffs have Judgment as follows:

a.    An Order declaring the rights of the parties to the cattle and their proceeds;

b.    Judgment for actual and punitive damages;

c.    Judgment for attorneys' fees through trial and at all applicable appellate levels, and costs;

d.    Any and all further relief, legal and equitable, to which Plaintiffs and Intervenors may be now and ever more entitled.

Respectfully submitted,

**NAMAN HOWELL SMITH & LEE, PLLC**
8310 N. Capital of Texas Hwy., Ste. 490
Austin, Texas 78731
(512) 479-0300; FAX (512) 474-1901
Email: dlebas@namanhowell.com


By:     */s/ David L. LeBas*
        David L. LeBas
        State Bar No. 12098600
        Michael Duncan
        State Bar No. 24097628

**Attorneys for Plaintiffs AgTexas Farm Credit
Services, AgTexas, PCA, Thorlakson Diamond T
Feeders, LP**

                    **- And -**


**SPROUSE SHRADER SMITH PLLC**
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas  79105-5008
(806) 468-3300; (806) 373-3454 FAX

By: */s/ John Massouh*
    John Massouh

-and-

**The Leal Law Firm, LLC**
abel@leal.law
14180 N. Dallas Parkway,Suite 300
Dallas, Texas 75254
Tel. (214) 395-5325;Fax. (806) 364-2526

By: */s/ Abel Leal*
    Abel Leal
    State Bar No. 24026989

**Attorneys For Dennis Buss, Buss Family Trust,
Eddie Bryant, Robert E. Gray, Ronnie Gray,
Gray Brothers, Craig Sutton, Amy Sutton, Steve**

**Ryan, Janice Lawhon, AJ Jacques Living Trust, Gungoll Cattle, LLC, Leah Gungoll, Morrison Café, LLC, Gary Lesh, Jan Lesh, Lesh Family Trust, Jared Lesh, Jordan Lesh, LLC, Joel Brookshire, Gene Brookshire Family, LP, Douglas Finley, Scarlet And Black Cattle, LLC, Bryan Blackman, Steve T Scott Farm, Inc., Scott Livestock Company, Inc., Arnold Braun Trust, Robert Braun, Jim Rininger, Robert Spring, Michael Evans, Miranda Evans, Charles Lockwood, Cole Lockwood, Sherle Lockwood, Nikki Lockwood, Lyndal Van Buskirk, Janet Van Buskirk, Colby Van Buskirk, Susan Van Buskirk, Jimmy Greer, Dustin Johnson and Dora Blackman**

**- And -**

*/s/ Amber S. Miller*

Amber S. Miller
State Bar No. 24050320
CRENSHAW, DUPREE & MILAM, L.L.P.
P.O. Box 1499
Lubbock, Texas 79408-1499
(806) 762-5281
(806) 762-3510 (fax)
***ATTORNEY FOR RIDGEFIELD CAPITAL GROUP, DREW PHILLIPS, CARRAWAY CATTLE, ROBERT ELLIS, BARRY PHILLIPS, BIG SEVEN CAPITAL PARTNERS, RICHARD CARRAWAY***

**- And -**

*/s/ James D. Bradbury*

James D. Bradbury
State Bar No. 02814500
jim@bradburycounsel.com
Kyle K. Weldon
State Bar No. 24097192
kyle@bradburycounsel.com
**JAMES D. BRADBURY, PLLC**
201 Main Street, Suite 600
Fort Worth, Texas 76102

Telephone:  817-339-1105
Fax:        817-886-3495

***ATTORNEYS FOR PRIEST CATTLE COMPANY, LTD, PRIEST VICTORY INVESTMENT LLC, W. ROBBIE RUSSELL LIVING TRUST, AND EDDIE STEWART***

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025, the foregoing document was filed as Exhibit A to PLAINTIFFS AND INTERVENORS' OPPOSED MOTION FOR LEAVE TO AMEND AND CONSOLIDATE PLEADINGS using the CM/ECF system of the court.

*/s/ David L. LeBas*
David L. LeBas