1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

IN RE:                        | CASE NOS. 23-20084-7-rlj
                              |           23-20085-7-rlj
McCLAIN FEEDYARD, INC.;       |           23-20086-7-rlj
McCLAIN FARMS, INC.; and      |
7M CATTLE FEEDERS, INC.,      |
                              |
     Debtors.                 | CHAPTER 7

_____

DEPOSITION OF MEAGAN GOAD

_____

     The deposition of MEAGAN GOAD, taken by Rabo
AgriFinance, LLC, pursuant to Subpoena on Tuesday, the
16th day of July, 2024, at the hour of 9:57 a.m., at
the Law Offices of Farmer & Wright, 4975 Alben Barkley
Drive, Suite 1, in the City of Paducah, County of
McCracken, State of Kentucky, before me, Amy S.
Fleming, RPR, CSR, and Notary Public in and for the
Commonwealth of Kentucky at Large, to be used for the
purpose of discovery and/or evidence and all other
purposes allowed under the Federal Rules of Bankruptcy
Procedure.

_____

WEST KENTUCKY REPORTING SERVICE, INC.
-Registered Professional Reporters-
-Certified Shorthand Reporters-
125 Nahm Street, Suite 105
Paducah, Kentucky 42001
(270)443-9631
info@wkrsdepo.com

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 2 of 206

MEAGAN GOAD

2

1                      APPEARANCES

2

   FOR RABO AGRIFINANCE:
3
   Michael R. Johnson, Esq.
4  Matthew Cannon, Esq.  (via Zoom)
   RAY, QUINNEY & NEBECKER, PC
5  36 South State Street, Suite 1400
   Salt Lake City, UT 84111
6  mjohnson@rqm.com

7  Linda Kobliska, Esq.
   Head of Litigation & Asset Recovery
8  RABO DIVERSIFIED SERVICES
   1402 Technology Parkway
9  Cedar Falls, IA 50613
   linda.kobliska@raboag.com
10
   Brad Bakker, Esq.  (via Zoom)
11 RABO DIVERSIFIED SERVICES
   14767 North Outer 40 Road, Suite 400
12 Chesterfield, MO  63017
   brad.bakker@raboag.com
13

14 FOR HTLF BANK:

15 John Lovell, Esq.
   Matthew S. Merriott, Esq.  (via Zoom)
16 LOVELL, ISERN & FARABOUGH, PLLC
   112 SW 8th Avenue, Suite 1000
17 Amarillo, TX 79101-2314
   john@lovell-law.net
18 matthew@lovell-law.net

19
   FOR AGTEXAS PCA AND DIAMOND T FEEDERS:
20
   David L. LeBas, Esq.
21 Naman, Howell, Smith & Lee, PLLC
   8310 N. Capital of Texas Highway, Suite 490
22 Austin, TX 78731
   dlebas@namanhowell.com
23

24

25

3

1                    APPEARANCES (continued)

2

FOR 2B FARMS, TERRY AND REBECCA ROBINSON:
3
Todd J. Johnston, Esq.  (via Zoom)
4  McWHORTER COBB & JOHNSON, LLP
1722 Broadway
5  Lubbock, TX  79401
tjohnston@mcjllp.com
6

7  FOR MAP ENTERPRISES:

8  Thomas A. Swafford, Esq.  (via Zoom)
SWAFFORD LAW
9  414 Union Street, Suite 1900
Nashville TN 37219
10  tony@swaffordlawfirm.com

11

FOR KENT RIES, CHAPTER 7 TRUSTEE:
12
Hudson Jobe, Esq.  (via Zoom)
13  JOBE LAW, PLLC
6060 North Central Expressway, Suite 500
14  Dallas, TX 75206
hjobe@jobelawpllc.com
15

16
FOR DENNIS BUSS, ET AL
17
John Massouh, Esq. (via Zoom)
18  Sprouse Shrader & Smith
701 South Taylor Street, Suite 500
19  Amarillo, TX 79101
john.massouh@sprouselaw.com
20

21  FOR WILD FOREST CATTLE:

22  David Kelly, Esq. (via Zoom)
KEULER, KELLY, HUTCHINS, BLANKENSHIP & SIGLER, LLP
23  100 South 4th Street, Suite 400
Paducah, KY 42001
24  dkelly@kkhblaw.com

25

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 4 of 206

MEAGAN GOAD

4

1                    APPEARANCES (continued)

2

FOR RIDGEFIELD CAPITAL ASSET MANAGEMENT; ROBERT ELLIS;
3  DREW PHILLIPS; BARRY PHILLIPS; ROBERT CARRAWAY;
   CARRAWAY CATTLE, LLC; AND BIG SEVEN CATTLE, LLC:
4

   Amber Miller, Esq.  (via Zoom)
5  CRENSHAW DUPREE & MILAM
   Happy State Bank Building
6  4411 98th Street, Suite 400
   Lubbock, TX 79424
7  amiller@cdmlaw.com

8

   FOR MECHANICS BANK:
9

   Javon Johnson, Esq.     (via Zoom)
10 HUSCH BLACKWELL
   1900 North Pearl Street
11 Suite 1800
   Dallas, TX 75201-2467
12 javon.johnson@huschblackwell.com

13

   FOR THE WITNESSES MEAGAN GOAD, WILLIAM JEDEDIAH GOAD,
14 AND KINSEY MORELAND

15 Charity Bird, Esq.
   KAPLAN JOHNSON ABATE & BIRD, LLP
16 710 West Main Street, 4th Floor
   Louisville, KY 40202
17 cbird@kaplanjohnsonlaw.com

18 Todd A. Farmer, Esq.
   FARMER & WRIGHT, PLLC
19 4975 Alben Barkley Drive, Suite 1
   Paducah, KY 42001
20

21

   ALSO PRESENT:
22

      Tom Thorlakson
23    Diamond T Feeders

24    Ben Thorlakson     (via Zoom)
      Diamond T Feeders
25

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 5 of 206

MEAGAN GOAD

5

1                    I N D E X

2

MEAGAN GOAD                                        PAGE

3

Direct Examination by Mr. Michael Johnson.....      8

4

Cross-Examination by Mr. Lovell .............      110

5

Cross-Examination by Mr. LeBas ..............      115

6

Redirect Examination by Mr. Michael Johnson...     183

7

Cross-Examination by Mr. Massouh ............      194

8

Recross-Examination by Mr. LeBas ............      197

9

Redirect Examination by Mr. Michael Johnson...     202

10

Recross-Examination by Mr. Massouh ..........      203

11

12

13  Signature of Deponent........................     206

14  Errata Sheet.................................     207

15  Certificate of Reporter......................     208

16

17

18

19

20

21

22

23

24

25

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 6 of 206

MEAGAN GOAD

6

1                          INDEX OF EXHIBITS

2     NUMBER              DESCRIPTION                      PAGE

3      2     Copies of Checks to Crystal McClain          49

4      4     Letter to M. Johnston from G. McNutt         47
             dated June 25, 2023
5
       17    Handwritten Letters from Brian McClain       51
6
       20    Documents produced by Whitlock               60
7            Invoices, Closeouts, Projected Closeouts,
             and Cattle Feeding Agreement
8            Bates Whitlock00064 through 0000128.

9      21    Excel Spreadsheet                            70

10     22    Mechanics Bank - Domestic Wire Out           72
             Request
11
       24    MeaganPowell/Goad                            74
12           Nonpayroll Amounts Received from
             Family Entities
13
       25    McClain Feedyard Invoices and                76
14           McClain Farms Inc. Checks - April 2023

15     29    Text Messages                                80
             "Z Kinsey @ McClain Livestock
16
       31    First Kentucky Bank - Bank Statement         82
17           W. and M. Goad   1/24/2023

18     32    CFSB - Checks from McClain Farms to JLE       83
             Trucking and JLE Trucking Checking
19           Deposits

20     33    Wire Record for JLE Trucking, Inc.            83

21     34    William (Jed) Goad/JLE Trucking              87
             Nonpayroll Amounts Received From
22           Family Entities

23     35    Cattle Feeding Agreements, Projected          28
             Closeouts, and Invoices
24           Re:  MAP Enterprises

25     36    Borrowing Base Certificates                  93
             and Reconciliation Summaries  10/31/22

7

1                    INDEX OF EXHIBITS (continued)

2    NUMBER                                                PAGE

3    37      Borrowing Base Certificates               102
             and Reconciliation Summaries  11/30/22
4
     38      Borrowing Base Certificates               103
5            and Reconciliation Summaries  12/31/22

6    39      Rabo AgriFinance Borrowing Base           105
             Certificates, Supplementals Schedule
7
     40      Email from C. Lawton to J. Hanson         106
8            and J. Dunn dated Friday, 3/27/23

9    42      MAP Deposit Summaries, Checks to MAP      112
             from McClain Farms, Closeout Reports
10

11   EXHIBITS MARKED FOR IDENTIFICATION

12   46      Intercreditor Agreement dated 1/27/21     127

13   47      Letter to J. Rabitin from M. Johnston     129
             dated 4/5/23
14
     48      Checks from McClain Farms, Inc.,          135
15           to 2B Farms

16   49      (Intentionally omitted - see page 146)    ---

17   50      T. Thorlakson and B. McClain              139
             dated 3/1/23
18
     51      Cattle Feeding Agreement - 109 Head       145
19           T. Thorlakson and B. McClain

20   52      Text Messages                             149
             Angela and Meagan McClain
21           Brian McClain and Meagan McClain

22   53      Text Messages                             186
             Brian McClain and Kinsey Moreland
23

24

25

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 8 of 206

MEAGAN GOAD

8

1                    *    *    *

2       The witness, MEAGAN GOAD, first having been duly

3    sworn, was examined and testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. MICHAEL JOHNSON:

6       Q.   Good morning.  May I call you Meagan?

7       A.   Yes, sir.

8       Q.   Good morning, Meagan.  My name is Michael

9     Johnson.  I represent Rabo AgriFinance.  To my left

10    is Linda Kobliska.  She's an attorney in-house for

11    Rabo.  And I'll let everybody else introduce

12    themselves to you.

13            MR. LEBAS:  David LeBas, I represent

14    Diamond T Feeders and AgTexas, PCA.

15            MR. LOVELL:  John Lovell, I represent

16    HTLF Bank, First Bank & Trust.

17    BY MR. MICHAEL JOHNSON:

18       Q.   And of course you know who your lawyers

19     are.

20            Can you confirm for me that you --

21            Well, first of all, give me your full name

22     and address, please.

23       A.   Middle name or just first and last.

24       Q.   Whatever you go by?

25       A.   Meagan Goad, 1775 Wadesboro Road South in

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 9 of 206

MEAGAN GOAD

9

1    Benton.

2        Q.    And will you confirm for me that you're

3    Brian McClain's daughter?

4        A.    Yes.

5        Q.    And you are married to Jed Goad.  Is that

6    correct?

7        A.    Yes.

8        Q.    How long have you been married to Jed?

9        A.    Since 2022.

10       Q.    And did you live together before you

11   married him or --

12       A.    Yes.

13       Q.    How long did you live together with Jed?

14       A.    Six months prior.

15       Q.    Okay.  And when did you start dating?

16       A.    November 2020.

17       Q.    And I know you met with your lawyers, but

18   let me go over some basic rules.

19            First of all, do you understand that you're

20   under oath here today?

21       A.    Yes, sir.

22       Q.    And it's just like giving testimony in

23   court, right?

24       A.    Uh-huh (affirmative).

25       Q.    It's very important -- and sounds like

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 10 of 206

MEAGAN GOAD

10

1   you've been talked to, but it's very important that

2   we not talk over each other.  So if I ask a

3   question, wait for me to finish before you answer,

4   and I will try to give you the same courtesy.

5   Okay?

6       A.   Okay.

7       Q.   If I ask you a question and you don't

8   understand it, will you please let me know?

9       A.   Uh-huh (affirmative).

10      Q.   And it's very important, of course, that

11  you give audible responses instead of, you know,

12  head nods and "uh-huh" and "uh-uh," so the court

13  reporter can take down --

14      A.   Yes, sir.

15      Q.   -- what we say.  Okay.

16           Can you tell me what you did today to

17  prepare for this examination?

18      A.   Spoke with my lawyers.

19      Q.   And was that just today?

20      A.   Yesterday as well.

21      Q.   Without telling me what you talked about,

22  how long did you meet with your lawyers?

23      A.   I think yesterday was two and a half hours.

24           MS. BIRD:  Probably.

25      Q.   And I assume that you looked at some

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
MEAGAN GOAD
Exhibit Goad Deposition Transcript    Page 11 of 206

11

1    documents or records.  Is that accurate?

2        A.    No, sir.

3        Q.    No?  None at all?

4        A.    No, sir.

5        Q.    Was there anybody in the meeting besides

6    yourself and Ms. Bird and Mr. Farmer?

7        A.    My husband.

8        Q.    Okay.  What is your educational background?

9        A.    I've got an associate's degree in ag

10    science.

11        Q.    From what institution?

12        A.    Murray State.

13        Q.    And what do you currently do for a living?

14        A.    I work for Marshall County Livestock.

15        Q.    Doing what?

16        A.    Running a feedyard.

17        Q.    So you work in the feedyard?

18        A.    Yes, sir.

19        Q.    Okay.  And I assume you've been doing that

20    for, what, about a year or so?

21        A.    Yes, sir.

22        Q.    All right.  You previously worked for the

23    McClain entities, correct?

24        A.    Yes, sir.

25        Q.    And how long had you worked for the McClain

MEAGAN GOAD

12

1    entities?

2        A.    Since probably 2005.

3        Q.    And what were your job duties or tasks for

4    the McClain entities?

5        A.    Going as far back as when I started or more

6    recently?

7        Q.    Yeah, let's start from when you started.

8    And if it changed, will you kind of give us the

9    history of, I started doing this, and then I did

10   this, and let us know when that happened?

11       A.    I was mainly just outside help.  I would

12   help fix fences, process cattle, catch cattle.

13   That was probably until I graduated college in

14   2012, maybe.

15            After that, I started doing some of the

16   inside work, inputting feed, helping pay bills.  I

17   was still doing outside work as well, helping

18   process cattle and things like that.

19            After I had my son in 2015, I started doing

20   more inside work.  Not really much different, just

21   more so inside than out, but I still would go

22   outside.

23            Probably in 2020, 2021, I started being

24   inside full time for the most part.  Just doing

25   basically anything he asked me to do:  Run errands,

13

1    go pick up medicine, go get parts, make invoices

2    for customers.  Basically anything he told me to

3    do, I would do.

4        Q.   And "he" is Brian?

5        A.   Yes.

6        Q.   Your dad, right?

7        A.   Yes.

8        Q.   Okay.  So what we're -- let's focus in on

9    the last half of 2022 and then up into 2023.

10           What were your, kind of, day-to-day job

11   responsibilities for the company?

12       A.   I would check the bank in the mornings.  I

13   would -- he had moved his office after he got hurt.

14   We had an IT company come in, and we moved his

15   office to his house.  He had a full -- his full

16   office set up in his bedroom so he could roll up in

17   his wheelchair, sit at his desk.  He had his

18   computer and everything there.

19           So, I mean, my duties didn't really change.

20   I did more paperwork because he had doctors'

21   appointments and things like that, but it was all

22   still basically the same thing.  I would run him

23   things.  I would have to run over there to grab

24   things that he needed me to do, but nothing had

25   really changed after that.

14

1    Q.    You were a signer on the McClain bank

2    accounts, correct?

3    A.    Yes, sir.

4    Q.    When did you become a signer on the McClain

5    bank accounts?

6    A.    The Rabo accounts, when it was opened, I

7    was a signer on it.

8    Q.    At the --

9    A.    At Mechanics --

10   Q.    -- Mech Bank?

11   A.    -- Bank, yes.

12   Q.    And then, were you also a signer on the --

13   I think it was McClain Farms account at CFSB?

14   A.    Yes, sir.

15   Q.    Did you interact with investors and

16   customers as part of your job duties?

17   A.    The only thing I interacted with them with

18   was giving them their invoices and telling them if

19   it would be -- I'm trying to figure out how to word

20   it.  Giving them their invoices.  Or if they asked

21   questions, it was basically, "You'll have to ask

22   Dad because I don't know."

23   Q.    Okay.  What other family members worked for

24   the business besides yourself?

25   A.    My sister.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 15 of 206

MEAGAN GOAD

15

```
1        Q.    Kinsey?

2        A.    Kinsey, yes.

3        Q.    What did Kinsey do?

4        A.    She was an errand runner, basically, and

5   did -- she did some office work if I wasn't

6   available, but she basically was an errand runner.

7        Q.    Was she full time?

8        A.    Yes.

9        Q.    And you were full time as well?

10       A.    Yes.

11       Q.    Did Piper or Kristin work for the company?

12       A.    No, sir.  Piper did briefly, but she -- all

13   she did was work in our lab where we have -- had --

14   what we call PI test the cattle.  So we'd take a

15   notch out of their ear and test it for disease so

16   we could pull them out, and that's all she did.

17       Q.    Okay.  Did Chelsea ever work for the

18   company?

19       A.    No.

20       Q.    How about Crystal?

21       A.    No.

22       Q.    What was your salary, at least at the end,

23   for the company?  How much were you making a year?

24       A.    I don't know a year, but at the end, I

25   think it was $1,200 a week.
```

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 16 of 206
MEAGAN GOAD

16

1      Q.    And then, do you recall how much your dad

2    was making and your sister?

3      A.    No, I don't know.

4      Q.    All right.  Tell me about --

5            So you said your husband's Jed Goad.  He's

6    the owner of JLE Trucking?

7      A.    Yes, sir.

8      Q.    And do you have an interest in that company

9    as well?

10     A.    What do you mean by "interest"?

11     Q.    Are you also an owner of the company?

12     A.    No, sir.

13     Q.    Do you work for the company?

14     A.    No, sir.

15     Q.    Have you ever worked for the company?

16     A.    No, sir.

17     Q.    What business is your husband in, JLE?

18    What business does that company engage in?

19     A.    Trucking.

20     Q.    All right.  There were -- and I'll show you

21    an exhibit later.  But we're aware that there are

22    many, many payments from the McClain entities to

23    JLE Trucking in the millions, many millions of

24    dollars.  Does that surprise you?

25     A.    No.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 17 of 206

MEAGAN GOAD

17

1    Q.   What was JLE doing for the McClain

2    entities?

3    A.   Trucking cattle.

4    Q.   Was it -- how big -- how big is the

5    company?  How many trucks does it have?

6    A.   The company itself has three trucks and had

7    about six or seven trailers, so he leased three to

8    four trailers to other independent owners.

9    Q.   Okay.

10   A.   And that was just JLE.

11   Q.   And was JLE the exclusive trucking company

12   for the McClain entities?

13   A.   I wouldn't say exclusive because he subbed

14   out.  He was a broker for other truck companies,

15   and so he would broker out loads that he couldn't

16   get covered.

17   Q.   You know who Hudson Jobe is, right?

18   A.   Uh-huh (affirmative).

19   Q.   Mr. Jobe told me that you and your husband

20   had provided backup, like shipping records and

21   things like that, to justify the over $8 million in

22   payments --

23   A.   Yes.

24   Q.   -- to JLE.  Is that true?

25   A.   Yes, sir.

18

1      Q.   Can we get copies of those records?

2           MS. BIRD:  Yeah.  I mean, I think that's

3      fine.  They were uploaded, I think.  Weren't they?

4      Yeah, that's fine.  We can send them over.

5   BY MR. MICHAEL JOHNSON:

6      Q.   Okay.  Do you know what records were

7      provided to the trustee?

8      A.   It was invoices, like JLE's invoice, and

9      then it would be the invoice from --

10          So on the invoices, it would tell who

11     hauled each load, and so it was the person -- like,

12     each invoice from those people.  And then if it was

13     trucks from JLE, it would be what we call their

14     trip pack.  It's what they fill out every week

15     whenever they load.  It says where they go and how

16     many miles.

17     Q.   Have you or Jed -- Like I said, my memory

18     is it's over $8 million that went to JLE.

19          Have you and Jed gone through -- you or Jed

20     gone through to try and determine how much of the

21     8 million actually went, you know, to the actual

22     truckers?

23          Do you understand my -- so my question is:

24     Did you really get $8 million but 7 1/2 million

25     went to other --

19

1           MS. BIRD:  I'm going to object to the way

2     you're phrasing the question.  JLE Trucking

3     received money.  She has no interest in it.

4           MR. MICHAEL JOHNSON:  JLE, yes.

5           MS. BIRD:  And I believe Jed is coming in

6     tomorrow to be deposed, and he could answer these

7     questions better since it's his company.

8  BY MR. MICHAEL JOHNSON:

9     Q.    Is he a better witness on JLE payments?

10    A.    Yes.

11    Q.    Did your -- going back to your duties for

12    the McClain entities, did they ever change in any

13    material way other than, kind of you explained, you

14    went from being outside more to the inside?

15    A.    No.

16    Q.    You said your dad got hurt.  When did that

17    happen?

18    A.    October, the beginning -- end of September,

19    first of October of 2022.

20    Q.    And what happened to him?

21    A.    He broke his pelvis.

22    Q.    Was he in a rodeo or something like that?

23    A.    Yeah.

24    Q.    All right.  And did your role change after

25    that really as far as responsibilities?

20

1       A.   No.

2       Q.   Can you describe -- and let's focus in the

3   20- -- let's say '21, '22, '23 period.

4        What was the business of the McClain

5   enterprise or entities?

6       A.   Background in cattle.

7       Q.   What do you mean by that?

8       A.   Growing cattle.

9       Q.   So it would purchase baby calves?

10      A.   I wouldn't call baby calves, but calves,

11   yes.

12      Q.   Okay.  And was there a particular area or

13   part of the country where it would -- where

14   calves -- calves would typically be acquired from?

15      A.   It would range from different places.

16      Q.   And so it would buy smaller calves, grow

17   them, and then sell them when they were ready --

18   when they became -- when they were ready to be

19   slaughtered?

20      A.   Yes.  Some was -- there was a middle piece

21   in there.  Some would go to horse shows in between,

22   but yes.

23      Q.   Cattle would go to horse shows?

24      A.   Yes.

25      Q.   How come?  What were they used for?

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 21 of 206
MEAGAN GOAD

21

1      A.    Team penning, cutting, sorting.

2      Q.    So, like, rodeos and things like that?

3      A.    Yes.

4      Q.    I know that there were -- there are three

5   entities.  There's McClain Farms, there's McClain

6   Feedyard, and there's 7M --

7      A.    Yes, sir.

8      Q.    -- right?

9           What was the reason or business purpose for

10  each of those entities?

11          MS. BIRD:  Objection.  You haven't asked

12  her if she had an interest in any of those entities

13  or reason to know that.

14          MR. MICHAEL JOHNSON:  She objected, but you

15  can still answer my question.

16          MS. BIRD:  If you know, you can answer.

17     A.    I don't.

18  BY MR. MICHAEL JOHNSON:

19     Q.    You don't know why -- you didn't -- you

20  didn't have an ownership interest in any of the

21  McClain entities, right?

22     A.    No.

23     Q.    That was your dad's companies?

24     A.    Yes.

25     Q.    And you don't know why your dad decided to

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 22 of 206

MEAGAN GOAD

22

1    have three separate entities:  McClain Farms,

2    McClain Feedyard, and 7M?

3        A.   No.

4        Q.   Did any of those entities do different

5    things?

6        A.   No.

7        Q.   So they all acquired calves, grew the

8    calves, and then sold the calves when they were

9    ready to slaughtered?

10       A.   Yes.

11       Q.   Did the -- while you were working for your

12   dad, did the nature of the business ever change?

13       A.    It got -- when we started sending cattle to

14   horse shows, it did.  We got more focused on

15   sending cattle to horse shows, but that's really

16   the only thing.

17       Q.   And how did the company make money sending

18   cattle to horse shows?  Did the --

19       A.   I don't know.

20       Q.   You don't know how that worked?

21       A.   (Shakes head negatively.)

22       Q.   I've seen the name "Lesh."  Were they big

23   in the horse show circuit?

24       A.   Yes.

25       Q.   Do you know where -- Well, was there a

23

1    particular part of the country where cattle were

2    typically purchased from when your husband was

3    typically shipping cattle for them?

4        A.   It wasn't ever just one place, if that's

5    what you're asking.  No, it was not just one

6    certain place.

7        Q.   I've heard that most of the -- most of the

8    cattle were acquired out of, like, Florida and

9    Georgia.  It that accurate or no?

10       A.   A lot of the cattle were purchased out of

11   Florida, yes.

12       Q.   And then they would be shipped to either

13   Kentucky or Texas?

14       A.   Yes.

15       Q.   Do you know -- do you know why certain

16   cattle would be shipped to Kentucky and certain

17   cattle would be shipped to Texas?

18       A.   When you get cattle out of Florida, they're

19   a bit on the crazy side.  In Kentucky, we did not

20   have resources to keep them in.  They would destroy

21   fences, things like that.  So if they were more on

22   the crazy side, they went to Texas.  If they were

23   more on the calm side, they would come to Kentucky.

24       Q.   So it really depended on --

25       A.   Their demeanor.

24

1      Q.    -- their demeanor?

2            And you indicated that either your husband

3      shipped a lot -- your husband personally, his

4      company, shipped a lot of the cattle.  And if not,

5      he also brokered loads for your dad, and so third

6      parties would have shipped?

7      A.    Yes.

8      Q.    Now, you said that the business was

9      primarily growing cattle, and then there was the --

10     the rodeo piece.

11           Did the McClain entities feed other

12     people's cattle?

