David L. LeBas, SBN 12098600
dlebas@namanhowell.com
Michael S. Duncan, SBN 24097628
mduncan@namanhowell.com
NAMAN HOWELL SMITH & LEE PLLC
8310 N. Capital of Texas Highway, Ste. 490
Austin, Texas 78731
Ph. (512) 479-0300
Fax (512) 474-1901

*ATTORNEYS FOR AGTEXAS FARM
CREDIT SERVICES AGTEXAS, PCA AND
THORLAKSON DIAMOND T FEEDERS, LP*

John Massouh, SBN 24026866
John.massouh@sprouselaw.com
Josh Kundert, SBN 24143877
Josh.kundert@sprouselaw.com
SPROUSE SHRADER SMITH PLLC
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas 79105-5008
(806) 468-3300; (806) 373-3454 FAX
--and--
Abel A. Leal, SBN 24026989
abel@leal.law
LEAL LAW FIRM, LLC
14180 N. Dallas Parkway, Suite 300
Dallas, Texas 75254
(214) 395-5325

*ATTORNEYS FOR DENNIS BUSS, BUSS
FAMILY TRUST, EDDIE BRYANT, ROBERT
E. GRAY, RONNIE GRAY, GRAY
BROTHERS, CRAIG SUTTON, AMY
SUTTON, STEVE RYAN, JANICE LAWHON,
AJ JACQUES LIVING TRUST, GUNGOLL
CATTLE, LLC, LEAH GUNGOLL,
MORRISON CAFÉ, LLC, GARY LESH, JAN
LESH, LESH FAMILY TRUST, JARED
LESH, JORDAN LESH, LLC, JOEL
BROOKSHIRE, GENE BROOKSHIRE
FAMILY, LP, DOUGLAS FINLEY, SCARLET
AND BLACK CATTLE, LLC, BRYAN
BLACKMAN, STEVE T SCOTT FARM, INC.,
SCOTT LIVESTOCK COMPANY, INC.,
ARNOLD BRAUN TRUST, ROBERT BRAUN,
JIM RININGER, ROBERT SPRING,
MICHAEL EVANS, MIRANDA EVANS,
CHARLES LOCKWOOD, COLE
LOCKWOOD, SHERLE LOCKWOOD,
NIKKI LOCKWOOD, LYNDAL VAN
BUSKIRK, JANET VAN BUSKIRK, COLBY
VAN BUSKIRK, SUSAN VAN BUSKIRK,
JIMMY GREER, DUSTIN JOHNSON AND
DORA BLACKMAN*

| | |
|---|---|
| Amber S. Miller, SBN 24050320 | James D. Bradbury, SBN 02814500 |
| amiller@cdmlaw.com | jim@bradburycounsel.com |
| CRENSHAW, DUPREE & MILAM, L.L.P. | Kyle K. Weldon, SBN 24097192 |
| 4411 98th Street, Suite 400 | kyle@bradburycounsel.com |
| Lubbock TX 79424 | JAMES D. BRADBURY, PLLC |
| (806) 762-5281 | 201 Main Street, Suite 600 |
| (806) 762-3510 (fax) | Fort Worth, Texas 76102 |
| | Telephone: 817-339-1105 |
| *ATTORNEY FOR RIDGEFIELD CAPITAL* | Fax: 817-886-3495 |
| *GROUP, DREW PHILLIPS, CARRAWAY* | |
| *CATTLE, ROBERT ELLIS, BARRY* | *ATTORNEYS FOR PRIEST CATTLE* |
| *PHILLIPS, BIG SEVEN CAPITAL* | *COMPANY, LTD, PRIEST VICTORY* |
| *PARTNERS, RICHARD CARRAWAY* | *INVESTMENT LLC, W. ROBBIE RUSSELL* |
| | *LIVING TRUST, AND EDDIE STEWART* |

**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE NORTHERN DISTRICT OF
TEXAS AMARILLO DIVISION**

| | |
|---|---|
| IN RE:<br><br>McCLAIN FEED YARD, INC., McCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br><br>     Debtors. | Case No. 23-20084-swe7<br><br>Jointly Administered |
| IN RE:<br><br>2B FARMS, a Texas General Partnership, et al.,<br><br>     Debtors. | Case No. 23-50096-swe12<br><br>Jointly Administered |
| IN RE:<br><br>AGTEXAS FARM CREDIT SERVICES; AGTEXAS, PCA; AND THORLAKSON DIAMOND T FEEDERS, LP<br><br>     Plaintiffs,<br><br>and<br><br>EDWARD DUFURRENA et al.,<br>     Intervenor-Plaintiffs<br>v.<br><br>RABO AGRIFINANCE, LLC et al.,<br><br>     Defendants | ADV. PROC. NO. 24-02007-swe<br><br>(Consolidated Adversary Proceeding) |
| IN RE:<br><br>HTLF BANK, as successor to FIRST BANK & TRUST, | ADV. PROC. NO. 24-02007-swe |

| | |
|---|---|
| Plaintiffs, Counter-Defendant, and Cross-Claim Defendant,<br><br>v.<br><br>2B FARMS, a Texas General Partnership, et al., TERRY M. ROBINSON, and REBECCA A. ROBINSON,<br><br>Defendants, Counterclaim-Plaintiffs, Third-Party Plaintiffs and Third-Party Counterclaim Defendants,<br><br>v.<br><br>RABO AGRIFINANCE LLC and MECHANICS BANK,<br><br>Third-Party Defendants, and as to Rabo AgriFinance LLC only, Third-Party Counterclaim Plaintiff and Cross-Claim Plaintiff. | (Consolidated Adversary Proceeding) |

**PLAINTIFFS' AND INTERVENOR-PLAINTIFFS' BRIEF IN RESPONSE TO TRUSTEE'S MOTION TO INTERVENE AND MOTION TO ENFORCE AUTOMATIC STAY AND RESPONSE TO DEFENDANTS' STANDING ARGUMENTS RAISED IN THEIR MOTIONS TO DISMISS**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs AgTexas Farm Credit Services, AgTexas PCA, and Thorlakson Diamond T.

Feeders, LP and Intervenor-Plaintiffs[1] (collectively "<u>Plaintiffs</u>") file the following Brief In

---

[1] The Intervenor-Plaintiffs are Dennis Buss, Buss Family Trust, Eddie Bryant, Robert E Gray, Ronnie Gray, Gray Brothers, Craig Sutton, Amy Sutton, Steve Ryan, Janice Lawhon, AJ Jacques Living Trust, Gungoll Cattle, LLC, Leah Gungoll, Morrison Cafe, LLC, Gary Lesh, Jan Lesh, Lesh Family Trust, Jared Lesh, Jordan Lesh, LLC, Joel Brookshire, Gene Brookshire Family, LP, Douglas Finley, Scarlet and Black Cattle, LLC, Bryan Blackman, Steve T Scott Farm, Inc., Scott Livestock Company, Inc., Arnold Braun Trust, Robert Braun, Jim Rininger, Robert Spring, Michael Evans, Miranda Evans, Charles Lockwood, Cole Lockwood, Sherle Lockwood, Nikki Lockwood, Lyndal Van Buskirk, Janet Van Buskirk, Colby Van Buskirk, Susan Van Buskirk, Jimmy Greer, Dustin Johnson, Dora Blackman, Ridgefield Capital Asset Management, LP, Robert Ellis, Carraway Cattle, LLC, Big Seven Capital Partners, LLC, Richard Carraway, Drew Phillips, Barry Phillips, Priest Cattle Company, Ltd, Priest Victory Investment, LLC, Wiley Roby Russell, Jr., Trustee of the W. Robbie Russell Living Trust, and Eddie Stewart.

Response to Trustee's Motion to Intervene and Motion to Enforce Automatic Stay [Dkt. No. 140]

and Response to Defendants' Standing Arguments Raised In Their Motions To Dismiss [Dkt. Nos.

119, 128, 133, and 153] and respectfully show the Court the following:

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ 7

Introduction .......................................................................................................... 9

Background ........................................................................................................... 11

   A.   Plaintiffs' State Court Lawsuit and its Removal. ........................................... 11

   B.   The Trustee's Complaint Against The Banks. ............................................... 12

   C.   Plaintiffs' Original Federal Complaint Against the Banks, Ragland, and Goad. .......... 13

   D.   The Trustee's Complaint against Plaintiffs and Others. .................................. 19

   E.   Plaintiffs' Discovery Efforts. .................................................................... 19

   F.   Additional Factual Background ................................................................. 20

Argument and Authorities .................................................................................... 23

   A.   Trustee's Intervention is Not Proper. ......................................................... 23

     a.   Trustee's Motion to Intervene is Untimely ............................................ 25

     b.   Trustee's Intervention Is Not Proper Under Either Mandatory or Permissive Intervention. ...................................................................................... 26

   B.   The Trustee Lacks Standing To Assert Claims Under 11 U.S.C. § 541(a)(1). ............. 28

   C.   The *Wagoner* Rule Deprives The Trustee of Standing to Pursue Plaintiffs' Claims..... 28

     a.   The Trustee Lacks Standing Because Debtors' Sole Shareholder Brian McClain Aided, Assisted, and Cooperated with Defendants to Perpetuate Fraud. .......................... 35

     b.   Established Texas Agency Law Undermines the Trustee's Fabricated Corporate Separateness Theory. ............................................................................ 39

     c.   The *Wagoner* Rule Applies Despite The Trustee's Allegations of Defendants' Alleged Excessive Control Over Debtors. ............................................................ 44

   D.   The Trustee Cannot Usurp Plaintiffs' Right to Pursue Their Own Direct Injuries. ...... 46

   E.   The Automatic Stay Does Not Prevent Plaintiffs from Pursuing Their Claims in this Adversary ........................................................................................... 47

   F.   Defendants' Assertions that Plaintiffs Lack Standing are Without Merit .................... 49

Conclusion ............................................................................................................ 53

Prayer .................................................................................................................. 54

## TABLE OF AUTHORITIES

**Cases**

*Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006) ............................................................ 29

*Bear Ranch, LLC v. HeartBrand Beef, Inc.*, 286 F.R.D. 313 (S.D. Tex. 2012) ............................ 27

*Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) ........................................................................ 53

*Bush v. Viterna*, 740 F.2d 350 (5th Cir. 1984) .............................................................. 27

*Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972) .......................... 30

*E.F. Hutton & Co. v. Hadley*, 901 F.2d 979 (11th Cir. 1990) ........................................... 29

*F.D.I.C. v. Ernst & Young*, 967 F.2d 166 (5th Cir. 1992) ........................................... 40, 42

*Grassmueck v. Am. Shorthorn Ass'n.*, 402 F.3d 833 (8th Cir. 2005) ................................... 29

*Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Cap. LLC*,
   716 F.3d 355 (4th Cir. 2013) ................................................................................ 29

*Greenstein, Logan & Co. v. Burgess Marketing, Inc.*,
   744 S.W.2d 170 (Tex. App.—Waco 1987, writ denied) ................................................ 43

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas*
   *Petroleum, Inc.)*, 522 F.3d 575 (5th Cir. 2008) .................................................. 51, 52

*Hill v. Day (In Re Today's Destiny, Inc.)*, No. 05-90080,
   2007 Bankr. LEXIS 2348, 2007 WL 202811 (Bankr. S.D. Tex. July 6, 2007) ...................... 47

*Hirsh v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ...................................... 46

*Holloway v. Skinner*, 898 S.W.2d 793 (Tex. 1995) ...................................................... 40

*In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54 (2d Cir. 2013) ............................... 32

*In re Buccaneer Resources, LLC*, 912 F.3d 291 (5th Cir. 2019) ................................... 51

*In re Cobb*, 88 B.R. 119 (Bankr. W.D. Tex. 1988) ...................................................... 49

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   2007 WL 789141 (S.D. Tex. Mar. 12, 2007) ...................................................... 32, 38

*In re Gibraltar Res.*, 197 B.R. 246 (Bankr. N.D. Tex. 1996) ...................................... 23

*In re NM Holdings Co., LLC*, 622 F.3d 613 (6th Cir. 2010) ...................................... 32

*Ingalls v. Gressett (In re Bradley)*, 326 Fed. Appx. 838 (5th Cir. 2009) ........................ passim

*Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955 (5th Cir. 2012) ................................. 30, 31

*Kirschner v. KPMG LLP,* 15 N.Y.3d 446 (2010) ...................................................... 30

*League of United Latin Am. Citizens v. Clements*, 884 F.2d 185 (5th Cir.1989) .................. 27

*Martin v. L & M Botruc Rental, LLC*, No. 16-14717,
   2017 U.S. Dist. LEXIS 25852 (E.D. La. 2017) ...................................................... 48

*Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271 (10th Cir. 2008) .................. 29

*Mumfrey v. CVS Pharmacy, Inc*., 719 F.3d 392 (5th Cir. 2013) .................................. 40

*NationsBank, N.A. v. Dilling*, 922 S.W.2d 950 (Tex. 1996) ...................................... 42

*Official Comm. of Unsecured Creditors of Allegheny Health, Educ. and Rsch.*
   *Found. v. PriceWaterhouseCoopers, LLP*, 607 F.3d 346 (3d Cir. 2006) ...................... 29

*Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP,*
   322 F.3d 147 (2nd Cir. 2003) ...................................................................... 29

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards,*
   437 F.3d 1145 (11th Cir. 2006) .................................................................... 28

