IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-20084-SWE-7 |
| | . | |
| McCLAIN FEED YARD, INC., | . | Earle Cabell Federal Building |
| | . | 1100 Commerce Street |
| Debtors. | . | Dallas, Texas 75242 |
| . . . . . . . . . . . . | . | |
| AGTEXAS FARM CREDIT | . | Adv. Pro. 24-02007-SWE |
| SERVICES, ET AL., | . | |
| | . | |
| Plaintiffs, | . | |
| v. | . | |
| | . | |
| RABO AGRIFINANCE, LLC, | . | |
| ET AL., | . | |
| | . | |
| Defendants. | . | Thursday, July 17, 2025 |
| . . . . . . . . . . . . | . | 10:23 a.m. |

TRANSCRIPT OF HEARING ON MOTION TO
DISMISS ADVERSARY CASE

BEFORE THE HONORABLE SCOTT W. EVERETT
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Chapter 7 Trustee: | Lynn Pinker Hurst & Schwegmann, LLP |
| | BY:  STEVEN G. GERSTEN, ESQ. |
| | ALAN DABDOUB, ESQ. |
| | CAMPBELL SODE, ESQ. |
| | 2100 Ross Ave., Suite 2700 |
| | Dallas, Texas 75201 |
| | |
| | Jobe Law PLLC |
| | BY:  HUDSON M. JOBE, ESQ. |
| | 6060 North Central Expressway, Ste 500 |
| | Dallas, Texas  75206 |
| Chapter 7 Trustee: | Quilling, Selander, Lownds, et al. |
| | BY:  KENT RIES, ESQ. |
| | 2001 Bryan Street, Suite 1800 |
| | Dallas, Texas  75201 |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES CONTINUED:

For UNB Bank, formerly          Lovell Isern & Farabough, LLP
HTLF Bank:                      BY:  JOHN H. LOVELL, ESQ.
                                112 SW 8th Avenue, Suite 1000
                                Amarillo, TX  79101-2314

                                Mullin Hoard & Brown, LLP
                                BY:  MATTHEW S. MERRIOTT, ESQ.
                                500 South Taylor
                                Suite 800 LB#213
                                Amarillo, TX  79101

For AGTexas Farm Credit         Naman, Howell, Smith & Lee, PLLC
Services, AgTexas PCA, and      BY:  DAVID L. LeBAS, ESQ.
Thorlakson Diamond T                 MICHAEL S. DUNCAN, ESQ.
Feeders, LP:                    8310 Capitol of Texas Highway
                                Suite 490
                                Austin, TX  78731

For Rabo AgriFinance, LLC:      Ray Quinney & Nebeker P.C.
                                BY:  MICHAEL R. JOHNSON, ESQ.
                                36 South State Street, Suite 1400
                                Salt Lake City, UT  84111

For Intervenor Plaintiffs:      Sprouse Shrader Smith, P.C.
                                BY:  JOHN F. MASSOUH, ESQ.
                                701 S. Taylor, Suite 500
                                Box 15008
                                Amarillo, TX  79101

                                SIMMONS & BROWN, PLLC
                                BY:  ABEL A. LEAL, ESQ.
                                400 13th St.
                                P.O. Box 180
                                Canyon, TX  79015

WEBEX APPEARANCES:

For 2B Farms and Rebecca and    McWhorter Cobb & Johnson, LLP
Terry Robinson:                 BY:  TODD JEFFREY JOHNSTON, ESQ.
                                     TIMOTHY T. PRIDMORE, ESQ.
                                1722 Broadway
                                Lubbock, TX  79401

For Shawn Ragland:              Crawford, Wishnew & Lang PLLC
                                BY:  MATTHEW S. MUCKLEROY, ESQ.
                                1700 Pacific Avenue, Suite 2390
                                Dallas, TX  75201

```
WEBEX APPEARANCES CONT'D:

For Mechanics Bank:          Husch Blackwell
                             BY:  BUFFEY E. KLEIN, ESQ.
                             1900 N. Pearl Street, Suite 1800
                             Dallas, TX  75201

For Meagan Goad:             Kaplan Johnson Abate & Bird, LLP
                             BY:  CHARITY S, BIRD, ESQ.
                             710 West Main Street, 4th Floor
                             Louisville, KY  40202

For Intervenor-Plaintiffs:   James D. Bradbury, PLLC
                             BY:  KYLE WELDON, ESQ.
                             201 Main Street, Suite 600
                             Fort Worth, TX  76102

                             Crenshaw Dupree & Milam
                             BY:  ASHLEY N. PIRTLE, ESQ.
                             4411 98th Street
                             Lubbock, TX  79424
```

- - - - -

(Proceedings commenced at 10:23 a.m.)

THE COURT:  Thank you.  Please be seated.

All right.  Sorry for the late start.  We're here starting late on the ten o'clock docket.  We have a number of matters set in Adversary 24-2007.  I'll go ahead and take appearances starting in the courtroom.

MR. GERSTEN:  Steven Gersten from Lynn Pinker Hurst & Schwegmann on behalf of the Chapter 7 Trustee, Kent Ries.

THE COURT:  Good morning.

MR. DABDOUB:  Good morning, Your Honor.  Alan Dabdoub, Lynn Pinker Hurst & Schwegmann, on behalf of the Trustee.

THE COURT:  Good morning.

MR. JOBE:  Good morning, Your Honor.  Hudson Jobe for Kent Ries, Chapter 7 Trustee.

THE COURT:  Welcome.

MR. SODE:  Good morning, Your Honor.  Campbell Sode for the Trustee.

THE COURT:  Good morning.

MR. LOVELL:  John Lovell on behalf of UNB Bank.

THE COURT:  Come on up.  I don't know if we're going to pick you up unless you're by a microphone.

MR. LOVELL:  John Lovell on behalf of UNB Bank, formerly HTLF Bank.

THE COURT:  All right.  Good morning.

MR. MERRIOTT:  Matthew Merriott, also on behalf of UNB and HTLF.

THE COURT:  Are we picking these up?  If not, I'm going to have everybody come up to the podium.

Why don't you come on up to the podium as you're doing the appearances, just to make sure we get you on the record.

MR. LeBAS:  Yes.  David LeBas for plaintiffs, AgTexas PCA and Thorlakson Diamond T Feeders.

THE COURT:  Good morning.

MR. JOHNSON:  Good morning, Your Honor.  Michael Johnson, Ray Quinney & Nebeker on behalf of Rabo AgriFinance, which is both a defendant in several of the cases pending before the Court and a counterclaim plaintiff.

THE COURT:  Good morning.

MR. MASSOUH:  Good morning.  John Massouh on behalf of intervenor-plaintiffs.

THE COURT:  Good morning.

MR. LEAL:  Good morning, Your Honor.  Abel Leal on behalf of intervenor-plaintiffs, co-counsel with Mr. Massouh.

THE COURT:  All right.  Good morning.

All right.  That looks like all courtroom appearances.  I'll go ahead and take WebEx appearances.

MR. JOHNSTON:  Good morning, Your Honor.  Todd Johnston and Tim Pridmore for 2B Farms, a Texas general

partnership, Terry and Rebecca Robinson.

THE COURT:  Good morning.

MR. MUCKLEROY:  Good morning, Your Honor.  Matt Muckleroy on behalf of the defendant Shawn Ragland.

THE COURT:  Good morning.

MS. KLEIN:  Good morning, Your Honor.  Buffey Klein, Husch Blackwell, on behalf of Mechanics Bank.

THE COURT:  All right.  Welcome.

MS. KLEIN:  Thank you.

MS. BIRD:  Good morning, Your Honor.  Charity Bird on behalf of defendant Meagan Goad.

THE COURT:  All right.  Could you repeat that one?  I think we had somebody starting to talk over you.

MS. BIRD:  Charity Bird on behalf of defendant Meagan Goad.

THE COURT:  All right.  Thank you.

MR. DUNCAN:  Good morning, Your Honor.  Mike Duncan on behalf of AgTexas and Thorlakson Diamond T Feeders.

THE COURT:  Good morning.

MR. WELDON:  Good morning, Your Honor.  Kyle Weldon on behalf of plaintiff-intervenor parties.

THE COURT:  Welcome.

MS. PIRTLE:  Good morning, Your Honor.  Ashley Pirtle on behalf of intervenor-plaintiffs.

THE COURT:  All right.  Good morning.

MR. RIES:  Good morning, Your Honor.  Kent Ries, case Trustee.

THE COURT:  Welcome back.

All right.  Last call for appearances.

(No audible response)

THE COURT:  All right.

Well, I got back from vacation.  I had a lot to read, so I've done my best.  I have a thought on how to proceed with the hearing.

In most hearings, I allow opening arguments from each side.  I think I'm inclined to waive opening arguments simply because I've read all the briefing.  I think the best way to proceed, and if anybody objects, you can try to persuade me otherwise, is to go straight to the counts and march through the counts.

I think there's a pretty well-established line of Fifth Circuit cases that tells me what factors I ought to consider in determining whether or not the claims are owned by the estate or are owned by creditors individually, such as the Seven Seas, Buccaneer type cases.  That's what I propose to do is to go through count by count, have brief -- well, what I propose to do is, as to each count, tell you my initial thoughts and observations, and then you all can tell me as to each count why you think I'm right or wrong.

Don't plan to spend a lot of time today talking about

the Wagoner rule.  I think the methodology that I have in mind is the correct one, figure out from the face of the complaints which counts belong to the Trustee or are individual creditors' claims.  When we're done and I've identified the counts that I think are owned by the Trustee, then I think Wagoner may become relevant, or then that would be the time to argue that at the next stage.

The other thing that I've observed going through all this is that on the motion to intervene, I think there's a fair chance, regardless of how I rule on ownership of the different causes of action, and I'll allow you to say your piece on intervention.  But even if a number of the counts I were to conclude are owned by creditors individually and not by the Trustee, I think there's a lot of strong arguments for allowing the Trustee to, in some form or fashion, intervene in this proceeding.  Even if not to take ownership of claims, but to take positions on issues where there are overlapping facts and law with the Trustee's lawsuits and for the Trustee to take a position, for example, on who owns the cattle.

That's just one example.  I mean, during some of the prior hearings, there was some consternation about the labels that were given, and the labels aren't controlling, but Mr. Jobe liked to use the term investors.  The counsel for the intervenor parties said, we don't want to be called intervenors, or investors, we're cattle purchasers.  And one

thought I had as I was going through all this is that I'm not sure they can be both. And I'm not sure how, even if some of these claims belong to individual creditors, I don't know how the Trustee doesn't participate in some form or fashion in this lawsuit.

So those are kind of my preliminary thoughts and observations before we march through the counts. Does anybody disagree with at least that methodology?

MR. LeBAS: Your Honor, may I be heard on one point?

THE COURT: Sure.

MR. LeBAS: David LeBas for plaintiff AgTexas and Thorlakson.

And I think that the structure you proposed, it makes a lot of sense to me about looking more at the specifics of the claims rather than trying to figure out who owns them right now. Without getting the cart before the horse, which is I think what you're saying.

One thing that we had thought might be helpful for the Court was to talk some about how does the cattle business work. We had hoped to do that in a status conference and we never actually got the opportunity to do that. I'm prepared to give a brief discussion about that subject, and it might be helpful as the Court listens to the arguments to understand something about how the industry works, and I'm happy to do that or not, or I don't want to be presumptive also. And so I

wanted to suggest that that might be something for the Court to hear the industry backdrop as to how do these claims fit within what the industry does.

THE COURT:  How long do you think that will take?

One thing I'm concerned about is the --

MR. LeBAS:  No more than 10 minutes.

THE COURT:  Okay.  Because I think if I'm -- or the three live pleadings, there's something else I want to talk about before we get going also.  So we're looking at Docket 103, right, Docket 104 in this adversary number, and then we have Docket Number 23 from Adversary Number 23-5002, which is now part of this adversary, but that's where everybody's pointing to me to where the Rabo claims are found.

So have I identified the correct pleadings as far as the parties are aware?

MR. LeBAS:  As far as I -- I don't remember the numbers, but I'm sure that's correct.

THE COURT:  All right.

MR. GERSTEN:  Yes, Your Honor, that's correct.

THE COURT:  Okay.

So if Mr. LeBas gives a ten-minute -- well, one thing.  I surely don't mind having an opening like that, but are we going to have other parties wanting to have back and forth on that type of an opening, I guess, because I really want to get going through the counts.  I'm not sure how long

it's going to take.

Any strong opposition to a short overview from Mr. LeBas?

MR. GERSTEN:  No, Your Honor.  In fact, I had planned to do something similar, very briefly, just walk through a diagram of a transaction because I do think it's helpful to understand or to frame the nature of the injury for each cause of action, having at least walked through the way the cattle purchasing supposedly worked within the claim debtors.

THE COURT:  Right.

MR. GERSTEN:  Happy for Mr. LeBas to do it as well.

