David L. LeBas, SBN 12098600
dlebas@namanhowell.com
Michael S. Duncan, SBN 24097628
mduncan@namanhowell.com
NAMAN HOWELL SMITH & LEE PLLC
8310 N. Capital of Texas Highway, Ste. 490
Austin, Texas 78731
Ph. (512) 479-0300
Fax (512) 474-1901

*ATTORNEYS FOR AGTEXAS FARM CREDIT SERVICES AGTEXAS, PCA
AND THORLAKSON DIAMOND T FEEDERS, LP*

John Massouh, SBN 24026866
John.massouh@sprouselaw.com
Josh Kundert, SBN 24143877
Josh.kundert@sprouselaw.com
SPROUSE SHRADER SMITH PLLC
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas 79105-5008
(806) 468-3300; (806) 373-3454 FAX

--and--

Abel A. Leal, SBN 24026989
abel@leal.law
LEAL LAW FIRM, LLC
14180 N. Dallas Parkway, Suite 300
Dallas, Texas 75254
(214) 395-5325

*Attorneys For Dennis Buss, Buss Family Trust, Eddie Bryant, Robert E.
Gray, Ronnie Gray, Gray Brothers, Craig Sutton, Amy Sutton, Steve Ryan,
Janice Lawhon, AJ Jacques Living Trust, Gungoll Cattle, LLC, Leah
Gungoll, Morrison Café, LLC, Gary Lesh, Jan Lesh, Lesh Family Trust,
Jared Lesh, Jordan Lesh, LLC, Joel Brookshire, Gene Brookshire Family,
LP, Douglas Finley, Scarlet And Black Cattle, LLC, Bryan Blackman, Steve
T Scott Farm, Inc., Scott Livestock Company, Inc., Arnold Braun Trust,
Robert Braun, Jim Rininger, Robert Spring, Michael Evans, Miranda Evans,
Charles Lockwood, Cole Lockwood, Sherle Lockwood, Nikki Lockwood,
Lyndal Van Buskirk, Janet Van Buskirk, Colby Van Buskirk, Susan Van
Buskirk, Jimmy Greer, Dustin Johnson and Dora Blackman*

Amber S. Miller, SBN 24050320
amiller@cdmlaw.com
CRENSHAW, DUPREE & MILAM, L.L.P.
4411 98th Street, Suite 400
Lubbock TX 79424
(806) 762-5281
(806) 762-3510 (fax)

*Attorney for Ridgefield Capital Group, Drew Phillips, Carraway Cattle,
Robert Ellis, Barry Phillips, Big Seven Capital Partners, Richard Carraway*

James D. Bradbury, SBN 02814500
jim@bradburycounsel.com
Kyle K. Weldon, SBN 24097192
kyle@bradburycounsel.com
JAMES D. BRADBURY, PLLC
201 Main Street, Suite 600
Fort Worth, Texas 76102
Telephone: 817-339-1105
Fax: 817-886-3495

*Attorneys for Priest Cattle Company, Ltd, Priest Victory Investment LLC, W.
Robbie Russell Living Trust, and Eddie Stewart*

**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE NORTHERN DISTRICT OF
TEXAS AMARILLO DIVISION**

| | |
|---|---|
| IN RE:<br><br>McCLAIN FEED YARD, INC., McCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br><br>      Debtors. | Case No. 23-20084-swe<br>            Chapter No. 7<br><br>Jointly Administered |
| IN RE:<br><br>2B FARMS, a Texas General Partnership, et al.,<br><br>      Debtors. | Case No. 23-50096-swe<br>            Chapter No. 12<br><br>Jointly Administered |
| | |

| | |
|---|---|
| IN RE:<br><br>AGTEXAS FARM CREDIT SERVICES; AGTEXAS, PCA; AND THORLAKSON DIAMOND T FEEDERS, LP<br><br>    Plaintiffs,<br><br>and<br><br>EDWARD DUFURRENA et al.,<br>    Intervenor-Plaintiffs<br>v.<br><br>RABO AGRIFINANCE, LLC et al.,<br><br>    Defendants | ADV. PROC. NO. 24-02007-swe<br><br>(Consolidated Adversary Proceeding) |
| IN RE:<br><br>HTLF BANK, as successor to FIRST BANK & TRUST,<br><br>    Plaintiffs, Counter-Defendant, and Cross-Claim Defendant,<br><br>v.<br><br>2B FARMS, a Texas General Partnership, et al., TERRY M. ROBINSON, and REBECCA A. ROBINSON,<br><br>    Defendants, Counterclaim-Plaintiffs, Third-Party Plaintiffs and Third-Party Counterclaim Defendants,<br><br>v.<br><br>RABO AGRIFINANCE LLC and MECHANICS BANK,<br><br>    Third-Party Defendants, and as to Rabo AgriFinance LLC only, Third-Party Counterclaim Plaintiff and Cross-Claim Plaintiff. | ADV. PROC. NO. 24-02007-swe<br><br>(Consolidated Adversary Proceeding) |

**PLAINTIFFS' AND INTERVENORS' FIRST AMENDED FEDERAL COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiffs AgTexas Farm Credit Services, AgTexas, PCA (collectively with AgTexas Farm Credit Services, "AgTexas"), Thorlakson Diamond T Feeders, LP ("Thorlakson"), and Intervenors identified in Paragraphs 16 through 65 below, file this, their First Amended Federal Complaint, complaining of Rabo AgriFinance LLC, Rabo Diversified Services LLC (collectively with Rabo AgriFinance, LLC "Rabo"), Mechanics Bank ("Mechanics"),  HTLF Bank, as successor to First Bank & Trust ("HTLF"), Community Financial Services Bank ("CFSB"), Shawn Ragland, and Meagan Goad (collectively, "Defendants"), and in support of same would show unto the Court as follows:

## I.
## PRELIMINARY STATEMENT

1.      This case exposes a massive agricultural fraud scheme that defrauded cattle producers of tens of millions of dollars—a scheme that could have been stopped years earlier but for the willful blindness and active complicity of sophisticated financial institutions that prioritized profits over prudent banking practices and legal obligations.

2.      At the center of this fraud was Brian McClain and his entities McClain Feed Yard, Inc., 7M Feeders, Inc., and McClain Farms, Inc. (collectively "McClain"), who operated what appeared to be a legitimate cattle feeding operation in the Texas Panhandle. Plaintiffs and Intervenors—cattle producers from across the country—entrusted McClain with millions of dollars to purchase cattle on their behalf, feed those cattle in McClain's feedlots, and eventually sell the cattle at market. Instead, McClain operated a sophisticated fraudulent enterprise that systematically stole cattle that belonged to his customers.

3.      But this was not a case of a lone fraudster operating in the shadows. This was a fraud enabled, facilitated, and concealed by a network of financial institutions that had both the duty and the ability to stop it. Rabo, one of the largest agricultural lenders in the United States with over 100 years of experience, extended nearly $70 million in credit to McClain despite knowing from the outset that his operations were high-risk and not creditworthy. Rabo's own internal inspections repeatedly raised "red flags" about McClain's inadequate accounting systems, unreliable financial reporting, and impossible cattle inventory claims. Yet rather than exercise the prudent oversight required by industry standards and its own policies, Rabo chose to look the other way—motivated by the 43% profit margin it earned on McClain's account.

4.      The scope of Rabo's willful blindness is staggering. McClain submitted monthly borrowing base certificates claiming ownership of cattle that exceeded his feedlots' physical capacity by tens of thousands of head—at one point claiming 87,000 cattle when his facilities could hold only 49,000. Rabo's own executive later admitted that "a full headcount/inspection has not been done for over 4 years." When Rabo finally conducted a physical inspection in February 2023, the house of cards collapsed: instead of the 80,000 cattle McClain claimed to own, investigators found only 8,000 cattle—and McClain didn't even own those. As one Rabo inspector noted, this was "basically a worst-case scenario" and a "possible fraud case."

5.      Defendant Mechanics Bank was equally complicit, facilitating a check-kiting scheme that involved hundreds of millions of dollars in suspicious transactions. Through deposit account control agreements, Rabo and Mechanics Bank jointly managed McClain's accounts, routinely covering overdrafts in the millions of dollars and enabling the constant movement of funds that kept the fraud afloat. Internal communications show bank employees expressing shock at $2.5 million overdrafts and explicitly filing an "SSS [Something Seems Suspicious] for check-

kiting", yet both banks continued to facilitate and participate in the scheme rather than shut it down.

6.      The fraud extended beyond these defendants. HTLF and its branch president Shawn Ragland facilitated over $50 million per month in check-kiting activities, accepting blank, pre-signed checks from McClain and providing immediate credit for uncollected funds. Megan Goad, McClain's daughter, actively orchestrated the daily mechanics of the fraud, coordinating the movement of funds and the backdating of invoices to maintain the illusion of legitimacy.

7.      Defendant Community Financial Services Bank ("CFSB") likewise played a critical role in enabling McClain's fraudulent enterprise. As McClain's longtime hometown bank, CFSB handled both his personal and business accounts for decades and was uniquely positioned to detect the irregularities in his finances. Instead, CFSB allowed McClain to exploit its accounts through repeated multimillion-dollar overdrafts, more than one hundred days of negative balances, and hundreds of millions of dollars in circular intercompany transfers that bore no legitimate business purpose. By disregarding obvious red flags and violating its own internal policies, CFSB did not merely overlook McClain's misconduct—it became an essential participant in the scheme, providing the banking access that concealed losses and prolonged the fraud.

8.      The human cost of this fraud is devastating. Cattle producers who worked their entire lives to build their operations lost millions of dollars. Some lost their ability to continue their ranching business. Others faced bankruptcy. All while the defendant financial institutions that had the power to prevent these losses chose instead to profit from them.

9.      This case seeks to hold these defendants accountable for their roles in participating in, enabling and concealing one of the largest agricultural fraud schemes in recent history. The evidence will show that this was not a case of sophisticated criminals deceiving innocent banks,

but rather a case of sophisticated banks choosing profits over principles, willfully ignoring obvious red flags, and actively participating in and facilitating fraud to protect their own financial interests at the expense of hardworking farmers and ranchers.

## II.
## JURISDICTION AND VENUE

10.     In its Order dated August 16, 2024, this Court concluded it has "related-to" jurisdiction over this case as an adversary proceeding. [Dkt. 1].

11.     Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     Plaintiffs and Intervenors disclaim that this suit is an effort to recover from McClain Farms, Inc. ("MFI"), McClain Feedyard, Inc. ("MFY"), and 7M Cattle Feeders, Inc. ("7M") (collectively referred to herein as "McClain").

## III.
## PARTIES/FACTUAL BACKGROUND

13.     Plaintiff AgTexas Farm Credit Services, is a federally chartered agricultural credit association formed under the Farm Credit Act of 1933.  It does business in various locations in Texas, including Deaf Smith County, Texas.

14.     Plaintiff AgTexas, PCA, is a federally chartered production credit association formed under the Farm Credit Act of 1933.  It does business in various locations in Texas, including Deaf Smith County, Texas.

15.     Plaintiff Thorlakson Diamond T Feeders, LP, is a Texas limited partnership.  It does business in various locations in Texas, including Deaf Smith County, Texas. Thorlakson began placing cattle with McClain in 2021 for feeding and care. In January 2021, Thorlakson and its lender, Ag Texas PCA, and Defendant Rabo (defined below) signed an Intercreditor Agreement

setting out the terms of the relationship between the parties. Ag Texas conducted formal third-party inspections of the McClain Texas yards on at least four different occasions, and Thorlakson received monthly inventory reports from McClain, detailing the number of head that were owned by Thorlakson and were being housed at McClain's Texas yards.

16.    Intervenor Dennis Buss is an individual with citizenship in Oklahoma.  Mr. Buss did business with McClain since at least 2016. During that time, Mr. Buss would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Buss typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  The wire transfer form would indicate the number of head purchased, the type of cattle, the weight of the cattle, and the price per pound. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Buss' cattle by McClain, McClain would have the proceeds delivered into his Mechanics Bank account earmarked for Mr. Buss. McClain would then remit the sales proceeds to Mr. Buss, less McClain's feed costs and handling fee. Mr. Buss is owed $308,873.53 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

17.    Intervenor Buss Family Trust ("BFT") is an entity formed under the laws of Oklahoma. BFT did business with McClain since at least 2020. During that time, BFT would purchase cattle from McClain for feeding and care at a McClain feedyard.  BFT typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  The wire transfer form would indicate the number of head purchased, the type of cattle, the weight of the cattle, and the price per pound. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale

of BFT's cattle by McClain, McClain would have the proceeds delivered into his Mechanics Bank account earmarked for BFT. McClain would then remit the sales proceeds to BFT, less McClain's feed costs and handling fee. BFT is owed $380,090.19 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

18.    Intervenor Eddie Bryant is an individual with citizenship in Texas. Mr. Bryant did business with McClain for a period of time prior to April 2023. During that time, Mr. Bryant would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Bryant typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Bryant's cattle by McClain, McClain would have the proceeds delivered into his Mechanics Bank account earmarked for Mr. Bryant. McClain would then remit the sales proceeds to Mr. Bryant, less McClain's feed costs and handling fee. Mr. Bryant is owed $214,820.95 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

19.    Intervenor Robert Gray is an individual with citizenship in Oklahoma. Mr. Gray did business with McClain since at least 2017. During that time, Mr. Gray would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Gray typically wired the purchase funds directly into a McClain account at Mechanics Bank or CFSB pursuant to an invoice and projected closeout received from McClain.  The wire transfer form would indicate the number of head purchased, the type of cattle, the weight of the cattle, and the price per pound and/or state that the purpose of the wire was to "Purchase Livestock.". Once the cattle were ready to be sold,

McClain would facilitate the sale of the cattle to a third party. After the sale of Mr. Gray's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Gray. McClain would then remit the sales proceeds to Mr. Gray, less McClain's feed costs and handling fee. Mr. Gray is owed $234,663.23 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

20.     Intervenor Ronnie Gray is an individual with citizenship in Oklahoma. Mr. Gray did business with McClain since at least 2022. Mr. Gray is now deceased as of the fall of 2023. Mr. Gray would purchase cattle from McClain for feeding and care at a McClain feedyard. Mr. Gray typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain. The wire transfer form the number of head of cattle purchased. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party. After the sale of Mr. Gray's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Gray. McClain would then remit the sales proceeds to Mr. Gray, less McClain's feed costs and handling fee. Mr. Gray is owed $200,450.00 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

21.     Intervenor Gray Brothers is a partnership formed in Oklahoma. Gray Brothers did business with McClain since at least 2022. During that time, Gray Brothers would purchase cattle from McClain for feeding and care at a McClain feedyard. Gray Brothers typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain. The wire transfer form would indicate that the purpose

of the wire was to "Purchase Livestock" or something similar. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Gray Brothers' cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Gray Brothers. McClain would then remit the sales proceeds to Gray Brothers, less McClain's feed costs and handling fee. Gray Brothers is owed $436,533.90 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

22.     Intervenors Craig Sutton and Amy Sutton are individuals with citizenship in Texas. Mr. Sutton did business with McClain since at least 2022. During that time, the Suttons would purchase cattle from McClain for feeding and care at a McClain feedyard.  The Suttons typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  The wire transfer form would indicate the number of head purchased, the type of cattle, the weight of the cattle, and the price per pound. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of the Suttons' cattle by McClain, McClain would have the proceeds delivered into his account earmarked for the Suttons. McClain would then remit the sales proceeds to the Suttons, less McClain's feed costs and handling fee. The Suttons are owed $400,109.56 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

23.     Intervenor Steve Ryan is an individual with citizenship in Oklahoma. Mr. Ryan did business with McClain since at least 2018. During that time, Mr. Ryan would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Ryan typically wired the purchase funds directly into a McClain account at Mechanics Bank or CFSB pursuant to an invoice and projected

11

closeout received from McClain.  The wire transfer form would indicate the number of head purchased, the type of cattle, the weight of the cattle, and the price per pound. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Ryan's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Ryan. McClain would then remit the sales proceeds to Mr. Ryan, less McClain's feed costs and handling fee. Mr. Ryan is owed $251,609.07 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

24.     Intervenor AJ Jacques Living Trust (AJT) is entity formed under the laws of Oklahoma. AJT did business with McClain since at least 2022. During that time, AJT would purchase cattle from McClain for feeding and care at a McClain feedyard.  AJT typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of AJT's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for AJT. McClain would then remit the sales proceeds to AJT, less McClain's feed costs and handling fee. AJT is owed $366,054.17 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. In addition, the last payment issued to AJT by McClain was returned for insufficient funds in the amount of $26,997.32.  This was done after Rabo and Mechanics Bank converted AJT's cattle and/or proceeds and then knowingly and wrongfully dishonored the check.

25.     Intervenor Gungoll Cattle Co., LLC (GCC) is a Oklahoma limited liability company. GCC did business with McClain since at least 2019. During that time, GCC would either

purchase cattle from McClain or deliver cattle to McClain, in both instances for feeding and care at a McClain feedyard.  When purchasing cattle, GCC typically wired the purchase funds directly into a McClain account at Rabobank or Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of GCC's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for GCC. McClain would then remit the sales proceeds to GCC, less McClain's feed costs and handling fee. GCC is owed $495,648.89 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. GCC representatives personally inspected their cattle on site at the McClain Texas yards. Many of GCC's business transactions with McClain involved purchasing cattle from McClain and then initially having the cattle delivered to the GCC property; they were then used in rodeos and other shows. Then, GCC would transfer the cattle back to the McClain Texas yards for feeding and care until the cattle were ready to be sold to a third party. GCC also made payments to McClain for pre-paid feed to ensure that its cattle were sufficiently fed.

26.     Intervenor Leah Gungoll is a citizen of Oklahoma.  Ms. Gungoll did business with McClain since at least 2020. During that time, Ms. Gungoll would purchase cattle from McClain for feeding and care at a McClain feedyard.  Ms. Gungoll typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Ms. Gungoll's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Ms. Gungoll. McClain would then remit the sales proceeds to Ms. Gungoll, less McClain's feed costs and handling fee. Ms. Gungoll

is owed $150,852.24 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

27.     Intervenor Morrison Café, LLC (Morrison) is an Oklahoma limited liability company.  Morrison did business with McClain since at least 2016. During that time, Morrison would purchase cattle from McClain for feeding and care at a McClain feedyard.  Morrison typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Morrison's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Morrison. McClain would then remit the sales proceeds to Morrison, less McClain's feed costs and handling fee. Morrison is owed $789,452 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

28.     Intervenor Lesh Family Trust (LFT) is an Oklahoma entity. LFT did business with McClain since at least 2017. During that time, LFT would purchase cattle from McClain for feeding and care at a McClain feedyard.  LFT typically issued checks drawn on its bank which were deposited by McClain into an account at Mechanics Bank or CFSB pursuant to an invoice and projected closeout received from McClain. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of LFT's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for LFT. McClain would then remit the sales proceeds to LFT, less McClain's feed costs and handling fee. LFT is owed $776,745.49 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever

accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

29.      Intervenor Gary and Jan Lesh are a citizens of Oklahoma. Gary and Jan did business with McClain since at least 2016. During that time, Gary and Jan would purchase cattle from McClain for feeding and care at a McClain feedyard.  Gary and Jan at times wired the purchase funds directly into a McClain account at Mechanics Bank or CFSB pursuant to an invoice and projected closeout received from McClain or delivered a handwritten check to McClain.  The wire transfer form would indicate the number of head purchased, the type of cattle, the weight of the cattle, and the price per pound. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Gary and Jan's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Gary and Jan. McClain would then remit the sales proceeds to Gary and Jan, less McClain's feed costs and handling fee. Gary and Jan are owed $330,335.37 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

30.      Intervenor Jared Lesh is an individual with citizenship in Texas. Mr. Lesh did business with McClain since at least 2018. During that time, Mr. Lesh would either purchase cattle from McClain or deliver cattle to McClain, in both instances for feeding and care at a McClain feedyard.  When purchasing cattle, Mr. Lesh typically wired the purchase funds directly into a McClain account at Rabobank or Mechanics Bank pursuant to an invoice and projected closeout received from McClain. At other times, he wrote a check for the cattle. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Lesh's cattle by McClain, McClain would have the proceeds delivered into his account earmarked

for Mr. Lesh. McClain would then remit the sales proceeds to Mr. Lesh, less McClain's feed costs and handling fee. Mr. Lesh is owed $7,699,133.33 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. Mr. Lesh representatives personally inspected his cattle on site at the McClain facilities. Many of Mr. Lesh's business transactions with McClain involved purchasing cattle from McClain and then initially having the cattle delivered to the Mr. Lesh's property; they were then used in rodeos and other shows. Then, Mr. Lesh would transfer the cattle back to the McClain for feeding and care until the cattle were ready to be sold to a third party. Mr. Lesh's transactions with McClain included housing between 1,000 and 1,500 head of cattle at the Lesh property for use in horse shows for a period of five to ten days at which time they were then shipped to the McClain for feeding and care until the cattle were sold.

31.     Intervenor Joel Brookshire is an individual with citizenship in Texas. Mr. Brookshire did business with McClain for several years. During that time, Mr. Brookshire would purchase cattle from McClain for feeding and care at a McClain feedyard. Mr. Brookshire typically wired the purchase funds directly into a McClain account at Mechanics Bank or CFSB pursuant to an invoice and projected closeout received from McClain. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party. After the sale of Mr. Brookshire's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Brookshire. McClain would then remit the sales proceeds to Mr. Brookshire, less McClain's feed costs and handling fee. Mr. Brookshire is owed $315,000 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. Mr. Brookshire

personally inspected his cattle at McClain facilities from time to time and McClain would identify
and show him his cattle.

32.     Intervenor Gene Brookshire Family Limited Partnership (GBF) is a Texas entity.
GBF did business with McClain since at least 2020. During that time, GBF would purchase cattle
from McClain for feeding and care at a McClain feedyard.  At other times GBF would deliver
cattle to McClain for care and feeding. GBF typically wired the purchase funds directly into a
McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from
McClain.  The wire transfer form would indicate the purchase invoice from McClain, reference lot
numbers, or indicate a cattle purchase. Once the cattle were ready to be sold, McClain would
facilitate the sale of the cattle to a third party.  After the sale of GBF's cattle by McClain, McClain
would have the proceeds delivered into his account earmarked for GBF. McClain would then remit
the sales proceeds to GBF, less McClain's feed costs and handling fee. GBF is owed $6,529,887.87
for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for
after one or more Defendants exercised control over either the cattle, the proceeds or both.

33.     Intervenor Douglas Finley is a citizen of Texas. Mr. Finley did business with
McClain since at least 2022. During that time, Mr. Ryan would purchase cattle from McClain for
feeding and care at a McClain feedyard.  Mr. Ryan typically wired the purchase funds directly into
a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from
McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to
a third party.  After the sale of Mr. Finley's cattle by McClain, McClain would have the proceeds
delivered into his account earmarked for Mr. Finley. McClain would then remit the sales proceeds
to Mr. Finley, less McClain's feed costs and handling fee. Mr. Finley is owed $99,921.28 for cattle

purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

34.    Intervenor Scarlet and Black Cattle, LLC (SBC) is an entity formed under the laws of Texas. SBC did business with McClain since at least 2021. During that time, SBC would at times purchase cattle from McClain for feeding and care at a McClain feedyard and at other times deliver cattle to McClain for feeding and care.  When purchasing cattle, SBC typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of SBC's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for SBC. McClain would then remit the sales proceeds to SBC, less McClain's feed costs and handling fee. SBC is owed $3,707,039.52 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. SBC's lender visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by the entity were present at the McClain Texas yards on four separate occasions. Owners of SBC also personally visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by the entity were present at the McClain Texas yards. SBC entered into separate "Forward Contract Agreements" with McClain, the terms of which clearly outlined that the cattle were forward contracted and the cattle were purchased by SBC through a third party, Langley Cattle. Further, Rabo communicated directly with SBC's lender and misrepresented McClain's financial condition, inducing SBC to continue doing business with McClain.

35.    Intervenor Janice Lawhon is a citizen of Oklahoma. Ms. Lawhorn did business with McClain since at least 2019. During that time, Ms. Lawhorn would purchase cattle from McClain

for feeding and care at a McClain feedyard.  Ms. Lawhorn typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  The wire transfer form would indicate the number of head purchased, the type of cattle, the weight of the cattle, and the price per pound. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Ms. Lawhorn's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Ms. Lawhorn. McClain would then remit the sales proceeds to Ms. Lawhorn, less McClain's feed costs and handling fee. Ms. Lawhorn is owed $149,488.75 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

36.     Intervenor Jordan Lesh, LLC is an Oklahoma entity. Jordan Lesh, LLC did business with McClain since at least 2022. During that time, Jordan Lesh, LLC would purchase cattle from McClain for feeding and care at a McClain feedyard.  Jordan Lesh, LLC typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Jordan Lesh, LLC's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Jordan Lesh, LLC. McClain would then remit the sales proceeds to Jordan Lesh, LLC, less McClain's feed costs and handling fee. Jordan Lesh, LLC is owed $315,238.95 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

37.     Intervenor Bryan Blackman is a citizen of Oklahoma. Mr. Blackman did business with McClain since at least 2021. During that time, Mr. Blackman would purchase cattle from

McClain for feeding and care at a McClain feedyard.  Mr. Blackman typically wired the purchase

funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected

closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate

the sale of the cattle to a third party.  After the sale of Mr. Blackman's cattle by McClain, McClain

would have the proceeds delivered into his account earmarked for Mr. Blackman. McClain would

then remit the sales proceeds to Mr. Blackman, less McClain's feed costs and handling fee. Mr.

