# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

**IN RE:**

**REAGOR-DYKES MOTORS, LP** *et al.*

    *Debtors*.

**Case No. 18-50214-rlj-11**
**Jointly Administered**

**DENNIS FAULKNER, TRUSTEE OF
REAGOR-DYKES AUTO GROUP
CREDITORS LIQUIDATING TRUST**

    *Plaintiff,*

      **vs.**

**AIMBANK,**

    *Defendant.*

**Adversary No. 20-05039-rlj**

## PLAINTIFFS' SECOND AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

    In accordance with Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure, Dennis Faulkner, as trustee of the Reagor-Dykes Auto Group Creditors Liquidating Trust ("Trustee" or "Plaintiff") files this complaint (the "Complaint") to turnover property of the estate, avoid certain obligations and recover certain transfers against AimBank ("AimBank" or "Defendant"), to disallow any claims held by Defendant and to recover compensatory damages.

    In particular, Trustee brings suit to (a) recover certain certificates of deposits previously offset by AimBank and belonging to Reagor Dykes Plainview, LP (CD No. XXX671) in the amount of $514,477.58 and Reagor Dykes Auto Company, LP (CD No.

Exhibit

A

exhibitsticker.com

XXXX060) in the amount of $540,018.01, and (b) to subordinate any other lien, claim or right that AimBank may otherwise have and to recover certain other monies as plead for here. The Trustee likewise seeks to set aside and recover certain payments made to AimBank in furtherance of Smith's fraudulent sight-draft scheme totaling some $5,330,863.80 and as more particularly detailed on the attached **Exhibit "A."** Finally, and in his capacity as Assignee of the claims and causes of action belonging to AmeriCredit Financial Services, Inc. d/b/a GM Financial, the Trustee asserts claims against AimBank for the breach of that certain Deposit Account Control Agreement dated January 23, 2018 attached hereto as **Exhibit "B"** and seeks damages in excess of $3,131,482.69 arising from that breach.

## I.   PARTIES.

### A.   Plaintiff

1.     Plaintiff Dennis Faulkner is the duly appointed Creditors Trustee of the Creditor Trust established by the Third Amended Chapter 11 Plan of Liquidation for Reagor-Dykes Auto Group, As Modified [Dkt. No. 1897] (the "Plan") confirmed by this Court's Order Confirming Debtors' Third Amended Chapter 11 Plan of Liquidation for Reagor-Dykes Auto Group, as Modified [Dkt. No. 1907] (the "Confirmation Order") on July 10, 2020.

### B.   Defendant

2.     Defendant AimBank ("AimBank" or "Defendant") is a depository banking and lending institution domiciled in the State of Texas. Defendant operates as an insured financial depository institution with its principal place of business in the State of Texas.

Pursuant to Rule 7004(h) of the Bankruptcy Rules, service of process in this adversary proceeding may be made on Defendant by mailing a copy of the Summons and Complaint via first-class mail prepaid to Defendant's attorney of record appearing on behalf of Defendant in the Bankruptcy Cases. By the nature of Plaintiff's claims against Defendant, the Court has personal jurisdiction over Defendant in this adversary proceeding. Defendant is named as a party in this action in the proper capacity as a member of the Federal Reserve System registered with the Federal Deposit Insurance Corporation as an insured financial depository institution.

## II.  JURISDICTION AND VENUE.

3.  This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 157 and 1334(b) because it arises under Title 11 and arises in and relates to those certain cases under Title 11 currently pending in the United States Bankruptcy Court for the Northern District of Texas, Lubbock Division (the "Court"), captioned *In re Reagor-Dykes Motors, LP, et al.,* Jointly Administered under Case No. 18-50214-rlj-11.

4.  The legal predicates for the relief requested in this adversary proceeding are §§ 105, 363, 502, 541, 542, 544, 547, 548, 549, 550, and 551 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"); Rules 3007, 7001(1), and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

5.  This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter final orders for

matters contained herein.

6.     Under the Plan and Disclosure Statement (including the various iterations thereof), Defendant AimBank had ample notice of the claims asserted herein. The terms "Causes of Action," "Chapter 5 Causes of Action," and "Claim" contained within the Plan (and iteration thereof) are each broadly defined and include the specific claims herein asserted.  *See Dkt. 797 at p. 11-12, Dkt. 1271 at p. 15-15, Dkt 1391 at p. 15, Dkt. 1762 at p. 9, Dkt 1897at p.9.*  The July 29, 2019 Disclosure Statement for the First Amended Plan of Reorganization specifically reserves claims against all "Causes of Action" against the Debtors prepetition lenders. *See Dkt. 1271 at p. 32-33.*  The July 1, 2019 Modified Disclosure Statement reserves claims against the Debtors prepetition lenders and further states that "[a]ll Causes of Action against AIM Bank [sic] are preserved under the Plan". *See Dkt. 1283, p. 35; Exhb. A. at p. 34.* The September 3, 2019 First Amended Modified Plan Disclosure Statement contains similar language. *Dkt. 1390 at p. 36, Exhb A. at p. 34., Exhb E. at p. 3.*  The March 3, 2020 Second Plan of Reorganization likewise reserves all Causes of Action against AimBank as does the Third Amended Plan of Reorganization. *See Dkt. 1762, § 5.6(c); Dkt. 1897 § 5.6(c).* Because the claims asserted herein were properly reserved and transferred to the Liquidating Trust as described above, this Court has subject matter jurisdiction over the disputes at bar. *See In re: Tex. Wyoming Drilling, Inc.,* 647 F3d 547, 551 (5th Cir. 2011); *In re: Adkins, 12-10314-RJL-7, 2012 WL 1952591 at *1,3 (Bankr. N.D. Tex., March 27, 2015).*

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 or 1409 because the Debtors' above-captioned bankruptcy cases are pending in this Court.

## III.   TRUSTEE'S AUTHORITY TO FILE SUIT.

8.     On July 10, 2020, the Court entered its Confirmation Order confirming the

Debtors' Plan. On July 14, 2020, the Debtors filed their Notice of Effective Date [Dkt No.

1912], which states that the Plan became effective as of July 10, 2020 (the "Effective Date")

and that all conditions precedent to the Effective Date were satisfied in accordance with

Section 9.2 of the Plan. Unfortunately, Plan proceeds are insufficient at this time to pay all

allowed claims in full.

9.     Section 8.1 of the Plan and the Confirmation Order provide for the creation

of a Creditors Trust and the appointment of a Creditors Trustee. Plan, § 8.1; Confirmation

Order, ¶ 9. On the Effective Date, Dennis Faulkner of Lain, Faulkner & Co. was appointed

the Creditors Trustee and vested with all of the general powers and duties to administer the

Creditors Trust in accordance with the Plan, Creditors Trust Agreement, and Confirmation

Order. *Id*.; Plan § 8.4.

10.     Under the Plan and this Court's order of July 10, 2020 [Dkt No 1907], all

Assets (as defined in the Plan) vested in the Trust, free and clear of all liens, Claims, Causes

of Actions, interests, rights, Security Interests, and other encumbrances.  The Court's July

10 order further provides that

> Pursuant to § 1123(b) of the Bankruptcy Code, all Causes of
> Action (as defined in the Plan and Disclosure Statement, other
> than those Causes of Action specifically settled and released
> pursuant to the Plan, and specifically including, but not limited
> to, (i) Chapter 5 Causes of Action, (ii) all actions currently on
> file, and (iii) all actions listed on Exhibit "A" to this Order) are
> hereby preserved by this Plan, notwithstanding the occurrence
> of the Effective Date. The Creditors Trustee shall, on behalf of
> the Debtors, retain the exclusive authority and all rights to

enforce, commence, and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Creditors Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved. For the avoidance of doubt, the preservation of Causes of Action herein includes, without limitation, the right to object to all Claims, including Secured Claims, Administrative Claims, Priority Claims, and General Unsecured Claims. The Trustee's right to commence and prosecute Causes of Action shall not be abridged or materially altered in any manner by reason of confirmation of the Plan.

