Timothy T. Pridmore; SBN: 00788224
Todd J. Johnston; SBN: 24050837
MCWHORTER, COBB & JOHNSON, LLP
1722 Broadway (79401)
P. O. Box 2547
Lubbock, Texas 79408
806/762-0214; 806/762-8014498-4808 (fax)
*Attorneys for Debtors/Defendants/Counter-Plaintiffs/Third-Party Plaintiffs/Third-Party
Defendants 2B Farms, a Texas General Partnership, Terry M. Robinson, Rebecca A. Robinson
and Non-Debtor, Angela Robinson*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| McClain Feed Yard, Inc., et al., | § | Case No. 23-20084-rlj7 |
| *Debtors.* | § | Jointly Administered |
| | § | |
| In re: | § | |
| | § | |
| 2B Farms, a Texas General | § | Case No. 23-500096-rlj12 |
| Partnership, et al., | § | Jointly Administered |
| *Debtors.* | § | |
| | § | |
| In re: | § | |
| | § | |
| AgTexas Farm Credit Services, AgTexas PCA, | § | |
| Thorlakson Diamond T Feeders, LP, | § | |
| *Plaintiffs,* | § | |
| | § | Adversary No. 24-02007-rlj |
| and | § | Consolidated Adversary Proceeding |
| | § | |
| Edward Dufurrena et. al., | § | |
| *Intervenor-Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| Rabo AgriFinance, LLC, et al., | § | |
| *Defendants.* | § | |
| | § | |
| | § | |

{00875990.DOCX - ver}

# EXHIBIT "1"

|  | § |  |
| --- | --- | --- |
| In re: | § | |
| | § | |
| HTLF Bank, as successor to First Bank & Trust, | § | |
| _Plaintiffs, Counter-Defendant and Cross-Claim Defendant,_ | § | Adversary No. 24-02007-rlj |
| | § | Consolidate Adversary Proceeding |
| v. | § | |
| | § | |
| 2B Farms, a Texas General Partnership, Terry M. Robinson, and Rebecca A. Robinson, | § | |
| _Defendants, Counterclaim-Plaintiffs, Third-Party Plaintiffs and Third-Party Counterclaim Defendants,_ | § | |
| v. | § | |
| | § | |
| Rabo AgriFinance, LLC and Mechanics Bank, | § | |
| _Third-Party Defendants and, as to Rabo AgriFinance LLC only, Third-Party Counterclaim Plaintiff and Cross-Claim Plaintiff._ | § | |

**2B FARMS, A TEXAS GENERAL PARTNERSHIP, TERRY M. ROBINSON AND REBECCA A. ROBINSON'S THIRD AMENDED THIRD-PARTY AND CONSOLIDATED COMPLAINT ~~ALSO AMENDING AND CONSOLIDATING REMOVED STATE COURT COUNTERCLAIMS AGAINST HTLF BANK~~[1]**

2B Farms, a Texas General Partnership, Terry M. Robinson and Rebecca A Robinson

(collectively, "**2B Farms**", "**Plaintiffs**" and/or "**Debtors**"), through their counsel, file their

~~Second~~ Third Amended Third Party and Consolidated Complaint ~~Also Amending and~~

---

[1] This ~~Second~~ Third Amended Third Party and Consolidated Complaint amends the ~~Second~~First Amended Third Party Complaint filed by 2B Farms against Rabo AgriFinance, LLC, Rabo Diversified Services, LLC and Mechanics ~~Bank and adds Rabo Diversified Services, LLC as a defendant~~. It also includes amendments to the consolidat~~ds the Counter Petition 2B Farms filed in the 72nd Judicial District of Texas, Lubbock County, Cause No. 2023-CV-0565~~ Complaint against First Bank & Trust (nka UMB Bank n.a., successor by merger to HTLF Bank, d/b/a First Bank & Trust~~HTLF Bank~~) ~~removal to federal court.~~

{00875990.DOCX - ver}

Consolidating Removed State Court Counterclaims Against HTLF Bank, complaining of Rabo AgriFinance LLC, Rabo Diversified Services LLC (collectively with Rabo AgriFinance, LLC "**Rabo**"), Mechanics Bank ("**Mechanics" or "Mechanics Bank"**"), and UMB Bank n.a., successor by merger to HTLF Bank, d/b/a First Bank & Trust HTLF Bank, as successor to First Bank & Trust, and all successor entities (jointly all collectively "**HTLF**" and/or "**First Bank**") (collectively, "**Defendants**" or "**Third Party Defendants**"), and in support of same would show unto the Court as follows:

**I.**
**PARTIES**

1. Defendant Rabo AgriFinance LLC is a limited liability company that does business in various locations in Texas. Rabo has appeared in this lawsuit and will be served through its attorneys of record.

2. Defendant Rabo Diversified Services, LLC, is a Delaware limited liability company. It may be served by serving its agent for service in Texas, Corporate Creations Network, Inc., 5444 Westhimer Rd., Suite 1000, Houston, Texas 77056. Issuance of citation is requested at this time.

3. Defendant Mechanics Bank is a California stock corporation that does business in Texas. Mechanics Bank has appeared in this lawsuit and will be served through its attorneys of record.

4. Defendant UMB Bank n.a., successor by merger to HTLF Bank, d/b/a First Bank & Trust HTLF Bank, as successor to First Bank & Trust, and all successor entities is a Colorado corporation, that does business in various locations in Texas. HTLF has appeared and answered in this lawsuit and will be served through its attorneys of record.

**II.**

{00875990.DOCX - ver}

**JURISDICTION AND VENUE**

5.      This is an adversary proceeding pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

6.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because the claims asserted herein are related to or arise in the above-captioned chapter 12 case.

7.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B), (C),(F),(H) and (O).

8.      Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**III.**
**FACTUAL BACKGROUND SUPPORTING PLAINTIFFS' CLAIMS**

**A.      Plaintiffs Entered Into Business Transactions with McClain Without Knowing That a Massive Fraud Scheme Was Taking Place.**

9.      Plaintiffs had ongoing business transactions with Brian McClain and his entities (collectively "**McClain**" or "**MFY**").  These business dealings included buying and selling of cattle, including having cattle owned by Plaintiffs that were delivered to one or more of McClain's facilities for growing and health care before they were ready for shipment to a finishing feedyard. Details of specific arrangements concerning these dealings have been provided in discovery and in claims made by Plaintiffs in the bankruptcy proceedings.

10.      The McClain Trustee in the bankruptcy proceedings confirmed that McClain engaged in a massive fraud involving cattle and that over $120,000,000.00 in claims have been filed by over 100 parties, including Plaintiffs herein. Plaintiffs here have filed their amended proof of claim in the amount $19,789,446.70 in each of the McClain bankruptcy proceedings, which is

incorporated by reference herein for all purposes. Other similar claimants have filed proofs of claims and complaints against the same or similar parties in this litigation.

**B.** **Rabo Continuously Extended Credit to McClain Despite Knowing Its Operations Posed High Risk and Significant Exposure and Mechanics Bank's Involvement.**

11.    Rabo[2] is one of the largest lenders in the agricultural industry in the United States and has over 100 years of experience in the agriculture lending industry. Rabo touts its robust understanding of all segments of the agricultural industry, including cattle feeding, with a nationwide team of agricultural lenders, financial analysts, and other leading professionals in the agricultural finance space. Rabo's own website explains that its "Relationship Managers are agricultural specialists with global networks and local knowledge, on-farm experience and financial expertise…."

12.    Starting in about 2018, Rabo allowed Brian McClain and his MFY entities to expand his cattle-feeding operations from Kentucky into the Texas Panhandle—the cattle-feeding capital of the world. However, this expansion followed an earlier period of significant concern regarding McClain's financial practices.

13.    In October 2017, MFY, operated by Brian McClain, sought credit from Rabo but was initially denied based on "red flags" contained in a Pre-Funding Collateral Inspection Report prepared by its lead inspector. The report raised numerous red flags, including inadequate

---

[2] Rabo AgriFinance, LLC provides financing to agribusiness in North America and Rabo Diversified Services LLC is a related entity that, on information and belief, provides operations support and other support services to Rabo AgriFiance LLC (collectively "**Rabo**").  Employees of both entities were engaged in Rabo's action that are the basis of this litigation, and some employees are at time identified as associated with both entities.

{00875990.DOCX - ver}

accounting records, unreliable borrowing base reports, and a high risk of inaccurate financial reporting. The inspection further revealed that MFY lacked proper accounting systems, with books maintained manually and no accurate general ledger or trial balance available. The company's financial records were disorganized, and even the external bookkeeper admitted the books had never been set up correctly.  Rabo initially reported that MFY was using two sets of books, and although it appears this report was later retracted, MFY could not produce balanced financial statements or provide accurate data for key financial metrics.

14.     Additionally, MFY's borrowing base documentation was incomplete and inconsistent, with no standardized method to value cattle accurately. MFY's borrowing base calculations relied on overly simplistic and unsupported pricing methods, which lacked the rigor Rabo's credit standards required. Rabo's lead inspector's report indicated that MFY did not have an adequate system in place to maintain financial records, requiring extensive oversight and coaching to meet even the most basic reporting standards. The inspector noted that MFY's operations posed a "high information risk", as the company failed to maintain proper documentation for intercompany transactions, accounts payable, and key financial activities. The lack of internal controls and MFY's inability to provide basic financial reports or reconcile key accounts led Rabo to conclude that MFY was not creditworthy.  In December 2017, Rabo declined credit to MFY.

15.     However, Rabo's Relationship Manager for McClain, Chip Lawson, pressured Rabo to re-examine MFY as a customer despite all the red flags in the first part of 2018. Therein, in May 2018, Rabo reversed its initial decision and approved a $6.5 million revolving line of credit in favor of MFY despite the unresolved risks documented in the initial 2017 Pre-Funding Collateral Inspection Report.  The same red flags identified by Rabo's lead inspector in late 2017

{00875990.DOCX - ver}

still existed in May 2018, yet inexplicably Rabo made the decision to extend credit to MFY, enabling McClain to begin to fund his fraudulent scheme.

16.     Over the next three years or so following the initial approval, Rabo, a self-described sophisticated and experienced agricultural lender with established policies and procedures designed to mitigate risk, extended nearly $2 million in real estate loans and approximately $50 million in operating capital to McClain. During this time, the information risk was still high, the red flags still existed, yet the credit extended to McClain increased almost 10-fold. Despite the substantial credit exposure, Rabo unbelievably simply relied on McClain's limited, self-reported submissions and borrowing base reports to assess the financial health of McClain's own operations. These reports were based primarily on McClain's representations regarding the number of cattle purportedly owned, which served as the primary collateral securing the multi-million-dollar credit facilities.

17.     Instead of exercising the rigorous oversight required by industry standards and its own policies and procedures, Rabo regularly failed to verify the accuracy of McClain's claims through independent audits, comprehensive collateral verifications, or consistent financial reviews of McClain's operations. Remarkably, Rabo continued to increase its loans to McClain even though (1) McClain's loans with Rabo were repeatedly overdrawn, (2) Rabo was fully aware of the ongoing significant financial and operational problems identified in 2017, including McClain's inadequate accounting systems, unreliable financial reporting, and high information risk, and (3) Rabo's own inspection reports which were negative or incomplete in every year, all of which remained unresolved as his credit exposure grew exponentially.

18.     In approximately May 2018, Mechanics Bank began to operate McClain's depository banking functions.  McClain had three separate bank accounts at Mechanics Bank.

Plaintiffs were using these accounts to transact business with McClain. Rabo's pleadings in Bankruptcy Court allege that it had control over the Mechanics Bank accounts used by McClain through "deposit account control agreements" (DACAs).[3] These accounts were "sweep" accounts in which all funds were "swept" to Rabo from Mechanics Bank to pay down McClain's line of credit extended by Rabo. Items presented that exceeded the funds available in the account were paid in one of the following ways 1) if available, an extension by Rabo on McClain's line of credit, 2) if the line was maxed out, by an "overline" extension to that line of credit, 3) by the intercompany transfer of funds from one McClain entity's account to another, or 4) by the wiring or other deposit of funds into the overdrawn account by third parties.  Because overdrafts in the millions of dollars were routinely presented (if not daily, weekly), Mechanics Bank and Rabo communicated directly between themselves and with McClain about how to handle these transactions regularly as evidence by emails produced in this litigation and as testified to by Rabo representatives.  One of the solutions Rabo and Mechanics Bank used to cure the consistent overdraft problem was to continue to extend credit, either on a temporary basis or a permanent basis, further enabling McClain to fund his fraudulent scheme to the detriment of Plaintiffs.

19.    Rabo's Internal Agricultural Field and Collateral Inspection Department's standards required at least biennial inspections for high rated loans over $3 million. Loans with higher risk characteristics required bi-annual inspections. Such inspections were "expected to provide an assessment on current assets, including asset quality, disposition, quantity, and valuation method, as well as validate information such as budgets, projections, accounting records, and various management or business strategies."

---

[3] These allegations may be found in Rabo's Amended Complaint filed in  Cause No. 23-02005-rlj, in the U.S. Bankruptcy Court for the Northern District of Texas, Amarillo Division, as well as testified to by Rabo representatives in depositions recently taken.

{00875990.DOCX - ver}

20.    Despite its own standards, Rabo periodically (but never regularly), conducted collateral inspections and prepared reports for Rabo's credit department and finance team as part of its risk management procedures. On multiple occasions, these internal reports identified significant concerns regarding McClain's operations. Despite the known and reported risks, Rabo and Mechanics Bank continued approving overdrafts and increasing the credit exposure for McClain without proper due diligence. The financial institutions facilitated the extension of credit even though McClain clearly violated the financial reporting requirements set by Rabo and account agreements with Mechanics Bank. Like putting lipstick on a pig, Rabo and Mechanics Bank, and their employees, appeared focused on the profits of McClain and thereby to them, not the stability or validity of McClain's operations. In the words of Rabo's Senior Relationship Manager, in an email dated October 15, 2020- he saw no issues or reasons to downgrade the accounts as they "made like $12mln in profits last year….", profits and greed had rooted in deep with Rabo and Mechanics Bank.

21.    Around this time (if not earlier), Rabo knew that at least 30% of the cattle fed in the McClain yards were owned by third parties, known as "customer feeders" (i.e. Plaintiffs). Mechanics Bank likewise had to know of the fraudulent scheme just by a cursory review of McClain's bank accounts alone and other internal reports generated relating to possible kiting schemes as early as 2019.

22.    Despite the consistent concerns with and red flags concerning McClain's operations, as well as the ever-increasing line of credit extended to MFY, in or around August 2019, Rabo extended nearly $5 million in additional credit to 7M (one of three (3) McClain Feedyards) for the expansion of McClain's operations with an additional feedyard in the Texas panhandle, and within the next twelve months was already extending total credit to McClain of

approximately $24 million.  Continuing increases in credit to both MFY and 7M continued apace from there.  Mechanics Bank likewise knew of these increases and actions, but did not say anything., despite internal check kiting reports warning of potential improper activities dating back to 2019.

