JOHNNY EARP; 12-6-2024

1

| | | |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF DALLAS AMARILLO DIVISION | |
| 2 | In re: § | |
| 3 | § | |
| 4 | McClain Feed Yard, Inc., § | Case No. 23-200-84-rlj7 |
| | et al, § | Jointly Administered |
| 5 | Debtors § | |
| 6 | § | |
| | In re: § | |
| 7 | § | |
| | 2B Farms, a Texas General § | Case No. 23-500096-rlj12 |
| 8 | Partnership, et al, § | Jointly Administered |
| | Debtors § | |
| 9 | § | |
| 10 | AgTexas Farm Credit § | |
| | Services, Ag Texas PCA, § | |
| 11 | Thorlakson Diamond T § | |
| | Feeders, LP, § | |
| 12 | Plaintiffs, § | |
| 13 | Edward Dufurrena, et al, § | Adversary No.24-02007-rlj |
| | Intervenor-Plaintiffs, § | Consolidated Adversary |
| 14 | § | Proceeding |
| | v. § | |
| 15 | § | |
| | Rabo AgriFinance, LLC, et § | |
| 16 | al, § | |
| | Defendants. § | |
| 17 | § | |
| 18 | HTLF Bank, as successor to § | |
| | First Bank & Trust, § | |
| 19 | Plaintiff, Counter- § | |
| | Defendant and § | |
| 20 | Cross-Claim Defendant, § | |
| 21 | v. § | |
| 22 | 2B Farms, a Texas General § | Adversary No.24-02007-rlj |
| | Partnership, Terry M. § | Consolidate Adversary |
| 23 | Robinson, and Rebecca A. § | Proceeding |
| | Robinson, § | |
| 24 | Defendants, § | |
| | Counterclaim- § | |
| 25 | Plaintiffs, Third- § | |
| | Party Plaintiffs and § | |
| 26 | Third-Party § | |
| | Counterclaim § | |
| 27 | Defendants, § | |
| 28 | v. § | |
| 29 | Rabo AgriFinance, LLC and § | |
| | HTLF Bank, § | |
| 30 | Third-Party Defendants § | |
| | and, as to Tabo § | |
| 31 | AgriFinance LLC only, § | |
| | Third-Party. § | |
| 32 | | |
| 33 | ORAL AND VIDEOTAPED DEPOSITION OF JOHNNY EARP | |
| 34 | DECEMBER 6, 2024 | |

**EXHIBIT H**

Rogers, Harvey & Crutcher * Lubbock, Texas * 806.744.7754

JOHNNY EARP; 12-6-2024

2

1  DEPOSITION OF JOHNNY EARP, produced as a witness at
2  the instance of HTLF BANK as Successor to First Bank &
3  Trust and duly sworn, was taken in the above-styled and
4  numbered cause on the 6th day of December, 2024, from
5  9:33 a.m. to 2:38 p.m., in person before Charles Walker,
6  CSR in and for the State of Texas, reported by machine
7  shorthand, at the law offices of McWhorter Cobb and
8  Johnson, LLP, 1722 Broadway, Lubbock, Texas 79401,
9  pursuant to the Federal Rules of Civil Procedure and the
10 provisions stated on the record or attached hereto.