13     A.    Some.

14     Q.    Did that happen in both Kentucky and Texas?

15     A.    Yes.

16     Q.    Okay.  And you say "some."  Off the top of

17     your head, do you remember whose cattle were being

18     fed?

19     A.    2B Farms, Scott Livestock.  Don Jones had

20     some there.  And these were people that would send

21     those cattle there to be fed.

22     Q.    Okay.  How did the company make sure that

23     company-owned cattle were segregated from

24     third-party cattle?  How did you make sure that --

25     you know, that -- for example, Tom Thorlakson, he

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 25 of 206

MEAGAN GOAD

25

1      may have been one who had cattle.

2              How'd you make sure that his cattle were

3      separated from McClain cattle?

4          A.    I don't know how they did it, but the

5      people who would send cattle in there, their cattle

6      would be branded.

7          Q.    Okay.   Always?

8          A.    Yes.

9          Q.    Okay.   And were McClain cattle branded?

10         A.    No.

11         Q.    Do you know why McClain cattle weren't

12     branded?

13         A.    No.

14         Q.    Do you know how -- how -- how big a part of

15     the business was the feeding other people's cattle

16     part?   Was it, you know, half the cattle on site

17     were third party?   Was it 5 percent?   Do you know?

18         A.    I'm not sure.

19         Q.    Would you say it was a large piece?

20         A.    Of cattle that I knew of that were from

21     other people that they sent them there would not be

22     a very large piece.

23         Q.    What records did the company maintain in

24     the ordinary course as far as -- for example, let's

25     start with cattle ownership.   If I wanted to know

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 26 of 206
MEAGAN GOAD

26

1    how many cattle we had besides going and counting

2    them, how many cattle he had, where would I go in

3    the company's records to find that out?

4        A.    I don't know.

5        Q.    How --

6        A.    He kept all of that.  I don't know if he

7    kept it in his head or what, but I don't know.

8        Q.    He kept all of those records?  So you

9    couldn't go on the computer and type up and say,

10   "We've got 25,000 head"?

11       A.    Back when I was doing more of the computer

12   work for that particular thing, yes, you could

13   have, but more recently, no.

14       Q.    You said "back when."  When was "back

15   when"?

16       A.    I can't really give you an exact date.

17   Maybe 2021.

18       Q.    And you said "he."  Brian kept all -- kept

19   all that information --

20       A.    Yes.

21       Q.    -- correct?

22            Are you in possession -- you personally,

23   are you in possession of any McClain records that

24   haven't been provided to the trustee?

25       A.    No.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 27 of 206

MEAGAN GOAD

27

1      Q.    Are you aware of any records that might be

2    missing that your dad may have had that no one can

3    find?

4      A.    No.

5      Q.    Tell me about the investor part of the

6    business.  How did that work?

7      A.    I never had any -- the only dealings I had

8    with the investors was making the invoices off the

9    information he gave me.  I never had any other

10   dealings with it.

11     Q.    So you don't know anything other than you

12   made invoices?

13     A.    No.

14     Q.    And so what would the -- so this would be

15   an invoice from a McClain entity?

16     A.    Yes.

17     Q.    Was it a particular McClain entity?  Was it

18   Farms, 7M, MFY, or was it all three of them?

19     A.    An invoice could be from any of the three.

20     Q.    How did you know what to put on the

21   invoice?

22     A.    He would tell me.

23     Q.    So he would say, for example, "Make out an

24   invoice to Mr. Lovell.  Here's the number of head.

25   Here's the price."

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 28 of 206

MEAGAN GOAD

28

1          Any other information on there?

2     A.   The weight.

3     Q.   The weight?

4     A.   (Nods head affirmatively.)

5     Q.   Okay.  And would he have you then send that

6     invoice to, say, Mr. Lovell?

7     A.   Yes, sir.

8     Q.   Okay.  And then what would happen?

9     Mr. Lovell presumably would send money to the

10     company?

11     A.   Yes.

12     Q.   All right.  And the purpose -- what was the

13     purpose of that transaction as you understand it?

14     A.   I don't know.

15     Q.   This is -- that's a check for you.

16          (Reference to Exhibit Number 35.)

17     BY MR. MICHAEL JOHNSON:

18     Q.   This is an exhibit book.  Will you turn to

19     Exhibit 35?

20          Have you -- I'll let Charity look at it

21     real quick.

22          Have you -- do you recognize either this

23     document or the form of this document?

24     A.   The form of it, yes.

25     Q.   Okay.  And is that your signature at the

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 29 of 206
MEAGAN GOAD

29

1    bottom?

2        A.    Yes.

3        Q.    So what is this page 1, Cattle Feeding

4    Agreement?

5        A.    I can just -- it's a cattle feeding

6    agreement.  I was never informed on what -- I just

7    plug numbers in and would print it off and send it.

8        Q.    So are you -- are you the person that would

9    typically prepare and sign these agreements for the

10   company?

11       A.    Yes.

12       Q.    Is it your testimony that your dad would

13   tell you who the other party was to it, make out a

14   cattle feeding agreement, for example, MAP

15   Enterprise, right?

16       A.    Yes.

17       Q.    All right.  And the information -- well,

18   it's dated March 31, '23.  And then the information

19   down at the bottom, it says, (As read) "This

20   agreement is for 434 head of heifers, total weight

21   of 258664 pounds at a price of 1.9296 per pound.

22   Total cost for this group of cattle is $499,118.05,

23   which MAP Enterprises paid to McClain Feedyard.

24   Sales contract at 18 -- 1.8640 @ 775."

25            So your testimony is your dad would provide

30

1    all that information that I just read to you?

2        A.   That information would come from this

3    projected closeout.

4        Q.   So that's page 3 of the exhibit, I believe.

5        A.   Yes.

6        Q.   Just for the record, we're looking at --

7    these ones are Bates labeled.  So it's Whitlock

8    1242 through 1263.

9             Well, let's just -- so page 2, Meagan, is

10   an invoice.  Is that the type of -- is that like

11   the invoice you testified you would prepare?  It's

12   similar to that?

13       A.   Yes.

14       Q.   Okay.  And so you would have prepared this

15   document?

16       A.   Yes.

17       Q.   And then it says if there's a question,

18   contact you at Meagan Goad at phone number and your

19   email address, correct?

20       A.   That's my father's email address.

21       Q.   Okay.  And then page 3 is the projected

22   closeout.  Did you prepare the projected closeout?

23       A.   Yes, with the numbers he would give me.

24       Q.   So he would tell you the information that

25   is set forth in the projected closeout, and you

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 31 of 206
MEAGAN GOAD

31

1    would create the document?

2        A.    Yes.

3        Q.    Okay.  And would you send -- what would you

4    send in this case to MAP?  Would you send the

5    cattle feeding agreement, the invoice, and the

6    projected closeout to MAP?

7        A.    Yes.

8        Q.    And then would you follow up with MAP in

9    this instance to make sure payment had been

10   received, or had they already paid?

11       A.    My sister would go meet with Whitlock, and

12   they would exchange checks.

13       Q.    Kelsey?

14       A.    Kinsey, yes.

15       Q.    Or Kinsey.  Okay.

16             So Kinsey would go -- Would that happen

17   before or after, or did it depend?

18       A.    They would have -- it wasn't really a

19   before or after.  It was within the same day.  They

20   would go -- she would go and take the invoices to

21   them and then get a check for the invoice, and she

22   would give the check for the closeout that she

23   provided.

24       Q.    And under these cattle feeding

25   agreements -- and MAP is just one of the

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 32 of 206

MEAGAN GOAD

32

1    counter-parties to this.

2         The counter-parties to these cattle feeding

3    agreements, they weren't actually providing cattle

4    to McClain, right?

5      A.   No.

6      Q.   McClain was getting cattle from a third

7    party, and they were funding that purchase, right?

8      A.   Yes.

9      Q.   All right.  So it's fair to say, right,

10   that the counter-parties to the cattle feeding

11   agreement were not sellers of cattle; they were

12   investors into cattle?

13        MR. LEBAS:  Object to form.

14        MR. MASSOUH:  Object as well.

15        MS. BIRD:  You can answer anyway.

16     A.   I don't really know how to answer it.

17     Q.   Do you want me to --

18        MR. MICHAEL JOHNSON:  Will you read the

19   question back?

20        THE REPORTER:  Sure.

21        (The requested material was read back by

22   the reporter.)

23        MR. LEBAS:  And the objection -- I'm not

24   sure if we're under federal rules, but if we are,

25   the objection is based on the overbroad nature of

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 33 of 206
MEAGAN GOAD

33

1   the question; that is, it refers to investors in

2   general, not the particular subject of the

3   deposition exhibit under review.

4          MR. MICHAEL JOHNSON:  This is --

5          MR. MASSOUH:  I join in Mr. LeBas'

6   objection, and also object to the extent it calls

7   for the witness to provide a legal conclusion.

8   BY MR. MICHAEL JOHNSON:

9      Q.   Do you feel able to answer the question?

10     A.   I don't know.

11         MS. BIRD:  If you don't know, then you

12  don't know.

13  BY MR. MICHAEL JOHNSON:

14     Q.   Well, let's talk about this specific

15  example.  So MAP Enterprises on March 31, 2023,

16  apparently sent the company $499,118.05 related to

17  434 head of heifers, correct?

18     A.   Yes.

19     Q.   Would those heifers have been acquired from

20  MAP Enterprises, or would they have been acquired

21  from somebody else?

22     A.   Someone else.

23     Q.   And was that typical of how these cattle

24  feeding agreements worked, that someone was funding

25  McClain, and then McClain was taking that money and

34

1    going to yet another party to acquire cattle?

2           MR. LEBAS:  I'm going to restate the

3    previous objection I made a few minutes ago.

4           MR. MASSOUH:  Same objection.

5           MS. BIRD:  You can answer if you know.

6       A.   Yes.

7    BY MR. MICHAEL JOHNSON:

8       Q.   Were you the only one to sign cattle

9    feeding agreements, or did your dad and/or Kinsey

10   sign them as well?

11      A.   I'm sure they signed at some point.

12      Q.   Who kept track of how much money was coming

13   in from these cattle feeding agreements and how

14   much money was going out on these cattle feeding

15   agreements?

16      A.   Brian.

17      Q.   Only Brian?

18      A.   Yes.

19      Q.   Do you know if he had -- did he have a

20   Quickbooks accounting program or anything like that

21   to help him track all the money coming in and going

22   out?

23      A.   We used Quickbooks, but it was for payroll

24   and just check-writing purposes.  I didn't do

25   anything else with that, and I don't believe he

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 35 of 206
MEAGAN GOAD

35

1    did.

2        Q.    So do you know how he kept track --

3        A.    I don't.

4        Q.    -- of that?

5              Was it in his head?

6        A.    I don't know.

7        Q.    On the Quickbooks, to the extent there is

8    information in there, would you have been the

9    person to put that in, or would that have been

10   Brian?

11             MS. BIRD:   Objection.   Information is

12   vague.   She testified that the payroll and

13   something else was only put into Quickbooks.

14   BY MR. MICHAEL JOHNSON:

15       Q.    On payroll, are you the person to put the

16   payroll information into Quickbooks?

17       A.    I wrote payroll checks, yes.

18       Q.    And you also said that -- what else was it

19   used for, Quickbooks?

20       A.    Writing checks.

21       Q.    Okay.   Was there a general ledger part that

22   was maintained as part of the Quickbooks?

23       A.    As like a check register?

24       Q.    Yeah.

25       A.    There was a check register, yes.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 36 of 206

MEAGAN GOAD

36

1      Q.    The counter-party to this cattle feeding

2    agreement, Exhibit Number 35, is McClain Feedyard.

3          Was McClain Feedyard always the

4    counter-party to the cattle feeding agreement, or

5    were the other entities sometimes counter-parties

6    to them?

7      A.    I think McClain Feedyard was mostly, but

8    7M, I believe, was some as well.

9      Q.    You're not --

10     A.    I'm not sure on McClain Farms.

11     Q.    Who was the person who decided whether it

12   would be McClain Feedyard or 7M or McClain Farms?

13     A.    Brian.

14     Q.    So he would tell -- he would tell you all

15   of that information?

16     A.    Yes.

17     Q.    Make out a cattle feeding agreement.  It's

18   going to be between this McClain entity and this

19   third party, right?

20     A.    (Nods head affirmatively.)

21     Q.    Here's how much money it's for.  Here's the

22   head.  Here's the weight.  Here's the closeout

23   information.  He provided all that information to

24   you?

25     A.    Yes.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 37 of 206

MEAGAN GOAD

37

1      Q.   Is it true that when investors in these --

2   or these counter-parties to the cattle feeding

3   agreements, when they were paid, is it true that

4   they were typically paid back out of McClain Farms?

5      A.   Yes.

6      Q.   Do you know why -- And I'm curious because

7   most of the cattle feeding agreements that I've

8   seen, not all of them, show McClain Feedyards.  I

9   note that McClain Farms is the one paying these

10   folks back.

11        Do you know why that was structured that

12   way?

13      A.   No, sir.

14      Q.   That's a Brian decision too?

15      A.   Yes.

16      Q.   It's my understanding that a number of

17   investors or third parties and/or their banks may

18   have been in possession of signed but otherwise

19   blank checks drawn on the McClain accounts.  Is

20   that true?

21      A.   Yes.

22      Q.   What was the purpose -- Well, first of all,

23   let me ask you this.

24        Who, sitting here today, do you remember

25   being in possession of signed but otherwise blank

38

1    McClain entity checks?

2        A.    Can you rephrase the question?

3        Q.    Sitting here today, from memory, who do you

4    remember as being in possession of signed but

5    otherwise blank McClain entity checks?

6        A.    I would send to 2B Farms' bank.  I don't --

7    I can't remember the name of his bank.  Charles

8    Lockwood, all of the Leshes.

9        Q.    And is that it as far as you remember?

10       A.    Yes, as far as I can remember, yes.

11       Q.    Do you know what the -- Why were they in

12   possession of signed but blank McClain checks?

13       A.    I have no idea.

14       Q.    That was a Brian decision as well?

15       A.    Yes, sir.

16       Q.    So would he tell you, "Hey, Meagan, send Bo

17   Robinson ten signed checks"?

18       A.    Absolutely.

19       Q.    And you would do that?

20       A.    Yep.

21       Q.    Were the McClain entities in possession of

22   signed but otherwise blank checks of third parties?

23       A.    Can you rephrase that?  Sorry, I didn't

24   hear the beginning of it.

25       Q.    Just like Bo Robinson, for example, was

39

1   holding signed but otherwise blank McClain checks.

2        Was McClain, Brian, McClain entities, were

3   they in possession of checks that were signed drawn

4   on the accounts of third parties?  Like, for

5   example, did you have any signed but otherwise

6   blank Bo Robinson checks?

7     A.   Not Bo Robinson, but the Lesh people we

8   did.

9     Q.   Tell me about the Leshes.  And the reason I

10  ask that is I'm aware that there's lots of

11  transactions between the McClain entities and the

12  Leshes.

13       Were they doing these cattle feeding-type

14  agreements with the company, or what were they

15  doing with the company?

16    A.   I don't remember.  I think that some of

17  their invoices would have cattle feeding agreements

18  but not all of them.  They would just get an

19  invoice and a projected closeout.

20    Q.   Okay.  But your understanding is they were

21  doing the same type of arrangements where they were

22  funding cattle purchases and then getting paid back

23  after the cattle were grown?

24    A.   I don't know what their deal was with

25  Brian, but I would get -- make them invoices, and

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 40 of 206

MEAGAN GOAD

40

1    they would get checks.

2         Q.   Okay.  And when -- when checks were sent,

3    it's true, isn't it, that you typically were the

4    one who signed the checks?

5         A.   There was a stamp with my signature in our

6    office.  So if Brian wrote a check, I wrote a

7    check, Kinsey wrote a check, my signature was the

8    one that was stamped on those checks.

9         Q.   Was Brian -- was he a signer on the

10   checking -- on the accounts?

11        A.   I don't see why he wouldn't be.

12        Q.   Nor do I.

13        A.   Yeah, that wouldn't make any sense, so I

14   would assume he was.

15        Q.   And you obviously were.  Anybody else that

16   you're aware of?

17        A.   Kinsey.

18        Q.   So she could sign too?

19        A.   Uh-huh (affirmative).  Yes.

20        Q.   And when checks were cut, was that also

21   just Brian telling you, "Meagan, make out a check

22   to Bo Robinson for this amount of money"?

23        A.   Yeah.

24        Q.   And would you do that?

25        A.   Yes.

41

1      Q.    And would he tell you anything else, like,

2    This is for lot whatever or this cattle feeding

3    agreement?

4      A.    No, he did not give any extra information.

5      Q.    Just tell you who to make it to and the

6    amount?

7      A.    Yes.

8      Q.    And you were the one who would do that.

9    And then would you send the checks out?

10     A.    I would more than likely put them in an

11   envelope, and then Kinsey would take them when

12   she'd go to town to send off the mail.

13     Q.    When investors needed checks, would they

14   contact you?

15     A.    No.

16     Q.    They would just contact your dad?

17     A.    Yes.

18     Q.    Did you ever talk to your dad about why he

19   was letting third parties hold signed but blank

20   checks?

21     A.    If I asked him any questions, he would say

22   let him handle it or let him deal with it.

23     Q.    You said that Bo and Bo's bank were two of

24   the parties who had signed blank checks.  How about

25   MAP Enterprises?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 42 of 206

MEAGAN GOAD

42

1        A.    No.

2        Q.    How about Wild Forest Cattle?

3        A.    No.

4        Q.    Did you ever talk to -- were you ever part

5    of the negotiations leading up to the execution of

6    these cattle feeding agreements?

7        A.    No.

8        Q.    That was strictly your dad?

9        A.    Yes.

10       Q.    Anybody else?

11       A.    No.

12       Q.    Did you prepare closeout records when --

13   Let me ask you this.

14            So I think you testified that usually, not

15   always, we would send a cattle feeding agreement,

16   an invoice, and a projected closeout --

17       A.    Yes.

18       Q.    -- correct?

19            And then at some point, you'd send a check

20   to the counter-party of the cattle feeding

21   agreement, right?

22       A.    The check would not be off of any of those

23   three documents.  The check would be off of the

24   closeout that they receive.

25       Q.    Okay.  And on closeouts -- so you're --

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 43 of 206

MEAGAN GOAD

43

1          Are you the person who prepared the

2    closeouts?

3      A.    Yes, off the information Brian would give

4    me.

5      Q.    So you didn't have any independent -- were

6    there any independent, like, records showing, hey,

7    we sold 434 head at Bluegrass Auction, and here's

8    the amount we got for them?

9      A.    No.

10     Q.    It would all be from Brian just telling

11   you, Here's the info to put in the closeout and

12   send that and the check to whoever gets the check?

13     A.    Yes.

14     Q.    I may have asked you this, and if I did, I

15   apologize.  You said that there were some

16   third-party cattle being fed.  Was that in Texas

17   and Kentucky or just in Texas?

18     A.    Mostly just Texas.  There was a handful in

19   Kentucky.

20     Q.    Are you aware of any records that are not

21   already in the possession of the trustee that would

22   relate to or belong to the McClain entities?

23     A.    No.

24     Q.    If I wanted to know how many cattle the

25   McClain entities owned at any one time, how would I

44

1    find that information out?

2        A.    I don't know.

3        Q.    I could obviously ask Brian, right?

4        A.    Yeah.

5        Q.    Are you aware that borrowing base reports

6    were submitted to Rabo?

7        A.    Yes.

8        Q.    Did you assist in the preparation of the

9    borrowing base reports?

10       A.    I put the information into the spreadsheet.

11   I got the information from Brian to put on the

12   spreadsheet.

13       Q.    So all of the information that was on

14   Rabo's borrowing base reports was relayed to you

15   from Brian?

16       A.    Yes.

17       Q.    You weren't looking at any independent

18   or -- any records, computer records, or hard copy

19   records?  It was just -- he would tell you what to

20   put on there, and you would put it on there?

21       A.    That's correct.

22       Q.    Do you know whether they were accurate or

23   inaccurate?

24       A.    I don't know.

25       Q.    Do you know where the business records of

45

1    the entities were kept prior to Brian's death?

2        A.    What business records?

3        Q.    Like all the cattle feeding agreements, all

4    the closeouts, all the projected closeout records,

5    bank statements, check registers, trucking records.

6        A.    They would all be kept in filing cabinets.

7        Q.    Where?

8        A.    In his office.

9        Q.    And you said it was -- Was it originally

10   called the barn?  Is that where --

11       A.    Yes.

12       Q.    And was the barn on his property?

13       A.    It was his grandmother's property.

14       Q.    And how close was that to his house?

15       A.    Way a crow flies, about a mile and a half.

16       Q.    And you said when he got hurt, all those

17   records were moved, or did they stay there?

18       A.    Half and half.

19       Q.    Okay.

20       A.    He would take some, and we would have to

21   take some to him, then bring some back.  It'd be a

22   back-and-forth.

23       Q.    And was your office at the barn?

24       A.    Yes.

25       Q.    That's where you worked, and that's where

46

1   Kinsey worked?

2       A.   Yes.

3       Q.   Is that also where the --

4            Did you have a feedyard there in Kentucky,

5   or was that only in Texas?

6       A.   It was there as well.

7       Q.   And it was right by the barn?

8       A.   Yes.

9       Q.   We've received a download from Brian's cell

10  phone.

11      A.   Uh-huh.

12      Q.   But there are text messages missing from

13  around March of 2021 through December of 2022.

14  Were you aware of that?

15      A.   No, sir.

16      Q.   Do you know if something happened to his

17  phone?  Did he break a phone?  Did he lose a phone?

18      A.   He did that quite often.

19      Q.   Do you know whether he had a separate

20  phone?

21      A.   I don't.  I'm assuming he just had one.

22      Q.   When you contacted him, did you always use

23  the same cell phone number?

24      A.   Yes.

25      Q.   How did he typically conduct business?  Do

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 47 of 206

MEAGAN GOAD

47

1    you know?

2       A.   On the phone.

3       Q.   So texting and talking on the phone?

4       A.   Yes.

5       Q.   Was he an emailer?

6       A.   Some.

7       Q.   What was his email address?

8       A.   Mcclainfarms@gmail.com.

9       Q.   Okay.  And was that an email address that

10   you and Kinsey sometimes used?

11      A.   It would have been used some to send to --

12   send invoices to customers.

13           (Reference to Exhibit Number 4.)

14   BY MR. MICHAEL JOHNSON:

15      Q.   Turn, if you would, to Exhibit 4.  Do you

16   need a break?

17      A.   No.  I was just washing off my glasses.

18      Q.   Let me know whenever you want a break.

19           If you'll turn to Exhibit 4.  It's a letter

20   from Greg McNutt?

21           MS. BIRD:  Did you say 4?

22           MR. MICHAEL JOHNSON:  Four, yes.

23           MS. BIRD:  Oh, yeah.

24   BY MR. MICHAEL JOHNSON:

25      Q.   Do you know Mr. McNutt?

MEAGAN GOAD

48

1      A.    Yes.

2      Q.    He's the life -- the insurance agent for

3   your dad, right?

4      A.    Yes, sir.

5      Q.    And I know that you've settled with -- you

6   and Kinsey have settled with the trustee on the

7   life insurance payments you received, right?

8      A.    Yes.

9      Q.    So was the total -- was the total you and

10  Kinsey each received, was it 3.3 million,

11  3.2 million?

12     A.    3.1, I believe.

13         MS. BIRD:    We provided all of that to the

14  trustee.    To the extent you haven't received it, we

15  can certainly send it.

16  BY MR. MICHAEL JOHNSON:

17     Q.    It was over 3, right?

18     A.    Yes.

19     Q.    And then I think you and Kinsey each paid a

20  million and a half.    Is that true?

21     A.    Yes.

22     Q.    Okay.    And Piper and Kristin received life

23  insurance payments, too, correct?

24     A.    Yes.

25     Q.    Did they receive the same amount as you and

49

1    Kinsey?

2        A.    I believe so.

3        Q.    Do you know how much Chelsea received in

4    life insurance?

5        A.    Not exactly, no.

6        Q.    Do you know generally?

7        A.    I think it was less than a million.

8        Q.    Do you know who paid the premiums on the

9    life insurance policies?

10       A.    McClain Farms.

11             (Reference to Exhibit Number 2.)

12   BY MR. MICHAEL JOHNSON:

13       Q.    If you'll turn back to Exhibit 2.  These

14   are checks to Crystal.  Crystal is your stepmom,

15   right?

16       A.    Yes.

17       Q.    The first three checks appear to have been

18   drawn on McClain Farms account at CFSB, correct?

19       A.    Yes.

20       Q.    And they were signed by Brian?  Is that

21   your dad's signature?

22       A.    Yes.

23       Q.    All right.  And then the -- the other

24   checks were drawn on the McClain Farms account at

25   Mechanics Bank, right?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 50 of 206

MEAGAN GOAD

50

1        A.    Yes.

2        Q.    And they were signed by you, correct?

3        A.    Yes.

4        Q.    Did McClain Farms move its bank account

5    from CFSB to Mechanics Bank?

6        A.    Yes.

7        Q.    Do you know when that happened?

8        A.    Not exactly, no.

9        Q.    Do you know why it happened?

10        A.    I wasn't involved in any of it, so, no, I

11    don't know why.

12        Q.    So your dad just said one day, "We're

13    moving to Mech Bank, and so now we're going to

14    start drawing checks on McClain Farms through

15    Mechanics Bank"?

16        A.    Yes.

17        Q.    And, I mean, I believe these are payments

18    that were made to Crystal to buy out her interest

19    in the company.  Is that your understanding, or do

20    you know?