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,*
    267 F.3d 340 (3rd Cir. 2001) ............................................................................ 29
*Picard v. HSBC Bank PLC*, 454 B.R. 25 (S.D.N.Y. 2011) ............................... 29, 30, 43
*Picard v. JPMorgan Chase & Co,* 460 B.R. 84 (S.D.N.Y. 2011) ............................ 33, 34, 35, 47
*Pope v. Manville Forest Prods. Corp.*, 778 F.2d 238 (5th Cir. 1985) ......................... 48
*Rogers v. McDorman*, 521 F.3d 381 (5th Cir. 2008)...................................... 42
*Ross v. Marshall*, 426 F.3d 745 (5th Cir. 2005) ........................................ 27
*Rotstain v. Mendez,* 986 F.3d 931 (5th Cir. 2021) ....................................... 25
*Schertz-Cibolo-Universal City v. Wright (In re Educators Group Health Trust)*,
    25 F.3d 1281 (5th Cir. 1994) ............................................................ 30, 31
*Sender v. Buchanan (In re Hedged-Inv. Assocs.),* 84 F.3d 1281 (10th Cir. 1996)........ 29
Shearson Lehman Hutton Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991) ........... 28, 29, 30
*St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969 (5th Cir. 2019) ................ 25, 26
*Terlecky v. Hurd (In re Dublin Sec. Inc.),* 133 F.3d 377 (6th Cir. 1997)................. 29
*Villarreal v. City of Laredo*, No. 5:03-CV-11, 2007 U.S. Dist. LEXIS 73584,
    2007 WL 2900572 (S.D. Tex. Sept. 28, 2007) .......................................... 48
*Warth v. Seldin,* 422 U.S. 490 (1975)..................................................... 29
*Wight v. BankAmerica Corp,* 219 F.3d 79 (2d Cir. 2000) ............................... 29

**Statutes**

11 U.S.C. § 362 ........................................................................... 47
11 U.S.C. § 541 ........................................................................ 27, 30, 34
28 U.S.C. § 158 ........................................................................... 24
7 U.S.C. § 217b............................................................................ 52
7 U.S.C. 217b(f).......................................................................... 52

**Rules**

Fed. R. Civ. P. 24........................................................................ 24, 25, 26
Fed. R. Civ. P. 65........................................................................ 26

## INTRODUCTION

1.      The Trustee seeks to intervene in this case not as an advocate for justice, but as an architect attempting to escape accountability for the very fraud he now condemns. After spending over five months beyond this Court's December 2024 deadline to investigate potential claims, the Trustee has filed a Motion to Intervene that is based on a fundamental misunderstanding of both the law and his own role in this litigation. The Trustee's motion represents a transparent attempt to usurp Plaintiffs' direct claims against the financial institutions that enabled what he characterizes as a "massive Ponzi scheme"—the same scheme in which the Debtors,[2] in whose shoes the Trustee now stands, were active and knowing participants.

2.      The central issue presented for the Court at this stage of the case is to determine who owns what causes of action.   Plaintiffs have prepared a chart, marked Exhibit A to their Appendix, that summarizes Plaintiffs' contentions about this subject.

3.      The legal doctrine governing this dispute is well-established and unforgiving: under the *Wagoner* Rule, recognized across federal circuits including the Fifth Circuit, holding a bankruptcy trustee cannot pursue claims against third parties when the debtor's management collaborated in the underlying wrongdoing. The Trustee's own exhaustively detailed Complaint destroys any claim to standing, as he alleges that the Debtors worked hand-in-glove with Defendants to perpetrate the alleged fraud. The Trustee specifically alleges that Defendants were "lynchpins" of the Debtors' Ponzi scheme and that the Debtors and Defendants shared "a meeting of the minds" to run the fraudulent operation. These admissions are fatal to the Trustee's standing because they establish precisely the type of management cooperation that courts have consistently

---

[2] "Debtors" collectively refers to McClain Farms, Inc. ("MFI"), McClain Feedyard, Inc. ("MFY"), and 7M Cattle Feeders, Inc. ("7M").

held bars trustees from asserting such claims.

4.      Moreover, the Trustee's intervention is not only legally baseless but procedurally improper and untimely. Having already filed his own separate adversary proceeding against the same Defendants, the Trustee seeks not genuine intervention but rather an injunctive dismissal of Plaintiffs' case—relief he has not properly sought under the applicable rules. The Trustee's motion comes after Plaintiffs conducted significant discovery, without the Trustee's objection and which the Trustee benefitted from, after substantial resources have been expended, and the case has progressed well beyond the point where intervention would be appropriate. This Court should reject the Trustee's attempt to circumvent established legal principles and deny his untimely and meritless motion.

5.      In addition, the standing arguments raised in Defendants' Motions to Dismiss are equally without merit and represent a fundamental misunderstanding of Fifth Circuit precedent. Defendants erroneously contend that Plaintiffs' claims are derivative of injuries to the Debtors and therefore belong exclusively to the Estate. However, as established in *In re Seven Seas Petroleum* and *In re Buccaneer Resources*, when wrongdoing flows outward from the debtor in concert with third-party tortfeasors, the directly injured parties—not the bankruptcy estate—retain ownership of their claims against those additional wrongdoers.  Here, Plaintiffs assert direct claims against Defendants for their participation in the Debtors' fraud and for injuries they caused to Plaintiffs in doing so.  The fact that the Trustee has filed similar claims in a separate proceeding does not transform Plaintiffs' direct injuries into derivative estate property, particularly where the Debtors were themselves joint tortfeasors in the alleged wrongdoing.  Defendants' standing challenges should be rejected, allowing Plaintiffs to pursue their legitimate claims for the direct harm they suffered.

# BACKGROUND

6.      Plaintiffs set forth below the procedural and factual background relevant to the legal issues raised in Trustee's Motion to Intervene and Defendants' standing arguments.

## A. Plaintiffs' State Court Lawsuit and its Removal.

7.      On April 24, 2023, following a plethora of dishonored checks from the sale of cattle, coupled with news of Brian McClain's suicide and discovery that cattle owned by Plaintiffs were not located in the Debtors' grow yards and could not otherwise be found, Plaintiffs filed a petition in the District Court for Deaf Smith County.  Four days later, the case was stayed when the Debtors filed for Chapter 7 Bankruptcy on April 28, 2023.

8.      On March 5, 2024, Plaintiffs filed their Second Amended Petition in State Court, voluntarily dismissing the Debtors as defendants.

9.      On March 28, 2024, Defendant Rabo AgriFinance LLC (collectively with Rabo Diversified Services, LLC, "Rabo") filed a notice of removal to remove the matter to Bankruptcy Court.  Following removal, on August 16, 2024, this Court issued an Order that (1) denied Plaintiffs' Motion to Remand, (2) consolidated the Plaintiffs' Adversary proceeding with the 2B Farms Adversary Proceeding to be Adversary No. 24-02007-rlj, (3) abated the Consolidated Adversary Proceeding, save and except discovery for a period of 120 days, and (4) denied Trustee's Motion to Intervene.  Dkt. No. 1.  The August 16, 2024 Order provided that the abatement was granted to give the Trustee time – until December 17, 2024 – to investigate potential claims that might belong to the Debtors.  *Id.*

10.      On September 19, 2024, additional Intervenors filed a Petition in Intervention to join in the now-consolidated adversary proceeding, asserting specific claims against Defendants. Dkt. No. 9. Following briefing by the parties and a hearing, the Court granted an Order Granting the Petition in Intervention on November 21, 2024.  Dkt. No. 36.

**B. The Trustee's Complaint Against The Banks.**

11.    On March 14, 2025, the Trustee filed Trustee's Original Adversary Complaint "Complaint")[3] against Community Financial Services Bank ("CFSB"), HTLF Bank, Mechanics Bank, and Rabo AgriFinance, LLC.   The Trustee alleges fifteen counts against the Defendants:

a.    Count I: Knowing Participation in Breach of Fiduciary Duties (Against All Defendants); *Id.* at ¶¶ 97-110;

b.    Count II: Breach of Fiduciary Duty: (Against CFSB, Mechanics Bank and Rabo); *Id.* at ¶¶ 111-19;

c.    Count III: Common-Law Civil Conspiracy (Against All Defendants); *Id.* at ¶¶ 120-32;

d.    Count IV: Professional Negligence: (Against All Defendants); *Id.* at ¶¶ 133-41;

e.    Count V: Punitive Damages; *Id.* at ¶¶ 142-44;

f.    Count VI: Determination of Extent, Validity, and Priority of Lien (Against Rabo); *Id.* at ¶ 145;

g.    Count VII: Avoidance of Deposit Account Control Agreement (Against Rabo); *Id.* at ¶¶ 146-52;

h.    Count VIII: Preferential Payments (Against Rabo); *Id.* at ¶¶ 153-55;

i.    Count IX: Fraudulent Transfer (Against Rabo); *Id.* at ¶¶ 156-57;

j.    Count X: Disallowance of Claim (Against Rabo); *Id.* at ¶¶ 158-59;

k.    Count XI: Money Had and Received (Against Rabo); *Id.* at ¶ 160;

l.    Count XII: Equitable Subordination (Against Rabo); *Id.* at pg. 60;

m.    Count XIII: Fraudulent Transfer (Against HTLF); *Id.* at ¶¶ 161-63;

n.    Count XIV: Preferential Payments (Against Mechanics Bank); *Id.* at ¶¶ 164-69; and

o.    Count XV: Fraudulent Transfer (Against CFSB and Mechanics Bank). *Id.* at ¶¶ 170-73.

12.    The Trustee's factual allegations against the bank defendants fall into two primary categories.  The first category of the Trustee's allegations can be referred to as the core Ponzi scheme operations, including a check-kiting scheme, that encompass allegations that Brian McClain operated a massive fraudulent cattle investment scheme through the Debtors from at least 2018 to 2023, where hundreds of "investors" were promised 30% returns on purported cattle partnerships but were paid fictitious profits using new investor funds rather than legitimate cattle sales, with the scheme's scope evidenced by over $119 million in fraudulent investor claims versus

---

[3] *See* [Adversary No. 25-02005-swe, Dkt. No. 1]; Plaintiffs will use "Complaint" when citing to it instead of the Adversary Proceeding No and Docket Number.

only $2.9 million in actual cattle transactions.  *See* Complaint at ¶¶19, 27, 30-31, 36.[4]

13.    The second category of the Trustee's allegations can be referred to as the banks facilitation and enablement, which details how each Defendant bank allegedly enabled the fraud: Rabo recklessly lent $70 million despite numerous red flags and internal warnings about the Debtors' financial irregularities; CFSB and Mechanics Bank facilitated a check kiting operation involving billions in suspicious transfers while maintaining chronically overdrawn accounts; and HTLF Bank actively participated by handling pre-signed blank checks and acting as a "shadow lender" to maintain fraudulent investor payments, with all banks allegedly coordinating through deposit control agreements while ignoring their fraud detection policies to keep Debtors' scheme operational.  *See* Complaint at ¶¶38, 41, 44, 52, 65-68, 70, 90, 126.

14.    The Trustee seeks to hold the Defendant banks liable for the damages Debtors' owe to Plaintiffs.  Complaint at ¶¶97-110, 120-132.  The Trustee states that he "quantifies damages from Defendants' . . . as exceeding $170 million" which the Trustee explains comprises of "more than 100 claimants have asserted claims exceeding $120 million for: (1) allegedly unpaid amounts for Cattle Purchases; (2) cattle that were dropped off for Feed Yard Services and sold without returns to their owners; (3) unpaid Partnership Agreement investments; and (4) other miscellaneous transactions."  *Id.* at ¶119.

**C.  Plaintiffs' Original Federal Complaint Against the Banks, Ragland, and Goad.**

15.    On March 12, 2025, this Court granted Plaintiffs/Intervenors' Motion for Leave to Amend and Consolidate Pleadings.  Dkt. No. 102.

16.    On March 14, 2025, Plaintiffs filed their Original Federal Complaint Amending and

---

[4] The $2.9 million Trustee references appears to be based on the USDA's estimate of the amount of claims perfected under the federal Dealer Trust Act, 7 U.S.C. 271b, which depends on filing dates and not the underlying validity of debt.

Consolidating their State Court Petitions ("Plaintiffs' Original Complaint"), Dkt. No. 103,

asserting claims against Rabo AgriFinance LLC, Rabo Diversified Services, LLC, Mechanics

Bank, HTLF Bank, Shawn Ragland, and Meagan Goad.  Plaintiffs allege the following counts:

    a.     Count One: Conversion and Common Law Fraud;
    b.     Count Two: Negligence of Defendants in Lending and Hiring or Supervision or Management Personnel.
    c.     Count Three: Negligent Undertaking;
    d.     Count IV: Claims Under the Uniform Fraudulent Transfer Act;
    e.     Count Five: Conversion and Fraud Against Defendant Goad;
    f.     Count Six: Tortious Interference With Contract Against Rabo and Mechanics Bank;
    g.     Count Seven: Aiding and Abetting and Knowing Participation of Fraud;
    h.     Count Eight: Civil Conspiracy;
    i.     Count Nine: Aiding and Abetting and/or Knowing Participation in Breach of Fiduciary Duty
    j.     Count Ten: Claims of Thorlakson and AgTexas Based on Intercreditor Agreement;
    k.     Count Eleven: Claims of Priest Cattle Company Ltd. Based on Letter of Understanding Agreement with Rabo; and
    l.     Request for Declaratory Judgment.