THE COURT:  All right.  So first we're going to mute.  There's some background noise on the WebEx.  We're going to mute those.  And so I'll go ahead and hear a brief opening like that, Mr. LeBas, and then does anybody else, after Mr. LeBas gives his overview and the Trustee gives a short overview, is anybody else going to want to do the same?  Or will we then be ready to start trudging through the pleadings?

MR. LeBAS:  I'll try to keep it neutral in my remarks so as not to excite a need for someone to rebut.

THE COURT:  All right.  That's fine.

All right.  Go ahead, Mr. LeBas.

MR. LeBAS:  I have a paper copy of what we're going to do.  I don't know if it's easier if you look at a paper copy or the screen.

12

THE COURT:  That's fine.  I usually work digitally, but I'll take paper.

Is this something that's filed on the docket somewhere?

MR. LeBAS:  It's not.  I just handed it to counsel. We prepared it last night, or Mr. Lovell, I should say, prepared it last night.

THE COURT:  All right.  So the only request is that any time I look at a demonstrative or whatever you want to call it, at some point, just file it on the docket.

MR. LeBAS:  We'll do that this afternoon, Your Honor.

THE COURT:  Yeah.  This afternoon is fine so that everybody, if anybody goes back and reads the transcript or listens to this, they can tell what I'm looking at.

MR. LeBAS:  Sure.  And it is a demonstrative.

THE COURT:  All right.

MR. LeBAS:  And just then, looking at it, this is generally what we understand the business operation was.  Of course, there were other aspects to it people didn't know about.  But the business that McClain was operating is known in the industry as a grow yard or a preconditioning yard, and its purpose was to take cattle at very light weights, recently weaned cattle, maybe 350 to 400 pounds, get them used to eating feed instead of drinking milk from their mother, give them shots, straighten them out, is the industry term, so that

they're healthy and growing and ready to go to either a pasture or to what's called a CAFO, confined animal feeding operation, for final finishing.

And so the McClain operation was sort of a mid-stop in the lifetime of a beef animal.  Calf, McClain, feed yard, is how it worked.  Then, McClain would sell the cattle after he got them to whatever the target weight was, typically 750 pounds, sell those animals to a finish yard, the most commonly used yards, and with McClain's operation they went to a feed yard owned or operated by Friona Industries or Cactus Feeders, two of the large feeding companies.

And then, the money flow, and I can see the thing just went off the screen.  If people are trying to follow, Matthew is trying to get us back on.

MR. MERRIOTT:  Network connection issue.

MR. LeBAS:  All right.  Well, John, do you have some other handouts for counsels?

I think counsel has copies, so.

Oh, he's got it back.

All right.  For those at home now, everybody's got one in the courtroom too.

The money flow then, how did that work?  McClain would pay cattle sellers and then sellers would send cattle to his feed yard, his grow yard.  Then he'd feed and care for them, sell the cattle to the finish feed yard.  That's running

14

left to right.

Now, there's another aspect to this operation, which involves most of the parties here, most of the cattle claimants here. We've called them here cattlemen. McClain would sell cattle that he had in his facility to cattlemen and then they would pay him for the cattle.

McClain would feed them, provide the care and feed for them, sell them to one of the finish yards, and then he would send money back to the cattlemen and they almost all had the same sort of formula for allocating that cost. The initial cost would be treated of the animal, sale cost would be treated as funds that should go back to the buyer, the cattleman. Then McClain would pull back, as his part of the cost, the feed and care attributable to that animal as it was in his possession.

Then if there were net amounts after those two cost factors were accounted for, they would split that, two-thirds to the cattleman, one-third to McClain. And that's what's shown on this chart. And it was a subject, some folks had written agreements, some didn't, but that was the sort of general cattle industry business model that he was operating under.

Now, this is very simplified because there were lenders involved and there were other parties doing other different things, but I thought it might be helpful for the Court to see how this worked. And I would say, having been

15

involved in this industry as attorney for 40-plus years, this sort of arrangement is a normal or typical arrangement.

There have been allegations that, for example, someone can't own the cattle without having possession of them. You can't do that in a commercial cattle operation. I mean McClain's operation didn't have as many cattle in it as we thought, but large operations, large feed yards, would typically have 100,000 to 120 to 150,000 cattle at a single location, owned by dozens of owners. Ownership and possession is not equivalent in the cattle business.

It's atypical for someone who owns the cattle to actually have possession of them. They have those in the possession of a feed yard or a commercial operation or a pasture caretaker for care and feeding.

Everybody's got liens. Everybody's got bank associations. Bankers come out and look at them and we can go through the documentation if the Court wants to see how those worked.

And then, let me go through one other document that might be helpful, and then I'll sit down.

For the record, Your Honor, I've just handed up Document 187. I said that wrong. Document 178-7, Page 32, and it runs to Page 43.

THE COURT: Just can you give me some comfort that this isn't one of the documents that the Trustee has asked me

to strike?  Didn't the Trustee file a request to strike?

MR. LeBAS:  I'm actually not even sure if he has or not.

MR. GERSTEN:  Yes, Your Honor, we moved to strike the whole appendix because, as Your Honor pointed out earlier in the hearing, the proper consideration for determining claims ownership are the facial allegations in the complaint.

MR. LeBAS:  And then, we're not offering it as substantive evidence at this hearing, but for illustrative purposes as part of what I said I was going to try to do with these opening remarks.  That is, tell the Court something about how the industry operated with respect to the operation that Mr. McClain was using.

THE COURT:  All right.  I consider this just attorney talk, so I'm not admitting this into evidence.  So it's just attorney talk, but go ahead.

MR. LeBAS:  All right.

The first page of it is what it is is it's an inspection report that was generated for a lender.  In this case, it was AgTexas.  And the inspector in this instance was Kandi Stewart.  And what these companies do -- some are independent, some are in-house.  They go look at cattle.  The banker sends them information about the customer.  Then the inspector goes to look, sort of like maybe you've been involved in car cases.  Like an inspector goes to check serial numbers

in cars, or VIN numbers on cars.  Inspectors go do that for feed yards.

And then, you'll see in the first page or two, there's a description of the project.  And then, in the third page, this is Page 178, no, Page 35.  There's a list which has information about the cattle in it.  And they're described by lot, what interest does the borrower have, because oftentimes people own joint -- they split ownership, so it might be 100 percent, it might be 50-50, whatever it is; how many head; are they feeder class, that's feeders; what is the weight; what's your valuation weight; what is it today; what are they held for; what are they at current value.  And then they calculate a price based on CME type sources to figure out what is the value of the cattle that the borrower has reported as owned in X location.

And so I use this to illustrate for the Court that on the chart, it just shows cattle flow in and out.  It doesn't show money flow, but there's lots and lots of money flow.  And typically, you're going to have liens on every animal that's in a commercial operation, often outside lenders.  That is, persons who own cattle that are in possession of a third party, like McClain, they have their liens on it.  And in this case, you may hear some argument about the intercreditor agreements.  Oftentimes, lenders do make agreements with one another.

So you have a lender to the cattle operator.  You

have a lender to a customer who's sending cattle to the cattle operator. The lenders don't want to get their positions mixed up, so they're not counting each other's cattle. And they'll enter into intercreditor agreements. And there is one in place in this case, between the bank for Thorlakson, AgTexas, and Rabo. And that also is a common feature in the cattle business of this type of operation.

So really, I think that's enough for what I wanted to say, unless the Court has questions about what I've said, then I'll wait and see what develops here.

THE COURT: Not right now. Thank you.

MR. LeBAS: All right. Thank you.

MR. JOBE: Your Honor, as this is just attorney talk and not evidence, I think this is a great opportunity to make a couple of small points. I don't have a copy of that demonstrative aid that was put up that I can put up myself. I would ask Mr. LeBas if he could put that up, please. Well, for everybody's (indiscernible).

And, Your Honor, would it be possible for me to walk up to that screen to point out a few things?

THE COURT: You're going to have to put on a mic if you're planning to talk while you're pointing at the screen. We have portable mics, but --

MR. JOBE: I'll try it from here, Your Honor.

THE COURT: All right.

MR. JOBE:  Thank you.

Your Honor, this is a helpful chart.  So the first point that was made about the grow yard operations.  So it was over here on Number 1, people that owned cattle that gave possession of their own cattle to McClain.  That's a grow yard.  That's a tiny percentage of the revenue in this case.  It's not going to be a huge focus.

The focus is over on the right-hand side of this sheet, Judge.  And it's this Number 2, cattle or cattlemen.  So you see here, you've got a category of people who gave money and got money back.  Gave money, got money back.

These are the investors, this is the Ponzi scheme.  And Judge, what you are going to eventually see is down here, this finished feed yards.  So the cattle that McClain had, all of the cattle in the McClain debtor's possession were sold to those finished feed yards.  Round numbers, in any one given month, we've got $100 million running through McClain with the Number 2 parties.  We've only got about $10 million of cattle getting sold to finish feed yards.

So of the actual cattle in his possession, you've got a nine to 10 times multiple of the money running through him that is just being churned and given from left pocket to right pocket to different cattlemen investors.  And so that's what we're here on, Judge, today is it's not so much the parties.  To the extent that there are a couple parties that are still

owed money for cattle that they can establish title to that they gave possession to McClain, the issue is the investors. And that's going to be the Ponzi scheme. And that's going to be the ratio of what these dollars are going to look like, Judge.

It is a 10:1 ratio. And necessarily, these folks getting paid by other people's money, not from actual cattle. Mr. Gersten with my side is going to handle the substantive arguments regarding the claim-by-claim. But I wanted to take this opportunity to also speak into this chart for purposes of today and next time.

THE COURT: All right. So my initial observation on both of these is that I've been instructed by the Fifth Circuit in a number of these cases to focus on the face of the complaint. And I know we have motions to dismiss also set. But today was really the day for me to figure out who owns what.

I know there were downsides to doing it both ways, to hear motions to dismiss first, then have this hearing, or have this hearing first and then the motions to dismiss. Some of what each of you are saying goes to the ultimate merits and what you think you're going to be able to prove at trial, which I understand. But I still have to look at the face of the complaints and do my best with the state that they're in to determine whether or not the Trustee owns them. And I

understand each side has a different view of what this case is about, investors versus cattlemen. But I'm going to have to stick with the face of the complaints for now and figure out who owns what.

And then, the merits are down the road. So I think each side kind of understands that it's not a predicament, but I think that's what I have to do.

MR. JOBE: Yes, Your Honor. And the only maybe slight nuance to that is the Trustee's position would be that you can use the four corners of the complaint and you can also look at the four corners of the claims that are filed by these parties. Those claims and their supporting documentation, except for maybe one or two parties, does not establish ownership of a cattle, possession of which was given to McClain debtors. The documentation is all consistent with that second category. And we think that that is fair game to consider.

THE COURT: All right. So I think let's turn to Docket 103 and start going through the counts.

MR. JOBE: Yes, Your Honor.

THE COURT: So the first count in Docket 103 is conversion and common law fraud. I'll just give you a few quick observations. I'll tell you which way I'm leaning on this count and then each side can, like I said before, tell me why you think I'm right or wrong.

Paragraph 145 kind of states as a preface that, to

the extent Rabo acquired cattle or proceeds belonging to the plaintiffs and the intervenors, they're asking for judgment for conversion against the defendants.  It goes on to lay out the elements for conversion.

There's also the next paragraph that has to do with common law fraud.  And, again, I'll tell you now, when we do get to the motion to dismiss stage, a lot of these counts are going to have to be re-pled.  This is part of the predicament that Mr. Jobe flagged at a prior hearing.  I don't think the default is if it's not sufficient enough to tell, then it must be owned by the Trustee.  I think, unfortunately for the Trustee, if it's not sufficient enough for me to tell, I'm not making a finding that it's owned by the Trustee.

And the way this potentially might play out, unfortunately, could lead to a lot more work by both sides.  If I end up at the end of the day finding that some of these claims on the face, either I can't tell or if there's an opportunity to replead -- well, we'll get there.  But I guess I'm going to caution -- well, let's not put the cart before the horse.

Let's go back to the count.  So as to the conversion count, with the preface that if the plaintiffs can show that Rabo acquired cattle or proceeds that actually belong to the plaintiffs and the intervenors, they are asserting a claim for conversion on the face of the complaint.  The same paragraph

alleges that Rabo seized funds in the Mechanics Bank account that represents funds delivered to McClain for the purchase of cattle when the defendants knew that McClain failed to purchase new cattle with those funds.

But, again, going back to Paragraph 145, if, and it might be a big if, if the plaintiffs and intervenors can prove at the end of the day that those are cattle or proceeds that belong to the plaintiffs, my initial take on this count is that the conversion count alleges direct claims.  So you can tell me why you think I'm wrong.