Blackman is owed $661,956.48 for cattle purchased from McClain, yet neither the cattle nor the

proceeds were ever accounted for after one or more Defendants exercised control over either the

cattle, the proceeds or both.

38.    Intervenor Steve T Scott Farm, Inc. (SSF) is a Mississippi entity.    SSF would

purchase cattle from Scott Livestock.  The purchase price would include delivery to McClain's

feedyards.  SSF would pay McClain the monthly feed bill directly to McClain. The cattle would

be forward contracted back to Scott Livestock and Scott Livestock would contract the cattle

McClain.  McClain would pay Scott Livestock for the cattle when shipped.  Scott Livestock would

then pay SSF for the cattle. SSF personally inspected and counted the cattle one to two times each

year at both McClain Texas yard locations, and the in person physical count would always match

the records for the number of cattle that should be present. SSF's lender, Land O' Lakes Finance,

would also perform routine in-person inspections of the cattle at the McClain Texas yards.

39.    Intervenor Scott Livestock Company, Inc. is a Mississippi entity. Scott Livestock

purchases cattle and then resells the cattle as a dealer.  Scott Livestock would sell cattle to McClain.

Scott Livestock sold and delivered cattle to McClain on April 12, 2023.  McClain failed to pay for

the cattle in the amount of $252,689.84.  If Scott Livestock would have known about Rabo's

control at the time, Scott Livestock would not have delivered the cattle.  This was a time when

Rabo was in control of McClain through its CRO and Scott Livestock was induced by Rabo to deliver cattle at a time when Rabo had frozen the McClain accounts. Rabo thereafter exercised control over the cattle for its own benefit to reduce the debt owed to it. This constitutes conversion and fraud as more specifically outlined below.

40.     Intervenor Arnold Braun Trust (ABT) is an Indiana entity. ABT did business with McClain since at least 2021. During that time, ABT would purchase cattle from McClain for feeding and care at a McClain feedyard. ABT typically wrote a check for purchase of cattle and the checks were deposited into a McClain account at Mechanics Bank all pursuant to an invoice and projected closeout received from McClain. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party. After the sale of ABT's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for ABT. McClain would then remit the sales proceeds to ABT, less McClain's feed costs and handling fee. ABT is owed $562,232.17 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

41.     Intervenor Robert Braun is a citizen of Indiana. Mr. Braun did business with McClain since at least 2015. During that time, Mr. Braun would purchase cattle from McClain for feeding and care at a McClain feedyard. Mr. Braun typically wrote a check for purchase of cattle and the checks were deposited into a McClain account at Mechanics Bank all pursuant to an invoice and projected closeout received from McClain. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party. After the sale of Mr. Braun's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Braun. McClain would then remit the sales proceeds to Mr. Braun, less McClain's feed costs and

handling fee. Mr. Braun is owed $345,547.65 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

42.     Intervenor Jim Rininger is a citizen of Indiana Mr. Rininger did business with McClain since at least 2012. During that time, Mr. Rininger would sell cattle to McClain and at other times would purchase cattle from McClain for feeding and care at a McClain feedyard.  When purchasing cattle from McClain, Mr. Rininger write a check which was deposited into a McClain account at Mechanics Bank, all pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Rininger's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Rininger. McClain would then remit the sales proceeds to Mr. Rininger, less McClain's feed costs and handling fee. Mr. Rininger is owed $240,778.44 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. Rininger purchased cattle directly from Riley Livestock, and those cattle were then kept at the McClain Texas yards for feeding and care until the cattle were of such a size to be sold to a feedyard.

43.     Intervenor Robert Spring is a citizen of Oklahoma.  Mr. Spring did business with McClain since at least 2022. During that time, Mr. Spring would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Spring typically wrote a check for purchase of cattle and the checks were deposited into a McClain account at Mechanics Bank all pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Spring's cattle

by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Spring. McClain would then remit the sales proceeds to Mr. Spring, less McClain's feed costs and handling fee, or roll over the proceeds for a new purchase of cattle. Mr. Spring is owed $160,797 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

44.     Intervenor Michael and Miranda Evans are citizens of Kentucky. Evans did business with McClain since at least 2021. During that time, Evans would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Braun typically wrote a check for purchase of cattle and the checks were deposited into a McClain account at Mechanics Bank all pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Evans's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Evans. McClain would then remit the sales proceeds to Evans, less McClain's feed costs and handling fee. Evans is owed $200,812.14 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.  In addition, McClain executed a Landlord Waiver and Cone=sent to Collateral Access in favor of Evans bank, River Valley Ag Credit.  Therein, McClain understood and agreed that Evans would be placing cattle on his property, that such cattle were collateral for River Valley, and agrees not to assert any claim or interest in the cattle.

45.     Intervenor Charles Lockwood is a citizen of Oklahoma. Mr. Lockwood did business with McClain since at least 2018. During that time, Mr. Lockwood would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Lockwood typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected

closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Lockwood's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Lockwood. McClain would then remit the sales proceeds to Mr. Lockwood, less McClain's feed costs and handling fee. Mr. Lockwood is owed $1,948,696.94 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. The last payment in the amount of $655,789.90 issued to Mr. Lockwood by McClain was returned for insufficient funds. This was done after Rabo and Mechanics Bank converted AJT's cattle and/or proceeds and then knowingly and wrongfully dishonored the check. Mr. Lockwood's lender visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by Mr. Lockwood were present at the McClain Texas yards.  In addition, every set of cattle purchased from McClain is evidenced by a separate promissory note, security agreement, and financing statement in favor of Mr. Lockwood's lender, American Nation Bank.

46.    Intervenor Cole Lockwood is a citizen of Oklahoma. Mr. Lockwood did business with McClain since at least 2018. During that time, Mr. Lockwood would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Lockwood typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Lockwood's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Lockwood. McClain would then remit the sales proceeds to Mr. Lockwood, less McClain's feed costs and handling fee. Mr. Lockwood is owed $576,533.01 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the

cattle, the proceeds or both. Mr. Lockwood's lender visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by Mr. Lockwood were present at the McClain Texas yards. In addition, every set of cattle purchased from McClain is evidenced by a separate promissory note, security agreement, and financing statement in favor of Mr. Lockwood's lender, American Nation Bank.

47.    Intervenor Sherle Lockwood is a citizen of Oklahoma. Mr. Lockwood did business with McClain since at least 2018. During that time, Mr. Lockwood would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Lockwood typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Lockwood's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Lockwood. McClain would then remit the sales proceeds to Mr. Lockwood, less McClain's feed costs and handling fee. Mr. Lockwood is owed $766,041.83 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. Mr. Lockwood's lender visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by Mr. Lockwood were present at the McClain Texas yards. In addition, every set of cattle purchased from McClain is evidenced by a separate promissory note, security agreement, and financing statement in favor of Mr. Lockwood's lender, American Nation Bank.

48.    Intervenor Nikki Lockwood is a citizen of Oklahoma.  Ms. Lockwood did business with McClain since at least 2021. During that time, Ms. Lockwood would purchase cattle from McClain for feeding and care at a McClain feedyard.  Ms. Lockwood typically wired the purchase

funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party. After the sale of Ms. Lockwood's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Ms. Lockwood. McClain would then remit the sales proceeds to Mr. Lockwood, less McClain's feed costs and handling fee. Ms. Lockwood is owed $389,578.09 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. Ms. Lockwood's lender visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by Ms. Lockwood were present at the McClain Texas yards. In addition, every set of cattle purchased from McClain is evidenced by a separate promissory note, security agreement, and financing statement in favor of Ms. Lockwood's lender, American Nation Bank.

49.     Intervenor Lyndal Van Buskirk is a citizen of Oklahoma. Mr. Van Buskirk did business with McClain since at least 2018. During that time, Mr. Van Buskirk would purchase cattle from McClain for feeding and care at a McClain feedyard. Mr. Van Buskirk typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain. Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party. After the sale of Mr. Van Buskirk's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Van Buskirk. McClain would then remit the sales proceeds to Mr. Van Buskirk, less McClain's feed costs and handling fee. Mr. Van Buskirk is owed $4,944,432.51 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. Mr. Van Buskirk's lender

visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by Mr. Van Buskirk were present at the McClain Texas yards.  Mr. Van Buskirk also personally inspected his cattle at the feed yard. In addition, every set of cattle purchased from McClain is evidenced by a separate promissory note, security agreement, and financing statement in favor of Mr. Van Buskirk's lender, American Nation Bank.

50.    Intervenor Janet Van Buskirk is a citizen of Oklahoma.  Ms. Van Buskirk did business with McClain since at least 2020. During that time, Ms. Van Buskirk would purchase cattle from McClain for feeding and care at a McClain feedyard.  Ms. Van Buskirk typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Ms. Van Buskirk's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Ms. Van Buskirk. McClain would then remit the sales proceeds to Ms. Van Buskirk, less McClain's feed costs and handling fee. Ms. Van Buskirk is owed $484,475.35 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. Ms. Van Buskirk's lender visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by Ms. Van Buskirk were present at the McClain Texas yards.  In addition, every set of cattle purchased from McClain is evidenced by a separate promissory note, security agreement, and financing statement in favor of Van Buskirk's lender, American Nation Bank. Ms. Van Buskirk personally visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by Ms. Van Buskirk were present at the McClain Texas yards.

51.    Intervenors Colby Van Buskirk and Susan Van Buskirk are citizens of Oklahoma. Van Buskirk did business with McClain since at least 2021. During that time, Van Buskirk would purchase cattle from McClain for feeding and care at a McClain feedyard.  Van Buskirk typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Van Buskirk's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Van Buskirk. McClain would then remit the sales proceeds to Van Buskirk, less McClain's feed costs and handling fee. Van Buskirk is owed $605,885.29 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. Van Buskirk's lender visited the McClain Texas yards to inspect the yards and confirm that the cattle owned by Van Buskirk were present at the McClain Texas yards.  In addition, every set of cattle purchased from McClain is evidenced by a separate promissory note, security agreement, and financing statement in favor of Van Buskirk's lender, American Nation Bank.

52.    Intervenor Jimmy Greer is a citizen of Kentucky.  Mr. Greer did business with McClain since at least 2020. During that time, Mr. Greer would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Greer typically wrote a check for purchase of cattle and the checks were deposited into a McClain account at Mechanics Bank all pursuant to an invoice and projected closeout received from McClain.  Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Greer's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Greer. McClain would then remit the sales proceeds to Mr. Greer, less McClain's feed costs and handling

fee. Mr. Greer is owed $354,918.73 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both.

53.    Intervenor Dustin Johnson is a citizen of Mississippi.  Mr. Johnson did business with McClain since at least 2021. During that time, Mr. Johnson would purchase cattle from McClain for feeding and care at a McClain feedyard.  Mr. Johnson typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  The wire transfer form would indicate that the purpose of the wire was to "Purchase Cattle.". Once the cattle were ready to be sold, McClain would facilitate the sale of the cattle to a third party.  After the sale of Mr. Johnson's cattle by McClain, McClain would have the proceeds delivered into his account earmarked for Mr. Johnson. McClain would then remit the sales proceeds to Mr. Johnson, less McClain's feed costs and handling fee. Mr. Johnson is owed $201,446.78 for cattle purchased from McClain, yet neither the cattle nor the proceeds were ever accounted for after one or more Defendants exercised control over either the cattle, the proceeds or both. As Mr. Johnson purchased cattle from McClain; the cattle would initially be delivered to Johnson for use in team pennings and ranch sortings, and then the cattle would be sent back to the McClain Texas yards for feeding and care until the cattle were of such a size to be sold to a feedyard. On occasion, Mr. Johnson also sold cattle directly to McClain.

54.    Intervenor Dora Blackman is a citizen of Oklahoma. Ms. Blackman did business with McClain since at least 2021. During that time, Ms. Blackman would purchase cattle from McClain for feeding and care at a McClain feedyard.  Ms. Blackman typically wired the purchase funds directly into a McClain account at Mechanics Bank pursuant to an invoice and projected closeout received from McClain.  The wire transfer form would identify the type and head count

of cattle purchased. Once the cattle were ready to be sold, McClain would facilitate the sale of the

cattle to a third party.  After the sale of Ms. Blackman's cattle by McClain, McClain would have

the proceeds delivered into his account earmarked for Ms. Blackman. McClain would then remit

the sales proceeds to Ms. Blackman, less McClain's feed costs and handling fee. Ms. Blackman is

owed $53,651.36 for cattle purchased from McClain, yet neither the cattle nor the proceeds were

ever accounted for after one or more Defendants exercised control over either the cattle, the

proceeds or both.

55.     Intervenor Ridgefield Capital Asset Management, LP is a limited partnership

located in Ridgefield, CT, which during all periods of time applicable to this lawsuit was

conducting business in various locations in Texas, including Deaf Smith County. Ridgefield

entered into a written agreement with McClain for the feeding of cattle. Under the terms of the

agreement, Ridgefield-owned cattle would be kept at the Texas McClain yards for feeding and

care, until such time as the cattle were marketed on Ridgefield's behalf by McClain. A Ridgefield

representative was in constant communication with Brian McClain at all times during their

business relationship to discuss shipping dates, lot numbers, updates on cattle, and related details.

Ridgefield sent a personal representative to the McClain Texas yards to inspect the Ridgefield-

owned cattle on site.

56.     Intervenor Robert Ellis is an individual, who is a resident of Easton, MD, who

during all periods of time applicable to this lawsuit was conducting business in various locations

in Texas, including Deaf Smith County. Ellis entered into a written agreement with McClain for

the feeding of cattle. Under the terms of the agreement, Ellis-owned cattle that were to be kept at

the Texas McClain yards for feeding and care, until such time as the cattle were marketed by

McClain on Ellis' behalf. Ellis communicated with McClain regularly, and he personally visited the McClain Texas yards to identify and inspect the cattle he owned in the McClain Texas yards.

57.     Intervenor Big Seven Capital Partners, LLC, is an Ohio limited liability company authorized to do business in Texas, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County. Big Seven entered into its own unique Cattle Feeding Master Agreement with McClain, outlining the terms of the relationship between the parties. Under the terms of the agreement, Big Seven entrusted cattle it owned to McClain for feeding and care at the McClain Texas yards, until such time as the cattle were marketed on Big Seven's behalf by McClain. Big Seven owner visited McClain at the McClain farm in Kentucky in December 2022, to discuss and sign the master agreement. During the course of its business relationship with McClain, a representative for Big Seven personally visited the McClain Texas yards to view and inspect the cattle and yards in Texas. Big Seven was in constant communication with McClain to discuss shipping dates, lot numbers, updates on cattle, and related details.

58.     Intervenor Carraway Cattle, LLC is a Texas limited liability company, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County. Carraway Cattle entered into a written agreement with McClain for the feeding of cattle. Under the terms of the agreement, Carraway Cattle owned cattle would be kept at the Texas McClain yards for feeding and care, until such time as the cattle were marketed by McClain on Carraway Cattle's behalf. Carraway Cattle owner visited McClain at the McClain farm in Kentucky in December 2022 to discuss terms for buying and selling cattle. A representative for Carraway Cattle also personally visited the McClain Texas yards to view and inspect the cattle

and yards in Texas. Carraway Cattle owner Robert Carraway was in constant communication with McClain to discuss shipping dates, lot numbers, updates on cattle, and related details.

59.     Intervenor Richard Carraway is an individual residing in Tennessee, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County. Richard Carraway has been in the cattle business for many years. He entered into a written agreement with McClain for cattle feeding and care. Under the terms of that agreement, McClain would feed and care for Carraway's cattle until such time as the cattle were ready to be marketed.  McClain would assist with or handle the marketing of the cattle and remit payment to Carraway. Richard Carraway visited McClain at his farm in Kentucky to learn more about his operation and to view the office and pens there. Richard Carraway also personally visited the McClain Texas yards to identify and inspect the cattle he owned in the McClain yards.

60.     Intervenor Drew Phillips is an individual residing in Jackson, TN, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County. Drew Phillips entered into a written agreement with McClain for cattle feeding and care at the McClain Texas yards. Under the terms of that agreement, McClain would feed and care for Phillips' cattle until such time as the cattle were ready to be marketed. McClain would assist with or handle the marketing of the cattle and remit payment to Phillips. During the course of his business relationship with McClain, Phillips personally visited the McClain Texas yards and inspected his cattle there. Phillips also made multiple trips to the McClain farm in Kentucky to inspect the farm and cattle operations there. On occasion, McClain would provide a video to Phillips to report to Phillips on the status of his cattle in the McClain yards.

61.     Intervenor Barry Phillips is an individual residing in Medina, TN, and during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County. Barry Phillips has been in the cattle business for many years. He entered into a written agreement with McClain for cattle feeding and care. Under the terms of that agreement, McClain would feed and care for Phillips' cattle until such time as the cattle were ready to be marketed.  McClain would assist with or handle the marketing of the cattle and remit payment to Phillips. During the course of his business relationship with McClain, Phillips had a representative visit the McClain Texas yards and inspected his cattle there. Phillips also visited the McClain farm in Kentucky to inspect the farm and cattle operations there. On occasion, McClain would provide a video to Phillips to report to Phillips on the status of his cattle in the McClain yards.

62.     Intervenor Priest Cattle Company, Ltd is a Texas limited partnership, which, during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County. Priest Cattle Company operates a large cattle operation with multiple facilities across the State of Texas. It transacts with numerous feeding facilities in addition to the McCain yards. From 2016 until 2023, Priest Cattle Company and its lender, National Finance Credit Corp. maintained a strict procedure by which they regularly identified and documented the animals subject to their ownership and interest at each McClain yard. Cattle were purchased and then placed on feed at one of McClain's grow yards or at Tommy Hefner's yard several miles west of McClain's Friona yard. Mr. Priest would inspect the cattle in the Texas yards at least quarterly, but often more frequently than that. Each time, he would inspect his cattle and confirm that the cattle were branded and had the corresponding lot number in each animal's ear tag. These brands were registered with each respective county that cattle were located. Moreover,

Priest Cattle Company's lender, National Finance Credit Corp, would perform bi-annual cattle inspections, where an inspector for the bank would go by and inspect, count and confirm the owned cattle. In addition, National Finance made the necessary filings in the public records to provide notice to lenders and other third parties of the existence of Priest's and National Finance's ownership and interest in cattle on site at the McClain yards by brand identification. They also secured an agreement with Rabo and McClain to clarify the ownership and priority of these cattle.

63.     Intervenor Priest Victory Investment LLC is a Texas limited liability company, which, during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County. Priest Victory maintained a strict procedure by which its principal, Cory Priest, regularly identified and documented the number of animals subject to its ownership and interest at each McClain yard. Cattle were purchased and then put on feed at one of McClain's grow yards or at Tommy Hefner's yard several miles west of McClain's Friona yard. Mr. Priest would typically get by to see all cattle in the Texas yards quarterly, but often more frequently than that. Every time, he would inspect cattle and make certain cattle were branded and had the corresponding lot number in each animal's ear tag. These brands were registered with each respective county that cattle were located.

64.     Intervenor W. Robbie Russell Living Trust is an entity formed under the laws of Tennessee, which, during all periods of time applicable to this lawsuit was conducting business in various locations in Texas, including Deaf Smith County. Russell, as Trustee, purchased and maintained cattle on feed at McClain's Kentucky yard, and in 2022 expanded to purchase and feed cattle at McClains facilities in Texas. Russell made, at a minimum, three trips to the Kentucky yard each year with McClain, during which he would drive through the yard, inspect cattle and verify ear tag numbers for the cattle confirming that they matched his records. When Russell began

to purchase and feed cattle in Texas, he made at least two trips annually to McClain's yards to visually inspect, count, and confirm the cattle on feed.

65.     Intervenor Eddie Stewart is an individual who resides in Brownsville, Tennessee, who during all periods of time applicable to this lawsuit conducted business in various locations in Texas, including Deaf Smith County. Stewart purchased and maintained cattle on feed at McClain's Kentucky yard, and in 2022 expanded to purchase and feed cattle at McClains facilities in Texas. On many occasions, Stewart went with McClain to buy calves at sale barns. Moreover, Stewart made, at a minimum, three trips to the Kentucky yard each year with McClain, during which he would drive through the yard, inspect cattle and verify ear tag numbers for the cattle confirming that they matched his records. When Stewart began to purchase and feed cattle in Texas, he made at least two trips annually to McClain's yards to visually inspect, count, and confirm the cattle on feed.

66.     Defendant Rabo AgriFinance LLC is a limited liability company that does business in various locations in Texas, including Deaf Smith County.  Rabo has appeared in this lawsuit and will be served through its attorneys of record. Rabo is a direct subsidiary of Utrecht-America Holdings, Inc., which is a subsidiary of Coöperative Rabobank U.A., a Dutch multinational banking and financial services company headquartered in Utrecht, Netherlands.

67.     Defendant Rabo Diversified Services, LLC is a Delaware limited liability company. Rabo Diversified Services, LLC is a direct subsidiary of Utrecht-America Holdings, Inc., which is a subsidiary of Coöperative Rabobank U.A. Rabo Diversified Services, LLC has appeared in this lawsuit and will be served through its attorneys of record.

68.     Defendant Mechanics Bank is a California stock corporation that does business in Texas.  Mechanics Bank is also the successor by acquisition to Rabobank N.A., which, prior to the

acquisition, was a subsidiary of Coöperative Rabobank U.A.  Mechanics Bank has appeared in this lawsuit and will be served through its attorneys of record.

69.     Defendant HTLF Bank, as successor to First Bank & Trust ("HTLF") is a Colorado corporation, that does business in various locations in Texas.  HTLF has appeared and answered in this lawsuit and will be served through its attorneys of record.

70.     Defendant Shawn Ragland is an individual who resides in the State of Texas.  Mr. Ragland has appeared in this lawsuit and will be served through his attorneys of record.

71.     Defendant Meagan Goad is an individual who resides in the State of Kentucky.  Ms. Goad has appeared in this lawsuit and will be served through her attorneys of record.

72.     Defendant CFSB is a corporation formed and existing under the laws of the State of Kentucky. Publicly available online records maintained by the Kentucky Secretary of State indicate that CFSB hosts its principal office at 221 West Fifth Street, P.O. Box 467, Benton, Kentucky, 42025. CFSB can be served with this lawsuit through its registered agent for service of process, Michael Radcliffe, at 221 West Fifth Street, P.O. Box 467, Benton, Kentucky 42025.

## IV.
## ADDITIONAL FACTUAL BACKGROUND SUPPORTING PLAINTIFFS' AND INTERVENORS' CLAIMS

**A.    Plaintiffs and Intervenors Entered Long-Standing Business Relationships with McClain Based on His Representations.**

73.     As referenced above, each Plaintiff and Intervenor conducted business with McClain. While the specific details of each business relationship varied as described herein, the general arrangement operated as follows: Plaintiffs and Intervenors either (1) entrusted McClain to procure calves on their behalf, which were then received and fed at McClain's feed yards, or (2) delivered cattle to McClain for feeding. Under both scenarios, the cattle remained at McClain's facilities until they reached a specified weight, at which point the cattle would be sold to a finishing

yard.  As part of these arrangements, Plaintiffs and Intervenors prepaid McClain for the cattle and feed costs in many instances.

74.    McClain expressly represented—and Plaintiffs and Intervenors reasonably relied upon these representations and expected—that McClain would hold both the prepaid funds and any cattle purchased with those funds in trust for their exclusive benefit. McClain further represented that these funds would be segregated and used solely for the benefit of the respective Plaintiff or Intervenor who provided them. Once the cattle were sold to a finishing yard, McClain consistently represented that he would distribute the net proceeds from the sale of the cattle according to a predetermined split, with two-thirds (2/3) of the proceeds going to the respective Plaintiff or Intervenor and one-third (1/3) of the proceeds retained by McClain as compensation for his services..

75.    Plaintiffs and Intervenors conducted business with one or more of the McClain entities for substantial periods of time, with some Intervenors maintaining business relationships spanning over ten years, while other Plaintiffs and Intervenors had established relationships lasting two to seven years. These extended commercial relationships were built on trust and McClain's repeated representations regarding the handling of their funds and cattle. Throughout these respective periods of business dealings, the Intervenors had consistently received payments from McClain in accordance with his representations and had experienced no problems or irregularities in receiving money owed to them from McClain. This established track record of performance over multiple years gave Plaintiffs and Intervenors reasonable grounds to rely upon McClain's representations regarding the trust arrangement and the segregation of their funds and cattle.

76.    However, unbeknownst to Plaintiffs and Intervenors at the time they entered these business arrangements and throughout the course of their relationships with McClain, McClain's

cattle-feeding operations became heavily financed and controlled by Rabo beginning in 2018. Rather than protecting the interests of cattle owners like Plaintiffs and Intervenors, Rabo—along with other financial institutions including Mechanics Bank, CFSB, and HTLF Bank as described further herein—enabled and facilitated McClain's fraudulent scheme, including a check kiting scheme, by continuing to extend credit and maintain financing relationships despite having actual knowledge of the high-risk nature of McClain's operations and the significant exposure this created for innocent third parties who had entrusted their cattle and funds to McClain's care.