11.    Article 2 of the Plan defines Causes of Action to include Chapter 5 Causes of Action. Plan, § 2.1. The Plan defines Chapter 5 Causes of Action as "any Cause of Action arising under §§ 510, 544 through 551 and 553 or otherwise under the Bankruptcy Code"

12.    Included within the Assets transferred to the Trust are the claims and Causes of Action of the following Debtors:

    a. Reagor Auto Mall Ltd. ("RAM") debtor in Chapter 11 Case No. 18-50324 pending in this Court.

    b. Reagor-Dykes Amarillo, LP ("Amarillo") debtor in Chapter 11 Case No. 18-50216 pending in this Court.

    c. Reagor-Dykes Floydada, LP ("Floydada") debtor in Chapter 11 Case No. 18-50219 pending in this Court.

    d. Reagor-Dykes Imports, LP ("Lmitsu") debtor in Chapter 11 Case No. 18-50215 pending in this Court.

    e. Reagor Dykes Auto Company, LP ("RDAC") debtor in Chapter 11 Case No. 18-50217 pending in this Court.

    f. Reagor-Dykes Plainview, LP ("RDT") debtor in Chapter 11 Case No. 18-50218 pending in this Court.

    g. Reagor-Dykes Motors, LP ("Lamesa" or "Spike

Dykes") debtor in Chapter 11 Case No. 18-50214 pending in this Court.

h. Reagor-Dykes Snyder, LP ("Snyder") debtor in Chapter 11 Case No. 18-50321 pending in this Court.

## IV. EXECUTIVE SUMMARY

13.     In the year leading up to the bankruptcy, over $449 million dollars went in-and-out of the AimBank business checking accounts of the Debtors Snyder and Lamesa dealerships. *See Exhibit C.*  The overwhelming majority of this money was in the form of intercompany transfers and was, in fact, kited funds. This amount of money would have been equivalent to approximately 32.8% of AimBank's approximate asset size as of the petition date, 318.8% of AimBank's total equity capital, and 3,989.6% of AimBank's loan loss reserve. *Id.*  The sheer amount of intercompany transfers was staggering in relation to the relevant bank metrics, and the existence of the massive kite would or should have been obvious to a bank. It also would or should have been obvious to AimBank that the volume and amount of transactions were due to kiting or fraudulent activity, given that Reagor Dykes' chief financial officer provided AimBank with financial statements for the Reagor Dykes entities that showed the amounts being deposited bore no rational relationship to the companies' business activity. On information and belief, AimBank's own computer system likewise notified bank officers and employees of the kiting from a very early stage.

14.     In the face of obvious fraudulent activity, AimBank did not invite Smith or the various Reagor Dykes entities to take their business elsewhere. Rather, AimBank continued doing business with Reagor Dykes former CFO Shane Smith and the Debtors when it knew what Smith was up to. And AimBank did not merely turn a blind eye to the

massive check kite running through its bank. Instead, it affirmatively helped Smith expand his fraud and create additional float by participating in the bogus inter-company "sight-draft" scheme, at a time when it knew that Smith was already relying on the check kite to continue operating.

15. The claims docket in the Debtors' bankruptcy proceedings are filled with the claims of the many innocent victims of Smith's fraud. The injury to these innocent creditors was caused, at least in part, by AimBank's inequitable conduct in facilitating and assisting Smith with the check-kite and sight-draft schemes. Moreover, AimBank cannot claim that (a) any of its dealings with any of the Debtors were in the ordinary course of business or (b) the monies were received in good faith. In bringing the instant claim, the Trustee seeks to recover certain certificates of deposit, recoup certain transfers, and to hold AimBank accountable for its inequitable conduct and the resulting injury to the legitimate creditors.

## V. FACTUAL BACKGROUND.

16. Although its charter is much older, Defendant AimBank was "founded" in 2003 when its President and CEO Scott Wade left his former employer, American State Bank, and, with the help of others, gained control of a majority in interest of the outstanding stock of what was once the First National Bank of Littlefield. Since that time, the size of AimBank has grown from about $13,000,000.00 in assets to $1,365,206,000.00 in assets as of the third quarter of 2018, when the subject bankruptcies were filed.

17. Mr. Wade is well known in banking circles for exercising an extraordinary degree of supervision and control over virtually all of the bank's core functions, even down to relationships on a customer-by-customer basis. AimBank has been able to achieve its

success largely through both organic growth and a series of deft mergers and acquisitions over the course of the seventeen years Mr. Wade has spent at AimBank's helm. One such merger – an April 27, 2018 merger in which AimBank's parent company acquired all of the issued and outstanding stock of Platinum Bancshares of Texas, Inc. and its wholly owned subsidiary Platinum Bank – is of particular relevance here, as explained below.

18. Snyder and Lamesa, together with the other Debtors and their affiliates, had established a banking and lending relationship with AimBank since at least 2014 and likely well before. This relationship was managed at first by AimBank Lubbock Market President Jonathan Hill and thereafter by AimBank Senior Vice President Mike Tibbit – at least until Tibbit's employment at AimBank ended sometime in late April or early May 2018.

19. Mr. Wade was also involved in various aspects of the relationship with the Debtors and especially where the question of extensions of credit were concerned. As for the Debtors, most of the interaction with AimBank was handled either by Former Reagor Dykes CFO Shane A. Smith or Ashley Dunn. Throughout the course of the relationship, and as was his practice, Smith would regularly supply Mr. Tibbit and others at AimBank with updated financial information regarding the various Reagor Dykes entities. This information included, among other things, consolidated financial statements, which demonstrated the performance of the individual dealerships as well as affiliated real-estate and other subsidiaries. For his part, Mr. Wade was complimentary of the quality of Reagor Dykes' financial reporting to the bank and the bank's relationship with the Debtors' business. In September 2014, Mr. Wade stated that:

> I think you know one thing that is important for the bank is

have good/timely/quality financial information to make a decision. Of course you're the big reason for us to have good financial information. AimBank takes pride in being able to make timely decisions and we are able to do this when we have good financial information from our customers.

AimBank also has a lot in common with our customer base. We have been able to grow as a result of expansion that our customers are experiencing. Reagor-Dykes is one of those customer that I previously mentioned. They are experiencing growth and AimBank is proud to have been able to be a part of the growth.

See September 28, 2014 email from Scott Wade, which was sent in response to an email from Shane Smith entitled "A Note of Thanks."

20.    Consistent with Mr. Wade's prediction, the size of the relationship of the various Reagor Dykes entities with AimBank continued to grow over the years. However, and of particular importance to this case is AimBank's banking relationship with two of the Debtor entities. In that regard, Debtors Reagor Dykes Snyder LP and Reagor Dykes Motors, LP d/b/a Spike Dykes Ford operated car dealerships in the cities of Snyder, Texas (population 11,165) and Lamesa, Texas (population 9,042), respectively. Snyder and Lamesa maintained two business checking (DDA) accounts with AimBank.

21.    The Lamesa Account was *never* the Lamesa dealership's primary deposit account – a fact that was at all relevant times known to AimBank.[1] Instead the Lamesa account's primary purpose was to receive floor-plan advances for a long inactive floor-plan line for custom trailers and also for the purpose of receiving immediate credit on

---

[1] The primary dealership account for the Lamesa dealership was kept with Lamesa National Bank, an institution that apparently was unwilling to offer Smith immediate credit on sight drafts.

deposited sight drafts.

22.     The Snyder dealership account was opened with AimBank on or about February 9, 2017, which coincided with that dealerships opening. At first, the Snyder dealership's AimBank account was not the primary checking account for that dealership either.  From February 2017 until February 2018, the Snyder dealership's primary checking account was with Branch Banking & Trust, which was that dealerships' primary floor-plan lender. It was only when Snyder changed its floor-plan lender to AmeriCredit Financial Services, Inc. *d/b/a* GM Financial in approximately February of 2018 that its account with AimBank became its primary checking account.  So too was this fact known by AimBank and at all relevant times.