23.    In 2021, Rabo worked to lump in MFI with MFY and 7M into one combined loan package that, once approved, would increase the total credit for McClain to $45 million. The 2021 Pre-Funding Collateral Inspection Report documented that while McClain was responsible for preparing monthly non-restrictive Borrowing Base Certificates (BBCs), there were pervasive issues with the accuracy of the submitted financial information. The report highlighted that McClain's financial reporting relied heavily on self-reported data with minimal supporting documentation, raising concerns about the reliability of the cattle inventory counts, the valuation of assets, and the accuracy of accounts receivable. The inspector noted that McClain's use of the upper average price for cattle valuation lacked conservatism, potentially inflating the value of the collateral. Moreover, errors were identified in the reporting of cash accounts, with an input error of over $1.6 million in misreported negative balances, suggesting a lack of internal controls and oversight over financial reconciliations. Nonetheless, Rabo approved this large credit increase, thereby increasing McClain's total line of credit to $45 million; and Mechanics Bank again said nor did anything to question or stop the fraud, despite internal check kiting reports warning of potential fraud dating back to 2019. .

24.    Sometime prior to May 2022, McClain's business model changed significantly because it was no longer feeding cattle for Friona Industries.  Rabo, which had previously been aware of McClain's heavy reliance on Friona, learned of this change in approximately May 2022, when it conducted a collateral inspection.

{00875990.DOCX - ver}

25.     The May 2022 Collateral Inspection Report revealed that McClain's accounting issues had not only persisted but had worsened with the growth of his operations. The report explicitly stated that McClain's operations had outgrown their bookkeeping support staff, and the information risk had increased substantially. During the inspection, Rabo identified a material understatement of outstanding checks by more than $3.4 million, discrepancies in accounts payable related to feed purchases, and an additional $250,000 in unreported liabilities. The inspector emphasized that McClain's accounting staff struggled to maintain accurate records, with errors stemming from handwritten checks being omitted from reconciliations and the reliance on an external accountant who was unaware of key transactions. Despite these ongoing and new "red flags" Rabo and Mechanics knowingly pressed on with the scheme.

26.     In Rabo's May 11, 2022 Collateral Inspection Report, Rabo's inspector noted that all cattle inventory were "claimed as owned by [McClain] and viewed on the date of inspection . . . ." The inspector noted that the change in McClain' business operations "has caused McClain to own more cattle personally . . ." and that would be a "temptation for McClain to grow more so that he can fill the hole left in his capacity which occurred once [Friona Industries] quit feeding/growing cattle on a regular basis." The inspector noted that it would take McClain great discipline not to expand his "personal" headcount and recommended that McClain not expand its operations any further until its accounting processes and procedures are up the standard needed for his current alleged headcount of 70,000 cattle.

27.     The inspector further noted that McClain had a large account receivable for feed relating to cattle that were owned by various customers. The account receivable noted in the inspection report reflected that the account receivable for feed was approximately 1/3 of the value of the feed and grain inventory accounted for in the inspection report—thus confirming that a

substantial amount of cattle at McClain facilities were not "company owned" as McClain represented. But yet again, Rabo and Mechanics Bank continued on with this scheme, that any reasonable lender would have immediately stopped.

28.    Moreover, Rabo's inspector openly acknowledged reviewing all McClain's bank statements for March 2022, in collaboration with Mechanics, the depository Bank. These statements unveiled numerous substantial transactions from third parties, supposedly for cattle purchases. Additionally, these statements showed several perplexing intercompany transactions, and Rabo's collateral inspection reports have always noted that McClain's record-keeping and accounting procedures consistently fell short of Rabo's standards. Again, Mechanics Bank also clearly failed to address these issues as well.

29.    Despite years of repeated recommendations from Rabo and Chip Lawson to hire an in-house Chief Financial Officer (CFO) and improve financial controls, McClain failed to implement these changes, and Rabo did nothing. The inspector concluded that the lack of proper accounting processes, insufficient staffing, and weak internal controls posed a significant financial risk, yet neither Rabo nor Mechanics Bank's management did anything to enforce corrective actions, and pressed on with the lending relationship and profits Rabo and Mechanics Bank were receiving from same.

30.    These red flags pointed to fundamental risks in McClain's business model and creditworthiness. Despite these documented concerns, Rabo's management disregarded the warnings, failing to initiate corrective measures or conduct deeper investigations. Instead, the credit facilities were routinely increased, exposing third parties who provided funds for cattle purchases and fed cattle in the yards owned by the McClain to even greater financial risk. Rabo's willful neglect of these internal warnings underscores a systemic failure to adhere to its lending

policies, contributing directly to the unchecked expansion of McClain's fraudulent activities.

31.     Finally, after a flurry of increased activity in deposits and checks in late 2022 and 2023, in February 2023, Rabo initiated an emergency collateral inspection, that, in the words of one of its inspectors, resulted in the "house of cards [being] pretty well crashed" and substantiated what Rabo and Mechanics Bank had known from the beginning – McClain was high risk and not credit worthy.  This was the first time in over four years that Rabo looked at, counted and inspected actual cattle.[4] The investigation revealed that McClain had been providing false reports regarding the number of cattle the companies purportedly owned. Despite McClain's claims that they possessed approximately 80,000 head of cattle (far above what the yards could sustain because of state regulatory rules and limited water availability), the collateral inspection conducted on February 28, 2203 by Michelle Stockett, Sr. AFCID Collateral Inspector for Rabo, uncovered a stark reality: only around 8,000 cattle were present at the two facilities in Texas. Furthermore, the inspection and subsequent inspection report dated March 10, 2023, revealed and confirmed that McClain did not even own the cattle in these yards; therefore, they were not financed by Rabo and were not subject to its security interest. Rather, third-party feed yard customers, like Plaintiffs, owned the cattle that were actually present—not McClain.

32.     In the words of one of Rabo's inspectors, Michelle Stockett, she noted:

> **"This is basically a worst-case scenario" and a "Possible Fraud Case. Recommendation to downgrade immediately and take control of cattle as soon as possible due to concerns related to cattle being owned by other parties."**

A true and correct copy of the Stockett Report is attached hereto as Exhibit "A" (the "**Stockett**

---

[4] On March 4, 2023, Rabo's Executive Vice President of Rural Banking, North America  was informed by another Rabo representative that "[i]t has come to my attention that a full headcount/inspection has not been done for over 4 yrs."

{00875990.DOCX - ver}

**Cattle Inspection Report"), and incorporated herein by reference for all purposes**

33.      It quickly became apparent to Rabo and Mechanics Bank that it had to act swiftly and discreetly to deal with a $70 million operating line not secured by any cattle assets owned by McClain. Rabo's Chip Lawson, who testified that he was "distraught" in learning the inspection results, stated that Rabo had no idea who owned the cattle in McClain's feed yards. After years of avoiding the hard questions related to McClain's business operations, in March of 2023 (after the final February inspection) Rabo took rapid action to protect its **own** interests, to the extreme personal detriment of Plaintiffs' funds and cattle. Rabo (1) presented a Forbearance Agreement to McClain to keep the operation afloat; (2) then – after taking control of McClain – installed its own "fixer" to serve as the Chief Restructuring Officer; ~~and~~ (3) Rabo, Mechanics and McClain then signed three (3) new DACA Agreements for each of the three (3) bank accounts at Mechanics and (4) in early April of 2023, Rabo and Mechanics Bank coordinated the freezing of the McClain bank accounts at Mechanics Bank as to all withdrawals, but continued to allow deposits of funds into the accounts of innocent ranchers and producers, such as Plaintiffs, who did not know of McClain's fraudulent scheme, unlike Rabo and Mechanics Bank at the time. ~~Plans were quickly arranged for Rabo to take possession of and auction off the cattle in McClain's yards, despite knowing that third parties owned these cattle and were not subject to Rabo's lending or security agreements with McClain.~~

34.      While Rabo and Mechanics were ~~was~~ busy taking action to protect themselves from the collapse of ~~the~~ the fraud they~~it~~ had enabled— coordinating the bankruptcy filing of McClain, seizing McClain's business records from his Kentucky headquarters, and shipping them to its investigators in Chicago—Plaintiffs, the cattle producers who had live animals on feed at McClain's yards, continued to unknowingly pay for feed, purchase cattle, and expected McClain and his banks (Rabo and Mechanics Bank) to send them payments for cattle purchased and/or sold

on their behalf. Millions of dollars flowed into McClain's Mechanics Bank accounts, which Rabo now also controlled through the DACA Agreements. Each used their power and control to subvert, take and wrongfully offset funds and cattle from parties such as Plaintiffs.  As to Plaintiffs, this is particularly true as shown below, when Mechanics Bank and Rabo took three (3) deposits (wires) and refused to honor three (3) checks to Plaintiffs on April 4, 5, and 6, 2023, for a collective loss to Plaintiffs for over $15,000,000.

35.    The February 2023 investigation by Michelle Stockett was not the first red flag concerning McClain's operations and creditworthiness. Instead, it was the culmination of years of both intentionally and negligently overlooked warnings, ignored financial discrepancies, and systemic failures within Rabo's risk management protocols that had allowed McClain's fraudulent activities to persist and expand.

**C.    Rabo and Mechanics Bank's Willful Disregard of Borrowing Base Red Flags, Policies and McClain's Capacity Limits.**

36.    Moreover, to their own benefit and to the detriment of Plaintiffs, Rabo sent a "Freeze and Turnover Letter" to Mechanics Bank on April 5, 2023, concerning funds in the three (3) McClain accounts, and again failed to advise the cattle owners such as Plaintiffs of this drastic change of events.  This directly effected Plaintiffs in that they had six (6) transactions on Apil 4, 5, and 6, 2023 that Mechanics Bank and Rabo intentionally took action by accepting three (3) wires for approximately $7.3 million and refusing to honor three (3) McClain Feed Yard checks for approximately $7.5 million.

37.    Still further, on April 6, 2023, Rabo sent a "Notice of Default Letter" to McClain and his entities. Again, failing to advise the cattle owners such as Plaintiffs of the course of action.

38.    Despite their expressed knowledge of the fraud and financial scheme, and knowingly participating in same, Mechanics Bank, per its pre-arranged agreement with Rabo,

{00875990.DOCX - ver}

incredibly took three (3) separate wires from ~~Plaintiffs~~ Plaintiff 2B Farms for approximately $2,500,000.00 each on April 4th, 5th, and 6th, 2023, and refused to honor three (3) separate checks in a similar amount that McClain had delivered to Plaintiffs drawn on the Mechanics Bank account for the purchase of Plaintiffs cattle ~~(See paragraphs 70-74 below for more detail).~~.  This culminated in a $15,000,000 + direct loss to Plaintiffs.

39.     In addition to the red flags raised during Rabo's intermittent collateral inspections, another source of information that raised serious questions and concerns about whether McClain had legitimate operations was McClain's Borrowing Base Certificates ("**BBC**"). McClain's monthly BBCs submitted were critical in supporting the multi-million-dollar credit facilities extended by Rabo. The BBC's reported the number of cattle McClain purportedly owned, the primary collateral for Rabo's loans. However, Rabo systematically ignored discrepancies between the reported cattle numbers and McClain's actual operational capacity, demonstrating a reckless disregard for basic risk management practices.

40.     McClain operated two feedlots in Texas, and one he allegedly leased from a third party, with a combined maximum capacity of approximately 59,000 head of cattle.[5] Despite this clear, physical limitation, in its January 2022 BBC, McClain reported ownership of 75,529 head of cattle, **exceeding the feedlots' capacity by more than 16,000 head**. This discrepancy should have been an immediate red flag for Rabo, especially given its role as a sophisticated agricultural lender with established procedures for monitoring collateral. The number was an even bigger red flag considering that Rabo knew McClain was also feeding third-party cattle at the feedlots and,

---

[5] However, Rabo knew as of June 21, 2019, that McClain only intended there to be 10,000 head at the 7M facility. Internal communications between Rabo representatives reveal that "Brian told Matt that he didn't expect to have over 10k head at one time [at the 7M facility]". Nonetheless, Rabo was pushing for a 40,000 head limit at the facility no matter what. This would reduce the capacity of the Texas facilities to between 19,000-49,000 head.

{00875990.DOCX - ver}

according to Rabo's own employees, McClain's BBCs reported only company-owned cattle, omitting third-party cattle. Similar discrepancies at the individual feed yard level had begun years before. *See* Table 1 below. Yet, Rabo failed to conduct routine physical inspections to verify the accuracy of McClain's reports, relying instead on self-reported data without any meaningful verification.

| BBC Date | Head Claimed at McClain Feed Yard | % Capacity |
|---|---|---|
| 4/30/2018 | 8,651 | 288% |
| 7/31/2018 | 9,971 | 332% |
| 7/31/2019 | 15,514 | 517% |
| 7/31/2020 | 21,191 | 706% |
| 7/31/2021 | 25,219 | 841% |
| 7/31/2022 | 31,927 | 1064% |
| 12/31/2022 | 37,924 | 1264% |

*Table 1: McClain Feed Yard had a permitted capacity of 3,000 head according to its Texas Commission on Environmental Quality permit, of which Rabo had knowledge. Purportedly, additional pens leased nearby brought that capacity up to 9,800, but even if the additional capacity existed, over-capacity BBCs were submitted by summer 2018.*

41.    In January 2023, McClain submitted another BBC dated 12-31-22 which claimed ownership of over 87,000 head of cattle. This was logistically impossible because the feedlots could not hold that many cattle. In early January 2023, Rabo's upper management finally became concerned that McClain reported more cattle than he could hold. Despite this, Rabo approved an increase in McClain's line of credit from $48 million to $55 million, as documented in a January 10, 2023, communication from Rabo's Vice President. This approval was granted even though McClain's quarterly financials were past due, and internal reports acknowledged concerns about McClain's cash flow management and lack of internal financial controls.

42.    Rabo's former Senior Relationship Manager (Chip Lawson) testified that McClain's cattle were the most important collateral for Rabo by far (real estate was only approximately 3% of the collateral base). However, as Lawson testified, Rabo did not conduct standard industry inspections to verify the existence of cattle serving as collateral for McClain's line of credit. Despite its reputation as a leading agricultural lender, Rabo's Executive Vice President-Head of

{00875990.DOCX - ver}

Rural Banking, North America, admitted in a March 4, 2023 email—sent after discovering McClain's fraudulent scheme but weeks before declaring a default and publicly disclosing the issue—that **"it has come to my attention that a full headcount/inspection has not been done for over 4 years."**

43.     The failure to question the inflated cattle numbers was not due to oversight but rather a deliberate choice by Rabo to ignore obvious red flags. The motivation was clear: Rabo earned a 43% profit margin on McClain's account, providing a strong financial incentive to keep the account afloat despite the growing signs of fraud. Had Rabo conducted even basic but essential due diligence—such as physical cattle counts or reconciling inventory with feed capacity—it would have discovered McClain's fraudulent activity much earlier.  Instead, Rabo prioritized short-term financial gains over prudent risk management, enabling McClain's scheme to continue unchecked.