JOHNNY EARP; 12-6-2024

```
                                                                    3
 1                        A P P E A R A N C E S
 2   FOR HTLF BANK, AS SUCCESSOR TO FIRST BANK & TRUST:
 3        John H. Lovell
          Attorney at Law
 4        LOVELL ISERN & FARABOUGH, LLP
          112 SW 8th Avenue, Suite 1000
 5        Amarillo, Texas 79101-2314
          john@lovell-law.net
 6
     FOR AGTEXAS FARM CREDIT SERVICES, AGTEXAS, PCA, AND
 7   THORLAKSON DIAMOND T FEEDERS, LP:
 8        David L. LeBas (Via Zoom)
          Attorney at Law
 9        NAMAN HOWELL SMITH & LEE, PLLC
          8310 N. Capital of Texas Hwy, Suite 490
10        Austin, Texas 78731
          dlebas@namanhowell.com
11
     FOR 2B FARMS:
12
          Timothy T. Pridmore
13        Todd J. Johnston
          Attorneys at Law
14        McWHORTER, COBB & JOHNSON, LLP
          1722 Broadway
15        Lubbock, Texas 79408
          tpridmore@mcjllp.com
16        tjohnston@mcjllp.com
17   FOR INTERVENORS IN STATE COURT ACTION:
18        John F. Massouh (Via Zoom)
          Abel Leon
19        Attorneys at Law
          SPROUSE SHRADER SMITH, PLLC
20        P.O. Box 15008
          Amarillo, Texas 79105-9158
21        john.massouh@sprouselaw.com
22   FOR SHAWN RAGLAND:
23        Dallas Flick (Via Zoom)
          Attorney at Law
24        CRAWFORD, WISHNEW & LANG, PLLC
          1700 Pacific Avenue, Suite 2390
25        Dallas, Texas 75201
```

Rogers, Harvey & Crutcher * Lubbock, Texas * 806.744.7754

JOHNNY EARP; 12-6-2024

4

```
 1   FOR RABO AGRIFINANCE :
 2        Heath Hendricks
          Attorney at Law
 3        UNDERWOOD LAW FIRM, PC
          P.O. Box 9158
 4        Amarillo, Texas 79105-9158
          heath.hendricks@uwlaw.com
 5
     FOR MECHANICS BANK:
 6
          Javon Johnson (Via Zoom)
 7        Attorney at Law
          HUSCH BLACKWELL, LLP
 8        1900 North Pearl Street, Suite 1800
          Dallas, Texas 75201
 9        Rick.illmer@huschblackwell.com
10   FOR RIDGEFIELD CAPITAL GROUP:
11        Amber Miller
          Attorney at Law
12        CRENSHAW DUPREE & MILAM, LLP
          4411 98th Street
13        Lubbock, Texas 79424
          amiller@cdmlaw.com
14
     FOR CHAPTER 7 RIES TRUSTEES:
15
          Hudson M. Jobe (Via Zoom)
16        Attorney at Law
          JOBE LAW PLLC
17        6060 North Central Expressway, Suite 500
          Dallas, Texas 75206
18        Hjobe@jobelawpllc.com
19   ALSO PRESENT:
20        Steve Payton, Videographer
          SIGNATURE PRODUCTIONS, LTD.
21        5331 85th Street
          Lubbock, Texas 79724
22        Phone:  806-744-6288
          Steve-payton@sbcglobal.net
23
24
25
```

Rogers, Harvey & Crutcher * Lubbock, Texas * 806.744.7754

JOHNNY EARP; 12-6-2024

**Page 61**

1  we can just to fill in a few things. I think from your
2  prior testimony, as of last month you're officially
3  retired?
4     A. Officially, yes.
5     Q. Congratulations.
6     A. November 15th.
7     Q. Congratulations.
8     A. Yeah.
9     Q. What did you do to prepare for this deposition
10 today?
11    A. The -- I reviewed the documents that I received
12 that I went over earlier today, the e-mails to Jason
13 Swann, basically, that kind of information.
14    Q. And this -- And I'm not asking what you talked
15 about, but did you have the opportunity to speak with
16 Mr. Lovell or someone from his firm?
17    A. On a brief, brief basis. No significant time.
18    Q. And you're not represented by an attorney?
19    A. I am here as a individual.
20    Q. And are you here as representative of the bank
21 as well?
22    A. Before they -- Before the merger -- Bank of
23 Heartland is in the middle of a merger between Heartland
24 and UMB, University -- or Missouri Bancshares, United
25 Missouri Bancshares. They wanted someone to basically