21        A.    I don't know.  No, I don't know.

22        Q.    And would your -- on the checks that you

23    signed, would that have been your dad just

24    directing you to, for example, make out a check to

25    Crystal for $50,000 and send it to her?

51

```
 1        A.   Yes.

 2             (Reference to Exhibit Number 17.)

 3   BY MR. MICHAEL JOHNSON:

 4        Q.   Turn to Exhibit 17, if you would.  This is

 5     the private suicide note that your dad left for

 6     Chelsea.  Did your dad leave suicide notes for you?

 7        A.   Yes.

 8        Q.   And Kinsey?

 9        A.   Yes.

10        Q.   Do we have those?

11        A.   You have mine.

12             MR. MICHAEL JOHNSON:  Do we have copies of

13     those?

14             THE WITNESS:  The trustee does, right?

15             MS. BIRD:  Yeah.  We turned over Meagan's.

16     Kinsey's was not turned over because it was not

17     responsive to the request.

18   BY MR. MICHAEL JOHNSON:

19        Q.   What did your dad tell you in the suicide

20     note he left you?

21        A.   He was sorry.  There's two sides of him.  I

22     didn't know the second side.

23        Q.   Similar to -- have you seen this one to

24     Chelsea before?

25        A.   No.
```

52

1       Q.   He makes similar statements here that

2   there's two sides.  That one was, you know, your

3   husband, and one was the person who was stealing.

4           Did he tell you that -- in the note he left

5   you that he was stealing money?

6       A.   No.

7       Q.   Did he explain what he meant by "separate

8   sides"?

9       A.   No.

10          MS. BIRD:  Can we take a break?

11          MR. MICHAEL JOHNSON:  Yes, yes.

12          (A brief recess was taken.)

13  BY MR. MICHAEL JOHNSON:

14      Q.   Before we talk about the note, let me go

15  back and ask a few follow-up questions.

16          Was there an outside bookkeeper for the

17  McClain entities?

18      A.   Yes.

19      Q.   Who was that?

20      A.   Angela Powell.

21      Q.   And where is she located at?

22      A.   Benton.

23      Q.   Does she have a company?

24      A.   She worked for H&R Block.

25      Q.   H&R Block.  Is she the same person who did

53

1    bookkeeping for, like, MAP --

2       A.   No.

3       Q.   -- or a different person?

4       A.   Different.

5       Q.   What services did she provide?  Was she

6    doing the books?

7       A.   She reconciled bank statements and things

8    of that nature, prepared -- she started to prepare

9    taxes.  She quit doing those.  But she would input

10   anything in Quickbooks that was not in there,

11   deposits, things like that, but mainly just

12   reconciling, and she would do the quarterly taxes.

13      Q.   And would she -- if you needed, for

14   example, a balance sheet or an income statement,

15   would she be the person you would talk to?

16      A.   I never asked for those, so I'm not sure.

17      Q.   Okay.  And you said she did taxes as well?

18      A.   Yes, sir.

19      Q.   And then was there an accounting firm that

20   also prepared -- either compiled or -- some sort of

21   financial statements?

22      A.   Carr, Riggs & Ingram.

23      Q.   I think they're out of New Mexico.  Is that

24   right?

25      A.   I'm not sure.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 54 of 206

MEAGAN GOAD

54

1      Q.    Did you work with the Carr Riggs folks?

2      A.    No, sir.

3      Q.    So they were strictly dealing with your

4  dad?

5      A.    My dad and Angela, I believe.

6      Q.    Other than Florida -- you said a lot of the

7  young calves were purchased out of Florida.  Do you

8  have a recollection where -- what other states

9  young calves would have been purchased out of?

10     A.    Kentucky, Tennessee, Oklahoma, Alabama,

11  Texas.

12     Q.    So all over?

13     A.    Yes, sir.

14     Q.    Do you know what weight the young calves

15  would typically be purchased at?

16     A.    They could be anywhere from 300 to

17  600 pounds.

18     Q.    And you mentioned the -- the demeanor of

19  the calves is the terminating fact- -- the

20  determinating factor on whether they would come to

21  Kentucky or go to Texas, right?

22     A.    It was one of them, yes.

23     Q.    Who made that decision?  Was it --

24     A.    Brian.

25     Q.    -- Brian?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 55 of 206

MEAGAN GOAD

55

1         So would he go and look at the calves

2    before they were shipped out?

3         A.    He would go down there in the spring and go

4    meet with the different farmers down there and look

5    at cattle.  He wouldn't go down there directly

6    before they were shipped, no, but he would go down

7    there in the spring.

8         Q.    And then so -- and then he was the one who

9    made the decision to either send them to Benton or

10    send them to Texas?

11         A.    Yes, sir.

12         Q.    Okay.  What was your dad's level of

13    computer skills?  Would you say he was, for a

14    50-year-old man, pretty competent or --

15         A.    No.

16         Q.    -- like most 50-year-old men, pretty

17    incompetent?

18         A.    Pretty incompetent.

19         Q.    Was he capable of building, like, an Excel

20    spreadsheet?

21         A.    Yes.

22         Q.    For the information that was provided to

23    Angela, did he input that data into the computer,

24    or would that be you?

25         A.    What information?

56

1      Q.   Like check information, whatever

2  information Angela was using to, like, reconcile,

3  things like that.

4      A.   She would use the check register from

5  Quickbooks, and she would use the bank statements.

6      Q.   Did your dad keep handwritten records?

7      A.   Yes.

8      Q.   What type of handwritten records would he

9  keep?

10     A.   Can you elaborate?

11     Q.   Yeah.  Like, was it, like, cattle inventory

12 records, sale records?

13     A.   I never went through any of his stuff, so I

14 don't know.

15     Q.   How did -- did he have like a notebook, or

16 did he have like a journal?  How did he keep his

17 handwritten records?

18     A.   Yellow legal pads.

19     Q.   Okay.  How many checks would you typically

20 make out each day for the companies?

21     A.   It could range from 2 to 20.

22     Q.   Was there a broker in Oklahoma that

23 assisted your dad in acquiring cattle?

24     A.   Yes.

25     Q.   What was that broker's name?

57

1      A.    Sonny Barthold.

2      Q.    Sonny Barthold?

3      A.    Yes.

4            MR. LOVELL:  Could you spell that last

5   name?

6            THE WITNESS:  B-A-R-T-H-O-L-D.

7            MR. LEBAS:  Do you know the town in

8   Oklahoma?  Do you recall?

9            THE WITNESS:  He purchased at Oklahoma City

10   Stockyards, but that's all I know.

11  BY MR. MICHAEL JOHNSON:

12      Q.    And then I know the company had some

13   relationship with Riley Cattle?

14      A.    Yes.

15      Q.    And what was that relationship?

16      A.    Basically, all of our cattle sold that went

17   to Friona Industries went through Riley's, and they

18   owned three of the sale barns that cattle were

19   purchased for, and they would purchase cattle to

20   come to us.

21      Q.    So they were acting like a broker?

22      A.    Yes, sir.

23      Q.    Do you know what their functional

24   arrangement was between Riley and McClain?

25      A.    No.

58

1      Q.   When you were working for the company, did

2   you have a -- like a PC, or did you have more like

3   a laptop?

4      A.   A PC.

5      Q.   And do you know what happened to that PC?

6   Does the trustee have that?

7      A.   I'm not sure who has it.

8      Q.   You don't have it?

9      A.   No.

10      Q.   How about Kinsey?  Did she have a separate

11   computer.

12      A.   No.  She had a laptop, but it was not

13   relevant to anything.

14      Q.   Let's turn back to the suicide note.  And I

15   understand this wasn't written to you, but -- but

16   about just more than halfway down the first page,

17   your dad tells Chelsea --

18         Well, first of all, do you recognize this

19   as your dad's handwriting?

20      A.   Yes.

21      Q.   All right.  Your dad tells Chelsea, "Cory

22   Robbie Russell and Eddie Stewart have life

23   insurance on me don't give them anything."

24         Do you see that?

25      A.   Yes.

59

1      Q.   Who are Cory, Robbie -- and I don't know if

2   it's Robbie Russell or if it's two different

3   people.  But do you know who Cory, Robbie Russell,

4   and Eddie Stewart are?

5      A.   Yes.

6      Q.   Who are they?

7      A.   Investors.

8      Q.   Investors.  What's Cory's last -- is that

9   Cory Priest?

10      A.   Yes, sir.

11      Q.   And is it Robbie Russell, or are Robbie and

12   Russell two different people?

13      A.   It's Robbie Russell.

14      Q.   Okay.  So it's Cory Priest, Robbie Russell,

15   and Eddie Stewart?

16      A.   Yes.

17      Q.   And are those Kentucky folks or Texans?

18      A.   Robbie and Eddie are from Tennessee, and

19   Cory is from Texas.

20      Q.   Were you aware that they had life insurance

21   on your dad?

22      A.   No.

23      Q.   Do you know why they would have life

24   insurance on your dad?

25      A.   I do not.

60

1      Q.   If you look at the bottom, do you see -- he

2   says, "There are two sides of me.  One you have" --

3   something or another, "the other that stole from

4   people."

5           Do you see that?

6      A.   Yes.

7      Q.   Were you aware that your dad was stealing

8   from people before he killed himself?

9      A.   No.

10     Q.   Do you have an understanding now that he

11  was doing that?

12     A.   I don't know what he was doing.  It wasn't

13  good whatever it was.

14     Q.   And you said your dad left you a suicide

15  note, and you've given a copy to the trustee?

16     A.   Yes.

17          MR. MICHAEL JOHNSON:  Do you have an

18  objection if the trustee shares a copy with us?

19          MS. BIRD:  No.

20          (Reference to Exhibit Number 20.)

21  BY MR. MICHAEL JOHNSON:

22     Q.   Let's turn to Exhibit 20.  These are

23  documents produced by Whitlock bearing

24  Whitlock00064 through 0000128.

25          Do you know who Julie Whitlock is?

61

1        A.    I know of her, yes.

2        Q.    Who do you understand her to be?

3        A.    She was who we met with to exchange checks

4   with for MAP Enterprises.

5        Q.    So she was an agent or accountant for MAP?

6        A.    Yes.

7        Q.    All right.  And this email is from Meagan,

8   maebrook627@gmail.com?

9        A.    Yes.

10       Q.    Is that you?

11       A.    Yes.

12       Q.    So is that your gmail account?

13       A.    Yes.

14       Q.    And did you often do business using your

15   personal gmail account for the company?

16       A.    I would send some invoices and cattle

17   feeding agreements and things through my email,

18   yes.

19       Q.    And did Kinsey ever send out documents like

20   you did?

21       A.    She would send them through my email.

22       Q.    Okay.  So if she sent them, it would be

23   through the same maebrook627 email?

24       A.    Yes, sir.

25       Q.    Who's Danni Ward?

62

1      A.    She worked at Whitlock.

2      Q.    Oh, so she worked for Whitlock.  Okay.

3            So if you turn to the next page --

4            MR. LEBAS:  What's the exhibit number?

5            MR. MICHAEL JOHNSON:  This is Exhibit 20.

6            MR. LEBAS:  Thank you.

7  BY MR. MICHAEL JOHNSON:

8      Q.    Well, thumb through this and tell me what

9   these records appear to be.

10     A.    I'd be the invoices, closeouts, projected

11  closeouts, and cattle feeding agreements to MAP.

12     Q.    So they're a whole host of cattle feeding

13  agreements and related documents related to

14  transactions between the McClain Feedyards and

15  MAP Enterprises, right?

16     A.    Yes.

17     Q.    Who did you understand the person -- if you

18  did understand, the person who was the owner or

19  operator in charge of MAP Enterprises?

20     A.    Mike Gourley.

21     Q.    And he's a -- he's a local Kentucky guy,

22  isn't he?

23     A.    Yes.

24     Q.    Is he in Paducah?

25     A.    No.  Mayfield.

63

1      Q.    Mayfield.   What does Mr. Gourley do for a

2   living?

3      A.    I don't know.

4      Q.    How about Wild Forest Cattle?  Do you

5   understand -- do you know who Wild Forest Cattle

6   is?

7      A.    Yes, sir.

8      Q.    That's a Kentucky entity, right?

9      A.    Yes, sir.

10      Q.    And Sam Brown was the person behind --

11      A.    Yes, sir.

12      Q.    And what did Sam -- do you know what Sam

13   Brown does for a living?

14      A.    He owns a pharmacy.

15      Q.    He's a pharmacist.   Okay.

16          Are you -- on this Exhibit 20, are you the

17   person who would have created and then sent all the

18   information to Danni?

19      A.    Yes.  After Brian would've given me the

20   information, I would have plugged them into the

21   spreadsheet.

22      Q.    So all of the information in here you have

23   created to send, but it would have been -- the

24   information would have been provided to you by

25   Brian?

64

1      A.   Yes.

2      Q.   Okay.  Do you have an understanding of how

3   these cattle feeding arrangements worked?

4      A.   I never paid them any attention.  I just

5   plugged in the numbers I was supposed to plug in

6   and...

7      Q.   Okay.  So if you'll turn, Meagan --

8   probably the easiest way is to look at the

9   bottom one, page 77.

10     A.   I don't know where the page numbers are.

11     Q.   Down here at the bottom.  I should have

12   told you.  I apologize.

13          So page 77 is an email that you sent to

14   Danni, right?

15     A.   Yes.

16     Q.   "Here's the information for today."

17          And then when you turn the page, there's

18   some closeout information, right?

19     A.   Yes.

20     Q.   So -- and these closeout sheets are the

21   sheets that -- what would have been sent along with

22   the checks for the same amount shown on -- where it

23   says "check for" and it shows the amount?

24     A.   Yes, sir.

25     Q.   So when an investor would be paid, they

65

1   would get a check, and they would get a closeout

2   sheet like this --

3       A.   (Nods head affirmatively.)

4       Q.   -- to support the information on the check?

5            MR. LEBAS:  Object to the form, to the use

6   of the term "investor" in an overly broad manner.

7       A.   Not all investors would get a closeout

8   form.

9            MR. LEBAS:  Object to the responsiveness of

10   the question -- of the answer to the overbroad

11   question.

12  BY MR. MICHAEL JOHNSON:

13      Q.   How was it decided whether an investor or

14   customer would get a closeout form?

15      A.   Brian would tell me who gets a closeout and

16   who doesn't.

17      Q.   Do you have an understanding about why some

18   people didn't get closeout forms?

19      A.   No.

20      Q.   Just whatever Brian told you?

21      A.   Yes.

22      Q.   So when a -- let's take the folks who did

23   get closeout forms, in this case MAP.

24           So you say, "Here's the information for

25   today."  And then we have one, two, three, four,

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 66 of 206

MEAGAN GOAD

66

1     five, six, seven -- we have seven different

2     closeout forms if I'm counting right.  Eight.

3     Sorry.  We have eight closeout forms.

4          And then would -- would there be a single

5     check cut totaling the eight closeout forms, or

6     would you cut a check to match the precise amount

7     on each closeout?

8     A.   It would be a check cut for each closeout.

9     Q.   So in this instance, in addition to sending

10    a closeout form, there would have been eight

11    separate checks that matched the amount of

12    closeout?

13    A.   Yes, sir.

14    Q.   And your testimony is that you didn't look

15    at any records to prepare these closeout forms.

16    You were just putting down what Brian told you to

17    do?

18    A.   Yes.

19    Q.   So would he come into the office and tell

20    you?  Would he call you?  How did that typically --

21    A.   He would call me.  He would -- sometimes he

22    would be there.  But after he got hurt, most of it

23    was done over the phone.

24    Q.   So he would just call you and tell you for

25    example, "Hey, Meagan, make out a closeout for MAP

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 67 of 206
MEAGAN GOAD

67

1    for 431 head.  Here's the cost.  Here's the bought

2    weight.  Here's the sold weight.  Here's the sale

3    weight.  Here's the cost of gain.  Here's the

4    profit.  Here's the check amount"?

5        A.   Yes.  And sometimes I would have that --

6    the invoice that corresponds to that closeout.

7        Q.   Okay.

8        A.   I would have that invoice, and I would

9    write the information down on that invoice so that

10   we would have that invoice that went with that

11   closeout, and then we would also have the

12   information written here if the closeout got

13   misplaced.

14       Q.   Okay.  And so when he called you or came in

15   the office, did you have notes that you would --

16   you know, where you would write this information

17   down before you would create it?

18       A.   Most of it would be on the invoice.  There

19   would be other times that there would be notes,

20   yes.

21       Q.   Okay.  But typically you would take the

22   invoice, which would already show you the amount

23   they forwarded, right?

24       A.   Yes.

25       Q.   And then you'd write on the cost of gain

68

1    and the sale price and then have your notes on

2    there to tie out to the check amount?

3        A.    Yes.

4        Q.    Okay.  And then if you'll turn to -- on the

5    bottom of 86 and 87, just so we understand your

6    testimony.  So 86 is an invoice, right?

7        A.    Yes.

8        Q.    And then 87 is a projected closeout?

9        A.    Yes.

10       Q.    So how it worked is typically, either when

11   money came in or right before or right after money

12   came in, you would send them an invoice and a

13   projected closeout?

14       A.    Yes.

15       Q.    The money would come in, and then once they

16   got paid back, you would send them a check and the

17   closeout information?

18       A.    If it was -- there was a select few that

19   Kinsey would go meet with.  And she would take the

20   invoices, the closeouts, all of the paperwork, and

21   the checks, and she would go meet that person, and

22   then she would get the checks from them and return.

23       Q.    And you said there were a select few.  Do

24   you remember which -- who the select few were?

25       A.    MAP, Wild Forest Cattle, John and Michael

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 69 of 206
MEAGAN GOAD

69

1    Tidwell.

2        Q.    Is Tidwell also a local person?

3        A.    Yes.  It would be just local people, like

4    the people in Mayfield, and there was a couple of

5    guys from Mortons Gap that she would meet.  But

6    everybody that she would meet would be local

7    people.

8        Q.    Okay.  And if you'll turn to 110, so this

9    is an email from you to Danni Moore, right?

10       A.    Yes.

11       Q.    And she worked for Julie Whitlock and MAP?

12       A.    I know that she worked at Whitlock.  I

13   don't know who it was, but I --

14       Q.    But this related to MAP, right?

15       A.    Yes.

16       Q.    And you're saying, "Here is Map info.  The

17   checks you are getting are $3,333,495.66."

18       A.    Yes.

19       Q.    And then there are closeouts.  And so

20   you're sending basically the closeouts, all of

21   which should total that number --

22       A.    Yes, sir.

23       Q.    -- correct?

24             And then would you -- you said on MAP, for

25   example, Kinsey would actually take them the check?

70

1        A.    Yes, sir.

2        Q.    Okay.  You're aware, right, that in early

3    April the Mechanics Bank accounts were frozen?

4        A.    Yes.

5        Q.    Okay.  Prior to that happening, did you

6    ever have a situation that you can recall where any

7    of these investors or customers, whatever we want

8    to call them, lost money on a sale?

9        A.    No.

10       Q.    They all made money every time?

11       A.    Yes.

12            (Reference to Exhibit Number 21.)

13   BY MR. MICHAEL JOHNSON:

14       Q.    All right.  I'm going to go -- if you'll

15   turn to the next exhibit.  And let me give you a

16   little context here.

17            This was an Excel spreadsheet that I

18   believe you produced to us as part of your

19   production.

20       A.    I don't --

21       Q.    Here's the issue --

22       A.    -- recognize this at all.

23            MS. BIRD:  She says she doesn't recognize

24   the document.

25   ///

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 71 of 206

MEAGAN GOAD

71

1  BY MR. MICHAEL JOHNSON:

2      Q.   I'll represent to you that it was in your

3  production list.  The reason I'm asking you about

4  this is --

5           MR. LEBAS:  What is the number?  I'm sorry.

6           MR. MICHAEL JOHNSON:  It's 21.

7           The reason I'm asking --

8           MR. FARMER:  I've never -- I don't think

9  I've ever seen that before.

10          MR. MICHAEL JOHNSON:  I thought you

11  produced it.

12          MS. BIRD:  I don't think we reproduced

13  this.

14          MR. FARMER:  I don't think we produced

15  that.

16  BY MR. MICHAEL JOHNSON:

17      Q.   Here's my question on this.  So there's a

18  dispute between Rabo and Kubota Credit and Komatsu

19  about whether certain equipment was owned by your

20  dad personally or by the companies.

21      A.   Okay.

22      Q.   This is some sort of a document which says,

23  for example, pay Kubota Credit out of the Farms

24  account, right?  And pay Komatsu out of the 7M

25  account, right?

MEAGAN GOAD

72

1        A.    Yes.

2        Q.    Did you have an understanding or do you

3    have an understanding of whether your dad

4    personally owned any Kubota or Komatsu Financial

5    equipment, or do you believe that it was owned by

6    the companies?

7        A.    I don't know.

8        Q.    One way or the other?

9        A.    No, I don't know one way or the other.

10            (Reference to Exhibit Number 22.)

11   BY MR. MICHAEL JOHNSON:

12        Q.    Okay.  Exhibit 22, please.  This is a

13   Domestic Wire Out Request that was submitted to

14   Mechanics Bank.  Is that your signature on the

15   bottom?

16        A.    Yes.

17        Q.    Okay.  And it appears that you are wiring

18   out 448,981.43 from the McClain Feedyard account to

19   your personal account --

20        A.    Yes.

21        Q.    -- correct?

22            And it says, "CATTLE PURCHASE"?

23        A.    Yes.

24        Q.    So tell me about your business dealings

25   with McClain unrelated to your working for them.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 73 of 206

MEAGAN GOAD

73

1      A.   I would do -- have groups of cattle.  They

2   would close out.  I never got any paperwork on

3   them.  Brian had all the paperwork.  He would tell

4   me, "Hey, you know, we need to close our cattle

5   out."

6           "Okay."  I would write him a check.  He

7   would wire me the money back .

8      Q.   So is it the same type of a deal that we

9   saw, for example, with MAP, that you were advancing

10   money, and he was then purportedly buying calves --

11      A.   Yes.

12      Q.   -- raising them, selling them, and then

13   paying you back and giving you some of the profit?

14      A.   Yes.

15           MR. LEBAS:  Object to the form.  We don't

16   believe that's what the document provides.

17   BY MR. MICHAEL JOHNSON:

18      Q.   So that's what this would be?

19      A.   Yes.

20      Q.   So you didn't actually sell and deliver

21   McClain cattle that was sitting on your property?

22      A.   No, sir.

23      Q.   Okay.  This was all an investment-type

24   relationship?

25      A.   Yes.

74

1      Q.    Are you the person who routinely was the

2    one who was signing wire requests for the company?

3      A.    Yes.

4      Q.    And did you independently fill these out,

5    or were they always done at the direction of Brian?

6      A.    Always done at the direction of Brian.

7      Q.    Did you have any -- do you have any -- and

8    I think your answer was no.  But do you have any

9    records that would support the cattle purchase

10   transaction referenced in this exhibit?

11     A.    No.

12           (Reference to Exhibit Number 24.)

13   BY MR. MICHAEL JOHNSON:

14     Q.    If you'll turn to Exhibit 24.  And I'll

15   represent to you that this is a document that was

16   created by Steve Dawson, who's an accountant that

17   we've engaged.

18           And at least according to Steve, there are

19   nonpayroll transactions between you and the

20   companies showing that the companies transferred to

21   you 3.905 million and some change, and that you

22   transferred to the companies 2.963 million and some

23   change.

24           Number one -- Well, let me ask you this.

25           Why do we have millions of dollars being

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 75 of 206

MEAGAN GOAD

75

1    exchanged between you and the McClain entities?

2            MR. FARMER:  Did you specify a time period

3    for these transfers?

4            MR. MICHAEL JOHNSON:  I did not specify a

5    time period.  I believe that this is based upon a

6    review of the relevant bank accounts we would have

7    had.

8            MR. FARMER:  Like, are we talking for --

9            MR. MICHAEL JOHNSON:  It'd be several

10   years.

11           MR. FARMER:  One year?  Three years?  Five

12   years?  Ten years?  I mean, what are we --

13           MR. MICHAEL JOHNSON:  Not ten.  Be like

14   probably three or four years.

15   BY MR. MICHAEL JOHNSON:

16       Q.   Let me ask it this way.  We just looked at

17   Exhibit 22, right?  And you said that that was a

18   wire transfer because you were doing an investment

19   in cattle like other folks.

20       A.   Yes.

21       Q.   Would that explain why we see other monies

22   being exchanged between you and the companies,

23   because these are investments?

24       A.   Yes.

25       Q.   So you received a paycheck, and you had

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 76 of 206

MEAGAN GOAD

76

1   these investment arrangements with your dad?

2       A.   Yes.

3           MS. BIRD:  Objection to the extent we don't

4   know what comprises this spreadsheet.

5           MR. MICHAEL JOHNSON:  Understood.

6   BY MR. MICHAEL JOHNSON:

7       Q.   But you believe that that's why you would

8   be receiving money, right?  Because of these

9   investment-type arrangements?

10      A.   Yes, but I can't guarantee that what's on

11  this spreadsheet is for investment purposes.  It

12  could be being reimbursed for funds from me having

13  to go to town and get things or buy parts or such

14  as that nature.

15          (Reference to Exhibit Number 25.)

16  BY MR. MICHAEL JOHNSON:

17      Q.   Okay.  Exhibit 25, these are more invoices

18  and checks, for example, but they're with Bo

19  Robinson, right?

20      A.   Yes.

21      Q.   And we're getting late in the game.  It's

22  dated -- the first one is dated April 4 of '23,

23  right?

24      A.   Yes.

25      Q.   Do you -- you know who Bo Robinson is,

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 77 of 206

MEAGAN GOAD

77

1    right?