17.    Plaintiffs' Original Complaint centers on a massive cattle fraud scheme orchestrated

by Debtors that caused over $120 million in damages to more than 100 parties. *Id.* at ¶69.  Plaintiffs

entered into business relationships with Debtors for cattle feeding and care services.  *Id.* at ¶¶68,

147. The core of the fraud involved Debtors accepting payments from Plaintiffs to purchase, feed,

and care for cattle at his feedlots, while systematically misrepresenting the number of cattle

Debtors actually owned and controlled.  Some Plaintiffs also delivered cattle to Debtors' facilities

or paid Debtors to purchase cattle on their behalf, expecting legitimate feeding services and

eventual sale proceeds.  However, Debtors were operating a massive fraudulent scheme, including

claiming ownership of cattle owned by Plaintiffs and far more cattle than Debtors owned or that

even existed at Debtors' facilities.

18.    Rabo AgriFinance LLC, a major agricultural lender, played a central enabling role

despite numerous red flags dating back to 2017.  *Id.* at ¶¶70-100.  Initially, Rabo denied MFY

credit based on a pre-funding inspection that identified inadequate accounting records, unreliable borrowing base reports, and high information risk. *Id.* at ¶¶72-74. The inspector noted that MFY was potentially using two sets of books and lacked proper financial controls. *Id.* at ¶72. However, just months later in May 2018, Rabo inexplicably reversed its decision and extended a $6.5 million credit line despite the unresolved issues. *Id.* at ¶ 74.

19.     Over the following years, Rabo increased Debtors credit exposure to approximately $50-70 million while consistently ignoring warning signs. *Id.* at ¶¶72-92. Rabo failed to conduct regular physical cattle counts required by its own policies, instead relying on Debtors' self-reported borrowing base certificates that claimed ownership of impossibly high numbers of cattle. *Id.* at ¶¶ 78-79. For example, the Debtors' Hereford feedlot, called "McClain Feed Yard," had a TCEQ permit to hold 3,000 head. By December 2022, the Debtor was reporting nearly 38,000 cattle at that facility and a nearby facility with a purported capacity of 6,800, an overage of more than 28,000 cattle. *Id.* at¶96-97.

20.     Even more telling, Rabo knew that approximately 30% of the cattle in Debtors' yards belonged to third-party customers, yet Debtors' borrowing base reports claimed all cattle were company-owned. *Id.* at ¶¶80, 96. Because the Debtors' borrowing base reports showed a total of cattle Debtors owned and not the customer owned cattle on Debtors' feedlots, the total head count exceeded the permitted amounts by even more than the Debtors' reported totals.

21.     Internal Rabo communications revealed the company's profit motive for maintaining the relationship with Debtors, with one employee noting Debtors "made like $12mln in profits last year" despite operational concerns. *Id.* at ¶79. Rabo earned a 43% profit margin on Debtors' account, providing strong financial incentive to overlook red flags. *Id.* at ¶99. Rabo's Executive Vice President-Head of Rural Banking, North America, later admitted that "a full

headcount/inspection has not been done for over 4 years," demonstrating a systematic failure to verify the primary collateral securing their loans. *Id.* at ¶98. And a Rabo inspector later testified that if Rabo had done its job then it would have seen the large transfers in and out of the Debtors' depository accounts, and the inspector would have "blown it up" by early 2022.

22.    Plaintiffs set out details of the extensive coordination between Rabo and Mechanics Bank (which handled Debtors' deposit accounts) to facilitate and conceal Debtors' insolvency through check-kiting schemes *Id.* at ¶¶70-132. Beginning in 2018, Debtors' accounts showed persistent massive overdrafts - $216,000 in October 2018, escalating to $2.5 million on a single day in October 2019, and reaching $5.2 million by November 2019. *Id.* ¶¶ 102, 104, 106. Rather than cutting off credit, both institutions worked together to cover these overdrafts through complex planning, including a proposed 60-day increase in MFY's line of credit to prevent future issues. *Id.* at ¶108. They attributed the significant overdrafts to a "miscalculation some would say a gross miscalculation by Debtors. . . ." *Id.* at ¶108. Stated differently, Rabo's fix for the continuous overdrafts was to lend more money to cover them, thereby keeping the fraudulent operation afloat.

23.    Rabo had established deposit account control agreements (DACAs) with Mechanics Bank, giving it sweep control over Debtors' accounts. *Id.* at ¶77. The banks maintained detailed email communications about managing Debtors' chronic overdraft problems, with Mechanics Bank statements even bearing the designation "Rabo AgriFinance Powered by Mechanics Bank." *Id.* at ¶117. In December 2019, Rabo's regional credit officer filed a "SSS Report" (meaning "Something Seems Suspicious") related to check-kiting, explicitly acknowledging fraudulent activity, yet both institutions continued facilitating and enabling the scheme to the detriment of Plaintiffs. *Id.* at ¶107.

24.    A particularly egregious example involved HTLF Bank and its employee Shawn

Ragland, who facilitated check-kiting through 2B Farms.  *Id.* at ¶126-132. McClain's daughter, Meagan Goad, would send HTLF batches of pre-signed blank checks drawn on Debtors' Mechanics Bank accounts.  *Id.* at ¶129.  HTLF's lending officer kept the blank checks in a filing cabinet at the bank.  When 2B Farms needed to "close out" cattle transactions, HTLF employees would retrieve the checks, fill in these blank checks based on information provided by Debtors, deposit them for immediate credit, then 2B Farms would wire the funds back to Debtors—a classic check-kiting operation.  *Id.* at ¶132. This scheme involved over $240 million in transactions between January and April 2023 alone.  *Id.* at ¶¶130 and 172.

25.    In February 2023, Rabo finally conducted an emergency collateral inspection that revealed the "house of cards" had collapsed. *Id.* at ¶90. Instead of the claimed 80,000+ cattle, inspectors found only about 8,000 cattle at Debtors' Texas facilities, and that many, if not all of them, belonged to third-party customers, not McClain.  *Id.*  As one Rabo inspector noted, this was "basically a worst-case scenario" and a "Possible Fraud Case." *Id.* at ¶91.  Rather than immediately alerting the affected cattle producers, Rabo acted swiftly to protect its interests.  The company installed a "fixer" as Chief Restructuring Officer, coordinated Debtors' bankruptcy filing, and seized business records.  *Id* at ¶92.

26.    As part of its initial reaction, in internal emails, Rabo stated that it was concerned that third parties might own the cattle it had found and that Rabo should act quickly to "make sure that others are not loading out cattle they believe to be theirs and that we believe to be ours."

27.    Meanwhile, unknowing Plaintiffs continued sending millions of dollars for cattle purchases directly into Debtors' Rabo-controlled accounts. *Id.* at ¶93.  Thorlakson alone sent over $2.8 million between March 12-18, 2023, after Rabo had already discovered the fraud but before publicly disclosing it.  *Id.* at ¶125.

28.     The Plaintiffs' Original Complaint details specific contractual breaches involving AgTexas, Thorlakson, and Priest Cattle Company. In 2021, Rabo entered into an Intercreditor Agreement acknowledging that cattle subject to feeding agreements belonged to Thorlakson, not Debtors, and that any proceeds held contrary to the agreement would be held in trust. *Id.* at ¶189-190.   Rabo in the agreement also expressly disclaimed that the underlying cattle-feeding agreements created a partnership.  Pls.' App at Ex. D.  Despite this, Rabo treated all cattle as Debtors' property and retained proceeds that belonged to Thorlakson.  *Id.* at ¶¶194-195. Similarly, Rabo entered a Letter of Understanding with Priest Cattle Company acknowledging Priest's ownership of cattle placed with Debtors, then seized and sold those cattle at auction claiming they were subject to Rabo's security interest.  *Id.* at ¶199-201.

29.     Meagan Goad, McClain's daughter, assisted Debtors' fraudulent efforts. *Id.* at ¶133. Under Brian McClain's direction, Goad signed borrowing base reports, controlled check-writing and wire transfers, and actively coordinated the check-kiting schemes.  *Id.* at ¶160. Her text messages with Brian McClain revealed awareness of backdating invoices and attempts to match check amounts with incoming payments, at one point warning him to "Stop back dating stuff... if they look into anything it's going to look suspicious." *Id.* at ¶138.

30.     Shawn Ragland, HTLF's branch president, facilitated the check-kiting despite having no experience in cattle financing. *Id.* at ¶131.  He personally filled out the pre-signed blank checks and authorized immediate credit for deposits, enabling the fraud to continue through his institution. *Id.* at ¶132.

31.     Plaintiffs seek damages for conversion, fraud, negligence, aiding and abetting fraud, civil conspiracy, tortious interference with contract, and breach of fiduciary duty, along with punitive damages and attorney fees.  (Counts one through Eleven).

32.     The case represents one of the largest agricultural fraud schemes in recent history,

enabled by sophisticated financial institutions that prioritized profits over basic risk management

and legal obligations.

**D.  The Trustee's Complaint against Plaintiffs and Others.**

33.     On April 25, 2025, in Adversary Proceeding Number 25-02003-swe, the Trustee

filed Trustee's First Amended Complaint ("Trustee's Avoidance Adversary") for (1) Avoidance and

Recovery of Preferences and Fraudulent Transfers; (2) Disallowance or Subordination of Claims;

and (3) Other Relief.  *See* [Adversary Proceeding Number 25-02003-swe, Dkt. No. 9].  The

defendants in this adversary proceeding include, among others, Plaintiffs.  The Trustee asserts the

following counts against Plaintiffs: (1) Count 3: Preference Claims – Investors; *see* Adversary

Proceeding No. 25-02003-swe Dkt. No. 9 ¶¶ 78-84; (2) Count 5: Fraudulent Transfer Claims –

Investors; *id.* ¶¶ 90-94; and (3) Count 6: Disallowance of Claim, Subordination of Claim.  *Id.* ¶¶

95-98.

34.     Except for the detailed allegations against the Banks in enabling and facilitating

Brian McClain's Ponzi and check-kiting scheme through the Debtors, the factual background in

the Trustee's Complaint and the Trustee's First Amended Complaint in Adversary Proceeding

Number 25-02003-swe are substantially similar, if not identical.

35.     On May 29, 2025, over five months after the Court's deadline for the Trustee to

investigate whether any of the claims asserted by Plaintiffs belonged to Debtors, the Trustee finally

filed his Motion to Intervene and Motion to Enforce Automatic Stay.  *See* Dkt. No. 140.

**E.  Plaintiffs' Discovery Efforts.**

36.     As previously presented to the Court, Plaintiffs have engaged in extensive

discovery since the Court's abatement lapsed in December, with the Trustee noticed of the

discovery, attending depositions, but asking no questions.  See Dkt. No. 160 at 6-7; Dkt. 160-1.

37.     Accordingly, the Trustee has allowed discovery to move forward, participated in

that discovery, benefited from it, and has never claimed that Plaintiffs violated the automatic stay

for conducting such discovery.  Indeed, the Trustee has attended depositions and has extensively

cited the deposition testimony of Rabo representatives taken by counsel for Plaintiffs in the

Trustee's Complaint.  *See* Complaint at ¶¶72-92.

### F.  Additional Factual Background

38.     Plaintiffs' claims and damages sought against Defendants are unique to each

Plaintiff.  Many Plaintiffs are cattlemen and ranchers who conducted inspections on their behalf

and on behalf of other Plaintiffs.  Some Plaintiffs entered cattle feeding agreements with Debtors

for certain transactions, while others did not, which makes each Plaintiff's relationship with

Debtors unique.  Despite the Trustee's blanket allegations in the Complaint, not all Plaintiffs had

the same cattle feeding arrangement with Debtors.