MR. GERSTEN:  I think you're right, Your Honor, with the critical caveat being, to the extent they can prove it and not only prove it, but allege it.  Right now, we don't believe that it's fairly alleged or sufficiently alleged under 12(b), acknowledging that that's not necessarily up for decision today.

But, again, it's important to keep in mind that 90 percent of the cattle never existed.  And so it's impossible that 90 percent of their claims are plausible.  And so --

THE COURT:  But here today, we don't know who's going to be able to prove their claims or not, right?

MR. GERSTEN:  Correct.  But we think that there needs to be additional factual allegations.  And, again, to your prior point, Your Honor, we do agree that this is one of the claims.  We don't think there are sufficient details today to

tell if it's a direct claim or really a generalized harm to the creditor claim. Rabo took cattle from the estate.

We think that 55 people making the same general allegation suggests it's a generalized claim, not a specific claim. And I think if you look at Counts 10 and 11 in that complaint, where you have AgTexas and Thorlakson and Priest Cattle Company putting forth their specific personalized allegations, which we would agree are direct claims and theirs to keep, that's very different than what's being pleaded generally in the conversion claim.

But, ultimately, if they can allege sufficient facts to establish a plausible claim of ownership of the cattle, then we would agree it's a direct claim.

THE COURT: All right. So, as of today, it's -- well, who's the point-by-point person on these counts?

MR. LEAL: Your Honor, Abel Leal on behalf of the intervenors.

THE COURT: All right. So you are both welcome to either stay at the podium, as long as there is no fisticuffs, that's fine. Or, it might be easier if you're both at the podium as we go through the counts.

So as to the conversion claim, my tentative conclusion is that it's not owned by the Trustee as pled.

MR. LEAL: Your Honor, I have no really anything further to add. I believe the Court is correct, especially

because there are no allegations in the complaint that the debtor suffered harm. We, as the Court recognized, allege direct harm.

THE COURT: All right. Anything else on this count?

MR. LEAL: On conversion and fraud?

THE COURT: For conversion? Any come back on that?

MR. GERSTEN: No, Your Honor. I think, ultimately, if the Trustee is allowed to intervene in the case, and this claim goes to 12(b) and we see what happens from there, I think that's our position is what should happen.

THE COURT: All right. So on the topic of the Trustee intervening, let's talk about that a little bit.

Why shouldn't the Trustee -- I'll tell you at the outset, I don't think it's untimely. To the extent that this is permissive intervention, Trustee tried to do this before, I'm kind of inheriting the case. Judge Jones' position was that he wanted to see what the Trustee was going to allege in his complaint before this was addressed, so they tried.

They tried to intervene. Judge Jones told them to hold off until you file your complaint. They did it within the two-year window that the Trustee has to do their investigation. Now that they have that complaint, they have tried to intervene here. I don't think that's untimely.

And so, if it's not untimely, it doesn't make perfect sense. Even if I conclude that the creditors own this claim,

26

the Trustee should be able to participate and argue that the cattle are, or in that case not, owned by creditors individually.  Am I wrong on that point?

MR. LEAL:  You're already throwing me into the briar's patch.  It is a very complex issue.  We expected, after Judge Jones' order, that the Trustee was going to file a complaint in this consolidated adversary proceeding.  The Trustee elected to file a complaint in a separate adversary proceeding.  And so, ultimately, Your Honor, I think at some point, that case is going to be consolidated, or should be possibly to avoid what the Trustee has identified with *res judicata* or other issues that may be common in both adversary proceedings.

So, I do not disagree with the Court's conclusion that at least in terms of permissive intervention that the Trustee has some interest.  But I also think that somewhere down the road, that adversary proceeding might be consolidated or should be consolidated.

THE COURT:  All right.  And that jogs my memory about something I told you I wanted to talk about before we get going and I forgot, which is that I never have, since I started with this case, talked to the parties about consents, jury trials. There's a lot there in the docket.  There was a lot on the docket in the removed matters.

At some point, and maybe at the end of this hearing,

I'm going to ask the parties to, each and every party, file something on the docket identifying where, if at all, they have ever asked for a jury trial in this case, either before it was removed or since. And as to each party, whether you filed the statement on whether -- I've seen various references to different parties on whether they think it's core or not core, consent, not consent, but I would like that laid out. I'm not convinced that I've seen it from all the parties.

But at some point in the near future, we have to discuss who you all think is going to try this case.

Anybody? So that's just a, we haven't had that discussion yet, but does that make sense?

MR. LEAL: Yes, Your Honor.

THE COURT: All right.

Common law fraud, the same count. Defendants made misrepresentations to plaintiffs. I'm not ruling on it, but I'm telling you right now that's going to have to be repled. But, as pled, they allege misrepresentations that the defendants made misrepresentations to the plaintiffs and intervenors. So as pled, my take on this is that it's not owned by the Trustee, so.

MR. GERSTEN: So, Your Honor, I think again, this is one where the Trustee believes there's not enough information in the complaint one way or the other to make a determination. There are no allegations in the complaint of any actual

misrepresentations or even representations being made by the defendants that are being sued by the plaintiff intervenors to the plaintiff intervenors.  There are a lot of misrepresentations.

THE COURT:  There's at least a few, aren't there?

MR. GERSTEN:  Excuse me, Your Honor?

THE COURT:  Aren't there at least a few about representations from the banks about what a great business this is and what a good place to put your cattle.  I mean, there are some.

MR. GERSTEN:  My understanding, or my recollection would be that you'll find those in Counts 10 and 11, again, which are the personalized, better pleaded at least, allegations of Thorlakson and Priest Cattle Company.  And, again, which is what the Trustee thinks that type or that amount of allegations is what we need to be able to make that type of determination as to who owns the claim.  But simply reciting the elements of fraud doesn't really state a fraud claim and it doesn't indicate one way or the other if there is a fraud claim.  That's direct to plaintiffs.

THE COURT:  So, Mr. Leal, I've read complaints, maybe that's not the right word, grievances or frustration by the Trustee that all the, maybe it was the banks, that a lot of time has passed and still the plaintiff intervenors have not filed a sufficiently detailed complaint.  Again, it's not set

today, but any thoughts on this predicament?

MR. LEAL:  Your Honor --

THE COURT:  I'm just imagining having to do this again, and Mr. Jobe warned me that that might happen.  And I decided this is how we're going to do it anyway.  But if you end up repleading this count.

MR. LEAL:  Your Honor, I believe your initial inclination is correct.  As pled, that claim does belong to plaintiff intervenors.  There was an order that Judge Jones entered in a, and I think, I believe it's Docket 189 where the Court, Judge Jones was looking at 2B Farms' complaint and whether or not it pled sufficient facts.  And I think Judge Jones said it did.  And it pretty much mirrored the allegations in our complaint.

However, I understand the Court's concern and we can add additional factual detail that will support and further flesh out our fraud claims against the defendants.

THE COURT:  All right.  So --

MR. GERSTEN:  Your Honor, if I may make just one other additional point, which is I believe the case law, or there is certainly a body of case law within the Fifth Circuit at the district court level, at minimum, that requires fraud to be a fraudulent inducement claim, that whatever the misrepresentation that plaintiffs may be alleging was said to them.  In order for it to be a direct actionable claim for them

to keep, they have to allege not just fraud, but fraudulent inducement that the losses they're now claiming to recover, whatever action they took to set that loss off in motion, that had to be fraudulently induced.

If the misrepresentations were made after the investments or the payments to McClain debtors were made, the cases have suggested that that is not a direct claim and it's not sufficient for them to keep it.

THE COURT:  You're referring to the Margaux City Lights type case?

MR. GERSTEN:  There are a couple.

There's the -- if I can read, I apologize.  But there's the Don Hanvey Oil case and the Hearn Family Limited Partnership case.  There are a number of other cases and we're happy to supplement the briefing or they are in the briefing.  But there are a number of cases that clearly define inducement as the key distinction between direct and indirect claims in this context.

THE COURT:  So I guess it's not an issue for today, but the Seven Seas case, you had the Fifth Circuit and that's probably the most detailed opinion of all the Fifth Circuit opinions where it talks about the type of counts that were alleged.  And one of the counts, and I believe the Fifth Circuit addressed.  Give me one minute.

Again, I don't want to get too far off down a rabbit

hole, but in the Seven Seas case, the Fifth Circuit talks about the claims against Chesapeake, Hefner, and Seven Seas, and that they employed material misrepresentations and/or omissions in order to induce potential investors and existing investors in the unsecured notes to either acquire interests or to refrain from selling interests in the unsecured notes.

I'm not sure that I necessarily agree with that dichotomy. I guess between now and the next hearing, we'll have to take a closer look at the cases that you cited and I'll reread Seven Seas, but I'm not sure that that dichotomy makes sense to me.

MR. LEAL: Yes, Your Honor. There's also a discussion, I believe, of Seven Seas in the case, In re With Purpose that was decided in 2023 where that distinction is also called out and discussed.

THE COURT: All right. Well, I guess an issue for another day.

As of right now, I can't make a finding. It's not an ideally pled count, I'll tell you that. But as pled, it alleges misrepresentations that the defendants made misrepresentations to the plaintiffs. It is a recitation of the elements, but as a less-than-ideal count, I would say it belongs to the creditors as pled, not to the Trustee.

MR. GERSTEN: Just for clarity, Your Honor, to the extent that you do replead, is it fair to say that your

findings or your initial findings today are not with prejudice to ever revisiting the topic?

THE COURT:  No, no, no.  This is just, this is the who-owns-what hearing that Mr. Jobe cautioned me against (indiscernible), but yeah, motions to dismiss and those arguments are for another day.

It looks like we have -- do you want to weigh in on this count before we move on?

MR. JOHNSON:  Sure, Your Honor.

Since this count is directed at my client, I thought I would weigh in a little bit.  So, I mean, that is the problem.  This count is subject to dismissal on a whole number of grounds.  Rule 9(b), Rule 8 even, the plausibility standards.  But the Fifth Circuit tells you on standing, you have to look at the face of the complaint.  And then we know that the law is that the plaintiff who is asserting a claim has the burden of proof to show standing.

And so, I would submit that this claim is subject to dismissal today, probably without prejudice, subject to repleading, for a failure to show lack of standing because you cannot tell from reading the allegations of this complaint whether or not any of these 55 or 60 plaintiffs and intervenors actually had cattle that were allegedly converted by Rabo.

So, it does go to the subsequent hearing we've got because that claim is deficient for a whole host of reasons.

33

But I think there is an independent basis to dismiss today for a lack of showing of standing, because it's their burden to establish that in their pleadings.

THE COURT:  That's the problem.  We're not hearing motions to dismiss today.  I guess the --

MR. JOHNSON:  Correct.  But I'm suggesting that one of their burdens is in the pleading itself to show they have standing.  And I don't think just saying, well, you converted a bunch of cattle, satisfies that requirement.

THE COURT:  But I really can't --

MR. JOHNSON:  Now, we can maybe punt it to the next hearing because at the next hearing, if they don't amend these pleadings, I'm going to say, you need to dismiss these because they haven't shown you which of these 55 or 60 plaintiffs actually had cattle and which of those cattle were allegedly taken by Rabo.

THE COURT:  I understand the argument.

I guess my thought on this hearing is, it's really a hearing on the Trustee's motion.  Trustee says these are mine. And before I got into all the details, I thought there was some logic to hearing the Trustee's motion, to see if he can convince me that these are his so that he should either control them, dismiss them, do what he wants with them.

And so I understand the arguments, but I do think that's for the next hearing.

MR. JOHNSON: Okay. Yeah. And the reason I stood up is because I thought you set the bank the portions of the bank defendants motion to dismiss that address standing, I thought we were hearing today, too. But if we're only dealing with the Trustee's motion intervene, then I will sit down and shut up.

THE COURT: It's just I'm trying to -- with having been on vacation last week, I did have a lot to digest just to get ready for this hearing. I've spent most of my time -- I mean, I've dealt with Seven Seas and Buccaneer and those issues before but getting re-familiarized with those cases and really focusing on the Trustee's allegations that we own these. Unfortunately, I think your issue is going to be at the next hearing.

MR. JOHNSON: Okay. That's fair because as long as we all acknowledge that the next hearing, the bank defendants can raise standing and every other argument that they want to raise, then that's perfectly fine.

THE COURT: Yeah. And I did. And I apologize if I misled you into what I planned to cover today because I think I did say we would hear not only the Trustee's motion but the motions to dismiss that had to do with standing. But just in the sequence, I'm going to I think continue with the Seven Seas analysis first.

MR. JOHNSON: Great.

THE COURT: All right.

35

MR. JOHNSON: So I guess I will come back up when we get to Rabo's third party complaint because --

THE COURT: That's fine.

That's fine.

MS. KLEIN: Your Honor, just briefly, Buffey Klein for Mechanics Bank.

I just echo Mr. Johnson's comments. And I also did want to clarify that we've not had a ruling on the pleadings in this case with regard to the sufficiency of pleadings, and Judge Jones never got to that point where he found that these were sufficiently pled claims. I just wanted to make certain that we were clear on that and that nothing herein would somehow implicate that these pleadings are in any way sufficient.