B.     **Rabo Aided and Assisted McClain's Fraudulent Scheme By Continuously Extending Credit to McClain Despite Knowing Its Operations Posed High Risk and Significant Exposure.**

77.     Rabo[1] is one of the largest lenders in the agricultural industry in the United States and has over 100 years of experience in the agriculture lending industry. Rabo touts its robust understanding of all segments of the agricultural industry, including cattle feeding, with a nationwide team of agricultural lenders, financial analysts, and other leading professionals in the agricultural finance space. Rabo's own website explains that its "Relationship Managers are agricultural specialists with global networks and local knowledge, on-farm experience and financial expertise…."

78.     Starting in about 2018, Rabo allowed McClain to expand his cattle-feeding operations from Kentucky into the Texas Panhandle—the cattle-feeding capital of the world. However, this expansion followed an earlier period of significant concern regarding McClain's financial practices.

---

[1] Rabo AgriFinance, LLC provides financing to agribusiness in North America. Rabo Diversified Services LLC is a related entity that, on information and belief, provides operations support and other support services to Rabo AgriFinance LLC. Employees of both entities were engaged in Rabo's action that are the basis of this litigation, and some employees are at time identified as associated with both entities.

79.     In October 2017, McClain Feed Yard ("MFY"), operated by Brian McClain, sought credit from Rabo but was denied based on alarming "red flags" contained in a Pre-Funding Collateral Inspection Report prepared by its lead inspector. The report documented severe deficiencies that should have permanently disqualified McClain from any future lending relationship, including grossly inadequate accounting records, fundamentally unreliable borrowing base reports, and an extremely high risk of inaccurate financial reporting. The inspection revealed that MFY operated without any proper accounting systems whatsoever, relying instead on primitive manual bookkeeping with no accurate general ledger or trial balance available. The company's financial records were in complete disarray, and even MFY's external bookkeeper admitted that the books had never been adequately established. Most disturbingly, Rabo initially reported that MFY was maintaining two separate sets of books—a classic indicator of fraudulent activity—and although this finding was later quietly retracted, MFY remained unable to produce balanced financial statements or provide accurate data for even the most basic financial metrics.

80.     The deficiencies extended far beyond mere bookkeeping problems. MFY's borrowing base documentation was fundamentally flawed and inconsistent, lacking any standardized methodology to accurately value cattle inventory. MFY's borrowing base calculations relied on grossly oversimplified and wholly unsupported pricing methods that failed to meet even minimal industry standards, much less Rabo's purported credit requirements. Rabo's lead inspector explicitly warned that MFY lacked any adequate system for maintaining financial records and would require "extensive oversight and coaching" to meet even the most rudimentary reporting standards. The inspector categorized MFY's operations as presenting a "high information risk" due to the company's complete failure to maintain proper documentation for intercompany transactions, accounts payable, and other critical financial activities. The absence of any

meaningful internal controls, combined with MFY's demonstrated inability to provide basic financial reports or reconcile fundamental accounts, led Rabo to conclude definitively that MFY was not creditworthy. In December 2017, Rabo declined to extend credit to MFY based on these serious and foundational deficiencies.

81.    Despite this, Rabo officers Chip Lawson ("Lawson") and Jason Dunn ("Dunn") aggressively pushed to overturn the rejection. Their efforts sidelined other staff and pressured the process until approval was secured. For instance, when a senior credit officer objected, they dismissed his concerns as "giving us problems." Dunn even threatened to "blow up and lose my job" if the credit line was denied, largely because the facility would represent the region's largest loan and generate millions in revenue for Rabo.

82.    Although Dunn later conceded that the request carried "clear warning signs," including poor recordkeeping that could cause serious issues, Lawson pressed forward. This was going to be his "Golden Goose." He mocked the cautious credit officer, proposing a bet on the outcome, and urged that internal lending policies should be bent to make the deal acceptable. Ultimately, Lawson, Dunn, and other supporters wore down opposition, and in mid-2018, the McClain's loan was approved. From then on, Rabo loosened its underwriting standards to consistently renew and increase the Debtors' borrowing capacity.

83.    Rabo staff occasionally filed collateral inspection reports that flagged troubling issues: uncertainty about who actually owned the cattle in the McClain's feedyards, discrepancies in reported headcounts, and an absence of adequate safeguards and operational controls. Nevertheless, in May 2019, Rabo expanded the line of credit to $12 million, then increased it again later that year to $16 million, and again in January 2020.

84.     Over roughly the next three years after the initial green light, Rabo—an institution that touted itself as a seasoned agricultural financier with established safeguards meant to reduce exposure—advanced nearly $2 million in land-backed loans and more than $50 million in working capital to McClain. During this entire period, the same glaring warning signs persisted, the information risk remained acute, and yet McClain's available credit ballooned nearly tenfold. Despite taking on such a significant risk position, Rabo relied almost exclusively on McClain's own limited disclosures and borrowing base statements to judge the stability of his operations. Those reports were driven largely by McClain's claims about how many cattle he supposedly controlled, which Rabo treated as the primary security supporting the multi-million-dollar lending facilities.

85.     Rather than applying the level of scrutiny its own rules and industry expectations demanded, Rabo repeatedly neglected to confirm McClain's assertions through outside audits, detailed collateral checks, or routine financial examinations. Shockingly, Rabo kept expanding McClain's credit even though (1) his accounts with Rabo were chronically overdrawn, and (2) Rabo had long been aware of the severe weaknesses identified back in 2017, including deficient accounting practices, unreliable reporting, and elevated information risk—problems that were never corrected even as his debt exposure soared.

## C.     Mechanics Bank Assists Rabo to Continue to Prop Up McClain Through the Accounts it Managed.

86.     In approximately May 2018, Mechanics Bank began to operate McClain's depository banking functions.  McClain had three separate bank accounts at Mechanics Bank. Rabo's pleadings in Bankruptcy Court allege that it had control over the Mechanics Bank accounts

used by McClain through "deposit account control agreements" (DACAs).[2]  These accounts were "sweep" accounts in which all funds were "swept" to Rabo to pay down McClain's line of credit extended by Rabo.

87.    From the very beginning, McClain's financial instability was unmistakable. Internal records reflect that at the outset of the lending relationship, McClain's account was already overdrawn by $178,547.79. Rather than treating this substantial deficit as a red flag confirming the serious risks previously identified, Rabo pressed forward with expanding his credit. This early overdraft should have been recognized as a concrete indicator that McClain lacked the liquidity and financial discipline to responsibly manage millions in borrowed funds.

88.    Instead of treating McClain's six-figure overdraft as proof of his inability to responsibly manage borrowed funds, Rabo responded by authorizing even more credit. Internal communications show that on the same day the $178,547.79 overdraft surfaced, Rabo officers moved to cover it by requesting approval and referencing a pending $900,000 temporary line increase. This demonstrates that rather than curbing exposure or requiring corrective measures, Rabo's solution was to enlarge McClain's borrowing capacity.  By bailing McClain out through additional lending, Rabo ignored its standards and exacerbated the very risks it had previously identified, transforming an already precarious relationship into one of unchecked expansion.

89.    Items drawn in excess of account balances were consistently covered through four methods: (1) Rabo's extensions of McClain's line of credit, (2) "overline" authorizations when the line was already fully tapped, (3) transfers shuffled between accounts held by different McClain entities, or (4) deposits from outside parties wired into the overdrawn account. Because overdrafts often reached into the millions—occurring with striking frequency—Rabo and Mechanics

---

[2] These allegations may be found in Rabo's Amended Complaint was filed in Cause No. 23-02005-rlj, in the U.S. Bankruptcy Court for the Northern District of Texas, Amarillo Division.

maintained ongoing communications to coordinate how these transactions would be processed.
Rather than halting the pattern, one of their recurring solutions was to continually inject more
credit, whether temporary or permanent. In doing so, Rabo and Mechanics worked hand in glove
to perpetuate McClain's fraudulent conduct, providing him with the financial lifeline necessary to
mask insolvency and expand his scheme.

90.     The coordinated response to McClain's financial crisis reveals the extent of Rabo
and Mechanics' collaborative relationship. When McClain faced a staggering $4,825,299.93
overdraft on December 20, 2019, both institutions immediately mobilized to prevent the company's
collapse. Rather than treating this as a routine banking matter, Mechanics proactively engineered
solutions, calculating that "if we apply all of McClain's funds to 7M the OD is reduced to
$3,191,044.06" while strategically noting they could "return three checks" to manage the shortfall
across both accounts.

91.     Most tellingly, Chip Lawson's communication with Rabo's senior leadership
demonstrates how this crisis became a profit opportunity rather than a liability concern. Lawson
assured Rabo that Mechanics was prepared to "clear this up" and advocated for covering the
overdraft through an over-line advance specifically because it "allows us to earn interest on this
amount." This wasn't damage control—it was calculated financial engineering designed to benefit
both institutions while keeping McClain operational. The swift approval of their "joint plan"
underscores how seamlessly these supposedly independent entities coordinated their response to
protect their mutual interests.  This was not a one-time occurrence, it was an almost daily event
coordinated by both parties.

92.     Repeatedly, upon an overdraft by McClain, Mechanics would contact Rabo to ask
how they should proceed, then the two banks would work together to keep the kite

afloat. Repeatedly, McClain's Customer Relation Manager at Rabo requested that Rabo and Mechanics approve the overdraft based on incoming intracompany or external deposits or advance overline credit to cover it. For example, he would "request payment of the overdraft. Cure is coming from inbound wires of 1,447,315.14 from 2B Farms, 764,744.10 from Sherle Lockwood and 1,145,310.41 from Riley Livestock"; "Cure is as follows; 1. 671K In [McClain's account; 2. 595K from Susan Van Buskirk; 3. 1.5M 2B Farms; 4. 2.2M MAP enterprises"; and "I request approval of this overdraft. The source of cure is 1.3M wire from 2B farms and 1.6M from Lockwood Cattle."

93.    This mode of operation went on even when the overdraft was so large as to elicit a "Holy CRAP!" from the bankers or require higher approval because "I feel like an overdraft of 40% is outside of materiality."

94.    In making the request, Rabo's Customer Relation Manager would cite to incoming wires and deposits that McClain told him would be arriving that day. Often, these included sums incoming from Plaintiffs and Intervenors. In one particular such email in December of 2019, the Customer Relation Manager pointed out that by funding the overdraft through an overline advance, Rabo could "get[] it out of Mechanics' system," "allow[] us to earn interest on th[e] amount," and allowed for a $5,000 fee for the overline service. By doing so, according to the email, representatives of Mechanics and Rabo could work together to "'clear this up' today."

95.    For longer-term resolution of the ongoing overdraft problems and to service McClain's debt, Rabo's Customer Relationship Manager wrote to his supervisor on December 11, 2022, that McClain intended to pursue additional customer cattle relationships to bring in more revenue.

**D.    Rabo Ignores Their Own Policies to Ensure McClain Can Continue to Operate.**

96.    Rabo's own Agricultural Field and Collateral Inspection Department mandated at least semiannual reviews for any loan over $3 million, and the same frequency for loans deemed higher risk. These inspections were designed to deliver a meaningful evaluation of current assets— including their quality, condition, quantity, and valuation—as well as to verify critical information such as budgets, forecasts, accounting practices, and overall business strategies. In other words, these reviews were a cornerstone of Rabo's risk-management framework, meant to prevent exactly the type of misconduct McClain was engaging in.

97.    Yet, in open defiance of its own policies, Rabo performed only occasional and superficial inspections, and never with the regularity or rigor required. The limited reports that were generated flagged serious deficiencies in McClain's operations, but those red flags were brushed aside. Instead of tightening credit or enforcing accountability, Rabo and Mechanics Bank routinely authorized overdrafts and enlarged McClain's borrowing capacity without undertaking even the most basic due diligence. By doing so, both institutions assisted and participated in McClain's ongoing check-kiting and fraudulent activities. Rabo, in particular, for the purpose of aiding and abetting McClain, chose to ignore obvious breaches of its financial reporting requirements, prioritizing short-term profit over institutional integrity. As one Senior Relationship Manager candidly admitted in an October 15, 2020 email, he saw "no issues" with the accounts simply because they had "made like $12mln in profits last year." This statement captures Rabo's posture: rather than enforcing its own standards, it consciously facilitated McClain's scheme, trading compliance for revenue and leaving Plaintiffs and Intervenors to bear the inevitable collapse.

98.    Rabo was not merely negligent—it knowingly enabled McClain's fraudulent enterprise. By this stage, Rabo had actual knowledge that a significant portion of the cattle in

McClain's yards—at least 30%—were owned by outside parties, commonly referred to as "custom feeders," which included Plaintiffs and Intervenors. An internal August 2021 report accompanying the McClain loan consolidation and $45 million credit line extension included an express note and explanation of McClain's custom feeding operation. But unlike Rabo and Mechanics, those custom feeders had no awareness of McClain's precarious financial condition, chronic overdrafts, or repeated violations of Rabo's own reporting requirements. Rabo's internal awareness of these facts created a duty to act. Instead, Rabo chose to conceal the risks, providing the very financing that allowed McClain to continue misleading third parties and prolonging the fraudulent scheme.

99.    Rabo never questioned inconsistent data or obvious fraudulent behavior by McClain.  Rather, Rabo took at face value all of the information McClain told them. Rabo's inspector Michelle Stockett accepted McClain's position that a one percent (1% ) death loss rate in a grow yard as "typical" of the industry, without confirming any independent sources and without asking to see any documentation of death losses. Over the course of the McClain loan, no actual collateral counts were performed; only spot checks. Rabo inspectors were never given yard sheets; any yard sheets that McClain kept were handwritten. Rabo never demanded that the cattle in the McClain yard be marked, tagged, or otherwise identified; some cattle were tagged and some were not. Rabo never questioned McClain about his head counts that were far in excess of permitted capacity and, Rabo inspector Michelle Stockett ignored the glaring discrepancies in the amount of feed purchased as compared to the number of cattle reported to be on feed.

100.    In August 2019, despite mounting concerns and obvious red flags, Rabo extended nearly $5 million in new credit to 7M Feeders, LLC ("7M") to expand McClain's operations with an additional feedyard in the Texas Panhandle. Within a year, Rabo had more than doubled down, extending McClain's credit exposure to approximately $24 million. These infusions of capital were

not defensive or cautious—they were aggressive, profit-driven moves designed to keep McClain's enterprise afloat. Rather than shutting down a borrower who had already demonstrated a pattern of deception and financial mismanagement, Rabo injected liquidity that allowed McClain to continue deceiving his custom feeders and perpetuating the check-kiting scheme.

101.    By 2021, Rabo escalated its involvement further. It rolled McClain Farms, Inc. ("MFI") together with MFY and 7M into a single consolidated loan package, increasing the total credit to $45 million. A Pre-Funding Collateral Inspection Report prepared that same year confirmed what Rabo already knew: McClain's Borrowing Base Certificates (BBCs) were riddled with inaccuracies, unsupported by reliable documentation, and grossly inflated. The report flagged unreliable cattle counts, inflated valuations based on overly optimistic price assumptions, and even identified a $1.6 million error in reported cash balances, exposing a complete lack of internal controls. Yet instead of treating these findings as proof of fraud, Rabo approved the massive loan facility. In doing so, Rabo not only ignored its own lending standards but became a critical financial partner in expanding McClain's fraudulent operations.

102.    By May 2022, McClain's foundation began to collapse, as he was no longer feeding cattle for Friona Industries—a customer Rabo had long acknowledged was vital to McClain's survival. When this fact was discovered during a collateral inspection, Rabo's own Vice President and Senior Regional Credit Officer candidly admitted: "I would agree that Friona pulling out changes the operation drastically. That was what we hung our hat on for the continuous flow of cattle." Despite recognizing that McClain's core business model had disintegrated, Rabo had already spent years inflating his credit, facilitating overdrafts, and approving suspect collateral valuations. In short, Rabo was not a passive lender caught unaware—it was an active enabler, choosing profit over prudence, and directly aiding and abetting McClain's fraudulent scheme.

103.    Rabo's May 2022 Collateral Inspection Report confirmed that McClain's accounting problems had not only continued but had worsened as his operations expanded—exactly as Rabo had long known they would. The report documented a $3.4 million understatement of outstanding checks, irregularities in accounts payable for feed purchases, and another $250,000 in hidden liabilities. The inspector candidly observed that McClain's accounting staff could not keep pace, with serious errors resulting from unreconciled handwritten checks and an outside accountant who was not even aware of key transactions. Stockett raised concerns to the customer relationship team; she expected, but was not receiving, accounting records, borrowing base reports, inventories, yard sheets, feed intake information, other standard documentation for cattle feeding. She also noted the complete lack of any audited financials, despite Rabo's internal policy to require audited financials on any loans over $30 million. These were not innocent mistakes; they were systemic deficiencies that Rabo identified, documented, and then disregarded. By continuing to extend credit in the face of such glaring red flags, Rabo was not protecting itself—it was actively enabling McClain to mask insolvency and perpetuate fraud.

104.    Rabo's own May 11, 2022, Collateral Inspection Report went further, acknowledging that McClain had shifted to personally owning more cattle following the loss of Friona Industries, a change that created an obvious temptation to overstate headcounts to fill the financial gap. The inspector expressly cautioned that McClain's operation required "great discipline" not to expand recklessly and recommended halting any further growth until his accounting processes could meet minimum standards for the then-claimed 70,000 head of cattle. Instead of enforcing these warnings, Rabo once again looked the other way and approved additional lending. In doing so, Rabo knowingly gave McClain the means to inflate numbers and conceal the absence of reliable collateral, furthering the deception on which his scheme depended.

105.    The same inspection revealed that McClain reported a massive receivable tied to feed purchases for cattle that were in fact owned by third parties, not McClain. The receivable equaled nearly one-third of the reported value of feed and grain inventory, confirming that a large portion of the cattle in McClain's facilities were "custom fed" for outsiders. Rabo knew this meant that third parties—including Plaintiffs and Intervenors—owned significant numbers of cattle in McClain's yards, contradicting McClain's repeated representations that he owned the cattle outright. Yet rather than protect those third parties from being misled, Rabo allowed the false representations to persist and continued to prop up McClain's scheme with ever more credit.

**E.     Rabo and Mechanics Bank Aided and Assisted McClain's Fraudulent Activity.**

106.    Even more alarming, Rabo's own inspector acknowledged that she had reviewed McClain's March 2022 bank statements in coordination with Mechanics Bank. Those records revealed significant inflows from third parties. The statements made plain that Plaintiffs and Intervenors were wiring McClain substantial sums of money under the belief they were purchasing cattle, when in reality those funds were being funneled into a fraudulent operation that Rabo and Mechanics were already monitoring:

**Electronic Credits (continued)**

| Date | Description | Amount |
|------|-------------|--------|
| 03/04/2022 | Wire/In/121000248/WELLS FARGO SF/43/THORLAKSON DIAMOND T FEEDERS, LP | $509,593.31 |
| 03/04/2022 | Wire/In/111319347///2B FARMS | $523,971.15 |
| 03/04/2022 | Remote Deposit | $64,796.26 |
| 03/07/2022 | Wire/In/111319347///2B FARMS | $201,968.85 |
| 03/07/2022 | Remote Deposit | $186,421.20 |
| 03/07/2022 | Remote Deposit | $951,851.90 |
| 03/08/2022 | Remote Deposit | $143,309.88 |
| 03/09/2022 | Wire/In/121000248/WELLS FARGO SF/44/THORLAKSON DIAMOND T FEEDERS, LP | $947,187.74 |
| 03/10/2022 | Wire/In/111010170/TIB DALLAS//MUENSTER STATE BANK | $371,225.45 |
| 03/10/2022 | Wire/In/121000248/WELLS FARGO SF/45/THORLAKSON DIAMOND T FEEDERS, LP | $899,317.20 |
| 03/11/2022 | Wire/In/075000022/US BANK WI MILW/220311037353/RIDGEFIELD CAPITAL ASSET MANAGEME | $216,977.09 |
| 03/11/2022 | Wire/In/121000248/WELLS FARGO SF/47/THORLAKSON DIAMOND T FEEDERS, LP | $917,110.35 |
| 03/14/2022 | Wire/In/075000022/US BANK WI MILW/220314021679/RIDGEFIELD CAPITAL ASSET MANAGEME | $358,276.44 |
| 03/14/2022 | Wire/In/121000248/WELLS FARGO SF/48/THORLAKSON DIAMOND T FEEDERS, LP | $903,824.83 |
| 03/15/2022 | Wire/In/121000248/WELLS FARGO SF/50/THORLAKSON DIAMOND T FEEDERS, LP | $301,402.95 |
| 03/16/2022 | Wire/In/082900432/SIMMONS BANK//EDWIN P STEWART | $74,932.90 |
| 03/16/2022 | Wire/In/082900432/SIMMONS BANK//W R RUSSELL JR | $74,932.90 |
| 03/16/2022 | Wire/In/111300958///SCARLET AND BLACK CATTLE LLC | $349,893.42 |
| 03/18/2022 | Wire/In/111300958///SCARLET AND BLACK CATTLE LLC | $64,664.01 |
| 03/21/2022 | Wire/In/062005690/REGIONS BK BHAM//GENE BROOKSHIRE FAMILY LP | $382,931.34 |
| 03/22/2022 | CACTUS FEEDERS F PAYMENT 123456 | $310,574.75 |
| 03/24/2022 | Wire/In/103003616/TBB//CHARLES LOCKWOOD | $226,281.48 |
| 03/25/2022 | Wire/In/103003616/TBB//LYNDAL VANBUSKIRK | $226,281.48 |
| 03/28/2022 | Wire/In/103104528/ARMSTRONG BANK//RONNIE GRAY | $200,153.25 |
| 03/29/2022 | Wire/In/062005690/REGIONS BK BHAM//GENE BROOKSHIRE FAMILY LP | $411,847.30 |

107.    The scope of the fraud that Rabo and Mechanics were monitoring becomes undeniably clear when examining the March 2022 bank statements their own inspector reviewed. In that single month alone, McClain's account received over $7.2 million in wire transfers from victims who believed they were purchasing cattle—including approximately $4.5 million from Thorlakson Diamond Feeders, LP, nearly $800,000 from Gene Brookshire Family LP, over $725,000 from 2B Farms, and more than $414,000 from Scarlet and Black Cattle LLC. These staggering figures demonstrate that Rabo and Mechanics were not merely observing suspicious activity, but were actively facilitating a multi-million dollar cattle fraud scheme by allowing McClain's account to continue operating as a conduit for Plaintiffs' and Intervenors' funds, despite having clear knowledge of the fraudulent nature of the operation.

108.    At this point, Rabo and Mechanics were not outsiders unaware of McClain's misconduct—they were active collaborators. They reviewed the very documents that exposed the falsity of McClain's representations, saw how Plaintiffs' and Intervenors' money was being misused, and nevertheless continued to authorize overdrafts and expand McClain's credit facilities.

Their conscious decision to ignore what they knew, and to keep providing McClain with the banking tools and financing necessary to sustain his deception, made them direct enablers of the fraud. In short, by validating and funding transactions they recognized as improper, Rabo and Mechanics ensured the scheme's survival and growth, to the severe detriment of Plaintiffs and Intervenors.

109.    Despite repeated recommendations—even from within Rabo itself—that McClain retain a qualified Chief Financial Officer and institute proper financial controls, McClain never made those changes. Rabo's own inspector concluded that the absence of effective accounting systems, chronic understaffing, and weak internal controls posed a material financial risk. Yet Rabo management took no steps to enforce these corrections. The reason was simple: the McClain loan was too profitable. Rather than risk losing those revenues, Rabo chose to ignore its own warnings and allowed the deficiencies to persist, thereby ensuring that McClain's fraudulent practices could continue unchecked.

110.    These red flags highlighted the very foundation of McClain's unreliability—his inability to produce accurate financial data, his disregard for reporting requirements, and the fact that large numbers of cattle in his feedyards belonged to third-party custom feeders, including Plaintiffs and Intervenors. Rabo's management consciously disregarded these realities. Instead of tightening controls or initiating investigations, Rabo steadily increased McClain's credit facilities, knowing full well that doing so magnified the risks to third parties who had entrusted funds for cattle purchases and feeding operations. By willfully neglecting its internal findings and refusing to act, Rabo not only violated its own lending policies but became a knowing participant in sustaining and expanding McClain's fraudulent scheme.

**F.      Rabo's Willful Disregard of Borrowing Base Red Flags and McClain's Capacity
Limits.**

111.    Beyond the warnings raised in Rabo's sporadic collateral inspections, McClain's

Borrowing Base Certificates ("BBCs") provided a consistent and undeniable source of evidence

that his operations were fraudulent. Each month, these BBCs purported to show the number of

cattle McClain owned—the single most important collateral for his multi-million-dollar credit

facilities. Yet Rabo knowingly ignored the fact that the headcounts in McClain's reports were

impossible given the physical capacity of his feedyards. By disregarding these glaring

inconsistencies, Rabo did not simply fail in its risk management—it made the intentional choice

to look the other way, allowing McClain's deception to continue so the loans could remain

profitable.