23.     From August 1, 2017 through August 1, 2018, the staggering sum of **$449,069,845.15** passed through these two AimBank business checking accounts even though Snyder's AimBank checking account was not its primary account until February 2018 and Lamesa's AimBank account was never its primary operating account. A table depicting this account activity is attached hereto as **Exhibit "C."**  As is evident from said table, the vast majority of these funds represents deposits and outgoing checks to and from other Reagor Dykes entities.  Further, and as stated above, this all occurred at a time when AimBank knew that only one of the DDA accounts was ever used as the relevant dealerships primary checking account, and even there for only a seven-month period.

24.     These deposits and withdrawals were grossly outsized in relation to the size of AimBank. To this end, the aggregate deposits approached nearly one-third (1/3) of AimBank's asset size and were in excess of 300% of the bank's Total Equity Capital as of

the Third Quarter of 2018.  These transactions were of such magnitude that they simply did not go unnoticed at the very highest levels of the bank or by Scott Wade himself.  Furthermore, AimBank had financed various Reagor Dykes entities over the course of several years, and had received financial statements and reports for all of the Reagor Dykes Entities, including Snyder and Lamesa. AimBank and certain of its officers knew that the Lamesa and Snyder Dealerships could not have possibly generated this kind of revenue. The activity is even more troubling when one considers that AimBank knew that most of the dealerships' revenue would have been fully encumbered as proceeds from the sale of floor-planned vehicles that should have otherwise been deposited in their respective primary checking accounts, and such account would have been subject to a lien in favor of the relevant floor-plan lender.

25.    AimBank's own computer system would have also informed Scott Wade, Mike Tibbit, Jonathan Hill, and others at the bank of Smith's ongoing fraud. Upon information and belief, AimBank employs data-analytics software published by Banker's Toolbox/Abrigo or a similar vendor (the "**Analytic Software**").  In that regard, the Federal Deposit Insurance Corporation and Office of the Comptroller of the Currency collectively regulate some 6,175 banks and financial institutions in the United States, of which AimBank is one.[2] And each regulated institution is legally obligated to maintain a program

---

[2]   See following websites of the Federal Deposit Insurance Corporation and Office of the Comptroller of the Currency: https://www.fdic.gov/about/what-we-do/ and https://www.occ.treas.gov/about/index-about.html (last checked on September 2, 2020).  In the case of AimBank, its regulator would be the Texas Department of Banking and the Federal Deposit Insurance Corporation.

designed to detect fraudulent activities and to keep detailed records regarding the same. As such, banks have frequently turned to data-analytics software providers to comply with these legal duties.[3] Abrigo/Banker's Toolbox, is a market leader in furnishing community banks and financial institutions with regulatory-compliance software, including kite-detection software, and boasts that it has some 2,500 financial institution customers in the United States.[4] Another market leader, Verafin, boasts that it has some 3000 financial-institution customers[5] and offers a comparable software package. And there are other vendors that supply a similar software to banks and regulated financial institutions.[6] Accordingly, given the market penetration of the data-analytic software vendors relative to the number of FDIC/OCC financially regulated institutions, it is reasonable to believe that AimBank deployed such analytic software at all relevant times.

26.     The data-analytic software is sufficiently sensitive and rigorous that it can detect a suspected check kite within the first few checks. The analytic software generates a report each day of all suspected check kiting, based on account activity on a bank-wide

---

[3] *See* e.g.  November 16, 2004 FDIC Financial Institution Letter FIL-121-2004, for a general discussion of some of the relevant topics, available at  https://www.fdic.gov/news/financial-institution-letters/2004/fil12104.html#body   (last checked on September, 2, 2020)

[4] *See* website for Abrigo  available at  https://www.abrigo.com/  (last checked on September 2, 2020)

[5]  *See* website for Verafin available at https://verafin.com/why-choose-verafin/  (last checked on September 2, 2020).

[6]  *See e.g.*  website for Yellowhammer BSA, an additional vendor,  available at https://www.jackhenrybanking.com/information-security-and-risk-management/financial-crimes-solutions/pages/yellow-hammer-bsa.aspx  (last checked on September 2, 2020)

basis. These kite-reports are dispatched first to a specified bank officer and, if not resolved, taken "all the way up" the chain of command. Given the sheer volume of inter-company transactions occurring on daily basis between the debtors, AimBank's analytic software would have lit up like a Christmas tree on a daily basis. In this way, AimBank did business with Shane Smith in spite of the red flags that its own computer system waved on a daily basis.

27.     Smith likewise engaged in several "in person" and telephonic meetings with Mike Tibbit and others at AimBank regarding Reagor Dykes relationship with the bank as well as account activity. One such meeting occurred on January 17, 2018, at AimBank's location at 3004 Slide Road in Lubbock. After the meeting was over, Smith sent Senior Vice President Mike Tibbit the following e-mail message:

> "Appreciate you guys meeting with me and letting me address the rumors. Some people just can't be happy in life!!!"

January 17, 2018 E-mail message from Shane Smith to Mike Tibbit entitled Re: Meeting, Wire Request, etc.

28.     It is not clear what "rumors" Smith was addressing with AimBank officers. However, in January 2018 the Snyder and Lamesa dealerships deposited and withdrew a combined amount in excess of $29 million dollars from the accounts at AimBank. *See* Exhibit "C." Moreover, and according to AimBank's account statements, it would appear that an aggregate average of 95 percent of all outgoing checks were to other Reagor-Dykes entities during that month. *See id*.

29.     During the months of February, March, and April 2018, a combined $206

million dollars went in and out of the Lamesa and Snyder checking accounts. Of that amount, the Snyder dealership contributed $109,672,943.50 to that total. On March 27, 2018, Smith provided to Tibbitt the 2017 year-end financials for all of the Reagor Dykes entities. Among other things, these financials showed that Snyder's annual sales for all of 2017 were only $47,715,224,00 – less than 44% of the amount contributed by Snyder in that <u>one</u> account. Thus, and in three months' time, Snyder had nearly twice as many deposits compared to the dealership's total gross sales from the year before. Lamesa's performance was even more blatant, insofar as it was not the operating account for the dealership, and yet somehow over $96 million dollars had been deposited and withdrawn from that account during the same time period. By comparison to the gross sales reflected on the 2017 year-end financials provided to Tibbitt, this amount would have been in excess of 51% of the entire gross sales proceeds generated by the Lamesa dealership. All of this was known by Mike Tibbit, Jonathan Hill, Scott Wade, and others at AimBank.

30. On April 18, 2018 Mike Tibbit sent Shane Smith the following request:

> Hi Shane. Will you have a little time later this afternoon for a call? I have a question on the checking accounts (Lamesa & Snyder) I would like you to walk me through.

*See* April 18, 2018 Email from Mike Tibbit to Shane Smith entitled "Question." Smith, for his part, responded by immediately arranging a call.

31. Thereafter and on April 23, 2018, Tibbitt reached out to Smith once again with the following query:

> Would you have a little bit of time this afternoon to meet at the bank. Just want to discuss more the Lamesa and Snyder accounts.

*See* April 23, 2018, Email from Mike Tibbit to Shane Smith entitled "Meeting." Thereafter, Smith immediately arranged a meeting for 1:00 p.m. at AimBank's location at 3004 Slide Road in Lubbock.

32.     Whatever was discussed by Smith and Tibbit in late April 2018, several changes occurred shortly thereafter. Following these conversations, the aggregate deposits and withdrawals into the Lamesa dealership's business checking account fell the following month by a factor in excess of 400%, though the same was not the case for the Snyder dealership's account. *See* Exhibit "C." What is also known is that sometime between April 23, 2018, and the first part of May 2018, Mr. Tibbit's employment with AimBank was terminated.

33.     This was not the only major change happening at AimBank at the time.  On or about April 20, 2018, AimBank announced that it had hired another American State Bank alumnus, Mike Epps, as its Executive Vice President of Administration. Epps is widely respected within the local banking community and was second in command at American State Bank for many years and ultimately served as its last President shortly before it merged with Prosperity Bank (a large regional bank).  Thereafter, Epps served as Prosperity Bank's Senior Executive President for Financial Operations and Administration.