44.     Ultimately, Rabo's actions demonstrate a systemic failure to adhere to its lending policies. The decision to ignore discrepancies in borrowing base reports and the refusal to perform fundamental collateral verification directly facilitated McClain's fraudulent activities. This pattern of intentional and willful blindness and financial self-interest caused devastating harm to Plaintiffs.

**D.     Rabo and Mechanics Bank Knew of the McClain Insolvency and Involvement in Check Kiting**

45.     From as early as 2018, Rabo and Mechanics Bank (Rabobank, N.A. until it was acquired by Mechanics Bank in September 2019) were fully aware of McClain's precarious financial condition, as evidenced by a persistent pattern of overdrafts, maxed-out credit lines, and questionable cash flow activities. Despite clear and repeated red flags, both institutions failed to intervene meaningfully and actively facilitated and concealed the McClain insolvency, enabling behavior consistent with check-kiting schemes to maintain the illusion of financial stability. As

{00875990.DOCX - ver}

addressed above, Mechanics Bank further had all of McClain's banking records and saw the hundreds of millions of dollars going in and out of the McClain accounts, and had to know of the fraud occurring, but again chose to do nothing.

46.    An early significant sign of trouble surfaced in October 2018, when MFY was overdrawn by $216,000.00. MFY arranged last-minute wire transfers to cover the deficit at Rabo's instruction.

47.    By January 2019, the problem had not only persisted but also worsened. This time, MFY was overdrawn by $96,284.97, with no available credit left. Rabo's Senior Relationship Manager casually noted that MFY would wire funds to cover the shortfall, treating the overdraft as a routine event rather than a more profound financial distress symptom.

48.    The situation escalated dramatically in late 2019, exposing the full extent of the McClain financial instability. On October 23, 2019, MFY was overdrawn by an alarming $2.5 million. Internal emails reflect disbelief and concern, with Rabo's Financial Analyst responding with shock: "$2.5 million!? WTF…". Despite acknowledging the severity of the overdraft, Rabo approved funding to cover it, effectively enabling MFY to continue operations without addressing the root cause of the financial collapse.

49.    Just days later, on October 28, 2019, MFY was again overdrawn, this time by $2.1 million. Rabo's Regional Credit Officer formally approved covering the overdraft, acknowledging that this represented a "significant cash management issue" and that MFY's financial situation was a "growing concern." Nevertheless, no action was taken to curtail MFY's credit or investigate the causes of the ongoing liquidity crisis.

50.    The overdrafts grew even larger. On November 1, 2019, MFY faced an overdraft of $4.3 million, followed by an overdraft of $5.2 million on November 22, 2019. Despite the

staggering amounts, Rabo and Mechanics Bank continued to approve transactions and cover deficits. Internal emails reveal staff members expressing frustration and disbelief but taking no corrective action beyond ensuring funds were shifted between accounts to prevent returned checks.

51.     In December 2019, when an overdraft of $4.8 million for 7M was reported, Rabo's Regional Credit Officer informed Rabo leadership that he and Rabo's Senior Relationship Manager had declined a request for $5.8 million to cover the overdraft just the day before. <u>Rabo's Regional Credit Officer filed a Suspicious Activity Report (SAR) related to check-kiting, explicitly acknowledging fraudulent financial activity</u>.

52.     Further evidence of collaboration between Rabo and Mechanics Bank to manage McClain's worsening financial condition is found in an email exchange between Mechanic Bank's representatives and several Rabo representatives.  On December 20, 2019, Rabo Diversified Services Transaction Monitoring Analyst alerted Mechanics Bank representatives and Rabo that 7M was overdrawn by approximately $4.8 million, outlining urgent options such as wiring funds, securing credit approval, returning checks, or transferring funds from other accounts.  Mechanics Bank representatives responded shortly after, providing account details and proposing to apply MFY's available funds from MFY's line of credit and checking account balance to reduce 7M's overdraft to approximately $3.1 million, and another option to return three checks.  Later that morning, Rabo's Senior Relationship Manager detailed a plan to cover the remaining overdraft with expected deposits. He proposed a 60-day temporary increase in MFY's line of credit to prevent future issues, attributing the significant overdraft to "a miscalculation (some would say gross miscalculation) by Mr. McClain . . .".

53.     An email chain dated December 23, 2019, shows coordination between Rabo and Mechanics Bank <u>to arrange a joint meeting</u> with Brian McClain at his farm in Benton, Kentucky,

{00875990.DOCX - ver}

scheduled for January 8, 2020. The agenda for the meeting included discussions about McClain's checking account activities, remote deposit capture processes, sweep account mechanics, the handling of overdrafts, cash flows between McClain entities, cattle logistics, and the structure and timing of upcoming credit facility renewals. Both Rabo and Mechanics Bank representatives were expected to attend, with a specific focus on understanding the mechanics of McClain's accounts and financial operations and whether an extension or increase in credit should be provided to McClain. *This level of involvement from Mechanics Bank, a depository institution, in credit-related matters typically managed by the lending bank is unusual and serves as further evidence of collusion between Rabo and Mechanics Bank to address and manage McClain's financial problems.*

54.    When Rabo and Mechanics Bank planned to visit McClain in Kentucky, Rabo and Mechanics Bank knew that 7M was overdrawn by over $3 million and there were significant problems with McClain's account, including frequent overdrafts without adequate explanation from McClain.  Again, this level of involvement is unusual for a depository bank like Mechanics Bank, further confirming Mechanics Bank's complicity in enabling McClain's misconduct and propping up an insolvent enterprise.

55.    Furthermore, an email chain dated February 18, 2021, reveals significant concerns within Rabo regarding the financial health and operations of McClain's entities. The discussion highlights multiple red flags, including confusion over more than 3,400 head of cattle ownership, unclear intercompany debts, and a lack of transparency regarding cash flows between McClain's various entities. There were also discrepancies in the reported livestock inventories and financial statements, with analysts unable to reconcile cattle purchases and sales with the year-end profit and loss statements. Notably, according to Rabo's analyst, MFY showed a gross loss of over $3

million and a net loss exceeding $4.5 million for 2020, raising serious concerns about the operation's sustainability. Additionally, internal concerns were raised about the reliability of borrowing base reports, herd reconciliations, and the possibility that intercompany transactions were being used to obscure the true financial performance of McClain's businesses. Despite acknowledging these financial irregularities and losses, Rabo continued extending credit.

56.    Despite recognizing the severity of the situation, both Rabo and Mechanics Bank chose to facilitate temporary fixes rather than confront the underlying insolvency, actively working together to conceal McClain's financial instability and keep the credit facility afloat.

56.57.

57.    In the fall of 2022, Rabo's Senior Relationship Manager and the Senior Vice President of Mechanics Bank, Jamie Rabatin, had conversations wherein phrases such as "kite" and "unusual activity" were used when addressing concerns raised by the huge number, size, and frequency of checks going in and out the various McClain accounts. Rabo's Senior Relationship Manager testified that in response to Mechanics Bank's Senior Vice President's request for advice, he told her that Mechanics could not go wrong by following Mechanics' "protocols and procedures" for handling and investigating such questionable activities.  NHowever, Mechanics Bank took no actions to stop these activities was taken at the time and there is no evidence that Mechanics Bank properly followed the any protocols and procedures when learning of a possible check kite.  In fact, Mechanics Bank's own check kiting software had already flagged suspicious activity through the McClain Accounts as early as June 10, 2019.  "Kiting Suspect Reports" produced for 2B Farms through discovery by Mechanics Bank show suspicious transactions identified by Mechanics Bank's check kiting software through both the 7M Cattle Feeders and McClain Feed Yard accounts on the following dates:

{00875990.DOCX - ver}

i.   June 10, 2019 – 7M Cattle Feeders Account

ii.   June 10, 2019 – McClain Feed Yard  Account

iii.   September 19, 2019 - 7M Cattle Feeders Account

iv.   September 25, 2019 - 7M Cattle Feeders Account

v.   March 10, 2020 - 7M Cattle Feeders Account

These are only the few reports produced by Mechanics Bank for 2B Farms pursuant to its discovery requests.  Undoubtedly, there are many more such reports generated by the software alerting Mechanics Bank of McClain's fraudulent scheme being perpetrated through his accounts with the bank.  Unfortunately for all involved in this matter, including 2B Farms, if Mechanics Bank had only reviewed and taken action on its own Kiting Suspect Reports and other policies and procedures, it could have stopped McClain's fraud as early as June 2019 and prevented the over $150,000,000.00 in combined damages claims asserted in this combined bankruptcy and adversary proceedings and the $15,000,000 direct losses Plaintiffs (2B Farms) suffered.

58.    Meanwhile Rabo's Financial Analyst recognized the issues noting that it was "very likely" that wires McClain had assured Rabo would be used to pay down his prior overdrafts were used to cover other checks that had been written, and that "I think Brian is in more cash trouble than we think."

59.    Mechanics had been monitoring the activity in McClain accounts.  For example, in February of 2023, before Rabo declared a default, Mechanics Bank's Senior Vice President (Jamie Rabatin) sent an email to Rabo's Senior Relationship Manager (Chip Lawson) expressing concern that a party who was depositing millions into McClain's account to cover an overdraft of approximately $3 million, because the checks submitted for deposit "don't appear to have anything to do with cattle."

{00875990.DOCX - ver}

Message

**From:**      Jamie Rabatin [Jamie_Rabatin@mechanicsbank.com]
**Sent:**       2/13/2023 9:43:41 PM
**To:**          Chip.Lawson@raboag.com
**Subject:**    McLain Feedyard
**Attachments:** CHECKS.pdf

**Importance:**  High

Good afternoon, Chip-

\Brian is wanting to deposit the attached checks and is asking us to increase his daily deposit limit form $5MM to $8MM.  He has approximately $8MM in presentments.

I don't feel comfortable with what he is doing.  These cheks don't appear to have aythign to do with cattle.

What are your thoughts?

Jamie Rabatin
Senior Vice President
Director of Commercial Servicing

Mechanics Bank
18400 Von Karman Ave Suite 1100 | Irvine, CA 92612
Tel (424) 230-5388 | Cell (949) 899-4882

jamie_rabatin@mechanicsbank.com
www.MechanicsBank.com

Mechanics Bank

Recognized by *Forbes* as one of America's Best Banks.

---

59.     A true and correct copy of this correspondence is attached hereto as Exhibit "B" and incorporated herein by reference for all purposes.  ~~Rabo's Senior Relationship Manager~~Lawson responded by telling ~~her~~ Rabatin the party was "wealthy," that "their money should be good" and that McClain told him this party was buying cattle from him and re-investing the proceeds. Mechanics Bank's Senior Vice President said she needed to check with her Credit Administrators for approval.  The beat went on.

60.     The overdrafts and check-kiting activities associated with McClain persisted and

increased into 2023, reflecting a continued pattern of financial misconduct that Rabo and Mechanics Bank had been aware of for years. Despite the escalating severity of McClain's financial instability— marked by repeated overdrafts, maxed-out credit lines, and the constant shifting of funds between accounts to cover shortfalls—both Rabo and Mechanics Bank continued to facilitate these activities without implementing meaningful corrective measures.

61.    As mentioned previously, Rabo had established control agreements (DACA's) with Mechanics Bank regarding the management of these accounts. The bank statements provided by Mechanics Bank prominently display the designation "Rabo AgriFinance Powered by Mechanics Bank," signifying the collaborative nature of the financial arrangements.

62.    In the months leading up to April 2023, a substantial volume of funds, totaling hundreds of millions of dollars, flowed in and out of McClain's three accounts with Mechanics Bank with remarkable frequency, including monies flowing in and out of HTLF for 2B Farms. Notably, transactions involving sums in the millions occurred almost daily from January 2023 through to the point when the accounts were eventually frozen. This recurrent cycle of substantial transactions, was another glaring indicator to HTLF, Rabo and Mechanics Bank that McClain was perpetrating a massive fraud on Plaintiffs.

63.    As of early April 2023, the McClain bank accounts reached a deposit amount in excess of $46,427,453.74$22,000,000.00; however, Rabo and Mechanics Bank wrongfully refused to honor three (3) checks written and deposited into 2B Farms' account at HTLF in the approximate amount of $7,500,000.00, and  despite accepting three (3) wires from 2B Farms in the combined total amount of approximately $7,500,000.00 on the same three (3) days that attempts were made to negotiate the checks.  We have learned that theThe accounts were later frozen early April 2023 because of a demand made by Rabo, all to the detriment of Plaintiffs in the amount of nearly

$20,000,000.00.

64.    Rabo alleged in the bankruptcy cases that after the accounts were frozen, an entity known as MAP Enterprises allegedly wired just over $3 million into the Mechanics Bank account to bring it up to a zero balance.  Again, this occurred when the accounts were frozen to all withdrawals but left open for deposits from parties like MAP per the early April 2023 agreement between Rabo and Mechanics Bank and the three (3) wires Plaintiffs (2B Farms) sent to Mechanics Bank for approximately $7,500,000 on April 4,5 and 6, 2023.

65.    Rabo and Mechanics Bank's internal communications, approvals of massive overdrafts, and documentation of suspicious transactions undeniably demonstrate that they had full knowledge of McClain's massive fraud, insolvency, and financial misconduct yet deliberately chose to allow it to continue to protect their own economic interest.  These events also demonstrate that Rabo and Mechanics Bank were actively complicit and conspired in covering up McClain's massive fraud. They knowingly facilitated a pattern of transactions designed to create the illusion of liquidity, while McClain's financial position deteriorated further. By continuously approving overdrafts, transferring funds between accounts, and failing to address systemic financial mismanagement, both Rabo and Mechanics Bank enabled McClain to continue its fraud, inclusive of a check-kiting scheme to the detriment of Plaintiffs.

66.    Rabo and its representatives acted in concert with Mechanics Bank and McClain to conceal McClain's true financial condition and made concerted efforts to allow McClain to sustain fraudulent operations. These concerted efforts to sustain a fraudulent operation resulted in millions of dollars in damages to Plaintiffs that provided funds for cattle purchases, expecting a legitimate return for the sale of their cattle. Furthermore, despite HTLF knowing and participating in this scheme, it failed to stop, warn or even investigate said actions of McClain, Rabo of or Mechanics

Bank – it never sought to protect 2B Farms, its own customer.

67.     A cursory examination of the financial records and bank accounts associated with McClain would have revealed the fraudulent nature of McClain operation. Yet, Rabo, Mechanics Bank and HTLF failed to take any action to stop McClain's fraud.

68.     Applicable banking industry standards required Rabo, Mechanics Bank and HTLF to review these transactions to detect illicit activity. Despite repeated alerts, neither Mechanics Bank nor HTLF took any affirmative action to determine if McClain was using its banking services for purposes of perpetuating fraud and causing substantial damages to Plaintiffs. Mechanics Bank and HTLF, knowing of the improper activity in the accounts, did nothing to stop the fraud and allowed it to perpetuate. In fact, a McClain entity consistently and repeatedly showed up on the Mechanics Bank kiting reports but conducted no action or verification to confirm or deny the existence of check kiting. A simple review and analysis of the bank statements and account activity would have shown the existence of kiting. If Mechanics Bank and HTLF would have fulfilled their obligation to verify activity in accounts, this "house of cards" would not have grown like it did and Plaintiffs damages would have been limited or non-existent. HTLF owed a direct duty to protect 2B Farms, as they had a bank/customer relationship.