**Page 62**

1  -- Meg Killian, who is the attorney with the bank,
2  wanted someone to speak on behalf of the bank. I guess
3  I drew the black bean.
4     Q. If you had to be in a room full of lawyers most
5  people would probably agree with you that.
6     A. And not that I -- Not that I know anything
7  about it. The only thing, I know about cattle.
8     Q. Yes, sir. And I want to ask you just a couple
9  of background questions. You've explained your
10 expertise in the cattle and the ag lending business;
11 correct?
12    A. Yes, sir.
13    Q. And then you addressed that in your opinion Mr.
14 Ragland did not have that expertise?
15    A. Shawn expressed it to me personally that he
16 didn't have the expertise in lending money to -- on
17 livestock.
18    Q. And then Mr. Swann, who was your supervisor,
19 also had that knowledge about Shawn?
20    A. Oh, yes, yes. And, in my opinion. I never
21 asked him directly, but in my opinion.
22    Q. And from the e-mails that you went over earlier
23 today, Mr. Swann and Mr. Ragland basically admitted the
24 same themselves; did they not?
25    A. I believe that's what it indicated.

**Page 63**

1     Q. And in fact, that's why Mr. Swan brought you in
2  to oversee and help a few things related to the 2B Farms
3  or Bo Robinson loans; right?
4     A. He brought me in to look over what he had
5  completed to see if it would be what a -- what I would
6  see when I was only looking at a loan. I pointed out a
7  few things and I didn't know how he had it calculated
8  and he explained it to me, so yes.
9     Q. You were not the loan officer for Bo Robinson;
10 were you?
11    A. Never. Never was.
12    Q. And where there was -- We say Bo Robinson or 2B
13 Farms, can we understand we're talking about the same
14 customer?
15    A. Same individual, yes.
16    Q. You used a word earlier. I want to make sure.
17 You'd used the word credits when you were talking about
18 responsible for credits at the bank. Is that the same
19 as customer?
20    A. Customers, loans, loans or credits. That's the
21 way we refer to them.
22    Q. And would you agree that bank officers need to
23 use ordinary and reasonable care in handling the
24 accounts?
25    A. Yes.

**Page 64**

1     Q. And in fact you gave testimony about that
2  earlier today; did you not?
3     A. Yes, sir.
4     Q. I want to briefly discuss the names of the
5  bank; all right? So now I'm going to focus. We're not
6  talking about Rabo. We're not talking about Mechanics
7  Bank; okay? I'm talking about your banks --
8     A. Yes, sir.
9     Q. -- if that makes sense? When you first started
10 in the ag lending business you were working with
11 AimBank; is that correct?
12    A. When I first started ag lending? I was with
13 Farmer's Home Administration. Then.
14    Q. And then you went to Wells --
15    A. Norwest Bank merger to -- or merged with Wells
16 Fargo Bank. Then I retired on Friday from Wells Fargo
17 and started working on Monday at AimBank.
18    Q. And you were with AimBank for 21 years?
19    A. No, I was at Wells Fargo for 21 years.
20    Q. Okay. Okay.
21    A. AimBank was about five years.
22    Q. Okay.
23    A. Aimbank/First Bank & Trust/Heartland was about
24 five years.
25    Q. And that's where I'm going.

16 (Pages 61 to 64)

JOHNNY EARP; 12-6-2024

**Page 81**

1  Q. And then on down under Paragraph 7 there is a
2  sub-paragraph c, Deposits; do you see that?
3  A. Yes, sir.
4  Q. Within that it references another document and
5  called the Regulation CC Funds Availability Disclosures?
6  A. Yes, sir.
7  Q. And that that is incorporated into the policies
8  of the bank; correct?
9  A. Correct.
10 Q. And it relates to the availability of the
11 deposited funds and when they're accredited to your
12 account; is that right?
13 A. When they're -- Yes.
14 Q. And just for reference, if you can turn to the
15 last two pages of Exhibit 70.
16 A. (Witness complies.) Okay.
17 Q. And does that appear to be a copy of the
18 Regulation CC Funds Ability Disclosure?
19 A. Yes, sir, that's the Available to Disclosure,
20 yes, sir.
21 Q. Okay. And so this is again is a policy of the
22 bank; correct?
23 A. Correct.
24 Q. If we take a look at the first page where you
25 were of the dis -- I'm going to call it the Regulations