2         A.    Yes.

3         Q.    Did you personally deal with Bo ever?

4         A.    I would send him his invoices and send him

5    his forms that he got for his closeouts, but

6    nothing more on a business level, no.

7         Q.    So if -- if he needed money -- if the

8    company needed money from Bo, you wouldn't be the

9    one to have that call; it would be your dad?

10        A.    Yes.

11        Q.    When did you find out that the companies'

12   accounts had been frozen?

13        A.    That morning.

14        Q.    And what do you recall your dad saying

15   about that?

16        A.    "What do you mean?  Let me make some

17   calls."

18        Q.    Did you make any calls?  Did you talk to

19   anybody at Mechanics Bank personally?

20        A.    I talked to -- I called customer service.

21   Because I didn't know that's -- I just know that I

22   couldn't get into the online banking, so I called

23   to ask.  You know, "Is my password messed up?  Do I

24   need to reset my token?"

25             And they said they would try to figure

78

1    something out and get back with me.  They didn't

2    tell me.

3        Q.    And then your dad -- you understand that

4    your dad had some conversations with them?

5        A.    Yes.

6        Q.    Did he tell you what they had relayed to

7    him?

8        A.    If he did, I don't -- I can't repeat it

9    verbatim.

10       Q.    Do you recall the general gist of what he

11   said?

12       A.    Accounts are frozen.

13       Q.    Between the time the accounts were frozen

14   and the time your dad passed away, which was -- was

15   it April 18th?

16       A.    Yes.

17       Q.    So about two weeks.  The accounts were

18   frozen that whole time, right?

19       A.    Yes.

20       Q.    Did you personally have any interactions

21   with investors/customers about, "Hey, where's my

22   check" or "Your check bounced" or anything like

23   that?

24       A.    If I had anyone text me, you know, "Hey, is

25   something going on," I would tell them, "Call

79

1    Brian."

2          And he told me -- he said, "If anybody

3    texts you or calls you, tell them to call me, and

4    I'll deal with it."

5      Q.   Okay.  So you didn't talk to them other

6    than, "Call my dad.  Here's his number"?

7      A.   Yeah.

8      Q.   Okay.  And you said your sister was the one

9    who would deal with MAP and Wild Forest?

10     A.   Yes, sir.

11     Q.   Not you?

12     A.   I mean, I would if she wasn't -- like, if

13   her kid was sick or something of that nature but --

14     Q.   And you were obviously communicating via

15   email with --

16     A.   Yes.

17     Q.   -- Julie Whitlock and her people?

18     A.   Yes.

19     Q.   Okay.  I believe you told me you understood

20   that the companies were paying all the life

21   insurance premiums, right?

22     A.   Yes, sir.

23     Q.   And I apologize if I asked this.  I forget.

24          But do you know why, generally, the

25   investors/customers were all being paid out of,

80

1    generally speaking, McClain Farms?

2        A.    I don't know.

3        Q.    Just was -- Brian just told you to do it

4    that way?

5        A.    Yep.

6            (Reference to Exhibit Number 29.)

7    BY MR. MICHAEL JOHNSON:

8        Q.    Turn, if you will, to Exhibit 29.  I'm not

9    going to ask you a whole bunch of questions about

10   this.  But it says, "Z Kinsey @ McClain Livestock."

11   Is that your sister?

12       A.    I can't tell you for sure.  I don't

13   recognize that name, so I would assume.

14       Q.    You don't know any other Kinseys who were

15   involved with McClain Livestock --

16       A.    No.

17       Q.    -- right?

18            And these do appear to be -- at least page

19   one appears to be invoices that are being sent to

20   MAP, which is consistent, I think, with your

21   testimony that she was the one that was dealing

22   with MAP primarily?

23       A.    Yes.

24       Q.    I'm sorry these aren't Bates labeled, but

25   if you can turn into where it says -- Monday,

81

1    November 7th, is the date.  It's probably -- I'm

2    sorry.

3         No, let's keep going.  I'm not going to ask

4    you about that one.  I'm going to keep going.

5    There's another one I was going to ask you about.

6         Oh, yeah, it's on Monday, November 14th.

7         MR. LEBAS:  There's a tiny Bates number in

8    the bottom.

9         MR. MICHAEL JOHNSON:  Oh, yes, there is.

10   It's Whitlock01293, if you can see it.

11        MR. LEBAS:  Does it have the

12   number 1,607,673.80, the middle of the page?

13        MR. MICHAEL JOHNSON:  Yes, that's it.

14        MR. LEBAS:  Thank you.  Got it.

15   BY MR. MICHAEL JOHNSON:

16       Q.   Do you see that?

17       A.   Yes.

18       Q.   Do you know what it means when someone told

19   your sister, "Hey, will you be around to swap

20   checks today?"

21       A.    It would be if she was coming to bring them

22   checks and they were giving her checks back for --

23       Q.   Was that common that you would have checks

24   being exchanged?  You know, "Here's a check for

25   you; here's my check back" on the same day?

82

1      A.   Yes.

2      Q.   Happened a lot?

3      A.   With the local investors, yes.

4           (Reference to Exhibit Number 31.)

5  BY MR. MICHAEL JOHNSON:

6      Q.   If you'll turn, Meagan, to Exhibit 31, I'll

7  just have you verify that this is a bank statement

8  for your --

9           William is your husband's legal name,

10 right?

11     A.   Yes.

12     Q.   Okay.  And so this is your and Jed's

13 account at FKB?

14     A.   Yes.

15     Q.   And I see at the bottom of page 1, there's

16 an incoming wire from McClain Feedyards for

17 448,981.43.  Do you see that?

18     A.   Yes.

19     Q.   So does JLE Trucking not have a separate

20 business account?

21     A.   Yes.

22     Q.   It does?

23     A.   Yes.

24     Q.   So do you know why monies would have been

25 coming -- would this have been a -- this -- so

83

1    would this not have been a bid for trucking?  It

2    would have been for the investment-type thing we

3    were talking about?

4        A.    That's correct.

5        Q.    Okay.  So if it was an investment deal, it

6    went to your personal account?

7        A.    Yes.

8        Q.    If it were trucking services, it went to

9    JLE?

10       A.    Yes.

11       Q.    And did JLE -- where did JLE -- where does

12   JLE bank?

13       A.    Tennessee at Macon Bank.

14       Q.    Macon Bank in Tennessee?

15       A.    (Nods head affirmatively.)

16            (Reference to Exhibit Number 32.)

17   BY MR. MICHAEL JOHNSON:

18       Q.    If you'll turn to Exhibit 32.  And I'll

19   tell you that this is just a -- a smorgasbord of

20   checks going back to 2018 to JLE Trucking.

21            That first page, it looks like Kinsey

22   signed the check?

23       A.    Yes.

24       Q.    So did she on occasion sign checks as well

25   for the company?

84

1      A.   Yes.

2      Q.   All right.  And then you'll notice as you

3  kind of skim through there, you know, the amounts

4  are fairly small -- 4,000, 5,000, 10,000, 8,000 --

5  until you get to, like, 2022.  Or -- yeah, 2022.

6  Like, for example, on October 31, '22, there's a

7  check for 41,284.25.

8      A.   What page is this?

9      Q.   These aren't Bates labeled.  3891 is the

10  check number.  They should be in date order, so

11  it's probably before that.  It's Check 3891.  There

12  you go.  Signed by you, right?

13      A.   Yes.

14      Q.   So what information would you have when you

15  cut a check, for example, to JLE, your husband's

16  company?  Did you have, like, a trucking record or

17  a shipping record or anything like that that you

18  used to fill out the number on the checks, or was

19  this just, Dad told me to send a check for that

20  amount to JLE?

21      A.   There were -- we had JLE Trucking invoices.

22      Q.   Okay.

23      A.   Jed would invoice.  I would have an

24  invoice.  I would have my calendar that I would use

25  for my schedule.  I would double-check my calendar

85

1    with his bill, and then the check would go out.

2        Q.    Okay.  So you would have some -- you would

3    make some attempt to verify, yeah, this appears to

4    square with my records, and so --

5        A.    Yes.

6        Q.    -- I'll write the check out.

7              On JLE payments, did you have to check with

8    your dad, or did he kind of put you in charge of

9    that?

10       A.    No, I would still have to check with him,

11   if it was okay to send it.

12       Q.    One thing I noticed, Meagan, in going

13   through the checks is, as I indicated, you know,

14   they start out fairly small -- 6,000, 8,000,

15   10,000 -- and then as we get later in time, they

16   jump up quite a bit --

17       A.    Uh-huh.

18       Q.    -- in amount.

19       A.    Yes.

20       Q.    What's the explanation for that?

21       A.    Beginning -- like 2018, we used multiple,

22   multiple different trucking companies.  And Dad

23   would be the one to call and be like, "Hey, I need

24   three trucks here tomorrow."  Or he would have to

25   call -- I mean, there was 10 or 12 different people

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 86 of 206

MEAGAN GOAD

86

1    he would call.  And then slowly he would call Jed

2    more.  He would call Jed more.  Jed was able to get

3    more trucks.  So finally it just got to where Jed

4    got all of the trucking.

5        Q.   Okay.  So that's why -- so it just

6    consolidated who the shipper was basically?

7        A.   Yes.

8             (Reference to Exhibit Number 33.)

9    BY MR. MICHAEL JOHNSON:

10       Q.   All right.  Exhibit 33 is a wire record.

11   Now, are you a signer on the JLE account?

12       A.   Yes.

13       Q.   So you have access to it.

14            If you'll turn to page 2.  And I'm just

15   curious.  I don't know which account this is

16   talking --

17            But do you see down there it says, "DDA

18   Account Number," gives the identifier, "JLE

19   Trucking, Inc."  And it says, "Closed due to fraud.

20   Instructed to deposit into" another account number,

21   "Wanda."

22            Do you see that?

23       A.   Yes.

24       Q.   Do you know what -- was there a JLE account

25   that was closed due to fraud, or is this talking

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 87 of 206

MEAGAN GOAD

87

1    about a McClain account?

2        A.    It was a JLE account.  Someone from a truck

3    washout stole one of his checks, created their own

4    checks with his checks, and was writing checks out

5    of that account.

6        Q.    All right.

7        A.    So it was a JLE account that was closed.

8        Q.    Okay.  So then the -- you had to establish

9    a new account for JLE?

10       A.    Yes.

11       Q.    Okay.

12            MR. MICHAEL JOHNSON:  You guys about ready

13   for lunch?  I'll ask about one more exhibit and

14   take a break for lunch.  Does that sound good?

15            THE WITNESS:  Sure.

16            (Reference to Exhibit Number 34.)

17   BY MR. MICHAEL JOHNSON:

18       Q.    Exhibit 34.  Again, I know you haven't seen

19   this.  This is a -- this is a listing of payments

20   according to our accountant, Steve Dawson, that

21   would have gone to either Jed or to JLE.  The total

22   is $8,685,147.90.  And if I understand your --

23   Well, let me ask you this this way.

24            If money was going to either Jed personally

25   or to JLE, what would be the reason for that?

88

1          MS. BIRD:  Objection to the extent you know

2     since you're neither Jed nor JLE.

3       A.   I'm not sure I understood your question to

4     begin with.

5       Q.   So we've got over $8 million in payments

6     going to Jed or JLE.  Let me ask it this way.

7          Other than providing trucking services,

8     would there be any other reason for money to go to

9     Jed or JLE other than this is for trucking

10    services?

11         MS. BIRD:  Same objection to the extent you

12    know since you're neither JLE or Jed Trucking -- or

13    Jed Goad.

14   BY MR. MICHAEL JOHNSON:

15      Q.   Are you able to answer the question?

16      A.   I'm unsure how to answer the question, so

17    no.

18      Q.   It looks like most of the payments are to

19    JLE Trucking, but I note that there are a few

20    payments shown on the spreadsheet to Jed

21    personally.

22         Do you know why Jed personally would

23    receive money since you were the person who was

24    signing the checks on behalf of the companies?

25      A.   On his invoices there was an amount, the

89

1    total amount.  There would be a discount on there,

2    which would be his broker fee.  His broker fee got

3    written to him personally.

4        Q.   So let's say you had a $100,000 invoice

5    from JLE.  So you're saying that that would be

6    broken down.  X dollars go to JLE, Y dollars go to

7    Jed personally?

8        A.   Each load that was not a JLE truck was

9    charged $50 for a broker fee.

10       Q.   Okay.

11       A.   So that's how that worked.

12       Q.   So if JLE hauled it, it's just a JLE

13   invoice.  If Joe's Trucking hauled it and Jed

14   brokered it, it's 50 bucks for this transaction

15   that this other trucker hauled?

16       A.   Yes.

17       Q.   For each load?

18       A.   Yes.

19       Q.   Okay.  Do you know how much typically JLE

20   was charging to haul cattle?

21       A.   It depended on the fuel price.

22       Q.   And distance, right, how far you're

23   trucking them?

24       A.   If it was a short amount, then it would be

25   a flat rate.  But, no, most of our stuff would be

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 90 of 206
MEAGAN GOAD

90

1  by miles.

2      Q.   On the loads that JLE or Jed brokered, how

3  did it work?  So McClain paid JLE, and then JLE was

4  responsible, then, to pay the actual shipper?

5      A.   Yes.

6      Q.   So if it was, again, using my hypothetical,

7  $100,000, you'd write JLE that check, and then

8  they'd be responsible for paying the actual person

9  who hauled the cattle --

10     A.   That's correct.

11     Q.   -- out of their money?

12         MR. MICHAEL JOHNSON:  Should we break for

13  lunch?  Good time to break?

14         MR. LOVELL:  Now would be fine.

15         MR. MICHAEL JOHNSON:  Are you guys okay

16  with that?

17         MS. BIRD:  Yeah, that's fine.

18         (A lunch recess was taken.)

19  BY MR. MICHAEL JOHNSON:

20     Q.   We're back on the record after lunch.

21         Meagan, let's go back and just ask you some

22  follow-up questions from before lunch.

23         We talked about the 400,000-plus, the

24  cattle you invested in.  Do you remember looking at

25  that wire transfer record?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 91 of 206

MEAGAN GOAD

91

1      A.    Yes.

2      Q.    Was it your idea to start investing, or did

3  Brian approach you about that?

4      A.    He approached me.

5      Q.    Did you have that kind of money sitting

6  around, or did you have to go borrow it?

7      A.    No.   I don't remember how our agreement

8  started.   He wanted to help me grow.   After my

9  divorce, I believe, is when it started.   It was

10  maybe a little bit beforehand when things started

11  getting rough.   But, no, I did not have the money

12  on hand.

13      Q.    And just so we have a time frame, when did

14  you get divorced?

15      A.    2020.

16      Q.    2020.   What was your name before it was

17  Goad?   Was it Powell?

18      A.    Yes.

19      Q.    And we talked about an Angela Powell.   Any

20  relation to Angela Powell?

21      A.    No, sir.

22      Q.    So did you borrow money to invest, or did

23  Brian lend that money to you, or did you have it

24  laying around?

25      A.    I did not have it laying around.   It was --

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 92 of 206

MEAGAN GOAD

92

1    I don't remember what the terms were.  I don't

2    remember how it all started.  But it was -- he came

3    to me and said that he wanted to help me and that

4    we would start doing this so --

5        Q.   Did you ever see the actual cattle you were

6    investing in?

7        A.   I didn't necessarily go look and see which

8    ones were mine, no.

9        Q.   If you would have said, "Hey, Dad, show me

10   the cattle I just invested in," could he have shown

11   them to you?

12       A.   I feel like he would have, yes.

13       Q.   Were they branded -- do you know? --

14       A.   No.

15       Q.   -- with your name on them?

16       A.   No.

17       Q.   So they were just part of the -- so they

18   were just part of the McClain herd?

19       A.   As far as I'm aware.

20       Q.   All right.  And as far as you're aware,

21   would they be considered McClain cattle that you

22   just had an investment interest in, but they were

23   McClain's cattle?

24       A.   I don't know how that would work.

25       Q.   What was the typical turnaround when you

93

1    invested with your dad?  Like, you know, you'd put

2    money in, and how long did it take to get the money

3    out?

4        A.   Most days it was 90 to 120 days.

5        Q.   And do you recall how many times you

6    invested -- entered into investment transactions

7    with your dad?

8        A.   Not off the top of my head.

9        Q.   Certainly more than once, right?

10       A.   Yes.

11       Q.   Do you think it was more than ten times?

12       A.   I don't know.

13            (Reference to Exhibit Number 36.)

14   BY MR. MICHAEL JOHNSON:

15       Q.   If you'll turn to Exhibit 36, do you

16   recognize this as a borrowing base report for the

17   Rabo loan?

18       A.   Yes.

19       Q.   Perioding ending 10/31/22, right?

20       A.   Yes.

21       Q.   And I think you testified earlier that you

22   would have input all the data in this borrowing

23   base report, correct?

24       A.   Yes.

25       Q.   When you filled these out, were you and

94

1      Brian sitting together, or did you -- were you

2      exchanging texts or phone calls?  How did that

3      process work?

4          A.   It could be any of the above.

5          Q.   So sometimes he might have been in the

6      office telling you the numbers?

7          A.   Yes.

8          Q.   Sometimes you might be working on it.

9      "Hey, Dad, tell me how many cattle are in McClain

10     Farms" --

11         A.   Yes.

12         Q.   -- and you put the number down?

13              Why did -- why did you and your dad sign

14     this borrowing base report?

15         A.   He was not available at the time to sign

16     this, to be physically there to sign it, so he told

17     me to sign his name and put by me.

18         Q.   Okay.  So that's your signature of his

19     name, but then --

20         A.   Yes.

21         Q.   -- you noted on there you're the one who

22     signed it for him?

23         A.   Yes.

24         Q.   Did he typically review the completed

25     borrowing base reports before they were submitted?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 95 of 206
MEAGAN GOAD

95

1      A.    Every time.

2      Q.    So you would create them based on

3  information that he had provided, correct?

4      A.    Yes.

5      Q.    Would you print it out for him?  Would you

6  email it to him?  What came next after that?

7      A.    Sometimes I would print it.  Sometimes he

8  would just come in my office and look on the

9  computer screen.

10      Q.    Okay.  But every time he looked at it --

11  before it was sent to Rabo, he would look at it and

12  give it the thumbs up?

13      A.    Yes.

14      Q.    So this -- this cover page shows that there

15  were 86,853 total head in the herd as of 10/31 and

16  over 7.925 million in accounts receivable.

17            Do you see that?

18      A.    Yeah, I see the head where it -- yes.

19      Q.    Did you ever make any effort to verify the

20  information that your dad was providing to you for

21  the reports?

22      A.    He -- no.  He would just give it to me, and

23  I would -- most of the time, he would give it off

24  of the -- one of the other pages, and then he would

25  handwrite on one of these other pages what I needed

96

1    to change and...

2        Q.    And then you would change it?

3        A.    Then I would change it.

4        Q.    Do you believe that there was, in fact,

5    around 86,000 total head of cattle owned by McClain

6    as of the end of October 2022?

7        A.    I didn't know because I never -- I didn't

8    know what was at Hereford or what was at 7M.

9        Q.    Did you believe that there was 12,459 head

10   in Kentucky?

11       A.    I was under the impression that it was

12   cattle that McClain Farms owned regardless if they

13   were in Kentucky, 7M, or Hereford.  It didn't

14   matter their location.  It was the cattle that that

15   particular entity owned.

16       Q.    So your -- your understanding is that there

17   were McClain Farms cattle in both Texas and

18   Kentucky?

19       A.    That's what I thought.

20       Q.    And is it the same answer for 7M and

21   McClain Feedyard, that there'd be cattle in both

22   states?

23       A.    I would think so.  I never knew where the

24   cattle exactly were.

25       Q.    But -- and maybe you don't know this.  But

1    besides the -- you know, the property that were

2    owned by the companies, were there other places,

3    like pastures, where McClain cattle were typically

4    located?

5        A.   No.  There was one feedyard, or two, I

6    guess, that we had sent cattle to that he was

7    partners on with those feedyards.

8        Q.   And who was that feedyard?

9        A.   Cactus Feeders and Keeling Cattle Feeders.

10       Q.   And they were, just like McClain Farms,

11   feeding some third-party cattle.  That's what they

12   were doing for McClain Farms.  They were feeding

13   McClain entity cattle?

14       A.   Yes, sir.

15       Q.   Do you know the scope of how many would

16   typically be in either Cactus or Keeling at any one

17   time?

18       A.   No, sir, I don't.

19       Q.   If you turn back into this exhibit --

20   again, we should have probably Bates-labeled

21   these -- you'll get to the accounts receivable

22   section, which is towards the back, I believe.

23           Oh, before that, let me ask you.  On the --

24   on the -- so what we have here, as you were

25   pointing out, is we've got the summary sheet with

1    the different entities totaling up 80-whatever

2    thousand, and then we've got separate sheets for

3    each, right?

4        A.   Yes.

5        Q.   So like on the McClain Farm sheet, when you

6    turn the page, it's got lot and pen numbers among

7    other things.  Do you want me --

8            Is it easier if I just show you what I'm

9    at?

10       A.   Are you looking at Farms or which one are

11   you looking at?  On the McClain Farms one?

12           MS. BIRD:  McClain Farms?

13           MR. MICHAEL JOHNSON:  Yeah, the McClain

14   Farms.

15           MR. LEBAS:  For our record, there's a

16   number of sheets here.  Would it be possible to put

17   a number on -- a physical number on them so we know

18   what we're looking at?  Otherwise, please describe

19   it enough so we can find it later.

20           MR. MICHAEL JOHNSON:  So I'm in Exhibit 36.

21   And as you thumb through there, you see the

22   borrowing base certificate only for McClain Farms,

23   Inc.  It's probably half to two-thirds of the way.

24           MR. LEBAS:  What's the title of the

25   document?

99

1          MR. MICHAEL JOHNSON:  Rabo AgriFinance

2     Borrowing Base Certificate.  Looks like that.

3          MR. LEBAS:  Give us a date, please, just to

4     make sure.

5          MR. MICHAEL JOHNSON:  It's dated

6     10/31/2022.

7          MR. LEBAS:  Thank you.

8     BY MR. MICHAEL JOHNSON:

9        Q.   All right.  So this shows that there were

10    12,459 head, right, owned by McClain Farms?

11       A.   That's what it says, yes.

12       Q.   And then when you turn, there's schedules

13    that purportedly support those cattle numbers,

14    correct?

15       A.   Yes.

16       Q.   And I'm looking at -- it's broken down,

17    among other things, by lot and pen numbers.  Do you

18    see that?

19       A.   Yes.

20       Q.   What is -- I see MURRAY, TECK, POND,

21    FARRIS, and TRENT.  What is that?

22       A.   Those are different pastures.

23       Q.   Were they pastures owned by McClain, or

24    were they leased?

25       A.   Three of them -- well, they were his

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 100 of 206

MEAGAN GOAD

100

1    grandmother's, but they were on the farm property

2    that he used.  And then Farris and Trent were not.

3         Q.   And is Farris and -- are they names of the

4    owners?

5         A.   Yes.

6         Q.   So what's Farris's full name?

7         A.   Danny Farris.

8         Q.   And he's from Kentucky somewhere?

9         A.   Yes.

10        Q.   And then how about Trent?

11        A.   Trent Harrison.

12        Q.   Okay.  So MURRAY, TECK, and POND were on

13   grandma's property?

14        A.   Yes.

15        Q.   If you turn about -- okay -- maybe seven or

16   eight pages, you'll see up at the top it says,

17   "Trade Accounts Receivable."  Do you see that?

18        A.   Yes.

19        Q.   And it's got "Rapp Ranch, Curtis Jones

20   Farm, Don Jones Farm, Don Jones Farm," correct?

21        A.   Yes.

22        Q.   Are these -- do you recognize those names?

23        A.   Yes.

24        Q.   Would those be investor folks?  Are

25   those -- are those folks -- are those folks who owe

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 101 of 206

MEAGAN GOAD

101

1   the company money, or are those investors?

2        MR. LEBAS:  Object to form, that is, the

3   term "investor" or "investor folks" is not defined,

4   and it's a compound question.

5        A.   They were people that were billed cattle

6   that were -- those cat- -- the money for those

7   invoices were still owed.

8        Q.   Okay.  So these would be people who were

9   placing money with McClain so McClain could go by

10  cattle from a third party?

11       MR. LEBAS:  Object to form.

12       Q.   Correct?

13       A.   Yes.

14       MS. BIRD:  Testimony is not consistent with

15  that characterization.

16  BY MR. MICHAEL JOHNSON:

17       Q.   And they hadn't actually paid the bill --

18  paid the invoice yet?

19       A.   That's correct.

20       Q.   Okay.  Did you do anything to verify any of

21  the accounts receivable numbers on any of these

22  borrowing base reports?

23       A.   He would give me invoices that I would copy

24  the amount from the invoice onto this accounts

25  receivable.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 102 of 206

MEAGAN GOAD

102

1      Q.   So, for example, you would have had an

2   invoice from McClain Farms to Rapp Ranch for

3   62,734.24?

4      A.   Yes.

5      Q.   And how did you know that Rapp Ranch hadn't

6   yet paid?

7      A.   He told me they hadn't.

8      Q.   So he would give you the -- these are the

9   invoices for either McClain Feedyard, 7M, McClain

10  Farms?

11     A.   Yes.

12     Q.   And list them on that document?

13     A.   Yes.

14          (Reference to Exhibit Number 37.)

15  BY MR. MICHAEL JOHNSON:

16     Q.   Okay.  Turn to Exhibit 37.  This is the

17  Rabo borrowing base report for the period ended

18  November 23th of 2022, correct?

19     A.   Yes.

20     Q.   And same question.  Is it true that on

21  every borrowing base report that was submitted to

22  Rabo, you prepared the reports and submitted the

23  reports to Rabo based upon information that your

24  father provided to you?