39.     Attached as Exhibit B to the Appendix to this Response is a chart detailing the

specific differences between the Plaintiffs, their activities, and their dealings with Debtors.  Unlike

the Trustee's broad-brush categorization of all Plaintiffs as "investors" or "partners" to generalize

the transactions, each Plaintiff had different dealings with the Debtors and was induced by the

Debtors' fraud in different ways.  For example, a significant number of Plaintiffs (47%) never

signed a feeding agreement with the Debtors, the same agreement the Trustee says constitutes an

"investment" or "partnership."  *See Pls.' App. at Exh. B.*  Even the Plaintiffs that did execute a

feeding agreement with Debtors did not do so on every transaction.  Furthermore, other Plaintiffs

sold cattle to the Debtors, or delivered cattle to Debtors for care and feeding.  *See, e.g. Pls.' App.
at Exh. E and F (representing a sampling of such transactions).*   Moreover, contrary to the

Trustee's bold assertion that no one ever went to look at their cattle, over 63% of Plaintiffs either

personally inspected their cattle or had their lender inspect their cattle on their behalf as part of the loan requirements. *See Pls.' App. At Exh. B and G (representing a sampling of such inspections).*

40.     One glaring example is Scott Livestock Company ("SLC"), a livestock dealer. SLC never entered cattle feeding agreements with Debtors. *See Pls.' App. at Exh. B.* Instead, SLC sold cattle directly to Debtors. *See Pls.' App. at Exh. B, E, and F (representing a sampling of such sales).* Similarly, Steve T. Scott Farms, Inc. ("STS") also never entered into a feeding agreement and physically delivered cattle to Debtors for care, feeding, and ultimate sale. *See Pls.' App. at Exh. B, E, and F (representing a sampling of such deliveries).* Lyndal VanBuskirk often delivered his own cattle to Debtors and agreed to pay Debtors for feeding and care, and did not have a cattle feeding agreement to share profits with Debtors. Furthermore, Lyndal VanBuskirk also purchased cattle from third parties or Debtors and verbally agreed to share profits with Debtors in those instances. Gungoll Cattle Co. LLC sent in live cattle for care and feeding and even made payments to Debtors for pre-paid feed, a common occurrence in the cattle feeding industry. *See Pls.' App. at Exh. B and E (representing a sampling of such pre-paid feed payments).*

41.     Plaintiffs were induced by Debtors in different ways to purchase cattle and enter business transactions with Debtors. One way the fraud occurred was by inducing Plaintiffs to purchase cattle from Debtors and providing them with what appeared to be specific written evidence of the cattle purchased. *See Pls.' App. at Exh. E (representing a sampling of such transactions).* Another way was for Debtors to misrepresent cattle at a physical inspection to Plaintiffs or their representatives. *See Pls.' App. at Exh. G (representing a sampling of inspections).* Another method was for Debtors to take in cattle on the gain for a Plaintiff and then misrepresent the Plaintiffs' cattle as their own. Each of these different inducements caused individualized and specific harm to each Plaintiff. Defendants all participated in these different

variations of fraud in various ways as alleged in Plaintiffs' Original Complaint causing specific, direct and individualized harm to Plaintiffs.

42.     Scarlett & Black Cattle Company, LLC ("S&B") is another example of a specific claim of fraud.  S&B's lender, Amarillo National Bank ("ANB"), wanted to perform due diligence on the Debtors prior to lending S&B additional funds.  In doing so, the ANB banker spoke with Rabo's relationship manager, wherein the relationship manager sold S&B's representative a bill of goods and induced ANB to loan S&B funds to purchase cattle from Debtors and ship other cattle to Debtors. The ANB banker's notes from the conversation indicate that Rabo represented that the Debtors "financial performance is excellent" and that Debtors "made a 'boat load' of money in 2021." *See Pls.' App. at Exh. H.*   The notes also reflect Rabo's misrepresentation about the strength of the Debtors' borrowing base and equity. *Id.*   These statements were made by Rabo at a time when Rabo knew they were false in an effort to induce S&B through its banker to continue to transact business with Debtors.

43.     For Plaintiffs who entered into written cattle feeding agreements with Debtors on certain transactions, the process worked as follows: Plaintiffs arranged for cattle they purchased from Debtors to be delivered to Debtors' "grow yards."  At the grow yards, the cattle received feeding and care until they were large and healthy enough to be sold to "finish yards," where they were fed to slaughter weight before being sold to a packer. After the feed bill was paid and the cattle sold to a packer, a Debtor and the cattle owner would split any net proceeds, typically 1/3 for a Debtor and 2/3 for the cattle owner.  This practice follows standard industry procedures in the cattle feeding industry.

44.     As set out above, Defendants Rabo, Mechanics Bank, and HTLF were all <u>fully aware</u> that third parties owned cattle on feed at Debtors' grow yards.  Defendants Rabo, Mechanics

Bank, and HTLF were also all <u>fully aware</u> of the financial games that Debtors were playing – and instead of shutting the Debtors down, the Defendants played along and, as Plaintiffs/Intervenors argue, facilitated Debtors' schemes.

## ARGUMENT AND AUTHORITIES

### A. Trustee's Intervention is Not Proper.

45.      The fundamental principle governing trustee standing is well-established: a trustee may only pursue third-party claims to the extent of valid claims in the bankruptcy case. *See, e.g.*, *In re Gibraltar Res.*, 197 B.R. 246, 253 (Bankr. N.D. Tex. 1996) ("the general rule is that a trustee has no greater rights than the debtor and stands in the shoes of the debtor").  This principle exposes a critical contradiction in the Trustee's position that undermines both legal precedent and basic fairness.

46.      The mathematics of this case reveal the Trustee's true motivation.  Aside from Defendants and 2B Farms, Plaintiffs represent the overwhelming majority of claims—both numerically and financially.  These are not minor, peripheral interests; they constitute the heart of the bankruptcy estate's potential recovery.

47.      The Trustee's stated justification—pursuing claims against Defendants "to maximize the pool of assets that will be available for distribution"—rings hollow when examined against his simultaneous actions.  The critical question becomes: distribution to whom?  The Trustee has simultaneously filed an avoidance adversary seeking to disallow virtually all of Plaintiffs' proofs of claim as well as the claims of other harmed individuals that did business with Debtors.  This creates an untenable paradox: the Trustee claims righteous motivation to pursue Defendants for the benefit of creditors while systematically working to eliminate those very creditors' rights to recovery.  The strategy is internally inconsistent and legally suspect.  Further,

Trustee's claims against these parties are flawed and draconian.  The claims seek recovery of every

dollar any harmed party received from Debtors for a number of years and disallowance of their

proof of claim in full.

48.      The Defendants' enthusiastic support for the Trustee's intervention motion exposes

the real dynamic at play.   Defendants recognize that if the Trustee succeeds in disallowing

Plaintiffs' claims, any potential damages would be drastically reduced—creating a substantial

windfall for Defendants at Plaintiffs' expense. This alignment of interests between the Trustee and

Defendants against the bankruptcy estate's primary creditors is both telling and troubling.

49.      Furthermore, the Defendants enthusiasm also stems from the fact that if the

Trustee's Motion to Intervene is granted, they have an iron-clad defense of *in pari delicto* against

the Trustee, which would allow them to escape all liability for their wrongdoing.[5]

50.      Allowing the Trustee to intervene under these circumstances would create precisely

the kind of prejudice courts are designed to prevent.   Plaintiffs would face the unconscionable

situation of watching the Trustee assert his own claims against Defendants, which may be

dismissed under the *in pari delicto* doctrine, while simultaneously attacking their right to any

recovery.  This is not merely prejudicial—it is a fundamental perversion of the trustee's fiduciary

duty and the bankruptcy system's core principles.

51.      The timing amplifies this prejudice.  After Plaintiffs have invested substantial time,

resources, and effort in pursuing these claims, the Trustee seeks to "swoop in" and commandeer

the litigation while working to ensure Plaintiffs receive nothing from any eventual recovery.  No

equitable principle supports such a result.

---

[5] Indeed, all of the Defendant banks have filed Motions to Dismiss against the Trustee.  And all of the Defendant
Banks have claimed the Trustee claims are barred by the doctrine of *in pari delicto*.  Adversary Proceeding No. 25-
02005-swe, Dkt. No. 22 at pages 30-35; Dkt. No. 24, at pages 6 – 9; Dkt. No. 27 at pages 20-21; Dkt. No. 32 at pages
14-15.]

### a. Trustee's Motion to Intervene is Untimely

52.    Interventions—whether as a matter of right or permissive—must be timely. *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 974 (5th Cir. 2019). The rules allowing each type of intervention "prize punctuality, beginning with the same three words: 'On timely motion.'" *Id.* (quoting Fed. R. Civ. P. 24(a), (b)). Timeliness is judged on four factors:

> (1)    The length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*Id.* (internal citations omitted). Determinations of timeliness are reviewed for abuse of discretion and reversed "only under extraordinary circumstances" even while the trial court's substantive decisions are reviewed de novo. *Id.*. at 973; see also 28 U.S.C. § 158(c)(2) (appellate standards apply to bankruptcy appeals to district court).

53.    To the extent that the Trustee has a viable interest in Plaintiffs' and 2B Farms' cases, which, as discussed herein for Plaintiffs, he does not, the Trustee has long known and should have known of such interest.[6] Furthermore, following a prior abatement by the Court (which expired in December 2024) to allow the Trustee time to investigate his potential claims, the parties have already expended significant resources on discovery, depositions, document production, and motions practice. See *Rotstain v. Mendez,* 986 F.3d 931, 938 (5th Cir. 2021) (discussing the prejudice to existing parties of an intervention after significant discovery has occurred). And Trustee has already asserted his own claims against the banks in the separate adversary

---

[6] The Debtors' bankruptcies were filed and the Trustee was appointed in April 2023. Plaintiffs' litigation was filed in state court in April 2023 and removed by Trustee in March 2024. The 2B Farms adversary was filed in July 2023.

proceeding. *See* Adv. Proc. No. 25-02005-swe; *see also St. Bernard Parish*, 914 F.3d at 975 (would-be intervenor is not prejudiced where intervenor has other avenues for relief).

54.     The Trustee has been aware of the claims for over a year and has even attended depositions. Although the Trustee elected not to ask any questions (as did many others), the Trustee did not preserve on the record or otherwise his intent to intervene. Therefore, in addition to the substantive grounds for this Court to deny the Trustee's motion to intervene, the timeliness elements also weigh against intervention.

### b. Trustee's Intervention Is Not Proper Under Either Mandatory or Permissive Intervention.

55.     The Trustee's "Motion to Intervene" does not seek intervention for the purposes allowed by Federal Rule of Civil Procedure 24. It is a motion to intervene in name only and Trustee is not entitled to the relief requested.

56.     As noted in more detail below, a party seeking to intervene must demonstrate that it has a legitimate interest in the outcome of the litigation; however, in this case, the Trustee wants to have the case dismissed, not advanced. Thus, the relief sought by the Motion is injunctive. The Trustee has not requested injunctive relief in the manner required by rule, see Fed. R. Civ. P. 65, and Plaintiffs object to this attempt to bypass the governing rules.

57.     And Trustee is not entitled to either mandatory or permissive intervention. To qualify for mandatory intervention under Rule 24(a), Trustee must show that he "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The Fifth Circuit has held that to meet the interest element, "an applicant must point to an interest that is direct, substantial, [and] legally protectable." *Ross v. Marshall*, 426 F.3d 745, 757 n. 44 (5th Cir. 2005).

Further, the Trustee must show that absent the intervention, his interests could be impaired or impeded. *Id*. at 760.

58.    As discussed at length below, the Debtor's wrongdoing in this case—and Trustee's position in the shoes of the Debtors—prevents the Trustee from being able to pursue the claims that Plaintiffs are pursuing. Whatever interest the Trustee may have or claim to have in Plaintiffs' claims, it is not one that is "legally protectable."

59.    Nor is Trustee entitled to permissively intervene. Rule 24(b) "gives district courts discretion to allow intervention when (1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *Bear Ranch, LLC v. HeartBrand Beef, Inc.*, 286 F.R.D. 313, 318 (S.D. Tex. 2012) (cleaned up) (quoting *League of United Latin Am. Citizens v. Clements*, 884 F.2d 185, 189 n. 2 (5th Cir.1989)). Further, "[p]ermissive intervention is wholly discretionary with the district court even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied." *Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir. 1984).

60.    Again, the Trustee stands in the shoes of the Debtors and, as such, is unable to assert the claims that the Plaintiffs have asserted in this Adversary. Going directly to the argument on that disability, however, would give short shrift to the critical fact that Trustee has not alleged any claims in this proceeding at all. Even if it were to appear that Trustee's *separate* Adversary Proceeding No. 25-02005 may share some common question of law or fact with the action brought by Plaintiffs in this proceeding, Trustee's Motion is not an intervention at all. The Court should not reward such procedural gamesmanship with relief that the Trustee has not properly sought.

61.    And as discussed above, intervention in this case would result in significant

prejudice to Plaintiffs, not only in the delay beyond Trustee's long-expired abatement but also in the elimination of Plaintiffs' claims that the Trustee is unable to assert.

**B.  The Trustee Lacks Standing To Assert Claims Under 11 U.S.C. § 541(a)(1).**

62.    The Trustee contends that Plaintiffs' claims are property of the Debtors' estate, and therefore, the Trustee, not the Plaintiffs, has standing to assert them under 11 U.S.C. § 541(a)(1). [Dkt. No. 140 at ¶64].  It is the Trustee who lacks standing, for three principal reasons: (1) the *Wagoner* Rule mandates the conclusion that the claims against the Defendants belong to Plaintiffs as Debtors' creditors and not the Trustee because Debtors joined the Defendants in defrauding Plaintiffs; (2) the Trustee lacks standing to assert Plaintiffs claims because the Debtors could not have raised Plaintiffs' claims as of the filing of bankruptcy; and (3)  Plaintiffs' claims seek damages for direct injuries that cannot be categorized as either "generalized" damages or damages derivative of any the Debtors' damages.