So I just further concur with Mr. Johnson's comments that if we're going to punt the standing that I think that makes the most sense to keep this clean.

THE COURT: All right. And, again, I understand the concern. But I guess the sufficiency of the complaint, I guess I'm only addressing is it sufficient enough for me to tell whether the Trustee owns it for purposes of today's hearing.

MS. KLEIN: Understood, Your Honor. Thank you.

THE COURT: All your all your rights are preserved on your other arguments on the motion to dismiss.

MS. KLEIN: Thank you, Your Honor.

THE COURT:  All right.  Anything else on Count 1?

MR. MERRIOTT:  Your Honor, briefly.

THE COURT:  Yes.

MR. MERRIOTT:  Matthew Merriott for HTLF.

I just wanted to echo Mr. Johnson that we agree that the counts are not adequately pled, but we agree with Your Honor's analysis that, at this stage, the question is not whether or not the pleadings are adequately pled, it's whether or not they state a claim for -- it's whether or not they assert an injury to the estate or the creditors.

And so, at this stage, we agree that the creditors are the parties withstanding to attempt to state a claim.  We doubt they can do it, but we agree with Your Honor's analysis at this stage.

THE COURT:  All right.  Thank you.

All right.  Anything else on Count 1?

MR. GERSTEN:  Just one point, Your Honor, which is the Trustee would agree with the approach of them keeping this claim, particularly, if we can intervene and continue to then participate in the case as the claim evolves and is repled.

THE COURT:  All right.

That's what I'm planning on is allowing the Trustee to intervene.  I don't see how I could not allow the Trustee to intervene.

All right.  Count 2, negligence of defendants in

lending and hiring or supervision or management of, I think maybe that's a typo. Supervision of management personnel. This one sure looks like the Trustee's count. So why am I wrong on that?

MR. GERSTEN: You're not, Your Honor.

THE COURT: The allegations are that the defendants were negligent in their banking and lending practices. The complaint, when I read the whole thing, we're talking about the McClain debtors' banking relationship and lending practices to the McClain debtors, including the underwriting investigative and assessment of customers, the hiring supervision of management personnel, the defendants failed to monitor and manage their lending relationships with McClain. This feels like the Trustee's count.

MR. LEAL: Your Honor, I think that claim, along with the negligent undertaking claim, at this stage, as it relates to the pleadings, we are alleging that the defendants undertook a duty when they learned that the McClain debtors were dealing with third parties, my clients, the creditors, and that they were purchasing cattle from the debtors that they had knowledge and --

THE COURT: You're mixing Count 3 and Count 2, right?

The negligent undertaking, you threw in a sentence that they undertook to perform services for the plaintiffs.

MR. LEAL: You want to do those separately, okay.

THE COURT: Let's go count by count. So Count 2.

MR. LEAL: Okay.

THE COURT: This count appears to allege a Trustee claim.

MR. LEAL: Well, Your Honor, at this stage, when we amend, maybe we can make it clear that the claim actually belongs to the creditors at this stage, at a later stage. I understand the Court's conclusion.

THE COURT: All right. Anything else on that one?

MR. LEAL: No, Your Honor.

THE COURT: All right. As pled, this one belongs to the Trustee. I guess we'll have to figure out, maybe when we're done, after I've identified the counts that the Trustee, as pled, owns, what's the Trustee going to do with them?

MR. LeBAS: Your Honor, may I be heard on this particular count?

THE COURT: Yeah. Go ahead, Mr. LeBas.

MR. LeBAS: Thank you. This is for AgTexas and Thorlakson.

AgTexas and Thorlakson have alleged and attached to the complaint a document, a contract that provided for an intercreditor arrangement between the lenders, Rabo for McClain, AgTexas for Thorlakson. And the parties agreed that they would not take each other's collateral, that they would, if they got somebody else's collateral, they would hold it in

trust for the benefit of the other, that they weren't claiming an interest in each other's collateral. I think that falls, that failure to engage persons who are competent on Rabo's part to maintain the existence and performance of that contract and maintain the existence of the trust falls within this count.

That's part of what we're saying is incorrect.

THE COURT: Isn't there a later count that's more specific on this point?

MR. LeBAS: There's a general count at the end that alleges claims based on the existence of those intercreditor agreements. But I didn't, I'm concerned that if there's a blanket ruling that the Trustee owns that claim, I don't want it to --

THE COURT: I'm not talking about that claim. I'm just talking about Count 2.

MR. LeBAS: Yes, but we have joined in Count 2.

And we can discuss this when we get to the specific counts. I just didn't want there to be a ruling that we can't pursue a negligent undertaking claim because of the general statement of the Court's, or hiring claim, because of the general statement by the Court.

THE COURT: It's only a general statement as to this count. This count appears to allege negligence by the defendants to the debtor.

MR. LeBAS: As I understand it, it alleges negligence

by the lender in engaging personnel in connection with its or their operations. It's not alleging a complaint against the debtor. We're not saying that.

THE COURT: No, no, no. I'm sorry. Not against the debtor, but it's alleging that the defendants were negligent in their banking and lending practices to McClain, right? Isn't that what this count is about?

MR. LeBAS: They certainly were negligent in their practices with respect to McClain. But they were also, we allege, negligent in connection with the way that they handled the relationship between the banks and the cattle claimants under our contract.

Now, that's what I'm saying is that I don't want the Court's ruling to be so broad as to take out the legs from the Thorlakson intercreditor agreement claims.

THE COURT: Well, we'll get to that one because if I scroll down, I think my notes next to that claim indicate that it's a direct claim, so --

MR. LeBAS: All right. Then --

THE COURT: -- we'll get there.

MR. LeBAS: All right.

Mr. Leal.

MR. LEAL: May I have a moment, Your Honor?

THE COURT: Yeah.

MR. LEAL: I think what's important is we've

incorporated the allegations, as the Court is aware, the 20 pages, the factual background about when the banks found out that the debtors were purchasing cattle from third parties and there were substantial red flags about check kiting and issues associated with how the money was going to be paid.

And so that is the factual background that is supporting our claim of negligence. It is not that they caused the Trustee or the debtors damages. It is, once they learned that they were buying cattle from my clients and there were individual transactions, and they knew this, then at that point in time, that's when they were negligent because they did not oversee that we were getting paid, checks were being not honored, and things of that nature.

So it's not alleging a direct injury to the debtors. It's alleging direct injury to the creditors.

THE COURT: Well, I guess you'll have a chance when you replead. But as pled, I find that this one is owned by the Trustee, so --

MR. LEAL: I understand.

THE COURT: -- you can try to fix it, I guess.

All right. Count 3, negligent undertaking.

My notes on this one are not the greatest in the way of pleading, but it's a direct claim as pled.

MR. GERSTEN: Your Honor, I think as pled, this claim is again, a generalized claim. It doesn't allege a source of a

42

duty from Rabo to the plaintiffs.  And as far as we're aware, there was no duty because they were not customers of Rabo, they were not dealing with Rabo directly in any way.  They were not dealing with Mechanics directly in any way.

It's also important to keep in mind that this claim may have been asserted against all defendants, not necessarily just Rabo.  And so, and that would be Rabo, Mechanics, HTLF, Meagan Goad, and Shawn Ragland.  But there's no duty to plaintiffs.  There's a duty to the debtors.  And so it could be that when they replead and they have to assert factual allegations to support this, and they can't, then we'll be able to make that decision.  But sitting here today --

THE COURT:  Well, defendants undertook to perform services for plaintiffs and intervenors.  I don't know exactly what that means, but if I'm trying to figure out which side it falls on, it's poorly pled, I'll tell you that.  But I can't conclude based on this, that this is owned by the Trustee.

So, again, when we get done with this process, I might regret my methodology in handling this issue first and the motions to dismiss later because I think we're going to be back here doing the same exercise.

MR. LEAL:  Your Honor, could I just have one moment?

THE COURT:  Yep.

MR. GERSTEN:  Understood, Your Honor.  We've got no further objection.

43

THE COURT:  All right.

So for now, it's direct.

MR. LEAL:  Your Honor, we can skip TUFTA.  We've conceded.

THE COURT:  All right.  Very good.  So Count 4, Trustee's claim.  Count 5, conversion and fraud against defendant Goad.

I guess my comment on this one is similar to the last, not the TUFTA claim, but the negligent undertaking isn't very well pled.  This one isn't very well pled, but on the face of this, if I have to decide which side it falls on, it would be a less than well-pled direct claim.

So anybody want to convince me I'm wrong on that one?

MR. GERSTEN:  No.  Again, Your Honor, I think as long as we intervene and get a come-along-for-the-ride and we're -- no objection at this point.

THE COURT:  All right.

MS. BIRD:  Your Honor, Charity Bird for Meagan Goad.  If I could be heard briefly.

THE COURT:  Sure.

MS. BIRD:  Your Honor, we believe that that claim is more generalized.  It's alleging that Ms. Goad took actions with respect to the debtors that created a harm to all creditors.  It's not, while we don't agree with the allegations and we've put that in our motion to dismiss, I do think that

44

the standing issue it would belong to the Trustee of the estate because it's suggesting that she didn't take from any specific creditor or any specific party.  There's no identification of proceeds or cattle or anything that is specifically related to any of these plaintiffs.  So it's a generalized injury that if anything she is alleged to have done it would have created a harm to the debtors in being unable to repay creditors or perform its duties as a corporation.

So the allegations, as we see it Your Honor, are to the bankruptcy estate and would belong to the Trustee.

THE COURT:  So Paragraph 161, it uses the term they a couple times.  So 161(a) says "They misrepresented the existence of cattle in their possession."  When I read this, the best guess that I have is that "they" refers to the debtors and Ms. Goad.  And so, if there's an allegation that Ms. Goad misrepresented the existence of cattle in the debtors' possession.

Again, now I'm not saying that it's super well-pled. Why wouldn't that be a potential direct fraud claim against Ms. Goad?

MS. BIRD:  Your honor, even if it was a direct fraud claim against Ms. Goad, I still believe it belongs to the estate because it's alleging -- well, as you've said they.  To me "they" always meant Brian McClain, her deceased father.  I don't know what "they" means, but that's what I've read "they"

to mean because a corporation acts through its officers and employees, so I've understood "they" --

THE COURT: That's a good point. That's a good point.

But even if it is Mr. McClain and Ms. Goad, the allegation is that "they" made misrepresentations to the plaintiffs and intervenors, right?

MS. BIRD: Acting in their capacity of the McClain entities. So it would seem that the McClain debtor would have the ability to pursue those claims.

And, Your Honor, I know that you've put the motions to dismiss separately and we of course have this in our motion to dismiss, and we intend to argue that when it's set for hearing. But just as a preview, I may raise this standing issue again at that point with respect to the way this is pled.

THE COURT: That fine, but I'm still -- what would be the damage to the estate of alleged misrepresentations by Mr. McClain and Ms. Goad to these plaintiffs? Again, they're not really specified. That'll be the subject of discussion at the motion to dismiss stage, but where is the alleged harm to the debtors here?

MS. BIRD: Your Honor, if they're misrepresenting to procure funds into the debtor and the allegations are suggesting that also that Ms. Goad somehow converted this to her own personal benefit, that would be against the debtor and

not against these creditors.

But I understand Your Honor.  I mean, I'm willing to wait to argue again at the motion to dismiss.

THE COURT:  That seems to be awfully close to what happened in Seven Seas, or at least the allegations in Seven Seas there were fraud claims against the debtors principal and Chesapeake and others that the Fifth Circuit found were direct claims based on alleged bad acts by those parties.

I'm having a difficult time, again, with the caveat that this is not very well pled, distinguishing this count from some of the counts in Seven Seas.

MS. BIRD:  All right.  Thank you, Your Honor.

THE COURT:  All right.  Anything else on conversion and fraud counts against defendant Goad?

(No audible response)

THE COURT:  All right.  Well, as pled then, direct claims.

Count 6, tortious interference with contract against Rabo and Mechanics Bank.  My notes on this are, if I'm looking at Fifth Circuit cases that appear to be closest, Buccaneer seems to be the closest analog, I guess.  So my first take on this is that it would be a direct claim as pled.

Again, some of the language that I've highlighted in this count, the allegations are that Rabo and Mechanics Bank took proceeds from McClain that belonged to the plaintiffs or

intervenors.

Are they actually going to be able to prove at trial that they took proceeds that belonged to the plaintiffs or intervenors or cattle -- well, that's a proof issue, but at least on the face of this it appears to be a direct claim.

All right, the trustee's position on this one?  If they can show -- if they can show that there was a taking by Rabo and Mechanics of proceeds that belonged to the plaintiffs or intervenors.  That's assuming a fact that they may or may not be able to prove, but given that allegation and the allegation of interfering with the plaintiffs and intervenors' contractual rights under the contracts, why is that not a direct claim?