112.    McClain operated two feedlots in Texas, and one he allegedly leased from a third

party, with a combined maximum capacity of approximately 59,000 head of cattle.[3] Despite this

fixed limitation, McClain's January 2022 BBC reported ownership of 75,529 head of cattle,

**exceeding the Texas feedlots' capacity by more than 16,000 head total, including exceeding

one feedlot's purported capacity by 26,000 head**.  Rabo knew this number was false, especially

because McClain was also housing thousands of cattle owned by third-party custom feeders,

including Plaintiffs and Intervenors.  Even Rabo's own employees recognized that McClain's

BBCs listed only 'company-owned" cattle, while omitting the cattle of outsiders. The fraud had

been obvious for years, as the discrepancies appeared in prior reports.  The Table below shows

just how extreme the overstatements were.   Yet, Rabo failed to conduct routine physical

---

[3] However, Rabo knew as of June 21, 2019, that McClain only intended there to be 10,000 head at the 7M facility.
Internal communications between Rabo representatives reveal that "Brian told Matt that he didn't expect to have over
10k head at one time [at the 7M facility]".  Nonetheless, Rabo was pushing for a 40,000 head limit at the facility no
matter what.  This would reduce the capacity of the Texas facilities to between 19,000-49,000 head.

inspections to verify the accuracy of McClain's reports, relying instead on self-reported data without any meaningful verification.

| BBC Date | Head Claimed at McClain Feed Yard | % Capacity |
|---|---|---|
| 4/30/2018 | 8,651 | 288% |
| 7/31/2018 | 9,971 | 332% |
| 7/31/2019 | 15,514 | 517% |
| 7/31/2020 | 21,191 | 706% |
| 7/31/2021 | 25,219 | 841% |
| 7/31/2022 | 31,927 | 1064% |
| 12/31/2022 | 37,924 | 1264% |

*Table 1: McClain Feed Yard had a permitted capacity of 3,000 head according to its Texas Commission on Environmental Quality permit, of which Rabo had knowledge. Purportedly, additional pens leased nearby brought that capacity up to 9,800, but even if the additional capacity existed, over-capacity BBCs were submitted by summer 2018.*

113.    Rabo had actual knowledge that the MFY, under its Texas Commission on Environmental Quality permit, was capped at 3,000 head, with possible leased pens increasing capacity to 9,800. Even assuming the maximum, the reported BBC numbers beginning in 2018 were absurd. Yet Rabo deliberately chose not to conduct routine inspections or cattle counts, preferring instead to accept McClain's fabricated reports at face value, knowing they were false.

114.    The charade escalated in December 2022 when McClain submitted a BBC claiming ownership of more than 87,000 head of cattle—an outright impossibility[4]. In early January 2023, Rabo's upper management acknowledged internally that McClain was claiming more cattle than his yards could ever hold. But instead of shutting down the facility or freezing lending, Rabo approved yet another credit increase, raising McClain's line from $48 million to $55 million. This approval came at a time when his financial statements were past due, and Rabo's own internal reports raised alarms about cash flow problems and nonexistent financial controls.

---

[4] This number is even more egregious considering Rabo knew that 30% of the cattle in McClain feed yards belonged to customers. That would mean there should be an additional 26,000 of customer owned cattle, making the total an astronomical 113,000 head.

115.    Rabo's former Senior Relationship Manager later testified that cattle collateral—not land or other assets—accounted for over 95% of McClain's borrowing base. Yet Rabo never conducted the industry-standard inspections that would have verified whether the collateral even existed. The magnitude of this willful blindness was underscored by a March 4, 2023 email from Rabo's Executive Vice President–Head of Rural Banking, North America, who admitted: **"it has come to my attention that a full headcount/inspection has not been done for over 4 years."** This admission was made only weeks before Rabo declared default, confirming that the bank had consciously chosen for years not to verify the very collateral it claimed justified the loans.

116.    This was no accident. Rabo's refusal to challenge McClain's fabricated BBCs was a calculated decision. The motive was financial: McClain's account generated an extraordinary 43% profit margin for Rabo. That profit gave Rabo every incentive to keep extending credit despite the obvious signs of fraud. If Rabo had conducted even the most basic due diligence—comparing reported headcounts with feedyard capacity or performing physical inspections—it would have exposed the scheme years earlier and been forced to cut ties. Instead, Rabo prioritized profit over policy and knowingly allowed McClain's fraudulent operation to grow unchecked.

117.    Rabo's conduct represents more than negligence. It is evidence of a systemic pattern of willful blindness and intentional disregard of its own lending standards. By ignoring impossible borrowing base numbers, refusing to perform collateral verification, and expanding McClain's credit in the face of overwhelming red flags, Rabo did not just fail to stop fraud—it actively enabled it. This conscious decision to keep the scheme alive caused devastating harm to Plaintiffs, Intervenors, and other unsuspecting creditors who relied on the integrity of McClain's operations.

**G.    Rabo and Mechanics Bank's Knowledge of McClain's Insolvency and Their Participation in Check-Kiting.**

118.    From as early as 2018, both Rabo and Mechanics Bank (formerly Rabobank, N.A., before its 2019 acquisition by Mechanics) had full knowledge of McClain's insolvency. Persistent overdrafts, maxed-out credit lines, and erratic cash flow patterns exposed the fact that McClain's operations were unsustainable. Rather than act to stop the bleeding, Rabo and Mechanics chose to facilitate it, actively concealing McClain's deteriorating financial condition and enabling check-kiting practices that created only the illusion of liquidity.

119.    Overdrafts, regardless of size, were never denied—not once until 2023. Instead, Rabo and Mechanics coordinated to ensure every overdraft was covered, whether through credit extensions, intercompany transfers, or third-party deposits. Emails show the banks even exchanged recommendations on how best to paper over the deficits. This was not passive oversight; it was a joint strategy to keep McClain's scheme alive.

120.    The pattern was clear by October 2018, when McClain Feed Yard (MFY) was overdrawn by $216,000. At Rabo's direction, last-minute wires were arranged to conceal the deficit. This marked the beginning of a years-long practice: overdrafts were never treated as a symptom of fraud, only as bookkeeping problems to be "cured" through credit.

121.    By January 2019, the problem had deepened. MFY was again overdrawn—this time by $96,284.97—with no credit remaining. Rabo's Senior Relationship Manager brushed it off, instructing McClain to wire funds, normalizing overdrafts as routine rather than treating them as evidence of collapse.

122.    The situation reached crisis levels by late 2019. On October 23, 2019, MFY was overdrawn by $2.5 million. Even Rabo's own financial analyst responded in disbelief: "$2.5

million!? WTF…." But despite acknowledging the severity, Rabo still approved the funds to cover it, giving McClain yet another lifeline.

123.    Only five days later, on October 28, MFY was overdrawn by $2.1 million. A Regional Credit Officer approved covering it, noting a "significant cash management issue" and admitting McClain's finances were a "growing concern." Yet again, no corrective action was taken.

124.    November 2019 exposed the depths of the problem. Overdrafts ballooned to $4.3 million on November 1, then to $5.2 million by November 22. Internal emails reveal frustration, but the only "solution" was for Rabo and Mechanics to shift funds around to avoid returned checks.

125.    In December 2019, when 7M was overdrawn by $4.8 million, Rabo's Regional Credit Officer filed a report entitled "Something Seems Strange" (SSS), explicitly noting check-kiting. Even then, Rabo and Mechanics continued to cover overdrafts and extend credit, further embedding itself in the scheme.

126.    That same month, Rabo's Diversified Services Transaction Monitoring Analyst alerted Mechanics Bank that 7M was $4.8 million overdrawn. Mechanics Bank responded with detailed proposals on how to move funds—including using MFY's line of credit and account balances—so the overdraft could be concealed. Later that day, Rabo's Senior Relationship Manager proposed covering the remainder with expected deposits and a 60-day temporary credit increase, casually blaming a "gross miscalculation" by McClain. This exchange shows not only knowledge, but coordinated efforts by both banks to keep the fraud alive.

127.    On December 23, 2019, emails confirmed Rabo and Mechanics arranged a joint meeting with McClain in January 2020. The agenda included overdrafts, remote deposits, sweep accounts, cattle logistics, and credit renewals—matters far beyond the typical role of a depository

bank. Mechanics' unusual involvement is proof of collusion, ensuring all parties were aligned in sustaining McClain's fraud.

128.    By the time of the January 2020 meeting, 7M was already overdrawn by more than $3 million. Rabo and Mechanics knew this, but instead of freezing accounts or halting credit, they coordinated with McClain to keep the scheme operational.

129.    In February 2021, internal Rabo discussions revealed confusion over ownership of more than 3,400 head of cattle, unclear intercompany debts, and unexplained cash flows. Analysts noted MFY posted a $3 million gross loss and $4.5 million net loss for 2020. Borrowing base reports were unreliable, herd reconciliations inconsistent, and intercompany transfers suspicious. Yet Rabo continued extending credit, choosing profit over prudence.

130.    By 2020 the Kentucky meeting plan was in full effect: temporary fixes were implemented, overdrafts were concealed, and both banks enabled the continuation of a borrower they knew was insolvent.

131.    By the fall of 2022, even Rabo's Senior Relationship Manager and Mechanics' Senior Vice President were using the word "kite" in their conversations about McClain's accounts. Yet instead of stopping the activity, Rabo advised Mechanics simply to "follow protocols." Nothing was done.

132.    On October 11, 2022, Rabo's financial analyst Jason Dunn admitted in writing it was "very likely" that wires McClain promised would cover overdrafts—often funds from third-party customers like Plaintiffs and Intervenors—were being diverted to cover prior checks. Dunn concluded: "I think Brian is in more cash trouble than we think."

133.    By February 2023, Mechanics' Senior Vice President emailed Rabo expressing concern that millions deposited to cover a $3 million overdraft "don't appear to have anything to

do with cattle." Rabo's response was to reassure her that the depositor was "wealthy" and that McClain claimed the money was cattle-related. Mechanics deferred to Rabo, and the overdrafts continued.

134.    These practices persisted into 2023, with overdrafts, fund transfers, and daily million-dollar transactions sustaining the illusion of liquidity. Both banks knew the activity bore the hallmarks of check-kiting, yet both continued facilitating it.

135.    Rabo had formal control agreements with Mechanics Bank (DACAs), and Mechanics' statements were even branded "Rabo AgriFinance Powered by Mechanics Bank." This relationship demonstrates that both institutions jointly controlled McClain's accounts and collaborated in managing his financial operations.

136.    By early 2023, hundreds of millions of dollars cycled in and out of McClain's three Mechanics accounts, often in daily transactions of millions. This unprecedented volume of activity was unmistakable evidence of check-kiting, yet neither bank acted to stop it.

137.    As of April 2023, McClain's accounts held deposits exceeding $22 million. Only then—when Rabo finally decided the scheme could no longer continue—were the accounts frozen.

138.    Even then, Rabo alleged in bankruptcy proceedings that MAP Enterprises wired $3 million into the Mechanics account to bring it to zero, showing the lengths to which funds were still being shuffled to cover overdrafts.

139.    The evidence is undeniable: Rabo and Mechanics knew of McClain's insolvency and participated in covering overdrafts, shuffling funds, and concealing kiting transactions. Their communications and approvals demonstrate deliberate complicity. They prioritized protecting their own financial interests over exposing fraud, and in doing so, they propped up McClain's deception for years.

140.    Rabo and Mechanics acted together with McClain to mask his true financial condition. Their joint efforts enabled McClain to continue defrauding Plaintiffs and Intervenors, who provided money believing it would purchase cattle but instead saw their funds diverted to sustain a fraudulent enterprise.

141.    Any objective review of McClain's account activity would have exposed the fraud. The refusal to act was not oversight but collusion.

142.    Even after Rabo's February 2023 inspection confirmed fraud, Plaintiffs and Intervenors continued wiring money to McClain to purchase cattle, unaware that their funds were being swept into controlled accounts to cover overdrafts.

143.    Banking industry standards required both Rabo and Mechanics to review suspicious transactions for evidence of illicit activity. Despite repeated warnings—including Mechanics' own kiting reports—no corrective action was taken. Mechanics, knowing of the improper activity, looked the other way, allowing the "house of cards" to grow unchecked and the damages to Plaintiffs and Intervenors to multiply.

144.    Rabo and Mechanics Bank routinely approved covering overdrafts.  Not once until 2023 did either bank refuse to cover an overdraft, no matter how large.  Correspondence between Rabo and Mechanics Bank shows a joint effort to ensure all overdrafts were covered no matter where the funds originated or how it happened. In fact, on several occasions Mechanics Bank would make recommendations to Rabo on how an overdraft could be covered.  This joint effort and knowing participation allowed this massive fraud scheme to continue for years.

## H.    Rabo Protected Itself.

145.    Starting in late 2022, Rabo decided its fraudulent revenue stream was unsustainable and began to start the process of winding down its involvement in McClain's fraudulent activity. This resulted in finally conducting an actual physical review and inventory of the cattle for the

first time in four years in order to document its withdrawal from its participation and facilitation
of the fraudulent scheme.

146.    In February 2023, Rabo initiated an emergency collateral inspection, that, in the
words of one of its inspectors, resulted in the "house of cards [being] pretty well crashed" and
substantiated what Rabo had known from the beginning – McClain was high risk and not credit
worthy.  This was the first time in over four years that Rabo looked at, counted and inspected
actual cattle.  The investigation confirmed that McClain had been providing false reports regarding
the number of cattle the companies purportedly owned. Despite McClain's claims that they
possessed approximately 80,000 head of cattle (far above what Rabo knew the yards could sustain
because of state regulatory rules and limited water availability), the collateral inspection uncovered
a stark reality: only around 8,000 cattle were present at the two facilities in Texas.

147.    Michelle Stockett testified in her deposition that she was concerned about "the
volume of money running through the account plus the number of people that were sending in
money that I'd never seen before."   Furthermore, the inspection revealed and confirmed that
McClain did not even own the cattle in these yards; therefore, they were not financed by Rabo and
were not subject to its security interest. Rather, third-party feed yard customers owned the cattle
that were actually present—not McClain.

148.    In the words of one of Rabo's inspectors: "This is basically a worst-case scenario"
and a "Possible Fraud Case. Recommendation to downgrade immediately and take control of cattle
as soon as possible due to concerns related to cattle being owned by other parties."

149.    Indeed, as the same Rabo investigator testified in a deposition taken in this matter
that if she had been told by the Relationship Manager about the extent of the customer cattle
operations and the concerns about the credit in 2022, she could have performed a more thorough

inspection earlier and she would have uncovered the issues then: "yes, if I'd gone six months earlier, I would have blown it up then." However, that was not what Rabo wanted—this loan was just too profitable for them to bring down the "house of cards" at that time.

150.    Tellingly, after Stockett released an Adverse Findings Memo with the results of the February 2023 inspection, she was immediately met with harsh criticism, screaming, and "bullying tactics" by the relationship team. The Rabo relationship team defended McClain and said he was "working as hard as he could" to get all the information requested – despite the five years' worth of evidence to the contrary. Stockett's memo suggested that McClain's credit be downgraded, but she was strongly criticized, and her work was rejected by Dan Villwock, JP Van Oosten and other top senior Rabo officials. While Rabo suggested referring the loan to "special assets" or "consider filling out an operational risk report", Rabo never actually stopped the McClain the operation, seeking only to profit from Plaintiffs and Intervenors' losses. Rabo continued to accept funds from third party customers into the Mechanic's Bank account during March 2023. As the cards began to fall and customers began to ask questions and retrieve cattle, internal Rabo communications revealed that despite Rabo's full awareness that cattle on site belonged to third parties, Rabo officials announced, "whether they [the cattle] are truly theirs or not, we have a priority lien on the cattle."

151.    Upon realizing that withdrawing from its knowing participation in the fraudulent scheme would not net sufficient cattle to repay the debt, Rabo knew that it had to act swiftly and discreetly to deal with a $55 million operating line not secured by any cattle assets owned by McClain. Lawson, who testified that he was "distraught" in learning the inspection results, stated that Rabo had no idea who owned the cattle in McClain's feed yards. Rabo knew it had to take rapid action to protect its own interests. Rabo presented a Forbearance Agreement to McClain to

keep the operation afloat and then – after taking control of McClain – installed its own "fixer" to serve as the Chief Restructuring Officer. Plans were quickly arranged for Rabo to take possession of and auction off the cattle in McClain's yards, despite knowing that third parties owned these cattle and not subject to Rabo's lending or security agreements with McClain. Rabo did not make any attempt to determine or contact the rightful owners of the cattle before the cattle were liquidated by Rabo. The next several weeks were essential to Rabo and they needed to keep their actions a secret.

152.    For example, upon information and belief, during the last week of March 2023, McClain, at Rabo's requirement and direction, sold over 10 loads of cattle, many of which were owned by third parties, including Plaintiffs/Intervenors. Of these cattle, 489 heifers (146 from Lot 927 and 343 from Lot 933) were owned outright by Priest Cattle Company, Ltd. and subject to a lien by National Finance Credit Corporation of Texas. These cattle had Priest's Double slash brand on their left hip (registered in Deaf Smith and Parmer Counties) and had Ear Tag Nos. 927 or 933 in right ear. Following McClain's sale of these heifers, McClain told Priest that the cattle had been sold to Cactus Feeders and he then overnighted a check to Priest for $709,680.77. However, through Rabo's control and freeze of all funds passing through McClain's accounts, the check was dishonored for insufficient funds. Thus, Rabo converted proceeds from Priest Cattle Company's owned cattle to its own account.

153.    Likewise, on March 22, 2023, a McClain customer was inspecting his cattle and noticed several trucks lined up at McClain's farm in Kentucky ready to load up cattle. The customer inquired of the truckers what was going on and what they were doing there. The truckers responded that the "bank" was having them load up the cattle and take them to a sale barn.

154.    While Rabo was busy taking action to collapse the fraud it had participated in and enabled—coordinating the bankruptcy filing of McClain, shipping off cattle, seizing McClain's business records from his Kentucky headquarters, and shipping them to its investigators in Chicago—Plaintiffs and Intervenors, the cattle producers who had live animals on feed at McClain's yards, continued to unknowingly pay for McClain for feed, purchase cattle from McClain, and expected McClain to send them payments for cattle purchased and/or sold on their behalf. Millions of dollars flowed into McClain's Mechanics Bank accounts, which Rabo now controlled and ultimately converted.

155.    The February 2023 "investigation" was not the first red flag concerning McClain's operations and creditworthiness. Instead, it was the culmination of years of overlooked warnings, ignored financial discrepancies, and systemic failures within Rabo's risk management protocols that had allowed McClain's fraudulent activities to persist and expand, all to the benefit of Rabo.

156.    After Rabo conducted its February 2023 inspection documenting the fraud it already knew about and participated in, several Plaintiffs and Intervenors continued to send money to a McClain entity for the purchase of cattle, oblivious to the fraudulent activity Defendants knew about. The chart below shows the parties and the funds wired into the Mechanics Bank account on or after March 1, 2023, the accounts that Rabo then swept to apply to the debt.

| Party | Date Money Sent | Amount |
|---|---|---|
| Arnold Braun Trust | March 3, 2023 | $526,205.17 |
| Brian Blackman | March 6, 2023 | $661,956.48 |
| Dora Blackman | March 15, 2023 | $53,651.36 |
| Robert Braun | March 3, 2023 | $345,547.65 |
| Buss family Trust | March 29, 2023 | $77,289.48 |
| Dennis Buss | March 6, 2023 | $158,170.34 |
| Robert Gray | March 6, 2023 | $150,039.98 |
| Jimmy Greer | March 20, 2023 | $354,918.73 |
| Jordan Lesh | March 6 and 15, 2023 | $315,238.95 |

| Janice Lawhorn | March 29, 2023 | $149,488.75 |
|---|---|---|
| Lesh Family Trust | March 15, 2023 | $212,957.94 |
| Jan and Gary Lesh | March 15, 2023 | $84,036.99 |
| Jared Lesh | April 3, 2023 | $500,341.56 |
| Charles Lockwood | March 23 and April 5, 2023 | $1,471,737.11 |
| Nikki Lockwood | March 31, 2023 | $390,739.21 |
| Cole Lockwood | March 31, 2023 | $576,533.01 |
| Sherle Lockwood | March 31, 2023 | $766,041.83 |
| Morrison Café | March 1, 2023 | $489,540.42 |
| Craig and Amy Sutton | March 8, 2023 | $200,109.56 |
| Scarlett and Black Cattle, LLC | March 2,16,17,30, 31, 2023 | $2,538,999.44 |
| Big Seven | March 13, 2023 | $173,225.05 |
| Carraway Cattle | March 30, 2023 | $250,725.27 |
| Richard Carraway | March 13, 2023 | $67,320.34 |
|  |  |  |

157.    In addition, Thorlakson alone paid McClain more than $2,800,000.00 to purchase cattle between March 12 and March 18, 2023, long after Rabo's inspection of February 28, 2023, proved that McClain had reported at least 60,000 cattle that he did not have.  This money went straight to Rabo's controlled account.  After Thorlakson discovered the problem, the cattle were long gone.

**I.    HTLF's and Ragland's Role in Facilitating McClain's Fraudulent Financial Scheme.**

158.    In addition, as described more fully below, HTLF, a bank that facilitated multiple transactions and millions of dollars exchanged between its customer, 2B Farms, and McClain, was intimately involved and knew about McClain's business operations.  The banking procedures HTLF utilized were unorthodox and, upon information and belief, in violation of industry banking standards. HTLF's branch president, Shawn Ragland, who had no prior experience in financing cattle operations, was involved in daily transactions and completed or authorized bank employees to complete blank, pre-signed checks drawn on McClain's account, deposit those checks for

immediate credit, then send the resulting uncollected funds directly back to McClain, a classic check kite. At times, the check kite through HTLF alone involved more than $50,000,000 per month in funds movement. HTLF's banking methods aided and assisted McClain to further their fraud.

159. This was not Ragland's first check kite rodeo. Ragland possessed intimate knowledge of fraudulent banking schemes through his central role in the largest auto dealer fraud in United States history—the Reagor Dykes Auto Group (RDAG) scandal. This massive fraud operation employed a sophisticated check kite scheme spanning six financial institutions, including Aim Bank, HTLF's predecessor institution. The parallels between the RDAG fraud and McClain's scheme are unmistakable. Both operations employed identical methodologies: massive check kiting schemes designed to artificially inflate account balances and create the illusion of legitimate business activity. Given Ragland's extensive experience with the RDAG fraud, his intimate understanding of check kiting red flags, and the striking similarities in account activity patterns, his claim of ignorance regarding McClain's activities is simply not credible.[5]

160. Ragland did far more than merely overlook suspicious activity—he actively facilitated the fraud. Ragland and HTLF possessed pre-signed blank checks from McClain, which they systematically completed, deposited, and credited with immediate availability. And according to 2B Farms's Bo Robinson, this had been the standard operating procedure for Ragland on the 2B Farms account since before HTLF's acquisition of Aim Bank in 2020. This arrangement was not

---

[5] *See In Re: Reagor-Dykes Motors, LP.*, United States Bankruptcy Court for the Northern District of Texas, Lubbock Division; Case No. 18-50214. For specific background regarding AIM Bank and Ragland's involvement in the Reagor Dykes check kiting scandal, *see Faulkner v. AIM Bank*, United States Bankruptcy Court for the Northern District of Texas, Lubbock Division; Adversary Proceeding No. 20-05039. Plaintiff and Intervenors refer to the allegations contained in the adversary proceeding against AIM Bank relating to AIM Bank's in-depth involvement in the Reagor Dykes fraudulent scheme and check kiting.

standard banking practice; it was a deliberate mechanism to expedite the fraudulent transfer of funds.

161.    The transaction volumes alone should have triggered immediate investigation. Daily fund transfers of millions of dollars between HTLF's customer 2B Farms and McClain bore no rational relationship to the scope of McClain's cattle operation—a business profile that HTLF knew intimately. These astronomical daily transactions defied both logic and industry standards for agricultural operations of McClain's documented size and scope.

162.    Ragland's prior experience with the RDAG check kiting scheme provided him with both the knowledge and the operational blueprint to recognize and facilitate McClain's fraud. The evidence establishes not mere negligence, but active complicity. The convergence of Ragland's specialized knowledge, the operational similarities between the schemes, and his active role in facilitating the McClain fraud compels only one reasonable conclusion: Ragland and HTLF knowingly participated in and enabled McClain's massive check kiting operation.

163.    McClain did business with 2B Farms, a partnership with its principal place of business in Lubbock County, Texas. 2B Farms filed a Chapter 12 Bankruptcy after McClain was allegedly unable to repay it approximately $16 million dollars.[6] This loss was documented in part by checks drawn on McClain's Mechanics Bank accounts, controlled by Rabo, which were returned non-sufficient funds (NSF) after the McClain crisis hit its stride in February 2023.

164.    After 2B Farms filed its bankruptcy case, Terry and Rebecca Robinson ("the Robinsons") testified at their meeting of creditors. They testified that 2B Farms often bought cattle (usually from McClain), delivered them to McClain's grow yards, and McClain would provide the feed and care. After the cattle reached 725-750 lbs, McClain would sell them to a finishing

---

[6] *See* Case No. 23-50096-rlj-12, pending in the U.S. Bankruptcy Court, Northern District of Texas, Lubbock Division.

feedyard buyer for 2B Farms, McClain would be paid his feed bill, the parties would account for their other inputs, and divide the profits, if any. At no time did McClain own the cattle.