34.     AimBank's hiring of Mr. Epps came as a surprise to many within the community, and presumably placed Mr. Epps in charge of running the entirety of AimBank's back-office operations.  As explained below, AimBank's decision to retain the services of Mr. Epps was followed by another change in the bank's relationship with the

Reagor Dykes Dealerships – namely to end its participation in Smith's fraudulent sight-draft scheme.

35.     Taken as a whole, and on the basis of the facts pled herein, it is clear that AimBank knew of Smith's check-kiting scheme for quite a long time and allowed him to use its facilities for that purpose. This is true objectively, given the massive intercompany deposits and withdrawals in the Lamesa and Snyder accounts, particularly by comparison of the economic capacities of these dealerships. Hundreds of millions of dollars flowed through these accounts, and all at a time when AimBank knew that the Lamesa DDA account was not the primary business account for that entity, and Snyder only became so in February 2018.  It is subjectively true, insofar as despite having multiple meetings with Shane Smith regarding the account activity for the Lamesa and Snyder Dealerships, Smith could not have come up with any remotely plausible explanation for the account activity other than that a kite was occurring. Moreover, it is subjectively true because even before the bank entertained any meetings with Smith, AimBank's own computer system would have notified its officers and employees of the kiting activity.

36.     But AimBank's assistance in Smith's check-kiting scheme was not the only part of Smith's fraudulent scheme in which AimBank participated. Through a series of undocumented loans, AimBank also let Smith create and control millions of dollars of additional "float" to fuel his financial schemes by creating "sales" of vehicles between the various Reagor Dykes dealerships and using an antiquated form of payment to support the transaction – that is, a sight draft. As explained below, sight drafts have no legitimate business or financial purposes for purported sales or transfers between related entities.

Specifically, AimBank would extend immediate credit against a deposited (sight) draft, which was to be dispatched to another bank for processing and ultimately payment. AimBank loaned[7] over $5.3 million to Snyder based on the intercompany sight drafts that Snyder presented to AimBank and for which AimBank extended credit. These loans were effectively paid back by other Reagor Dykes dealerships.

37.     A sight draft is a form of documentary draft, not unlike a letter of credit used in international business transactions.  At its heart, it is payment against documents of title. The drafting process was designed long ago to facilitate transactions between <u>unrelated</u> buyers and sellers so they could each mitigate the credit and performance risk of the other by allowing their respective banks to act as intermediaries. To assist in further explaining this outdated process, the attached Exhibit "D" provides a simplified illustration of how a typical sight draft transaction between parties ***should*** work.

38.     In a normal transaction involving a sight draft and between unrelated parties, one dealership would "agree" to purchase one or more vehicles from a third-party dealership. Following this agreement, the selling dealership would deposit the draft together with the original certificate of title to the vehicle with its own bank. The selling dealership's bank would thereafter present the draft together with the original certificate of title to the purchasing dealership's bank for payment. The draft would contain instructions for payment – like usually upon "sight" plus a certain number of days. Usually seven

---

[7] *See e.g. In re: C.M. Turtur Investments, Inc., 93 B.R. 526, 530-531* (Bankr. S.D. Tex. 1988) (finding provisional credit given to dealership by bank on deposited sight draft constituted a loan).

business days.

39.     During this time period, the purchaser's bank would inspect the certificate of title so as to insure its authenticity. Upon expiration of the time period and assuming the title was good, the purchaser's bank would issue a cashier's check[8] by way of payment on the draft; cause the same to be delivered to the seller's bank, and concurrently deduct an equal amount from the buyer's bank account.  Ostensibly, if the buyer lacked the funds to pay, the buyer's bank would return the draft, together with the documents of title to the seller's bank. When the seller's bank received the cashier's check from the buyer's bank – and not before – it would deposit a like amount of money into the selling dealership's bank account.  Suffice to say, the sheer complication of this process belies its antiquated nature, as it more appropriately would have been used to buy and sell herds of cattle between far-flung ranches in the 19th century, rather than for the buying and selling of vehicles here.

40.     As noted above, the entire purpose of the documentary sight-draft process is to mitigate credit and performance risk between unrelated parties. It serves virtually no purpose in a transaction between related parties, such as the various Reagor-Dykes dealerships.  Moreover, the sheer volume of intercompany checks that were already being deposited between the dealerships would seem to moot any need for the use of this process at all.  That is until Shane Smith and AimBank devised a way to deploy an aberrant version

---

[8] The use of the cashier's check is key to understanding the process.  A cashiers' check constitutes immediately-available funds, and because it is drawn on the bank instead of the buyer account, the seller does not bear the credit risk of the buyer's insolvency. It also illustrates why using a sight draft between two related parties serves zero purpose unless it is to create "float" under the irregular and abnormal process implemented by Shane Smith and AimBank.

of the drafting process to help create additional "float," which served as an unsecured lending facility (and credit) that benefitted AimBank and Debtors while avoiding AimBank's loan-underwriting processes and review and regulatory scrutiny.

41.     Smith and AimBank agreed to a highly irregular and abnormal version of the sight-draft process to assist Smith with his schemes. As illustrated in the diagram attached as Exhibit "E," Reagor-Dykes and AimBank's corruption of the sight-draft process resulted in a three-step financial operation.

**STEP 1**

> Reagor-Dykes Snyder submits sight draft with photocopies of vehicle title & MSO to AimBank and AimBank immediately advances Reagor-Dykes Snyder against the value of the future sale

42.     First, the "selling" Reagor-Dykes dealership, typically Reagor-Dykes Snyder, would deposit a draft and *photocopies* of vehicle titles and MSOs with AimBank. Upon receipt of these items, AimBank would give *immediate* credit to Reagor-Dykes Snyder's account as a loan for the value of the future sale.

**STEP 2**

> AimBank dispatches sight draft to the bank of a related Reagor-Dykes entity and, upon expiration of the draft period, AimBank receives a cashier's check drawn on the account of the related Reagor-Dykes entity as payment

43.     The second step of the process began when AimBank transmitted the draft to the "purchasing" dealership's bank – a ***related*** Reagor-Dykes dealership. The related entity's bank would have anywhere between seven to ten business days to pay on the draft. The purported "sale" of the vehicle would not officially be consummated until the buying dealership's bank paid the draft. Upon expiration of the draft period, the "buyer/purchaser's" bank would issue a cashier's check to AimBank, drawing funds from the account of the ***related*** Reagor-Dykes entity.  In a typical sight-draft process, the amount of the cashier's check would be deposited into the selling dealership's account. *See* Exhibit "D." At which time, presumably Smith would cause the floor-plan lender to be paid – assuming he paid the floor-plan lender at all.



STEP 3

AimBank keeps the funds for itself as repayment for the loan issued to Reagor-Dykes Snyder upon immediate receipt of the sight draft.

44.     However, these transactions were anything but typical. In the third and final step, AimBank would simply ***retain the funds of the cashier's check for itself as repayment for the loan it issued Reagor-Dykes Snyder*** in the beginning of this scheme. In receiving immediate credit for the drafts, Smith was essentially given an undocumented (unregulated, off-books) loan for a period of seven to ten business days, and this debt was solely repaid by related Reagor-Dykes entities.

45.     AimBank first consented to this process on or about January 5, 2017. On that date, Mr. Tibbit dispatched an email noting that the bank would extend immediate credit

to the Lamesa dealership for deposited drafts on a sight plus ten-day basis. Elated with this news, Smith forwarded Tibbit's e-mail on to his cohorts, Pepper Rickman and Ashley Dunn, noting

> Pepper, I will get with you next week to start this. If you guys have some that are not to First Capital, you could start those today or tomorrow. Ashley and the folks on sixth floor can help with taking them to the bank if you want, we go there every day.

*See* January 5, 2017, Email from Shane Smith to Pepper Rickman and Ashley Dunn entitled "Fwd: Draft Processing." On or about March 4, 2017, Tibbit authorized Smith to implement this process at the Snyder Dealership.