69.     As an example, Thorlakson alone paid McClain more than $2,800,000.00 to purchase cattle between March 12 and March 18, 2023, long after Rabo's inspection of February 28, 2023, proved that McClain had reported at least 60,000 cattle that he did not have. A similar situation (detailed below) occurred with 2B Farms in an combined total amount of $7,500,00.00 in early April 2023. This money went straight to Rabo's controlled account at Mechanics Bank. After Thorlakson and 2B Farms discovered the problem, their specifically owned cattle were long gone and their money was taken as well. Plaintiffs also continued to pay and send millions of

dollars, for deposit into McClain's bank accounts from 2018 – through April 2023.

**E.      2B Farms' Additional Specific Factual Allegations Related to Mechanics Bank and Rabo HTLF Bank**

————As stated previously, Rabo's Stockett Cattle Inspection Report dated March 10, 2023 (inspection Friday 28, 2023), revealed that McClain was perpetrating an on-going fraud, which the Rabo and Mechanics Bank did nothing to stop, and, in fact, allowed the fraud to continue against the unwitting parties including, 2B Farms.   Incredibly, in this very same report disclosing the fraud to Rabo, the inspector used **McClain's transactions with 2B Farms itself** as a sample of the fraud being committed by Rabo and Mechanics Bank's customer (Brian McClain).   See attached Exhibit "A", Stockett Cattle Inspection Report, p. 6, in which the inspector cited McClain's extensive transactions with 2B Farms in the February 2023 time period. ‒

70.      With this specific information of faudulent activity in hand, most federally regulated and ethical financial institutions would have immediately taken action to stop the fraud by freezing the accounts (both for withdrawals and deposits) and alerted the authorities, regulators and innocent parties caught in the scheme.  At the very least, Rabo and Mechanics Bank, with this information in hand about McClain's specific transactions with 2B Farms in their report could have reached out to 2B Farms to warn it that their customer was a fraud. Inspector Stockett even testified to this as to 2B Farms.  Instead, Rabo and Mechanics Bank allowed the fraud to continue for several more months while Rabo continued to sweep the McClain account and work to put a strategy in place with Mechanics Bank to minimize **their** potential losses at the expense of 2B Farms and others.

71.      Rabo, along with Mechanics Bank began the process of  exercising direct control over the McClain Accounts pursuant to the certain *Deposit Account Control Agreements*

{00875990.DOCX - ver}

("**DACA**") dated March 23, 2023 (*See* attached three (3) DACA agreements collectively as Exhibit "C"), which are incorporated by reference herein.  The three (3) DACAs by and between Rabo, Mechanics Bank and McClain state in relevant part:

2.      Pledge.  The Debtor (McClain) hereby grants, pledges and assigns to the Secured Party (Rabo), and hereby creates a continuing first priority lien and security interest in favor of the Secured Party in, ***and transfers to the Secured Party (Rabo) all dominion and control over, all of its right, title and interest in and to*** the following:

(a)      ***the Account***, including, without limitation, all documents, passbooks, and similar evidence representing such Account, together with all deposits made from time to time therein and all funds and other property standing to the credit of such Account from time to time; and . . .

*See* Exhibit "C", each Deposit Account Control Agreement, p. 1, para. 2 (emphasis added).

72.      Finally, when Rabo was in position exercise control over the McClain accounts to its maximum benefit and having pre-coordinated the same with Mechanics Bank, Rabo sent the following letter to Jamie Rabatin, Senior Vice President/Director of Commercial Servicing on April 5, 2023:

RAY QUINNEY & NEBEKER

April 5, 2023

## VIA EMAIL, FEDERAL EXPRESS AND REGULAR MAIL

Jamie Rabitin
Senior Vice President/Director of Commercial Servicing
MECHANICS BANK
18400 Von Karman Ave.
Irvine, CA 92612
Email: jamie_rabitin@mechanicsbank.com

Michael R. Johnson
ATTORNEY AT LAW

PO Box 45385
Salt Lake City, Utah
84145-0385

36 South State Street
Suite 1400
Salt Lake City, Utah
84111

801 532-1500 FIRM
801 323-3363 DIRECT
801 532-7543 FAX
mjohnson@rqn.com
www.rqn.com

Re:    *Rabo AgriFinance LLC ("RAF" or "Lender"); (A) Deposit Account
Control Agreement Between Lender, Mechanics Bank ("Deposit
Bank") and McClain Farms, Inc. ("MFI Debtor") Regarding
Account 3505283070 ("MFI Account"), (B) Deposit Account Control
Agreement Between Lender, Deposit Bank and 7M Cattle Feeders, Inc.
("7M Debtor") Regarding Account 469420423 ("7M Account"), (C)
Deposit Account Control Agreement Between Lender, Deposit Bank
and McClain Feed Yard, Inc. ("MFY Debtor") Regarding Account
819150197 ("MFY Account"); WRITTEN INSTRUCTIONS TO
FREEZE MFI ACCOUNT, 7M ACCOUNT AMD MFY ACCOUNT,
AND TO PREVENT ITEMS FROM BEING WITHDRAWN OR
PAID FROM THE MFI ACCOUNT, 7M ACCOUNT AND MFY
ACCOUNT*

Dear Ms. Rabitin:

This law firm represents RAF with respect to the above-referenced
Deposit Account Control Agreements (the "**DACAs**") between Lender,
Deposit Bank and each of MFI Debtor (with respect to the MFI Account), 7M
Debtor (with respect to the 7M Account) and MFY Debtor (with respect to the
MFY Account).  The MFI Account, 7M Account and MFY Account are
collectively referred to herein as the "**Accounts**."

On behalf of RAF, written notice is hereby provided to Deposit Bank
that one or more Events of Default have occurred and are ongoing under the
loan and security agreements that exist between Lender and each of MFI
Debtor, 7M Debtor and MFY Debtor (collectively, the "**Debtors**").

As a result of those Events of Default, and pursuant to paragraph 5(a)
of each of the DACAs, **DEPOSIT BANK IS HEREBY INSTRUCTED TO
IMMEDIATELY FREEZE THE ACCOUNTS.  DEPOSIT BANK MAY**

A  PROFESSIONAL  CORPORATION

{00875990.DOCX - ver}

RAF/McClain/Mechanics Bank
April 5, 2023
Page 2

**ALLOW ADDITIONAL ITEMS OR FUNDS TO BE DEPOSITED INTO THE ACCOUNTS, BUT DEPOSIT BANK IS HEREBY INSTRUCTED TO PRECLUDE ANY WITHDRAWALS, DRAWS, TRANSFERS FROM OR OTHER DISPOSITIONS OF ANY FUNDS OR PROPERTY IN ANY OF THE ACCOUNTS, WITHOUT THE FURTHER WRITTEN AUTHORIZATION OF LENDER.**

Additionally, and unless contrary written instructions are provided to Deposit Bank at a later date by an authorized representative of Lender, Lender hereby requests that Deposit Bank remit to Lender all funds currently on deposit in the Accounts, as well as all funds that are subsequently deposited into or that otherwise become available in the Accounts. Lender hereby authorizes Deposit Bank to deduct its standard wire/transfer fees as part of any transfer of funds from the Accounts to Lender. Lender's payment instructions are as follows:

<u>LENDER'S WIRE INSTRUCTIONS</u>

Correspondent Bank: US Bank
#1 US Bank Plaza
St. Louis, MO 63101
ABA Routing Number: 081000210
For credit to: Rabo Agrifinance, Inc.
Account Number 1001087913
For further credit to: "Rabo Agrifinance, Inc. Obligation #22122953 McClain Farms, Inc."
Contact Servicing Department
(314) 317-8000

<u>OVERNIGHT SERVICE DELIVERY</u>

Overnight packages should be delivered to:
Rabo Agrifinance, Inc.
Attn: Servicing Department
14767 N Outer 40 Road
Suite 400
St. Louis, MO 63017
(314) 317-8000

Finally, Lender hereby requests that Deposit Bank provide Lender with online, "read only" access to the Accounts so that Lender can monitor the activity in the Accounts.

RAF/McClain/Mechanics Bank
April 5, 2023
Page 3

   If you would like to discuss this matter further, please contact me by
phone at (801) 323-3363 or by email at mjohnson@rqn.com.  You also may
contact Jeff Hanson, Vice-President and Senior Financial Restructuring
Manager for Lender.  Mr. Hanson's telephone number is (763) 244-7651, and
his email address is jeff.hanson@rabo.com.

   Please advise if this letter needs to be sent to any other authorized
representatives of Mechanics Bank.

   Thank you for your urgent attention to this matter.

      Sincerely,

      RAY QUINNEY & NEBEKER P.C.

      Michael R. Johnson

MRJ/mj

cc:  Brian Keith McClain, Authorized Representative for MFI Debtor, 7M
   Debtor and MFY Debtor (mcclainfarms@gmail.com)
   Jeff Hanson (via email only)
   Linda Kobliska (via email only)
   Kurt Leistikow, Esq. (via email only)
   Brad Bakker (via email only)

1634358

---

*See* Exhibit "D", Rabo's Account Instruction Letter dated April 5, 2023, which is incorporated by
reference herein.

  73.  Again, instead of shutting down the McClain scheme completely on April 5, 2023
by simply freezing the accounts as to all deposits and withdrawals, Rabo instead at this late date
advised Mechanics Bank to only freeze the accounts as to any "withdrawals, draws, transfers"
BUT to continue to "allow additional items or funds to be deposited in the accounts".  This
intentional act to capture and control as much funds from innocent ranchers and producers, such

{00875990.DOCX - ver}

as 2B Farms, as possible by Rabo and Mechanics Bank ensnared approximately $7.4 +/- million in cattle purchase wire transfers directly from 2B Farms which occurred on April 4th, 5th, and 6th, 2023.  Also, Mechanics Bank, on its own volition and at Rabo's instruction, refused to honor 2B Farms' three (3) checks cattle sales checks dated April 4th, 5th, and 6th, 2023 in the amount of $7.6 +/- million (six (6) separate McClain transactions at the time involving a total of approximately $15 million in 2B Farms's funds), both Mechanics Bank and Rabo **knew** of the McClain scheme, but, during a period in which they were in complete control,  let the scheme continue nonetheless to the extreme personal detriment of 2B Farms.

74.    Finally, Rabo's letter dated April 5, 2023 also instructed Mechanics Bank to remit all funds currently in the McClain accounts, as "well as all funds subsequently deposited into or the otherwise become available in the Accounts" and conveniently provided Mechanics Bank with wiring instruction to Rabo to accomplish same.    2B Farms' has obtained statements of McClain's account during this period and would represent that, as of April 6, 2023, McClain's account xxx0197 at Mechanics Bank held $20,872,962.34, and McClain's account xxx3070 at Mechanics Bank received a combined total of $25,554,491.40 of deposit transfers on April 3 and 4, 2023 from McClain's account xxx0197, a combined total amount of $46,427,453.74 in the McClain accounts at the beginning of April 2023.

75.    Again, as part of a pre-orchestrated undertaking to take control of the maximum amount of rancher and producer funds, Ms. Rabatin, acknowledged Mechanics Bank's freezing of the McClain accounts and agreed to comply as "instructed".  By her actions, the Senior Vice President of Mechanics Bank effectively agreed to and subsequently did accept deposits from 2B Farms in the McClain account, including the $7.4 +/- million in cattle purchase wire transfers, and while at the same time denied negotiation of 2B Farms' cattle sales checks totaling approximately

$7.6 +/- million, for a direct loss of over \$15,000,000 to 2B Farms.

**From:** Jamie Rabatin <Jamie_Rabatin@mechanicsbank.com>
**Sent:** Wednesday, April 5, 2023 6:33 PM
**To:** O'Neal, J (Jacqueline) <Jene.ONeal@raboag.com>
**Cc:** Hanson, J (Jeffrey) <Jeff.Hanson@rabo.com>; nico.didonato@mechanicsbank.com
**Subject:** RE: Rabo AgriFinance/McClain Farms, Inc., McClain Feed Yard, Inc. and 7M Cattle Feeders, Inc.; Demand for Freeze of Borrower Accounts SECURE

> This message was sent securely by Mechanics Bank®

Hi Jene-

The accounts are frozen. I have the wire instructions provided in the letter notifying us of the default.

We will review the accounts daily and wire all collected funds as directed.

I have a question – the letter requested that we provide "read only" access to online Banking to the Lender. Are you able to let me know who needs access? I will arrange to get them set up and trained.

Feel free to contact me any time.

Regards,

Jamie Rabatin
Senior Vice President
Director of Commercial Servicing

Mechanics Bank
18400 Von Karman Ave Suite 1100 | Irvine, CA 92612
Tel (424) 230-5388 | Cell (949) 899-4882

jamie_rabatin@mechanicsbank.com
www.MechanicsBank.com



Recognized by *Forbes* as one of America's Best Banks.

See Exhibit "E", Mechanics Bank's Acknowledgment Correspondence dated April 5, 2025, which

is incorporated by reference herein.

    76.     In a subsequent correspondence by Rabo to Chris Pierce, Chief Operating

Officer of Mechanics Bank, dated April 18, 2023, Rabo's counsel stated the following:

    Dear Mr. Pierce:

{00875990.DOCX - ver}

This law firm represents RAF [Rabo] with respect to the above referenced Deposit Account Control Agreements (the "DACAs") between Lender, Deposit Bank [Mechanics Bank] and each of MFI Debtor (with respect to the MFI Account), 7M Debtor (with respect to the 7M Account) and MFY Debtor (with respect to the MFY Account). The MFI Account, 7M Account and MFY Account are collectively referred to herein as the "Accounts."

On April 4, 2023, we sent written notice to Deposit Bank exercising RAF's rights under the DACAs. **Subsequent thereto, numerous conversations occurred between the representatives of RAF and Deposit Bank regarding the Accounts, some of which we understand you have been involved with**. We understand that Deposit Bank is currently holding approximately $500,000 in the MFY Account, Account No. 819150197. We further understand that Deposit Bank is willing to immediately release these funds to RAF conditioned upon RAF's agreement to indemnify Deposit Bank from any third-party claims asserted against Deposit Bank based upon the release of the funds.

The purpose of this letter is to acknowledge, in writing and on behalf of RAF, that subject to Deposit Bank's continuing cooperation in matters involving the Accounts . . . . (emphasis added)

E. 77.    Again, even at this late date, Rabo and Mechanics Bank were continuing their efforts to gather ranchers and producers' funds and working to mitigate their respective losses by freezing the accounts to withdrawals such as the three (3) checks for $7.5 million +/- to 2B Farms, but continuing to accept deposits like the $7.5 million +/- deposited from 2B Farms account at HTLF Bank.