**Page 82**

1  CC?
2  A. Yes, sir.
3  Q. This is talking about how this document is
4  applicable to Heartland Financial, like you said;
5  correct?
6  A. Yes, sir.
7  Q. Under the first main paragraph, under Your
8  Ability to Withdraw Funds at the member bank, does it
9  say our policy is to make funds from your cash and
10 checks deposits available to you on the first business
11 day after the day we received your deposit?
12 A. That's what this statement says, yes.
13 Q. So that's not the an instant credit --
14 A. No.
15 Q. -- customer; is it?
16 A. No.
17 Q. It doesn't give immediate availability to the
18 customer to take those funds; does it?
19 A. No.
20 Q. And if we move down, as it were, to
21 sub-paragraph it says longer delays may apply?
22 A. Yes, sir.
23 Q. And then it gives examples of when additional
24 time, more than the one business day?
25 A. Yes, sir.

**Page 83**

1  Q. And the exceptions that goes up to seven
2  business days is if the deposit checks total more than
3  $5,525; do you see that?
4  A. Yes, sir.
5  Q. Now, in the Bo Robinson case and the exhibits
6  you looked at a moment ago and you referenced during the
7  month of February there was a series of checks; were
8  there not?
9  A. Yes, sir.
10 Q. And in those, all those checks were dealing
11 with significant numbers of multiple millions of
12 dollars; were they not?
13 A. I believe all the checks were in excess of a
14 million dollars that I saw on the list.
15 Q. And so clearly those checks during that time
16 period would have been more than the $5,525 exceptions
17 here; right?
18 A. Yes, sir.
19 Q. So, in that case, under the bank's policy, it
20 should not have given immediate credit for those checks;
21 is that right?
22 A. That's right.
23     MR. JOHN LOVELL: Objection, misstating the
24 language of the document.
25 Q. (BY MR. TIMOTHY PRIDMORE) Did you understand

**Page 84**

1  my question?
2  A. Sir, repeat.
3  Q. If a check -- If the check has been deposited
4  for at least a million dollars, that is more than the
5  $5,525 exception that's put forth on the FCC
6  regulations; correct?
7  A. That is larger than the 5,025, yes.
8  Q. And if that is the case the bank should impose
9  a longer hold period before it gets credit, up to seven
10 days?
11     MR. JOHN LOVELL: Objection, you misstated
12 the language of the document.
13 Q. (BY MR. TIMOTHY PRIDMORE) You can answer it,
14 sir.
15 A. You can put a longer hold period. You may.
16 Q. And in this case do you know if the bank did?
17 A. I have no idea.
18 Q. Were you making any of those decisions?
19 A. No, sir.
20 Q. The bank clearly had the ability to make that
21 decision according to its own policy; correct?
22 A. According to the policy, yes, you can put a
23 hold.
24 Q. So whether it be Mr. Ragland, Mr. Garland, Mr.
25 Swann, any of them could have done that; correct?

21 (Pages 81 to 84)

JOHNNY EARP; 12-6-2024

105

1   question. We're all talking about this at one time.
2       MR. JOHN LOVELL: I just want to make sure
3   it's clear who's buying and who's actually doing the
4   selling.
5       MR. TIMOTHY PRIDMORE: And I'm glad you
6   clarified that. Thank you.
7       Q. (BY MR. TIMOTHY PRIDMORE) Can you give your
8   testimony of what you believe the series of checks that
9   we're about to go over are concerning?
10      A. These checks that we're looking at represent
11  the proceeds from sales of cattle that McClain Feed Yard
12  sold that were Bo Robinson's cattle, from what I -- what
13  I understand.
14      Q. Up at the very top of the first page it says
15  "Refer to Maker". What does refer to maker mean to you?
16      A. I don't -- I don't see that. They were -- They
17  were only -- I have no idea what that is. I would guess
18  we're going to have to go -- It's referring it back to
19  the bank.
20      Q. Back to Mechanics Bank?
21      A. Back to Mechanics Bank probably because the
22  check wasn't any good. That's what I'm guessing, is
23  that they're sending it back.
24      Q. And -- What you -- Common knowledge is when
25  it's a returned check, bad check; is that right?