25     A.   Yes.  Everything I put on these reports

103

1    came directly from him.

2        Q.   And you're the one who was tasked with

3    completing reports and sending them on after he

4    approved them?

5        A.   Yes.

6        Q.   Okay.  I note you signed this one too.  Is

7    there a reason why you signed this borrowing base

8    report?

9        A.   He very well could have been at a doctor's

10   appointment because this was after he got

11   hurt so -- or he was at home and just told me to do

12   it so I didn't have to go over there because I'd

13   been, probably, over there ten times prior that

14   day.

15       Q.   How far from the office did he live?

16       A.   Eight minutes tops.  Five.

17       Q.   Okay.  And if I asked you the same

18   questions about, "Did you verify or do anything to

19   assure yourself that the head count and the

20   receivable count and the inventory count in this

21   borrowing base is accurate," would it be the same

22   answer, that "I just relied upon my dad"?

23       A.   Yes.

24            (Reference to Exhibit Number 38.)

25   ///

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
MEAGAN GOAD
Exhibit Goad Deposition Transcript   Page 104 of 206

104

1   BY MR. MICHAEL JOHNSON:

2      Q.   Okay.  The next exhibit is Exhibit 38.

3   This is the borrowing base report submitted to Rabo

4   for the period ending 12/31/2022, correct?

5      A.   Yes.

6      Q.   And these were typically submitted three or

7   four weeks after the period you're reporting on,

8   right?  So like the 12/31/22 report would have been

9   submitted sometime in January?

10     A.   Yes, sir.

11     Q.   Was that typically, what, two, three weeks?

12     A.   I'm not aware fully, but it had to be done

13  by the 15th.

14     Q.   Okay.  So --

15     A.   I think that's correct.

16     Q.   So more like two weeks?

17     A.   Yes.

18     Q.   So this particular borrowing base report

19  would have been submitted sometime in January,

20  we're assuming.  I note you signed this one too.

21          Do you have a recollection of why you

22  signed this one?

23     A.   It'd have been the same reason as the

24  others.

25     Q.   He had something going on or --

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 105 of 206

MEAGAN GOAD

105

1      A.    Yeah.

2      Q.    How would he have reviewed these before

3    they were submitted?  Did he have access to them on

4    his home computer?

5      A.    I would print the pages off and either take

6    them to him or take pictures and send to him if he

7    wasn't in the office.

8      Q.    And your same answer on verification of the

9    data?  You just relied upon your dad?

10     A.    That's correct.

11     Q.    And then Exhibit 40, a little different

12   format, but this is the -- the borrowing base

13   report for the period ending 2/28/23, so that would

14   have been submitted sometime in March, right?

15         MS. BIRD:   Mine says 1/31.

16     A.    Yeah, mine says 1/31/23.

17     Q.    Are we on 40?

18     A.    No, that was 39.

19         (Reference to Exhibit Number 39.)

20   BY MR. MICHAEL JOHNSON:

21     Q.    Did I ask you about -- let me ask you about

22   39 first.  Yeah, let's go to 39.

23         This one you didn't sign, but 39 is dated

24   1/31/2023, right?

25     A.    Yes.

106

1      Q.   And it shows 80,342 head of cattle?

2      A.   I believe that's right.

3      Q.   And about 12.227 million in receivables,

4   right?

5      A.   Looks correct.

6      Q.   Okay.  And you didn't sign this, but you

7   would have been the one who sent this to Rabo after

8   your dad signed off, right?

9      A.   Yes.

10          (Reference to Exhibit Number 40.)

11  BY MR. MICHAEL JOHNSON:

12     Q.   Now, if you'll turn to Exhibit 40, the

13  first page is some email exchanges, right?

14     A.   Yes.

15     Q.   Looks like you emailed this borrowing base

16  report to Chip Lawson --

17          You know who Chip Lawson is, right?

18     A.   Yes.

19     Q.   -- on March 16th?

20     A.   Yes.

21     Q.   And is Chip the one that you always sent

22  the borrowing base reports to?

23     A.   Yes.  Chip and Jason Dunn.

24     Q.   Did you ever talk to Chip or Jason Dunn?

25     A.   Only when Dad would ask me to send them

107

1    text messages relevant to banking information.

2        Q.    Give me like an example.

3        A.    If a wire didn't come in the day prior that

4    we were expecting and the account did not go to

5    zero that day and it was overdrawn, then --

6        Q.    So your dad would --

7        A.    -- I would say, Hey, there's a wire that's

8    coming in from so-and-so.  It's for this much

9    amount of money.

10       Q.    All right.  So let me give you a

11   hypothetical.  So your account's overdrawn, and you

12   might need a check cleared.  So you would call Chip

13   or text him and say, "Hey, can you clear this check

14   even though it's going to overdraw us because we've

15   got some money coming in tomorrow"?

16       A.    No, I did not say that.  I would say, "The

17   accounts are overdrawn.  This is coming in."

18       Q.    Okay.  And that was the -- kind of the

19   whole -- the whole nature of your discussions with

20   Chip or things like that?

21       A.    Yes.

22       Q.    This borrowing base report, if you look at

23   page 2, let's compare it to the prior borrowing

24   base report.  So we're looking at -- 39 is the

25   borrowing base report for the period ending

108

1    January 31 of '23.  And 40 is the borrowing base

2    report for the period ending February 20th of '23.

3    Do you see that?

4        A.   Yes.

5        Q.   And it's reporting that cattle has -- the

6    number of head of cattle has reduced from 80,342

7    from 37,992.  Do you see that?

8        A.   Yes.

9        Q.   And in this reporting, receivables went

10   from 12.227 million to 33.705 million.  Do you see

11   that?

12       A.   Yes.

13       Q.   Do you know what happened in January to

14   cause so many cattle to be liquidated?

15       A.   I don't.

16       Q.   You didn't have any discussion about that

17   with your dad?

18       A.   No, sir.

19       Q.   You didn't say, "Hey, Dad, we've been

20   reporting 80,000-plus head of cattle for the last

21   six months, and now we've got less than half of

22   that"?

23       A.   I never looked at totals.  I filled in what

24   I was to fill in and gave him the information.  I

25   never studied these borrowing bases.  I never went

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 109 of 206

MEAGAN GOAD

109

1    through them and checked on anything or looked

2    at -- I made sure that the information transferred

3    over from the ending spreadsheets to the beginning

4    page, but that's all I did.  I never went through

5    and really paid attention to the numbers.

6        Q.   At the end of January of 2023, did the

7    McClain entities really own over 80,000 head of

8    cattle, or do you just not know one way or the

9    other?

10       A.   I don't know.

11       Q.   You have no idea?

12       A.   No.

13       Q.   Sitting here today, you couldn't tell me,

14   within 5,000 or 10,000 head, how much -- or how

15   many head of cattle the McClain entities actually

16   owned?

17       A.   No.

18       Q.   Did you ever have any discussion with your

19   dad about, "Geez, Dad, there's a lot of money going

20   in and out of our accounts with these other

21   people."

22            Did you ever discuss those issues with your

23   dad?

24       A.   There was never a discussion.  If I raised

25   any questions, he would say, "It's for me to worry

MEAGAN GOAD

110

1   about.  Don't worry about it."

2       Q.   So "none of your business," basically --

3       A.   Yeah.

4       Q.   -- was the response?

5       A.   Yeah.

6            MR. MICHAEL JOHNSON:  At this time I'll

7   pass.

8            MR. LOVELL:  Okay.

9                    CROSS-EXAMINATION

10  BY MR. LOVELL:

11      Q.   Ms. Goad, my name is John Lovell, and I

12  represent First Bank & Trust, who is the bank that

13  was financing 2B Farms.

14      A.   Okay.

15      Q.   Okay.  Now, it's my understanding from your

16  testimony, if I can find -- yeah -- that you would

17  be the person, the primary person, that would

18  finalize the invoices when cattle were sold to 2B

19  Farms, right?

20      A.   Yes.

21      Q.   And that you would get the information from

22  your dad, and then that would be -- you would put

23  it together in an invoice, how many head, weight,

24  that sort of thing, right?

25      A.   Yes.

111

1      Q.    And then you would communicate that to

2   Bo Robinson, right?

3      A.    That's correct.

4      Q.    And then Bo Robinson would be responsible

5   for informing his bank about the size of the check

6   that's needed, right?

7      A.    That's correct.

8      Q.    You didn't communicate with the bank?

9      A.    No, sir.

10     Q.    Okay.  So you'd give Bo Robinson an

11  invoice, and that would be then up to Bo to have

12  one of the checks that you had previously sent to

13  the bank filled out, right?

14     A.    Yes.

15     Q.    And then to your knowledge, the bank always

16  filled out the numbers per the instructions you had

17  on the invoice as far as the amounts and dates?

18     A.    Yes.

19     Q.    And then you would also send information to

20  Bo about how much was due to McClain Farms, to be

21  wired to McClain Farms, to pay for the next lot of

22  cattle, right?

23     A.    Yes, sir.

24     Q.    So were you responsible for actually

25  sending those pre-signed checks on to the bank?

112

1      A.    Me or my sister one would do it.

2      Q.    You or who?

3      A.    Me or Kinsey one would.

4      Q.    Okay.  And would Bo be the person that

5   would contact you and say "We need some more

6   checks" --

7      A.    Yes.

8      Q.    -- "sent"?

9            Okay.  Do you know who Shawn Ragland is?

10     A.    The name sounds familiar, but I don't know

11   him, no.

12     Q.    Okay.  And do you know who Rebecca

13   Fernandez?

14     A.    No, sir.

15     Q.    So would it be correct that it would be up

16   to Bo to finalize the transactions at his bank,

17   both getting the checks to McClain Farms filled out

18   appropriately and then also getting the wire

19   transfer amounts to McClain Farms --

20     A.    Yes, sir.

21     Q.    -- filled out?

22     A.    Yes, sir.

23           (Reference to Exhibit Number 42.)

24   BY MR. LOVELL:

25     Q.    Let me just show you.  As an example, if

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 113 of 206

MEAGAN GOAD

113

1    you could turn to Exhibit 42.  Now, the checks I'm

2    having you look at are made out to MAP Farms [sic]

3    not to 2B Farms, but just for illustration so we're

4    on the same page.  So looking at -- these pages

5    aren't numbered.  Can you turn over to Check Number

6    7525?

7        A.   Yes, sir.

8        Q.   Do you see that?  Okay.

9             So the checks that were sent either by you

10   or Kinsey would have your signature, Meagan Goad,

11   on the check, correct?

12       A.   Yes, sir.

13       Q.   But that's actually a stamped signature?

14       A.   That is correct.

15       Q.   Okay.  So that's not -- so you didn't make

16   that with a pen.  You or somebody just used a

17   signature stamp?

18       A.   Yes, sir.

19       Q.   And so you or your sister would have

20   stamped three, four, five, ten checks at a time and

21   Fedex'd or UPS'd them to the bank?

22       A.   Yes, sir.

23       Q.   But otherwise, all the -- the payee and

24   amounts and dates would be blank, right?

25       A.   Correct.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 114 of 206

MEAGAN GOAD

114

1          Q.    And is it your testimony, then, that all

2    the checks that were filled out by the bank were

3    filled out in the amounts that you had given to

4    Bo Robinson?  Right?

5          A.    To my knowledge, yes.

6          Q.    Okay.  Both the dollar numerically and then

7    the amount written in words?

8          A.    I did not pull up each individual check and

9    look at it, no, but to my knowledge, that --

10         Q.    Yeah, as far as you know.

11         A.    Yes.

12         Q.    In other words, if the number had been off

13   significantly, you would have been alerted to that

14   at some point, right?

15         A.    I feel like Dad or -- more than likely, Dad

16   would have been alerted, yes.

17         Q.    Yeah.  If somebody was off a hundred

18   thousand dollars, somebody on your end would have

19   noticed?

20         A.    Yes.

21         Q.    And as far as you recall, that never

22   happened?

23         A.    That's correct.

24         Q.    So all the checks that were filled out, to

25   your knowledge, were filled out according to the

115

1    instructions that you transmitted to Bo Robinson,

2    right?

3        A.   Yes.

4        Q.   And to the best of your memory, you

5    transmitted all that information on completing the

6    checks to Bo, not to the bank, correct?

7        A.   That's correct.

8             MR. LEBAS:  Pass the witness.

9                    CROSS-EXAMINATION

10   BY MR. LEBAS:

11       Q.   On the subject of that -- let me introduce

12   myself.  I introduced myself this morning.  My name

13   is David LeBas.  I represent Thorlakson, Diamond T

14   Feeders and AgTexas, which is their lender.

15            Please let me know if you can't hear me

16   because we're across the table.

17       A.   You're good.  I can hear you.

18       Q.   Okay, good.  Thank you.  On the questions

19   just addressed by Mr. Lovell -- and I'm going to

20   work through some of the questions he asked you,

21   some Mr. Johnson asked you, and then I'll have some

22   others as well, so it might be disjointed.

23            On this question of communications with

24   Mr. Robinson and the bank, did you expect

25   Mr. Robinson to convey the information that you

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 116 of 206

MEAGAN GOAD

116

1    were providing to him to his lender?

2        A.    I did not necessarily know what -- who he

3    told the information to.  I just know that I was

4    supposed to send it to Bo.

5        Q.    And after you sent the information to Bo,

6    then did you receive checks from the bank or wire

7    transfers from his bank?

8        A.    Yes, sir.

9        Q.    Did they come on a daily basis in some

10   instances?

11       A.    Yes, sir.

12       Q.    And in some instances, particularly in the

13   time frame of February and March 2023, were there

14   millions of dollars being exchanged between McClain

15   entities and Mr. Robinson on a daily basis?

16       A.    I can't tell you exactly without looking at

17   any type of documentation, but I know there was

18   quite a bit of money being transferred, yes.

19       Q.    Did you talk to either Mr. Robinson or your

20   dad about the reason for the very large exchanges

21   of funds between those two entities?

22       A.    No.

23       Q.    Did it cross your mind that that was a

24   reasonable exchange of funds for the number of

25   cattle that were involved?

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 117 of 206
MEAGAN GOAD

117

1       A.   At this point, I had been getting shut down

2   so many times on asking questions, it was pointless

3   because I knew what the answer was going to be.

4   "It's none of your business.  I'll deal with it.

5   Don't worry about it."

6       Q.   Who was shutting you down?

7       A.   Brian.

8       Q.   Your dad?

9       A.   Yes.

10      Q.   When did the shutdown of communication

11  between you and your dad begin?

12      A.   It was always like that.  He never would

13  elaborate on anything, personal or business.

14      Q.   When did you start asking him questions

15  that he refused to answer?

16      A.   When I was ten.

17      Q.   Did you have any communications, either

18  verbal or -- I mean, like the telephone, for

19  example, email or text with the -- with

20  Mr. Robinson's banker?

21      A.   No, sir.

22      Q.   Did you have any direct communications,

23  verbal, email, or otherwise, with any of the

24  Thorlakson family?

25      A.   Text, yes.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 118 of 206

MEAGAN GOAD

118

1      Q.   And have you produced those documents?

2      A.   Yes.

3      Q.   Do you recall any telephone conversations

4    with any of the members of that family?

5      A.   Possibly, but not off the top of my head,

6    no.

7      Q.   I told you I was going to skip around a

8    little bit, so this is where the skip-around part

9    starts.

10          Do you recall what the head -- Well, first,

11   before I do that, you indicated you work now for a

12   feedyard?

13     A.   Yes, sir.

14     Q.   What's the name of that feedyard?

15     A.   Marshall County Livestock.

16     Q.   Was it Marshall County?

17     A.   Yes, sir.

18     Q.   Where is Marshall County feedyard?

19     A.   It's in Benton, Kentucky.

20     Q.   Is it a finish yard or grow yard?

21     A.   A grow yard.

22     Q.   What is its capacity?

23     A.   I don't know.  I'm a separate -- I don't

24   work at Marshall County Livestock.  I work at a

25   branch off of Marshall County Livestock but for

1    them.

2        Q.    So you don't work at the animal husbandry

3    facility itself?

4        A.    No.

5        Q.    And you don't know how many cattle are on

6    feed at any given time at your employer's place of

7    business?

8        A.    At theirs, no, sir.

9        Q.    Does Marshall County take in cattle owned

10   by others, or does it own the cattle that it's

11   feeding or both?

12       A.    I don't know.  I'm not privy to that

13   information.

14       Q.    What do you do for this feedyard?

15       A.    I manage the cattle.  I take care of the

16   cattle, doctor them, move them.  When they get big

17   enough, we ship them.  There's no -- I input

18   medicine that I give to the cattle in their

19   computer program.

20       Q.    Are the cattle in pens?

21       A.    Yes, sir.

22       Q.    Is it as many as 5,000 head?

23       A.    Their main location, it's a good

24   possibility.

25       Q.    Did you ever go to the Texas facilities

120

1    that were owned by McClain Farms or 7M?

2        A.   I briefly pulled in the parking lot of 7M

3    one -- when I went down there with Jed, I rode with

4    him on one of his trips that he took down there.  I

5    have not ever walked through that feedyard, not one

6    time.

7            And the last time I was at Hereford was

8    around the same time, and it was so I could see my

9    granddad that worked there.  But the last time that

10   I actually did anything in the McClain feed- -- or

11   the feedyard in Hereford would have been probably

12   2010 or '12.

13       Q.   How many cattle was the 7M facility capable

14   of providing care for?

15       A.   I believe it was permitted for 80,000 head.

16       Q.   Do you know how many it could actually care

17   for --

18       A.   No, sir.

19       Q.   -- in a given time without regard to the

20   permit?

21       A.   No, sir.

22       Q.   Where did you get the understanding it was

23   permitted for 80,000 head?

24       A.   That's what I was told whenever he was

25   talking about purchasing it.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 121 of 206

MEAGAN GOAD

121

1      Q.    Told by whom?

2      A.    Brian.

3      Q.    Did you see any paperwork that would

4   address that question of capacity either one way or

5   the other?

6      A.    No, sir.

7      Q.    And what about the McClain Farms yard?

8   What was its capacity?

9      A.    I really don't know.  8 to 10,000 possibly.

10     Q.    When you went on your trip to Texas -- I

11   missed what you said -- which facility did you

12   visit?

13     A.    7M.

14     Q.    And when was that?

15     A.    It would have been 2021.

16     Q.    And you said your grandfather worked there?

17     A.    Yes.

18     Q.    And is he Brian's father or --

19     A.    Yes.

20     Q.    What is his name, please?

21     A.    Philip McClain.

22     Q.    Where does he live now?

23     A.    Somewhere in Oklahoma.

24     Q.    You don't know where?

25     A.    No, sir.

122

1      Q.    When was the last time you talked to him?

2      A.    Right after my died dad.

3      Q.    Do you know how to spell his name?  There's

4    different ways to spell Philip?

5      A.    P-H-I-L-I-P.

6      Q.    Was Philip married to your grandmother?

7      A.    No.

8      Q.    Was he married at the time that you saw him

9    last?

10     A.    No.

11     Q.    What is the name of your grandmother?

12     A.    She's passed away.

13     Q.    And what was her name?

14     A.    Joetta McClain.

15     Q.    Where did she live?

16     A.    Benton.

17     Q.    I don't mean to pry with personal

18   questions.  Thank you for answering.

19          This is -- would you turn to Exhibit 34,

20   please.  This is the list -- it's upside down.  I

21   want to make sure I'm looking at the right exhibit.

22          This is an accumulation that, I believe,

23   Mr. Johnson said had been generated by someone for

24   his office concerning payments to JLE Trucking.

25          Do you have the same thing in front of you?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 123 of 206

MEAGAN GOAD

123

1        A.    Yes, sir.

2        Q.    What is -- what is the JLE in JLE Trucking

3    stand for?

4        A.    Jed, Leslie, Emma.

5        Q.    And what does that refer to?

6        A.    Jed's name, his ex-wife's name, and his

7    daughter's name.

8        Q.    I take it he started the company before you

9    and he got married?

10        A.    Yes, sir.

11            MS. BIRD:  Hope so.

12            MR. LOVELL:  Let's hope, yeah.

13            THE WITNESS:  That would be very

14    uncomfortable if not.

15  BY MR. LEBAS:

16        Q.    Yeah.  And just trying to read this --

17    we'll ask him tomorrow.  So if you refer us to him,

18    then that's fine.  But the question I have is

19    really just how to understand the trucking and

20    brokerage arrangement that you discussed a few

21    minutes ago.

22            Do you know how many miles it was from

23    Benton to the Texas panhandle?

24        A.    It depended on where it was going, but it

25    was approximately 900.

MEAGAN GOAD

124

1      Q.    And generally were the trips between

2   Kentucky and Texas as opposed to, say, Florida and

3   Texas or somewhere else?

4      A.    They were really everywhere.  There was

5   not -- I don't feel like there was one that was

6   more -- there was not more to one place than there

7   was the other, I don't feel like.

8      Q.    So there were some trips between Florida

9   and Kentucky?

10     A.    Yes.

11     Q.    Is that correct?

12     A.    They would go from Florida to Kentucky, but

13  there was more that went from Florida to Texas than

14  there would be from Florida to Kentucky.

15     Q.    So JLE would haul from the Florida source

16  to the Texas grow yard, for example?

17     A.    Yes, sir.

18     Q.    Are those truck -- you called it, I think,

19  the trip -- what did you call it?  The truck

20  packet?

21     A.    The trip pack?

22     Q.    Pack.  That's been produced to the trustee?

23     A.    Yes, sir.

24         MR. LEBAS:  We haven't seen it yet.

25         MR. MICHAEL JOHNSON:  And I believe you

125

1    confirmed that you don't have any problem if the

2    trustee shares those with us, correct?

3         MS. BIRD:   Correct.

4  BY MR. LEBAS:

5     Q.   There was mention made of some gentlemen

6    that had life insurance policies on your dad's

7    life:  Cory Priest, Robbie Russell, Eddie Stewart.

8         Have you talked to those gentlemen since

9    the time all this erupted --

10    A.   No, sir.

11    Q.   -- in early 2023?

12    A.   No, sir.

13    Q.   Do you know the amount of life insurance

14   that they held?

15    A.   No, sir.

16    Q.   Do you know who was paying the premiums on

17   the life insurance policies?

18    A.   No, sir.

19    Q.   I think you've told us this, but you

20   mentioned there was a Quickbooks account.  The

21   Quickbooks file, the electronic file, where was

22   that kept?

23    A.   It was on my desktop.

24    Q.   So the data was on a computer that was in

25   your -- at the barn in your office?

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 126 of 206
MEAGAN GOAD

126

1        A.    Yes, sir.

2        Q.    And were you the person who input the

3     information into the Quickbooks program?

4        A.    The only information that I input in the

5     Quickbooks was when I would write checks or do

6     payroll.

7        Q.    Was there other information in the

8     Quickbooks folder other than that?

9        A.    As far as?

10        Q.    Well, Quickbooks can do a lot of things.

11        A.    We do not invoice or anything like that out

12     of Quickbooks.  It was solely for check register

13     purposes.

14        Q.    Has that Quickbooks file been provided to

15     either the trustee or to the bank or both?

16        A.    I don't know who took it, but someone came

17     and took it so --

18            MR. MICHAEL JOHNSON:  Yeah, the trustee has

19     it.

20     BY MR. LEBAS:

21        Q.    When you say "they took it," you mean they

22     took the laptop or the computer?

23        A.    They took everything out of the office.

24        Q.    And that includes the computer on which the

25     Quickbooks file was located?

127

1      A.   Yes, sir.

2           MR. LEBAS:  Unfortunately, I don't have

3   copies of everything.

4           MR. LOVELL:  Do you need to switch with me?

5           MR. LEBAS:  No, if you don't mind, just

6   hand this down.

7           What is our next number, please?

8           MR. MICHAEL JOHNSON:  The last exhibit in

9   my book is 45.  Let's just run them consecutive

10  from 45.

11          MR. LEBAS:  This will be 46.

12          (Exhibit Number 46 marked for

13  identification.)

14          (Off-the-record discussion.)

15  BY MR. LEBAS:

16     Q.   Do you have Exhibit 46?  There's a sticker

17  at the bottom.

18          MS. BIRD:  Yes, it's 46.

19     Q.   And for the record, I'll say it's got a

20  document control number on it of -- starting on

21  page -- at the bottom, Thorlakson_002030 and then

22  to 002036.  The title of the document is

23  "Intercreditor Agreement."

24          Ms. Goad, have you seen this document

25  before?

128

1      A.   No, sir.

2      Q.   Would you turn to the document -- the

3   second-to-last page, Document Number 2035.  Do you

4   see your father's signature?

5      A.   Yes, sir.

6      Q.   Were you aware that there was an agreement

7   between AgTexas Farm Credit Services and Rabo

8   AgriFinance and Brian McClain concerning cattle and

9   finances?

10     A.   No, sir.

11     Q.   Did your father ever mention the existence

12   of an agreement involving different lending

13   institutions with you?

14     A.   No, sir.

15     Q.   Do you feel confident in saying -- because

16   you didn't know about it, you didn't talk to

17   anybody about this, did you?

18     A.   No.

19     Q.   Nobody talked to you about it?

20     A.   No, sir.

21     Q.   And then I'll ask you, then, more generally

22   the same question about intercreditor agreements

23   with other financial institutions.

24          Were you aware of intercreditor agreements

25   between Rabo and McClain and any other lender or

129

1    financial institution?

2        A.    No, sir.

3        Q.    Did you ever hear anyone say anything about

4    that?

5        A.    No, sir.

6              (Exhibit Number 47 marked for

7    identification.)