**C.  The *Wagoner* Rule Deprives The Trustee of Standing to Pursue Plaintiffs' Claims.**

63.    The *Wagoner* Rule, established in *Shearson Lehman Hutton Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), states that "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." The Second Circuit held that a trustee lacked standing to assert the claims of creditors against third parties who allegedly aided the bankrupt debtor in diverting its assets. *Id.* at 120.  The *Wagoner* Rule is followed by a majority of circuit courts in bankruptcy proceedings. [7]

---

[7] Circuits following the rule include at least the First, Second, Third, Fourth, Sixth, Eighth, Tenth, and Eleventh.  *See Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards,* 437 F.3d 1145, 1151 (11th Cir. 2006) ("If a claim of [debtor] would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.") (citing *Grassmueck v. Am. Shorthorn Ass'n.,* 402 F.3d 833, 837 (8th Cir. 2005); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 356-57 (3rd Cir. 2001); *Terlecky v. Hurd (In re Dublin Sec. Inc.),* 133 F.3d 377, 381 (6th Cir. 1997); *Sender v. Buchanan (In re Hedged-Inv. Assocs.),* 84 F.3d 1281, 1285 (10th Cir. 1996); *Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP,* 322 F.3d 147, 158-66 (2nd Cir. 2003)); *see also Grayson*

64.     With the *Wagoner* Rule in mind, Trustee bears the burden of establishing standing.

*E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 984 (11th Cir. 1990).  In *Picard v. HSBC Bank PLC*,

454 B.R. 25, 29 (S.D.N.Y. 2011), a case arising out of Bernie Madoff's infamous Ponzi scheme,

the court was called upon to determine whether the bankruptcy trustee for the consolidated

liquidation of Bernard L. Madoff Investment Securities ("Madoff Securities") had standing to

pursue common law claims against third parties who allegedly violated a duty to Madoff

Securities' customers by failing to detect Madoff's fraud.  The *Picard* court began its analysis by

stating that standing under Article III of the United States Constitution "is a threshold issue in all

cases, since putative plaintiffs lacking standing are not entitled to have their claims litigated in

federal court." *Id.* (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir.

1991)).

65.     "To meet Article III requirements, a trustee must demonstrate: (i) a concrete and

particularized 'injury in fact,' (ii) that can be fairly traced to the defendants' conduct, and (iii) that

can be redressed by a favorable decision." *Picard*, 454 B.R. at 29.  "Moreover, to satisfy

'prudential' limitations on standing, 'a party must "assert his own legal rights and interests, and

cannot rest his claim to relief on the legal rights or interests of third parties."'" *Id.* (quoting *Wight

v. BankAmerica Corp,* 219 F.3d 79, 86 (2d Cir. 2000) (quoting *Warth v. Seldin,* 422 U.S. 490, 499

(1975))).  "Accordingly, even though a bankruptcy trustee can seek to recover monies on behalf

of the debtor's estate that will ultimately be used to help satisfy creditors' claims, it is settled law

that the federal Bankruptcy Code (Title 11, United States Code) does not itself confer standing on

---

*Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Cap. LLC*, 716 F.3d 355 (4th Cir. 2013); *Mosier v. Callister,
Nebeker & McCullough*, 546 F.3d 1271 (10th Cir. 2008); *Official Comm. of Unsecured Creditors of Allegheny Health,
Educ. and Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 607 F.3d 346 (3d Cir. 2006) (applying the *in pari delicto*
doctrine to claims brought by the unsecured creditors committee on behalf of the debtor); *Baena v. KPMG LLP*, 453
F.3d 1 (1st Cir. 2006).

a bankruptcy trustee to assert claims against third parties on behalf of the estate's creditors themselves, because the trustee stands in the shoes of the debtor, not the creditors." *Id.* (citing *Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 434 (1972)).

66.     The *Picard* court further stated that "[w]hen it comes to common law claims, moreover, a bankruptcy trustee is often barred from bringing claims on behalf of the debtor's estate because of the common law doctrine of <u>in pari delicto</u>, which generally precludes a wrongdoer like Madoff Securities from recovering from another wrongdoer." *Id.* at 29.   The *Picard* court further explained that "[a]lthough <u>in pari delicto</u> is typically an affirmative defense, "in federal court prudential considerations deprive a bankruptcy trustee of standing to even bring a claim that would be barred by <u>in pari delicto</u>. *Id.* (citing *Wagoner*, 944 F.2d at 118.[8]   The *Wagoner* Rule is a prudential limitation on standing under federal law.   Given that the trustee's complaint was replete with allegations of Madoff's role as the "mastermind[]" of the fraud, the *Picard* court held that the *Wagoner* Rule deprived the trustee standing to bring common law fraud claims against third parties. *Id.*   This prudential limitation on standing in federal court has become known as the *Wagoner* Rule.

67.     While the Fifth Circuit has not directly addressed the *Wagoner* Rule specifically, it has referenced the principle in multiple cases. *See Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955 (5th Cir. 2012); *Schertz-Cibolo-Universal City v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281 (5th Cir. 1994).   In *Jones*—a receivership case rather than a bankruptcy case—the Fifth Circuit discusses the importance of Bankruptcy Code Section 541 in the application of the *Wagoner* Rule.   The court noted that cases applying the rule are "distinguishable [from the

---

[8] This prudential limitation on standing under federal bankruptcy law has become known as the *Wagoner* Rule. *See, e.g., Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 459 n.3 (2010).

receivership context] because they rely upon Section 541(a) of the Bankruptcy Code, which limits the debtor estate to interests of the debtor 'as of the commencement of the case.'" *Id* at 967.

68.     In *Schertz*, the Fifth Circuit decided that the *Wagoner* Rule did not preclude the trustee's claims because, on the alleged facts of that case in the complaint, it was unclear whether the debtors' representatives had participated in the acts or omissions giving rise to the cause of action.[9]  *Id.* at 1286, n.7.   The court specifically noted that "we cannot conclude from the allegations in the complaint whether representatives of [the debtor] actually participated in the acts or omissions giving rise to the causes of action." *Id.*   The court therefore found that "the plaintiff school districts' reliance on" *Wagoner* was "misplaced." *Id.*   The Schertz court distinguished *Wagoner* on the basis that in *Wagoner*, "it [was] uncontested" that the management of the debtor-corporation cooperated with the third-party defendant in stripping the corporation of its assets.[10]  *Id.*

69.     Furthermore, the Fifth Circuit applied the *Wagoner* principle in *Ingalls v. Gressett (In re Bradley)*, 326 Fed. Appx. 838, 839 (5th Cir. 2009).   In the *Bradley* case, the Fifth Circuit held that a trustee lacked standing to bring a civil conspiracy claim against a third party who conspired with the debtor to fraudulently transfer assets.  *Id.* at 839-840.   The Fifth Circuit explained that "in suing Gressett for his role in the conspiracy, the Trustee does not represent the creditors' interests in Bradley's conspiracy claims against Gressett but attempts to assert the creditors' own direct claim against Gressett in which Bradley has no interest.  This he cannot do."

---

[9] As discussed more fully below, Trustee's Adversary Complaint related to this this case alleges Brian McClain, as the sole shareholder and officer of the Debtors, operated a "massive Ponzi scheme" that "would not have been possible without the Defendants' lawless conduct."  *See* Adversary No. 25-02005-swe, Dkt. No. 1 at ¶1; *see also* Dkt. No. 1 at ¶¶2, 19-34, 44-45.

[10] It is uncontested in the Trustee's case that Brian McClain cooperated with the Defendants in the acts, omissions, and fraudulent conduct that caused Plaintiffs' damages.  *See supra*, fn.3; *see also* Adversary No. 25-02005-swe, Dkt. No. 1 at ¶107 (Trustee alleged damages consist of the amount of Debtors' liability to the victims of the Ponzi scheme.)

*Id.* at 840. The Fifth Circuit emphasized that Texas law did not suggest that the debtor "has any cognizable legal or equitable interest in the damages sought here to replace assets that he conspired to transfer fraudulently or that [the debtor] could seek damages from his co-conspirator for assisting with those transfers." *Id.*

70.     Courts within the Fifth Circuit and from other circuits have applied the *Wagoner* Rule to divest the trustee of standing to assert common law claims when the debtor assisted or consented in the fraud with third parties. For example, in *In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* 2007 WL 789141, at *7 (S.D. Tex. Mar. 12, 2007), the court held that "if the debtor has joined a third party in defrauding creditors, the trustee does not have standing to sue the third party for damages to creditors." *Id.* The Sixth Circuit in *In re NM Holdings Co., LLC,* 622 F.3d 613, 624 (6th Cir. 2010), explicitly endorsed the *Wagoner* Rule, stating that "the key point is that 'a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself.'" *Id.* at 118. Similarly, the Second Circuit in *In re Bernard L. Madoff Inv. Sec. LLC,* 721 F.3d 54, 58 (2d Cir. 2013), reaffirmed that "a party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,'" noting that "this prudential limitation has been consistently applied in the bankruptcy context to bar suits brought by trustees on behalf of creditors." *Id.*

71.     The *Jones, Schertz* and *Bradley* cases from the Fifth Circuit, cases within the circuit and from other circuits strongly suggest that if squarely faced with the issue, the Fifth Circuit would adopt the *Wagoner* Rule and hold that the Trustee lacks standing to assert Plaintiffs' claims because the Debtors—in whose shoes the Trustee now stands—assisted and cooperated with Defendants that caused significant damage to Plaintiffs.

72.     *Picard v. JPMorgan Chase & Co,* 460 B.R. 84 (S.D.N.Y. 2011)[11] illustrates how courts apply the *Wagoner* Rule's limitations on trustees' standing to assert common law claims against third parties when the debtor was involved in fraudulent conduct.  In *J.P. Morgan*, the trustee sought to pursue common law claims against various financial institutions for their involvement in Bernie Madoff's massive Ponzi scheme and their failure to detect it.  *Id.* at 88-89.  The trustee sought billions of dollars in avoidance and common law damages claims against the "JP Morgan Defendants".  *Id.*  Madoff maintained bank accounts with JPMorgan through which he funneled the money coming into and going out of Bernard L. Madoff Investment Securities, LLC's ("BMIS") bank accounts.  *Id.*  The trustee asserted common law claims for aiding and abetting fraud, breach of fiduciary duty, unjust enrichment, conversion, aiding and abetting conversion, knowing participation in a breach of trust, and contribution.  *Id.*at 89.

73.     The Madoff trustee's common law claims were premised on the trustee's allegation that the JPMorgan Defendants, as Madoff and BMIS's primary banker, knew, should have known, or consciously avoided discovering, that BMIS was not engaged in lawful securities trading, but was illegally misappropriating customer funds.  *Id.*  The trustee alleged that by this failure, the JPMorgan Defendants substantially assisted, or knowingly participated in the scheme, breaching duties they owed to BMIS's customers, and aiding and abetting BMIS's breach of such duties.  *Id.*  The trustee sought damages on behalf of the customers for approximately $19 billion.  *Id.*

74.     In a separate adversary proceeding, the Madoff trustee also sued the "UBS Defendants," who allegedly serviced and sponsored two "feeder funds" for BMIS.  *Id.*  The trustee also sued the "Access Defendants" who were alleged to have joined the scheme by marketing the feeder funds to investors, despite knowing, or consciously avoiding knowing, that BMIS was a

---

[11] To avoid confusion with the *Picard* case discussed *supra*, this case will be referred to as "JP Morgan".

fraud, and misrepresenting to investors that it performed rigorous due diligence.  *Id.* at 90.  The trustee asserted common law causes of action against all the defendants for aiding and abetting BMIS's fraud, breach of fiduciary duty, and conversion, knowing participating in a breach of trust, conversion, unjust enrichment, money had and received, and contribution.  *Id.* at 90.

75.    The *JP Morgan* court first explained that the trustee lacked standing to pursue claims on behalf of the debtors' creditors because the trustee is empowered to pursue only those claims that properly belonged to the debtor before it entered bankruptcy.  *Id.* at 91.  Because the trustee steps into the debtor's shoes to bring property into the bankruptcy estate, the trustee possesses only the debtor's rights.  *Id.*  The court emphasized that "giving the [t]rustee the power to pursue claims on behalf of creditors would usurp the creditors' right to determine whether and in what forum to vindicate their legal injuries, and would raise difficult issues of preclusion.  *Id.* at 91 (citing *Caplin,* 406 U.S. at 431-32).  The *JP Morgan* court also explained that if the trustee was empowered to pursue claims of third-party creditors, "the debtor's assets would be depleted to enforce rights possessed by third parties and defendants would face the danger of duplicative recoveries."  *Id.* (internal citations omitted).  The court held that there was "no doubt that the common law causes of action . . ., premised on a Ponzi scheme of unprecedented scope and duration orchestrated by [the debtor] belonged to the creditors, not to [the debtor]".[12]  *Id.* at 91.