MR. GERSTEN:  Your Honor, I think our position is the same.  To the extent they're going to replead this and we're going to be involved in the case at that point, we're okay for now with them keeping it until then.

THE COURT:  All right, all right.  So, for now, that's a direct claim as pled.

Count 7, aiding and abetting and/or knowing participation in fraud.  My notes on this are it looks an awful lot like Seven Seas type claims, direct claims, as pled.

MR. GERSTEN:  I think again, Your Honor, the trustee's position would be the same, which is to the extent they're going to replead and we're along in the case, then if

they keep it for now, that's not a problem.

THE COURT:  All right.  All right, anything else on Count 7?

UNIDENTIFIED SPEAKER:  No, Your Honor.

THE COURT:  Count 8, civil conspiracy, as pled, appears to be more along the lines of a direct claim.  Again, I have a hard time distinguishing these claims as pled from the claims in cases like Seven Seas.

MR. GERSTEN:  I think the trustee's position is the same.

THE COURT:  All right.  Anything else on Count 8?

UNIDENTIFIED SPEAKER:  No, Your Honor.

THE COURT:  All right.  Count 9, aiding and abetting and/or knowing participation, and breach of fiduciary duty.

As pled, my initial take on this again is that these are more like Seven Seas type direct claims.

MR. GERSTEN:  Again, I'd point out some of the elemental deficiencies in the pleading, but beyond that, again, if we're intervening in the case and they replead, we're fine.

THE COURT:  All right.  Anything else on Count 9?

UNIDENTIFIED SPEAKER:  No, Your Honor.

THE COURT:  Count 10, the claims of Thorlakson -- is it Thorlakson or Thorlakson, Mr. LeBas?

MR. LEBAS:  Thorlakson, Your Honor.

THE COURT:  Thorlakson -- and AGTexas is based on an

intercreditor agreement.  My initial take and notes on this are that it would be a direct claim, as pled.

MR. LEBAS:  Yes.  Thank you, Your Honor.  I don't know if there is -- I think the trustee agrees with that.

MR. GERSTEN:  Yeah, this is not one of the claims we were contesting ownership of.

THE COURT:  All right, very good.

Count 11 --

MR. GERSTEN:  I could save a lawyer a trip up here. We also were not contesting ownership of this claim.

THE COURT:  All right.  So that one is a direct claim, as pled.

So, we have headings, not necessarily counts, but we have a request for attorneys' fees, damages, exemplary damages, requests for declaratory judgment.  I seem to recall in the trustee's papers arguing that somehow the declaratory judgment is owned by the trustee.  I'm not sure I understand that. Anybody -- if you're allowed -- it's the same thing, if you're allowed to participate and intervene and somebody asks -- if somebody else asks for a declaratory judgment to figure out all the stuff, any reason that this would be a trustee claim?

MR. GERSTEN:  No, Your Honor.  And I think our thinking behind our position was simply we didn't actually really know what it was asking for.  It was just mainly an administer the estate please request more than a please

determine a specific dispute, but otherwise we have no objection.

THE COURT: All right. Anything else then on Docket 103?

UNIDENTIFIED SPEAKER: No, Your Honor.

MR. GERSTEN: No, Your Honor.

MR. MASSOUH: Really quick, Your Honor. I know we're not discussing the sufficiency of the pleadings and you've made your case pretty clear with regard to our pleading, obviously we'll need to amend the complaint. The question I have is, in terms of amending the complaint, I know the Court was focusing on the counts and the language contained within the count, we did have 34 pages of factual background that were incorporated into those counts. And so, as we amend the complaint, does the Court want us to put more factual content in the actual count section or the factual -- I mean, how does the Court want us to plead --

THE COURT: No, I mean, I understand. I saw the reference, which is typical, you're incorporating the stuff above and below, but for the most part I found that that was at least good enough to avoid the trustee claiming an ownership interest other than maybe one or two.

But when you do replead, I am going to ask for redlines, but I don't necessarily think you have to put additional detail in the count itself, you could put it

wherever you want.

MR. MASSOUH:  Okay.  Thank you, Your Honor.

UNIDENTIFIED SPEAKER:  Your Honor, just one last question, I guess, on the administrative matter is, do you want us to replead before you consider any motions to dismiss?

THE COURT:  Let's get through the others and then we'll talk about this.  Mr. Jobe warned me that we might be doing this again.  So, he'll have his chance to say I told you so, Judge, but for now anything else on Docket 103?

MR. GERSTEN:  No, Your Honor.

MR. LEBAS:  Not at this time, Your Honor.  Thank you.

THE COURT:  All right.  104 is very similar to 103, so maybe this will go quicker.  And I know there's some counts, there's extra bells and whistles, but a lot of it is substantially the same as Count 103.

MR. JOHNSTON:  Yes, Your Honor, Todd Johnston and Tim Pridmore for the 2B Farms.  We're ready to address the counts, Your Honor.

THE COURT:  All right.  So, Count 1, my initial take, the same comments as before that it's, as pled, a direct claim, given the allegations that -- to the extent that they -- Rabo or Mechanics acquired cattle or proceeds belonging to the plaintiffs.  So, any different outcome on this one, direct claim, as pled?

MR. GERSTEN:  Not from the trustee's perspective.

52

THE COURT:  All right.  Count 2, this is the one, notwithstanding the incorporation of the paragraphs above and below, as pled, belongs to the trustee.

Any different outcome on this one?

MR. GERSTEN:  No, Your Honor.

MR. JOHNSTON:  No, Your Honor, we would agree.

THE COURT:  All right.  Count 3, negligent undertaking, same as before, I believe.  Not great, but direct count?

MR. GERSTEN:  For now, Your Honor.

THE COURT:  All right.  Count 4, TUFTA, I think that's one agreed to be pursued by the trustee.

MR. GERSTEN:  Just to clarify, I don't know that -- go ahead, Mr. Johnston.

MR. JOHNSTON:  Your Honor, in speaking with trustee's counsel on this particular -- of course 2B Farms is in bankruptcy -- among the counts we're asserting, we are stating that we have bankruptcy causes of action that we exclusively have standing to assert.  And as far as the Texas Uniform Fraudulent Transfer Act claims, it's our position that to the extent we're asserting under 544 of the Bankruptcy Code TUFTA causes of action and we're specifically limiting them, Your Honor, to transactions, transfers to 2B Farms' interest on April 4th, 5th, and 6th of 2023, I think that's -- we certainly need t when we replead, we'll clarify that, but I think this

53

particular count, Count 4, is one where we would say this is a bankruptcy cause of action that belongs to 2B as a debtor in bankruptcy.

THE COURT:  All right.  So I'm glad you raised that because paragraph 101 is not crystal clear.  Plaintiffs allege that transfers made by McClain to the defendants were fraudulent transfers.  So I guess --

MR. JOHNSTON:  And, yes --

THE COURT:  -- is everybody in agreement then that if -- to the extent any of the fraudulent transfer counts allege transfers by the McClain debtors that they would be owned by the trustee in this case, and to the extent that there are alleged transfers by the 2B Farms debtors that those would not be owned by the trustee and Mr. Jobe's client?

MR. GERSTEN:  There's just a slight nuance scenario where we both own the claim.  So take, for example, these April 4th, 5th, and 6th wire transfers, those went from 2B to McClain --

THE COURT:  The wires.

MR. GERSTEN:  -- the wires did, went to McClain's Mechanics Bank depository accounts.  And in the typical conception of that transaction, that's money of the debtors, McClain debtors.  Once they received it, that got deposited into their deposit account, and the McClain debtors being the initial transferee.  Then to the extent Mechanics and/or Rabo

swept that money and took it to pay down an overdraft or the loan, that would be a transfers of the McClain debtor's property to those lenders or to the bank.

At the same time, we also recognize that 2B can make a theoretically viable claim where potentially Mechanics Bank is the initial transferee from its transfer of funds instead of McClain debtors being -- or they can make a subsequent transferee argument.

And so in that -- probably in those three instances, for those three transactions, both the trustee and 2B will be asserting those TUFTA claims on the same property, to be determined on the merits at a later time.

THE COURT:  Right, I get it, but there's no disagreement that each one owns its own claims and you're each trying to go after the same copyright.  So --

MR. GERSTEN:  Correct.

THE COURT:  -- no problem with this count then?  I guess the --

MR. GERSTEN:  I'll just note that, just from the way that it's pleaded, it suggests that they're going after -- okay.

(Pause)

MR. GERSTEN:  Okay.

THE COURT:  So --

MR. JOBE:  Your Honor, I'm sorry, just to clarify --

and I believe Mr. Johnston can confirm this -- 2B is not asserting a 544 claim under TUFTA as a creditor of McClain. What they're wanting to retain is just a claim under 548 for those couple of transfers right before both petition dates in both cases.  That particular -- those particular transactions under 548, we recognize that they are a debtor in bankruptcy with the ability to make a direct claim on that and good letting that one ride, so long as we intervene and figure out who gets to ultimately collect on that one.

THE COURT:  I understand.

MR. JOBE:  Thank you, Your Honor.

THE COURT:  Is there any disagreement on that point?

MR. JOHNSTON:  No, Your Honor, we do not disagree with Mr. Jobe's assessment.

THE COURT:  All right, very good.

Count 5, tortious interference with contract against Rabo and Mechanics Bank.  My notes are, as pled, direct.  Any different result?  With the same caveats before?

MR. GERSTEN:  Yes, yes, Your Honor --

THE COURT:  You just say ditto --

MR. GERSTEN:  -- with the same caveats that --

THE COURT:  -- ditto, ditto?

MR. GERSTEN:  Ditto.

THE COURT:  All right.  Count 6, aiding and abetting and/or knowing participation in fraud.  Again, as pled, direct

claims with the same caveats?

MR. GERSTEN: Ditto.

THE COURT: All right. Any disagreement?

MR. JOHNSTON: No, Your Honor.

THE COURT: All right. Count 7, civil conspiracy. Again, as pled, direct. Any disagreement, with the same caveats?

MR. GERSTEN: Nope, same caveats.

THE COURT: All right. Count 8, aiding and abetting, breach of fiduciary duty, same direct claim, same caveats.

Any disagreement?

MR. JOHNSTON: No, Your Honor.

MR. PRIDMORE: No, Your Honor.

MR. GERSTEN: Your Honor, before we continue further, I did want to make one slight distinction on the negligence claims that's probably favorable to the 2B plaintiffs, but to the extent that they make the negligent -- even Count 2, the negligent hiring or supervision, that claim out against HTLF, who they have a direct banking relationship with and therefore can plausibly assert some type of duty there, we agree they can pursue that claim as to HTLF, but we would then contest Rabo and Mechanics.

THE COURT: All right. I assume 2B is okay with that?

MR. PRIDMORE: Yes, Your Honor. Your Honor, Tim

Pridmore for 2B Farms. And in that regard, Alan and Hudson, we've had several discussions related to that and, as I understand it generally, given our direct relationship, as he had just mentioned, with HTLF, they are not going to be asserting our direct standing claims against HTLF for these matters.

MR. GERSTEN: That's correct, Your Honor.

THE COURT: All right.

MR. GERSTEN: Again, with the caveat that we may have a separate claim for the same property, but --

THE COURT: Understood. Are we up to Count 9? 548. This is 2B's, right?

MR. GERSTEN: Yes, Your Honor. And I believe that goes back to kind of the discussion from the TUFTA claims, which is we recognize their right to pursue those April wire transfers under 548. I think beyond that we contest any of the other transfers, but --

THE COURT: All right. All right, very good.

Count 10, this is the recovery under 550. Same thing, 2B's?

MR. GERSTEN: Yes, Your Honor.

THE COURT: All right, Count 11. I interpreted this to refer to claims in the 2B case. So this would be the same, 2B's, is that everybody's understanding?

MR. GERSTEN: Yes, Your Honor.

MR. PRIDMORE:  Yes, Your Honor.  And I believe these are specific claims that were against HTLF, and that goes with what the trustees have agreed to as well that they are direct claims of 2B.

THE COURT:  All right, very good.

All right, Count 12, specific negligence and gross negligence claims --

MR. GERSTEN:  The trustee doesn't contest 12, I believe, 13 or 14, because they're all just against HTLF.

THE COURT:  All right.  So those are 2B's, correct, 12, 13 --

MR. GERSTEN:  Yes, Your Honor.

THE COURT:  -- Counts 12, 13, and 14?

MR. PRIDMORE:  Yes, Your Honor.

THE COURT:  Count 15, wrongful offset.  I had a hard time figuring out why this would be any different than the conversion claim, which again, as pled -- as pled, it appears to be a direct claim.

MR. JOHNSTON:  Yes, Your Honor, and we appreciate that.  And we understand we need to amend and clean that up as well, we appreciate that opportunity to do so and clarify that, Your Honor.