165.    Mr. Robinson also testified that McClain, or Megan McClain, also known as Megan Goad (Brian McClain's daughter), would send blank, pre-signed checks written on McClain accounts at Mechanics Bank to HTLF.  Those checks were kept by an employee (or multiple employees) at HTLF until it was time to "close out" a transaction for the sale of a lot of cattle. McClain told Robinson the information needed to fill out the checks, such as head counts and amounts, and 2B Farms relayed this information to Ragland and/or another HTLF employee.  The HTLF employee would then fill out the blank, pre-signed checks for the amounts given to them by the Robinsons.  The checks were then deposited into 2B Farms' HTLF account and HTLF provided immediate credit for the deposit.  Often on the same day, 2B Farms would write a check or wire funds back to McClain, using funds that HTLF had given it immediate credit, thus enabling a check kite.

166.    According to documents provided as a part of the 2B Farms bankruptcy proceeding, 2B Farms transferred more than $231,000,000.00 from its account at HTLF to McClain's Mechanics Bank accounts between January 30, 2023, and April 6, 2023.  The same source describes transfers over $246,000,000.00 from McClain accounts into 2B Farm's accounts, much of it in the same time period.  The Robinsons also testified that during this timeframe, the transactions with McClain went from approximately $1.4 million to $1.5 million and then on approximately February 7, 2023, those transactions nearly doubled to $2.5 million and upwards of $3.5 million.  The Robinsons claimed that they were involved in either a cattle sale and/or a purchase of cattle on their part almost every single day other than weekends or holidays during

this timeframe.  At approximately $1000 per head, this would account for approximately 246,000 head of cattle, an astronomical number that HTLF ignored.

167.    The Robinsons testified that Shawn Ragland was their loan officer and that they knew Ragland all their lives. Ragland was not a brand new bank teller. He was an experienced loan officer who had performed well enough to be named branch president of HTLF. While, Ragland had no prior experience in financing cattle operations, he did know 2B Farms and the Robinsons and after years of serving as their loan officer, he had a base understanding of the size and scope of their operation – and knew they did not feed 246,000 head of cattle.

168.    Certainly, according to testimony from Johnny Earp, a retired loan officer with HTLF, Ragland had been known to be so over his head on dealing with a loan file that financed cattle that he assigned the file to another loan officer. According to Earp, Ragland had no fundamental understanding of how to analyze the financial condition of a cattle feeding operation or how to adequately analyze and protect against well-known financial risks involved with cattle feeding. However, Ragland kept working for the Robinsons and 2B Farms. He knew the historical size and scope of their operation. Notwithstanding that history, he completely ignored the rapid changes to the 2B Farms operation and never verified that the increase in funds and transactions represented real cattle transactions. Ragland knew that McClain was feeding cattle for many other customers. But, he completely ignored his own banking regulations and procedures and never performed an on-site collateral inspection to confirm that 2B Farms' cattle were at the McClain Texas yards.

169.    Moreover, Ragland knew that $50,000,000 circulating in the 2B Farms account in less than one month's time was unusual. But, he again ignored the obvious risk to his bank and third parties whom he also knew were doing business with McClain by accepting blank

checks from McClain, and by overseeing his own employees' facilitation of a massive check kiting scheme.

**J.      CFSB's Role in Aiding and Abetting McClain's Fraud.**

170.    CFSB was not a passive bystander. As McClain's longtime hometown bank, with decades of experience handling McClain's bank accounts, CFSB was uniquely positioned to detect the irregularities in McClain's finances. Instead of intervening, however, CFSB ignored obvious warning signs, disregarded its own compliance obligations, and provided the banking access necessary for McClain to sustain and expand its fraudulent scheme.

171.    CFSB, a Kentucky-based community bank, originally financed McClain's early agricultural ventures, including Debtor McClain Farms. By 2006, however, CFSB expressed serious reservations, citing discomfort with the rapid pace of McClain's livestock expansion, the enormous capital requirements, and the inadequacy of real estate collateral compared to livestock collateral. McClain briefly shifted his accounts to Regions Bank, only to return to CFSB after becoming dissatisfied there. Ultimately, CFSB refinanced McClain's operations and continued as a principal banking partner, remaining one of McClain's primary secured lenders until 2021. For years, CFSB maintained a close and ongoing relationship with McClain's business activities, eventually transforming from a cautious lender into an active enabler of McClain's fraudulent practices.

172.    As McClain's hometown bank, CFSB was more than just a commercial lender. It also served as the family's bank for over twenty years, managing both business and household accounts for the McClain family. CFSB provided banking services to McClain's companies and affiliates for decades. Alongside Rabo, Mechanics, and HTLF, CFSB became a key participant in McClain's unlawful operations by allowing the constant cycling of funds

through intercompany transfers, overdrafts, and manufactured float. McClain routinely consumed new credit before it was fully authorized or documented, and CFSB played a critical role in accommodating this pattern, thereby ensuring the continuation of fraudulent practices through volume-driven, chaotic transactions.

173.    CFSB, together with Rabo, Mechanics and HTLF, permitted McClain to abuse banking channels by tolerating the routine floating of hundreds of millions of dollars in checks, turning a blind eye to obvious warning signs. These included frequent, multimillion-dollar overdrafts; dishonored checks and wires; massive intercompany transfers measured in the hundreds of millions annually; glaring contradictions in financial statements; and business model representations that were inconsistent on their face. Rather than intervening, CFSB allowed McClain continued access to liquidity, enabling it to conceal the true condition of its operations.

174.    Had CFSB, Rabo, Mechanics, or HTLF taken even minimal steps to review McClain's financial records, they would have uncovered the full scope of misconduct their own systems had already flagged. Instead, Rabo and each bank disregarded its own internal safeguards and compliance obligations, thereby becoming willing participants in sustaining McClain's scheme. Their refusal to act on repeated warnings underscores intentional involvement in the continuation of the fraudulent conduct.

175.    CFSB, in particular, was uniquely positioned to recognize the deception. Before McClain turned to Rabo in 2017, CFSB had been both a lender and depository bank for years, giving it a detailed history of McClain's finances. The shift from modest beginnings—when CFSB itself was hesitant to provide financing—into rapid and implausible growth should have raised alarm. Instead, CFSB tolerated a surge of illegitimate intercompany transfers coursing

through its accounts, even as legitimate transactions dwindled. The bank also witnessed more than 100 days in which McClain's accounts at CFSB were overdrawn, sometimes by over $1 million, all while holding financial statements that were inconsistent on their face. This context gave CFSB a baseline against which the irregular and highly suspicious activity after 2018 should have been obvious. Rather than shutting it down, CFSB chose to facilitate it, and in doing so, aided and abetted McClain's fraudulent scheme.

### K.    Meagan Goad.

176.    Goad exercised direction and control over McClain, including, but not limited to, signing McClain checks and wire requests, instructing third parties such as 2B Farms on behalf of McClain entities on how to fill in the blank McClain checks she signed and provided, signing borrowing base reports, and executing cattle feeding agreements for McClain.  She also helped determine how much money McClain needed on a daily basis from individual third parties.

177.    As Goad elaborates in her testimony, she had a total target number of deposits she needed to collect for the day and, because of limits the bank placed on check deposits but not on wire transfers, she needed to go to Bo Robinson of 2B Farms for a higher number because he wired money to McClain entities rather than remitting by check.  Appx. B at 115-16 (Goad Tr. 154 ln. 12 – 158 ln. 1).

178.    As described above, Goad actively participated in the McClain check-kiting scheme.  Goad would overnight HTLF a batch of signed blank checks from the McClain Mechanics Bank accounts, and subsequently would provide an invoice to 2B Farms' Robinson, who in turn would wire funds to Mechanics Bank and instruct Ragland and/or other representatives of HTLF of the amount of a cattle sale transaction based on the invoice.  HTLF would then fill out the signed blank checks for the money McClain owed 2B Farms for the purported sale of cattle and would deposit the check in 2B Farm's bank account at HTLF.

179.    Goad's own testimony supports Robinson's testimony.  "Q:  So all the checks that were filled out, to your knowledge, were filled out according to the instructions that you transmitted to Bo Robinson, right?  A:  Yes."

180.    Goad also provided blank checks drawn on McClain entities' accounts to other parties besides 2B, and then instructed the counterparties as to the amount of the check in approximately the same amount as McClain invoices to the counterparties.

181.    Likewise, Goad's text messages with Brian McClain reflect an awareness of and willing participation in McClain's backdating of invoices and the attempts to match check amounts with incoming payments, including identifying how much to try to get from different parties each day in order to cover McClain's expenses, and whether to backdate invoices in doing so.  At one point, as the wheels began to come off, Goad texted Brian "Stop back dating stuff . . . if they look into anything it's going to look suspicious as shut [sic]."

182.    Likewise, Goad either knew or should have known of the falsity of the information or was recklessly turning a blind eye.  At a minimum she would guide McClain as to how much invoices needed to be based on what they were bringing in from other third parties on given days. This scheme was done to secure future agreements for McClain from which she and McClain would benefit.

**L.    General Allegations.**

183.    Plaintiffs and Intervenors have or will present their claims more than 30 days before Judgment can be rendered in this case.  All payments, offsets, and credits due have or will be provided.

184.    Plaintiffs and Intervenors have engaged the services of the undersigned attorneys to assist them in pursuing this cause of action and have agreed to pay reasonable attorneys' fees.

185.    Pursuant to Rule 9(c) of the Federal Rules of Civil Procedure, Plaintiffs and Intervenors plead that all conditions precedent to their recovery have been performed or have occurred.

186.    Throughout this Complaint, where it is alleged that any opposing party performed or failed to perform any acts or activities, or made any representations, it is meant that such party's agents, officers, servants, employees or representatives performed or failed to perform such acts or activities and at the time such acts or activities were done, they were with full authorization or ratification of said party, or were in the normal or routine course of business.

## V.
## CAUSES OF ACTION

### A.    COUNT ONE: CONVERSION (RABO, MECHANICS BANK, AND GOAD).

187.    The allegations stated above and below are incorporated by reference.

188.    Plaintiffs and Intervenors are entitled to and seek recovery of judgment for conversion against Defendants Rabo, Mechanics Bank, and Goad.

189.    To succeed on a claim for conversion under Texas law, a plaintiff must prove: (1) it owned or had legal possession of the property or entitlement to possession; (2) defendants unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendants refused to return the property.

190.    In every instance, Plaintiffs' and Intervenors' agreements with McClain for the care of cattle was for the care of the cattle that belonged to Plaintiffs and Intervenors. Plaintiffs and Intervenors purchased the cattle. McClain sent invoices detailed the cattle purchased.  Plaintiffs and Intervenors received confirmation from McClain that the cattle had been purchased, received regular updates on the health condition and status of the cattle that had been purchased, and

received sales revenue when the cattle were sold, save and except any amounts paid to McClain for the care and feeding of the cattle. As described herein, it was no secret to Defendants that McClain kept "customer cattle." But, after the February 2023 collateral inspection revealed the massive cattle shortage, Rabo unlawfully and without authorization took control of, seized, and sold, destroyed, or otherwise disposed of the remaining cattle that were left in McClain's feedyards. Rabo took and applied proceeds towards McClain's loans and Mechanics took proceeds and applied them towards McClain's overdrafts.

191.    By way of specific example, as detailed above in Paragraph 152, McClain, at Rabo's direction, sold 489 heifers owned by Priest Cattle Company, Ltd. However, Rabo, not Priest, received the proceeds from the sale of these cattle in early April 2023 when Rabo directed and froze McClain's accounts.

192.    In addition, as set forth in the chart above in Paragraph 156, Rabo and Mechanics continued to accept deposits into the accounts from Plaintiffs and Intervenors in an effort to reduce overdrafts and reduce the line of credit as much as possible before the cat was out of the bag. Finally, in early April 2023, Rabo and Mechanics Bank realized that they finally had to end the scheme, shut down accounts, swept accounts, and returned checks to Plaintiff's and Intervenors. These actions constituted conversion.

193.    Despite Plaintiffs' and Intervenors' demands to return the cattle, and then to return the sales proceeds to them, Defendants have refused. In addition, Rabo seized funds in the Mechanics Bank accounts that represent funds delivered to McClain for the purchase of cattle, when Defendants knew McClain failed to purchase new cattle with those funds.

194.    In addition, upon information and belief, Goad unlawfully and without authorization transferred sales revenue from cattle owned by Plaintiffs/Intervenors from McClain bank accounts and into her personal account.

195.    Plaintiffs and Intervenors seek judgment for their reasonable attorney fees at trial and through all applicable appellate levels, pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(b)(6).

## B.    COUNT TWO: COMMON LAW FRAUD (RABO, CFSB, MECHANICS BANK, AND HTLF).

196.    The allegations stated above and below are incorporated by reference.

197.    In order to establish a claim for common law fraud under Texas law, a plaintiff must show (1) the defendant made a material representation, (2) which was false, (3) which was either known to be false when made or which was recklessly made as a positive assertion without knowledge of its truth, (4) which the speaker made with intent that it be acted upon, (5) the other party took action in reliance upon the misrepresentation, and (6) thereby suffered injury. *In re FirstMerit Bank, N.A.*, 52 S.W. 3d 749, 758 (Tex. 2001); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

198.    Here, the Defendants made misrepresentations to Plaintiffs and Intervenors as shown herein, both directly and through McClain recklessly without any knowledge of the truth and as a positive assertion. Moreover, the misrepresentations were made with the intention that they should be acted on by Plaintiffs and Intervenors, and Plaintiffs and Intervenors in fact relied upon those misrepresentations, suffering injury and damage as a result thereof. Thus, the misrepresentations and reliance so described were a proximate cause of injury and damage to Plaintiffs and Intervenors for which they now sue in a sum within the jurisdictional limits of the Court. The misrepresentations made were made directly and through their co-conspirator,

McClain.  It is uncontested that McClain misrepresented to Plaintiffs and Intervenors almost everything related to the cattle transactions McClain induced Plaintiffs and Intervenors into.

199.   Plaintiffs and Intervenors were induced by the banks and McClain in different ways.  One way the fraud took place was to induce Plaintiffs to buy cattle from McClain and to provide Plaintiffs what appeared to be written evidence of cattle.  Another way was for McClain to misrepresent cattle at a physical inspection by Plaintiffs or their representatives. Yet another way was for Debtors to take in cattle on the gain for a Plaintiff and then misrepresent Plaintiffs cattle as Debtors' cattle.  Each of these different inducements caused individualized and specific harm to each Plaintiff and Intervenor.  Defendants all participated in these different variations of fraud in various ways as alleged herein.

200.   Scarlett & Black Cattle Company, LLC ("S&B") is another example of a specific claim of fraud.  S&B's lender, Amarillo National Bank ("ANB"), wanted to perform due diligence on the Debtors.  In doing so, in early 2022, the ANB banker spoke directly with Rabo's relationship manager, Chip Lawson, wherein Mr. Lawson as a representative of Rabo, sold S&B's representative a bill of goods and induced ANB to loan S&B funds to purchase cattle from Debtors and ship other cattle to Debtors. The ANB banker's notes from the conversation indicate that Rabo represented that the Debtors "financial performance is excellent" and that Debtors "made a 'boat load' of money in 2021." The notes also reflect Rabo's misrepresentation about the strength of the Debtors' borrowing base and equity. Rabo made no disclosure of any negative information or qualification about doing business with McClain.  Based on Rabo's false statements about McClain, S&B continued to do business with McClain, increased its line of credit to do additional business with McClain, and continued to send in funds for the purchase of cattle.  These statements

were made by Rabo at a time when Rabo knew they were false in an effort to induce S&B through its banker to continue to transact business with Debtors.

201.    S&B's principal was Colton Long.  Mr. Long was employed as a relationship manager with AgTexas.  Mr. Long was the relationship manager for Thorlakson.  Mr. Long, individually and as representative of S&B and AgTexas, relied on the same misrepresentations made by Rabo to continue to allow its customer to continue to do business with McClain.

202.    Other representations are set out below in Counts 8, 9, 10, 11, 12, 13, 14, 15, and 16 and are incorporated by reference.

## C.    COUNT THREE: NEGLIGENCE AND GROSS NEGLIGENCE OF DEFENDANTS IN LENDING (RABO, CFSB, MECHANICS BANK, AND HTLF).

203.    The allegations stated above and below are incorporated by reference.

204.    Defendants were negligent in their banking and lending practices, including, but not limited to, their underwriting, investigative, and assessment of customers. Defendants failed to properly monitor and manage their lending relationships with McClain.  Defendants are, therefore, liable for the losses Plaintiffs and Intervenors suffered because of their actions and omissions.  Their actions and omissions are described above.

205.    As described herein, throughout Rabo's relationship with McClain, despite Rabo employees documenting "major concerns" about risks that the McClain operation presented, those concerns were ignored. In February 2021, Rabo's Financial Analyst, wrote a highly critical report of the McClain operation, regarding the frequency and high volume of transfers of money between the McClain entities. In February 2023, Rabo's collateral inspection report described the McClain operation as a: "**Possible Fraud Case**." Yet, Rabo took no action to stop the charade to the

detriment of many, including Plaintiffs/Intervenors who continued to do business with McClain during this time.

206.    Rabo's "front line" team of Chip Lawson and Jason Dunn recognized as early as 2022 that check kites were occurring. Rabo's credit analyst, Doug Williams, remitted a "SSS" report – Something Seems Strange – based on his inclination that check kites were happening. But, these red flags raised by Rabo's own personnel were completely ignored.

207.    As described herein, by virtue of being 2B Farms' primary lender for many years, HTLF knew a lot about the McClain business and accounts.  Shawn Ragland and other HTLF representatives were intimately involved in 2B Farm's business with McClain – including accepting blank checks and completing them based on oral instructions -- clearing **more than $50,000,000 through the 2B Farms account in one month**.

208.    The losses incurred by Plaintiffs and Intervenors were a proximate result of Defendant's negligent actions exceeding the minimum jurisdictional limits of this Court.  Plaintiffs and Intervenors seek judgment against Defendants for these damages.

209.    Furthermore, Rabo, CFSB, Mechanics Bank, and HTLF are each liable to Plaintiffs and Intervenors for punitive damages for their gross negligence in this case.  Their actions discussed herein, when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Rabo, CFSB, Mechanics Bank, and HTLF had actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.  For example, HTLF had recently been involved in another check-kiting fraud through the same branch and under the same branch president. Rabo, with its well-documented history of disregarding regulatory safeguards and enabling misconduct, knew it

lacked sufficient visibility into McClain's operations, had not conducted a full cattle count in years, and was fully aware that McClain was commingling Plaintiffs' and Intervenors' cattle with those he claimed as his own. Yet despite these glaring deficiencies—and consistent with its prior pattern of bad acts—Rabo permitted McClain's conduct without restraint.

**D.      COUNT FOUR; CIVIL CONSPIRACY TO COMMIT GROSS NEGLIGENCE (RABO, CFSB, MECHANICS BANK, AND HTLF).**

210.    The allegations stated above and below are incorporated by reference.

211.    Defendants Rabo, CFSB, Mechanics Bank and HTLF did not act in isolation. Their conduct reflects a coordinated pattern of neglect and conscious indifference that went far beyond ordinary lending and banking error. Each Defendant had independent knowledge of McClain's irregular transactions, repeated overdrafts, and obvious signs of check-kiting. Mechanics Bank, in particular, was directly involved in managing McClain's accounts with Rabo, enabling Rabo and Mechanics Bank to monitor and control transactions jointly.  Yet rather than intervene, Rabo and each bank chose to continue providing credit and banking services in ways that actively complemented the others' misconduct. Together, they formed a network of financial institutions that knowingly disregarded their duties, concealed risks, and enabled McClain's fraudulent enterprise to flourish. By working in parallel—and in some instances in direct collaboration—Rabo and these banks effectively conspired to commit gross negligence, placing their own profit ahead of the rights and safety of Plaintiffs and Intervenors.

212.    Defendants engaged in negligent banking and lending practices, including but not limited to deficient underwriting, inadequate investigation, and allowed McClain to defraud Plaintiffs and Intervenors.

213.    Rabo repeatedly documented "major concerns" regarding McClain's operations but chose to ignore them. In February 2021, Rabo's financial analyst prepared a critical report

highlighting the suspicious frequency and high volume of intercompany transfers. By February 2023, Rabo's own collateral inspection report explicitly identified McClain's activities as a "Possible Fraud Case." Despite this, Rabo continued financing and facilitating McClain's operations, to the detriment of Plaintiffs and Intervenors who relied on McClain's apparent legitimacy during this time.

214.    As early as 2022, Rabo's own front-line employees, including Chip Lawson and Jason Dunn, acknowledged that check-kiting was occurring. Rabo's credit analyst, Doug Williams, even issued an "SSS" report ("Something Seems Strange"), identifying signs of kiting. Yet Rabo's management disregarded these internal warnings and allowed McClain's activities to continue unchecked.

215.    HTLF also knowingly contributed to the scheme. As 2B Farms' primary lender, HTLF gained intimate knowledge of McClain's operations. Its representatives, including branch president Shawn Ragland, went so far as to accept blank checks from McClain, complete them based on oral instructions, and process over $50 million in transactions through 2B Farms' account in a single month. These actions were not isolated errors but conscious decisions to disregard obvious risks.

216.    The losses sustained by Plaintiffs and Intervenors were the direct and proximate result of Defendants' negligent and reckless conduct, which far exceeded the minimum jurisdictional limits of this Court. Plaintiffs and Intervenors seek judgment against Defendants for these damages.

217.    In addition, Defendants Rabo, CFSB, Mechanics Bank and HTLF are liable for punitive damages for their gross negligence. Their conduct, viewed objectively, involved an extreme degree of risk considering the magnitude of foreseeable harm to Plaintiffs and Intervenors.

Each Defendant had actual, subjective awareness of this risk but proceeded with conscious indifference to the rights and safety of others. For example:

218.    HTLF had recently been implicated in another check-kiting scheme through the same branch and branch president but continued the same practices with McClain.

219.    Rabo, with its established history of disregarding safeguards, failed to conduct cattle counts for years, despite knowing McClain was commingling Plaintiffs' and Intervenors' cattle with his own. Instead of cutting off exposure, Rabo fueled the misconduct in pursuit of profits.

220.    CFSB, as McClain's longtime hometown bank, knowingly tolerated repeated multimillion-dollar overdrafts, illegitimate intercompany transfers, and more than 100 days of negative balances, choosing to look the other way at clear evidence of check-kiting.

221.    These facts establish not only gross negligence, but also a civil conspiracy among Rabo, CFSB, Mechanics Bank, and HTLF to act in concert. Each Defendant knowingly agreed, explicitly or implicitly, to facilitate and perpetuate McClain's fraudulent conduct by continuing to provide banking services, extending credit, and disregarding obvious warning signs. Their coordinated actions and parallel failures reveal a common design: to preserve their own financial gain at the expense of Plaintiffs and Intervenors.

222.    Accordingly, Defendants Rabo, CFSB, Mechanics Bank and HTLF are jointly and severally liable for civil conspiracy to commit gross negligence. Plaintiffs and Intervenors seek actual damages, punitive damages, and such other relief as the Court deems just and proper.

**E.    COUNT FIVE: NEGLIGENCE AND GROSS NEGLIGENCE OF DEFENDANTS IN HIRING OR SUPERVISION AND MANAGEMENT OF PERSONNEL (RABO, CFSB, MECHANICS BANK, AND HTLF).**

223.    The allegations stated above and below are incorporated by reference.

224.    Defendants were negligent in their hiring, supervision, and/or management of their personnel. Defendants failed to properly monitor and manage their own employees in the manner of a reasonably prudent employer, and that as a proximate result, Defendants suffered damages. *See Wansey v. Hole*, 379 S.W.3d 246, 247 (Tex. 2012) ("there is a broad consensus among Texas courts that [] a [negligent hiring or supervision] claim requires that the plaintiff suffer some damages from the foreseeable misconduct of an employee hired pursuant to the defendant's negligent practices.") Rabo's inspector Michelle Stockett did not perform regular on-site inspections of the cattle at the McClain Texas yards. As revealed during her deposition, the few times she did visit the McClain yards, she utilized handwritten yard sheets that were provided by Brian McClain and only "spot checked" the pens that Brian drove her to. Stockett explained that Rabo prevented her from doing so "during COVID." Cattle numbers in the McClain Texas yards began to increase exponentially during this time frame; but, desktop inspections continued. Stockett's collateral inspection reports included one consistent conclusion: McClain was a high information risk. Yet, as Rabo's credit analyst Doug Williams testified, instead of imposing limitations on McClain, Rabo "regularly" approved overdrafts and overlines. Rabo personnel would freely authorize additional cash to be advanced to McClain – frequently based on the knowledge that third party funds coming in from parties such as the Plaintiffs/Intervenors to be used to purchase cattle were being used to cover the McClain account deficiency.

225.    Meanwhile, HTLF's Ragland was openly participating in a check-kite between 2B Farms and McClain.  This was entirely foreseeable on HTLF's part.  In or about the year 2020, HTLF acquired AimBank.  AimBank, in particular its Snyder, Texas branch, had participated or played a role in a massive check kite involving nine banking institutions and eighteen accounts in support of another fraudulent enterprise operating in the panhandle involving the Reagor-Dykes

automotive dealerships. Defendant Ragland worked at the Snyder branch of AimBank at the time and, on information and belief, was directly involved in a Reagor-Dykes building loan and other Reagor-Dykes accounts and was involved in the check kite. HTLF's own corporate representative testified that while he does not know what HTLF actually knew about the McClain kite going on within their branch, "They should have."