46. While there were some legitimate drafts to and from *bona-fide* third parties, most of the drafts presented to AimBank for immediate credit were intercompany drafts – particularly at the Snyder Dealership. Moreover, and with respect to the intercompany drafts, both Smith and AimBank soon gave up any pretense that this process was anything other than a construct to create float ***when it ceased requiring that the selling dealerships tender original certificates of title and manufacturers certificate of origins with respect to intercompany drafts*** – which is normally a key aspect of the sight-draft process as they are used to allow a buyer to confirm it is receiving valid title before making payment. There were other reasons AimBank knew that the sight-draft process was bogus and was being used merely to generate short term unsecured loans to create float.

47. Among others, that Snyder was using sham drafts to obtain loans from AimBank that would then be repaid by a different Debtor was or should have been apparent to AimBank that there was a scam. This is because AimBank's own records show that

Snyder was depositing drafts based on the purported "sale" of the same car to another Reagor Dykes entity on multiple occasions.

48.     For example, on September 15, 2017, Snyder deposited a draft with AimBank for $55,500 to be drawn on RDAC's funds at FirstCapital. This purported transaction was for the "sale" of a car from Snyder to RDAC. The purported car had a vehicle identification number ending in 549061. A copy of the deposit slip reflecting the VIN is shown below:



Date 9/15/017, Amount $55,500.00

49.     AimBank's records reflect that on January 22, 2018, Snyder deposited another draft for $55,500 to be drawn on RAM's funds at FirstCapital for the purported sale of the same car that Snyder had supposedly sold in September 2017.  A copy of the January 2018 deposit slip reflecting the VIN is shown below:



Date 1/22/018, Amount $55,500.00

50.    The above is far from the only example of Snyder depositing drafts on different dates for the same amount based on the purported purchase of a car that it had purportedly (already) ***purchased*** only a few months earlier. For example, Exhibit A reflects that many of the drafts deposited with AimBank on January 22, 2018, were for identical amounts as drafts deposited by Snyder at AimBank between September 15, 2017, and September 22, 2017.  In many cases, the January 22 deposit slips reflect that the January 22 drafts that were for the same amount as a draft in September 2017 were purportedly for Snyder's purchase of a car from RAM that it had supposedly already bought from RAM four months earlier. For example, on September 19, 2017, Snyder deposited a draft for $20,354 based on its purported sale to RAM of a vehicle with a VIN ending in GZ901847.



Date 9/19/017, Amount $20,354.00

51.     On January 22, 2018, Snyder deposited another draft for $20,354. The deposit slip for the January 22 draft refers to a car with a VIN ending in the same six digits as the September 19 draft.



Date 1/22/018, Amount $20,354.00

52.     There were a number of other drafts deposited on September 19 and January 22 that reflect the purported sale by Snyder to RAM of the same car for the same price on

both dates. For example, Snyder deposited drafts on both dates for $20,000 for its purported

sale of cars both of which supposedly had VINs ending in 25505.



Date 9/19/017, Amount $20,000.00



Date 1/22/018, Amount $20,000.00

53.     While Plaintiff can and will provide more examples of this, the above

examples make the point. On multiple occasions, AimBank loaned Snyder money based

on the purported sale of a car that Snyder had claimed to have sold before and for which

AimBank had lent money on the prior "sale" as well. This is no mere mistake on the part

of AimBank, a bank which prides itself on having a full complement of ex-banking regulators within its upper management.

54.     All-in-all hundreds of thousands of dollars changed hands between dealerships on a monthly basis and through this sight-draft process. Apparently, AimBank and Tibbit grew uncomfortable with this process after a time, because in March 2018, it shortened the repayment period for AimBank drafts from 10 to 7 business days even though during that same month, the Lamesa and Snyder dealerships had a combined $83 million dollars in deposits and withdrawals, again consisting largely of intercompany transactions that dwarfed the historic economic performance of the dealerships.

55.     On May 24, 2018, - that is, just over one month since Mike Epps had been retained as AimBank's Executive Vice President of Administration – Shane Smith was abruptly notified that AimBank would no longer extend immediate credit on intercompany sight drafts. Thus and within a few short weeks of Epps' hiring, the following things occurred; (a) Reagor-Dykes' long time loan officer Mike Tibbit departed from the bank; (b) deposits and withdrawals into the Lamesa checking account decreased by approximately 400%; and, (c)  AimBank elected to end its role in Smith's fraudulent sight draft scheme. As will soon be made clear, this timing is no coincidence.

56.     Between September 1, 2017 and May 24, 2018, Snyder deposited the sight drafts identified on Exhibit "A."  AimBank gave immediate credit to Snyder for the full amount of each of these sight drafts even though the purported buyer's bank had not yet issued or delivered a check to AimBank.   AimBank's granting of immediate credit to Snyder was a loan to Snyder.   AimBank's loan to Snyder was then repaid by another

Debtor.

57.     AimBank knew or reasonably should have known the nature and extent of Shane's fraudulent schemes.  And AimBank benefitted from its participation in Smith's schemes.    In that regard, in December 2017, AimBank's holding company AIM Bancshares, Inc. issued a press release announcing that it was planning to acquire all but not less than all of the assets of Platinum Bancshares of Texas, Inc. and its wholly owned subsidiary Platinum Bank[9]. In a statement to local media, Platinum Bank Director Mickey Travis stated the following with respect to the merger:

> Structuring the transaction as ***primarily a stock transaction*** will enable former Platinum Bank shareholders to ***enjoy ownership in a much larger and steadily growing institution*** that continues to provide services to and focus on the Lubbock community

*See id. (emphasis added).*  It can be presumed that the negotiations with respect to the merger preceded the December 2017 preliminary announcement by some time.  Moreover, the merger must have taken longer than expected, as the closing of the transaction was not announced until the end of April 27 2018.[10]  This announcement came just seven days after the date which AimBank announced the retention of Mike Epps to run the bank's back office, and a week or two before AimBank made the decision to end its participation in the fraudulent sight draft scheme.  Further and in the months that followed, deposit account

---

[9] See  https://www.everythinglubbock.com/news/local-news/aimbank-announces-planned-acquisition-of-platinum-bank/  (last checked September 2, 2020)

[10] See https://www.everythinglubbock.com/news/local-news/aimbank-announces-completed-acquisition-of-platinum-bank/1146630687/

activity in the Lamesa account fell by some 400%.

58.     As Scott Wade stated in his email to Shane Smith in 2014, the bank's relationship with the Reagor Dykes dealerships was one of the reasons that AimBank was able to enjoy such steady growth.  Through the massive (though kited) deposits being made by the Snyder and Lamesa dealerships, AimBank was able to project itself as a strong and growing institution to the shareholders of Platinum Bank, and as such the stock of AimBank's parent company—apparently the primary consideration paid to Platinum shareholders—was made to appear more valuable than cash.  And when Scott Wade was done with his merger, he enlisted the help of Mr. Epps to begin shutting off the spigot.

59.     Thus, and as long as it suited bank management, AimBank was more than happy to take active measures to help Smith carry out his schemes.  Nowhere is this assistance more evident than in the "float" created by the sham draft process that AimBank helped Smith carry out.  The "sales" were nothing more than the meaningless churning of inventory between dealerships assuming, of course, that the vehicles ever left Snyder's lot at all.  And the elaborate and antiquated method deployed to pay for these sales was utterly without purpose—save for giving Smith additional float to continue the kite and the sight draft scheme elsewhere, all to the detriment of the legitimate creditors of the Reagor Dykes debtors. Moreover, and when participating in these schemes no longer suited AimBank, bank management began to slowly and methodically shut off the spigot to Shane Smith. In light of these facts, AimBank cannot say that the transfers it received were in the ordinary course of business or otherwise taken in good faith.

**A.     AimBank's Breach of Deposit Account Control Agreement with Americredit Financial Services, Inc. d/b/a GM Financial.**

60.     The Trust holds certain claims against AimBank that belonged to AmeriCredit Financial Services, Inc. d/b/a GM Financial (hereinafter "**GM Financial**"). Pursuant to a 9019 Settlement Approved by the Court on or about May 12, 2020 [Dkt. No. 1833], GM Financial assigned, inter alia, its claims against AimBank to Debtors.  Those claims subsequently vested in the Liquidating Trust.