**F.    2B Farms' Additional Specific Factual Allegations Related HTLF Bank.**

70.78.    First Bank & Trust and its predecessor, AimBank (HTLF), handled most of the banking with 2B Farms, and was very active in, and participated with said buying and selling of cattle, including dealing directly with McClain.  2B Farms' wires to purchase cattle from McClain and checks received and negotiated from McClain for the sale of 2B Farms' cattle were transacted through McClain's account(s) held at Mechanics Bank (collectively, the "**McClain Account**") and 2B Farms' account at HTLF.

71.79.  In this regard, at any given time, HTLF held a large number of pre-signed checks from McClain on a McClain account at Mechanics Bank, and which a McClain representative

{00875990.DOCX - ver}

would periodically hand-deliver or overnight mail to HTLF to hold in trust in order to do business with 2B Farms and HTLF.  Whenever 2B Farms sold cattle through one of the McClain Feedyards, HTLF would typically take one of the pre-signed/hand-delivered checks on the McClain Account **it was holding for McClain in the HTLF representative's desk**, and it (HTLF) would then directly fill in the name of the payor (*i.e. "2B Farms"*) and fill in the amount of the check for McClain, often totaling millions of dollars, and then HTLF would deposit the check into the 2B Farms' account at HTLF, generally without 2B Farms' endorsement – and as in fact happened on April 4th, 5th and 6th, 2023 (see below).  The amounts HTLF would write on the checks was based upon hand-written cattle sale statements prepared and forwarded by McClain to the parties2B Farms.  HTLF was directly active and involved in this entire process, along with Rabo, Mechanics Bank and McClain.  Their actions were grossly negligent at best, and complicit at worst and clearly violative of bank standards and protocols.

72.80.  In early April, 2023, a HTLF representative again filled out the following three (3) separate checks based upon sale statements prepared by McClain Feedyard, and then HTLF directly deposited them into 2B Farms' account **without** 2B Farms' endorsement (giving instant credit on said deposits in order to send out similar amounts by wire to McClain's account at Mechanics Bank):

| Check | Date of Check | Amount of Check |
|---|---|---|
| McClain Farms Inc. Check # 7331 | April 4, 2023 | $2,530,920.39 |
| McClain Farms Inc. Check # 7620 | April 5, 2023 | $2,559,407.02 |
| McClain Farms Inc. Check # 7621 | April 6, 2023 | $2,510,991.45 |
| | **TOTAL:** | **$7,601,318.86** |

True and correct copies of the checks are attached hereto as Exhibits "AF-1", "AF-2" and "AF-3", {00875990.DOCX - ver}

respectively (the "**Cattle Sale Checks**"), and incorporated herein by reference for all purposes. These specific cattle were owned by 2B Farms and sold, and 2B Farms has direct and personal claims to the cattle and/or proceeds for same.  These claims and damages as to all Defendants are separate and distinct claims and damages to 2B Farms.  Unfortunately, none of the Cattle Sale Checks were permitted to clear the McClain ~~Account~~ account at Mechanics Bank as Rabo and/or Mechanics Bank had wrongfully taken control of the McClain ~~Account~~ account at that time and prevented their successful transaction through the McClain ~~Account~~ account – namely by not honoring the three (3) checks deposited by HTLF into the 2B Farm~~'s~~'  account for 2B Farms' cattle McClain sold and for which funds were available to pay.  Instead, Mechanics Bank and/or Rabo wrongfully used and offset amounts owed by McClain to 2B Farms to their own benefit and use, all to the detriment to 2B Farms. HTLF allowed this to happen by their direct actions and inactions. Said funds were further for the sale of 2B Farms' owned cattle, and Mechanics Bank and/or Rabo wrongfully offset/took said funds from 2B Farms for which they knew belonged to 2B Farms.   HTLF should have known through reasonable banking standards and practices that a fraud was occurring, through its own actions and inactions and should not have allowed this scheme to continue to the detriment of 2B Farms, nor provide instant credit on said deposits without proper time for the same to clear.~~.~~

~~73.~~81.  During the exact same time period the above-referenced checks were being filled out and deposited into 2B Farms' account by HTLF, the following wire transfers were also initiated and sent out by HTLF to the McClain ~~Account~~ account at Mechanics Bank to purchase additional cattle on behalf of 2B Farms based upon cattle offered for sale by McClain:

| Wire Out Date | Recipient | Amount | # Cattle Intended to Purchase from McClain |
|---|---|---|---|
| April 4, 2023 | McClain Feedyard, Inc. | $2,473,847.58 | 2205 hd |

{00875990.DOCX - ver}

| April 5, 2023 | McClain Feedyard, Inc. | $2,499,037.72 | 2222 hd |
| April 6, 2023 | McClain Feedyard, Inc. | $2,486,071.62 | 2219 hd |
| | **TOTAL:** | **$7,458,956.92** | **6,646 hd** |

True and correct copies of the HTLF wires from 2B Farms' account and supporting McClain Feedyard, Inc. sale invoices are attached hereto as Exhibits "BG-1", "BG-2" and "BG-3", respectively (the "**Cattle Purchase Wires**"), and incorporated herein by reference for all purposes. This was based upon the instant credit HTLF wrongfully gave to the Cattle Sale Checks. Moreover, these wires sent out represented 2B Farms' funds sent to Mechanics Bank for its purchase of specific cattle and as a result represent a direct and personal claims to said cattle and/or proceeds for same.  These claims against all Defendants are separate and distinct claims and damages to 2B Farms.

82.    HTLF Bank's own designated corporate representative for this case and former Senior Ag Lender for HTLF Bank, Mr. Johnny Earp, gave his deposition on December 6, 2024. In his deposition,  Mr. Earp testified to the following as to the action of HTLF Bank related to 2B Farms' account and transaction with McClain:

Q:    And then you addressed that in your opinion Mr. Ragland [2B Farms' loan officer for HTLF Bank and Snyder bank branch president at the time] did not have the expertise [in cattle and the ag lending business].

**A:    Shawn [Ragland] expressed it to me personally that he didn't have the expertise in lending money to – on livestock.**

*See* Earp Deposition, Ex. H, 62: 13-17, which is incorporated herein by reference..
**. . . .**

Q:    So, in that case, under the bank's policy, it should not have given immediate credit for those checks; is that right?

**A:    That's right.**

*See* Earp Deposition, Ex. H, 83: 19-22

. . . .

> Q:      And so if McClain Farms, Inc. is sending a pre-signed blank check to First Bank & Trust to hold in a desk drawer, that's unusual; is it not?
>
> **A:      Very unusual.  I mean, I wouldn't send any forms like that.  That just –**
>
> Q:      That's not normal?
>
> **A:      Normal course of business, no.**
>
> Q:      What about if the bank employee filled out the pay to the order of and the amount of the check?  That would not be normal either; would it?
>
> **A:      That would not be normal.  How would – How would they know?**

*See* Earp Deposition, Ex. H,107:25 – 108: 1- 11.

. . . .

> Q:      That is not what a similarly situated bank would do traditionally; is it?
>
> **A:      No.**

*See* Earp Deposition, Ex. H,108:24 – 109:1.

. . . .

> Q.      Basically, would you – would you agree that Shawn Ragland had the ability to oversee the Bo Robinson and McClain transaction and do other – other things to protect the bank and Bo Robinson than what he did?
>
> **A:      He [Shawn Ragland] had the – As far as I know, Shawn had the ability to not give immediate credit to a deposit coming in and he did not have to wire the funds out because there was basically no funds in the account to wire out so he was wiring uncollected funds.**

*See* Earp Deposition, Ex. H, 125:9 – 21.

83.      As HTLF's corporate representative testified, HTLF Bank's own branch president and 2B Farms' long time loan officer did not follow their own policies, procedures and deposit agreement with 2B Farms and this was an improper handling of the accounts and not in the normal course and scope of banking operations. 2B Farms relied upon HTLF Bank's expertise and

{00875990.DOCX - ver}

longstanding relationship on this matter, and HTLF Bank had a special relationship and duty to not act in the manner it did – all as testified to by Mr. Johnny Earp, former Senior Ag Lender for the HTLF Bank. Those same policies and procedures related to "instant credit" are in effect to protect a bank customer in the event the check being deposited bounces or is returned, and no funds are then available. That is exactly what happened on April 4th, 5th, and 6th, 2023, when HTLF Bank gave 2B Farms instant credit (without 2B Farms requesting same) on approximately $7,500,000.00 and wired out a similar amount on the same days, but unfortunately, the three (3) checks deposited were not honored by Mechanics Bank/Rabo and 2B Farms "lost" all of said deposited funds, and lost a like amount by HTLF Bank wiring out similar amounts. This caused a huge negative balance in 2B Farms' account, which it could not pay back to HTLF Bank.

84.    In addition, 2B Farms' cattle held at McClain's yards were sold for approximately $750,000, and said funds are currently held in trust at HTLF Bank, and immediately prior to the instigation of the lawsuit by HTLF in May 2023, HTLF Bank received $865,269.94 in 2B Farms' cattle proceeds from 2B Farms' owned branded cattle.  Subsequently, 2B Farms sold a loader pursuant to the Court's Order during the pendency of its bankruptcy cases as referenced below, which funds totaling $160,000.00 were also paid over to HTLF Bank, for a combined total of close to $2,000,000 paid to HTLF Bank both immediately prior to and during the pendency of the bankruptcy cases. In addition, HTLF has received proceeds from the forced sale of the Debtors' rental houses and annual adequate protection payments of $90,000.00 per year to HTLF.   These collective sums are also part of 2B Farms' damages/offsets claims against HTLF Bank.  But for HTLF's actions and inactions, it would not have incurred the losses it has suffered.

Again, while Rabo and Mechanics Bank had wrongfully **STOPPED** payment on 2B Farms' Cattle

{00875990.DOCX - ver}

Sale Checks at this exact same time, they did knowingly and wrongfully permit and accept Cattle Purchase Wires/transfers of 2B Farms' funds into the McClain Account they had taken control of, including 2B Farms' Cattle Purchase Wires through the DACA Agreement (see below) entered into by Rabo, Mechanics Bank and McClain on March 23, 2023. Again, evidencing their direct knowledge of the fraudulent activities of McClain. Moreover, HTLF through its actions and inactions should have recognized such fraudulent actions of McClain and not participated in same to the detriment of 2B Farms.

74. As referenced above, 2B Farms is further informed and believes, and hereby alleges, that Rabo claimed a perfected lien on the funds in the McClain Account, and, in fact, on or about April 5, 2023, the same time period that the 2B Farms' Cattle Purchase Wires were being deposited into the McClain Account and the Cattle Sale Checks were being denied payment, Rabo, along with Mechanics Bank were exercising direct control over the McClain Accounts pursuant to these certain *Deposit Account Control Agreements* ("**DACA**") dated March 23, 2023 (*See* attached three (3) DACA agreements collectively as Exhibit "C") and a certain *Written Instructions to Freeze MFI Account, 7M Account and MFY Account, and to Prevent Items from Being Withdrawn or Paid from the MFI Account, 7M Account and MFY Account* (the "**Freeze and Turnover Letter**") from Rabo to Mechanics Bank dated April 5, 2023. *See also Rabo AgriFinance LLC's Response to the Trustee's (A) Motion for Status Conference on Trustee's Notice of USDA Approved Trust Claims, and (B) Notice of Approved Trust Claims* (Bankr. Case No. 23-20084-rlj7, Dkt. No. 134, para. c, p. 9-11), which are all incorporated by reference hereto for all purposes. The three (3) DACAs by and between Rabo, Mechanics Bank and McClain state in relevant part:

2.   ~~Pledge.  The Debtor (McClain) hereby grants, pledges and assigns to the Secured Party (Rabo), and hereby creates a continuing first priority lien and security interest in favor of the Secured Party in,~~ ***~~and transfers to the Secured Party (Rabo) all dominion and control over, all of its right, title and interest in and to~~*** ~~the following:~~

(a)   ***~~the Account~~***~~, including, without limitation, all documents, passbooks, and similar evidence representing such Account, together with all deposits made from time to time therein and all funds and other property standing to the credit of such Account from time to time; and . . .~~

~~*See* Exhibit "C", Deposit Account Control Agreement, p. 1, para. 2 (emphasis added). Upon information and belief, the only accounts which McClain had at Mechanics Bank were the three (3) accounts upon which Rabo had a DACA.  Therefore, at the exact same point that Rabo and Mechanics Bank had stopped 2B Farms checks drawn on the McClain accounts from clearing, they knowingly and intentionally did not stop the wires into this very same account over which they exercised control—including the three (3) wires from 2B Farms.  *See* Exhibits B-1, B-2 and B-3.~~

75. ~~Still further, on April 6, 2023, knowing of the fraudulent scheme, Rabo sent a notice of default letter to all the McClain entities/principals. However, it still conspired with Mechanics Bank to accept 2B Farms' April 6, 2023 wire, and refused to honor McClains' April 6, 2023 check deposited by HTLF. Thereafter, 2B Farms tried to re-run the three (3) checks several times but all were not honored despite funds being available to pay on same.~~

~~Rabo and Mechanics Bank therefore wrongfully and knowingly benefited from these improper actions to the detriment of 2B Farms.    It is clear that Rabo and Mechanics Bank had prior knowledge of the tenuous and fraudulent scheme McClain was perpetrating on 2B Farms, but chose to stay quiet and wrongfully collect all dollars they could, irrespective of the illegal scheme, and to the detriment of 2B Farms.~~

## G.   Collapse of the McClain Fraud and Subsequent Bankruptcy Filing by 2B Farms and the McClain Entities.

~~76.~~

77.85.  Therein, in late April, 2023, the McClain Feedyard operations were ultimately uncovered to be a large multi-million-dollar fraudulent scheme, and it appears that most of the cattle which McClain used in his buy/sell transaction scheme did not exist or the same cattle were sold to multiple parties. The scheme was uncovered and made public right after 2B Farms three (3) Cattle Sale Checks were dishonored and its three (3) Cattle Purchase Wires were accepted by Mechanics Bank and Rabo. Despite their direct knowledge of the scheme, they still wrongfully accepted 2B Farms' funds, causing it significant damage. Moreover, HTLF knew or should have known about this fraudulent scheme and stopped the same, and not participated in it as they did. The collapse of this scheme has caused immense damage to 2B Farms with damages and losses in excess of $20,000,000.00.

78.86.  On April 28, 2023, McClain Feed Yard, Inc. (Case No. 23-20084-rlj7), McClain Farms, Inc. (Case No. 23-20085- rlj7), and 7M Cattle Feeders, Inc. (Case No. 23-20086- rlj7) (collectively referred to as the "**McClain Debtors**") filed Chapter 7 bankruptcy cases with the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division.  The Trustee, Kent Reis, is the duly appointed Chapter 7 Trustee in each of the cases of the McClain Debtors.