106

1       A. Returned check.
2       Q. Does this appear to be a form that the back
3   office of First Bank & Trust is generating?
4       A. This looks like something that -- It was not
5   generated at the local branch, I can assure you that.
6       Q. So, is that -- When you say back office, would
7   that be the back office of the bank?
8       A. Of the bank, yes.
9       Q. And then like on Page 2 of this exhibit, that's
10  the back of this check; do you see that?
11      A. Yes.
12      Q. All right. And there's no endorsement
13  signature on that; is there?
14      A. No. That's not uncommon.
15      Q. As a general practice when a check is deposited
16  doesn't the customer endorse the check?
17      A. Generally they do. There are occasions when a
18  customer has a large amount of checks and there's times
19  that the bank will stamp it like an endorsement and it's
20  guaranteed like an endorsement missing. There's stamps
21  that we would normally be put on. I don't know why
22  there was no stamp on the check or no one endorsed the
23  check. Can't speak to that. But I don't know why
24  somebody couldn't have done something. There's only one
25  check that day.

107

1       Q. And a significant amount of money, $2.5 million
2   --
3       A. Yes.
4       Q. -- correct?
5       A. Yes.
6       Q. Were you -- The signature on the McClain Farm
7   Account on this first page again is Megan Goad; do you
8   see that?
9       A. I see that, yes.
10      Q. Do you understand that to be Brian McClain's
11  daughter?
12      A. I do not know that. I know that his family
13  worked in the business. That's all that I --
14  understand.
15      Q. Were you aware that McClain would send multiple
16  pre-signed blank checks to First Bank & Trust to use in
17  this -- in this cattle operations we've been discussing?
18      A. Have no knowledge of that.
19      Q. Would that be unusual?
20      A. It was quite unusual.
21      Q. Because McClain Farms Account, Inc. is not a
22  customer per se of the First Bank & Trust; is it not?
23      A. They have no -- They are no customer of the
24  bank that I'm aware of.
25      Q. And so if McClain Farms, Inc. is sending a

108

1   pre-signed blank check to First Bank & Trust to hold in
2   a desk drawer, that's unusual; is it not?
3       A. Very unusual. I mean, I wouldn't send any
4   forms like that. That just --
5       Q. That's not normal?
6       A. Normal course of business, no.
7       Q. What about if the bank employee filled out the
8   pay to the order of and the amount of the check? That
9   would not be normal either; would it?
10      A. That would not be normal. How would -- How
11  would they know?
12      Q. Were you aware that First Bank & Trust employee
13  Rebecca Fernandez was filling out pre-signed checks for
14  McClain Farms account and depositing them into the 2B
15  Farms account?
16      A. No knowledge of that.
17      Q. Do you have knowledge if Shawn Ragland knew
18  about that?
19      A. I have no knowledge of that, either.
20      Q. Did, in any of your dealings with bank officers
21  in talking about the McClain situation, did you discuss
22  that with any other bank officers?
23      A. First I ever heard of that is today.
24      Q. That's not something that a similarly situated
25  bank would do traditionally; is it?

27 (Pages 105 to 108)

JOHNNY EARP; 12-6-2024

**Page 109**

1 A. No.
2 Q. So, what we can see, at least as to the first
3 check on April the 4th of 2023 on Exhibit 73 is Bo
4 Robinson did not endorse it; correct?
5 A. That's correct.
6 Q. It was deposited into the 2B Farms account;
7 correct?
8 A. I don't know what his account number is, but if
9 it -- that's --
10 Q. I'll represent to you it is.
11 A. Okay.
12 Q. Were you aware that First Bank & Trust was
13 given immediate credit to 2B Farms accounts for these
14 checks?
15    MR. JOHN LOVELL: Objection, misstates the
16 facts.
17    THE WITNESS: I have no knowledge as to how
18 the checks were -- availability of the funds of the
19 checks.
20 Q. (BY MR. TIMOTHY PRIDMORE) Would it surprise
21 you if the bank made these funds immediately available?
22 A. In the normal course of business when we're
23 dealing with reputable customers such as let's just say
24 Cactus Feeders or Feed -- I mean, Packers, Packers,
25 checks that come in for cattle are typically made