8    BY MR. LEBAS:

9        Q.    We're looking at Exhibit 47.  It's a letter

10   dated April 5, 2023, and it is a document subpoena

11   response RAF/180001.

12             Do you see that in the lower right-hand

13   corner?

14       A.    Yes.

15       Q.    And it's a letter addressed to Jamie

16   Rabitin, senior vice president/director of

17   commercial servicing, Mechanics Bank, and signed by

18   Mr. Johnson.

19             Do you see that on the third page?

20       A.    Yes.

21       Q.    Have you seen this letter before?

22       A.    No, sir.

23       Q.    Were you aware that on April 5th, 2023,

24   Rabo AgriFinance, through its attorney, instructed

25   that accounts of Mechanics Bank -- let me rephrase

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 130 of 206

MEAGAN GOAD

130

1    that.

2            Were you aware on April 5, 2023, Rabo

3    AgriFinance instructed Mechanics Bank to freeze

4    accounts of McClain and McClain Farms?

5        A.    Was I aware on this date?

6        Q.    Yes.

7        A.    No, sir.

8        Q.    When did you become aware of that event?

9        A.    On the 6th, when I tried to log into the

10    bank account online.

11        Q.    And that would have been April 6th, 2023?

12        A.    Yes, sir.

13        Q.    Do you know who the person is that received

14    this letter, I mean, who it's addressed to?  Do you

15    know who that is, Jamie Rabitin?

16        A.    I spoke with her some, but, no, I don't.

17    She did not -- I did not have a business

18    relationship with her.

19        Q.    You spoke with her by telephone?

20        A.    Or email, yes.

21        Q.    Did you meet her in person anywhere?

22        A.    Not that I'm aware of.  I -- but I don't

23    remember.

24        Q.    When did you exchange electronic

25    communications or phone calls, have phone calls

131

1    with Ms. Rabitin?

2        A.    That would have -- are you asking when did

3    I --

4        Q.    Yes.

5        A.    -- when did we get --

6        Q.    Yes.

7        A.    I don't know.  I -- she was who I would --

8    she is who I would contact if I had any issues with

9    deposits on online banking.

10        Q.    So she was your contact person at Mechanics

11    Bank?

12        A.    Yes.

13        Q.    Did you understand that Mechanics Bank was

14    accepting deposits and would honor checks

15    pertaining to the McClain account and the Rabo

16    AgriFinance line of credit?

17        A.    Can you rephrase your question?

18        Q.    I'll try.  You're aware that Rabo

19    AgriFinance is not a bank that accepts deposits and

20    honors checks?

21        A.    Yes, sir.

22        Q.    And that the line of credit for Rabo as a

23    result had to go through a depository bank?

24        A.    Yes.

25        Q.    Are you aware of that?

132

1        A.    Yes, sir.

2        Q.    And that the depository bank in that

3   relationship was Mechanics Bank?

4        A.    Yes.

5        Q.    Then Ms. Rabitin, was she the person that

6   you would interact with at Mechanics Bank when you

7   had questions about the account?

8        A.    I would never have questions about the

9   accounts.  Brian spoke with her more than I did.  I

10  would just have questions if the checks -- if -- it

11  was only on online banking is what I would have if

12  I needed -- if something happened with one of our

13  deposits or something didn't read correctly on one

14  of the deposits would be when I would talk to her.

15  I didn't have any other conversations with her.

16       Q.    So I hate to use this word, but I don't

17  know a better one.  The mechanics of the bank

18  account, making sure that deposits were accounted

19  for, checks that were presented for payment were

20  actually paid, Jamie would be the person that you

21  would interact with at the Mechanics Bank about

22  those subjects?

23       A.    I wouldn't interact with anyone about those

24  subjects.  That would be Brian.

25       Q.    Give us an example of what would prompt

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 133 of 206

MEAGAN GOAD

133

1    your communication with Jamie.

2        A.    If I had a check that I was depositing on

3    the online banking and there was an issue with it

4    or if they had a deposit limit -- so if the deposit

5    limit needed to be raised, I would contact her to

6    raise the deposit limit.

7        Q.    What would be a problem with a check

8    presented for deposit?

9        A.    If it didn't read correctly on the reader

10   that it would scan through.

11       Q.    Did you have a scanner at your office --

12       A.    Yes, sir.

13       Q.    -- at the barn?

14       A.    Yes, sir.

15       Q.    And so if you got a check from someone that

16   dealt with this account, it would scan the check

17   in?

18       A.    Yes.

19       Q.    And send it to the Mechanics Bank account?

20       A.    Yes.

21       Q.    And if something was smudged or something

22   and the bank couldn't read the check, then you

23   would have a discussion with Jamie about that

24   problem?

25       A.    Yes.

134

1      Q.    That's what you're talking about?

2      A.    Yes, sir.

3      Q.    Did Mechanics Bank have remote deposit

4  devices like the one you just described at any

5  location in addition to the barn?

6      A.    Not that I'm aware of.

7      Q.    Was that remote device moved to your dad's

8  home when his office moved, or did it stay at the

9  barn?

10     A.    It stayed at the barn.

11     Q.    Turn to the third page of the letter,

12 please.  What I want to ask you about are some

13 names that are listed on this letter.

14          The top paragraph refers to someone named

15 Jeff Hanson.  Do you know who Jeff Hanson is?

16     A.    No, sir.

17     Q.    Have you had any telephone calls or email

18 communication with Mr. Hanson?

19     A.    Not that I'm aware of, no, sir.

20     Q.    And there's a number of people at the

21 bottom who got copies.  Of course, we know who

22 Mr. McClain is, and Mr. Hanson is repeated.  Linda

23 Kobliska, who is here in the room with us today.

24          Other than your interaction with

25 Ms. Kobliska today, have you had any interaction

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 135 of 206

MEAGAN GOAD

135

1    with her?

2        A.    No, sir.

3        Q.    And there's another name of Kurt Leistikow,

4    K-U-R-T.  Have you had any interaction with

5    Mr. Leistikow?

6        A.    Not that I'm aware of, no, sir.

7        Q.    And then there's another name on here, Brad

8    Bakker.  Do you know who that is?

9        A.    No, sir.

10           (Exhibit Number 48 marked for

11    identification.)

12    BY MR. LEBAS:

13        Q.    I've handed you Exhibit 48.  I'll represent

14    to you that these are checks, copies of checks,

15    released to us by HTLF Bank.  They start with Bates

16    Number HTLF 000400 and go to 000405.

17           Would you page through that exhibit,

18    please, and verify that your name appears on the

19    signature line for each of these checks?

20        A.    Yes, sir.

21        Q.    Is this the stamped signature, or is this

22    the -- your personal signature?

23        A.    Stamped signature.

24        Q.    Who would make the stamp on the check?

25        A.    Me, Kinsey, Brian.  It could be any of us.

MEAGAN GOAD

136

1    Q.   This first check is made payable to 2B

2   Farms, April 4th, 2023.   The amount is

3   $2,530,920.39, correct?

4    A.   Yes.

5    Q.   Where did that number that's -- the dollar

6   figure come from?

7    A.   I don't have any documentation in front of

8   me, so I can't...

9    Q.   So you don't know?

10    A.   Not without any -- having any documentation

11   in front of me, no.

12    Q.   If I went through the rest of the checks in

13   this series, would you have the same answer?

14    A.   Yes.

15    Q.   You can see, just looking at the amounts

16   between April 4, 2023, and April 6, 2023, about

17   $10 million was sent to 2B Farm by McClain.

18    A.   Is that a question?

19         MR. FARMER:  Was that -- I didn't hear it.

20   Was that a question or a statement?

21         MR. LEBAS:  I'll restate it.

22   BY MR. LEBAS:

23    Q.   Can you see from looking at the checks made

24   a part of Exhibit 15 that approximately -- I'll

25   start over.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 137 of 206

MEAGAN GOAD

137

1        Can you see from the checks made a part of

2   Exhibit 48 that approximately $15 million was sent

3   from McClain Farms, Inc., to 2B Farms between

4   April 4, 2023, and April 6, 2023?

5        A.   Yes, but each -- there's only three

6   different amounts of the six checks.  So there's

7   two checks of each of these that have the same

8   amount on them, the exact same amount.

9        Q.   Oh, I see what you're saying.  Why -- for

10  example, let's look at the first two pages in the

11  exhibit, HTLF 400 and HTLF 401.

12        The first one dated April 4, 2023, Check

13  Number 7331, is for $2,530,920.39.  And the second

14  check also dated April 4, 2023, for the same

15  amount, but it's got the Check Number 7328.

16  Correct?

17        A.   Yes.

18        Q.   Why were two checks in the exact same

19  amount sent on the exact same day to the same

20  payee?

21        A.   I don't know.

22        Q.   It appears that same sequence occurred with

23  the next two checks in the exhibit, HTLF 402 and

24  403.  Check Number 7620 dated April 5, 2023, is in

25  the amount of $2,559,407.02, and the next check is

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 138 of 206

MEAGAN GOAD

138

1    for the same amount on the same day, but it's Check

2    Number 7329, correct?

3         A.    Yes.

4         Q.    Do you know why that occurred?

5         A.    No, sir.

6         Q.    Do you recall the transactions that led to

7    the issuance of these checks?

8         A.    No, sir.

9         Q.    The last two checks in the exhibit are both

10   dated August 6, 2023.  Excuse me.  I'll say it

11   again.

12              The last two checks in the series are dated

13   April 6, 2023, correct?

14        A.    Yes, sir.

15        Q.    Both are dated -- both are in the amount of

16   $2,510,991.45?

17        A.    Yes, sir.

18        Q.    And one check is Check Number 7330 and one

19   is Check Number 7621, correct?

20        A.    Yes, sir.

21        Q.    Do you know why these two checks were made

22   in the same amount to the same payee on the same

23   date?

24        A.    No, sir.

25        Q.    Were these checks presented for payment to

139

1    2B Farms and its lender?

2            MS. BIRD:  Objection.  I'm not sure how

3    Ms. Goad would know what happened between 2B Farms

4    and its lender.

5            MR. LEBAS:  Maybe she knows; maybe she

6    doesn't.

7    BY MR. LEBAS:

8        Q.   You don't know?

9        A.   No.

10       Q.   Did you receive any information from anyone

11   to suggest that these checks were refused?

12       A.   No.

13           (Exhibit Number 50 marked for

14   identification.)

15   BY MR. LEBAS:

16       Q.   I've handed you Exhibit 50.  That's a

17   document that has Document Control Thorlakson_00047

18   to 00051.  The first page is titled "Cattle Feeding

19   Agreement."

20       A.   Yes, sir.

21       Q.   Are you familiar with the form of the

22   document?

23       A.   I've seen it, yes, but it is not something

24   I prepare.

25       Q.   Okay.  And do you see that in the document

140

1    itself there is a description of cattle by head,

2    weight, and price, which are assigned a lot number,

3    which is 1511, and that they are currently located

4    at 7M Feeders or McClain Feeders.  Do you see that

5    language?

6        A.   Yes, sir.

7        Q.   And then it says there's a cost of

8    $295,458.47, correct?

9        A.   Yes.

10       Q.   And so this document reflects a purchase of

11   cattle that either McClain Feedyard or 7M Feeders

12   had on hand and was selling to Thorlakson, correct?

13           MR. MICHAEL JOHNSON:  Objection.  Object to

14   lack of foundation, and calls for a legal

15   conclusion, and the document speaks for itself.

16       A.   I don't know really how to answer that

17   question.

18   BY MR. LEBAS:

19       Q.   Well, you've been asked some questions to

20   suggest that persons who were buying cattle from

21   McClain Feedyard or 7M were providing money for

22   McClain Feedyard or 7M to go get cattle.  But this

23   document says that cattle were on hand, doesn't it?

24           MS. BIRD:  Objection to the extent the

25   document says what it says, and she already said

1    she didn't prepare it.

2        A.    Yeah, I don't -- I didn't have anything to

3    do with preparing this, so I don't know if it was

4    meant that they were located there now or if they

5    were located prior to the purchase of the cattle.

6        Q.    It contains the words, does it not, "They

7    are Lots 1511 and located at 7M feeders or McClain

8    feeders"?  Correct?

9        A.    Yes.

10       Q.    And let's look at the second page, please,

11   of the document.  It's got Document Control 48.  Do

12   you recognize the form of this calculation?

13       A.    Yes.  This is Brian's version of an

14   invoice.

15       Q.    And what -- why do you say it's Brian's

16   form as opposed to some other form?

17       A.    This is the form that was on his computer,

18   and he prepared these invoices?

19       Q.    Okay.  So he -- Mr. McClain, then, he had

20   this form, I guess, with the blanks to be filled in

21   on his computer?

22       A.    Yes, sir, in an Excel spreadsheet.

23       Q.    It was an Excel spreadsheet, you said?

24       A.    Yes, sir.

25       Q.    So for -- if you follow the same

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 142 of 206

MEAGAN GOAD

142

1      procedure -- maybe you saw him do this -- he would

2      type in the head count, sex, weight, price per

3      pound, and cost, information that's shown on this

4      document?

5          A.   The total cost would be auto-calculated

6      from the weight and price per pound that was

7      inputted.

8          Q.   Got it.  Now, there's an address at the top

9      that says "824 Mullins Lane."  What address is

10     that?

11         A.   That's his house address.

12         Q.   As opposed to the barn?

13         A.   We didn't use the barn address for any mail

14     incoming to us.  There was a house that's there

15     that has occupants, and they use that mailbox.

16         Q.   I'm confused.  Which house had occupants?

17         A.   A house that was located at the barn

18     property --

19         Q.   Okay.

20         A.   -- that had that.

21         Q.   All right.  So you didn't want mail going

22     there because it wouldn't be addressed to the

23     persons who were --

24         A.   That's correct.

25         Q.   -- occupying the house?

143

1      A.    That's correct.

2      Q.    Who was occupying that house?

3      A.    There was a range of different people.  I

4  couldn't exactly tell you exactly who.

5      Q.    Were they tenants?

6      A.    Yes.

7      Q.    And they paid rent to your grandmother --

8      A.    Yes.

9      Q.    -- or to whoever inherited the property?

10      A.    Yes.

11      Q.    Next page, please, turn to that.  It's

12  00049 titled "Projected Closeout."  Are you

13  familiar with that form of document?

14      A.    Yes, sir.

15      Q.    Who prepared that?

16      A.    I can't say for sure.

17      Q.    Did you prepare some of these?

18      A.    I have, yes.  But given that this invoice

19  was prepared on Brian's computer, I would have to

20  assume that he prepared this.

21      Q.    All right.  Well, if you prepared these,

22  then, did you have a Excel form document to fill in

23  with this information --

24      A.    Yes.

25      Q.    -- to generate this information?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 144 of 206

MEAGAN GOAD

144

1      A.    Yes.

2      Q.    And I take it Brian did too?

3      A.    Yes.

4      Q.    What would be the inputs for the

5  projections, and what would be the information that

6  was generated automatically?

7      A.    The head count would be put in.  The cost

8  would be put in.  Bought weight would be put in.

9  Profit would be put in.  I'm trying to think and go

10  back.  The sale weight would be automatically

11  generated because it would take either 750 or 775

12  multiplied by the sale that had the head count in

13  it, and that would get your sale weight.

14          The dollars sold would be generated because

15  it would take the cost, the profit, and the cost of

16  gain, and it would add those up and put them in

17  that column.

18          And the pounds gained would be

19  auto-generated because it would take the sold

20  weight, subtract the bought weight, and the pounds

21  gained would be in that section.

22      Q.    So if you prepared the document, you would

23  use those inputs from Bri- -- that you received

24  from Brian?

25      A.    Yes.

145

1    Q.   And how would you get those inputs from

2    Brian?

3    A.   Call, text, picture.  I could be sitting

4    beside him.  It ranged.

5    Q.   The next two pages they have some black

6    marks on those, those are redactions that my office

7    created.  It's bank account information from the

8    Thorlakson's bank is why that was done so we are

9    just producing information material to the

10    transaction question.

11          I don't know if you recall this particular

12    transaction, so I'm going to ask you in general.

13          Did Thorlakson Diamond T Feeders pay every

14    invoice that was submitted to it for payment by

15    McClain?

16    A.   I can't say for sure because I don't know.

17    Q.   Do you know of any it did not pay?

18    A.   Not that I'm aware of, no.

19    Q.   Within the books that -- and records that

20    were available to you, did you keep track of who

21    owned what cattle according to documents such as

22    Exhibit 50?

23    A.   No.

24          (Exhibit Number 51 marked for

25    identification.)

146

1           (Off-the-record discussion.)

2           MR. LEBAS:  I'll note for the record that

3   Exhibit 49 is intentionally omitted.

4           I just handed you Exhibit 51, a document

5   entitled "Cattle Feeding Agreement," and the

6   document control number at the bottom is

7   Thorlakson_00076 to 00079.  Tell me when you're --

8       A.   Yes.

9       Q.   -- ready to look at it.  Okay.

10          Do you see that's a cattle feeding

11  agreement that is signed by your dad?  Correct?

12      A.   Yes.

13      Q.   And by -- I don't know if you know Tom's

14  signature, but someone signed for Tom Thorlakson,

15  correct?

16      A.   Yes.

17      Q.   First, 109 head of heifer calves, correct?

18      A.   Yes.

19      Q.   And it has the same language we looked at

20  before.  It refers to Lot 1527 located at 7M

21  Feeders or McClain Feeders?

22      A.   Yes.

23      Q.   Turn to the next page, please.  Is that an

24  invoice?

25      A.   Yes.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 147 of 206

MEAGAN GOAD

147

1     Q.   Do you know who prepared that invoice?

2     A.   I would have prepared that invoice.

3     Q.   It's a different form from the invoice that

4  we just looked at with previous Exhibit Number 50,

5  isn't it?

6     A.   Yes.

7     Q.   And how do you know that you prepared it as

8  opposed to the other form that sometimes was

9  prepared by you and sometimes by Brian?

10     A.   If they were like this, 99 percent of the

11  time I prepared them.  If they were like that,

12  99 percent of the time he prepared them.

13     Q.   When you say "this" or "that," you're

14  referring to Exhibits 50 and 51?

15     A.   Yes, sir.

16     Q.   So if it looks like the second page of

17  Exhibit 51, that's -- 99 percent of the time that

18  was your preparation?

19     A.   Yes.

20     Q.   Was this an invoice form that was on your

21  computer?

22     A.   Yes.

23     Q.   Where did you get the information to fill

24  in for the head count, weight, and price?

25     A.   From Brian.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 148 of 206

MEAGAN GOAD
148

1          Q.    And that was -- he gave you that

2    information the same way as you discussed before?

3          A.    Yes.

4          Q.    The next page in Exhibit Number 0078.  It's

5    a projected closeout document?

6          A.    Yes.

7          Q.    Is that one that you prepared?

8          A.    I can't say for sure, but since the invoice

9    is that invoice, then you could assume that I

10   prepared that, yes.

11         Q.    Last page of the exhibit shows a transfer

12   in the amount of the invoice.

13         A.    Yes, sir.

14         Q.    Were you aware of inspections made by the

15   Thorlaksons to look at their cattle at Texas

16   Feedyard locations?

17         A.    Dad might mention that he was going down

18   there, if he went down there, but other than that,

19   no.

20         Q.    Do you remember any particular occasion --

21         A.    No.

22         Q.    -- in which there were inspections by

23   Thorlaksons of their cattle at the Texas

24   facilities?

25         A.    No.

MEAGAN GOAD

149

1         (Exhibit Number 52 marked for

2    identification.)

3         MR. LEBAS:  This is one I was able to make

4    extra copies of, so I'll hand copies to counsel.

5         MR. MICHAEL JOHNSON:  What did we mark

6    this?  52?

7         MR. LEBAS:  Yes.

8   BY MR. LEBAS:

9     Q.    Ms. Goad, I've handed you Exhibit 52, and

10   it's a collection of some pages that -- that we

11   received a couple of days ago.  I'm not saying you

12   didn't produce them before then.  I'm just saying

13   when I got them.  So they're not as formally

14   arranged as they might be.

15    A.    Okay.

16    Q.    And these are -- as I understand it, these

17   are text messages that are in printed form, all

18   of -- except the very last page is text messages

19   between you and your dad.

20    A.    The first page is not between me and my

21   dad.

22    Q.    Oh, it's not?

23    A.    No.

24    Q.    I see that at the top now.  Thank you.

25         We know that because in the upper left-hand

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 150 of 206

MEAGAN GOAD

150

1    corner it says "Messages - Angela"?

2        A.    And by reading them.

3        Q.    Who is Angela?

4        A.    The lady that Brian used for reconciling

5    and for taxes.

6        Q.    Is that Angela Powell?

7        A.    Yes, sir.

8        Q.    And we'll go through some of these, but I

9    just want to make sure I get the exchanges correct.

10   Then that's Document Control Number 0032, first

11   page.

12           And then the next ones starting at 00332

13   and continuing to 00351, those are between you and

14   Brian, correct?

15       A.    Yes.

16       Q.    And the last page, 00077, "Messages - Bad

17   Bitches"?

18       A.    Those aren't mine.  Those are my sister's.

19       Q.    So this -- this was a text exchange between

20   whom?

21       A.    I don't know.  This is from my sister's

22   phone.  It's not mine.

23       Q.    Oh, all right.  Good, I didn't want to ask

24   you about those anyway.

25           MR. MICHAEL JOHNSON:  Do you know who Abby

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 151 of 206

MEAGAN GOAD

151

1    Glisson is?

2           THE WITNESS:   She worked for Sam Brown.

3   BY MR. LEBAS:

4       Q.   Abby Glisson's name is mentioned in 00077.

5       A.   Yes.

6       Q.   And who did she -- you say she is?

7       A.   She worked for Sam Brown.

8       Q.   And Sam Brown is the person who --

9       A.   Wild Forest.

10      Q.   Yes.

11      A.   Wild Forest Cattle.

12      Q.   Have you ever talked to Abby Glisson?

13      A.   Not that I'm aware of.

14      Q.   Have you ever exchanged emails or letters

15   with her?

16      A.   No, sir, not that I'm aware of.

17      Q.   Do you know if your sisters have, other

18   than this?

19      A.   I'm sure she has.  She is who she met with

20   sometimes for Sam when she met with -- to exchange

21   checks and invoices.

22      Q.   Abby would be the representative of the

23   Wild Forest Group?

24      A.   I can't say that for certain but --

25      Q.   That's what you --

152

1        A.   -- she would be -- I don't know if she

2    would be a representative, but she would be who she

3    would meet with so...

4        Q.   All right.  Very good, thank you.

5             I wanted to look at the first page of

6    Exhibit 52, 0032.  The top entry starting with

7    "Meagan, I have you," is that something that Angela

8    Powell was telling you?

9        A.   Yes.

10       Q.   She says, "Meagan, I have you making the

11   deposits into Farms from your personal account,

12   11/29 of $32,086.53 and 12/30, $31,000.  I can't

13   figure out where you paid yourself back.  Could you

14   help me with this?  Thanks."

15            And you said, "I had a wire come in 11/29,

16   32,212.81 and a wire on 1/9, 38,043.60."

17            Tell us about those transactions, please.

18       A.   They were for investment purposes, then me

19   paying for cattle and getting paid for cattle that

20   had shipped.

21       Q.   So you paid whom for cattle?

22       A.   McClain Farms.

23       Q.   And then McClain Farms sold the cattle,

24   correct?

25       A.   I paid for cattle, and then McClain Farms

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 153 of 206

MEAGAN GOAD

153

1    paid me for cattle of mine that had sold.

2        Q.   Who conducted the sale transaction?

3        A.   Brian.  He did all the buying and selling.

4        Q.   Do you know who --

5        A.   I didn't do any of it.

6        Q.   I'm sorry?

7        A.   I didn't do any of the buying and selling.

8    He did all of it.

9        Q.   Do you know who the buyer was?

10       A.   No, sir.

11       Q.   Did you get paperwork from your dad that

12   said who the buyer was, what the price was, what

13   the cattle weighed, that kind of thing?

14       A.   No, sir.

15       Q.   He just told you, "You made money on this

16   deal; here's how much."  Something like that?

17       A.   It would be, "You need to do a -- write a

18   check to me for this.  You can get Y for this."

19       Q.   Let's go to the next page, please.  There's

20   some names on here I'm going to ask you about.

21       A.   Okay.

22       Q.   At the very top of it, first entry, message

23   from Brian, "Call me and hang up.  Let it ring a

24   few times."

25       A.   Yes.

154

1      Q.   What does that mean?

2      A.   I don't know.  That's why I asked.  "Is

3   everything okay?"

4           He responded with "Absolutely."

5           I said, "Okay."

6           And he said, "Nothing to do with here."  So

7   I dropped it.

8      Q.   And I can't tell from this if that was on

9   March 20 or not, but the next entry did occur on

10  March 20?

11     A.   Yes.

12     Q.   And you say, "I need to get at least a

13  million from Bo."

14     A.   Yes.

15     Q.   And does that mean $1 million from Bo

16  Robinson?

17     A.   That was on the transactions that we had

18  talked about on the phone, and I was telling him

19  what was going to be coming from Bo.

20     Q.   Why did you need to get at least $1 million

21  from Bo?

22     A.   Because that's what -- I was texting him so

23  he would tell me if -- what I was doing on the

24  paperwork, to text him what I was doing.  Like, he

25  told me what to do, but then he would tell me to

155

1    text him the same thing, basically, so he could

2    have it in front of him.  And that's just what he

3    had told me to do.