---

[12] Courts across the nation agree on this issue.  *See Rochelle v. Marine Midland Grace Trust Co.*, 535 F.2d 523, 527 (9th Cir. 1976); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988) (The conduct of defendants, officers of a bankrupt corporation, "bribery, perjury, fraud, and bankruptcy fraud – caused [plaintiff creditor monetary damage, and the right to recover for that injury belongs, not to [the bankrupt corporation] or its bankrupt estate, but to [plaintiff]."), *cert. denied*, 490 U.S. 1007, 104 L. Ed. 2d 158, 109 S. Ct. 1642 (1989); *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1042 (2d Cir. 1986)(right to recover for alleged tort committed against creditor by officer of bankrupt corporation belongs to creditor, not the bankruptcy estate), *cert. denied*, 479 U.S. 950, 93 L. Ed. 2d 385, 107 S. Ct. 436 (1986); *Hadley*, 901 F.2d at 986-987; *Williams v. California 1ˢᵗ Bank*, 859 F.2d 664, 666-67 (9th Cir. 1988)(defrauded investors, rather than bankruptcy trustee, entitled to pursue claims arising from bankrupt corporation's Ponzi scheme); *In re Ozark Restaurant Equip. Co.* (Mixon v. Anderson) 816 F.2d 1222, 1225 (8th Cir. 1987) ("Where . . . 'the applicable state law makes such obligations or liabilities run to the corporate creditors personally, rather than to the corporation, such rights of action are not asserts of the estate under Section 541(a) . . . .'" (quoting 4 Collier on Bankruptcy P 541.10[8], at 541-69 to 541-70 (15th ed. 1986))

76.     The court then held that the *Wagnor* Rule's prudential limitation on standing "mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Id.* at 91-92. Furthermore, under general principles of agency law, Madoff's wrongdoing was imputed to BMIS, and as a result, BMIS could not have sued the defendants for the alleged scheme. Thus, the trustee, standing in the debtor's shoes, also could not sue the defendants. *Id.*

77.     The court then addressed the trustee's argument that 11 U.S.C. § 541(a)(1), (2) provided him the powers of a judgment creditor that extends credit to the debtor at the commencement of the case. *Id.* at 91. The trustee claimed that this language empowered him to pursue pre-petition common law claims that belonged to creditors. *Id.* The court strongly disagreed and explained that the trustee's argument would lead to a "preposterous" result because it would mean that the trustee could appropriate claims belonging to creditors against third parties and assert them on behalf of the guilty debtor. *Id.* at 94. The court emphasized that the trustee's argument would render the Supreme Court's decision in *Caplin*, along with *Wagoner* and its progeny, a dead letter. *Id.* at 94. The court also noted that the trustee's theory has been rejected in numerous persuasive cases, including cases from at least three circuits, including the Fifth Circuit. *Id.* (citing, *inter alia*, *In re Bradley*, 326 Fed. Appx. 838).

78.     Accordingly, the *Wagoner* Rule serves as an essential prudential barrier depriving a trustee of standing to pursue claims against third parties when the debtor's management participated in the underlying misconduct, thus reinforcing the principle that claims against third parties for defrauding a corporation with management's cooperation accrue to creditors, not to the guilty corporation.

### a. The Trustee Lacks Standing Because Debtors' Sole Shareholder Brian McClain Aided, Assisted, and Cooperated with Defendants to Perpetuate Fraud.

79.     The Trustee's Complaint presents an exhaustively detailed account of what he

characterizes as a massive fraudulent scheme, spanning multiple pages with specific factual allegations, dates, dollar amounts, and internal communications. The Complaint meticulously describes the alleged operational mechanics of the purported Ponzi scheme, including detailed allegations about cattle investments, "investor" payments, loan arrangements, and financial transfers.[13] The Trustee provides specific allegations about individual Defendants' roles, including verbatim quotes from internal bank communications, precise loan amounts totaling tens of millions of dollars, and detailed descriptions of allegedly fraudulent practices such as check kiting operations and the use of pre-signed blank checks. The Complaint also includes specific allegations regarding red flags that were allegedly ignored, as well as internal bank designations of the Debtors as "Clients of Key Concern," and detailed timelines of allegedly fraudulent activities. The Trustee's comprehensive pleading establishes the collaborative wrongdoing between Debtors and the Defendants that deprives the Trustee of standing under the *Wagoner* Rule to pursue the claims he has so thoroughly alleged.

80. The Trustee's Complaint establishes the foundational element for applying the *Wagoner* Rule. The Trustee begins by stating that his case "seeks justice and recompense for the victims of a massive Ponzi scheme operation by the Debtors' owner, Brian McClain, that would not have been possible without the Defendants' lawless conduct." [Adv. No. 25-02005-swe, Dkt. No. 1 at ¶ 1.] The Trustee alleges that Defendants dealt directly with Brian McClain in his

---

[13] Plaintiffs dispute the Trustee's characterization of the McClain Entities' operation as a "Ponzi scheme" and reserve all rights to contest the factual and legal bases for such allegations. Plaintiffs reserve all rights to dispute the Trustee's attempt to secure a presumption that the McClain Entities operated a Ponzi scheme, and thus, were insolvent at their inception. Indeed, the Trustee admits that the McClain Entities had legitimate business operations at one point in time. [Adversary Proceeding No. 25-02005-swe, Dkt. No. 1 at ¶ 15.]. Accordingly, the McClain Entities operations may not have been fraudulent at its inception. Plaintiffs' citations to the Trustee's Original Adversary Complaint are made to show the Trustee lack of standing to assert Plaintiffs' claims. They are not an admission of the truth or veracity of the Trustee's allegations. Plaintiffs also dispute Trustee's characterization of the business transactions between Debtors and Plaintiffs. Plaintiffs dispute that they were "investors" and that they entered into what Trustee characterizes as "futures contracts" or "partnership agreements."

capacity as a director, officer or employee of Debtors. [*Id.* at ¶102]. The Trustee alleges that "Defendants were lynchpins of McClain's Ponzi scheme." [Adv. No. 25-02005-swe, Dkt. No. 1 at ¶ 4]. These allegations alone establish the precise type of management cooperation that triggers the *Wagoner* Rule's prudential limitations on standing. Under *Wagoner* and its progeny, including the Fifth Circuit's decision *in Ingalls v. Gressett (In re Bradley)*, such allegations of collaborative wrongdoing between debtor management and third parties categorically deprive the Trustee of standing to assert common law claims against Defendants. But the Trustee's Complaint goes even further, unveiling additional allegations that suggest an even deeper, more troubling entanglement between the Debtors and the Defendants—allegations that strike at the heart of the Trustee's lack of standing.

81.    The Trustee's allegations demonstrate the extensive collaborative relationship between McClain and Defendants that courts have consistently found fatal to the Trustee's standing. According to the Trustee's Complaint, Rabo provided essential funding with McClain's active participation, lending "the Debtors $70 million to facilitate the Debtors' too-good-to-be-true growth, which allowed McClain to massively expand his Ponzi scheme." [*Id.* at ¶ 44.] Furthermore, the Trustee alleges that "Rabo worked directly with McClain to: (a) process Debtors' application for credit; (b) secure documents and paperwork needed for the original application and future increases and extension; and (c) overcome Rabo's own internal controls, policies, and procedures to force through approval of the Rabo loan and subsequent increases." *Id.* at 105.

82.    Further, the Trustee's allegations against HTLF exemplify the kind of insider cooperation that squarely triggers the *Wagoner* Rule's prudential bar. Far from portraying the Debtors as unwitting victims, the Complaint asserts that Debtors knowingly provided HTLF with "pre-signed blank checks"—a deliberate act that, according to the Trustee, enabled a coordinated

check-kiting scheme.  [Id. ¶ 65.]  These allegations do not reflect misconduct directed at the Debtors, but misconduct undertaken with them, reinforcing that any injury was self-inflicted through Brian McClain's complicity and thus beyond the Trustee's standing to pursue.

83.    Moreover, the Trustee's allegations against Mechanics Bank further underscore the collaborative misconduct that courts have consistently found dispositive under *Wagoner*. According to the Complaint, Mechanics Bank's Chief Operating Officer admitted that the bank "knew it was in the middle of a check kiting operation," yet continued to facilitate the scheme— with the Debtors' knowing and active participation.  [*Id.* ¶ 69.].  This level of mutual involvement is not incidental; it exemplifies the very "cooperation of management" that the *Wagoner* Rule identified as the critical factor barring a trustee from asserting such claims on behalf of the estate.

84.    The Trustee expressly pleads that McClain and the Defendants shared "a meeting of the minds" to run a fraudulent Ponzi scheme.  [*Id.* ¶ 130.]  That allegation squarely fits the collaborative wrongdoing that the *Wagoner* Rule deems fatal to trustee standing.  As the court held in *In re Enron Corp.*, when "the debtor has joined a third party in defrauding creditors, the trustee lacks standing to sue that third party for damages to creditors." 2007 WL 789141, at *7 (S.D. Tex. Mar. 12, 2007).  By casting the Debtors as willing co-conspirators—not duped victims—the Trustee's own pleading extinguishes any basis for the Trustee's standing to pursue these claims on behalf of the Debtors' bankruptcy estate.

85.    The Trustee's standing deficiency is not merely a technical pleading issue—it represents a fundamental legal barrier established by decades of precedent protecting the integrity of the judicial system.  Under the *Wagoner* Rule and its underlying principle, consistently applied by courts across the country and the Fifth Circuit, trustees cannot pursue claims against third parties when the debtor's management actively participated in the underlying wrongdoing.  The

Trustee has alleged in exhaustive detail that Brian McClain—the Debtors' sole controlling party—conspired with Defendants in operating what he characterizes as a fraudulent scheme, complete with a "meeting of the minds" on fraudulent objectives. These allegations satisfy every element courts have identified as fatal to the Trustee's standing: (1) management cooperation; (2) collaborative wrongdoing; and (3) claims that properly belong to defrauded creditors rather than the guilty corporation. As the Fifth Circuit emphasized in *Bradley*, the Trustee cannot assert the creditors' direct claim against co-conspirators. *In re Bradley.* 326 F.Appx. at 839-840. Allowing the Trustee to proceed would not only contradict binding precedent but would permit the very architect of the alleged scheme to benefit Debtors, guilty entities, through the Debtors' bankruptcy estate. The *Wagoner* Rule's prudential limitations exist precisely to prevent such unjust results, and they bar the Trustee from pursuing Plaintiffs' claims as a matter of law.

### b. Established Texas Agency Law Undermines the Trustee's Fabricated Corporate Separateness Theory.

86.     The Trustee's Complaint rests on a fundamental legal fiction: that Brian McClain operated the alleged Ponzi scheme as an individual actor separate and apart from the Debtors, with the Debtors serving as innocent victims rather than active participants. This artificial separation strategy overlooks the well-established principle under Texas agency law that a sole owner's actions conducted through their corporations are legally attributable to those corporate entities. The Trustee cannot simultaneously claim that McClain controlled and operated the Debtors while arguing that his actions through and on behalf of the Debtors should not be imputed to them.

87.     Under Texas law, "the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). A corporate agent's actions are imputed to the company unless he was acting solely for his own

purposes. *Mumfrey v. CVS Pharmacy, Inc*., 719 F.3d 392, 403 (5th Cir. 2013) ("Even an agent's mixed motives—benefitting himself and the corporation—are insufficient [to avoid imputation].").  The Trustee's allegations establish that McClain was not acting solely for personal purposes but was operating the alleged Ponzi scheme through and on behalf of the Debtors.

88.    The Trustee's Complaint acknowledges that McClain "formed, owned, and operated each of the Debtors" and used them "for various functions in the cattle industry." [Adv. No. 25-02005-swe, Dkt. No. 1 at ¶14].  The Trustee explicitly alleges that the Defendants dealt with McClain in his corporate capacity.  [*Id.* at ¶102].  More tellingly, the Trustee asserts that McClain "used the cattle to attract investors for a massive Ponzi scheme that McClain operated *through Debtors*."  [*Id.* at ¶18](emphasis added).  This language itself defeats the Trustee's separation theory—McClain was not operating independently of the Debtors but was acting through them as their sole owner and operator.

89.    Furthermore, the factual allegations in the Trustee's Complaint establish that McClain's and the Debtors' purposes in the alleged scheme were completely aligned.  As the *F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992), court explained: "Woods acted on the corporation's behalf because by serving Western, he served himself, Western's sole owner.  As the sole owner, Woods' fraudulent activities on Western's behalf benefitted himself and injured outsiders to Western." *Id.*

90.    Here, as Trustee alleges, McClain owned and controlled all three Debtor entities, and his alleged activities were conducted through the Debtors' business operations, bank accounts, and corporate infrastructure.  The Trustee's allegations detail this operational unity: (1) McClain "formed, owned, and operated each of the Debtors"; Adv. No. 25-02005-swe, Dkt. No. 1 at ¶14 (2) conducted the alleged scheme "through Debtors"; *Id.* at ¶18; (3) used "the Debtors'

three bank accounts" for all investor transactions; *Id.* at ¶32; and (4) operated through "the Debtors' Texas facilities" and business relationships with "their two Texas customers." *Id.* at ¶¶15-16  In addition, the Trustee's description of the alleged scheme's mechanics further defeats the separation theory.  The Trustee asserts that "McClain generally accepted all investor money into one of the Debtors' three bank accounts, paid out all investor money out of a different Debtor bank account." *Id.* at ¶3.  This demonstrates complete operational unity between McClain and the Debtors even under Trustee's own allegations—there was no meaningful distinction between McClain's actions and the Debtors' actions, as the corporate entities had no independent decision-making capacity or operations distinct from McClain's control.

91.     The Trustee cannot credibly argue that McClain was acting adversely to the Debtors when he alleges that "investors" contracted directly with the Debtor entities themselves.  The Trustee contends that "investors intended to invest money with the Debtors" under "partnership agreements,"[14] and the Trustee's own exhibit shows a "Cattle Feeding agreement" between "Thorlakson Diamond T Feeders LP" and "McClain Feedyard's/7M Feeders." *Id.* at ¶21.  These allegations establish that the alleged scheme was conducted in the Debtors' corporate names and for their apparent benefit, not as some independent venture by McClain that harmed the corporate entities.  The fact that purported "investors" were contracting with the Debtors directly—rather than with McClain personally—demonstrates that any alleged fraudulent activity was undertaken on behalf of the corporations, making it imputable to them under established agency principles. *F.D.I.C. v. Ernst & Young*, 967 F.2d at 171; *Rogers v. McDorman*, 521 F.3d 381, 394-395 (5th Cir. 2008).