THE COURT:  Any other thoughts on Count 15?

MR. GERSTEN:  Your Honor, I think it could be construed as a relabeled conversion claim, but it also could be

construed as a fraudulent transfer claim as well.  And in that case we would agree that they could pursue a wrongful offset claim against HTLF, but to the extent that they're talking about offsetting transfers of the debtors' property to Mechanics or Rabo, and Mechanics and Rabo are somehow offsetting the McClain debtors' debt, that that would be within our domain of the fraudulent transfer claims.

THE COURT:  All right, that sounds fair.  Any disagreement on that?

MR. JOHNSTON:  No, Your Honor.

THE COURT:  All right.  And then we have the same kind of wrap-up headings, including requests for declaratory judgment.  So, anything else on Docket 104?

MR. JOHNSTON:  No, Your Honor.

THE COURT:  All right, I'll give you all the option, it's close to noon.  We have Rabo's complaint at Docket 23 in 23-5002.  Shall we plow forward, so you all can get out of here, or do you want a lunch break?  Does anybody need a shorter break?

MR. GERSTEN:  I'm fine to keep going, Your Honor, whatever your preference is.

MR. JOHNSON:  Your Honor, Mike Johnson, counsel for Rabo.  Given your rulings on the other claims, I think it's pretty easy to conclude that you're going to say that every claim in there, at least as pled, is a direct claim.  And Rabo

in this case, of course, has a unique position that none of these other folks -- whether you call them investors or cattle persons -- did and that's that Rabo was a secured lender with a lien on every asset.  And so clearly, if a cow that was encumbered by Rabo's lien was taken by a third party without Rabo's consent or authorization, that's clearly a direct claim that Rabo has, even though the trustee standing in McClain's shoes may have a similar claim on the ownership interest.

THE COURT:  Understood.  I had -- I was going through that same analysis.  I understand.  So, let's quickly go through them.

The first cause of action, declaratory judgment, dealer trust claims.  My notes are that this one is agreed, is that right?

MR. GERSTEN:  I believe it's agreed.  I'd ask Mr. Johnson to confirm he thinks we could do the same thing, but I don't --

MR. JOHNSON:  Yeah, I think the trustee and Rabo both can seek declaratory relief on the dealer trust claims.  As a matter of fact, the trustee may be in a better position given Judge Jones' prior ruling on standing.  So --

THE COURT:  All right.  Anything else on Count 1 or cause of action 1?

MR. GERSTEN:  No, Your Honor.

MR. JOHNSON:  No.

THE COURT:  Count 2, direct claim, as pled.  Any -- at least with my methodology, any disagreement on that one?

MR. GERSTEN:  No, Your Honor.

MR. JOHNSON:  No, Your Honor.

MR. GERSTEN:  Again --

THE COURT:  Same caveats.

MR. GERSTEN:  -- same caveats.

THE COURT:  Third claim, conversion.  Direct claims, as pled.

MR. GERSTEN:  Same answer.

THE COURT:  All right.  Fourth cause of action, aiding -- I'll have to say, I've never heard of aiding and encouraging, is that different than aiding and abetting?  But aiding and encouraging an intentional tort, same direct, as pled, with the same caveats?

MR. GERSTEN:  Yes, Your Honor.

THE COURT:  All right.  Fifth cause of action, aiding and participating in an intentional tort.  Direct, as pled, with the same caveats?

MR. GERSTEN:  Yes, Your Honor.

THE COURT:  Number 6, conspiracy to defraud against 2B parties and the bank.  As pled, Seven Seas direct claim, with the same caveats?

MR. GERSTEN:  Yes, Your Honor.

THE COURT:  The same thing on 7, money had and

received.  I don't know how that's different than a conversion claim.  At least as pled, direct, with the same caveats?

MR. GERSTEN:  We agree with your analysis on the conversion claim as well, Your Honor.

THE COURT:  All right.  Number 8, unjust enrichment.  Again, same, as pled, a direct claim?

MR. GERSTEN:  Yes, Your Honor.  I believe it's verbatim to the money hadn't received Claim 7.

THE COURT:  All right.  Number 9, 523 count.  Everybody is I think on agreement on this one, not owned by the trustee?

MR. GERSTEN:  Yes, Your Honor.

THE COURT:  Same for Count 10, another 523 count, not owned by the trustee?

MR. GERSTEN:  Correct, Your Honor.

THE COURT:  And I think that takes care of this document.

MR. JOHNSON:  Yes, Your Honor, it does.

MR. PRIDMORE:  Your Honor, Tim Pridmore for 2B Farms.  This is one of the points, if I may, that just -- you know, it's a paradox almost.  The trustee is responding to these questions, but these are claims against HTLF and the 2B Farms parties, and that just -- for backdrop information, Your Honor, just where I can at least just briefly address that one issue.  That is one of the reasons why we believe we do have standing

63

on these, we have to defend ourselves in these claims.  You know, we have been sued by HTLF, we've been sued by Rabo, and we have to be able to defend ourselves instead of relying upon the trustee to handle the defense of all the claims made against us.  It's just a little nuance, Your Honor.  So --

THE COURT:  All right.  Anything else in response to that?

(No audible response)

THE COURT:  All right.  So, having gone through all this, I'm going back to I'm going to give Mr. Jobe the opportunity to say I told you so.

I'm not sure if this has been productive or not.  If we have another -- I'm not sure that it makes sense to have a hearing on the motion to dismiss only for me to repeat in more detail some of the things I've already said.  Would the parties be interested -- well, thoughts on that?  I think it might be wise to allow a repleading first.

MR. JOBE:  Yes, Your Honor.  I think what I've heard the Court say today is that the Court is inclined to allow the trustee to intervene.  The Court has certainly given the parties some suggestions on things that need to get cleaned up in repleading.  And then I think what I've heard the Court say today is that your findings today with respect to standing are based upon this current version of the document and they're without prejudice as other facts come out and specifics come

64

out later on in this case.

So what -- and I was kind of framing this out myself, but I mean at least what made sense to us was grant the trustee's motion to intervene, we will address, you know, a couple of the fraudulent transfer claims that were held to be the trustee's based upon what's been filed right now, and then the Court's finding that certain claims appear to be direct claims as pled. We'll include the without prejudice language. And then give the parties a period of time to replead and then not come in on a hearing on the pending motions to dismiss, but let them replead and then we'll -- we could all come back around after that.

THE COURT: That seems to make the most sense.

MR. LEAL: Yes, Your Honor, I believe that would probably be the most economical and efficient way. I do want to bring the issue up about the Wagoner rule. I think that is a significant issue in this case and I don't know when or if the Court wants to make a determination on that issue because I believe that is -- the framework underneath Wagoner I think will inform us as to who owns the claims ultimately and whether or not the trustee has any standing to assert claims either in this case or intervene or in his -- the case against the banks.

MR. MERRIOTT: Your Honor, Matthew Merriott for HTLF. Mike Johnson for Rabo and I have conferred briefly, and we're in agreement that we prefer the pleadings to be amended before

having the motions to dismiss heard.  We would unopposed to a motion to amend pleadings within two weeks from today.  You know, if we go until after the hearing on the motion to dismiss, we would probably oppose any motion to amend at that point, but we would be unopposed to amendment within two weeks.

THE COURT:  All right.  So let's talk about -- let me table the Wagoner rule for now.  Does anybody have any heartburn with the suggestion that we not take up the pending motions to dismiss, given my 30,000-foot observations on the complaints as pled, and allow repleading?  There's been a suggestion of two weeks to replead.  Is that enough time?

MR. PRIDMORE:  Your Honor, 2B Farms would agree with that analysis and to amend.  Two weeks is a little short time during the peak vacation season and prepaid vacations and things of that nature, maybe a little longer given the seriousness of what this pleading document will be.

MR. LEBAS:  Your Honor, David LeBas.  I'm going to follow up a little bit on something that Mr. Leal said a few minutes ago, and it's actually something that I've been thinking about as we're preparing for the hearing, and that is that we have two lawsuits now, that is Rabo versus -- or trustee versus Rabo and then cattlemen versus Rabo, if you want to -- for shorthand purposes with the parties, and there's a third related one, which is Rabo versus trustee on the Dealer Trust Act issues, but all three of those involve some similar

66

transactions, if not identical in many cases.  I'm concerned about what effect rulings in one case may affect another without all the parties having a chance to see what's happening, or participate or introduce evidence, or what do you do with the witness and testimony in Case A and then, in Case B, the witness is not available anymore.

And I'm thinking that the cases should be consolidated so that we don't have a problem with a possible difference in result.  And I think that if the Court would consider that -- I haven't filed a motion, maybe I should to try to do that so everybody can really think about it, but I think if that were presented then the Wagoner versus -- or the Wagoner issue of what is this question of is it a bar, does the *in pari delicto* defense absolutely prevent the trustee from making a claim or is it just a defense, you don't have to make that ruling up front that would foreclose someone from making a pitch, at least introducing their evidence.

Once the evidence is all in and you've got all of the evidence, you've got the claims, you've got the pleadings, everybody is in one spot, then you can decide on the basis of where the evidence takes you instead of having to make decisions like that, which is I would say sort of, you know, death penalty almost type decisions, without having a full development of pleadings, evidence, trial, instead of making a decision simply on what the pleadings are alleged.  If we put

it all in one pot, then we all have a chance to develop.

So that's my suggestion, if the Court would consider that, and then set a pleading deadline whenever it would be appropriate for the Court and the parties to do that.

THE COURT: So I had some of the same thoughts about the different adversaries and with the intervention that's allowed, something along the lines of what Mr. LeBas has suggested. That also comes back to a point I raised earlier, which is that where do you all believe this -- if we put everybody in the same pot, who you all think is going to handle the matter?

I think there were some references to a jury trial at some point in the motion to remand. I couldn't find it during our quick look to the docket yesterday. There was a reference to in the motion to remand one of the adversaries the time that a jury trial was available in state court. Do you know offhand, who has raised a demand for a jury trial? Has anybody not consented that plans to not consent? Who all do you believe is going to resolve this dispute?

Because to your point, Mr. LeBas, everything is consolidated, handled together, we have to get to the bottom of where -- who and where is -- who's going to decide that.

MR. LEBAS: Well, I'm at least one of the suspects on the jury plea. I'm not sure if we said we want a jury trial, I'd just have to go back and look at what our pleading says. I

do know that we checked what the jury status was availability for Deaf Smith County at the time that we were pursuing our motion to remand, with the thought being we can get to trial sooner in state court than we would be able to get to trial in district court.

I don't know beyond that -- that's what I recall. We'll comply with your request that you made earlier in the hearing to say did you do it and show me where, and as it stands today, I just don't recall. Maybe --

THE COURT: And then not only on the jury trial, but some of you have expressly consented, some of you I don't think have said one way or the other, you're just participating as if you're consenting, which might work, but --

MR. MASSOUH: Your Honor, I think I might be able to maybe shed a little bit of light on this. If my memory serves me right, without looking at the documents, I believe in our papers, the plaintiffs/intervenors' papers, we have not consented, is my recollection. We have not -- no one has moved to withdraw a reference or anything of that nature, we had previously requested a jury trial. I don't know with regard to the other parties where they stand and maybe we could make it more clear in our paperwork, but I believe that is where we are.

And then I guess the question would be, you know, if it's not a consent, who handles the case. I guess -- my guess,

would that be Judge Kacsmaryk, or does it stay with you to handle it on a report-and-recommendation type basis?

THE COURT:  By the way, by asking the question, I'm not -- how do I say this -- a long time has passed since this case was filed, nobody has filed a motion to withdraw the reference, so I'm not necessarily inviting it, I don't know what I would do --

(Laughter)

THE COURT:  -- I don't know what I would do with it if somebody did file a motion to withdraw the reference, but you all have to chat about where you think this case is headed and who's going to handle it.  I may or may not agree with some of you, but I couldn't see in my preparations for this hearing did Judge Jones ever have the same discussion with you all, but he might have.  Is somebody familiar with this issue being raised before, because I just -- I didn't go back and listen to all the audio of prior hearings.  I've just done my best to review the papers for today and look at the docket.

So, did Judge Jones ask you all these same questions, Mr. Jobe?

MR. JOBE:  Well, not me.  Your Honor, my understanding -- because this adversary proceeding that we're in on today is a combination of a couple other ones, some filed in state court, some filed in the bankruptcy case.  I think at one point in a previous iteration in this lawsuit that we're

not a party to that there was a discussion of that, but then there was other consolidations that happened.

So, I'm trying to do two things: one, answer that specific question as quickly as possible, but then also say I think it's absolutely worth asking the parties to this adversary proceeding by a certain date to file something that references a prior position that they've had, as well as whether they had filed a proof of claim in the case.

We've got -- in addition to the items that Your Honor pointed out, we have many of these parties that have filed proofs of claim, and then some of these parties are also defendants to what we call the other lawsuit, which is the avoidance actions. So there are several things to flesh out there and we would agree that that would be helpful to get everybody to commit to what they filed before and where they sit today.