226.    The losses incurred by Plaintiffs and Intervenors were a proximate result of Defendant's negligent actions exceeding the minimum jurisdictional limits of this Court. Plaintiffs and Intervenors seek judgment against Defendants for these damages.

227.    Furthermore, HTLF and Rabo are each liable to Plaintiffs and Intervenors for punitive damages for their gross negligence in hiring, supervision, and management of their personnel in this case. Their actions discussed herein, when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and HTLF and Rabo had actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. For example, with regard to HTLF it had recently been involved in another check-kiting fraud through the same branch and under the same branch president. For example, with regard to Rabo it remained aware that it had too little information about McClain's operations and that it had not performed a full count of cattle in years, while also being aware that McClain had Plaintiffs and Intervenors' cattle in addition to purportedly having its own. Still, Rabo allowed the enterprise to balloon unchecked.

## F.    COUNT SIX: NEGLIGENT UNDERTAKING (RABO, CFSB, MECHANICS BANK, AND HTLF).

228.    The allegations stated above and below are incorporated by reference.

229.    A bank may owe a duty to a non-customer where "a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation." *See Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 518 (5th Cir. 2018) (citing and relying on *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094–95 (11th Cir. 2017)). Put another way, banks are discouraged from willfully ignoring warning signs that their customer may be committing an intentional tort against the non-customer (with whom the customer has a fiduciary relationship). *Id.*

230.    "[I]n determining whether a duty exists, a court must consider factors such as risk, foreseeability, conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Owens v. Comerica Bank*, 229 S.W.3d 544, 547(Tex. Civ. App. – Dallas 2007, no pet.) (applying the factors in the bank context); *see also Guerra v. Regions Bank*, 188 S.W.3d 744, 747 (Tex. Civ. App. – Tyler 2006, no pet.). These factors are consistent both inside and outside the bank context. *See Nabors Drilling, Inc. v. Escoto*, 288 S.W.3d 401, 405 (Tex. 2009) (applying the factors in the context of fatigued employee drivers).

231.    Rabo possessed superior knowledge of McClain's fraudulent operations and failed to meet its duty of care to protect third parties from foreseeable harm. As McClain's primary lender, Rabo held a unique and privileged position that afforded it comprehensive insight into McClain's precarious financial condition and suspicious account activity. Despite this comprehensive knowledge, Rabo continued facilitating the fraud by permitting wire transfers of Plaintiffs' and Intervenors' funds into McClain entity accounts while simultaneously aware of the ongoing

fraudulent scheme. This conduct established Rabo's voluntary undertaking to monitor and control these transactions.

232.    Rabo's pattern of negligent conduct fell far below the standard of care expected from commercial lending institutions. The banking industry recognizes established protocols for identifying and responding to suspicious account activity, particularly in high-volume commercial relationships. Rabo's actions and inactions were objectively unreasonable and constituted a clear departure from accepted industry practices for commercial lenders managing accounts with obvious fraud indicators.

233.    Despite its knowledge of millions of dollars in transactions occurring through the McClain accounts almost daily or, at the very least weekly, Rabo, as McClain's lender, had unique knowledge of McClain's precarious financial position and the alarming inspection reports itself (certainly by early 2023), when it was allowing wires of Plaintiffs/Intervenors funds into the McClain entity accounts, while, at the same time, being fully aware of the fraudulent scheme being perpetrated through the same accounts.

234.    Rabo had a duty to Plaintiffs/Intervenors, as a third-party by virtue of its employment of one or more individuals, which, it wholly failed to adequately train and/or supervise to properly monitor the McClain accounts or, at the very least, stop the transactions going in and out of the McClain accounts upon becoming aware of the McClain check kiting scheme in early 2023 based on the report of its own cattle inspector, and those inspection reports produced earlier. Still further, the facts show a negligent pattern of conduct by Rabo in the handling, monitoring, and supervision of McClain's Accounts. Said actions and inactions were not reasonable and failed to meet the industry standard for commercial lending institutions.

235.    Mechanics Bank possessed actual knowledge of McClain's systematic financial misconduct and voluntarily assumed a duty to protect third parties from harm. The evidence establishes that Mechanics Bank was intimately aware of McClain's pattern of frequent overdrafts—occurring multiple times per week—that were consistently cured using Plaintiffs' and Intervenors' funds. This knowledge alone placed Mechanics Bank on notice of potentially fraudulent activity. .More significantly, Mechanics Bank received comprehensive daily and weekly check-kiting reports that explicitly flagged suspicious account activity. McClain's various accounts consistently appeared at or near the top of these reports, providing clear and repeated warnings of ongoing check-kiting schemes.

236.    Despite this unambiguous evidence of financial fraud, Mechanics Bank failed to take appropriate action to prevent harm to innocent third parties.  By maintaining these monitoring systems and generating regular reports identifying check-kiting activity, Mechanics Bank voluntarily undertook a duty of care to prevent the very type of harm that befell Plaintiffs and Intervenors. Having assumed this responsibility through its own compliance and monitoring protocols, Mechanics Bank cannot now claim ignorance or disclaim liability for its failure to act on the clear warning signs it systematically tracked and documented.

237.    HTLF most assuredly acted in a way that requires the imposition of a duty where one otherwise would not exist. *See Nall,* 404 S.W.3d at 555. HTLF's branch President, Shawn Ragland, had access to sufficient information that would lead any reasonable person to anticipate danger of injury to others. Ragland knew 2B Farms and the Robinsons, he knew the size and scope of the 2B Farms operation, and he knew 2B Farms' banking history.  HTLF and Ragland's history with 2B Farms included detailed knowledge of 2B Farms' prior loan amounts and collateral inspections. Given the awareness and familiarity with the historical size and scope of the 2B Farms

operation, **when more than $50,000,000 circulated through the McClain-2B check farms in a single month**, HTLF and Ragland should have immediately anticipated foreseeable danger of injury to others. *See Owens*, 239 S.W.3d. 544. But, Ragland instead actively facilitated and participated in the check kite. Ragland could have easily asked for help within the HTLF banking system – the Snyder branch was but one of many branches at the time – to monitor the cattle loan and to take action on the red flags that were appearing on a daily basis. But, he never verified that the increase in funds and transactions represented real cattle transactions. HTLF had a duty to take action to protect those third parties who incurred significant damages as a result of the check kite – including Plaintiffs and Intervenors.

238.   CFSB, as McClain's longtime hometown bank and lender, owed a duty of care to Plaintiffs and Intervenors by virtue of its longstanding knowledge of McClain's business operations and financial history. CFSB repeatedly observed significant irregularities in McClain's accounts, including more than one hundred days of overdrafts, some in excess of $1 million, and a steady increase in suspicious intercompany transfers that lacked legitimate business purpose. These facts, combined with CFSB's receipt of McClain's financial statements as part of its lending relationship, placed CFSB on notice of a pattern of misappropriation of funds belonging to Plaintiffs and Intervenors. Despite these warning signs, CFSB continued to extend account access and credit accommodations, thereby facilitating McClain's misuse of third-party funds.

239.   CFSB's decision to disregard its own compliance obligations and industry standards fell below the level of care required of financial institutions. By knowingly tolerating repeated overdrafts, ignoring its automated alerts, and permitting circular transfers of massive sums, CFSB enabled McClain to generate the artificial liquidity necessary to perpetuate his

fraudulent scheme. CFSB's failure to act not only breached its duty to investigate and intervene but directly contributed to the foreseeable harm suffered by Plaintiffs and Intervenors.

## G.    COUNT SEVEN: COMMON LAW FRAUD (GOAD).

240.    The allegations stated above and below are incorporated by reference.

241.    In order to establish a claim for common law fraud under Texas law, a plaintiff must show (1) the defendant made a material representation, (2) which was false, (3) which was either known to be false when made or which was recklessly made as a positive assertion without knowledge of its truth, (4) which the speaker made with intent that it be acted upon, (5) the other party took action in reliance upon the misrepresentation, and (6) thereby suffered injury. *In re FirstMerit Bank, N.A.*, 52 S.W. 3d 749, 758 (Tex. 2001); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). "A corporation's employee is personally liable for tortious acts which [s]he directs or participates in during [her] employment." *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984).

242.    Goad was intimately involved in McClain's cattle operation and was much more than a mere record-keeping clerk, despite her attempts to appear otherwise. An April 2020 collateral Inspection Report from Rabo reveals that Goad helped to prepare the monthly borrowing base reports. The monthly borrowing base reports and certificates were often submitted and signed by Goad. Goad signed the litany of daily million dollar-plus checks on behalf of McClain. Company QuickBooks reports of McClain show that Goad transferred money into and out of McClain bank accounts and her personal account. In 2022, when Brian McClain was reeling from injuries suffered after a rodeo accident, Goad was responsible for the Company's financial management – and during that time, multiple overlines and overdrawn notices were issued.

243.    Goad directed and controlled the actions and omissions of McClain in a manner that was fraudulent in at least the following ways:

a.  Misrepresented the existence of cattle in their possession;

b.  Promised and agreed to purchase individual lots of cattle for customers, but sent false yard sheets to the customers for whom they promised and agreed to purchase cattle, although there were far fewer lots of cattle than were represented, such that multiple customers were being informed they were owners if the same cattle;

c.  Used the yard sheets, and other means, such as verbal reports and inspections, to report to Plaintiffs and Intervenors that cattle delivered to McClain were in their possession and under their control when in fact they were not; and

d.  Directed and allowed the McClain entities to keep and use the proceeds of their wrongdoing for their own purposes.

e.  Provided pre-signed blank checks to HTLF and Ragland to enable the check kite.

f.  Specifically identified the amounts of proceeds necessary to keep afloat and directed HTLF and Ragland in the amount to fill in for the blank checks and the amount to wire back to McClain, either directly or through the Robinsons.

g.  Determined amounts to be billed to other customers to keep the kite afloat, all the while remaining conscious of deposit limits in place that could effect how much McClain could take from customers who paid by check.

h.  Took other acts described herein in support of McClain's fraudulent enterprise and check kite.

244.  Further, Goad executed Cattle Feeding Agreements for McClain Entities and Borrowing Base Certificates provided to Rabo to perpetuate the cattle fraud, and she created and sent invoices to Plaintiffs in the course of the scheme for cattle that Plaintiffs were unable to locate after the scheme unraveled. In short, Goad either knew or should have known of the falsity of the information or was recklessly turning a blind eye.

245.  Goad is therefore personally liable for all damages, both actual and punitive, that Plaintiffs and Intervenors suffered because of her actions and omissions.

## H.    COUNT EIGHT: TORTIOUS INTERFERENCE WITH CONTRACT (RABO AND MECHANICS BANK).

246.  The allegations stated above and below are incorporated by reference.

247.    To establish a claim for tortious interference with an existing contract, a plaintiff

must show "(1) an existing contract subject to interference, (2) a willful and intentional act of

interference with the contract," that (3) "proximately caused the plaintiff's injury, and (4) caused

actual damages or loss." *Peykoff v. Cawley*, No. 24-10186, 2025 WL 1380070, at *6 (5th Cir. May

13, 2025) (*citing Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)).

248.    As described in greater detail above, Plaintiffs and Intervenors entered into valid

contracts with McClain for the purchase and sale of cattle.  Defendants Rabo and Mechanics Bank

willfully and intentionally interfered with Plaintiffs' and Intervenors' contracts by, among other

things, taking proceeds from McClain's accounts (that belonged to Plaintiffs or Intervenors),

applying those proceeds against debts owed to Rabo or Mechanics Bank, and thus, interfering with

Plaintiffs' and Intervenors' contractual rights to be paid under the contracts. Defendants Rabo and

Mechanics Banks interference proximately caused Plaintiffs' and Intervenors' injury, and caused

them to suffer actual damage or loss.  Plaintiffs and Intervenors seek damages against Defendants

Rabo and Mechanics Bank in excess of the jurisdiction limits of the Court.

# I.    COUNT NINE: CIVIL CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACT (RABO AND MECHANICS BANK).

249.    The allegations stated above and below are incorporated herein by reference.

250.    Plaintiffs and Intervenors entered into valid and enforceable contracts with

McClain for the purchase, feeding, and sale of cattle. These contracts gave Plaintiffs and

Intervenors enforceable rights to the proceeds from the sale of their cattle and related payments

under those agreements.

251.    As described in detail above, Defendants Rabo and Mechanics Bank engaged in

willful and intentional acts of interference with these contracts. Specifically, both banks knowingly

diverted and applied proceeds from McClain's accounts—funds that rightfully belonged to

Plaintiffs and Intervenors under their cattle contracts—to satisfy McClain's indebtedness to the banks. By doing so, Rabo and Mechanics Bank directly impaired Plaintiffs' and Intervenors' contractual rights to payment, effectively inserting themselves into and overriding those contracts for their own financial benefit.

252.    The wrongful diversion and misapplication of these funds proximately caused injury to Plaintiffs and Intervenors. Instead of receiving the proceeds owed under their contracts with McClain, Plaintiffs and Intervenors were deprived of those funds and suffered actual damages and losses in amounts exceeding the jurisdictional limits of this Court.

253.    Furthermore, Rabo and Mechanics Bank acted in concert with one another to carry out this interference. Through their deposit account control agreements, coordinated monitoring of McClain's accounts, and shared practices of applying customer-owned proceeds toward McClain's debts, Rabo and Mechanics Bank worked together to ensure that their financial interests were protected at the expense of Plaintiffs' and Intervenors' contractual rights. Their coordinated conduct demonstrates a meeting of the minds to interfere with the cattle contracts intentionally.

254.    Defendants Rabo and Mechanics Bank are therefore jointly and severally liable for civil conspiracy to tortiously interfere with Plaintiffs' and Intervenors' contracts. Plaintiffs and Intervenors seek recovery of their actual damages, together with punitive damages and such other relief as the Court deems just and proper.

## J.    COUNT TEN: AIDING AND ABETTING AND/OR KNOWING PARTICIPATION OF FRAUD (ALL DEFENDANTS).

255.    The allegations stated above and below are incorporated by reference.

256.    "Each party to a fraudulent transaction is responsible for the acts of the others done in furtherance of the fraudulent scheme." *See Crisp v. Sw. Bancshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex. App.—Amarillo 1979, writ ref'd n.r.e.) (affirming judgment on aiding and abetting

a fraud). Further, in Texas, third-party fraud liability may be incurred through "silent acquiescence for the fraudulent misrepresentations of a third party." *Corpus Christi Area Teachers Credit Union v. Hernandez,* 814 S.W.2d 195, 198 (Tex. App.—San Antonio 1991, no writ).

257.    Plaintiffs and Intervenors were each victimized by the McClain fraud. Brian McClain solicited and accepted payment from Plaintiffs and Intervenors for the purchase of cattle with the intent to defraud Plaintiffs and Intervenors. McClain did not tell Plaintiffs and Intervenors that their purchase money was being used to make payments other than for the purchase of cattle. In addition to the fraudulent misrepresentations, the check kiting scheme, in which Defendants willingly participated, was used to perpetuate the cattle fraud. "Check kiting is a species of fraud or fraudulent practice consisting of the exchange of checks of approximately the same dates and amounts between two banks for the purpose of obtaining money." *Denby v. State*, 654 S.W.2d 457, 459 (Tex. Crim. App. 1983), *overruled on other grounds*, *Geesa v. State*, 820 S.W.2d 154, 161 (Tex. Crim. App. 1991).

258.    Defendants Rabo, CFSB, Mechanics, HTLF, Ragland, and Goad actively facilitated, enabled and supported the fraud orchestrated by McClain. With significantly greater access to the inner workings of McClain's operations, Defendants were in a prime position to identify the numerous red flags and glaring inconsistencies in the books and records, yet they chose to turn a blind eye to the unmistakable signs of illegitimacy. Rabo was aware of the staggering, unsustainable growth trajectory of McClain and the evident lack of operational capabilities on McClain's part to support such rapid expansion. Despite conducting inspections that revealed glaring deficiencies in McClain's accounting procedures and overall business operations, Rabo failed to take decisive action. They were cognizant of irregularities such as McClain's unorthodox practice of receiving purchase orders via text, particularly given the significant scale of cattle

purchases involved. Moreover, Rabo was aware of discrepancies between McClain claiming ownership of all cattle in their feedyard and the conflicting information in accounting and banking records, which indicated that Rabo was feeding cattle owned by others.

259. Internal communications within Rabo further confirmed their awareness that, despite outward appearances of financial health and profitability, McClain was perpetually strapped for cash to sustain operations. Additionally, Rabo's scrutiny of McClain's bank statements revealed information that directly contradicted representations made by McClain. Rather than launching a thorough investigation into these glaring issues, Defendants allowed the fraud to continue.

260. Defendants aided and abetted and/or knowingly participated in McClain's fraud. Shawn Ragland was 2B Farms loan officer for several years, including when 2B Farms was banking with Aim Bank. 2B Farms continued its relationship with Ragland when Aim Bank was purchased by HTLF.

261. 2B Farm's representative, Bo Robinson, testified that Goad would send HTLF a batch of signed blank checks from the McClain Mechanics Bank accounts. 2B Farms would wire funds to Mechanics Bank for the alleged purchase of cattle in an amount provided by Goad. At or around the same time, Robinson would advise Ragland and/or other representatives of HTLF of the amount of a cattle sale transaction based on an invoice Robinson received from Goad or another McClain Entity representative. HTLF would then fill out the signed blank checks for the money McClain owed 2B Farms for the purported sale of cattle and would deposit the check in 2B Farm's bank account at HTLF.

262. Mr. Robinson testified that HTLF relied on a simple invoice from McClain to effectuate the banking transaction between 2B Farms and McClain. The McClain invoice was

often prepared by Goad, who was involved in determining how much was needed from different entities. Goad often turned to 2B Farms to fill in gaps because, while Mechanics had daily limits for check deposits, it had no limits for wire transactions such as 2B and HTLF were utilizing. HTLF did not ask for any additional documents, such as a bill of sale or close out sheets, to confirm that cattle were being purchased and sold. Mr. Robinson testified that he rarely saw the actual check HTLF completed and deposited in 2B Farm's bank account.

263.    The average transactions between 2B Farms and McClain and the frequency of those transactions spiked significantly, leading to a transaction of approximately $2.5 - $3 million daily from January 2023 until mid-April 2023. The sum of these transactions for the alleged purchase and sale of cattle amounted to approximately $240 million from January 2023 – mid-April 2023.

264.    Mechanics Bank was on the receiving side of these large transactions between 2B Farms and McClain. The McClain bank account statements confirm that Mechanics Bank knew there were multiple transactions involving millions of dollars being transferred on almost a daily basis between 2B Farms and McClain. These transactions were unusual, but Mechanics Bank did not stop them from happening.

265.    Upon information and belief, as part of banking industry standards, client monitoring is particularly important when large amounts of money are involved, which creates a greater risk that the bank's services are being used for illicit purposes. CFSB, HTLF and Mechanics Bank knew a lot about the McClain business and accounts. According to Mr. Robinson, Ragland and other HTLF representatives were intimately involved in 2B Farm's business with McClain. Ragland and other HTLF representatives worked closely with Mr. Robinson regarding 2B Farms banking transactions with McClain. The spike in the amount and frequency of

transactions, among other things, should have raised red flags for HTLF and Mechanics Bank that McClain was involved in illicit activity.

266.    Defendant CFSB, as McClain's longtime hometown bank, had decades of experience managing both McClain's personal and business accounts and was therefore uniquely positioned to detect irregular activity. Despite this long-standing relationship and intimate knowledge of McClain's historical financial patterns, CFSB permitted accounts to be repeatedly overdrawn—sometimes by more than $1 million—and tolerated more than 100 days of negative balances. CFSB also processed hundreds of millions of dollars in intercompany transfers that had no legitimate business explanation, all while ignoring obvious inconsistencies in McClain's financial statements that it received in connection with lending activities. These practices provided McClain with the liquidity and cover he needed to perpetuate fraudulent transactions involving Plaintiffs and Intervenors.

267.    CFSB's failure to act was not inadvertent but deliberate acquiescence in furtherance of McClain's scheme. By disregarding its own internal controls, failing to respond to suspicious activity alerts, and continuing to provide McClain with access to credit and account services in the face of glaring red flags, CFSB became a critical participant in concealing the fraud. Without CFSB's willingness to float checks, process circular transfers, and ignore irregularities that deviated sharply from McClain's prior banking history, the fraudulent scheme could not have reached the scale or duration that it did.

268.    Intervenor Scarlett & Black Cattle Company, LLC ("S&B")'s claim provides another specific example of fraud.  S&B's lender, Amarillo National Bank ("ANB"), wanted to perform due diligence on the Debtors prior to lending S&B additional funds.  In doing so, the ANB banker spoke with Rabo's relationship manager, wherein the relationship manager sold S&B's

representative a bill of goods and induced ANB to loan S&B funds to purchase cattle from Debtors

and ship other cattle to Debtors. The ANB banker's notes from the conversation indicate that Rabo

represented that the Debtors "financial performance is excellent" and that Debtors "made a 'boat

load' of money in 2021."    The notes also reflect Rabo's misrepresentation about the strength of

the Debtors' borrowing base and equity. These statements were made by Rabo at a time when

Rabo knew they were false in an effort to induce S&B through its banker to continue to transact

business with Debtors.

269.    Defendants aided and abetted the McClain fraud and are accordingly liable for the

damage caused to Plaintiffs and Intervenors.  Defendants gave assistance to the illicit schemes,

which was a substantial factor in causing fraud against Plaintiffs and Intervenors.

270.    As a result of Defendants abetting of fraud, Plaintiffs and Intervenors have been

damaged in an amount to be determined at trial.

## K.    COUNT ELEVEN: CIVIL CONSPIRACY (ALL DEFENDANTS).

271.    The allegations stated above and below are incorporated by reference.

272.    All Defendants in this case—Rabo, CFSB, Mechanics Bank, HTLF, Ragland, and

Goad—committed conspiracy to commit fraud, to breach fiduciary duties, to tortiously interfere

with contract, and to convert cattle, proceeds from cattle, and other funds. Facts supporting

McClain's, the banks', and Goad's fraudulent activity are pleaded throughout this complaint, as

are allegations of Rabo's, Mechanics Bank's, and CFSB's conversion of Plaintiffs' and

Intervenors' property, and the breaches of fiduciary duty by McClain, Rabo, and Mechanics Bank.

273.    Civil conspiracy is composed of two or more persons combining to accomplish an

unlawful purpose or to accomplish a lawful purpose by unlawful means." *In re Enron Corp.

Securities, Derivative & ERISA Litigation*, 623 F. Supp. 2d 798, 808–09 (S.D. Tex. 2009).  Claims

for civil conspiracy arise when there are "(1) two or more persons; (2) an object to be

accomplished; (3) a meeting of minds on the object *or* course of action; (4) one or more unlawful,

overt acts; and (5) damages as the proximate result." *Agar Corp., Inc. v. Electro Circuits Int'l,*

*LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (emphasis added).  The damages result from the underlying

tort, not necessarily the conspiracy or the acts in furtherance of the conspiracy.

274.    The meeting of the minds may be inferred from evidence of a course of conduct

demonstrating a tacit agreement.  *Wackman v. Rubsaman*, 602 F.3d 391, 409 (5th Cir. 2010).

"Conspiracy agreements need not be formal, the understanding may be a tacit one, and it is not

essential that each conspirator have knowledge of the details of the conspiracy." *Id.* (internal

quotations omitted) (citing *Bourland v. State*, 528 S.W.2d 350, 354 (Tex. App.—Austin 1975, writ

ref'd n.r.e.)).   Likewise, intent, which goes to the meeting of the minds, "can be proven by

circumstantial evidence and reasonable inference." *Id.* (citing *Schlumberger Well Surveying Corp.*

*v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968).

275.    Based on information and belief, the Defendants, and their agents or employees had

an agreement with and/or understanding among them to commit and to cover up the course of

action inflicting damages on Plaintiffs and Intervenors.

276.    For example, the check kite perpetuated by McClain and Defendants was a course

of action agreed upon by the parties in furtherance of the fraudulent enterprise. Goad participated

by signing and providing blank pre-signed checks to HTLF, Ragland, and others, by directing how

and when those checks should be completed, and by identifying the amounts McClain needed from

2B Farms and other customers to keep the kite afloat. HTLF and Ragland participated by holding

blank, pre-signed McClain checks, authorizing employees to complete the checks for purported

cattle purchase payments, depositing them, and immediately crediting McClain's accounts with

millions of dollars in uncollected funds. Rabo and Mechanics Bank participated by ignoring their

own internal check-kiting reports, approving multimillion-dollar overdrafts, and facilitating transfers that kept McClain's operations afloat. And CFSB, despite decades of experience banking McClain and knowledge of his historical financial patterns, permitted more than 100 days of negative balances, routinely tolerated overdrafts in the millions, and processed hundreds of millions of dollars in suspicious intercompany transfers—transactions that allowed McClain to create the float necessary to conceal the fraud.

277.    In doing so, Rabo, Mechanics Bank, and CFSB actively conspired with each other, with HTLF, and with McClain and Goad, to conceal McClain's financial instability and divert funds that should have been held in trust for Plaintiffs and Intervenors.

278.    Meanwhile, through their actions, HTLF, Ragland, and Goad actively conspired with each other and with McClain to float an ever-growing fraudulent check kite, knowingly providing the paper and process that disguised the misuse of Plaintiffs' and Intervenors' funds.