61.     On or about January 23, 2018[11], GM Financial, Reagor-Dykes Snyder, LP and AimBank entered into a Deposit Account Control Agreement ("DACA"), attached hereto as Exhibit "B".  Among the DACA's purposes was to protect GM Financial's security interest in Reagor-Dykes Snyder, LP's collateral including vehicles and the proceeds of sold vehicles. The Agreement expressly states that it "is made with reference to the following facts" and then states as one of those facts that "Dealer has designated the deposit account(s) for which the account number(s) have been set forth above (collectively, and together with any renumbered or successor accounts, the 'Operating Account') as the deposit account(s) into which Dealer will deposit cash and cash equivalent proceeds derived from the sale, lease or other disposition of Lender's collateral.  Dealer has agreed that these proceeds belong to Lender and that at all times while Dealer may hold the proceeds (whether directly or in the form of deposits with [AimBank]), it will hold such

---

[11] Mr. Tibbitt did not sign this agreement on behalf of AimBank until February 2018.

funds "in trust" for and on behalf of [GM Financial]." *See* Exhibit "B," *at para 1.2.* The DACA pertains explicitly to "Operating Accounts" which are defined as AimBank account numbers. xxxxx3183 and xxx1026, together with any subaccounts thereof. *See* Exhibit "B," *paras. 1.2 and 2.1*

62.     The DACA contained warranties and imposed obligations on the part of AimBank. Specifically, and as of the date of the execution of the same, AimBank represented and warranted that "**there are no perfected liens or encumbrances[12] with respect to the Operating Account**.". *See* Exhibit "B," *at para 2.2.* The DACA further waives the confidentiality of Reagor-Dykes Snyder's financial information, and provides for a duty on the part of AimBank to disclose information to GM Financial regarding the dealerships business with the bank. *See* Exhibit "B," *at para 2.5.* AimBank further agreed to subordinate all present and future liens, encumbrances, claims, and rights of set-off in the account or in any future accounts. *See* Exhibit "B," *at para 2.6.* Most importantly, AimBank agreed that *all funds* held in Reagor Dykes Snyder's account were trust monies and fully encumbered collateral of GM Financial.

63.     As of the date of its execution of the DACA, AimBank was in breach of its representation that it knew of no "encumbrances" with respect to the Operating Account. In January of 2018, there was a total of $14+ million dollars that moved in and out of

---

[12] The term "encumbrance" is not defined in the DACA. Black's Law Dictionary defines the term as "[a] claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership interest. *Black's Law Dictionary* 667 (11th ed. 2019).

Account No. xxxxx3183—an amount which far surpassed the historic economic performance of the dealership and that at least 92% of all outgoing items were checks to other Reagor Dykes affiliates. Moreover, on information and belief, AimBank's computers would have alerted relevant bank personal of the existence of an ongoing check kite at that time. And AimBank had already held at least one in-person meeting with Shane Smith to address "rumors" regarding the business of Reagor Dykes. In short, AimBank knew that Operating Accounts at issue was being used to kite millions of dollars of monies and that as a consequence there were therefore outstanding claims or "encumbrances" against the account and in favor of other financial institutions that had honored Reagor Dykes Snyder's bogus checks.

64. Moreover, AimBank further facilitated the denuding of the accounts funds even though AimBank, GM Financial, and Snyder had agreed the funds were to be held "in trust" for GM Financial, via its participation in the kiting and fraudulent sight-draft scheme which acts facilitated Snyder's ability to double floor vehicles and sell vehicles out of trust. In essence, the sight-draft scheme was used by both Snyder and AimBank as a tool to circumvent GM Financial's security interest in the account.

65. GM Financial began providing floorplan lending to Snyder in mid-February 2018. From February 2018 through July 2018, only 16.7% of withdrawals from the account went to GM Financial; 83.3% of withdrawals went to various other accounts, as illustrated in the Figure below:

| Reagor Dykes Snyder, LP – AIM DDA Account #xxxxx3183 | | | | |
|---|---|---|---|---|
| Month | Deposits | Checks and Charges | Aggregate Payment to GM Financial | Pct. of Non GMF Payments of Total Checks and Charges |
| Feb. 2018 | $25,646,319.43 | $25,387,654.98 | $2,587,194.07 | 90% |
| Mar. 2018 | $42,807,538.47 | $43,128,414.37 | $7,526,936.99 | 82.5% |
| Apr. 2018 | $41,219,085.60 | $40,921,706.02 | $6,020,726.42 | 85% |
| May 2018 | $30,710,759.51 | $30,543,639.82 | $7,409,193.09 | 76% |
| Jun. 2018 | $38,788,248.70 | $39,218,720.37 | $7,556,469.94 | 81% |
| Jul. 2018 | $50,397,161.20 | $50,363,737.14 | $7,256,043.59 | 86% |
| 6 Month Total | $229,569,112.91 | $229,563,872.70 | $38,356,564.10 | 83.3% |

| February – July 2018 Account Summary | | | |
|---|---|---|---|
| Percentage Outgoing to *GM Financial* | Amount Outgoing to *GM Financial* | Percentage Outgoing to *Other Accounts* | Amount Outgoing to *Other Accounts* |
| 16.7% | $38,356,564.10 | 83.3% | $191,207,308.60 |

66.     Despite agreeing that all cash in the Operating Account represented "trust" proceeds from the sale of GM Financial's collateral, AimBank assisted Smith and Reagor-Dykes Snyder, LP with their fraudulent financial schemes by facilitating the dealership's pattern of selling vehicles out of trust, and self-evident failure to remit sales proceeds to GM Financial. The numbers in the preceding table are derived entirely from AimBank's own bank statements and demonstrate the bank's actual knowledge of the net effect of the scheme on GM Financial.

67.     A duty to cooperate is implied in every contract in which cooperation is necessary for performance of the contract. *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). This duty requires that a party to the contract may not interfere with another party's ability to perform its obligations thereunder. *Id.* at 435. All three parties to the DACA have an implied duty to refrain from

hindering or preventing another party's performance of its duties. *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 770 (Tex. App.—Dallas 2005, pet. denied).

68.     This Court has acknowledged the implied contractual duty of cooperation and succinctly described the contours of the same in *In re: Baerg Real Prop. Tr.,* 585 B.R. 373 (Bankr. N.D. Tex. 2018).   *Baerg* involved only two parties*,* this case involves a tripartite contract.   Nevertheless, the implied duty to cooperate must necessarily impose a duty on the contracting parties to a tripartite contract not to actively assist one other in breaching their respective contractual duties.

69.     AimBank breached this duty by actively facilitating Smith's fraudulent conduct.   By facilitating Smith's fraudulent scheme, it breached the DACA, deprived GM Financial of the very benefits and protections the DACA provided GM Financial, and made GM Financial's performance under the contract impossible.   The parties to the DACA expressly agreed that the funds in the Operating Account were being held "in trust" for GM Financial.   By actively facilitating Smith's fraudulent scheme, AimBank undermined the agreed basis on which the entire contract was based and breached its duties and obligations under the DACA.   AimBank further breached its duty of cooperation under the contract by actively assisting and facilitating Smith and Reagor Dykes Snyder's failure to remit trust proceeds to GM Financial and the double flooring of vehicles through the sight draft scheme.

70.     AimBank also breached its warranty with respect to the DACA as it knew that the ongoing and massive check kite created an encumbrance on the account and in contravention of Section 2.2 of the DACA.