79.87.  On May 22, 2023, HTLF commenced Cause No. DC-2023-CV-0565 in the District Court of Lubbock County, Texas, by filing a state court action against 2B Farms, Terry Robinson and Rebecca Robinson based upon the above-referenced transactions and loss of funds.  2B Farms answered, asserted affirmative defenses and filed their counterclaims against HTLF in said action. Also on May 22, 2023, HTLF commenced Cause No. DC-2023-CV-0641 in the District Court of Lubbock County, Texas, by filing a state court action against Defendants 2B Farms, Terry Robinson and his daughter, Angela Robinson to which they each answered (collectively, the "**State**

**Court Actions**”).

80.88.  On June 1, 2023 (the “**Petition Date**”), the Debtors, 2B Farms and Terry M. Robinson and Rebecca A. Robinson filed their respective voluntary petitions for relief under Chapter 12 of Title 11 of the United States Code (the “**Bankruptcy Code**”).  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their farming and ranching affairs and assets as debtors-in-possession.    These bankruptcy cases were administratively consolidated by Order of the Court under Bankruptcy Case No. 23-50006-rlj12.

81.89.  On or about July 13, 2023, HTLF filed its notices of removal of the State Court Actions, which were assigned Adversary Case Nos. 23-05002-rlj and 23-05003-rlj, respectively. These matters are currently pending before the Bankruptcy Court underwere consolidated in Adversary Case No. 23-05002-rlj.

90.    On August 19, 2024, Adversary No. 23-05002 was then further consolidated into the current consolidated case, Adversary 24-02007, in both Bankruptcy Case No. 23-50096-swe12 (2B Farms) and Case No. 23-20084-swe (McClain Feed Yard) per the Court's Order (Dkt. No. 80).

82. On or about August 10, 2023, Rabo filed its proofs of claim in both the 2B Farms and Terry M. Robinson and Rebecca A. Robinson bankruptcy proceedings asserting an unliquidated claim amount.  *See* Proof of Claim No. 12 on the Court's Claims Register in bankruptcy case # 23-50096-rlj12 and Proof of Claim No. 13 on the Court's Claims Register in bankruptcy case # 23-50097-rlj12.

83. On December 14, 2023, Defendants 2B Farms, Terry Robinson and Rebecca Robinson brought their *Third-Party Plaintiffs' Third-Party Complaint Against Non-Parties Rabo AgriFinance, LLC* (“**Rabo**”) and Mechanics Bank (“**Mechanics Bank**”) [Adversary

Case No. 23-05002, Dkt. # 17] (collectively, "**Third-Party Defendants**").

84. On January 22, 2024, Rabo filed its *Third-Party Answer, Counterclaim and Cross-Claim* [Adversary Case No. 23-05002, Dkt. # 23] against Third-Party Counterclaim Defendants 2B Farms, Terry Robinson and Rebecca Robinson and Cross-Claim Defendant HTLF.

## F.H.    General Allegations

85.91.  Plaintiffs have or will present their claims more than 30 days before Judgment can be rendered in this case.  All payments, offsets, and credits due have or will be provided.  Plaintiffs have answered and asserted affirmative defenses in their respective pleadings to HTLF and Rabo, and same are adopted and incorporated by reference herein for all purposes.

86.92.  Plaintiffs have engaged the services of the undersigned attorneys to assist them in pursuing these causes of action and defend any allegations against them, as well as have agreed to pay reasonable attorneys' fees for same. 2B Farms requests the recovery of said attorneys fees as allowed by law and equity.

87.93.  Pursuant to Rule 9(c) of the Federal Rules of Civil Procedure, Plaintiffs plead that all conditions precedent to their recovery have been performed or have occurred.

88.94.  Throughout this Complaint, where it is alleged that any opposing party performed or failed to perform any acts or activities, or made any representations, it is meant that such party's agents, officers, servants, employees or representatives performed or failed to perform such acts or activities and at the time such acts or activities were done, they were with full authorization or ratification of said party, or were in the normal or routine course of business and/or employment when the same occurred.

89.95. 2B Farms hereby asserts and incorporates by reference herein all claims,

objections, defenses and other matters raised in 2B Farms' Chapter 12 bankruptcy and in the

McClain bankruptcy proceedings to the extent not addressed herein.

**IV.**
**CAUSES OF ACTION**

**A.      COUNT ONE: CONVERSION AND COMMON LAW FRAUD AS TO RABO AND MECHANICS BANK**

90. 96.  The allegations stated above and below are incorporated by reference.

91. 97.  Plaintiffs are entitled to and seek recovery of judgment for conversion against

Defendants to the extent that Rabo and/or Mechanics Bank acquired, or attempts to acquire, cattle

or proceeds belonging to Plaintiffs.

92.      98.      To succeed on a claim for conversion under Texas law, a plaintiff must

prove: (1) it owned or had legal possession of the property or entitlement to possession; (2)

defendants unlawfully and without authorization assumed and exercised dominion and control

over the property to the exclusion of, or inconsistent with, plaintiff's rights as an owner; (3) the

plaintiff demanded return of the property; and (4) the defendants refused to return the property.

99.      In every instance, Plaintiffs' agreements with McClain for the care of cattle was

for the care of the cattle that belonged to Plaintiffs. Plaintiffs purchased the cattle. Plaintiffs

received confirmation from McClain that the cattle had been purchased, received regular updates

on the health condition and status of the cattle that had been purchased, and received sales revenue

when the cattle were sold, save and except any amounts paid to McClain for the care and feeding

of the cattle. As described herein, it was no secret to said Defendants that McClain kept "customer

cattle." Specific documentation and details of the specific cattle purchased and sold by 2B Farms

on April 4th, 5th and 6th, 2023, are shown by the attached Exhibits "F-1", "F-2" and "F-3" and

Exhibits "G-1", "G-2" and "G-3", which are incorporated herein by reference.

{00875990.DOCX - ver}

100.    ~~But~~Furthermore, after the February 2023 ~~collateral inspection~~Stockett Report unquestionably revealed the massive cattle shortage, said Defendants unlawfully and without authorization took control of, seized, and sold, ~~destroyed,~~ or otherwise disposed of 2B Farms'~~the remaining~~ cattle that were left on McClain feedyards or ~~otherwise~~their proceeds in the McClain Account. On April 5, 2023, instead of simply freezing the McClain Account as to all deposits and withdrawals, Rabo instead advised Mechanics Bank to only freeze the accounts as to any "withdrawals, draws, transfers" BUT to continue to "allow additional items or funds to be deposited in the accounts". Per Rabo's instruction letter dated April 5, 2023, and its pre-arranged orchestrated scheme with Mechanics Bank, Rabo ordered the following, to which Mechanics Bank agreed and complied (*See* Exhibit "E"):

> As a result of those Events of Default, and pursuant to paragraph 5(a) of each of the DACAs, DEPOSIT BANK IS HEREY INSTRUCTED TO IMMEDIATELY FREEZE THE ACCOUNTS. DEPOSIT BANK MAY ALLOW ADDITIONAL ITEMS OR FUNDS TO BE DEPOSITED INTO THE ACCOUNTS, BUT DEPOSIT BANK IS HEREBY INSTRUCTED TO PRECLUDE ANY WITHDRAWALS, DRAWS, TRANSFERS FROM OR OTHER DISPOSITIONS OF ANY FUNDS OR PROPERTY IN ANY OF THE ACCOUNTS, WITH THE FUTHER WRITTEN AUTHORIZATION OF LENDER.

*See* Exhibit "D", Rabo's Account Instruction Letter dated April 5, 2023, P. 1-2.

101.    This intentional fraudulent act ensnared approximately $7.4 +/- million in cattle purchase wire transfers from 2B Farms which occurred on April 4th, 5th, and 6th, 2023. Also, Mechanics Bank, at Rabo's instruction, refused to honor 2B Farms' three (3) checks Cattle Sales Checks dated April 4th, 5th, and 6th, 2023 in the amount of $7.6 +/- million (six (6) separate, distinct and personal McClain transactions at the time involving a total of approximately $15 million in 2B Farms's funds). Both Mechanics Bank and Rabo **knew** of the McClain scheme, but, during a period in which they were in complete control, let the scheme continue nonetheless to the extreme personal detriment of 2B Farms. ~~Despite Plaintiffs' demands to return the cattle,~~

{00875990.DOCX - ver}

and then to return the sales proceeds to them, Defendants have refused. In addition, Mechanics Bank and/or Rabo wrongfully seized and/or offset funds of Plaintiffs in its accounts that represent funds delivered to McClain for the purchase and sale of cattle, and that same should have been held in trust for Plaintiffs.  See attached Exhibits "D" and "E".

93.102.To succeed on a claim for fraud under Texas law, a plaintiff must prove: (1) a material misrepresentation was made; (2) the representation was false; (3) the one who made the representation either knew the representation was false or made it recklessly without any knowledge of its truth; (4) the representation was made with the intent to induce action; (5) the other party actually and justifiably relied on the false representation; and (6) the reliance on the false representation caused injury.

94.103.The Defendants Rabo and Mechanics Bank made misrepresentations to Plaintiffs recklessly without any knowledge of the truth and as a positive assertion.  Moreover, the misrepresentations were made with the intention that they should be acted on by Plaintiffs, and Plaintiffs in fact relied upon those misrepresentations, suffering injury and damage as a result thereof.  Thus, the misrepresentations and reliance so described were a proximate cause of injury and damage to Plaintiffs for which they now sue in a sum within the jurisdictional limits of the Court.

95.104.Plaintiffs seek judgment for their reasonable attorney fees at trial and through all applicable appellate levels, pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(b)(6).

**B.**    **COUNT TWO: NEGLIGENCE OF DEFENDANT HTLF S IN LENDING AND HIRING OR SUPERVISION OR MANAGEMENT PERSONNEL**

96.105.The allegations stated above and below are incorporated by reference.

97.106.All Defendants wereHTLF was negligent in their its banking and lending practices, including, but not limited to, operational activities, their underwriting, investigative, and assessment of customers, and in the hiring or supervision of their its management personnel.

{00875990.DOCX - ver}

Defendant~~s Rabo and Mechanics Bank~~ HTLF failed to properly monitor and manage ~~their~~ its lending, and/or business relationships ~~with McClain, and HTLF failed to do same~~ as to McClain and 2B Farms. As shown above, HTLF's **own representative** testified that HTLF's actions related to these transactions was extremely odd and not reasonable, ~~and~~ violated bank policies and that Shaun Ragland was not experience in Ag Lending – yet they continued to allow him to operate for years in this negligent and grossly negligent manner, all to the detriment of 2B Farms~~., as well as held similar opinions as to Rabo and Mechanics Bank.~~. Defendant HTLF ~~s are~~is, therefore, liable for the losses Plaintiffs suffered because of ~~their~~its actions and omissions. ~~Their~~ Its actions and omissions are described above and below in this pleading.

~~98.~~107. The losses incurred by Plaintiffs were a proximate result of Defendant HTLF's~~s'~~ negligent actions exceeding the minimum jurisdictional limits of this Court. Plaintiffs seek judgment against ~~all Defendants~~ HTLF for these damages.

## C.    COUNT THREE: NEGLIGENT UNDERTAKING AS TO ALL DEFENDANTS.

~~99.~~108. The allegations stated above and below are incorporated by reference.

109.    To plead a claim of negligent undertaking, a plaintiff must show "(1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm." *Nall v. Plunkett*, 404 S.W.3d 552, 556 (Tex. 2013).

110.    As to Defendants Rabo and Mechanics Bank, in early April, 2023, they knew McClain was carrying out a massive fraudulent cattle scheme against hundreds of innocent ranchers and producers, specifically including 2B Farms, who were not in the same position as Rabo and Mechanics Bank to know what was taking place through the McClain Accounts. Instead

{00875990.DOCX - ver}

of stopping the illegal scheme instantly by freezing the McClain Accounts as to all deposits and withdrawals upon becoming aware of same, they instead pre-arranged and orchestrated the following, to which Mechanics Bank fully agreed and complied (See Exhibit "E"):

> As a result of those Events of Default, and pursuant to paragraph 5(a) of each of the DACAs, DEPOSIT BANK IS HEREY INSTRUCTED TO IMMEDIATELY FREEZE THE ACCOUNTS. DEPOSIT BANK MAY ALLOW ADDITIONAL ITEMS OR FUNDS TO BE DEPOSITED INTO THE ACCOUNTS, BUT DEPOSIT BANK IS HEREBY INSTRUCTED TO PRECLUDE ANY WITHDRAWALS, DRAWS, TRANSFERS FROM OR OTHER DISPOSITIONS OF ANY FUNDS OR PROPERTY IN ANY OF THE ACCOUNTS, WITH THE FUTHER WRITTEN AUTHORIZATION OF LENDER.

*See* Exhibit "D", Rabo's Account Instruction Letter dated April 5, 2023, P. 1-2.

111.   This negligent undertaking ensnared approximately $7.4 +/- million in cattle purchase wire transfers from 2B Farms which occurred on April 4th, 5th, and 6th, 2023.  Also, Mechanics Bank, at Rabo's instruction, refused to honor 2B Farms' three (3) checks cattle sales checks dated April 4th, 5th, and 6th, 2023 in the amount of $7.6 +/- million (six (6) separate McClain transactions at the time involving a total of approximately $15 million in 2B Farms's funds), and both Mechanics Bank and Rabo **knew** of the McClain scheme, but, during a period in which they were in complete control,  let the scheme continue nonetheless to the extreme personal detriment of 2B Farms.

100.112.        All DefendantsFurther, as to Defendant HTLF Bank, HTLF Bank undertook to perform services for Plaintiffs that it knew or should have known were necessary for Plaintiffs protection.  Defendant HTLFs did not exercise reasonable care in performing those services. That is,  HTLF held a large number of pre-signed checks from McClain on a McClain account at Mechanics Bank, and which a McClain representative would periodically hand-deliver or overnight mail to HTLF to hold in trust in order to do business with 2B Farms and HTLF. Whenever 2B Farms sold cattle through one of the McClain Feedyards, HTLF would typically

{00875990.DOCX - ver}

take one of the pre-signed/hand-delivered checks on the McClain Account **it was holding in the HTLF representative's desk**, and it (HTLF) would then directly fill in the name of the payor (*i.e.* "2B Farms") and fill in the amount of the check for McClain, often totaling millions of dollars, and then HTLF would deposit the check into the 2B Farms' account at HTLF, generally without 2B Farms' endorsement – and as in fact happened on April 4th, 5th and 6th, 2023 (see below).  The amounts HTLF would write on the checks was based upon specific hand-written cattle sale statements prepared and forwarded by McClain.  HTLF would then wire out millions of dollars from 2B Farms' account without having confirmed the deposited checks and giving instant credit for same.  Plaintiffs relied on Defendant HTLF's's performance or Defendants's performance increased Plaintiffs' risk of harm.  As a proximate result of the Defendants' HTLF's failure to use reasonable care, Plaintiffs suffered damages exceeding the minimum jurisdictional limits of this Court.  Plaintiffs seek judgment against all Defendants for thesefor damages.