**Page 110**

1 available the same day. That's all -- Let's just use
2 cotton checks for PCCA. Those are -- Typically we do
3 not put holds on those deposits. But, it's common in ag
4 lending that the -- our crop insurance checks or
5 whatever, we just typically do not put holds on those
6 checks.
7 Q. Despite you had testified earlier today?
8 A. The policy says we do. The lender has
9 discretion or the officer on the account has discretion.
10 And when you are dealing with people that you've done
11 business with for years, like Cargill or somebody like
12 that that's -- you don't -- we don't typically hold the
13 checks. I don't know what their relationship was there
14 at the bank.
15 Q. But what we do know is McClain Farms, Inc. did
16 not have a direct customer relationship with the bank?
17 A. That's true.
18 Q. Do you know if First Bank & Trust ever
19 contacted Mechanics Bank to verify these funds?
20 A. Have no knowledge.
21 Q. Have you seen any documents that suggest they
22 did?
23 A. No.
24 Q. I haven't either.
25    MR. JOHN LOVELL: Objection to the comment.

**Page 111**

1    MR. TIMOTHY PRIDMORE: I was waiting for
2 that.
3    MR. JOHN LOVELL: You're welcome.
4 Q. (BY MR. TIMOTHY PRIDMORE) And if we look
5 through, without going through everything -- So we just
6 went through the first check of April the 4th and then
7 if we go to Page 3 and 4, we see similar amount checks,
8 $2.5 million done on April the 5th, 2023; correct?
9 A. Yes, sir.
10 Q. And you see the same signatures and the same
11 handwriting on both of those checks; right?
12 A. I'm not a handwriting expert, but it looks
13 similar to me.
14 Q. And again no endorsement; correct?
15 A. Correct.
16 Q. Then we go to the third check that was April
17 the 6th of 2023 and a similar $2.5 million amount;
18 correct?
19 A. Yes.
20 Q. And my same questions related to those, would
21 your answer be the same?
22 A. It would be the same, yes. All checks in this
23 series appear the same.
24 Q. All right, that's the three. And then if you
25 go back to the next, where it looks like this

**Page 112**

1 (indicating)?
2 A. Uh-huh.
3 Q. You see this page right here?
4    MR. JOHN LOVELL: What check number.
5    MR. TIMOTHY PRIDMORE: Well, it's the same
6 check; it's just a double.
7    THE WITNESS: Same page.
8    MR. JOHN LOVELL: 7331?
9 Q. (BY MR. TIMOTHY PRIDMORE) From my looking at
10 it, it appears to be a page with the front and back,
11 just the same. They appear to be the same.
12 A. Will, this is actually the same as the first
13 check.
14 Q. That's what I'm saying; right?
15 A. Yes.
16 Q. Is it just that -- Is it in -- If you know, is
17 it in an archive way the way First Bank & Trust produces
18 it?
19 A. It is a -- You can have the option to print the
20 first page, then print the second page or you have the
21 option where you get both front and back printed on one
22 page.
23 Q. So. So, if I'm correct and if we look through
24 the three different checks, they are the same as the
25 first three we discussed earlier?

28 (Pages 109 to 112)