4       Q.   All right.  And then your next entry, you

5    tell him, "I only have 772 from Sam.  I didn't do

6    Friday."

7            What does that mean?

8       A.   So that would be invoices on Wild Forest

9    that -- that was the total of the invoices from

10   Wild Forest that were done -- or not done on the

11   Friday before.  So I guess he had told me to add up

12   the invoices from Sam that were not done on the

13   Friday prior.

14      Q.   "772," does that mean $772,000?

15      A.   Yes.

16      Q.   And then you say, "Do some from Friday?"

17           And he says, "Yes.  Remember deposit

18   limit."

19           What does that mean?

20      A.   We had a deposit limit.

21      Q.   Who's "we"?

22      A.   McClain Farms, Feedyard, 7M.

23      Q.   What was the deposit limit?  Was it an

24   amount?

25      A.   Yes, sir.

156

1        Q.    And was the amount an amount of dollars

2   that could be deposited on a single day at

3   Mechanics Bank?

4        A.    Yes, sir.

5        Q.    What was the total amount of that limit?

6        A.    If you would have asked me a year ago, I

7   probably could have told you.

8        Q.    You don't remember today?

9        A.    I can't remember today, no, sir.

10       Q.    All right.  Well, it might come to you.

11             And then you say to him, "That's why I have

12   to do so much of Bo."

13             What does that mean?

14       A.    Bo would wire money in instead of a check,

15   and so he would want more money to get wired in

16   than a check.

17       Q.    I don't understand "wanting to get more

18   money wired in than a check."

19       A.    Because of the deposit limit, we could only

20   deposit so much money, so they would have -- it

21   would only --

22             Wires didn't count in the deposit limit, so

23   we could only physically deposit so much money.

24   And he would want -- need so much more money to

25   come in, and so that money would be in wires.

1          MR. MICHAEL JOHNSON:  So you're saying the

2    wire -- they could wire you a hundred million

3    dollars?

4          THE WITNESS:  Yes, they could wire a

5    hundred million dollars.  It didn't matter.

6  BY MR. LEBAS:

7      Q.   The deposit limit applied to checks and not

8    to --

9      A.   Yes, sir.

10     Q.   -- electronically transmitted funds --

11     A.   That's correct.

12     Q.   -- right?

13          Was there some amount that you had in mind

14    that you needed to get in deposits, whether they

15    were checks or wires?

16     A.   It would have been an amount he told me.

17     Q.   That "he" being Brian --

18     A.   Yes.

19     Q.   -- told you?

20     A.   That's correct.

21     Q.   So he might say just, for example, "Today

22    we need $8,500,000"?

23     A.   Yes.

24     Q.   And if the deposit limit is 1 million, then

25    you need 7,000,500 from electronic sources?

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 158 of 206

MEAGAN GOAD

158

1    A.   Yes.

2    Q.   The next entry says, "We have to send

3  Westin", W-E-S-T-I-N "wire today."

4         What is Westin?

5    A.   Westin is one of the investors.

6    Q.   Is that a company, or --

7    A.   No.  It's a person.

8    Q.   -- is that an individual?

9    A.   Individual.

10   Q.   What is his name, full name?

11   A.   Westin Raub.  R-A-U-B.

12   Q.   R-A-U-B?

13   A.   Yes, sir.

14   Q.   Do you know where he lives?

15   A.   Texas.

16   Q.   Do you know where in Texas?

17   A.   No, sir.

18   Q.   Was he someone that you -- whose name you

19  regularly saw?

20   A.   No.

21   Q.   Next entry, "Can't do Westin because I

22  can't figure enough for what he was taking out."

23        What does it that mean?

24   A.   My guess -- I don't want to guess.  I

25  can't -- without me having anything to support it,

159

1    I don't remember.

2        Q.   He then asks you -- your dad asks you, "How

3    much extra you get?"

4             And you typed in "96."

5             Do you know what that means?

6        A.   That would have been over the amount he

7    told me of the amount of money to receive for the

8    day.

9        Q.   So you had $96,000 in excess of the target

10   figure that Brian gave you for that day?  Is that

11   what that's telling us?

12       A.   Yes.

13       Q.   Next entry refers to -- this is from Brian.

14   It reads, "Okay, we better do some Lyndal,"

15   L-Y-N-D-A-L.

16            Do you know who that is?

17       A.   Lyndal Van Buskirk.

18       Q.   Do you know how to spell his last name?

19       A.   V-A-N -- can I see a pen?  I can write it.

20   V-A-N  B-U-S-K-I-R-K.

21       Q.   Do you know where Lyndal was from?

22       A.   Oklahoma.

23       Q.   Do you know what part of Oklahoma?

24       A.   No, sir.

25       Q.   I'm just going to call him Lyndal.

160

1          Was Lyndal a person who was doing business

2     with McClain, with your dad, in some capacity?

3          A.    Yes, sir.

4          Q.    Do you know what kind of business he was

5     doing?

6          A.    An investor.

7          Q.    He was putting money in?

8          A.    Yes, sir.

9          Q.    And receiving payments back?

10         A.    Yes, sir.

11         Q.    Do you know what the scale of the

12    transactions with Lyndal were?

13         A.    Not off the top of my head, no, sir.

14         Q.    Was he someone whose name you saw very

15    often or not very often?

16         A.    Not very -- I mean, not as much as MAP or

17    Wild Forest.

18         Q.    Did you have direct communications with

19    Lyndal?

20         A.    No, sir.

21         Q.    And we've got another entry that -- first,

22    Kinsey.  That'd be your sister, right?

23         A.    Yes.

24         Q.    "I know ... Kinsey," that one.

25         A.    Yes.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
MEAGAN GOAD
Exhibit Goad Deposition Transcript   Page 161 of 206

161

1       Q.   "I'm gonna be on sale in a little while."

2            Is that at the sale?

3       A.   No.  He would have a guy call him from the

4  sale barn, and he would sit on the phone with him

5  while the guy was...

6       Q.   Okay.  While he was -- seeing if he wanted

7  to buy any as represented by the auctioneer?

8       A.   Yes.

9       Q.   Next entry I want to ask you about on this

10 page refers to Michael Acey, A-C-E-Y.

11      A.   Yes, sir.

12      Q.   "... wanted you to be available this

13 afternoon for some loads or something."

14           Who is Michael Acey?

15      A.   He is a guy that purchased cattle from

16 Washington County Livestock for Brian.

17      Q.   And is that in the Benton area?  I'm not

18 sure --

19      A.   No, sir.  It's in central Tennessee -- or

20 central Kentucky.  I'm sorry.  Around Lexington.

21      Q.   Michael Acey is a -- he's an order buyer?

22      A.   Yes, sir.

23      Q.   And was he buying cattle on order for your

24 dad?

25      A.   Yes, sir.

162

1    Q.    And he'd bring the cattle here to be sorted

2    or to -- I mean, your dad pens in Kentucky to be

3    sorted?

4    A.    Yes, sir.

5    Q.    So that's what was happening here?

6    A.    Yes, sir.

7    Q.    Do you have -- would you turn to the next

8    page, please?  It's Number 00340.

9    A.    Yes, sir.

10    Q.    The entries I want to ask you about start

11    on April 3.  There's a -- something that your dad

12    sent with some information about "Jared Lesh

13    cowhorses inc"?

14    A.    Yes.

15    Q.    And that looks to me like a printout, or at

16    least an electronic version, of someone's contact

17    information.  Is that what that is?

18    A.    To me it looks like wire instructions.

19    Q.    Okay.  You're ahead of me.  Do you know why

20    your dad sent you wire instructions for Jared Lesh

21    Cowhorses, Inc.?

22    A.    With the next message being sent, I'm going

23    to say I was supposed to send a wire to Jared.

24    Q.    Do you know what the amount was?

25    A.    Absolutely not.

MEAGAN GOAD

163

1    Q.    You just don't recall the transaction?

2    A.    No.

3    Q.    Then we're going now further into the day,

4    April 3.  All that happened at 12:55, the

5    information about Mr. Lesh.

6          Then April 3, the next -- that evening, he

7    says, "Limit is raised."

8          You get that and you say, "Okay."

9          Do you recall what that's about?

10   A.    That would be the deposit limit for the day

11   was raised.

12   Q.    So that means that limit we talked about

13   in my hypothetical of $1 million, that got raised

14   to -- I'll make it up -- say $2 million?

15   A.    Yes, sir.

16   Q.    Do you know what the new deposit limit was

17   after April 3, 2023?

18   A.    They would only raise it as -- day by day.

19   It was not permanently raised.

20   Q.    When you say they would always -- only

21   raise it --

22   A.    Mechanics.

23   Q.    -- who's "they"?

24   A.    Mechanics.

25   Q.    So Mechanics would raise the deposit limit

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 164 of 206

MEAGAN GOAD

164

1    on a day-by-day basis from time to time?

2        A.    Yes, sir.

3        Q.    How would you find out about that?

4        A.    How would I find out the deposit limit was

5    raised?

6        Q.    Yes.

7        A.    That would be one of the things that Jamie

8    did.

9        Q.    So Jamie -- if she did it, though, how

10   would you find out about it?

11       A.    She would email.  It would have to be

12   requested.

13       Q.    And who would do the request?

14       A.    Me or Brian.

15       Q.    How would you make that request?

16       A.    Email.

17       Q.    Now we're in the next day, April 4, 2023,

18   8:09 a.m.  You say, "She is getting phone numbers."

19             "Told her I didn't have Tom's."

20             Do you know what that's about?

21       A.    She was -- there was a lady from Rabo

22   there.  I don't know what she was doing because I

23   was not privy to any of that information.  I was

24   only told to speak with her when she wanted to

25   speak with me and to stay sparse the rest of the

165

1    time.  And told her I didn't have Tom's number

2    because I did not have Tom's number saved in my

3    phone.

4        Q.   And "Tom" being Tom Thorlakson --

5        A.   Yes, sir.

6        Q.   -- who's here today with --

7             You said a lady from Rabo was where?

8        A.   At the barn in Benton.

9        Q.   With you in your office?

10       A.   Yes.

11       Q.   At the barn?

12       A.   Yes.

13       Q.   Do you remember her name?

14       A.   No, sir.

15       Q.   Was she alone, or did she come with someone

16   else?

17       A.   I feel like there was somebody else there,

18   but I don't really recall much.

19       Q.   A man or a woman?

20       A.   It would have been a man.

21       Q.   Do you recall his name?

22       A.   No, sir.

23       Q.   Did they tell you why they were there?

24       A.   No.

25       Q.   Did you know they were coming?

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 166 of 206

MEAGAN GOAD

166

1      A.    Yes.

2      Q.    How did you find out?

3      A.    Brian told me.

4      Q.    What did he tell you?

5      A.    "There's some people coming from Rabo to

6   ask some questions."

7      Q.    Did he tell you there was any difficulty?

8      A.    No.

9      Q.    I have some names I may -- that I'll try to

10   read through for you.  If you'll give me a moment,

11   I'll get the list.

12          MS. BIRD:  So we're at about 2:35 right

13   now, and Meagan has to leave by 3:30 at the latest.

14   Do you know how much longer you're going to go?

15          MR. LEBAS:  Let me go through the list of

16   names later and see.  Maybe I can provide those to

17   you.  Otherwise, I'll go as quickly as I can.  But

18   if we're not done, perhaps we can come back in the

19   morning.

20          MS. BIRD:  Well, that was with respect to

21   Mr. Johnson's deposition because he's the only one

22   that noticed this.  I'd have to talk to her,

23   whether she wants to come back for depositions that

24   were not noticed.

25          MR. MICHAEL JOHNSON:  I do have some

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript    Page 167 of 206
MEAGAN GOAD

167

1    follow-up questions to David's questions so -- I

2    mean, I don't know about these folks.

3              MS. BIRD:  Right.  Well, Rabo is the only

4    person that noticed it.

5              MR. MICHAEL JOHNSON:  True.

6              MS. BIRD:  So we are here for Rabo.  We are

7    trying to be accommodating to everybody, but she

8    does have to leave at 3:30.

9              MR. LEBAS:  Okay, we understand that.  I'll

10   go as fast as I can.

11   BY MR. LEBAS:

12       Q.   I'll try to get a -- I'll give you a name

13   that's possible.  It wasn't -- it was someone from

14   Rabo.  It wasn't Jamie, correct, who was the

15   Mechanics Bank lady?

16       A.   Can you repeat that?  I'm sorry.

17       Q.   Okay.  The lady from Rabo that you were

18   talking about, I was trying to find the name here.

19       A.   No, I do not believe it was Jamie.

20       Q.   Was the gentleman named Chip Lawson?

21       A.   No, sir.

22       Q.   We're looking back now at Exhibit 52, page

23   00340.  And you said you didn't have Tom's number.

24              Did she tell you why she wanted Tom's

25   number?

168

1        A.    No, sir.

2        Q.    Did she ask for any phone numbers other

3    than Tom's?

4        A.    Yeah.  She got -- there was quite a few

5    numbers that I gave her, but I can't recall whose

6    they were.

7        Q.    Then -- then you say, "Do I just get money

8    from Bo and then what," correct?

9        A.    Yes.

10       Q.    And what do you mean by that?

11       A.    So that would be just doing Bo's invoices.

12   Would I just do Bo's invoices, or were there more

13   invoices that he wanted me to do?

14       Q.    Below that is something that says,

15   "Bank Lady.vcf."

16       A.    That would be a contact.

17       Q.    And what did -- the lady from Rabo that

18   we're talking about, did she give you a contact

19   card or something that you then sent to Brian?

20       A.    Maybe.  I don't recall what that is.

21       Q.    Could you look at your phone and see who

22   that person's identity is?

23       A.    It's not going to tell me -- that's going

24   to be the name that's on the contact.

25       Q.    Bank lady?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 169 of 206

MEAGAN GOAD

169

1      A.    Bank lady will be the -- and it's not in my

2    phone, so I don't know, which could have gotten --

3      Q.    I know it's been a couple years.  So you

4    don't have it with you today?

5      A.    No, sir.

6      Q.    Then Brian sends you something that says

7    "Tom Thorlickson.vcf." [sic]

8      A.    That would have been Tom's contact.

9      Q.    And you said -- you asked him, "Give it to

10    her?"

11          And he said "Tom yes nothing else yet."

12          That's on the inspection?

13      A.    Yes.

14      Q.    This exchange we've just been discussing --

15    and this was April 3, 2023, correct?

16      A.    This past one was April 4th.

17      Q.    April 4.  I'm sorry.

18      A.    Yes, sir.

19      Q.    April 4, 2023.  Thank you for correcting

20    me.

21          And we looked at an exhibit a moment ago

22    that indicated a letter of April 5, 2023, that

23    froze the Mechanics Bank account?

24      A.    Yes.

25      Q.    Did the gentleman and the lady from Rabo

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 170 of 206

MEAGAN GOAD

170

1    tell you that was about to happen?

2        A.   No, sir.

3        Q.   Did they tell you not to accept payments

4    that were being wired into that account because the

5    account was about to be frozen?

6        A.   No, sir.

7        Q.   Did they tell you that funds that were

8    going to be sent to you by cattle purchasers, like

9    Mr. Thorlakson, could not be satisfied because

10   McClain was not going to be able to provide cattle?

11       A.   No, sir.

12       Q.   Did they ask you to contact persons who

13   were doing business with McClain to stop sending

14   money to that bank account?

15       A.   No, sir.

16       Q.   Would you be surprised to the learn that

17   Mr. Thorlakson sent $1,861,766.55 to Mechanics Bank

18   account on April 4, 2023?

19       A.   I don't have anything in front of me that

20   says yes or no, so I can't --

21       Q.   And because you gave that information on --

22   Tom's contact information to the Rabo personnel,

23   they could have contacted him to tell him to not

24   send that money, correct?

25            MR. MICHAEL JOHNSON:  Objection.  Calls for

171

1    speculation.

2        A.    I don't know what they would do with it.

3            MR. MICHAEL JOHNSON:  She also doesn't know

4    why she was asked for his contact info.

5            THE WITNESS:  Yeah.

6  BY MR. LEBAS:

7        Q.    Would you turn to the next page, please,

8    Number 342.  I think it's a continuation of the

9    previous email string --

10       A.    Uh-huh.

11       Q.    -- on 341.  And then there's an entry.

12   It's the third one down from Brian to you that

13   says, "Pay for Florida cattle today"?

14       A.    Yes.

15       Q.    What -- what does that mean?

16       A.    That would have been to send checks for

17   cattle that were purchased out of Florida.

18       Q.    Did the Rabo representatives tell you not

19   to send any checks to pay for cattle?

20       A.    No.

21       Q.    At the bottom of this page 00342, there's

22   some numbers from you to Brian and numbers back.

23   Yours are 3-650, 3-700, 4-675.  Those sound like

24   weight classes of cattle, but do you know what they

25   are?

172

1      A.    That would have been three loads of

2    650-pound calves, three loads of 700-pound calves,

3    and four loads of 675-pound calves.

4      Q.    What does that mean?  Were those the

5    Florida cattle?

6      A.    No, sir.  That would have been going off of

7    the next entry down that was Brian's response.

8    Those were cattle that he sold to be delivered.

9      Q.    That Brian sold to be delivered?

10     A.    Yes, sir.

11     Q.    And then he sends back to you "3-650" and

12   then "75390a."  What does that mean to you?

13     A.    Three loads of 650-pound calves, and the

14   75390a is the PO number for that load -- or for

15   those loads.

16     Q.    We haven't used this term yet.  What's a PO

17   number?

18     A.    Purchase order.

19     Q.    Yeah, explain that.

20     A.    Like, so when the cattle go to the

21   feedyard, they give them this number so they know

22   that those cattle are supposed to be going there.

23   They unload them.  They know who -- where they came

24   from, things --

25     Q.    Who the owner is?

173

1        A.    -- of that nature.  Yes.

2        Q.    Okay.  On the next page, it's 00345.  Most

3   of it appears to be screenshots from handwritten

4   notes.

5        A.    Yes.

6        Q.    I can't read them, but I think on the

7   originals maybe we could.  You mentioned that your

8   dad kept handwritten notes.  Is this the sort of

9   handwritten notes that you saw him generate?

10       A.    Yes.

11       Q.    Where did he keep those handwritten notes?

12       A.    In his office or his office at home.

13       Q.    Were they file cabinets, or did they kind

14   of look like the stuff in front of me right now?

15       A.    It was worse than what's in front of you

16   right now.

17       Q.    Okay.  Were they organized by person

18   he dealt with?  You know, he had a file for

19   Wild Forest, he had a file for MAP, or was it

20   daily or --

21       A.    His handwritten notes, no, they were not.

22   They were just all thrown together on legal pads.

23       Q.    Do you know where those pads are today?

24       A.    I assume someone -- I don't know -- no, I

25   don't know where they're at.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 174 of 206

MEAGAN GOAD

174

1      Q.   The last time you saw them, where were

2   they?

3      A.   On his desk.

4      Q.   At his home office?

5      A.   Either/or.  His home office or his office

6   at the barn.

7      Q.   Underneath the first one of these pictures,

8   there's something that says, "I messed the close

9   out up.  Charlie is right."

10         That's you sending a message?

11      A.   Yes.

12      Q.   What does that mean, "I messed the close

13   out up"?

14      A.   On the previous one, he asked me to check

15   on closeout, so I would have gone back and checked.

16   I could have typed a number wrong or put the

17   decimal in the wrong place so...

18      Q.   And then you say "Charlie is right."  Who's

19   Charlie?

20      A.   Charles Lockwood.

21      Q.   Lockwood?

22      A.   Yes, sir.

23      Q.   And tell us who he is.

24      A.   He was a loan officer in Oklahoma that was

25   an investor.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 175 of 206

MEAGAN GOAD

175

1      Q.   He's a loan officer?

2      A.   Yes, sir.

3      Q.   So his job was loan officer?

4      A.   Yes, sir.

5      Q.   But he privately was a cattleman?

6      A.   Yes, sir.

7      Q.   Do you know what bank Mr. Lockwood --

8      A.   I can't --

9      Q.   -- worked for?

10     A.   -- remember off the top of my head, no.

11     Q.   But somewhere in Oklahoma?

12     A.   Yes, sir.

13     Q.   Do you recall if Mr. Lockwood was someone

14   that you saw his name often or not often?

15     A.   It wasn't super often, but it was often.

16     Q.   Was he associated with a company?

17     A.   No, sir.  He was doing it as an individual.

18     Q.   So whatever transactions, if we want to try

19   to figure it out, it would say Lockwood as opposed

20   to Lockwood Cattle or something?

21     A.   Yes, sir, it would say "Charles Lockwood."

22     Q.   On the next page, it's 00347, there's the

23   name Janet Van Buskirk.

24     A.   Yes.

25     Q.   And you've told us about her already.  Same

176

1    lady?

2        A.    No.   I spoke of one of her relatives.   It

3    was Lyndal.   I'm not sure if Janet is a daughter, a

4    sister, a wife, not sure, but same family.

5        Q.    Do you know why Janet was calling you?

6        A.    No, sir.

7        Q.    And then you sent a contact for someone.

8    Do you know who that was you were sending?

9        A.    No, sir.

10       Q.    Below that you say, "Has Chip called back?"

11             Is that Chip Lawson?

12       A.    Yes.

13       Q.    Was he calling you or Brian, or what's the

14   context of that entry?

15       A.    Since this appears to be on April 6th of

16   '23, I would say that Chip was calling Brian, and

17   we were trying to figure out what was going on

18   while we were locked out of the accounts.

19       Q.    And then you wrote, "Jamie may have

20   answers."

21       A.    Yes.

22       Q.    Is that Jamie at Mechanics Bank --

23       A.    Yes, sir.

24       Q.    -- that you were referring to?

25       A.    Yes, sir.

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 177 of 206

MEAGAN GOAD

177

1      Q.   Later on this sheet but the next day,

2   April 7, 2023, 1:27, you asked, "Are they going to

3   return every check we have written?"

4           And then you say, "I'm asking because Jed's

5   trucking checks were written Tuesday and I need to

6   know what to tell him if they are getting

7   returned."

8           Is that Jed, your husband?

9      A.   Yes.

10      Q.   And what does that mean trucking -- his

11   trucking checks?

12      A.   The JLE Trucking invoices.

13      Q.   So were these checks delivered -- I mean,

14   were these checks written to him --

15      A.   To JLE.

16      Q.   -- from McClain?

17      A.   Yes.  To JLE Trucking.

18      Q.   To JLE?

19      A.   Yes.

20      Q.   From McClain?

21      A.   Yes.

22      Q.   So the question is:  Are the checks written

23   to JLE going to be returned back because the

24   account is frozen?

25      A.   Yes.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 178 of 206
MEAGAN GOAD

178

1      Q.    That's what you're asking?

2      A.    Yes.

3      Q.    And your dad responds, "... rerun them and

4    they will be good Monday," correct?

5      A.    Yes.

6      Q.    And then you write back the next day,

7    afternoon, 4:54, and you say, "Probably too late"

8    with a string of numbers.  What does that mean?

9      A.    That's the McClain Farms EIN.

10     Q.    Why do you say "Probably too late" with the

11   McClain Farms EIN?

12     A.    I would say he called me and asked me to

13   get it, and it took me a long time to get it.

14     Q.    The "Probably too late" didn't refer to

15   running the checks back?

16     A.    No.  That has -- that was the company EIN.

17   That would have nothing to do with checks.

18     Q.    Let's look at page 351.  These sort of got

19   out of order, so it's a couple pages in.  And at

20   the top of page 351, there's a date stamp, 4/11/23.

21   Do you see that?

22     A.    Yes.

23     Q.    And there's a -- looks like an image of --

24   it says, "Last week invoice.  She sent it last

25   night."

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
MEAGAN GOAD
Exhibit Goad Deposition Transcript   Page 179 of 206

179

1          Can you tell what that is?

2     A.    That would be an invoice from Riley

3  Livestock.

4     Q.    Riley Livestock?

5     A.    Yes.

6     Q.    And was Riley one of the persons or

7  companies that your father dealt with?

8     A.    Yes.

9     Q.    Did Riley sell cattle to your dad or buy

10  cattle from your dad?

11     A.    They bought cattle for my dad.

12     Q.    They were a buyer?

13     A.    Yes.

14     Q.    Broker?

15     A.    Broker or buyer, all of the above.

16     Q.    Cattle jockey?

17     A.    Yeah, they did it all.

18     Q.    Okay.  So you say, "Last week invoice.  She

19  sent it last night."

20          So this is Riley sending a bill, right?

21     A.    Yes.

22     Q.    And then you say, "Stop back dating stuff.

23  I can't keep up with all the trucking shit I have

24  to do.  And if they look into anything it's going

25  to look suspicious as shut."

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 180 of 206

MEAGAN GOAD

180

1     A.    Yes.

2     Q.    What are you getting at there?

3     A.    He was back dating invoices, so he was --

4     Q.    "He" being?

5     A.    That Brian was going and taking things that

6  I had done and changing them and backdating them.

7     Q.    So you would send an invoice for payment to

8  be paid?

9     A.    It was --

10    Q.    You'd send a McClain invoice saying, dear

11  somebody, please pay McClain --

12    A.    Yes.

13    Q.    -- X dollars?

14    A.    An invoice, like, on these other exhibits,

15  one of those invoices, a cattle invoice, and then

16  he was going back in and backdating them.

17    Q.    How would you find -- how did you find out

18  about that?

19    A.    I went in my office, and he was in there

20  doing it.

21    Q.    On the computer?

22    A.    Yes.

23    Q.    Do you know which persons that he was doing

24  business with that he was backdating records?

25    A.    No.

181

1      Q.   Do you have any way to figure that out

2  today?

3      A.   No.

4      Q.   When you confronted him -- well, I take it

5  you confronted him with that at the time you saw

6  him?

7      A.   Yes.

8      Q.   What did he say?

9      A.   He didn't.  He just blew me off and said,

10  "I'll deal with it.  Don't worry about it."