92.     Moreover, the Trustee's damages theory fatally undermines its separation strategy.

---

[14] [*Id.* at ¶19]

The Complaint seeks over $100 million in damages, claiming that these represent the Debtors' liability to the alleged victims of the Ponzi scheme. [Adversary Proceeding No. 25-02005swe, Dkt. No. 1 at ¶107]. However, the Debtors can only be liable for such damages if McClain was acting on their behalf in his corporate capacity. Corporate liability requires that the agent was acting on behalf of the corporation. *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952 (Tex. 1996). Consequently, the Trustee cannot simultaneously argue that the Debtors are liable for $100 million in scheme-related damages while claiming McClain was acting independently of the Debtors.

93.     The Fifth Circuit's decision in *Rogers v. McDorman* directly supports the conclusion that McClain's alleged actions must be imputed to the Debtors. 521 F.3d at 394-95. In *Rogers*, the court analyzed a check-kiting scheme. It held that corporate directors' knowledge and participation in fraudulent activity were imputed correctly to the bank, rejecting arguments that the directors were acting adversely to the corporation's interests. *Id.* The court emphasized that "fraud on behalf of a corporation is not the same thing as fraud against it," and found that the directors' calculated risk-taking to benefit the corporation's business (even though it ultimately failed) meant their actions were imputable to the corporation. *Id.*

94.     Here, as in *Rogers*, the Trustee has failed to establish that McClain was acting adversely to the Debtors' interests. The Complaint alleges that McClain used the Debtors' legitimate cattle operations as the foundation for attracting investors, suggesting he was attempting to generate business for the Debtors (albeit through allegedly fraudulent means). [Adversary Proceeding No. 25-02005swe, Dkt. No. 1 at ¶18]. Under *Rogers*, this would constitute "fraud on behalf of a corporation," not fraud against it, making McClain's actions fully imputable to the Debtors.

95.     The *Greenstein, Logan & Co. v. Burgess Marketing, Inc.*, 744 S.W.2d 170, 190 (Tex. App.—Waco 1987, writ denied), decision reinforces that corporate agents' fraudulent acts are imputed to corporations when committed on behalf of the corporation.  The court emphasized the critical distinction that "fraud on behalf of a corporation is not the same thing as fraud against it." *Id.*  Fraud is imputed to the corporation when the agent acts to benefit the corporation (even if through improper means), but fraud is *not* imputed when the agent acts against the corporation's interests for purely personal gain.  *Id.*  Here, the Trustee contends the alleged scheme was conducted through the Debtors' own business operations, using their corporate infrastructure, bank accounts, and business relationships—indicating McClain was acting on behalf of the Debtors, making his conduct imputable to them under *Greenstein*.  The Trustee has alleged no facts suggesting that McClain was harming the Debtors for his gain—instead, the alleged scheme was conducted through the Debtors' business operations, using their infrastructure and accounts.

96.     Furthermore, the Trustee alleges that Defendants' continuous extensions of credit and participation in check-kiting operations damaged the Debtors by enabling and prolonging the alleged Ponzi scheme, ultimately resulting in greater losses when the scheme collapsed.  [*See generally* Adversary Proceeding No. 25-02005-swe, Dkt. No. 1 at ¶¶ 45, 114-119].  However, this theory is legally flawed because the extensions of credit and check-kiting operations actually benefited the Debtors by providing them with funding and liquidity, rather than causing them harm.  *See Picard v. HSBC Bank PLC*, 454 B.R. at 32-33  (explaining that the trustee's claim that defendants were liable for Madoff's scheme because they knowingly and recklessly "funneled" money into the scheme was untenable because the funding caused a gain rather than a loss to the debtor).  While Defendants had an interest in keeping Debtors afloat and did so, albeit illegally, the Trustee cannot credibly argue that receiving millions of dollars in credit extensions and

banking services constituted harm to Debtors as oppose to harm to the Plaintiffs.

97.     The Trustee's attempt to portray the Debtors as innocent victims of McClain's scheme fails as a matter of law.  Under settled principles of Texas agency law, McClain's actions as the sole owner, director, and operator of the Debtors are imputed to them.  The Debtors cannot be considered separate innocent parties when their own corporate operations, bank accounts, facilities, and business relationships were the very mechanisms through which the alleged Ponzi scheme was conducted.  The Trustee's separation theory would effectively render Texas agency law meaningless by allowing corporations wholly owned by one shareholder to escape liability for fraudulent schemes conducted through their operations simply by claiming their sole stockholder and officer was acting independently.

98.     Because McClain's actions are imputed to the Debtors as a matter of law, the Debtors were active participants in the alleged Ponzi scheme, not innocent victims.  This participation precludes the Trustee from asserting direct claims against third parties based on the theory that those parties harmed innocent corporate entities.

     **c.   The *Wagoner* Rule Applies Despite The Trustee's Allegations of Defendants' Alleged Excessive Control Over Debtors.**

99.     The Trustee may argue that the *Wagoner* Rule does not bar his claims because Defendants allegedly exercised excessive control over the Debtors. [See Adversary Proceeding No. 25-02005-swe, Dkt. No. 1 at ¶¶70-71, 93-96.] This argument fails because the Trustee's allegations of excessive control are vague and conclusory, and are contradicted by the Complaint's detailed factual allegations showing Defendants lacked the requisite control to overcome Wagoner's prohibition.

100.    Beyond the allegations of a Ponzi scheme, the Trustee makes specific claims that the Debtors participated in the scheme. The Trustee alleges that the Debtors repaid investors with

other investors' funds, *see* Complaint at ¶30, that the scheme's volume exceeded actual cattle operations by a 10x multiple, *see id.* at ¶31, and that the Debtors engaged in check kiting between banks to cover "investor" payments when funds were insufficient. *See id.* at ¶32. The Trustee also points to irregular practices, such as accepting investor money in one account while paying returns from another, *see id.*, and extensive intercompany transfers totaling $2 billion over a five-year period. *See id.* at ¶ 43.

101.    The Trustee unequivocally alleges that Rabo, CFSB, Mechanics Bank, and HTLF "allowed the Debtors to thwart acceptable banking practices by improperly floating hundreds of millions of dollars of checks and blithely ignoring numerous red flags." *See id.* at 45. According to the Trustee, when Rabo expressed concern about regular significant overdrafts, Brian McClain "brushed off those overdrafts" by claiming people owed money, *see id.* at 76, and that "Rabo took McClain's word at face value and assumed others were buying cattle from the Debtors such that payment was forthcoming". *See id.*

102.    Accordingly, the Trustee's excessive control theory fundamentally contradicts his factual allegations. The Complaint extensively details how the Debtors operated a sophisticated Ponzi scheme, engaged in check kiting across multiple banks, and when Rabo inquired about the overdrafts, McClain represented that the Debtors were owed money. These allegations demonstrate that Debtors' check-kiting scheme stemmed from the Debtors' autonomous actions, not from Defendants' control or direction.[15] The Trustee's specific allegations indicate that the Debtors acted independently in their fraudulent conduct, not under the Defendants' control or direction. Indeed, the Trustee does not allege that Defendants instructed Debtors to engage in a

---

[15] Plaintiffs note that they are merely addressing the allegations in the Trustee's Complaint for the purposes of this response and do not concede any material facts regarding Rabo's, HTLF's, Mechanics Bank's and CFSB's knowledge of the Debtors' check-kiting scheme.

Ponzi or check-kiting scheme. The Trustee's specific allegations control over the Trustee's general claims that Defendants exercised excessive control over the Debtors. *Hirsh v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (the trustee's attenuated allegations of control are contradicted by the more specific allegations in the complaint, and thus, the trustee lacked standing).

### D.  The Trustee Cannot Usurp Plaintiffs' Right to Pursue Their Own Direct Injuries.

103.    Courts use three categories of actions to determine who can assert them, the trustee or the creditors. The three categories are as follows: (1) actions by the estate that belong to the estate; (2) actions by individual creditors asserting a generalized injury to the debtor's estate, which ultimately affects all creditors; and (3) actions by individual creditors that affect only that creditor personally. *Schimmelpenneck* at 359.

104.    Trustee argues that Plaintiffs' claims belong to the estate because they are either (1) actions to the estate that belong to the estate, or (2) actions by individual creditors asserting a generalized injury to the debtor's estate which ultimately affects all creditors. *See* Motion to Intervene at ¶62. The Trustee is wrong.

105.    First, the Complaint shows the Debtors' alleged damages consist of the amount of the Debtors' liability to the victims for the Ponzi scheme, not independent business losses. *See* Complaint at ¶¶93-96, 101, 119, 141.

106.    Second, Plaintiffs entered separate and distinct transactions with Debtors. Plaintiffs' claims are based on the fact that Debtors duped Plaintiffs into entering these transactions and that Defendants knew of Debtors' unlawful activities and went further and participated and assisted Debtors in their fraudulent scheme. Thus, Plaintiffs' claims are based on the allegedly fraudulent statements made by Debtors and Defendants that induced Plaintiffs to enter into the agreements. Accordingly, Plaintiffs seek direct damages for their injuries. *See Hill*

*v. Day (In Re Today's Destiny, Inc.)*, No. 05-90080, 2007 Bankr. LEXIS 2348, 2007 WL 202811, at *10 (Bankr. S.D. Tex. July 6, 2007). The creditors in *In Re Today's Destiny, Inc.* alleged that debtor's insiders fraudulently induced the creditors to enter into leasing agreements involving debtor, and a third party lender. *Id.* The court held that debtor's fraudulent schemes caused damages to the creditors to enter leasing agreements, and thus, the fraud claims and others belonged to the creditors, not debtors. *Id.* at 10. Accordingly, Plaintiffs, who were affected personally, had the right to pursue the claims asserted in this Adversary Proceeding. *See* Exh. A.

107.    Third, Trustee asserts that the ultimate purpose of his case will be to make the maximum distribution possible to innocent parties that suffered net losses by properly adjusting allowed claims and maximizing the pool of assets that will be available for distribution. Complaint at ¶3. However, recovery on these claims will not necessarily accrue to the benefit of all creditors harmed by the unlawful conduct of Defendants in the same way. For instance, a "net winner" in the fraudulent scheme may have been damaged in the amount of his final investment by Defendants' alleged wrong-doing, but he will not be benefitted by the Trustee's recovery, which goes into the customer fund and then directly (and only) to the "net losers." *Picard v. JPMorgan,* 460 B.R. at 96. And even if the Trustee recovers all Plaintiffs' losses and provides excess to the general fund, a net winner may share in the recovery only ratably. In contrast, a net loser, a different class of creditor, recovers its claims against the estate in full. *Id.*

**E. The Automatic Stay Does Not Prevent Plaintiffs from Pursuing Their Claims in this Adversary**

108.    The Motion also seeks to use the automatic stay provided by 11 U.S.C. § 362(a)(3) to force Plaintiffs to cease pursuit of this Adversary No. 24-02007, so he can pursue similar claims against similar parties, ostensibly as representative of the Plaintiffs, in his own Adversary No. 25-

02005.[16]  This is an improper use of the automatic stay.

109.    First, we note that § 362(a)(3) is restricted to actions involving "property of the estate."  For the reasons discussed above, the causes of action the subject of Plaintiffs' claims belong to Plaintiffs, not to the Trustee, and therefore these causes of action are not "property of the estate" and not subject to the stay.

110.    Next we note that the relief sought by the Trustee – dismissal of Plaintiffs' claims – is not warranted.   The automatic bankruptcy stay (if it applies) "operates against the commencement or continuation of judicial proceedings."  *Pope v. Manville Forest Prods. Corp.*, 778 F.2d 238, 239 (5th Cir. 1985).  Thus, "absent the bankruptcy court's lift of the stay, or perhaps a stipulation of dismissal," stayed cases "must, as a general rule, simply languish on the court's docket until the final disposition of the bankruptcy proceeding."  *Id*.  The automatic stay is not a complete bar to the *existence* of a case or claims, but instead acts as a bar to *further proceedings*. *Martin v. L & M Botruc Rental, LLC*, No. 16-14717, 2017 U.S. Dist. LEXIS 25852, at *3 (E.D. La. 2017) (citing *Villarreal v. City of Laredo*, No. 5:03-CV-11, 2007 U.S. Dist. LEXIS 73584, 2007 WL 2900572, at *4-5 & n.3 (S.D. Tex. Sept. 28, 2007)).

111.    Third, the Trustee has waived the automatic stay by prosecuting claims in Adversary No. 25-02005, that are virtually identical to the claims asserted by Plaintiffs in this proceeding.

112.    *In re Cobb*, 88 B.R. 119, 120-21 (Bankr. W.D. Tex. 1988), illustrates this point. That case started in state court, like this case did.  The plaintiff in the state court case, Sholund, sued Cox for debt.  Both Sholund and Cox then filed bankruptcy cases, and the state court

---

[16] The defendants in Adversary No. 25-02005 are all three of the bank Defendants in this proceeding:  Rabo AgriFinance, LLC, Mechanics, and HTLF.

dismissed Sholund's suit for failure to prosecute. Sholund moved to reinstate the state court case and, over Cobb's protest, the state court granted the motion to reinstate. Next, in his bankruptcy case, Cobb argued Sholund's motion to reinstate violated the automatic stay. The bankruptcy court held that Cobb waived the automatic stay because he had appeared and argue against the motion to reinstate without seeking protection of the stay. The court said:

> [W]hen the debtor-in-possession appears and defends a suit on any basis other than application of the automatic stay, then the debtor-in-possession waives the automatic stay. To hold otherwise would allow a debtor-in-possession to have a trump card that he could play if he did not like the outcome of the action, but allowing him take a favorable judgment. Such a one-sided result could hardly have been intended by Congress when it enacted the Bankruptcy Code. As an alternative holding, this Court finds that if the motion to set aside did violate the automatic stay, then Cobb has waived the stay by defending the suit as debtor-in-possession.