THE COURT: And so I guess I'm just throwing this out there. We're talking about deadlines to replead, do you all want to have the larger discussion first, are we going to pick a date now for repleading in this adversary before I get everybody's take on where this case is headed, at least as far as venue and judge or jury or --

MR. JOBE: Well, Judge, we would suggest dual track both. So the repleading and then the new 12(b)s, and then the responses to that and then the hearing. I mean, that's months

to play out.  Regardless of the parties -- and there may be some disputes that you have to address with the parties' views on jurisdiction and consent and things like that -- this lawsuit is going to go forward likely in this court, even on a report-and-recommendation basis, no matter what.  So it doesn't make sense to us to hold up on the progression of the lawsuit while we flesh out jurisdiction and, again, given how long that's going to take, and we also think that this process could take some time too such that dual-tracking would make sense versus one or the other.

MR. LEAL:  Your Honor, I have an opposing view and I think because --

THE COURT:  Why don't you get closer to the microphone, Mr. Leal.

MR. LEAL:  Yes, Your Honor.  I'm sorry.  Again, I think it would be putting the cart before the horse again because we do have the trustee that filed claims against the banks in a separate adversary proceeding.  I think the Court ought to consider the consolidation of those, the larger issue, before we get down to the more finite issues and setting pleading deadlines and things of that nature because, if we work on a pleading on dual tracks, we may have to be back at it again reassessing the same issues, determining whether the trustee has standing to assert claims based on the Wagoner rule and things of that nature.  I mean, it's -- there's a lot of

unknowns and it's a paradox, and it's really caused me a lot of headache to think about the claims and the parties and where we're going.

And so I think the larger issue needs to be decided first.

THE COURT:  So my gut is, if you all haven't done that yet, I'm not going to -- I don't want to hold up the case to allow that to play out.  I mean, I know some of the attorneys are frustrated today because I'm not taking up issues that I suggested that I might.  It was too much to address today.  I do want to get the ball rolling on the next round of pleadings in this case.

So I am going to allow you to dual-track these issues, but they really do need to be dual-tracked.  If Judge Jones hadn't addressed this before, there has to be, if not a consensus, an understanding of when you're going to tee up the issue of where this -- who's going to handle this case.  Did he ever set a deadline?  I could not find a deadline in any of the documents for a motion to withdraw the reference.

MR. LEAL:  I don't think so.  I think he raised it kind of in a discussion format like this at the time of our motion to remand hearing, I believe, if my memory serves me right.  I think there was a discussion about it, you know, I think he raised the same questions that you're raising, and then it just -- and then at the same time, when he entered his

order on that and then stayed the case for a period of time, I think things just kind of fell off the wayside a little bit.

And so we're happy to discuss it with the trustee and re-urge whatever we need to make a statement to the Court about our position regard, and then at the same time work to amend our complaint to the Court's satisfaction.

THE COURT:  That's fine, but, again, I'm not -- I'm not -- by asking the question, I'm not suggesting that -- I'm inviting you to do something that you haven't already done. I'm just --

MR. LEAL:  Understood.

THE COURT:  -- I could not find that it had ever been asked or addressed.  And so, before we get to the repleading deadline, could -- within two weeks could each of the parties file a document that identifies where if at all they requested a jury demand, where their statement of whether it's core or non-core and, if it's not non-core, whether they consent or don't consent.  Mr. Jobe has suggested that we throw in identify which clients have filed proofs of claim.  Those are the three things that I think, hopefully, you could all find quicker than I could.

Does it make sense to do that and would two weeks be enough time?

MR. LEAL:  I think for that two weeks should be sufficient, yes.

74

MR. LEBAS:  And I think it makes sense too because that will help us make a decision -- and maybe we've sort of made it by default by not seeking withdrawal and showing up here and acting like we're in the case anyway, but make that a formal decision and, once we know what court we're in, then we're going to know what pleading standard do we need to hit and what do we need to say.

So, assuming that we all stay here, that we all come here and maybe the case gets consolidated, then of course we'll have to do what you've told us we have to do to amend the pleading and make it fit.

THE COURT:  So, of all the options of where the case is going to be handled, state court is off the table, right? Judge Jones has already denied the motion to remand --

MR. LEBAS:  He has, yes.

MR. LEAL:  Correct.

UNIDENTIFIED SPEAKER:  One hundred percent.

THE COURT:  So we're only talking about here or -- upstairs here or -- or I don't know --

MR. LEBAS:  Or Judge Kacsmaryk, yes --

THE COURT:  -- I don't know --

MR. LEBAS:  -- correct.

THE COURT:  -- I don't know which division.  So I'm not sure if the pleading standard is going to change --

MR. LEBAS:  Yeah, it probably would not.

THE COURT: So how about July 31st to file this statement, would that work for all parties?

MR. LEBAS: Is that a Friday?

THE COURT: It is a Thursday.

MR. LEBAS: Could we make it the next -- could we make it Friday, just so --

THE COURT: That's fine. August 1st is a Friday.

MR. GERSTEN: And that's for the statement on jurisdiction?

THE COURT: It's the --

MR. GERSTEN: Or the --

THE COURT: -- where if at all did you demand a jury trial, where if ever did you state that this is -- that the claims are core or non-core, and whether, if they're non-core, you consent to me -- or Judge Jones, now me, entering final orders and judgments, and then what information do you want on the proofs of claim, the docket or the proof of claim numbers and the date that it was filed. Would that work?

MR. JOHNSON: That will work, Your Honor. I just had a couple of comments and observations. I'm happy to say whether we filed a claim or not, we obviously did. I don't think the law is that if you filed a claim you consent to final rulings of a Bankruptcy Court on affirmative damage claims, but we can cross that bridge --

THE COURT: Right, and I'm not --

MR. JOHNSON: -- I think the defendant group, I don't think we've weighed in on core versus non-core because we haven't answered yet. That's the whole problem, we've been in this case for two years.

THE COURT: But I don't think it's -- I don't think it has to be in an answer. You filed papers, right?

MR. JOHNSON: We filed a motion to dismiss, motions to dismiss.

THE COURT: If I pull up Rule -- somewhere, if I thumb through the rules, I think it has to be in the first papers that you file whether you consent or not consent, but I could be wrong.

MR. JOHNSON: But you're giving us two weeks, so that's a nonissue there.

The last thing I wanted to say, Mr. Leal's point about consolidation bears some consideration just because of this. Given your rulings today, the trustee is asserting claims that are very similar to the claims that these folks are asserting against our clients, which you've now said belong to them, so that means we probably have standing -- lack-of-standing arguments vis-a-vis the trustee. And then of course they want to argue the Wagoner rule, which also, at least in -- I disagree with their position, but they say that's a standing question too.

So I guess the question is, is the trustee going to

77

be repleading as well to eliminate claims that are -- given today's rulings and observations belong to the investors, they're direct claims, they're not estate claims?  I raise that issue as well.

MR. JOBE:  Well, Your Honor, I don't think that there is any case law recognition that the trustee would not have standing to pursue the claims of the debtor or the statutory claims that he's pled.  The case law discusses whether he has exclusive standing as to overlap between him and -- a trustee and a creditor's claim.  There's no case law that suggests the trustee lacks standing merely because a creditor has an overlapping claim.

MR. JOHNSON:  Well, a trustee has standing to assert claims that become property of the estate by virtue of 541, but that's the issue is are these claims that were debtor claims that became trustee claims under 541, or are they investor, slash, cattlemen claims?

THE COURT:  So I'll tell you, as I prepared for this hearing, I did not do a side-by-side.  I know Mr. Jobe prepared a chart that had some of the overlapping factual and legal issues in his complaint comparing them to what was happening here.  I didn't focus on that, really I was focusing just on the face of these complaints.

So I don't know if he has counts that are affected by what I've done here or not --

MR. JOHNSON:  Understood.

THE COURT:  -- I just don't know that.

MR. JOHNSON:  I guess -- and, you know, Mr. Leal raised the issue as far as consolidation, but I'm suggesting you at least may want to -- because all the bank defendants have filed motions to dismiss or will file motions to dismiss the complaints too, and I believe we will all raise lack of standing as an argument, so you may want to hear all of these motions to dismiss at the very same time.

THE COURT:  Is there some logic to that, Mr. Jobe?

MR. JOBE:  Are you talking about in the other adversary proceeding?

MR. JOHNSON:  Yes, I am.  And I believe these folks would tell you that you should do that.  I'll let them speak for themselves, but their view is that Wagoner deprives the trustee from asserting some of the claims, I think --

MR. LEBAS:  Yes.

MR. JOHNSON:  -- but I will let them --

MR. LEBAS:  Yeah, we do say that.

MR. JOBE:  Your Honor, in this adversary proceeding, what you are going to be hearing is a 12(b) on has there been sufficient specifics pled to show that these creditors have a direct claim.  The creditors want to introduce the Wagoner rule or *in pari delicto* into that discussion; I think you've seen the case law saying that it is irrelevant to the standing

issue.  So we don't see Wagoner and *in pari delicto* being relevant to any further standing disputes between the trustee and the creditor.

In our separate adversary proceeding, which has not been consolidated with this one and which is not teed up today, we have our own claims in that lawsuit that we may have 12(b) arguments, completely different 12(b) type arguments to things that we're arguing about with the bank defendants over here, whether or not there is trustee standing under <u>Seven Seas</u> is not going to be an issue over there.  So we don't see overlap between the 12(b) practice that will be happening in our separate lawsuit and any sort of continuing standing issue that's playing out here.

THE COURT:  Do you have thoughts on Mr. LeBas' suggestion that at least those two -- at least -- I left my handy-dandy chart back in my chambers with the adversary -- your big -- I'll call it your big lawsuit against multiple defendants, should that be consolidated with this adversary?

MR. JOBE:  So, Your Honor, our lawsuit against Rabo, Mechanics, and CPSB?

THE COURT:  No, not that one.

MR. JOBE:  The avoidance lawsuit with the investors?

THE COURT:  Let's pause for a minute.  Give me just a minute.

(Pause)

MR. JOBE:  Your Honor, I believe that the --

MR. LEBAS:  Your Honor, if I --

MR. JOBE:  -- Mr. LeBas --

MR. LEBAS:  -- I'm sorry, go ahead.

MR. JOBE:  No, go ahead.  You can clarify.

THE COURT:  Hold on, let me --

MR. LEBAS:  The --

THE COURT:  -- stay there.  I'm going to go get my cheat sheet.  Don't move.

(Pause)

THE COURT:  All right.  So, rather than call it the big lawsuit, 25-2003.

MR. LEBAS:  Is 25-2003 the avoidance lawsuit?

THE COURT:  It's mostly preference and fraudulent transfer counts --

MR. LEBAS:  Okay, yeah.

THE COURT:  -- against lots of people.

MR. LEBAS:  My suggestion about consolidation did not include that one.  That's the trustee asserting the statutory avoidance claims.  I was --

THE COURT:  So I'm asking as to all of them, but including -- so we have 25-2003, I don't know if anybody was suggesting that one be consolidated.  You also have the trustee's lawsuit against, I have the banks, 25-2005.  I believe that's the one you, Mr. LeBas, were suggesting could be

-- or should be consolidated, correct?

MR. LEBAS:  Yes, Your Honor.  And actually there's another one that could be, although I don't know how it -- if it ought to be carved out or not, is the declaratory judgment action with respect to he Dealer Trust Act claims.

THE COURT:  23-2005.

MR. LEBAS:  That's 5?  Okay.  I think that one could be consolidated, but it may not need to be because I think it's probably a discrete enough question.  But if the Court were to decide that the Dealer Trust claimants' claims are perfected and that takes the value -- or the proceeds, now they're just proceeds -- from the trustee's bank account and gives it to the claimants who had perfected claims, then I think there's a little bit of money left over.  Rabo is claiming that, the trustee is claiming it, I'm sure everybody is, so the Court would have to deal with what to do with that excess -- with those excess proceeds.  Maybe it's a million dollars, I mean, it's not nothing.

And if that feeds back into the main case that we're disputing, I think that would be appropriate.  That's why I would say we might want to think about that one, but I don't think that the avoidance case really fits within the claims that -- that the trustee is asserting against the banks, that we're asserting against the banks, and that they're asserting back.

THE COURT:  All right.  Anybody disagree on the -- your fraudulent transfer preference suit, we're not talking about consolidating that one, right, 25-2003?

MR. JOBE:  Correct, Your Honor.  I think what we're talking about is the -03 -- I'm sorry, the -05 bank lawsuit and then the other -05 USDA lawsuit.

THE COURT:  All right.

MR. JOBE:  So --

MR. LEBAS:  In this adversary proceeding?

MR. JOBE:  Correct, consolidating those here.