279.    The object of the conspiracy was the continued apparent viability of McClain's fraudulent operations, which benefitted the banks in the form of fees, interest income, and profits, and benefitted the individual defendants in the form of compensation and influence.

280.    To this end, Defendants and their agents, employees, and/or representatives had a meeting of the minds as to both the course of action and as to the object—although only one or the other is needed to show a conspiracy—and committed unlawful and overt acts and/or lawful acts committed for an unlawful purpose which proximately caused damages to Plaintiffs and Intervenors. Therefore, Defendants and their agents, employees, and/or representatives are directly and vicariously liable for the actions of each other in furtherance of this conspiracy.

281.    Plaintiffs and Intervenors seek judgment for all damages, both actual and punitive, that they suffered as a result of the actions of any of them.

282.    Plaintiffs and Intervenors seek judgment for their reasonable and necessary attorney's fees at trial and through all applicable appellate levels

## L.    COUNT TWELVE: BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING AND/OR KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY (RABO AND MECHANICS BANK).

283.    The allegations stated above and below are incorporated herein by reference.

284.    Texas courts recognize causes of action for aiding and abetting or otherwise knowingly participating in a breach of a fiduciary duty. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor with the fiduciary and is liable as such"); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 655 (S.D. Tex. 2008) (elements of aiding and abetting are existence of a fiduciary relationship, knowledge of the relationship, and knowing participation in the breach).

285.    Furthermore, as it specifically concerns banks, "Texas has long held that if a bank knows that deposits by a debtor in his own name are in fact held by him in a fiduciary capacity, then the bank may not apply such funds to the individual indebtedness of the debtor." *See S. Cent. Livestock Dealers, Inc. v. Sec. State Bank*, 551 F.2d 1346, 1349 (5th Cir. 1977) (citing *Steere v. Stockyards National Bank*, 256 S.W. 586, 589-92 (Tex.Com.App.1923, opinion adopted) (bank was precluded from applying proceeds known to be from a consignment sale to dealer's overdraft)). Indeed, where a seeks to "benefit from a fund held in trust by a depositor," "the bank becomes a party to the action of the trustee and stands as any other person dealing with one holding property in a fiduciary capacity." *Steere*, 256 S.W. at 590.

286.    Plaintiffs and Intervenors had fiduciary relationships with McClain. These fiduciary relationships arose statutorily and at common law for all Plaintiffs and Intervenors, and by contract for some, including Thorlakson and AgTexas. Such statutory trusts arose

automatically under the Dealer Trust Act. *See* 7 U.S.C. 217b ("All livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers."). Common law fiduciary relationships arose informally. *ARA Auto. Grp. v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997) (informal fiduciary relationships "may arise from a variety of relationships where the parties are 'under a duty to act for or give advice for the benefit of another upon matters within the scope of their relation.'") (quoting *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)); ; *see also Ritchie v. Rupe*, 443 S.W.3d 856, 892 n.63 (Tex. 2014) (existence of an informal fiduciary duty is generally a question of fact). Contractual fiduciary duties arose pursuant to the Intercreditor Agreement that McClain Feedyard, Rabo AgriFinance, AgTexas, and Thorlakson entered providing, among other things, that a party that obtains possession of proceeds of cattle subject to the agreement "will hold said proceeds in trust for the benefit of the other Party or Parties, will notify the other Party or Parties of such fact, and will promptly deliver such proceeds . . . ."

287.    McClain breached its fiduciary duties owed to Plaintiffs and Intervenors. McClain's breach either: (1) proximately caused injuries to Plaintiffs and Intervenors or (2) resulted in a benefit to McClain. As a proximate result of McClain's breach of fiduciary duties, Plaintiffs and Intervenors were damaged. Plaintiffs and Intervenors seek actual damages.

288.    Rabo and Mechanics Bank knowingly provided substantial assistance to McClain in breaching its fiduciary duties owed to Plaintiffs and Intervenors. Both institutions were fully aware that McClain had contractual obligations with Plaintiffs and Intervenors to feed cattle that did not belong to McClain and that he was responsible for managing and selling these cattle for the benefit of Plaintiffs and Intervenors. Rabo and Mechanics Bank knew that the proceeds from

these cattle sales were to be held in trust for Plaintiffs and Intervenors, reflecting McClain's fiduciary obligation to safeguard and adequately account for these funds. Despite this knowledge, Rabo and Mechanics Bank continued to extend credit, approve overdrafts, and facilitate financial transactions that enabled McClain to misappropriate these funds, directly aiding and abetting his breaches of fiduciary duty.

289.    Internal communications between Rabo and Mechanics Bank reveal that both institutions had detailed insight into McClain's operations, including the fact that he was selling cattle owned by third parties and that the proceeds from these sales were not McClain's to use freely. They were aware of the significant discrepancies in McClain's borrowing base reports, the impossibility of his reported cattle inventory given his feedlot capacity, and the manipulation of financial records. Despite these red flags, Rabo and Mechanics Bank actively worked together to conceal McClain's financial mismanagement, allowing it to divert funds that should have been held in trust for Plaintiffs and Intervenors to cover personal and business debts. Their involvement included approving overdrafts funded by these misappropriated proceeds, coordinating credit extensions despite McClain's insolvency, applying such proceeds to cover McClain overdrafts, principal, and interest, and failing to enforce basic financial controls that would have exposed the misuse of trust funds.

290.    Mechanics Bank's role extended beyond that of a typical depository institution, as it directly engaged in discussions about McClain's creditworthiness and financial operations. Rabo, motivated by the substantial profit margins it earned from McClain's account, repeatedly ignored internal warnings and risk assessments to keep the credit lines active. This conduct reflects more than negligence; it demonstrates a deliberate decision to support McClain's fraudulent activities, knowing that such actions would harm Plaintiffs and Intervenors. By enabling McClain

to continue accessing and misusing funds that were held in trust, Rabo and Mechanics Bank substantially aided and abetted McClain in breaching his fiduciary duties, or, at a minimum, knowingly participated in such breaches.

291.    Furthermore, Rabo and Mechanics applied funds it knew to be held in trust by McClain to satisfy overdrafts and other debts.  In so doing, they undertook to acquire title to, an interest in, or a benefit from a fund held in trust by their customer McClain.  In so doing, the banks became parties to McClain's fiduciary breaches and stand as any other person owing a fiduciary duty to the Plaintiffs and Intervenors. *See Steere*, 256 S.W. at 590.

292.    As a direct and proximate result of Rabo and Mechanics Bank's actions, Plaintiffs and Intervenors suffered significant financial damages. The banks' conduct not only facilitated McClain's ability to misappropriate trust funds but also provided him with the financial credibility necessary to continue his fraudulent operations. Their substantial assistance in these breaches of fiduciary duty makes them jointly and severally liable for the resulting harm to Plaintiffs and Intervenors.

## M.    COUNT THIRTEEN: VIOLATION OF THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT AGAINST RABO AND MECHANICS.

293.    Defendants Rabo and Mechanics associated together to form an enterprise (the "Enterprise") that raided assets owned by others and converted those assets for the benefit of Rabo. The members of the Enterprise did so through a pattern of wire frauds, mail frauds and bank frauds. The victims included Plaintiffs and Intervenors. The Enterprise unlawfully enriched itself through a campaign of racketeering activity. It misappropriated funds belonging to Plaintiffs and Intervenors that were to be held in trust for their benefit by McClain.

294.    McClain would collect funds from Plaintiffs and Intervenors for cattle purchases, hold the cattle, and then sell the cattle purportedly for the benefit of the customers. Rabo wanted

Plaintiffs' and Intervenors' cattle purchase payments, and the proceeds of cattle sales, and used the Enterprise to unlawfully get them. Mechanics, which is partly owned by Rabo's parent company, was used by the Enterprise to hold the payments and proceeds of sales of Plaintiffs' and Intervenors' cattle in accounts that were supposed to be in trust for Plaintiffs and Intervenors. Mechanics would have the funds deposited into McClain's accounts, and then pay those funds to Rabo through daily account sweeps. In two instances, Rabo installed Focus as a "management consultant" for the feed lot companies. Focus would then cause the feed lot companies to pay money from the Mechanic's accounts or trust accounts over to Rabo, ostensibly to pay alleged debts that Rabo claimed the companies owed. Mechanics would then sweep the accounts and pay the money over to Rabo. The Enterprise stole millions of dollars from the Plaintiffs and Intervenors in this fashion. In this action, Plaintiffs seek recovery of damages for the theft committed by the Enterprise.

## The Rabo-Mechanic's Connection

295.    Rabo is a part of the Cooperative, which owns various banking and financial entities around the world and is headquartered in Utrecht, Netherlands.

296.    Another part of the Cooperative was RaboBank, N.A.  RaboBank, N.A. formerly operated retail banks in California. It became embroiled in an illegal money laundering scheme on behalf of drug traffickers and other criminals.  In 2018, the United States Justice Department filed a criminal information (the "Information") in the case of United States v. RaboBank, N.A., Case No. 18-cr-00614 (S.D. Cal.).  The Information charged RaboBank, N.A. with having conspired to defraud the United States in connection with the money laundering scheme, thereby violating 18 U.S.C. § 371.  A copy of the Information is attached hereto as Exhibit "A."

297.    RaboBank, N.A. pled guilty to the felony charges raised in the Information. In connection with its guilty plea, it was required to forfeit more than $368 million. RaboBank, N.A. was also forced by federal regulators to cease offering depository accounts.

298.    With the taint of the felony conviction and the federal regulatory action hanging over RaboBank, N.A., Rabobank Group decided to sell RaboBank, N.A. In 2019, Mechanics bought RaboBank, N.A. from Rabobank Group in a deal reportedly valued at $2.1 billion. As part of the deal, the Cooperative received 9.9% of the capital stock of Mechanics. Mechanics then continued the business formerly operated by RaboBank, N.A. under the Mechanics name.

299.    Through their connection to the Cooperative, Rabo and Mechanics are sister companies. They formed an incestuous relationship that was incorporated into the Enterprise. Focus also joined the Enterprise.

### The Enterprise

300.    Rabo was in the business of making loans to agricultural businesses, including operators of feed lots for cattle, such as Quint Waggoner and his closely held business entities, Brian McClain and his closely held business entities and Philip Cattle Co. When those feed lot operators encountered difficulty in repaying the loans, the Cooperative and Rabo put together the Enterprise for the purpose of collecting the assets of non-borrowers and the collateral of their respective lenders in order to repay Rabo's loans to its feedyard or cattle feeding customers by unlawful means.

301.    Rabo is a lender, but is not a bank. Rabo cannot perform banking functions, such as providing depository accounts. So as part of Rabo's lending business, it is necessary for Rabo's borrowers to establish depository accounts with a bank. Prior to RaboBank, N.A. pleading guilty to felony money laundering, RaboBank, N.A. provided the depository accounts and associated

banking services to Rabo's borrowers. After RaboBank, N.A.'s felony conviction, those services were provided by Mechanic's bank. As the depository bank for Rabo's borrowers, RaboBank, N.A., and then Mechanic's, provided the necessary services to Rabo and the Enterprise to facilitate Rabo's conversion of the money, collateral and proceeds of the property of Rabo's customers and their customers' respective lenders.

302.    In its initial incarnation, the Enterprise consisted of Rabo, RaboBank, N.A. and Focus, all of which were under the overall direction of the Cooperative. When RaboBank, N.A. could no longer offer depository accounts as a consequence of its felony conviction, Mechanics took over RaboBank, N.A.'s business as well as its functions within the Enterprise, effectively replacing RaboBank, N.A. as a member of the Enterprise.

303.    The Cooperative, Rabo, Mechanics and Focus took part in a scheme to obtain money and property belonging to the customers of the cattle feeders and feedyard operators and other lenders by means of false and fraudulent pretenses. Through the use of false representations, the Cooperative, Rabo, Mechanics and Focus convinced the feedyard operators to convert the collateral of lenders, customer assets and funds that they held in trust for their customers, and to use the fruits of the conversions to pay down the imprudent loans Rabo had made. Rabo, Mechanics and Focus also prepared inventory reports and borrowing base reports that contained false representations as to the financial health of the cattle feeders and feed lot operators in order to induce other lenders to provide funding to the cattle feeders and feedyard operators, which could then be converted by Rabo. In order to execute the scheme, Rabo, Mechanics and Focus transmitted interstate fraudulent communications containing the foregoing false representations by wire, including but not limited to telephone calls and e-mails, thereby violating 18 U.S.C. § 1343 and 18 U.S.C. § 1344.

304.    Rabo, in connection with the operations of the Enterprise, transmitted documents by wire across state lines that fraudulently and falsely claimed senior security interests in cattle in which it either had no rights at all or in which its security interests were junior, thereby further violating 18 U.S.C. § 1343 and 18 U.S.C. § 1344.

305.    From the time of its formation onward, The Enterprise was engaged in interstate commerce within the United States.

306.    The Cooperative, Rabo, Mechanics and Focus are all associated with the Enterprise and participated in its affairs through a pattern of racketeering activity, as hereinafter alleged.

307.    Although Rabo could make loans, after its felony conviction for laundering money for Mexican drug cartels, it could not engage in retail banking. Initially, RaboBank, N.A. handled retail banking for the Enterprise. After taking over RaboBank, N.A. in 2019, Mechanics assumed the role that RaboBank, N.A. had until then filled in the Enterprise. Rabo would have its borrowers establish retail banking accounts with the Enterprise's retail banking arm (first RaboBank, N.A., and then with Mechanics), including operating accounts and trust accounts for the benefit of the borrowers' customers. Mechanics facilitated the raiding of customer property and funds in the operating accounts and trust accounts and funneled money to Rabo.

308.    Rabo would insist that its agent, Focus, be installed as a financial consultant to the financially distressed feed lot operator. Once it was in place, Focus would falsely represent to the feed lot operator, by means of communications transmitted by wire, that it could lawfully apply funds under its control that belonged to its customers to make payments to Rabo. In fact, those very funds were customer prepayments for cattle purchases or for feed and/or proceeds of sales of the customers' cattle, all of which rightfully belonged to the customers and could *not* lawfully be applied to the feed lot operators' debts to Rabo. In furtherance of the scheme, Focus would issue

instructions that those funds and proceeds be sent to Rabo. Mechanics, based on its relationship with Rabo and its participation in the Enterprise, would then send Rabo money that should have been held in trust.

309.    The Cooperative, Rabo, Mechanics and Focus knew at all relevant times that the customers' prepayments and sales proceeds belonged to the customers, and constituted the collateral of other lenders, and therefore could not lawfully be appropriated to make loan payments to Rabo.   Notwithstanding that knowledge, they pressured the feed lot operators to turn over customer funds to Rabo.

## **Waggoner Entities**

310.    One group of feed lot operators to which Rabo made loans consisted of several entities then owned by a Texas cattleman named Quint Waggoner. Those entities included Waggoner Cattle, LLC, Cliff Hanger Cattle, LLC ("Cliff Hanger"), Bugtussle Cattle, LLC and Circle W of Dimmit, Inc. (collectively, "the Waggoner Entities").  In November 2014, Rabo loaned more than $31 million to Cliff Hanger. The loan was secured by a lien on the cattle owned by two of Quint Waggoner's closely held business entities, Waggoner Cattle and Cliff Hanger.

311.    Lone Star State Bank of West Texas ("Lone Star") is a bank insured by the FDIC, and as such, is a "financial institution" as that term is used in Title 18 of the United States Code. 18 U.S.C. § 20. Lone Star had loaned money to the Waggoner Entities which were secured by liens on cattle owned by those entities. Lone Star and Rabo entered into an intercreditor agreement under which Lone Star retained a senior security interest as to certain categories of Waggoner Entities cattle (the calves being feed at the Waggoner Cattle, LLC "calf ranch"), and Rabo was to acquire a senior security interest as to other categories of Waggoner Entities cattle (those owned by Cliff Hanger, which were being fed in several commercial feedyards).

312.    Cliff Hanger became financially distressed and was having difficulty in repaying Rabo. To try to collect its loan to Cliff Hanger, Rabo set out to (1) convert proceeds of collateral belonging to Lone Star, and (2) syndicate the Cliff Hanger loan to other financial institutions to mitigate its anticipated loan losses when Cliff Hanger failed. The instructions to North American Rabo employees to get the Cliff Hanger loan syndicated came from a committee of directors based in Utrecht known as the AD KRM committee, and directors Martin van Vaals and Robert Kuipers.

313.    The Collective, through the AD KRM committee, gave the order to syndicate the Cliff Hanger loan at all costs. To facilitate the effort to syndicate the Cliff Hanger loan, false and fraudulent borrowing base reports were created by Rabo relationship manager Paul Strouhal which materially misrepresented the financial condition of Cliff Hanger by stating fake costs of gain, "comit weights" and projected outweights. Rabo transmitted the false and fraudulent borrowing base reports to Lone Star and to potential participants in the syndication by means of wire and/or the U.S. mail. The false and fraudulent borrowing base reports were transmitted by Rabo employees to Lone Star with the intent of inducing Lone Star to continue providing financing to the Waggoner Entities, causing Lone Star to continue to allow its lien collateral (in particular, the calves leaving the Circle W calf ranch facility) to be shipped to the Cliff Hanger feedyards (Dean Cluck Feedyard, Barrett & Crofoot Feedyard and Great Plains Feedyard) where Rabo would claim a senior lien to Lone Star's. This generated collateral that could thereafter be taken by Rabo and liquidated, with the proceeds paying down the Rabo loan to Cliff Hanger. Because Rabo was then anticipating a major loss in its loan to Cliff Hanger, Rabo transmitted the false and fraudulent borrowing base reports created by Paul Strouhal to potential syndication participants with the intention of inducing them to purchase a $20 million syndication interest in the loans that Rabo had made to Cliff Hanger.

314.     Rabo executed a scheme or artifice to obtain proceeds of sales of Waggoner Cattle Co. cattle that constituted collateral for loans made by Lone Star. Rabo's false and fraudulent assertions were transmitted by interstate wire and/or U.S. mail. RaboBank, N.A., which at the time was the Enterprise's banking arm, maintained accounts for Cliff Hanger from which funds were swept daily and transmitted to Rabo. Proceeds of cattle sales over which Lone Star held a senior interest were included in the sweeps. The false and fraudulent assertions by Rabo of an alleged right to those proceeds provided cover for Rabo to obtain millions of dollars of Lone Star's collateral. The Enterprise thereby engaged in bank fraud in violation of 18 U.S.C. § 1344.

315.     The misappropriation by the Enterprise of Lone Star's collateral was the subject of Lone Star State Bank of West Texas v. Rabo AgriFinance, LLC, Adv. Case No. 18-02007-rlj-11 in the United States Bankruptcy Court for the Northern District of Texas.

## McClain Feed Yard, Inc.

316.     Another feed lot operator to which Rabo made loans were the business entities of McClain Feed Yard, Inc., Brian McClain, McClain Farms, and 7M Feeders ("McClain"). McClain established accounts at Mechanics to hold funds entrusted to it by the McClain Entities.  After McClain encountered financial difficulties, Rabo insisted that Focus be installed as McClain's financial consultant. Upon information and belief, once Focus was installed, it directed McClain, by means of fraudulent communications transmitted by wire, to misappropriate customer cattle, proceeds of customer cattle and customer funds held in accounts at Mechanics in order to make payments to Rabo. In those wire communications, Focus falsely represented to McClain that it could lawfully apply proceeds of customer cattle, payments for cattle made by customers and customer funds to pay McClain's debt to Rabo. With the inducement of Focus's false representations, McClain issued instructions to Mechanics to forward funds held in accounts for

the benefit of McClain's customers to Rabo. The instructions so issued gave Mechanics cover for converting customer cattle and the proceeds of customer cattle and raiding the customer accounts, even though Mechanics knew that the funds were being held in trust or constructive trust for the benefit of McClain's customers. In furtherance of the Enterprise, Mechanics transferred the customer funds to Rabo. In this fashion, the Enterprise misappropriated millions of dollars of McClain's customers' funds.

317.    Fraudulent borrower base reports were prepared by McClain that falsely represented that McClain had 60,000 or so more head of cattle than it actually had. To stay afloat and cover the many overdrafts, McClain had to engage in check kiting. Rabo, Mechanics and Focus knew of the falsification of the borrower base reports and the check kiting and allowed McClain to continue operating for at least another five weeks after those things were clearly known by Rabo and Focus. During those five weeks, McClain sold non-existent cattle and/or sold the same actual cattle to multiple buyers. While this was going on, Mechanics regularly swept the proceeds of McClain's fraudulent sales from its accounts and forwarded the money to Rabo. In the process, millions of dollars of collateral belonging to Amarillo National Bank and AgTexas (both of which are financial institutions as that term is used in Title 18 of the United States Code) was converted by the Enterprise.

318.    After the Enterprise had converted as much of McClain's assets as it could, McClain wound up in bankruptcy. *See.* In re McClain Feed Yard, Inc., Case No. 23-20084-rlj7 in the United State Bankruptcy Court for the Northern District of Texas.

## **Phillips Cattle Co. Becomes Ensnared by the Enterprise.**

319.    Another feed lot operator to which Rabo made loans was Phillips Cattle Co. ("Phillips"). Phillips' management office and its feed lot were located in the County of Imperial, State of California.

320.    Phillips began borrowing money from Rabo in 2010 or 2011. When Phillips was unable to repay the money it had borrowed from its own funds, Rabo, Mechanics and Focus engaged in the same pattern of illegal activity that they had used with McClain. Rabo once again installed Focus as a financial consultant. Rabo and Focus falsely represented to Phillips by means of wire communications that it could lawfully use prepayments and proceeds of sales of customer cattle held at Mechanics to make payments to Rabo and directed that such funds be forwarded to Rabo. Mechanics, with the cover of instructions from Phillips, then sent the customer funds to Rabo, even though it knew that Phillips was holding the funds in trust for the benefit of Phillips' customers. The Enterprise thereby misappropriated millions of dollars of Phillips' customers' funds.

321.    Rabo knew that it had no right to take customer prepayments or proceeds of sales of customer-owned cattle. Rabo's knowledge as to prepayments dates back at least to 2012. One of Rabo's employees, Ronald Redden, performed an inspection of the collateral for Rabo's loans to Phillips on May 30, 2012. His report noted a "pre-paid liability" to Charles Johnson ("CJ") of CJ Cattle. Redden wrote that "pre-paid feed is a liability not an asset" and that prepayments attributable to CJ needed to be "eliminated" from Phillips' "borrowing base."

322.    An October 30, 2012 credit application prepared for Rabo further demonstrates Rabo's knowledge that the prepayments were being held in trust. The application accounted for prepayments Phillps received from customers as "consigned inventory." This "consigned

inventory" represented "prepaid feed monies that [Phillips] had received from their customers."
Rabo's business records accordingly stated that the prepaid monies belonged "in a special and
separate account dedicated exclusively for prepaid-feed monies."

323.    Notwithstanding their knowledge that customer prepayments were not assets of
Phillips, the Enterprise pressured Phillips to misappropriate the customer funds in order to make
payments to Rabo.

324.    The Enterprise also sought to appropriate cattle at Phillips' facility, including those
that belonged to Phillips' customers. This intent is reflected in a July 5, 2022 e-mail exchange
about a request from "Utrecht" for a count of all cattle at the facility. When one of the participants
asked if the request was limited to those cattle owned by Phillips or those financed by Rabo, the
response was that the total number in the facility was preferred.

325.    Through their raiding of customer funds with the use of fraudulent wire
communications transmitted to feed lot operators including the Waggoner Entities, McClain and
Phillips, along with their misappropriation of collateral belonging to various financial institutions,
Defendants engaged in a pattern of racketeering activity.

### CJ's Business Relationship with Phillips.

326.    CJ was a long-time customer of Phillips, going back some 25 years ago. Phillips
acted as CJ's agent in procuring calves and their feed on CJ's behalf. In the latter part of each year
during their business relationship, CJ prepaid for his cattle and their feed. Phillips would then
receive CJ's purchased cattle at its feed yard between December and April of the following year.
Phillps would assign CJ's cattle a lot number and pen number. Phillips would mark bills of sale or
other commercial documents to reflect that CJ held full, complete, and clear title to his cattle free
and clear of any liens and encumbrances from any third parties.

112

327. Phillips would then feed CJ's cattle at its yard for approximately one year. CJ prepaid Phillips for the feed that the cattle would need during the feeding cycle.

328. When CJ's cattle reached maturity, they would be shipped to JBS Processing in Tolleson, Arizona. Then, JBS Processing would transfer the net proceeds from sales of the cattle in Arizona into a Phillps customer trust account at Mechanics in California. The money from sales of CJ's cattle was supposed to be held by Phillips in trust for CJ and belonged to CJ. At CJ's direction, Phillips would typically pay some of the sales proceeds directly to Farm Credit Southwest to pay down CJ's operating line of credit. The balance would be remitted to CJ.

329. CJ's prepayments to Phillips were supposed to be segregated in accounts at Mechanics separate from Phillips' own operating accounts. Phillips represented, and CJ expected, that Phillips would hold the prepaid money in trust and use it solely and exclusively for CJ's benefit. At all times, Rabo was aware that CJ's funds at Mechanics were to be held in trust.