71.     As a consequence and a direct foreseeable result of these breaches, GM Financial was substantially harmed by AimBank's breach of the DACA in the amount of $3,131,482.69—a detailed description of the damages is outlined in the Figure below:

| Description | Amount |
|---|---|
| Net Principal Balance Due | $ 2,423,567.83 |
| Insurance | $ 186,464.24 |
| Customer Fees | $ 400,954.62 |
| **Total Floorplan Obligations** | **$ 3,010,98.69** |
| **Description** | **Amount** |
| Unpaid Tax, Title, & License | $ 34,508.80 |
| Unpaid 3rd Party Trade-In Liens | $ 100,176.41 |
| Ancillary Balance | $ <15,202.08> |
| **Total Retail Obligations** | **$ 120,483.13** |
| **TOTAL** | **$ 3,131,482.69** |

72.     On November 2, 2018, RAM and Snyder filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The other Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on August 1, 2018.

**B.     Certificates of Deposit.**

73.     Plainview owned a certificate of deposit (CD No. XXX671) at AimBank in the amount of $514,477.58 ("Plainview CD").

74.     RDAC owned a certificate of deposit (CD No. XXXX060) at AimBank in the amount of $541,776.91 ("RDAC CD").

75.     Following the commencement of the Bankruptcies, AimBank sought and received lift-stay relief under the aegis of 11 U.S.C. § 362 to set off the aforesaid certificates of deposit. *See Dkt. 893, 1097.*

76.     The granting of lift stay relief, however, does not preclude subsequent

avoidance actions as to the certificates of deposit or otherwise have preclusive effects as to the Trustee's ability to seek equitable subordination and the return of property of the estate. *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 32 (1st Cir. 1994)(no issue preclusion arose from determination of § 362 issue); *Estate Const. Co. v. Miller & Smith Holding Co*., 14 F.3d 213, 219 (4th Cir. 1994) (given summary nature of §362 proceedings, counterclaims are not precluded if later raised); *Matter of Vitreous Steel Prod. Co*., 911 F.2d 1223, 1234 (7th Cir. 1990) (determination of § 362 motion is not a bar to the prosecution of the adversary complaint for preference and fraudulent transfer claims); (*In re Goldberg*, 277 B.R. 251, 266 (Bankr. M.D. La. 2002)("[s]tay relief does not extinguish avoidance actions"); *Willis v. Borg-Warner Acceptance Corp. (In re Willis)* 48 B.R. 295, 303-304 (S.D. Tex. 1985)(rejecting assertion that debtors should have raised fraudulent transfer claim as part of its action to lift automatic stay); *Coleman v. Home Sav. Ass'n (In re Coleman),* 21 B.R. 832, 836 (Bankr. S. D. Tex. 1982) (concluding that "[a]n action to avoid a fraudulent transfer is simply not a proper issue in a § 362 complaint" and refusing to consider res judicata as a defense to a fraudulent transfer action)

77.     On the basis of the facts alleged above, by helping Shane Smith perpetuate the kite and sight draft schemes, AimBank engaged in serious inequitable conduct which injured the creditors of the Reagor Dykes entities.  Accordingly, and under the rubric of Section 510(c) of the Bankruptcy Code, AimBank's claim against the certificates of deposit should be subordinated, and the lien securing said certificates transferred to the Liquidating Trust.  Moreover, AimBank should be compelled to return the Certificates of Deposit as property of the Estates and pursuant to 11 U.S.C. § 542.

### C.    AimBank's Purported Claims Should Be Disallowed.

78.    To the extent Defendant's liability exceeds the balance of any purported claim held by AimBank, AimBank will not hold an enforceable right to payment. Without an enforceable right to payment, no debt would exist and Defendant cannot hold a "claim" as defined under 11 U.S.C. § 101(5). Without a claim against Debtors or the Trust, any and all security interests pledged to secure such nonexistent debt will also cease to exist.

79.    Through this adversary proceeding and pursuant to Rule 3007(b) of the Bankruptcy Rules, Plaintiff objects to and seeks to disallow any and all portions of Defendant's purported secured and unsecured claims.

## VI.    CLAIMS FOR RELIEF.

### COUNT 1:    Avoidance, Preservation, and Return of Actual Fraudulent Transfers under—-11 U.S.C. § 544, 548(a)(1)(A), 548(a)(1)(B), 550, and 551.

80.    Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

81.    With respect to each sight draft identified on Exhibit A, Defendant extended immediate credit to Snyder when Snyder presented the sight draft that was to be paid by another Debtor.  Certain Debtors, other than Snyder, transferred funds to Defendant to pay Snyder's obligations (the "Deposited Sight Transfers").

82.    During the two years prior to November 2, 2018 (for Debtors who had a Petition Date of November 2, 2018) and prior to August 1, 2018 (for Debtors who had sought bankruptcy relief on August 1, 2018), Debtors made the above-defined Deposited

Sight Transfers that served to pay off debts owed by Snyder to Defendant. Each such transfer was made from the property of a Debtor.

83.     Each such transfer was made with the intent to hinder, delay, or defraud creditors of the Debtor who was the transferor of each Deposited Sight Transfer because the transfer was made in connection with and in furtherance of Smith's fraudulent scheme

84.     Each such transfer was in violation of 11 U.S.C. §548(a)(1)(A).

85.     The transferor Debtor for each Deposited Sight Transfer received less than a reasonably equivalent exchange for such transfer and (a) was insolvent on the date that such transfer was made; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

86.     Each such transfer was in violation of 11 U.S.C. §548(a)(1)(B)

87.     Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee.

88.     As of the date hereof, Defendant has not returned any such transfer to Debtors or Plaintiff,

89.     The Defendant did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

90.     The Deposited Sight Transfers were also fraudulent transfers under Section 24.006(a) of the Texas Fraudulent Transfer Act because transferor Debtor did not receive

reasonable equivalent value for the funds it transferred and because it was insolvent at the time of such transfer.

91.    As a result of the foregoing, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 548(a)(l)(B), 550, and 551 and Texas Business and Commerce Code §24.005 and 24.006, Plaintiff is entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Defendant.

**COUNT 2:  Recovery of Avoided Transfers—11 U.S.C. § 550.**

92.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

93.    All transfers referred to in Count 1 are collectively referred to as "All Avoided Transfers."

94.    Defendant was the initial transferee of the All Avoided Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit All Avoided Transfers were made.

95.    Pursuant to § 550(a), Plaintiff is entitled to recover from Defendant an amount not less than the total aggregate balance of all the All Avoided Transfers, plus interest thereon to the date of payment and the costs of this action.

96.    Pursuant to 11 U.S.C. § 551, all of the Avoidable Transfers are preserved for the benefit of Plaintiffs' bankruptcy Estates.

97.    All conditions precedent to the bringing of this action have been performed or have occurred.

**COUNT 3: Equitable Subordination of Defendant's Claim(s) Against the Estate.**

98.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

99.     Subject to proof, any claim asserted by Defendant against Plaintiffs' bankruptcy Estates arises from inequitable conduct, including conduct described in this Complaint, which has resulted in injury to creditors or the conferring of an unfair advantage on Defendant. This inequitable conduct has resulted in hardship to Plaintiffs' bankruptcy Estates and the entire creditor body. Accordingly, pursuant to §§ 510(c)(1) and 105(a), all of Defendant's claims against Plaintiffs' bankruptcy Estates should be equitably subordinated to the allowed claims of legitimate general unsecured creditors for distribution purposes.

100.    All conditions precedent to the bringing of this action have been performed or have occurred.

**COUNT 4: Objection to and Disallowance of all Claims—11 U.S.C. § 502(d) and (j).**

101.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

102.    Pursuant to Rule 3007(b) of the Bankruptcy Rules, a party in interest shall not include a demand for relief of a kind specified in Rule 7001 of the Bankruptcy Rules in an objection to the allowance of a claim but may include such objection in an adversary proceeding.  Rule 7001(8) specifies that an "adversary proceeding" includes any

proceeding to subordinate any claim or interest. Because Plaintiff's objections to Defendant's claims include a request to equitably subordinate such claims, Plaintiff's objection to any and all claims of Defendant against Debtors' Estates should be merged into and included within this Adversary Proceeding.

103. Defendant is a transferee of transfers avoidable under § 549 of the Bankruptcy Code, which property is recoverable and preserved under §§ 550 and 551 of the Bankruptcy Code.