**D.    COUNT FOUR: CLAIMS UNDER THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AGAINST RABO AND MECHANICS BANK AS TO THE 2B FARMS' CATTLE SALE CHECKS AND CATTLE PURCHASE WIRES ONLY ON APRIL 4TH , 5TH AND 6TH OF 2023 DURING THE PERIOD WHEN THE BANKS HAD TAKEN CONTROL OF THE MCCLAIN ACCOUNTS.
D.**

113.    The allegations stated above and below are incorporated by reference.

114.    With respect to the non-payment of the Cattle Sale Checks and the Cattle Purchase Wires on April 4th, 5th and 6th of 2023 only, as to the McClain Account, which were controlled by Rabo and Mechanics Bank at this time, said Defendants' actions resulted in a combined total transfer of $15,060,275.78 to one or both of these parties in violation of Texas Uniform Fraudulent Transfer Act. Specific documentation and details of the distinct and specific cattle purchased and sold by 2B Farms on April 4th, 5th and 6th, 2023, are shown by the attached Exhibits "F-1", "F-2" and "F-3" and Exhibits "G-1", "G-2" and "G-3", which are incorporated herein by reference.

101.    The allegations stated above and below are incorporated herein by reference.
{00875990.DOCX - ver}

115.    ~~P~~Pursuant to Section 544 of the Bankruptcy Code, Plaintiffs allege that ~~that~~ the above transfers made ~~by McClain~~ to Defendants and/or offsets taken by Defendants were fraudulent under Sections 24.005 (a)(1), (a)(2)(A) and (a)(2)(B), and Section 24.006(a), and 24.006(b) of Chapter 24 of the Texas Business & Commerce Code, commonly known as the Texas Uniform Fraudulent Transfers Act ("**TUFTA**").

~~90.~~116. Plaintiffs seek all remedies against Defendants afforded under Section 24.008, et. seq. of TUFTA.

~~91.~~117. Plaintiffs also seek the recovery of costs and attorneys' fees against Defendants under Section 24.013 of TUFTA.

## E.    COUNT FIVE: TORTIOUS INTERFERENCE WITH CONTRACT AGAINST RABO AND MECHANICS BANK

~~92.~~118. The allegations stated above and below are incorporated by reference.

~~93.~~119.        Plaintiffs entered into valid contracts with McClain for the purchase and sale of cattle. Specific documentation and details of the specific cattle purchased and sold by 2B Farms on April 4th, 5th and 6th, 2023, are shown by the attached Exhibits "F-1", "F-2" and "F-3" and Exhibits "G-1", "G-2" and "G-3", which are incorporated herein by reference.  Defendants Rabo and Mechanics Bank willfully and intentionally interfered with Plaintiffs' contracts by, among other things, taking proceeds and/or wrongfully offsetting funds that belonged to Plaintiffs, applying those proceeds against debts owed to Rabo and/or Mechanics Bank, and thus, interfering with Plaintiffs' contractual rights to be paid under the contracts and/or receiving cattle on same. Defendants Rabo and Mechanics Banks interference proximately caused Plaintiffs' injury, and caused them to suffer actual damages or loss. Plaintiffs seek damages against Defendants Rabo and Mechanics Bank in excess of the jurisdiction limits of the Court.

## F.    COUNT SIX: AIDING AND ABETTING AND/OR KNOWING PARTICIPATION

{00875990.DOCX - ver}

**OF FRAUD**

94.120. The allegations stated above and below are incorporated by reference.

95.121.        Plaintiffs were victimized by the McClain fraud as set forth above.  Through McClain, Brian McClain solicited and accepted payment from Plaintiffs for the purchase and sale of cattle with the intent to defraud Plaintiffs.  McClain did not tell Plaintiffs that their purchase money was being used to make payments other than for the purchase of cattle.

96.122. Defendants Rabo, Mechanics, and HTLF each actively facilitated, enabled and supported the fraud orchestrated by McClain. With significantly greater access to the inner workings of McClain's operations and banking activities, Defendants were in a prime position to identify the numerous red flags and glaring inconsistencies in the books and records, yet they chose to turn a blind eye to the unmistakable signs of illegitimacy. Each Defendant was aware of the staggering, unsustainable growth trajectory of McClain and the evident lack of operational capabilities on McClain's part to support such rapid expansion. Despite conducting inspections that revealed glaring deficiencies in McClain's accounting procedures and overall business operations, Defendants failed to take decisive action. They were cognizant of irregularities such as McClain's unorthodox practice of receiving purchase orders via text, particularly given the significant scale of cattle purchases involved. Moreover, they were aware of discrepancies between McClain claiming ownership of all cattle in their feedyard and the conflicting information in accounting and banking records, which indicated that McClain was feeding cattle owned by others. Further, Mechanics Bank saw all bank account activities and chose to do nothing, and HTLF Bank saw all the activity with 2B Farms and did nothing.

97.123. Internal communications within Rabo further confirmed their awareness that, despite outward appearances of financial health and profitability, McClain was perpetually

strapped for cash to sustain operations. Additionally, Rabo's and Mechanics Bank's scrutiny of McClain's bank statements revealed information that directly contradicted representations made by McClain. The same is true for HTLF on 2B Farms' bank statements.  Rather than launching a thorough investigation into these glaring issues, Defendants allowed the fraud to continue.

98.124.          HTLF and Mechanics Bank aided and abetted and/or knowingly participated in McClain's fraud.  HTLF's Shawn Ragland was 2B Farms loan officer for many years, including when 2B Farms was banking with Aim Bank.  2B Farms continued its relationship with Ragland when Aim Bank was purchased by HTLF. 2B Farms relied upon Ragland's and HTLF's experience and training to protect its interests.

99.125.2B Farms' representative, Bo Robinson, testified that Goad would send HTLF a batch of signed blank checks from the McClain Mechanics Bank accounts.  2B Farms would wire funds to Mechanics Bank for the alleged purchase of cattle in an amount provided by Goad.  At or around the same time, Robinson would advise Ragland and/or other representatives of HTLF of the amount of a cattle sale transaction based on an invoice Robinson received from Goad or another McClain Entity representative.  HTLF would often then fill out the signed blank checks for the money McClain owed 2B Farms for the purported sale of cattle and would deposit the previously held check in 2B Farm's bank account at HTLF. These exact events occurred on April 4th, 5th and 6th, 2023 to the detriment of 2B Farms as set forth above.

100.126.          Mr. Robinson testified that HTLF relied on a simple invoice from McClain to effectuate the banking transaction between 2B Farms and McClain.  The McClain invoice was often prepared by Goad, who was involved in determining how much was needed from the different McClain entities.  Goad often turned to 2B Farms to fill in gaps because, while Mechanics had daily limits for check deposits, it had no limits for wire transactions such as 2B and HTLF

were utilizing. HTLF did not ask for any additional documents, such as a bill of sale or close out sheets, to confirm that cattle were being purchased and sold.  Mr. Robinson testified that he rarely saw the actual check HTLF completed and deposited in 2B Farms' bank account. This exact scenario occurred on April 4th, 5th and 6th, 2023 to the detriment of 2B Farms as set forth above.

101.127.    McClain began increasing the frequency and amount of the wires and checks in January of 2023, until the final events of April 4th, 5th and 6th, 2023. Despite this, HTLF never investigated or even asked 2B Farms or McClain about the same. A reasonable bank would have looked into these McClain actions further. HTLF's representative, Mr. Earp, even testified to HTLF's inappropriate handling of the 2B Farms and McClain transactions in the manor they did.

102.128.    Mechanics Bank was on the receiving side of these large transactions between 2B Farms and McClain.  The McClain bank account statements confirm that Mechanics Bank and HTLF knew there were multiple transactions involving millions of dollars being transferred on almost a daily basis between 2B Farms and McClain in the end.  These transactions were highly unusual, but neither Mechanics Bank nor HTLF did anything to stop them from happening; nor warn 2B Farms about the same.

103.129.    As part of banking industry best practices and standards, client monitoring is particularly important when large amounts of money are involved, which creates a greater risk that the bank's services are being used for illicit purposes.  HTLF and Mechanics Bank knew a lot about the McClain business and accounts.  According to Mr. Robinson, Ragland and other HTLF representatives were intimately involved in 2B Farm's business with McClain. Ragland and other HTLF representatives worked closely with Mr. Robinson and McClain regarding 2B Farms banking transactions with McClain.  The spike in the amount and frequency of transactions, among other things, should have raised red flags for HTLF and Mechanics Bank that McClain was

involved in illicit activity. Neither ever warned or even raised a red flag to 2B Farms.

104.130.        Defendants Rabo, HTLF and Mechanics Bank aided and abetted the
McClain fraud and are accordingly liable for the damage caused to Plaintiffs. Defendants Rabo,
HTLF and Mechanics Bank gave assistance to the illicit schemes, which was a substantial factor in
causing fraud against Plaintiffs.

105.131.        As a result of Defendants abetting of fraud, Plaintiffs have been damaged
in excess of $20,000,000.00, but in an amount to be determined at trial.

## G.    COUNT SEVEN: CIVIL CONSPIRACY

106.132.        The allegations stated above and below are incorporated by reference.

133.    Additionally, and/or in the alternative and based on information and belief,
Defendants Rabo and Mechanics Bank, and their agents or employees, had an agreement with
and/or understanding among them to commit and to cover up the wrongs and damages inflicted
on Plaintiffs.  On April 5, 2023, instead of simply freezing the McClain Account as to all deposits
and withdrawals when it was known that a crime was being committed, Rabo instead advised
Mechanics Bank to only freeze the accounts as to any "withdrawals, draws, transfers" BUT to
continue to "allow additional items or funds to be deposited in the accounts".   Per Rabo's
instruction letter dated April 5, 2023, and its pre-arranged orchestrated scheme with Mechanics
Bank, Rabo ordered the following, to which Mechanics Bank agreed and complied (*See* Exhibit
"E"):

> As a result of those Events of Default, and pursuant to paragraph 5(a) of each of
> the DACAs, DEPOSIT BANK IS HEREY INSTRUCTED TO IMMEDIATELY
> FREEZE THE ACCOUNTS. DEPOSIT BANK MAY ALLOW ADDITIONAL
> ITEMS OR FUNDS TO BE DEPOSITED INTO THE ACCOUNTS, BUT
> DEPOSIT BANK IS HEREBY INSTRUCTED TO PRECLUDE ANY
> WITHDRAWALS, DRAWS, TRANSFERS FROM OR OTHER DISPOSITIONS
> OF ANY FUNDS OR PROPERTY IN ANY OF THE ACCOUNTS, WITH THE
> FUTHER WRITTEN AUTHORIZATION OF LENDER.

{00875990.DOCX - ver}

*See* Exhibit "D", Rabo's Account Instruction Letter dated April 5, 2023, P. 1-2.

107.    To this end, said Defendants and their agents, employees and/or representatives had a meeting of the minds and committed unlawful and overt acts and/or lawful acts committed for an unlawful purpose which proximately caused further and additional damages to Plaintiffs. Therefore, said Defendants and their agents, employees and/or representatives are directly and vicariously liable for the actions of each other in furtherance of this conspiracy.

108.134.    Plaintiffs seek judgment for all damages, both actual and punitive, that they suffered as a result of the actions of any of them.

109.135.    Plaintiffs seek judgment for their reasonable and necessary attorney's fees at trial and through all applicable appellate levels

## H.    COUNT SIXEIGHT: AIDING AND ABETTING AND/OR KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY AS TO ALL DEFENDANTS

110.136.    The allegations stated above and below are incorporated herein by reference.

111.137.    Plaintiffs had a fiduciary relationship with McClain.  McClains breached its fiduciary duties owed to Plaintiffs.  McClains' breach either: (1) proximately caused injuries to Plaintiffs or (2) resulted in a benefit to McClain. As a proximate result of McClain's breach of fiduciary duties, Plaintiffs were damaged.

112.138.    Plaintiffs seek actual damages in excess of $20,000,000.00.

113.139.    Rabo, and Mechanics Bank and HTLF knowingly provided substantial assistance to McClain in breaching its fiduciary duties owed to Plaintiffs. Both Each institution was were fully aware that McClain had contractual obligations with Plaintiffs to feed cattle that did not belong to McClain and that he was responsible for managing and selling these cattle for

the benefit of Plaintiffs. Rabo and Mechanics Bank knew that the proceeds from these cattle sales were to be held in trust for Plaintiffs, reflecting McClain's fiduciary obligation to safeguard and adequately account for these funds. Despite this knowledge, Rabo and Mechanics Bank continued to extend credit, approve overdrafts, and facilitate financial transactions that enabled McClain to misappropriate these funds, directly aiding and abetting his breaches of fiduciary duty. In fact, Mechanics Bank took 2B Farms' three (3) wires on April 4th, 5th and 6th, 2023, but failed to honor the three (3) McClain checks provided to 2B Farms on same dates.  HTLF participated with using pre-signed checks, providing instant credit to 2B Farms and other actions.

114.140.    Internal communications between Rabo and Mechanics Bank reveal that both institutions had detailed insight into McClain's operations, including the fact that he was selling cattle owned by third parties and that the proceeds from these sales were not McClain's to use freely. They were aware of the significant discrepancies in McClain's borrowing base reports, the impossibility of his reported cattle inventory given his feedlot capacity, and the manipulation of financial records. Despite these red flags, Rabo and Mechanics Bank actively worked together to conceal McClain's financial mismanagement, allowing it to divert funds that should have been held in trust for Plaintiffs to cover personal and business debts. Their involvement included approving overdrafts funded by these misappropriated proceeds, coordinating credit extensions despite McClain's insolvency, and failing to enforce basic financial controls that would have exposed the misuse of trust funds.

127141.    Mechanics Bank's role extended beyond that of a typical depository institution, as it directly engaged in discussions about McClain's creditworthiness and financial operations. Rabo, motivated by the substantial profit margins it earned from McClain's account, repeatedly ignored internal warnings and risk assessments to keep the credit lines active. This

conduct reflects more than negligence; it demonstrates a deliberate decision to support McClain's fraudulent activities, knowing that such actions would harm Plaintiffs. By enabling McClain to continue accessing and misusing funds that were held in trust, Rabo and Mechanics Bank substantially assisted him in breaching his fiduciary duties. HTLF's actions/inactions likewise assisted in the same.

128.142.      As a direct and proximate result of Rabo and Mechanics BankDedendsnts's actions, Plaintiffs suffered significant financial damages in excess of $20,000,000.00. The banks' conduct not only facilitated McClain's ability to misappropriate trust funds but also provided him with the financial credibility necessary to continue his fraudulent operations. Their substantial assistance in these breaches of fiduciary duty makes them jointly and severally liable for the resulting harm to Plaintiff 2B Farms.s.

**I.     COUNT NINE: AVOIDANCE, PRESERVATION, AND RETURN OF FRAUDULENT TRANSFERS UNDER - 11 U.S.C. § 548(a)(1)(B), 550, and 551 AGAINST RABO AND MECHANICS BANK**

129.143.      2B Farms hereby incorporates all paragraphs above and below as if fully set forth herein.

130.144.      With respect to the non-payment of the Cattle Sale Checks and the Cattle Purchase Wires on April 4th, 5th and 6th of 2023, as to the McClain Account, which were controlled by Rabo and Mechanics Bank at this time, said Third Party Defendants' actions resulted in a combined total transfer of $15,060,275.78 to one or both of these parties in violation of 11 U.S.C. §548(a)(1)(B)B).