JOHNNY EARP; 12-6-2024

**Page 125**

1  came up there.
2  Q. Did Shawn go with you to Kentucky?
3  A. Shawn went with me to Kentucky, yes, sir.
4  Q. Do you have any knowledge about the actions Bo
5  has taken to try to help secure funds for the bank?
6  A. I have no knowledge of anything --
7  Q. You weren't involved in any of that?
8  A. I'm not involved in any of it.
9  Q. Basically, would you -- would you agree that
10 Shawn Ragland had the ability to oversee the Bo Robinson
11 and McClain transactions and do other -- other things to
12 protect the bank and Bo Robinson than what he did?
13      MR. DALLAS FLICK: This is Dallas Flick,
14 objection to form.
15      THE WITNESS: Did he have the ability?
16      MR. TIMOTHY PRIDMORE: Yes.
17      THE WITNESS: He had the -- As far as I
18 know, Shawn had the ability to not give immediate credit
19 to a deposit coming in and he did not have to wire the
20 funds out because there was basically no funds in the
21 account to wire out so he was wiring uncollected funds.
22 Q. (BY MR. TIMOTHY PRIDMORE) And they could have
23 looked for an endorsement on the checks that were being
24 deposited?
25 A. Right. There was numerous things that could

**Page 126**

1  have been done.
2  Q. But they weren't; were they?
3  A. The indication --
4      MR. JOHN LOVELL: Objection.
5      MR. DALLAS FLICK: This is Dallas Flick,
6  objection to form.
7  Q. (BY MR. TIMOTHY PRIDMORE) Do you know what due
8  diligence the bank did on Brian McClain and his
9  entities, if any?
10 A. No knowledge.
11 Q. Other than the inspection that you went on up
12 to Kentucky, do you know if the bank did any type of
13 proactive actions related to the McClain accounts?
14     MR. JOHN LOVELL: Objection, vague.
15     THE WITNESS: The only thing that I know of
16 is there's probably a freeze put on the account. I
17 mean, that would -- That's calling for speculation on my
18 part. I don't know what, anything that was done.
19 Q. (BY MR. TIMOTHY PRIDMORE) And that would have
20 been after the checks were rerun?
21 A. Yeah.
22 Q. Fair enough. Mr. Ragland could have stopped
23 the holding of the authorized and signed -- Excuse me.
24 Mr. Ragland could have stopped the process in which the
25 bank was holding the pre-signed checking from McClain

**Page 127**

1  entities; correct?
2      MR. DALLAS FLICK: This is Dallas Flick,
3  objection to form.
4      THE WITNESS: I had no idea that there was
5  even any checks there. But I suppose he had that
6  ability, if he -- if he knew about it.
7  Q. (BY MR. TIMOTHY PRIDMORE) And the same thing
8  with Rebecca Fernandez; correct?
9  A. Now, like I say, I have no idea who was holding
10 checks for -- unsigned checks from anywhere. I don't
11 know if Bo Robinson held the checks or anybody held the
12 checks. I don't -- I didn't know there were any checks
13 out there.
14 Q. But if they were held by the bank in a drawer
15 and when invoices would come in Rebecca Fernandez would
16 open a drawer, put the check out, and fill it out?
17 A. No. Because that's --
18     MR. DALLAS FLICK: This is Dallas Flick,
19 object to the form.
20     THE WITNESS: The invoices would have been
21 being paid with a wire. These were on cattle sales.
22 These checks that were coming in were for cattle sales.
23 How do you know what cattle were being sold?
24 Q. (BY MR. TIMOTHY PRIDMORE) And if they got the
25 paperwork for that?

**Page 128**

1  A. If they received the paperwork for the sale of
2  the cattle, it'd still have to be highly irregular.
3  Q. Mr. Earp, I appreciate you. You've been
4  hearing a lot of attorneys talk and everything. We
5  appreciate your time in coming out of retirement here
6  today. Have you understood all the questions you've
7  been asked --
8  A. I have --
9  Q. -- today --
10 A. -- so far.
11 Q. -- by all the attorneys?
12 A. So far.
13 Q. And have you answered them to the best of your
14 knowledge and ability?
15 A. To the best of my ability, yeah. I'm sure
16 there's going to be more questions, but --
17 Q. Well, I appreciate your time.
18 A. Yes, sir.
19     MR. TIMOTHY PRIDMORE: I pass.
20     MR. JOHN MASSOUH: This is John Massouh. I
21 have a number of questions. It's about 12:40. I don't
22 know if the witness, we want to take a short lunch break
23 or not? If we want to just push through just let me
24 know.
25     THE COURT REPORTER: I'd like to have a

32 (Pages 125 to 128)