11          MS. BIRD:  Since we're almost at 3:00 --

12          MR. LEBAS:  I'm going -- yeah, I'm going to

13  pass the witness.

14          MR. MICHAEL JOHNSON:  All right.

15          MR. LEBAS:  Well, we have people on the

16  line also who may have questions.

17          MS. BIRD:  Again, they didn't notice it

18  so --

19          MR. MICHAEL JOHNSON:  So what do you

20  want -- I mean, again, it's up to you.  You're

21  right.  On the other hand, if we don't let them ask

22  questions today or tomorrow, they may call you in

23  here again, so it's kind of up to you.

24          MS. BIRD:  Right.  It's something we'll

25  talk about.  I don't know -- nobody's voiced

182

1    anything on the Zoom, and we've been clear about

2    the 3:30 start time -- stop time so --

3          MR. MICHAEL JOHNSON:  Yeah.

4          MR. MASSOUH:  This is John Massouh.  I do

5    have a handful of questions, but, you know, if you

6    prefer us to separately notice you, that's fine,

7    however you want to do it.  I just have a handful

8    of questions.  I don't know how many you have,

9    Michael.

10         MR. MICHAEL JOHNSON:  Probably 5 to 10

11   minutes of questions.

12         MS. BIRD:  So hopefully we'll get through

13   all of it, then.

14         MR. FARMER:  Let's go through your

15   questions first.  That way we know we've at least

16   complied.  And then if we have time left over

17   before 3:30, then we'll --

18         MR. MICHAEL JOHNSON:  We've got 35 minutes.

19   And if everybody's willing to not take a break,

20   maybe we can just press through.

21         MS. BIRD:  I think that's probably

22   preferable to Meagan.

23         THE WITNESS:  Yeah, that's fine.

24   ///

25   ///

183

1                    REDIRECT EXAMINATION

2  BY MR. MICHAEL JOHNSON:

3      Q.   So, Meagan, Mr. LeBas showed you Exhibit

4  47, the letter I sent to Mechanics Bank.

5      A.   Yes.

6      Q.   Do you remember that?

7           And he asked you about the names on that

8  letter, and you said, other than Jamie, you didn't

9  know who they were, correct?

10     A.   Yes.

11     Q.   Who at Rabo do you recall dealing with by

12  name?  Chip Lawson, probably?

13     A.   Yeah, the only dealings I had would be

14  what -- like, minimal.  I didn't have any dealings

15  with -- Chip would be the only person I feel like

16  at Rabo that I had even spoke to.

17     Q.   So you don't recall anybody other than Chip

18  ever -- ever speaking to anybody at Rabo other than

19  Chip Lawson?

20     A.   No.  And the lady that came --

21     Q.   In April?

22     A.   -- in April, yes.

23     Q.   And you don't remember her name?

24     A.   No.

25     Q.   Okay.  And you don't -- it's fair to say,

184

1    is it not, that you don't know what actions, if

2    any, Mechanics Bank took in response to my letter

3    other than freezing the account, correct?

4        A.   That's correct.

5        Q.   So you don't know if they gave us any

6    money, didn't give us any money, anything like

7    that?

8        A.   No, I have no idea.

9        Q.   All right.  Exhibit 48 was what?

10       A.   2B checks.

11       Q.   I'm not going to ask you any questions

12   about that.

13           Exhibit 50, I think you said Exhibit 50,

14   you believe your dad actually prepared this

15   information -- this documentation?

16       A.   Yes, sir.

17       Q.   Because it's an -- the invoice form is

18   different than the form that you use, right?

19       A.   Right.

20       Q.   And the cattle agreement form looks similar

21   but maybe a little different than what you're used

22   to, or is it the same basic cattle agreement?

23       A.   No, it's different from what I use.

24       Q.   Okay.  And that reflects some sort of an

25   agreement with Mr. Thorlakson and his company,

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 185 of 206

MEAGAN GOAD

185

1    correct?

2       A.   Yes.

3       Q.   To your knowledge, did Mr. Thorlakson or

4    any of these people that I've called investors, did

5    they actually sell, physically sell -- sell and

6    physically deliver cattle to McClain, or was this

7    just -- were they all just investment arrangements?

8            MR. LEBAS:  Object to the form.  The word

9    "investors" is not defined.

10      A.   None of them would bring physical cattle to

11   the feedyard.

12   BY MR. MICHAEL JOHNSON:

13      Q.   Okay.  And then, for example, on this

14   example with this Thorlakson, assuming he or

15   somebody else -- you know, another person that was

16   doing the same thing sent money to McClain, would

17   McClain do anything to segregate the cattle, brand

18   the cattle, show the cattle as being owned by

19   anybody other than the McClain entities?

20           Like, for example, was there a Thorlakson

21   ear tag stuck on the cattle or a Thorlakson brand

22   stuck on the cattle?

23      A.   It would go off of the lot number.

24      Q.   So you'd -- other than the lot number, that

25   was it?

186

1      A.   Yes, that I'm aware of.

2      Q.   Okay.  That is the only exhibit I have.

3  It's a stack of texts.  So you produced some texts

4  with you and Kinsey, correct?

5          MR. LEBAS:  This is our next one, 53.

6          MR. MICHAEL JOHNSON:  Do you have an extra

7  copy?

8          MS. KOBLISKA:  Yeah.  It's in a staple, but

9  that's --

10          MR. MICHAEL JOHNSON:  Okay, we'll mark it

11  as 53.

12          (Exhibit Number 53 marked for

13  identification.)

14  BY MR. MICHAEL JOHNSON:

15      Q.   I just have a few questions on this.  I'm

16  putting in front of you Exhibit 53.  Do you have

17  that?

18      A.   Yes.

19      Q.   For the record, it's Bates labels

20  GoadMoreland_000259 through 000278, for the record.

21          Are these texts between you and your dad,

22  or are they between Kinsey and your dad, or do you

23  know?

24      A.   These would be from Kinsey because my kids

25  are not in daycare.

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 187 of 206

MEAGAN GOAD

187

1      Q.    Okay.

2            MR. LEBAS:  Would you identify the numbers,

3      please?

4            MR. MICHAEL JOHNSON:  Yeah, it's

5      GoadMoreland_000259 through 000278.

6            MR. LEBAS:  259, 278.  All right, thank

7      you.

8   BY MR. MICHAEL JOHNSON:

9      Q.    In these emails, your dad -- and you said

10     that these are Kinsey's, right, texts?  But he's

11     saying, "I need you to do some research to add

12     small hidden cameras see which is best and easy to

13     use."

14           Do you know anything about your dad wanting

15     to put cameras up?

16     A.    They were for his home, for personal use.

17     Q.    And did you -- did he ever tell you why he

18     was looking into cameras?

19     A.    No.

20     Q.    If you'll turn to -- at the bottom of the

21     page, it's 262.  It's some texts that are occurring

22     on January 20th of '23 at 6:01 p.m.  Do you see

23     that?

24     A.    Yes.

25     Q.    So apparently Kinsey says, "You good with

188

1     me leaving 20 in your truck and taking money out of

2     what I got for you today."

3            "There is one that's on the bottom shelf.

4     Is that it?"

5            And your dad says, "It is black." [sic]

6            Do you see that?

7     A.    Yes.

8     Q.    And then there's the answer, "Yes."

9            "Not very inconspicuous with it right there

10    when you open the doors."

11           Do you see that?

12    A.    Yes.

13    Q.    So did your dad often ask you or Kinsey to

14    give him large cash amounts?

15    A.    No.

16    Q.    Did it ever happen?

17    A.    He would cash small checks on calves that

18    he would take to -- we have local slaughterhouses.

19    Q.    Uh-huh.

20    A.    And when those calves would go to the

21    slaughterhouse, they would be random, different

22    people that would purchase a half beef or whole

23    beef, and he would cash those checks.  I mean, they

24    were -- most of them were $1,500 or less.

25    Q.    And then he would cash the checks, and then

1    he would ask you to put the money in the McClain

2    accounts?  Is that what happened?

3        A.    No, we can't -- we could not put cash into

4    the McClain accounts with it being in California.

5        Q.    And you said on the checks that were

6    written, you had a remote capture machine, right --

7        A.    Yes.

8        Q.    -- that you'd run the checks through?

9        A.    Yes.

10       Q.    Did he ever tell you -- maybe I just asked

11   you this.  If I did, I'm sorry.

12            Did he ever tell you why he was worried

13   about or wanted cameras?  Was there something going

14   on?

15       A.    He never told me anything about it, no.

16   They spoke about it, I think, but I didn't know.

17       Q.    "They" being he and Kinsey?

18       A.    Yes.

19       Q.    Okay.  If you turn to GoadMoreland_000265,

20   up at the top, it says, "Hey Brian! I actually need

21   165 now if you have it.  80-Angie, 25-donnitta,

22   10-Tyra, 50-Beth.  Need this money from harts weigh

23   please."

24            "Take it to maranda, Michael Evans wife,

25   work."

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 190 of 206

MEAGAN GOAD

190

1        Do you see that?

2    A.   Uh-huh (affirmative).  Yes.

3    Q.   Do you know what's going on here in this

4  text exchange?

5    A.   That would be hamburger meat from --

6  because Hart's is a slaughterhouse.

7    Q.   And so what does it mean when -- do you

8  know who told your dad, "I need 165 now"?

9    A.   No.

10   Q.   Do you know what that means?  "I actually

11 need 165 now if you have it.  80-Angie,

12 25-donnitta, 10-Tyra, 50-Beth."

13   A.   I can speculate, but I don't know for sure.

14   Q.   What's your speculation?

15   A.   That it's pounds of hamburger meat.

16   Q.   All right.  So you think this is just

17 somebody wanting some burger --

18   A.   Yeah.

19   Q.   -- or some meat?

20   A.   Because it says, "Need this Monday from

21 harts weigh please."

22        So that's what makes me believe it was

23 hamburger meat.

24   Q.   Turn to 267, if you would.  Again, I

25 understand these are not your texts.  They're

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 191 of 206

MEAGAN GOAD

191

1    Kinsey's.  But on February 6, '23, at 5:16, Kinsey

2    texts your dad, apparently, that says, "I'm at the

3    light at beanies coming to your house to bring cash

4    and get a check."

5          Did you or Kinsey often take cash to your

6    dad and exchange cash for checks?

7      A.   No.

8      Q.   Do you know what this is about?

9      A.   No.

10     Q.   On 1276, GoadMoreland_276, your dad says,

11   again to Kinsey, "Can you come by and get cash for

12   David?"

13         Do you know who David is?

14     A.   He was the feed guy.

15     Q.   So did he work for McClain?

16     A.   Yes.

17     Q.   So rough math, there's somewhere between

18   $150 and $170 million missing, unaccounted for.

19         Do you have any idea where all of the cash

20   that ran in and out of the McClain enterprises may

21   have ended up?

22     A.   I have no idea.

23     Q.   Do you know if -- I mean, did your dad buy

24   any property or anything like that?

25     A.   Not that I'm aware of.

192

1      Q.    Did he invest in anything?

2      A.    Not that I'm aware of.

3      Q.    Did he -- did he use drugs?

4      A.    I can't say for sure.

5      Q.    Do you believe he used drugs?

6      A.    Yes.

7      Q.    Do you believe he was having an addiction

8   problem?

9      A.    Yes.

10     Q.    Was that the entire time, or was it more

11   kind of later towards the end?

12     A.    Probably the last year.

13     Q.    Do you know -- what type of drugs do you

14   believe your father was abusing?

15     A.    He was drinking heavily.

16     Q.    Drinking?

17     A.    Drinking heavily.

18     Q.    Was he using any other drugs whether

19   prescribed or not?

20     A.    Adderall or Vyvanse.

21           MR. LEBAS:  Adderall and what?

22           THE WITNESS:  Vyvanse.

23           MR. LEBAS:  What is Vyvanse?

24           THE WITNESS:  A form of Adderall.

25   ///

MEAGAN GOAD

193

1   BY MR. MICHAEL JOHNSON:

2       Q.   And Adderall is -- it's like an ADHD

3   medicine, isn't it?

4       A.   Yes.

5       Q.   Did he have ADHD problems, to your

6   knowledge?

7       A.   Not that I'm aware.

8       Q.   So it's your belief that he was abusing

9   Adderall and drinking way too much?

10      A.   Yeah.

11      Q.   Did you ever notice a change in his

12   behavior or actions or anything like that that made

13   you suspicious?

14      A.   I wondered why he started drinking so much

15   more, but other than that, I mean --

16      Q.   Was that -- was he drinking a lot before --

17   while he was still married to Crystal, or was that

18   more after he was married to --

19      A.   After.

20      Q.   -- Chelsea?

21      A.   Him and Crystal divorced is whenever he

22   started drinking more.

23      Q.   Okay.

24           MR. MICHAEL JOHNSON:  That's all I have.

25           John, you had some questions?

194

1          MR. MASSOUH:  Yes, just a few.

2                    CROSS-EXAMINATION

3    BY MR. MASSOUH:

4       Q.   Hi.  My name is John Massouh.  I represent

5    a handful of different -- what we refer to as

6    cattle creditors, including some of the Leshes.  I

7    know you testified a little bit about some of the

8    Leshes's dealings with Mr. McClain.

9            You had mentioned that -- I think your

10   testimony was all the Leshes got a checkbook, a

11   McClain checkbook or checks, that were already

12   blank checks.  Is that correct?

13      A.   A lot of them did, yes, sir.

14      Q.   Okay.  Can you tell me which ones?  I think

15   there's several different Leshes.  Do you know

16   which of the Leshes actually received blank checks?

17      A.   I believe Jan and Gary, Colette, which Joel

18   and Colette were one in the same at that time.  And

19   I want to believe that Jared also got blank checks

20   as well.

21      Q.   Okay.  Any other Leshes that may have

22   received blank checks?

23      A.   I don't believe so.

24      Q.   Earlier Mr. Johnson was asking you about

25   the borrowing base reports that were submitted to

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 195 of 206

MEAGAN GOAD

195

1    Rabo.  With regard to those reports, it's my

2    understanding from your testimony that you would

3    fill them out based on information you would

4    receive from Brian, correct?

5        A.   Yes.

6        Q.   And there was times when -- my

7    understanding, there were times when you were

8    filling those out based on that information where

9    Brian was in the same room with you and other times

10   where he was not.  Is that fair?

11       A.   Yes.

12       Q.   When he was in the same room with you

13   providing you the information for the borrowing

14   base report, what types of document -- or what was

15   he looking at in order to provide you the

16   information to include in the report?

17       A.   He always had one of his legal pads with

18   him, but I don't know exactly what he was looking

19   at.

20       Q.   Would he ever refer to any information on

21   his computer?

22       A.   No.

23       Q.   It was just simply whatever his notes were

24   on the legal pad?

25       A.   Yes, sir.

196

1      Q.    Did you ever come across -- I think you

2    mentioned you came across a lady and possibly a

3    gentleman who was in the barn with you from Rabo.

4          Did you ever come across any other in

5    person any other representatives of Rabo?

6      A.    Other than Chip Lawson, no.  I was always

7    told to make myself disappear when there was anyone

8    around.

9      Q.    Do you know if Rabo sent inspectors to the

10   various yards to do an inspection of cattle?

11     A.    I do not know.

12     Q.    Do you know whether or not other banks,

13   like AgTexas or Amarillo National Bank or Community

14   State Bank or First Bank & Trust sent inspectors to

15   look at -- to the yards to look at cattle and

16   inspect cattle?

17     A.    I do not know.

18     Q.    Did you ever come across any bank

19   inspectors that were there to inspect the yard for

20   cattle?

21     A.    No, sir.

22     Q.    Did you ever come across any bank

23   inspectors that were seeking financial or

24   accounting information from you or anyone else who

25   worked for McClain?

197

1        A.    Other than the one lady from Rabo, no, sir.

2              MR. MASSOUH:  I pass the witness.

3              MR. MICHAEL JOHNSON:  We've got about 15

4     more minutes.  Does anybody else have a few

5     questions for Ms. Goad?

6              MR. LEBAS:  I've got a follow-up question.

7     I don't know if it's my turn or not.

8              MS. BIRD:  If no one on the Zoom has one,

9     Mr. LeBas said he has more.

10             MR. LEBAS:  Just one and maybe a follow-up

11    depending on the answer.  Okay, not hearing any

12    objection.

13                    RECROSS-EXAMINATION

14 BY MR. LEBAS:

15        Q.    Does the name Michelle Stockett sound

16    familiar to you?

17        A.    Yes, sir.

18        Q.    How do you know Michelle Stockett's name?

19        A.    I feel like she was the one that came to do

20    the inspections, I think.  But the name definitely

21    sounds familiar.

22        Q.    You think she was the lady who was at the

23    barn?  Was that Michelle Stockett?

24        A.    It would not be the one that was asking

25    questions.  So prior to the one who came that was

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 198 of 206

MEAGAN GOAD

198

1    asking questions, there was a lady that came to do

2    an inventory count.  I was not privy to any of

3    that.  I just know that she came and did it.  I

4    never saw her.  I just know that it was happening.

5    And the name sounds familiar.

6        Q.   Okay.  So the sequence of events, would

7    this be correct?  That you met with the lady in the

8    barn whose name you can't remember right now and

9    you think Mr. Lawson.  And then sometime after that

10   meeting, Ms. Stockett came to look at cattle in

11   Kentucky?

12       A.   No.  It would be opposite.  They came to do

13   inventory prior, and then the one that came that

14   was asking questions came after they did an

15   inventory.

16       Q.   All right.  So the sequence of events would

17   be Michelle Stockett came to look at cattle in

18   Kentucky.  And after that, the lady with Mr. Lawson

19   came to talk to you in your office at the barn?

20       A.   It was not Mr. Lawson.  I'm not sure who it

21   was, but it was not Mr. Lawson.

22       Q.   All right.  Well, whoever that was -- so

23   let me rephrase it.

24            Michelle Stockett did the report -- sorry.

25   Michelle Stockett performed an inspection in

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 199 of 206
MEAGAN GOAD

199

1    Kentucky.  After that, you had the meeting in your

2    office at the barn with a Rabo representative who

3    was female and one that was male --

4        A.   Yes.

5        Q.   -- correct?

6             Do you know how long before the meeting at

7    the barn that you just described the inspection

8    occurred?  What was the time lapse?

9        A.   Within a week, I feel like.  I can't be for

10   sure, but I feel like it was within a week.

11       Q.   So if the -- the meeting in the barn was

12   early April 2022, then the inspection would have

13   been maybe late March or very early April 2022?

14   Does that sound right?

15       A.   Honestly, I don't know.

16       Q.   Okay.  I can give you a date of the barn

17   meeting because that's on Exhibit Number 52,

18   page 340.  It's three pages into the exhibit.  And

19   the reference to "bank lady" appears under the

20   timestamp April 4, 2023.

21       A.   Yes, sir.

22       Q.   And so you're saying, to the best of your

23   recollection, the inspection in which Ms. Stockett

24   was involved occurred within approximately one week

25   before April 4, 2023?

Case 24-02007-swe    Doc 153-2    Filed 06/05/25    Entered 06/05/25 15:23:40    Desc
Exhibit Goad Deposition Transcript    Page 200 of 206

MEAGAN GOAD

200

1      A.   I feel like that would be accurate, but my

2   sense of time could be off because it's been a

3   little over a year.

4      Q.   I understand.  I'm just asking for your

5   best estimate at this time.

6      A.   Okay, we'll stretch it out.  We'll just say

7   within the month just to make sure it'll be broad

8   enough.

9      Q.   Did you keep any records of the visit by

10   Ms. Stockett of an inspection?

11      A.   No.

12      Q.   Did she leave any records with you of the

13   results of her inspection?

14      A.   I was not privy to any of that information.

15      Q.   Were you present when the inspection

16   occurred?

17      A.   No.

18      Q.   Was your dad?

19      A.   Yes.

20      Q.   Do you know where the inspection occurred?

21      A.   No.  I was told to make myself scarce and

22   to go away for a while.

23      Q.   Who told you that?

24      A.   Brian.

25      Q.   Did he tell you ahead of time that the

1    inspection was going to occur?

2        A.    Yes.

3        Q.    How long before the time that you learned

4    about the inspection occurring did he tell you it

5    was going to occur?  That's probably a bad

6    question.

7        A.    Yeah.  Can you rephrase that?

8        Q.    When he told you the inspection would

9    occur, how long before that call in which he told

10    you the inspection would occur did the inspection

11    occur?

12        A.    He probably told me the day before.

13        Q.    Did he tell you how he learned it was going

14    to happen?

15        A.    No.

16        Q.    Did you see documents that said, "Someone's

17    coming out.  We need to get ready.  Get the cowboys

18    prepared"?  Anything like that?

19        A.    No.

20        Q.    Do you remember anyone other than Michelle

21    Stockett coming to look at the Kentucky facility

22    during the time frame that you mentioned?

23        A.    No.

24        Q.    She was by herself as far as you know?

25        A.    As far as I know.  I never laid eyes on

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 202 of 206

MEAGAN GOAD
202

1    her, so I don't know.

2            MR. MICHAEL JOHNSON:  Just one.  Couple

3    follow-up.

4            MR. LEBAS:  Hold on.  I want to make sure I

5    covered everything.

6            MR. MICHAEL JOHNSON:  Sorry, David.

7    BY MR. LEBAS:

8        Q.   Did you have any contact with the

9    inspection team after this inspection occurred?

10       A.   No.

11           MR. LEBAS:  I pass the witness.

12                    REDIRECT EXAMINATION

13   BY MR. MICHAEL JOHNSON:

14       Q.   You said you knew Michelle Stockett came.

15   You didn't ever see her, lay eyes on her, talk to

16   her, or anything like that, right?

17       A.   Correct.

18       Q.   If I told you that Michelle Stockett was

19   there in Kentucky on or about March 10th, would

20   that sound about the right time frame?  So almost a

21   month prior to the April 4th meeting?

22       A.   That could be, yes.

23           MR. MICHAEL JOHNSON:  That's all I have.

24           MR. MASSOUH:  One quick follow-up question.

25   ///

203

1                    RECROSS-EXAMINATION

2  BY MR. MASSOUH:

3      Q.    The lady that came and was asking

4  questions while you're in the barn, what -- you may

5  have answered this before, and I may have missed

6  it, so I apologize.

7            What types of questions do you recall her

8  asking you?

9      A.    General questions of cattle flow and things

10  of that nature.  I didn't answer that many

11  questions with her.  I spent maybe 30 minutes with

12  her.

13     Q.    Did she ask for any documents or financials

14  or anything of that nature?

15     A.    Not from me, no, sir.

16     Q.    How long did that meeting occur when she

17  was in there with you in the barn?

18     A.    With me, it was probably only 30 minutes,

19  but she was with my dad for -- I can't recall, but

20  they were together a lot.

21     Q.    I couldn't see some of the exhibits that

22  Mr. LeBas was asking you about, but if I recall, if

23  I understood correctly from the questioning and

24  your answers, there was some -- I guess some text

25  messages relating to seeking of telephone numbers

Case 24-02007-swe   Doc 153-2   Filed 06/05/25   Entered 06/05/25 15:23:40   Desc
Exhibit Goad Deposition Transcript   Page 204 of 206

MEAGAN GOAD

204

1    for different individuals.

2            Was she asking you about telephone numbers

3    for individuals?

4       A.   Yes, sir.

5       Q.   Okay.  And what individuals do you recall

6    her asking you for a telephone number for?

7       A.   I don't.  The only one would be Tom

8    Thorlakson because that was on the text messages,

9    but I don't recall anyone else other than that.

10      Q.   Do you recall if she was asking you for

11   phone numbers related to other customers of

12   McClain?

13      A.   Yes.

14      Q.   Do you recall approximately how many, just

15   in -- an approximation?

16      A.   I don't remember.

17      Q.   Do you think it was over 12?

18      A.   I wouldn't think so.

19           MR. MASSOUH:  Pass the witness.

20           MR. MICHAEL JOHNSON:  Anybody else?

21           MR. LOVELL:  Not here.

22           MR. JAVON JOHNSON:  This is Javon Johnson

23   on behalf of Mechanics Bank.  I don't have any

24   questions for the witness, but I did not do an

25   announcement at the beginning, so I just wanted to

205

1    do that for the sake of the record.  Thank you.

2           MR. MICHAEL JOHNSON:  So I think we're done

3    with the examination.  I assume you want to read

4    and sign?

5           MS. BIRD:  Yes.

6           MR. MICHAEL JOHNSON:  Okay.  That means

7    they'll send the transcript to Charity or Todd.

8           Probably Todd, right?

9           And then you'll have the opportunity to

10   read through it, make any necessary corrections.  I

11   think you have 30 -- at least you usually have 30

12   days.

13          MS. BIRD:  Yeah.

14          MR. MICHAEL JOHNSON:  And then if you don't

15   make changes, it's going to be exactly as the court

16   reporter takes it down.  If you have changes, there

17   will be a correction sheet.  You can mark down page

18   whatever, line whatever, change it to this.  Send

19   it back to Todd.  He'll send it to the court

20   reporter.

21          We thank you for making yourself available

22   today, and we are going to get you out of here by

23   3:30.

24          (The deposition concluded at 3:21 p.m.)

25

MEAGAN GOAD

206

_____

MEAGAN GOAD

COMMONWEALTH OF KENTUCKY        )
                                )
COUNTY OF _____  )

    I certify that this deposition was signed in my
presence by MEAGAN GOAD, on the _____ day of
_____, 2024.

    IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my seal of office on this the _____ day of
_____, 2024.

                        _____
                        Notary Public No. _____
                        State of Kentucky at Large

My Commission expires _____.