*Id.* The Trustee is trying to do here what *Cobb* prevents. He has asked the Court to enforce the stay defensively, to prevent Plaintiffs from pursuing their claims, while simultaneously seeking offensively to recover for those same claims.

113.    In sum, the Trustee's efforts to invoke the automatic stay should be denied because (1) it is an improper attempt to impose an injunction, (2) the claims sought to be stayed are not "property of the estate," and (3) the Trustee has waived the stay by attempting to prosecute his affirmative claims in Adversary No. 25-02005.

**F. Defendants' Assertions that Plaintiffs Lack Standing are Without Merit**

114.    Defendants' assertions of lack of standing by Plaintiffs vary from one to another, but for the most part follow the argument that the challenged claims belong to the Trustee. *See* Dkt. 120 ¶ 27 (HTLF); Dkt. 129 at 25-27 (Rabo); Dkt. 134 ¶¶ 22-29 (Mechanics); Dkt. 153-1 (Goad). For all the reasons stated above as to the limitations on the Trustee's standing to intervene in this adversary, and as further discussed below, that is not the case.

115.    The Defendants' arguments are largely of a feather with some variation.

Mechanics, Rabo, and Goad all assert that Plaintiffs' injuries are derivative of injuries to the Debtors. Mechanics points out "overlap" between Plaintiffs' claims and the claims of the Trustee, Dkt. 134 ¶ 22, and that Trustee's complaint in his separate adversary proceeding[17] is comprised of claims against Mechanics that are "word for word" the same or substantially similar to Plaintiffs' claims, asserting that "this fact alone" supports a conclusion that the claims belong to the Estate. *Id.* ¶¶ 23-26. Rabo meanwhile seeks to twist Plaintiffs' damages into an "alleged loss of Plaintiffs' investment in McClain," Dkt. 129 at 26, though Plaintiffs have not alleged any investment in McClain and Rabo's description is a mischaracterization at best. Rabo goes on to assert that Plaintiffs have not pleaded facts allowing an inference that Plaintiffs' claims for negligence, negligent undertaking, tortious interference with Plaintiffs' contracts, aiding and abetting and conspiracy belong to Plaintiffs, *id.* at 27, despite that these claims allege direct actions of Rabo against the Plaintiffs and further wrongful actions Rabo took in concert with the estate. Meanwhile Goad asserts that conversion, fraud, aiding and abetting fraud, and civil conspiracy are actions asserting a generalized injury to the estate, Dkt. 153-1 at 8, despite the fact that the Debtors were joint tortfeasors in those actions. HTLF only asserts that fraudulent transfer belongs to the estate. Dkt. 120 ¶ 27.

116.    But the similarities between Plaintiffs' well pleaded complaint and Trustee's subsequently pleaded claims are no coincidence. Plaintiffs' claims in this case have been on file for months in their current form and years dating back to the state court litigation. The broad availability and acceptance of copy-and-paste in modern practice does not and cannot automatically reduce a party's claims to the exclusive property of the Estate.

117.    Nor is the similarity in claims conclusive of any exclusivity. As the Fifth Circuit

---

[17] The claims Mechanics references have not been asserted by Trustee in this adversary.

has said:

> the existence of common parties and shared facts between the bankruptcy and the [plaintiff] bondholders' suit does not necessarily mean that the claims asserted by the bondholders are property of the estate. Indeed, as Educators Group Health Trust demonstrates, it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct.

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 585 (5th Cir. 2008).

118.    Fifth Circuit precedent is inapposite to Defendants' position. *In re Buccaneer Resources, LLC*, 912 F.3d 291 (5th Cir. 2019), demonstrates that in cases such as this one where the wrongdoing flows out from the debtor and is contributed to by other tortfeasors, the plaintiffs that are harmed—not the bankruptcy estate—own the claims against the additional tortfeasors. In that case the former CEO of a debtor, who alleged he was fired in violation of his contract shortly before the bankruptcy, sued the debtor's lead secured creditor in state court for tortious interference with his employment contract *that the debtor had breached* and conspiracy in wrongdoing *with the debtor*. *Id.* at 293. The defendant argued that the claims belonged to the trustee rather than the former CEO, but the bankruptcy court disagreed. *Id.* at 293, 297. The Fifth Circuit affirmed the bankruptcy court's determination that the claims belonged to the former CEO, not the trustee. *Id.* at 297.

119.    Likewise, *In re Seven Seas Petroleum, Inc.* involved plaintiff bondholders' claims against various defendants for conspiracy to defraud and aiding and abetting fraud for its actions in concert with the debtor. There, the claims were not derivative of injury *to* the estate where the injury had been caused, at least in part *by* the estate. 522 F.3d at 586 ("Although [debtor] Seven Seas is not named as a defendant, the bondholders' theory is that Seven Seas itself was a wrongdoer, in conjunction with Chesapeake and Hefner. It is thus not surprising that the injury

that this claim alleges is not derivative of an injury to Seven Seas").

120.    In this case, Plaintiffs assert claims against the Defendants for their role participating in the debtor's fraud and for the injuries they caused to Plaintiffs in doing so.

121.    Mechanics goes further to assert Plaintiffs claims against Mechanics are "the same or similar in nature to" claims that this Court has stated other courts in other cases concluded belonged to an estate.  Dkt. 134 ¶¶ 28-29 (citing Dkt. 1. at 10).  But in the same order, this Court expressly refused to decide the ownership or exclusivity of the claims.  Dkt. 1 at 11-12 ("Unless and until the Trustee actually intervenes and asserts actions with overlapping facts *on behalf of the estate*, the Court cannot definitively determine the ownership and rightful party to pursue such actions.  The Court is *not* prepared to decide that plaintiffs, as primary plaintiff or by counterclaim or cross action, *cannot* bring the actions they assert here.") (emphasis original).

122.    Furthermore, the claims in this adversary are not of a kind with those this Court discussed in its prior order in which it refused to reach the issue.  The negligence claims asserted by Plaintiffs do not relate to the management of the debtor, the conspiracy and aiding and abetting claims are claims of participation *with* the debtor to cause injuries to the Plaintiffs rather than concerted actions against the debtor, and the tortious interference claims are claims that the Defendants interfered with Plaintiffs contracts with the debtor in which the debtor was the breaching party.  *Contra* Dkt. 134 ¶ 28 (quoting Dkt. 1 (including as claims that may belong to an estate "negligent management of debtor that causes insolvency, fraudulent transfers by debtor, conspiracy to make debtor insolvent and to defraud the debtor, breaches of duties of good faith and fair dealing, and unjust enrichment (from debtor's funds)")).

123.    Likewise, fraudulent transfer claims against the Defendants exist beyond the Estate, because, among other reasons, the estate is precluded from bringing the claim under the *Wagoner*

Rule, as discussed at length above, and because many of Plaintiffs' claims relate to statutory dealer trusts which are not the property of the Estate. *See* 7 U.S.C. § 217b (establishing a statutory trust for cash cattle purchases by a dealer and the proceeds therefrom); *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) (money held in trust for another is not property of debtor, but of the trust beneficiary) Dkt. 103 ¶¶ 184-187 (discussing Mechanics' and Rabo's awareness of the statutory trusts on Plaintiffs' cattle and the proceeds therefrom).

124.    Therefore, Plaintiffs claims assert clear claims of injury *to the Plaintiffs* rather than the estate. The claims, like those in *Seven Seas* and *Buccaneer*, flow from the wrongdoing of the Defendants in concert with and in addition to the wrongdoing of the debtor. And, for the reasons discussed above, the Trustee is precluded from asserting such claims on behalf of the Estate. Therefore, Plaintiffs have alleged facts allowing a reasonable inference that their claims are not the exclusive property of the Trustee.

## CONCLUSION

125.    Far from seeking the maximum possible recovery for creditors, Trustee's attempt at intervention in Plaintiffs' case undermines such efforts while eschewing both legal precedent and basic fairness. If the Trustee succeeds in disallowing Plaintiffs' claims, any damages caused by Defendants would be drastically reduced by Trustee's inability to pursue claims for wrongdoing in which the debtors participated—creating a windfall for Defendants at both Plaintiffs' and the Estate's expense.

126.    Allowing the Trustee to intervene under these circumstances would create precisely the prejudice Plaintiffs without advancing the recovery for the wrongdoing by Defendants for their actions in concert with and in aid of the debtors. This is a fundamental perversion of the trustee's fiduciary duty and the bankruptcy system's core principles.

## PRAYER

For the reasons set forth above, the Court should deny Trustee's "Motion to Intervene" and deny Defendants Rabo, Mechanics, HTLF, and Goad's motions to dismiss on standing grounds, with consideration of Defendants' motions on other grounds to be considered by the Court later.

DATED this 30th day of June, 2025.

Respectfully submitted,

**NAMAN HOWELL SMITH & LEE PLLC**
David L. LeBas, SBN 12098600
dlebas@namanhowell.com
Michael S. Duncan, SBN 24097628
mduncan@namanhowell.com
8310 N. Capital of Texas Highway, Ste. 490
Austin, Texas 78731
Ph. (512) 479-0300
Fax (512) 474-1901

By:    _/s/ David L. Lebas_____
          David L. LeBas

*ATTORNEYS FOR AGTEXAS FARM CREDIT
SERVICES AGTEXAS, PCA AND THORLAKSON
DIAMOND T FEEDERS, LP*

**SPROUSE SHRADER SMITH PLLC**
John Massouh, SBN 24026866
John.massouh@sprouselaw.com
Josh Kundert, SBN 24143877
Josh.kundert@sprouselaw.com
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas 79105-5008
(806) 468-3300; (806) 373-3454 FAX
—*and*—
**LEAL LAW FIRM, LLC**
Abel A. Leal, SBN 24026989
abel@leal.law
14180 N. Dallas Parkway, Suite 300
Dallas, Texas 75254
(214) 395-5325

By: ___/s/ John Massouh_____
　　　John Massouh

*ATTORNEYS FOR DENNIS BUSS, BUSS FAMILY
TRUST, EDDIE BRYANT, ROBERT E. GRAY,
RONNIE GRAY, GRAY BROTHERS, CRAIG
SUTTON, AMY SUTTON, STEVE RYAN, JANICE
LAWHON, AJ JACQUES LIVING TRUST,
GUNGOLL CATTLE, LLC, LEAH GUNGOLL,
MORRISON CAFÉ, LLC, GARY LESH, JAN LESH,
LESH FAMILY TRUST, JARED LESH, JORDAN
LESH, LLC, JOEL BROOKSHIRE, GENE
BROOKSHIRE FAMILY, LP, DOUGLAS FINLEY,
SCARLET AND BLACK CATTLE, LLC, BRYAN
BLACKMAN, STEVE T SCOTT FARM, INC.,
SCOTT LIVESTOCK COMPANY, INC., ARNOLD
BRAUN TRUST, ROBERT BRAUN, JIM
RININGER, ROBERT SPRING, MICHAEL EVANS,
MIRANDA EVANS, CHARLES LOCKWOOD,
COLE LOCKWOOD, SHERLE LOCKWOOD,
NIKKI LOCKWOOD, LYNDAL VAN BUSKIRK,
JANET VAN BUSKIRK, COLBY VAN BUSKIRK,
SUSAN VAN BUSKIRK, JIMMY GREER, DUSTIN
JOHNSON AND DORA BLACKMAN*

**CRENSHAW, DUPREE & MILAM, L.L.P.**
Amber S. Miller, SBN 24050320
amiller@cdmlaw.com
4411 98th Street, Suite 400
Lubbock TX 79424
(806) 762-5281
(806) 762-3510 (fax)

By: ___/s/ Amber Miller_____
　　　Amber S. Miller

*ATTORNEY FOR RIDGEFIELD CAPITAL
GROUP, DREW PHILLIPS, CARRAWAY CATTLE,
ROBERT ELLIS, BARRY PHILLIPS, BIG SEVEN
CAPITAL PARTNERS, RICHARD CARRAWAY*

**JAMES D. BRADBURY, PLLC**
James D. Bradbury, SBN 02814500
jim@bradburycounsel.com
Kyle K. Weldon, SBN 24097192
kyle@bradburycounsel.com
201 Main Street, Suite 600
Fort Worth, Texas 76102
Telephone: 817-339-1105
Fax: 817-886-3495

By:   */s/ James D. Bradbury*
     James D. Bradbury

*ATTORNEYS FOR PRIEST CATTLE COMPANY, LTD, PRIEST VICTORY INVESTMENT LLC, W. ROBBIE RUSSELL LIVING TRUST, AND EDDIE STEWART*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2025, the foregoing document was filed with the Clerk of the Court in the foregoing case using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in this case.

*/s/ John F. Massouh*
    John F. Massouh