So, Your Honor, our -05 lawsuit against the banks, we're open to consolidating that.  We've been in discussions with some of the bank defendants on that already.  So I do think you will be seeing a motion to consolidate the two lawsuits where the primary defendants are these three or four banks, I think you're going to be seeing an agreed -- it sounds like an agreed motion to consolidate those.

The USDA lawsuit involves a hundred-plus defendants on a very narrow issue of can they -- do they have an allowed USDA claim under a very specific statute.  We have previously referenced some overlapping parties and some overlapping issues.  We would like to make a run at cleaning up and resolving that lawsuit, at least as to the non-common defendants, before we pull them into a much bigger scope, longer, drawn-out lawsuit.

So, at this time, we would not be agreeable to combine the USDA lawsuit.  And I think that the defendants to that lawsuit, the ones that aren't here today, would agree.

THE COURT:  All right.  We don't have to decide that today, but I guess you and Mr. LeBas can discuss that and see if he feels strongly about that one or not, but the other -- the 25-2005 trustee lawsuit against the banks seems to make sense, especially with your intervention here, to consolidate those.

All right.  So, shall we talk then about the deadline to replead?  Two weeks is not enough, I'm hearing.  Any suggestions?

MR. LEBAS:  If it's consolidated, if the two cases are consolidated, then it seems to me that whatever deadline would run for pleadings should run from that date of consolidation, so we don't, you know, wind up having to guess as to what case we're going to be pleading in.

And Mr. Leal has just suggested this, which we do need that, we need a scheduling order.  And maybe after it's consolidated, I don't know if we'll get a trial setting, we're going to have to do what you said, which is tell me where you want this case to be tried anyway, by then we'll know that also.  And so we can get a scheduling order that says what date are your pleadings, what date is your discovery, what date are pretrials, all that other stuff that it would encompass.

84

THE COURT:  So I'm not hearing a lot of disagreement that it makes sense to consolidate at least this lawsuit with 25-2005, and so it sounds like you could come up with some agreed order on consolidation in the short term.  It doesn't matter to me if you -- if the repleading deadline is triggered from the date that consolidation order is entered.  If you don't think it's going to take that long, I don't have a problem with that.

MR. JOBE:  Your Honor, we do have one party to that bank lawsuit that's not here today and in this lawsuit, they could throw a monkey wrench into things.  So, we do agree it makes sense, we'll move forward on that.  I don't know that them repleading their claims against the banks is coupled with procedurally consolidating that.

So maybe we're talking about a triple track, which is we all take our position on jurisdiction, we all agree that we're going to be working forward on consolidation, and then there's just some independent deadline two weeks, three weeks, four weeks, whatever, for these parties to replead in this case, so we can move along -- we can move along this issue about who is going -- who has ownership claims, who doesn't, and trying to make progress on clarifying who's got what claims.

MR. MERRIOTT:  Your Honor, we agree with that, HTLF agrees with that point, and I think Mr. Johnson would agree as

well that we've been waiting for two years for adequate pleadings and, you know, I don't think that we need to wait any longer to get that process starting. So let's just set a deadline and go forward. And, you know, whether or not the pleading is filed under one caption or another really shouldn't affect how the claims are pled.

MR. JOBE: And, Your Honor, I want to just want to drop one more thing that hasn't been mentioned yet and I think just gives some context. We have -- we've been in discovery and discussions with some of these major players for quite some time, we are interested in scheduling mediations with some of the key players, it makes it really tough to schedule mediations when there's so much uncertainty about who's got what claim and who's going to get to sue whom for what. And so the more we can make progress on moving that part along, the more we're going to move along the ultimate resolution of this whole case.

MR. LEAL: That's why whatever -- I mean, that's how come I think it's important for the cases to be consolidated and then we determine or the Court can decide whether the trustee -- whether the Wagoner rule bars the trustee from asserting claims, and have a pleading deadline and get the scheduling order in place, so the parties can move forward on one cause -- we don't have a problem with -- if we can have at least until August 19th. We have vacations, family vacations,

we can't -- so we need until -- you asked for the other -- the jury demand and the exception to be filed August 1st, if we could have until August 19th, we'll replead our complaint in this adversary proceeding and let -- you know, without -- there's going to be a pleading deadline following the scheduling order, but at some point, I do agree with Mr. Hudson, that the defendants need to know who owns the claims, and I think the Wagoner rule, among other -- well, the Court's decision today gives us some guidance, but I think the Wagoner rule is going to be a big issue.

MR. JOBE:  Your Honor --

THE COURT:  Is it Mr. Kauffman's client, is that who you're saying is not here?  Okay.  So I just don't know how long this discussion on consolidation will take.

So, why don't we go ahead and for now pick a deadline to replead in this adversary.  Mr. Leal suggested August 19th.

MR. MERRIOTT:  HTLF is agreeable to that, Your Honor.

MR. JOHNSON:  Yeah, we're fine with that.  It's a little long, but if they need until August 19th, we're not going to jam them up, we would consent.  But that will be the last consent we give, so they better get it right this time.

THE COURT:  I understand.  So I have a lot of people at the podium on Webex.  Any heartburn with August 19th, Ms. Klein or anybody else on Webex?

MS. KLEIN:  No, Your Honor, no problem from Mechanics

Bank.  Thank you.

MR. PRIDMORE:  2B Farms agrees, Your Honor.

THE COURT:  All right, I don't hear any other -- anybody else objecting.  So we'll go with August 19th then.

And you can dual-track or triple-track, whatever you need to do to discuss consolidation as between this adversary and the 25-2005.  We have August 1st as the deadline to file the statement with the information we already discussed.

MR. JOHNSON:  Your Honor, I don't know if this is something you can or will be able to do for us, but frankly one issue about -- you know, that would impact our decision about whether to consent or not consent to final orders from you would be which District Court judge would hear this case, would this case go to District Court in Dallas or would it go to Judge Kacsmaryk in Amarillo.  And so I don't know if that's something --

MR. MASSOUH:  Or Judge Hendrix in Lubbock.

MR. JOHNSON:  -- or Judge Hendrix in Lubbock.  And so if that's something you could give us guidance on, that might help us come to a decision.

MR. JOBE:  And, Your Honor, one complicating factor that you may have seen or not, the 2B case is actually a Lubbock case.  The McClain case is an Amarillo case.  There were pending adversary proceedings, the precursor to the adversary proceeding that you're in now, there was one Lubbock

and one Amarillo that got mashed together.  One was pending in connection with the 2B case, there was a Lubbock adversary and then one was Amarillo.

So we've got -- to Mr. Johnson's point, there's arguably a menu of options.

THE COURT:  I don't know that it's my decision --

(Laughter)

THE COURT:  -- I hate to tell you.  If a motion to withdraw the reference is filed, all I do is a report and recommendation, and then at that time I will figure out where to try to send it.

MR. JOBE:  One idea, Your Honor -- and, again, the 2B is a Lubbock case, the 2B main case is a Lubbock case, the McClain main case is an Amarillo case, we're talking about the adversary proceedings.  In other cases, I've seen motions to transfer cases intra- and inter-division, and I've seen Bankruptcy Courts sign that order and that effectuates a transfer.

One way to shorten this up might be a motion --

MR. JOHNSON:  I mean, I'll stipulate this is a Lubbock case.

MR. JOBE:  Or Dallas.

MR. JOHNSON:  Or a Dallas case.

MR. JOBE:  But I mean arguably somebody could move to transfer within the district, could move to transfer a

division, both 2B and McClain and the related adversary proceedings, and I think you could sign that order -- or at least I've seen Bankruptcy Judges sign that order in the past.

THE COURT:  You are all agreeing, for example, that the matter should be transferred to the Dallas division?

MR. JOBE:  Or Lubbock or Amarillo.

MR. JOHNSON:  I don't think they're agreeing, but --

UNIDENTIFIED SPEAKER:  Hypothetically.

MR. JOHNSON:  -- hypothetically.

UNIDENTIFIED SPEAKER:  Yeah, we'd need to talk to our clients.

THE COURT:  So, whatever it is --

MR. JOBE:  I'd agree with that.

(Pause)

MR. JOBE:  So, Judge, perhaps we -- we will include that in our August 1st discussion?  Do you have --

MR. JOHNSON:  Yeah.

THE COURT:  That's fine.  Yeah, I don't know what kind of guidance I can give you today on that one because that's --

MR. JOBE:  So, Judge, would you sign the order?

THE COURT:  -- as I look at the docket and the number of pleadings -- well, I was going to make a joke, but --

MR. JOBE:  I'll withdraw my joke questions, Your Honor.

(Laughter)

THE COURT:  Yeah.  Yeah, I just don't know.  Off the top of my head, since you have a consolidation, or this was both in Lubbock and Amarillo, which judge it would go to, absent an agreement, an agreed to transfer intra-district, I just don't know the answer.  So, I can let you all discuss that.

I have thick skin.  If people decide you don't like the matter tried here, I won't be offended.  But, again, the case has been pending for a long time.  So, I'm not inviting something that you hadn't done before, I'm just asking it as an informational request on my part, if that makes sense.

MR. JOBE:  Well, Your Honor, we absolutely plan on discussing and conferring in advance of that August 1st deadline.  So, we will definitely put those items into the agenda to see what we can discuss and get figured out as far as maybe some agreements or consensus on a direction.

THE COURT:  All right.  All right, any other things we should talk about?

MR. MERRIOTT:  Your Honor, I think one more minor pleading issue, you know, we're talking about consolidating the trustee's case against the banks into the creditors' case against the banks.  Presumably, if that occurs, then the trustee would be filing an amended complaint that -- as part of that consolidation.  It may not be a substantive change, but

I'm wondering if we want to try to accomplish that before we start the motion to dismiss process on the second amended complaint that's currently pending.

MR. JOBE:  So, if we consolidated, the pleadings would ride through.  We do not intend to change our complaint at all.  So let's just stick with you respond to what's on file; if it all gets procedurally consolidated together, great.

MR. MERRIOTT:  Okay, we'll just change the caption -- okay.  I just wanted to make sure we weren't going to have another change of pleadings as a result of that.

THE COURT:  All right, fair enough.

Anything else for this afternoon?

MR. LEAL:  I think the law clerks look hungry, Your Honor.

THE COURT:  I'm sorry?

MR. LEAL:  I think the law clerks look hungry.

THE COURT:  Yeah, yeah.  Time flies, doesn't it?  It's 12:45, 12:43.

MR. JOHNSON:  Just one more thing, Your Honor, and this is not for you to make any rulings, just for your information.  So, last Friday, there was interestingly a class action lawsuit filed by several investors or cattle people, whatever we want to call them, in Graves County Circuit Court in Kentucky against Rabo, Mechanics Bank, and CFSB.  We will be moving to remove that to the Bankruptcy Court in the Western

District of Kentucky, and then asking that court to transfer that action here too.  So that -- look for that on your radar too.  So I just wanted to give you a heads-up.

MR. MASSOUH:  That was not filed by us.

(Laughter)

THE COURT:  Well, I saw a news report, I think, about that lawsuit and I couldn't tell -- there were not a lot of details, I couldn't --

MR. JOHNSON:  Well, they basically took the trustee's complaint and copied it verbatim.  And so my guess is they will take the position that, you know, you're violating the automatic stay.

MR. JOBE:  Your Honor, the complaint is actually attached to the amended exhibit list I filed yesterday.  So yesterday and in this adversary proceeding, I amended an exhibit list, attached a copy of that complaint, if you'd like to take a look at it, but it is a copy-paste job of our -05 bank lawsuit.

THE COURT:  All right.

MR. JOHNSON:  I just tell you that just so you know that it's coming.

THE COURT:  All right, I appreciate the heads-up.

Anything else for this afternoon?

MR. LEBAS:  Nothing for the plaintiffs.

THE COURT:  All right.  Well, I'm sorry if we weren't

93

able to accomplish everything that some of you wanted to accomplish today.  I apologize.  I did the best I could with the time that I had to get ready for this hearing.  I think we've made some progress.  And with the trustee intervening and the potential consolidation, my hope and expectation is that this will begin to move forward.  So --

MR. DABDOUB:  It's ours as well.

THE COURT:  All right.

MR. JOBE:  This has been helpful, Your Honor.  Thank you.

MR. DABDOUB:  Yes.

THE COURT:  All right.  Anything else from the folks on Webex?

MS. KLEIN:  No, Your Honor.  Thank you.

MR. JOHNSTON:  Thank you, Your Honor.

THE COURT:  All right, very good.  Last call, anybody in the courtroom?  We're good for today?

MR. GERSTEN:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Thank you all.  Court will be in recess.

(Proceedings adjourned at 12:46 p.m.)

* * * * *

94

# C E R T I F I C A T I O N

WE, KAREN WATSON and TRACEY WILLIAMS, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Karen Watson

KAREN WATSON


/s/ Tracey Williams

TRACEY WILLIAMS

J&J COURT TRANSCRIBERS, INC.      DATE:  July 29, 2025