330. Rabo assisted Phillips in setting up and maintaining two custodial accounts at Mechanics meant to segregate monies that it received and held as an agent and fiduciary for CJ from Phillips' operating capital: (1) an account ending in 200 known as the "Prepaid Feed" account; and (2) an account ending in 8045 known as the "Customer Trust" account. A true and correct copy of a "Remote Deposit Service Maintenance Form" identifying these accounts are attached hereto as Exhibit "B." Rabo and Mechanics both knew that prepayments received for CJ's cattle belonged in the Prepaid Feed account and that proceeds from sales of finished cattle belonged in the Customer Trust account.

## The 2019 Conversions of CJ's Money.

331. Rabo's loans to Phillips included a "bridge loan" to provide Phillips with emergency cash to pay a feed supplier, an operating line of credit, and a customer loan line. Upon

information and belief, Phillips was required to repay the bridge loan by December 31, 2019, and

also had payments due on other loans from Rabo on December 15, 2019.

332.    In December 2019, Phillips was expecting to receive CJ's annual prepayment for

cattle and feed. Such prepayments were supposed to be held in trust in the Prepaid Feed Account.

333.    At the time, Phillips was having difficulty in making payments on the loan and had

failed to make certain payments that were then due. Upon information and belief, Rabo did not

want to declare the loan to be in default. Rabo used the Enterprise to get money that Phillips held

in trust for the benefit of its customers. Rabo could then enhance its financial records by showing

the misappropriated customer funds as payments made by Phillips on its loan.

334.    Phillips' chief financial officer, Denise Matejovsky, and a Rabo loan office named

Jared Redden had a telephone conversation in December 2019 to discuss means of repaying the

loan. In that telephone conversation, Redden falsely represented to Matejovsky that it would be

perfectly fine for Phillips to deposit CJ's prepayment into Phillips' operating account, from which

Phillips could pay Rabo. Redden further stated in the telephone conversation that there was no

reason why Phillips could not redirect the prepayment to its operating account and then send the

money to Rabo to repay the loan.

335.    The representation made by Redden on Rabo's behalf was false. Rabo knew that it

was not perfectly fine to redirect a prepayment that should have been deposited into the Prepaid

Feed Account and to deposit it instead in Phillips' operating account at Mechanics.  Rabo knew

that there was a very good reason why Phillips could not lawfully do that. The prepayment was

supposed to be held in trust and only used for CJ's benefit.

336.    On December 31, 2019, Phillips received a prepayment of $10,378,200 from CJ.

In reliance on Redden's representations, Phillips deposited this prepayment into its operating

account at Mechanics. Mechanics accepted the deposit into the Phillps operating account, even though it knew that there was a separate, aptly-named, Prepaid Feed Account at Mechanics that had specifically been set up for the purpose of receiving prepayments from CJ.

337.    Immediately after Phillips received CJ's prepayment, Matejovsky transmitted an e-mail to Redden with the subject line "Pay down on loans" dated December 31, 2019. A true and correct copy of this e-mail is attached hereto as Exhibit "C".  Pursuant to that e-mail, Rabo took the following amounts from Phillips' operating account: (i) $1 million on the Bridge Loan "plus whatever interest Phillips owes"; (ii) $4,750,000 on Phillips' operating line of credit; and (iii) $1,498,000 on Phillips' customer loan line. On information and belief, the money came entirely from CJ's prepayment.

### The Cover Up.

338.    Rabo helped Phillips conceal the misappropriation of CJ's prepaid feed monies.  On information and belief, on January 14, 2020, Redden and Matejovsky discussed that Phillips had used a significant amount of CJ's prepaid trust monies to illegally pay down Phillips' loans with Rabo. In a subsequent e-mail dated January 15, 2020 – attached hereto as Exhibit "D", Matejovsky wrote to Redden, "what we talked about yesterday, Robert [Bauer, the CEO of Phillips] doesn't want anyone to know, so please keep it confidential." On information and belief, Matejovsky's reference to "what we talked about yesterday" specifically refers to Phillips' illegal misappropriation of CJ Cattle's prepaid cattle and feed money. In response, Rabo, through Mr. Redden agreed to "keep it quiet" to cover up the fact that Rabo had substantially participated in misappropriating CJ's prepayments.

339.    Thereafter, on April 17, 2020, Rabo agreed to amend various loan agreements with Phillips and provide it with additional credit. To service the loans from Rabo, Phillps engaged in

extensive commingling between customer accounts and its operating account and misappropriated several customers' prepayments and sales proceeds.

340.    Rabo assisted in covering up Phillips' commingling and misappropriations. Rabo monitored Phillips' customer trust account with Mechanics (ending in 8045) and notified Phillips by wire communication when the account had a negative balance. These notifications from Rabo prompted Phillips to transfer money into the customer trust account so that Phillips' customers, including CJ, would not discover that their trust funds had been misappropriated.

341.    Similarly, Rabo monitored Phillips' operating account with Mechanics (ending in 4495) and notified Phillips by wire communication when the account had a negative balance. These notifications prompted Phillips to transfer monies from the customer trust account and enabled it to mislead its customers, including CJ, as to its financial condition.

342.    Rabo further assisted Phillips in concealing its insolvency and habitual use of customer proceeds by providing false representations to third parties which, in turn, gave the illusion that Phillips was a healthy company.

343.    For example, on or about November 16, 2021, Phillips bounced two checks to A&M Livestock. At Matejovsky's request Jared Redden of Rabo provided a letter to A&M Livestock, a copy of which attached hereto as Exhibit "E." In that letter, Redden falsely represented that Phillips was a healthy company, falsely stating in relevant part:

> "It has come to our attention that two checks made out to you from Phillips Cattle Co. were returned by Mechanic's Bank on 11/16/21. This letter is to inform you that these checks were returned due to a miscommunication on the time of an advance from Rabo Agrifinance. This was not due to Phillips inability to pay these checks."

344.    Rabo knew that the assurances provided in Exhibit E were false. Only months prior, Rabo had provided emergency funding that allowed Phillips to conceal from CJ it had misappropriated his 2021 cattle proceeds. Moreover, on information and belief, Phillips' operating

account was habitually overdrawn, reaching a negative balance of -$577,882.05 on December 1, 2021.

### The 2021 and 2022 Conversions of CJ's Money

345.    In 2021, JBS Processing purchased cattle belonging to CJ that had been fed and brought to maturity at Phillips' feed lot. In June of 2021, JBS Processing paid for the cattle by means of ACH transfers into Phillips' Customer Trust Account at Mechanics.

346.    Phillips misappropriated the funds that JBS Processing paid into the Customer Trust Account. To conceal the misappropriation from CJ, Phillips sent CJ copies of checks to Farm Credit Southwest – CJ's lender – that Phillips had not actually sent out. Rabo assisted in covering up the misappropriation by making an emergency advance so that checks to CJ drawn on the Customer Trust Account would not bounce.

347.    Farm Credit Southwest (now known as AgWest Farm Credit) is a financial institution within the meaning of Title 18 of the United States Code. The failure to send out the checks to Farm Credit Southwest enabled Rabo to obtain funds that should have gone to pay CJ's operating loans.

348.    In late 2021, Phillips was again having trouble making required payments on its loans to Rabo. Upon information and belief, Rabo again falsely assured Phillips in communications transmitted by wire that there was nothing wrong with using CJ's prepayments to pay down Phillips' loans with Rabo. In actuality, Rabo knew CJ's prepayments were a liability on Phillps' books and belonged in a segregated trust account separate from Phillips' operating capital.

349.    In late 2021 and again in late 2022, CJ sent checks to Phillips as prepayments for cattle and feed. Phillips should have deposited the checks into the specific accounts at Mechanics that had been created to receive funds to be held in trust for CJ. It did not. Instead, it deposited the

checks into its operating account, from which funds were used to repay the loans from Rabo. Rabo instructed Mechanics Bank, its partner in the Enterprise, to lift any hold on the checks. Upon information and belief, this instruction was transmitted by wire. Mechanics complied with Rabo's instructions.

350.    In early 2023, Phillips' financial condition worsened. In July 2023 (and perhaps earlier), Rabo compelled Phillips to accept Focus as a financial consultant. Upon information and belief, Focus falsely represented to Phillips that it could properly appropriate still more customer funds, including CJ's, to pay down the loan to Rabo. On Focus's instructions, Phillips misappropriated more of CJ's money.

351.    Phillips concealed its misappropriations of customer funds from CJ with the assistance of Rabo. As a result of those concealments, CJ did not learn of the misappropriation of the money he entrusted to Phillips until June or July 2023. He could not have learned of the misappropriations any earlier through the exercise of reasonable diligence.

352.    CJ has been injured in his business and property through the Enterprise's use of racketeering activity to misappropriate the funds that Phillips held in trust for his benefit. CJ's damages are not less than $12,461,361.72.

353.    Pursuant to 18 U.S.C. § 1864(c), CJ is entitled to recover treble damages and reasonable attorneys' fees and costs.

**N.    COUNT FOURTEEN: VIOLATION OF THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT AGAINST HTLF, RAGLAND, AND GOAD.**

354.    The allegations stated above and below are incorporated by reference.

355.    Plaintiffs and Intervenors assert claims against Defendants HTLF, Ragland, and Goad under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§

1961–1968. Defendants engaged in a pattern of racketeering activity by participating in, aiding, abetting, and otherwise furthering a fraudulent scheme involving the misappropriation of Plaintiffs' and Intervenors' funds and cattle, in violation of 18 U.S.C. § 1962(c).

356.    HTLF, Ragland, and Goad together constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4). This enterprise functioned as a continuing unit with a common unlawful purpose: to perpetuate and conceal McClain's fraudulent cattle transactions through check-kiting, manipulation of banking procedures, and misappropriation of Plaintiffs' and Intervenors' funds.

357.    The predicate acts of racketeering include wire fraud, mail fraud, and bank fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1344, as well as aiding and abetting those offenses in violation of 18 U.S.C. § 2. HTLF, through Ragland, knowingly processed and facilitated sham cattle transactions, while Goad generated fraudulent invoices, determined the fraudulent amounts, and coordinated the check-kiting activity.

358.    Ragland, acting on behalf of HTLF, directly participated in the scheme by holding and completing blank pre-signed checks, authorizing HTLF employees to fill in false information, and ensuring the immediate crediting of multimillion-dollar checks without verifying legitimate cattle transactions. Goad furthered the scheme by supplying those fraudulent amounts, coordinating the flow of funds, and ensuring that purported cattle purchases and sales could be used as a front for illicit transfers.

359.    HTLF and Ragland's banking authority, combined with Goad's role in generating fraudulent invoices and identifying amounts necessary to keep the kite afloat, created a closed-loop system of fraud that deceived Plaintiffs and Intervenors and allowed McClain's fraudulent operation to appear viable. Their collaboration demonstrates both a tacit and express meeting of the minds to continue the fraudulent enterprise.

360.    In further support of Plaintiffs' RICO claims, HTLF's predecessor, AimBank, has been the subject of prior litigation alleging similar misconduct in connection with fraudulent check-kiting and improper banking practices. *See Faulkner v. AIM Bank,* United States Bankruptcy Court for the Northern District of Texas, Lubbock Division; Adversary Proceeding No. 20-05039 (the "RD Aim Bank Complaint") (attached hereto as Exhibit A). That complaint describes how AimBank and its representatives knowingly facilitated fraudulent transactions, including the processing of checks and wires unsupported by legitimate underlying transactions. The recurrence of materially identical conduct—facilitating fraudulent transactions, overlooking glaring red flags, and participating in check-kiting schemes—establishes a pattern of racketeering activity under 18 U.S.C. § 1961(5).

361.    The RD Aim Bank Complaint evidences that HTLF, as successor to AimBank, together with Ragland and Goad, were not unwitting participants but part of a continuing practice of racketeering conduct. This prior act demonstrates the continuity, intent, and knowledge of the Enterprise, and further supports that the racketeering activity alleged herein is part of a broader pattern rather than an isolated occurrence.

362.    As a direct and proximate result of Defendants' racketeering activity, Plaintiffs and Intervenors suffered substantial damages, including the loss of cattle, proceeds, and funds wrongfully diverted through the fraudulent scheme.

363.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and Intervenors are entitled to recover treble damages, costs, and reasonable attorney's fees incurred in prosecuting this action.

364.

## O.    COUNT FIFTEEN: CLAIMS OF THORLAKSON AND AGTEXAS AGAINST RABO BASED ON INTERCREDITOR AGREEMENT.

365.    The allegations stated above and below are incorporated by reference.

366.    Effective as of January 27, 2021, Rabo, Brian McClain DBA McClain Feed Yard, and AgTexas, joined by Thorlakson, entered into a written agreement "to set forth the relative priority of the security interests, lien and other interests relating to cattle and related assets subject to the Cattle Feeding Agreements and the underlying transactions between McClain and Thorlakson LP."

367.    Among other provisions, the Intercreditor Agreement provided:

A.      ¶1(i) Disclaimer of partnership between McClain and Thorlakson

B.      ¶1(ii) Agreement that McClain has no ownership of cattle subject to a Cattle Feeding Agreement ("CFA")

C.      ¶1(iii) Agreement that all cattle subject to a CFA are owned by Thorlakson

D.      ¶1(iv) Agreement that the AgTexas lien on Thorlakson cattle is subject to McClain's agister's lien

E.      ¶1(v) Agreement that RAF and McClain disclaim a lien on cattle of Thorlakson, except for McClain's agister's lien

F.      ¶1(vi) Agreement that AgTexas disclaims a lien on cattle owned by McClain

        ***

G.      ¶3 Agreement that the proceeds of cattle subject to CFA held by a party contrary to the Intercreditor Agreement are held in trust and must be delivered to the other party or parties.

368.    Rabo induced AgTexas and Thorlakson to enter into the Intercreditor Agreement with representations that it knew that Thorlakson would "purchase from McClain and/or place cattle owned by Thorlakson with McClain" and that AgTexas, not Rabo, would have a security interest in these cattle, except to the extent an agister's lien existed.  Rabo also represented that if it acquired possession of proceeds from cattle sales of Thorlakson, it would hold those proceeds in trust for the benefit of the other parties to the Agreement and pay them to the party entitled to receive them.

369.    AgTexas and Thorlakson were also induced by representations by Lawson that McClain was an outstanding cattle caretaker and a successful businessman who know how to take care of his business.  As discussed above, Lawson assured Ag Texas that McClain's feedyards would be a reliable place for its loan customer, Thorlakson, to place cattle for feeding and care. Although the Intercreditor Agreement was signed in late January, and business did not get under way immediately, on February 18, 2021, Rabo employee and financial analyst, Rabo's Financial Analyst, wrote a highly critical report that said McClain Farms had lost $4.5 million in 2020, that he had "major concerns," that the sales prices reported by McClain made "zero sense to me," and that because McClain was transferring so much money between his entities, "we have no idea who owes who and how much."  Rabo did not relay this concern to AgTexas and Thorlakson.  Had they known what Rabo did, they would not have suffered their $9.8 million loss.

370.    AgTexas and Thorlakson reasonably relied on these representations. Thorlakson relied by shipping and/or buying thousands of cattle to or from McClain operations and AgTexas relied by providing financing for these operations to Thorlakson.

371.    Despite these assurances to Thorlakson and AgTexas, Rabo conducted collateral inspections, and received borrowing base reports, to the effect that all cattle in McClain's possession were subject to its interest.  Rabo made no effort to segregate or hold Thorlakson proceeds in trust.

372.    Even after its February 2023 collateral inspection report described noted: "**Possible Fraud Case**. Recommendation to Downgrade immediately and take control of cattle as soon as possible due to **concerns related to cattle being owned by other parties**" (emphasis added) Rabo took no action to notify Thorlakson or AgTexas that it considered its borrower to have committed fraud and that the fraud related to the very subject of the Intercreditor Agreement.  Instead, Rabo

permitted McClain to accept payment from Thorlakson more than $2.8 million for cattle purchases, which funds were deposited into bank account controlled by Rabo. These funds were held in trust for the benefit of Thorlakson and AgTexas, and Rabo's failure to return the funds constitutes conversion and breach of trust.

373.    Rabo's failure to notify Thorlakson and AgTexas of its knowledge that McClain's loan had substantial red flags, was constantly in overdraft status, that he was reporting thousands of cattle on had in excess of his capacity without considering the additional thousands of customer cattle, and failure to inform them of the crisis in early 2023, also constituted a fraud and breach by non-disclosure.

374.    AgTexas and Thorlakson are therefore entitled to and seek recovery of judgment for fraud, conversion, breach of contract, and breach of fiduciary duty against Rabo to the extent that Rabo acquired cattle or proceeds belonging to Plaintiffs.

375.    Plaintiffs further seek judgment for their reasonable attorney fees at trial and through all applicable appellate levels, pursuant to agreement and/or TEX. CIV. PRAC. & REM. CODE § 38.001(b)(6) and (8).

**P.      COUNT SIXTEEN: CLAIMS OF PRIEST CATTLE COMPANY LTD. AGAINST RABO BASED ON LETTER OF UNDERSTANDING AGREEMENT.**

376.    The allegations stated above and below are incorporated by reference.

377.    Effective as of January 4, 2022, Priest Cattle Company, Ltd. ("Priest"), Rabo, McClain, and National Finance Credit Corporation of Texas ("National") entered into a written agreement (the "Letter of Understanding") by which it was acknowledged that Priest "owns cattle placed on feed at or with [McClain]." Among other provisions, the Agreement provides:

> A. An acknowledgement by all parties that McClain "has an existing borrowing relationship with Rabo" and the Priest "has an existing borrowing relationship with [National]."

B. McClain represented and warranted that all of Priest's cattle in McClain's possession or control would "always be permanently identified by [Priest's] brand and not commingled with other cattle."

C. McClain also acknowledged that it would be subject to the security interest of National unless any check issues to [Priest] as full or partial payment from any sale of [Priest's] farm products is made."

378.    Rabo induced Priest to enter into the Letter of Understanding with representations that Rabo acknowledged and knew that the cattle owned by Priest would be fed by McClain but that those cattle were not owned by McClain. Priest reasonably relied on those representations by shipping hundreds of head of cattle to be held and fed by McClain.

379.    Rabo's failure to notify Priest of its knowledge that McClain's loan had substantial red flags, was constantly in overdraft status, that he was reporting thousands of cattle on had in excess of his capacity without considering the additional thousands of customer cattle, and failure to inform them of the crisis in early 2023, also constituted a fraud and breach by non-disclosure.

380.    Despite its written agreement with Priest, Rabo took possession of all cattle at McClain's yard and sold those cattle at auction, claiming those cattle were subject to Rabo's purported security interest with McClain. Specifically, the below described cattle were owned by Priest and were branded with Priest's registered brand (Double slash on left hip): (1) 146 heifers in this lot were shipped out from the McClain Feed Yard on April 1, 2023 with proceeds due to Priest in the amount of $275,679.17, and (2) 343 heifers were shipped out from the McClain Feed Yard on April 1, 2023 with proceeds due to Priest in the amount of $434,001.60. Following the sale of both lots of cattle, McClain overnighted Priest a check for the total proceeds for the 489 heifers (146 from Lot 927 and 343 from Lot 933) on April 1, 2023 in the amount of $709,680.77. On April 11, 2023, Priest received notice that the check had been dishonored.

381.    Priest is entitled to and seeks recovery of judgment for breach of contract and conversion against Rabo for its acquiring and sale of cattle belonging to Priest.

**Q.    ATTORNEYS' FEES.**

382.    By reason of the wrongful acts and conduct of the Defendants, Plaintiffs and Intervenors have been required to employ attorneys to bring and prosecute this action.  Plaintiffs and Intervenors seek to recover the reasonable and necessary costs and attorneys' fees and legal expenses, including expert witness fees.

383.    Under all claims asserted herein, Plaintiffs and Intervenors seek recovery of their reasonable and necessary costs and attorneys' fees at trial and all appellate levels, in equity or at law, to the extent provided by agreement, pursuant to Texas common law, or as described in Texas Civil Practice and Remedies Code chapters 37 and 38, Texas Business and Commerce Code chapter 24, and pursuant to analogous provisions of other state or federal statutory and common law as the Court may find applies to the claims set forth herein.

**R.    DAMAGES.**

384.    The facts and allegations stated above are incorporated herein by reference.

385.    The Defendants' acts, omissions, conduct, and breaches were, and continue to be, a proximate and/or producing cause of damages to Plaintiffs and Intervenors, and the Defendants have been unjustly enriched by their actions.

386.    Defendants acts include breaches of fiduciary duty for which Plaintiffs and Intervenors are entitled to disgorgement.

387.    To the extent that Defendants have received funds or property in which the Plaintiffs and Intervenors have superior rights, Plaintiffs and Intervenors seek recovery of their damages from Defendants, either directly or by way of disgorgement.

388.    Plaintiffs and Intervenors will respectfully request the Court to determine the amount of Plaintiffs' and Intervenors' damages. Plaintiffs and Intervenors seek recovery of their damages proximately caused by any responsible party, including, without limitation, all damages caused by the Defendants, both actual and punitive.

**S.    EXEMPLARY DAMAGES.**

389.    The conduct of the Defendants as described above, was done in gross negligence, bad faith and in violation of the law and public policy of the State of Texas, was done willfully, knowingly and maliciously, was intentional and/or committed with conscious indifference to the rights of Plaintiffs and Intervenors such as to warrant the imposition of punitive and/or exemplary damages under Chapter 41 of the Texas Civil Practices & Remedies Code, Section 41.001, et. seq.

390.    Plaintiffs and Intervenors seek the recovery of exemplary damages against Defendants.

**T.    REQUEST FOR DECLARATORY JUDGMENT.**

391.    The facts and allegations stated above are incorporated herein by reference.

392.    Plaintiffs and Intervenors seek declaratory judgment as to priority of their claims to cattle and sales proceeds.

<u>**CONCLUSION**</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs and Intervenors respectfully pray that all Defendants be cited to appear and to answer this Complaint and that upon final hearing hereof, Plaintiffs and Intervenors have Judgment as follows:

a.    An Order declaring the rights of the parties to the cattle and their proceeds;

b.    Judgment for actual and punitive damages;

c.    Judgment for attorneys' fees through trial and at all applicable appellate levels, and costs; and

d.     Any and all further relief, legal and equitable, to which Plaintiffs and Intervenors may be now and ever more entitled.

Respectfully submitted,

**NAMAN HOWELL SMITH & LEE, PLLC**
8310 N. Capital of Texas Hwy., Ste. 490
Austin, Texas 78731
(512) 479-0300; FAX (512) 474-1901
Email: dlebas@namanhowell.com

By:     */s/ David L. LeBas*
David L. LeBas
State Bar No. 12098600
Michael Duncan
State Bar No. 24097628

**Attorneys for Plaintiffs AgTexas Farm Credit Services, AgTexas, PCA, Thorlakson Diamond T Feeders, LP**

**- And -**

**SPROUSE SHRADER SMITH PLLC**
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas  79105-5008
(806) 468-3300; (806) 373-3454 FAX

By: */s/ John Massouh*
    John Massouh

-and-

**The Leal Law Firm, LLC**
abel@leal.law
14180 N. Dallas Parkway,Suite 300
Dallas, Texas 75254
Tel. (214) 395-5325;Fax. (806) 364-2526

By: */s/ Abel Leal*
    Abel Leal
    State Bar No. 24026989

**Attorneys For Dennis Buss, Buss Family Trust, Eddie Bryant, Robert E. Gray, Ronnie Gray, Gray Brothers, Craig Sutton, Amy Sutton, Steve Ryan, Janice Lawhon, AJ Jacques Living Trust,**

**Gungoll Cattle, LLC, Leah Gungoll, Morrison Café, LLC, Gary Lesh, Jan Lesh, Lesh Family Trust, Jared Lesh, Jordan Lesh, LLC, Joel Brookshire, Gene Brookshire Family, LP, Douglas Finley, Scarlet And Black Cattle, LLC, Bryan Blackman, Steve T Scott Farm, Inc., Scott Livestock Company, Inc., Arnold Braun Trust, Robert Braun, Jim Rininger, Robert Spring, Michael Evans, Miranda Evans, Charles Lockwood, Cole Lockwood, Sherle Lockwood, Nikki Lockwood, Lyndal Van Buskirk, Janet Van Buskirk, Colby Van Buskirk, Susan Van Buskirk, Jimmy Greer, Dustin Johnson and Dora Blackman**

- And -

/s/ Amber S. Miller
Amber S. Miller
State Bar No. 24050320
CRENSHAW, DUPREE & MILAM, L.L.P.
P.O. Box 1499
Lubbock, Texas 79408-1499
(806) 762-5281
(806) 762-3510 (fax)
***ATTORNEY FOR RIDGEFIELD CAPITAL GROUP, DREW PHILLIPS, CARRAWAY CATTLE, ROBERT ELLIS, BARRY PHILLIPS, BIG SEVEN CAPITAL PARTNERS, RICHARD CARRAWAY***

- And -

/s/ James D. Bradbury
James D. Bradbury
State Bar No. 02814500
jim@bradburycounsel.com
Kyle K. Weldon
State Bar No. 24097192
kyle@bradburycounsel.com
**JAMES D. BRADBURY, PLLC**
201 Main Street, Suite 600
Fort Worth, Texas 76102
Telephone:   817-339-1105
Fax:          817-886-3495

***ATTORNEYS FOR PRIEST CATTLE COMPANY, LTD, PRIEST VICTORY INVESTMENT LLC, W. ROBBIE RUSSELL LIVING TRUST, AND EDDIE STEWART***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2025, the foregoing document was filed with the Clerk of the Court in the foregoing case using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in the case.

*/s/ John Massouh*
John Massouh