104. Defendant has not paid the amount of the Avoidable Transfers, or turned over such property, for which Defendant is liable under 11 U.S.C. § 550.

105. Pursuant to 11 U.S.C. § 502(d), any and all claims of Defendant or its assignees, against Debtors' bankruptcy Estates must be disallowed until such time as Defendant pays to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

106. In addition, Plaintiff's investigation of the fraud allegations raised by Ford Motor Credit Company is ongoing. Included within Plaintiff's investigation is the extent of Defendant's involvement in the fraudulent activities alleged by Ford. The extent of Defendant's potential involvement and liability remains undetermined at this time. To the extent Defendant's liability exceeds the balance of Defendant's claims against Debtors' bankruptcy Estates, Defendant will not hold an enforceable right to payment against the Estates under 11 U.S.C. § 502(d). Without an enforceable right to payment, no debt would exist and Defendant cannot hold a "claim" as defined under 11 U.S.C. § 101(5). Without a "claim" against Plaintiff, any and all security interests pledged to secure such nonexistent

debt will also cease to exist.

107. Through this adversary proceeding and pursuant to Rule 3007(b) of the Bankruptcy Rules, Plaintiff objects to, seeks to disallow, and seeks to withhold any distributions to Defendant and seek to prevent Defendant from enforcing any and all portions of Defendant's alleged claims against the Estates, both secured and unsecured, until such time as (i) Plaintiff's investigation against Defendant is concluded, and (ii) Defendant pays to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

108. Pursuant to 11 U.S.C. § 502(j), any and all claims of Defendant or its assignee(s) against Debtors' bankruptcy Estates previously allowed, if any, must be reconsidered and disallowed until such time as (i) Plaintiff's investigation against Defendant is concluded, and (ii) Defendant pays to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

109. All conditions precedent to the bringing of this action have been performed or have occurred.

**COUNT 5: Breach of Contract.**

110. Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

111. On January 23, 2018, GM Financial, Reagor-Dykes Snyder, LP and AimBank entered into a Deposit Account Control Agreement ("DACA"), attached hereto as Exhibit "B". The purpose of the DACA was to protect GM Financial's security interest in Reagor-Dykes Snyder, LP's vehicles and the proceeds of sold vehicles.

112.     Specifically, the DACA provided that money in the Reagor-Dykes Snyder, LP account was to be held "in trust". AimBank acknowledged and agreed that Snyder's proceeds would be held in trust for GM Financial, that there was a duty for it to provide information regarding the account, and that it would fully subordinate all present and future liens, encumbrances, claims and rights of setoff in the account. Moreover, AimBank also represented and warranted that there were no encumbrances against the operating account.

113.     At the time that the DACA was executed, AimBank knew the Operating Account was being utilized to kite massive amounts of money and that consequently there were encumbrances against the account in the forms of third-party claims. As such, AimBank breached its representation and warranty by failing to disclose the existence of the Kite to GM Financial. Moreover, AimBank further breached its duty of cooperation with GM Financial under the DACA by actively assisting Smith and Reagor Dykes Snyder, LP in breaching the dealerships obligations thereunder, and consequently making G.M. Financial's performance under the agreement impossible.

114.     AimBank's breach of the contract caused GM Financial to be harmed in the amount of $3,131,482.69 as set forth in Paragraph 49.

115.     All conditions precedent to the bringing of this action have been performed or have occurred.

116.     Plaintiff is entitled to $3,131,482.69 in compensatory damages, as well as its reasonable attorneys' fees, cases expenses, costs, prejudgment interest, postjudgment interest, and all other relief to which it is entitled.

117.     Plaintiff is entitled to recover its attorneys' fees under Chapter 38 of the

Texas Civil Practice and Remedies Code and the DACA. Plaintiff is entitled to recover its expenses and costs under the DACA.

**COUNT 6: Demand for Attorneys' Fees and Recovery of Costs.**

118.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

119.    Plaintiff had to retain attorneys to prepare, file, and prosecute this action and have incurred fees and expenses in connection therewith.

120.    Based on the facts and circumstances surrounding Defendant's willful and intentional acts described herein, it is equitable and just that Plaintiffs recover their costs and reasonable legal fees. Accordingly, Plaintiff seeks recovery of costs, including reasonable attorneys' fees and legal expenses incurred by Plaintiff in connection with the preparation and filing of all pleadings in this case and in prosecuting the same.

121.    All conditions precedent to the bringing of this action have been performed or have occurred.

**COUNT 7: Return of Certificates of Deposits**

122.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

123.    The Plainview CD and RDAC CD represent property interests owned by the Trust or a debt owed to the Trust. Thus, the Plainview CD and RDAC CD are property of the Trust under 11 U.S.C. § 541(a) and the Plan.

124.    Defendant is in possession, custody and control of the Plainview CD and RDAC CD.

125.    Defendant is not authorized to have possession, custody or control of the Plainview CD and RDAC CD.

126.    The Plainview CD has more than inconsequential value because the amount of the Plainview CD equal to exceeds $514,477.58. The RDAC CD has more than inconsequential value because the amount of the RDAC CD is equal to or exceeds $541,776.91.

127.    Accordingly, pursuant to 11 U.S.C. § 542 and any other applicable provision of the Code, Defendant is required to turnover exclusive physical possession, custody, dominion and control of the Plainview CD and RDAC CD via transfers of $514,477.58 and $541,176.91, plus any amounts of additional interest that have accrued since the RDAC CD's and Plainview CD's respective dates of maturity, and any and all other interest to which Plaintiff is entitled thereon.

128.    All conditions precedent to the bringing of this action have been performed or have occurred.

## VII.    RESERVATION OF RIGHTS.

129.    During this Adversary Proceeding, Plaintiff may learn through discovery (or otherwise) additional facts and circumstances regarding the relationships among Debtors, any other Debtor parties or their affiliates, Defendant, and other third parties that were unknown to Plaintiff as of the date of this Complaint. The allegations in this Complaint are formed on Plaintiff's ongoing investigation to date regarding the transactions evidenced by Plaintiff's books and records

130.    Plaintiff reserve all rights to supplement and amend this Complaint,

including, without limitation, the right to (a) f further state, allege, or aver additional facts and information; (b) seek to avoid additional obligations, transfers, or conveyances; (c) seek to recover additional transfers; (d) modify, add, subtract, revise, or otherwise amend the parties; (e) allege additional defendant parties; or (f) allege additional causes of action that may become known to Plaintiff at any time during this Adversary Proceeding through discovery or otherwise, and for the all such amendments to this Complaint to relate back to the same.

### Conclusion and Request for Relief.

For the foregoing reasons, Plaintiff asks the Court to grant them all of the relief requested in this Complaint. Plaintiff further requests all other relief to which it may be justly entitled.

Respectfully submitted,

By:    */s/ Andrew S. Hicks*
Andrew S. Hicks
Texas Bar No. 24032419
Marc S. Tabolsky
Texas Bar No. 24037576
Schiffer Hicks Johnson PLLC
700 Louisiana Street, Suite 2650
Houston, Texas 77002
Tel:    (713) 357-5150
Fax:    (713) 357-5160
ahicks@shjlawfirm.com
mtabolsky@shjlawfirm.com

/s/ Andrew R. Seger
Andrew R. Seger
State Bar No. 24046815
KEY TERRELL & SEGER, LLP
P.O. Box 98433 (Mail)
Lubbock, Texas 79499
4825 50th St., Ste A
Lubbock, Texas 79408
Tel:   (806) 793-1906
Fax:   (806) 792-2135
aseger@thesegerfirm.com

/s/ Dustin Burrows
Dustin Burrows
Texas Bar No. 24048375
LIGGETT LAW GROUP, P.C.
1001 Main Street, Suite #300
Lubbock, Texas 79401
Tel:   (806) 744-8478
Fax:   (806) 744-8479
dustin@liggettlawgroup.com


**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2020, the foregoing was filed in the papers of this case with those parties receiving electronic notices herein presumptively receiving a copy of same.


/s/ Andrew S. Hicks
By:  Andrew S. Hicks