131.145.      The transferor received less than a reasonably equivalent value exchange for such transfer and (a) was insolvent on the date that such transfer was made or became insolvent as a result of such transfer; (b) was engaged in business or a transaction, or was about to engage

in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. Each of these elements are satisfied in this matter.  Each of these elements were satisfied herein as to Plaintiffs.

132.146.      Rabo and/or Mechanics Bank is either the initial transferee or the immediate transferee of such initial transferee.

133.147.      As of the date hereof, Rabo and/or Mechanics Bank havee not returned any such transfer to 2B Farms.

134.148.      Rabo and/or Mechanics Bank did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

135.149.      The Wire Transfers from 2B Farms' account and the stop-payment of the Cattle Sale Checks were also fraudulent transfers under Section 24.006(a) of the Texas Fraudulent Transfer Act because the transferor debtor did not receive reasonable equivalent value for the funds it transferred and because it was insolvent at the time of such transfer.

136.150.      As a result of the foregoing, pursuant to 11 U.S.C. §§548(a)(1)(B)(a)(1(B), 550, and 551 and Texas Business and Commerce Code §24.005 and 24.006, 2B Farms is entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Rabo and/or Mechanics Bank. These are fact specific claims asserted by 2B Farms.

**J.      COUNT TEN: RECOVERY OF AVOIDED TRANSFERS — 11 U.S.C. § 550 AGAINST RABO AND MECHANICS BANK**

137.151.      2B Farms re-alleges and incorporates by reference the paragraphs above and below of the Complaint.

138.152.        All transfers referred to above are collectively referred to as "Avoided Transfers."

139.153.        Rabo and/or Mechanics Bank was the initial transferee of the Avoided Transfers or the immediate transferee of such initial transferee or the person for whose benefit the Avoided Transfers were made.

140.154.        Pursuant to § 550(a), 2B Farms is entitled to recover from Rabo and/or Mechanics Bank an amount not less than the total aggregate balance of all the Avoided Transfers, plus interest thereon to the date of payment and the costs of this action.

141.155.        Pursuant to 11 U.S.C. § 551, all of the Avoidable Transfers are preserved for the benefit of 2B Farms' bankruptcy estate.

142.156.        All conditions precedent to the bringing of this action have been performed or have occurred and such claims and damages thereto are asserted herein against said Defendants.

**K.    COUNT ELEVEN: PLAINTIFFS' OBJECTION TO AND DISALLOWANCE OF ALL CLAIMS—11 U.S.C. § 502(d) and (j) OF RABO AND HTLF**

143.157.        2B Farms re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

144.158.        Pursuant to Rule 3007(b) of the Bankruptcy Rules, a party in interest shall not include a demand for relief of a kind specified in Rule 7001 of the Bankruptcy Rules in an objection to the allowance of a claim, but may include such objection in an adversary proceeding. Rule 7001(8) specifies that an "adversary proceeding" includes any proceeding to subordinate any claim or interest. Because 2B Farms' objections to Rabo and HTLF's claims include a request to equitably subordinate such claims, 2B Farms' objection to any and all claims of Rabo and HTLF against 2B Farms' bankruptcy estate should be merged into and included within this Adversary Proceeding.

{00875990.DOCX - ver}

145.159.        Rabo is a transferee of transfers avoidable under § 549 of the Bankruptcy Code, which property is recoverable and preserved under §§ 550 and 551 of the Bankruptcy Code.

160.    Rabo has not paid the amount of the Avoidable Transfers, or turned over such property, for which Rabo is liable under 11 U.S.C. § 550. Pursuant to 11 U.S.C. § 502(d), any and all claims of Rabo's or its assignees, against Debtors' bankruptcy estates must be disallowed until such time as Rabo pays to 2B Farms an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

146.161.        Similarly, HTLF Bank took and are holding cattle proceeds from Plaintiffs and other payments, as well as 2B Farms' damages claim against HTLF asserted herein.

## L.    COUNT TWELVE:  SPECIFIC NEGLIGENCE/GROSS NEGLIGENCE CLAIMS AGAINST HTLF

147161.Plaintiffs incorporate by reference the allegations set forth above and below as if the same were fully set forth herein.

148162.        HTLF owed a duty to 2B Farms.

149163.        HTLF breached its duty to 2B Farms by failing to implement or failing to follow its own loan agreement, policies, procedures, and state/federal regulations, including but not limited to those which require funds to clear prior to wiring out uncleared funds on a customer's account.

150164.        HTLF breached its duty to 2B Farms by being aware of all 2B Farms' dealings with McClain and the McClain Feedyards, and being directly involved in the buying and selling of cattle as set forth above, and it knew or should have known of the status of any monies, or lack thereof, associated with such transactions, the extreme risk of giving instant credit on the McClain checks (Deposited Funds), wiring out millions of dollars to McClain simultaneously and failure to see the fraudulent nature of McClain's scheme through all the transactions.  But instead,

{00875990.DOCX - ver}

it chose to proceed with wires (payments) to McClain Feedyard with funds totaling nearly $7,500,000.00, which such corresponding McClain checks had not cleared 2B Farms' account held by HTLF, as well as the holding of pre-signed checks for McClain and depositing checks without endorsement.  HTLF's own corporate representative (Mr. Earp) testified to these actions being unreasonable and against bank policies and procedures, and that the bank officer in charge of the 2B Farms account did not have roper experience in this type of Ag lending.

151165.    HTLF's breach of its duty is the proximate cause of injuries suffered by Plaintiffs, which are in excess of $20,000,000.00.

152166.    Further, as set forth above, HTLF's conduct was grossly negligent, in that, when viewed objectively form the standpoint of 2B Farms at the time of its acts or omissions, the conduct involved an extreme degree of risk to Plaintiffs.  Furthermore, said conduct was grossly negligent considering the probability and magnitude of the potential harm to 2B Farms, and that HTLF had actual and subjective awareness of the risk involved, but, nevertheless, proceeded with conscious indifference to the rights, safety and/or welfare of Plaintiffs to their detriment.  These facts were each testified to by Mr. Earp.

**M.    COUNT THIRTEEN:  BREACH OF CONTRACT AGAINST HTLF**

153167.    Plaintiffs incorporate by reference the allegations set forth above and below as if the same were fully set forth herein.

154168.    2B Farms seeks to recover under a breach of contract cause of action against HTLF.

155169.    2B Farms asserts that HTLF, by and through its employees and officers, committed a material breach of the parties' Loan Agreement (as defined above) and other bank policies and procedures of HTLF, by failing to monitor the deposits made and monies paid on

behalf of 2B Farms' account held by HTLF and the transactions with McClain.  HTLF received and maintained possession of signed checks on the McClain Farms' account held at another bank, which HTLF would then fill out in amounts totaling millions of dollars, for which HTLF then deposited said pre-signed McClain Farms' checks into 2B Farms' account without endorsement. Moreover, HTLF gave immediate credit for said Deposited Funds in breach of the Loan Agreement and other bank policies and procedures, and then would wire out additional funds on the 2B Farms' account without said Deposited Funds having cleared. HTLF further failed to notice and advise 2B Farms of such improper activities of McClain when it should have caught same.

170.    Moreover, HTLF knew or should have known that there was no mechanism for immediate credit to be given to McClain Farms' checks (totaling millions of dollars) deposited into 2B Farms' account, which HTLF directly filled out for McClain Farms, yet HTLF still chose to give immediate credit to 2B Farms' account and allowed wire transactions to occur from the aforementioned account knowing said Deposited Funds had not cleared. At no time did HTLF ask or require the Deposited Funds to clear prior to outbound wire transactions occurring, yet HTLF still did this in direct violation of HTLF's own policies and procedures.  HTLF was in control of McClain Farms' checks, filled the same out, deposited the same (without endorsement) and gave instant credit into the deposited funds on its own direction and control, all of which injured and damaged 2B Farms in an amount of over $20,000,000.00.  Each of these actions was a breach of contract that caused Plaintiffs' harm and was further testified to by HTLF's corporate representative, Mr. Earp.  Plaintiffs also seek recovery of attorneys' fees and all other consequential damages caused by said breaches.

**N.    COUNT FOURTEEN: BREACH OF INFORMAL FIDUCIARY DUTIES AS TO HTLF**
    N.

171.    Plaintiffs incorporate by reference the allegations set forth above and below as if the same were fully set forth herein.

172.    2B Farms seeks to recover under a breach of an informal fiduciary duty cause of action.

173.    At all material times herein, 2B Farms were fiduciaries with HTLF, at a minimum informally, because of the extreme confidential and special relationship of the parties due to the specific trust and confidence present in this relationship, and HTLF exercised excessive lender control over, or influence in, 2B Farm's cattle business activities.

174.    HTLF owed 2B Farms fiduciary duties including, without limitation, the duty of: (1) reasonable care of any assets within its custody, as well as the duties of (2) loyalty and utmost good faith, (3) candor, (4) to refrain from self-dealing, (5) to act with integrity of the strictest kind, (6) duty of fair and honest dealing, and (7) duty of full disclosures.  The facts described above demonstrate that the HTLF was negligent, as well as grossly negligent in performing its duties by failing to use reasonable care of 2B Farms' assets, failed to act with utmost good faith and loyalty to 2B Farms, failed to act with candor, failed to refrain from self-dealing, failed to act with integrity of the strictest kind, failed to deal fairly and honestly with 2B Farms, and failed in its duty of full disclosure.  HTLF's actions and omissions in this regard have caused significant damages to Plaintiffs, in excess of $20,000,000.00.

## O.    ACCOUNT FIFTEEN: WRONGFUL OFFSET

175.    INTENTIONALLY OMITTED as Plaintiffs withdrew this claim. Plaintiffs incorporate by reference the allegations set forth above and below as if the same were fully set forth herein.

176.    2B Farms seeks to recover and seeks the return of all wrongful offsets Defendants

{00875990.DOCX - ver}

~~have made and/or taken against 2B Farms and funds it was rightfully and legally entitled to receive.~~
~~One particular instance, Mechanics Bank and/or Rabo wrongfully offset 2B Farms' funds for its~~
~~(their) own use and/or benefit, which were held in the McClain deposit accounts at Mechanics~~
~~Bank.  The funds wrongfully offset on April 4th, 5th and 6th, 2023 in particular, represent funds~~
~~held for cattle that 2B Farms owned and sold.  But, in fact, Mechanics Bank and/or Rabo~~
~~wrongfully offset said funds to their own benefit and to the detriment of 2B Farms.~~

**P.    ATTORNEYS' FEES**

~~163.~~176.        By reason of the wrongful acts and conduct of the Defendants as set forth
above and below, Plaintiffs have been required to employ attorneys to bring and prosecute and
defend ~~this~~ these action~~s~~.  Plaintiffs seek to recover the reasonable and necessary costs and
attorneys' fees and legal expenses, including expert witness fees.

~~164.~~177.        Under all claims asserted herein, as allowed, Plaintiffs seek recovery of their
reasonable and necessary costs and attorneys' fees at trial and all appellate levels, , to the extent
provided by agreement, pursuant to Texas common law, or as described in Texas Civil Practice and
Remedies Code chapters 37 and 38, Texas Business and Commerce Code chapter 24, and pursuant
to analogous provisions of other state or federal statutory and common law as the Court may find
applies to the claims set forth herein.

**Q.    DAMAGES**

~~165.~~178.        The facts and allegations stated above and below are incorporated herein
by reference.

~~166.~~179.        The Defendants' acts, omissions, conduct, and breaches were, and
continue to be, a proximate and/or producing cause of damages to Plaintiffs, and the Defendants
have been unjustly enriched by their actions.

~~167.~~180.        To the extent that Defendants have received funds or property in which the

{00875990.DOCX - ver}

Plaintiffs have superior rights, Plaintiffs seek recovery of their damages from Defendants, either directly, by way of disgorgement, or otherwise as allowed by law and equity.  Plaintiffs have been damaged in excess of $20,000,000.00 in actual damages alone and seek all other damages at law and equity to which they are entitled.

168.181.        Plaintiffs will respectfully request the Court to determine the amount of Plaintiffs' damages.  Plaintiffs seek recovery of their damages proximately caused by any responsible party, including, without limitation, all damages caused by each of the Defendants, both actual, consequential, and punitive, as allowed by law and equity.

**R.    EXEMPLARY DAMAGES**

169.182.        The conduct of the Defendants as described above and below, was done in bad faith and in violation of the law and public policy of the State of Texas, was done willfully, knowingly and maliciously, was intentional and/or committed with conscious indifference to the rights of Plaintiffs such as to warrant the imposition of punitive and/or exemplary damages under Chapter 41 of the Texas Civil Practices & Remedies Code, Section 41.001, et. seq., and as otherwise allowed by all other legal or equitable remedies.

170.183.        Plaintiffs seek the recovery of exemplary damages against all Defendants in the amount determined reasonable by the Court.

**S.    REQUEST FOR DECLARATORY JUDGMENT**

171.184.        The facts and allegations stated above and below are incorporated herein by reference.

172.185.        Plaintiffs seek declaratory judgment as to priority of their claims to cattle and sales proceeds.

**<u>CONCLUSION</u>**

WHEREFORE,  PREMISES  CONSIDERED,  Plaintiffs  respectfully  pray  that  all

{00875990.DOCX - ver}

Defendants be cited to appear and to answer this Complaint and that upon final hearing hereof,

Plaintiffs have Judgment as follows:

    a.  An Order declaring the rights of the parties to the cattle and their proceeds;

    b.  Judgment for all damages including but not limited to actual and punitive damages;

    c.  Judgment for attorneys' fees through trial and at all applicable appellate levels, and costs;

    d.  Any and all further relief, legal and equitable, to which Plaintiffs may be now and ever more entitled.

Respectfully submitted,

**McWhorter, Cobb & Johnson, L.L.P.**
1722 Broadway (79401)
P.O. Box 2547
Lubbock, Texas 79408
(806) 762-0214 - Telephone
(806) 498-4808 – Facsimile

Timothy T. Pridmore
SBN: 00788224
*tpridmore@mcjllp.com*
Todd J. Johnston
SBN: 24050837
*tjohnston@mcjllp.com*

By: */s/ Timothy T. Pridmore*
      Timothy T. Pridmore

*ATTORNEYS FOR DEFENDANTS, COUNTER-PLAINTIFFS, THIRD-PARTY PLAINTIFFS AND THIRD-PARTY DEFENDANTS 2B FARMS, A GENERAL TEXAS PARTNERSHIP, TERRY ROBINSON, REBECCA ROBINSON, AND ANGELA ROBINSON*

## CERTIFICATE OF SERVICE

I hereby certify that on ~~February 19~~August 18, 2025, the foregoing document was filed as ~~Exhibit A to PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND CONSOLIDATE PLEADINGS~~ using the CM/ECF system of the court.

        */s/ Timothy T. Pridmore*

{00875990.DOCX - ver}

Timothy T. Pridmore