# ADV. PROC. NO. 25-02005-swe

## KENT RIES, CH. 7 TRUSTEE

### v.

## COMMUNITY FINANCIAL SERVICES BANK et al.



- Choice of law ill suited for disposition at MTD stage

- Trustee plausibly pleads Texas law applies so MTD should be analyzed through lens of Texas law

- Trustee's common law claims not preempted by UCC

- Trustee plausibly pleads claims of knowing participation in breach of fiduciary duty, civil conspiracy, professional negligence, money had and received and fraudulent transfer against CFSB



LYNN
PINKER
HURST &
SCHWEGMANN

# CFSB raises fact disputes, making choice of law ill suited for resolution on MTD

## ECF No. 79 (Trustee's Objection to CFSB's MTD)

10.    Federal and Texas choice-of-law rules both incorporate the Restatement (Second) of Conflict of Laws ("**Restatement**"). Under the Restatement, when there is no applicable state statutory directive about choice of law, courts apply the Restatement's most significant relationship test. *See Jelec USA, Inc. v. Safety Controls, Inc.*, 498 F. Supp. 2d 945, 949–50 (S.D. Tex. 2007) (citing Restatement § 6). That most significant relationship test encompasses four factors: (i) the location of the injury; (ii) the location of the injurious conduct; (iii) the parties' locations; and (iv) the location where the parties' relationship is centered. *Id.* at 952. Those "contacts are to be evaluated according to their relative importance with respect to the particular issues" in the case. *Id.* The Restatement further instructs that, in tort contexts, "[t]he applicable law will usually be the local law of the state where the injury occurred." *Id.* (citing Restatement § 156). And application of the most significant relationship test to this case weighs in favor of Texas law.

## ECF No. 57 (CFSB's Brief iso MTD)

58.    It is unclear where the alleged injury occurred, if anywhere in particular. Because the Trustee shifts the blame on McClain, individually, as the primary perpetrator of the fraud, his location must be taken into account. According to the Complaint, McClain "lived in and was primarily based out of Benton, Kentucky." *Compl.* ¶ 15. The Trustee also alleges that the Debtors acquired livestock in Kentucky and then transported cattle to Texas, but this does not detail where the injury occurred. *See Compl.* ¶ 17. The Trustee alleges that the Debtors procured passive investments from hundreds of parties starting in 2018, but he does not allege where this activity occurred, if anywhere outside of the Debtors' principal operations in Benton, Kentucky. *Compl.* ¶¶ 15, 20. Similarly, the Trustee does not specify where the alleged check-kiting scheme took place, if anywhere outside of the Debtors' principal location in Benton, Kentucky. Because

# Given such fact issues, COL cannot be resolved at this stage

*CapLOC LLC v. Liberty Mut. Ins. Europe Ltd.*, No. 3:20-CV-3372-B, 2021 WL 2551591, at *8 (N.D. Tex. June 22, 2021)

*Canidae, LLC v. Cooper*, No. 6:21-CV-0019-H-BU, 2022 WL 660197, at *6 (N.D. Tex. Feb. 9, 2022), report and recommendation adopted, No. 6:21-CV-019-H-BU, 2022 WL 658581 (N.D. Tex. Mar. 4, 2022)

in Dallas, Texas." Doc. 16, Am. Compl., ¶ 1.[6] But aside from the allegation that Plaintiff's offices are located in Texas and that "all of the events relevant to this cause of action took place in Dallas, Texas," Doc. 16, Am. Compl., ¶ 9, Plaintiff's complaint does not provide facts permitting the Court to analyze the Policy's relationship to Texas in light of the factors of § 188. *See, e.g., Uniwest Mortg. Co. v. Dadecor Condos., Inc.*, 877 F.2d 431, 435–36 (5th Cir. 1989). Given this determination is such a fact-sensitive inquiry with the potential to dispose of Plaintiff's claim, it is not suited for resolution at the motion-to-dismiss stage.

The choice-of-law determinations that are intertwined with Canidae's claims and the Coopers' Motion involve factual disputes that are ill-suited for resolution on a Rule 12(b)(6) motion and legal questions that the parties did not address.[5]

Trustee has pleaded facts for Court to determine TX law could plausibly apply to his claims

*In re Vantage Benefits Administrators, Inc.*, No. 18-31351-SGJ-7, 2021 WL 1815065, at *12 (Bankr. N.D. Tex. May 5, 2021)

This court cannot possibly ascertain at this stage of the litigation whether the choice of law provision in the Services Agreement should be enforced without going beyond the four corners of the SAC and Services Agreement…Accordingly, the court concludes that the Trustee has pleaded enough facts in the SAC for this court to determine that Texas law ***could plausibly apply*** to all of the claims against the Matrix Defendants in the SAC—especially the tort claims. Thus, since Texas law could plausibly apply (as contended by the Trustee), the court will analyze the Matrix Defendants' *in pari delicto* argument and their other Rule 12(b)(6) arguments through the lens of Texas law, to assess whether the Trustee has pleaded plausible claims.

# Trustee pleads common law tort claims outside of funds transfer process

*Henderson v. Wells Fargo Bank*, 779 F. Supp. 3d 910, 915 (S.D. Tex. 2025)

[7] Article 4A does not preempt Plaintiff's negligence claims relating to failures *before* the transfer. Duties to prevent unauthorized access do not relate to the wire transfer itself and are not covered by Article 4A. *See 3T Oil*, 2018 WL 5018483, at *3 (holding no preemption as negligent misrepresentation claim was not based on the wire transfer itself). Article 4A also does not preempt Plaintiff's negligence claims to the extent they arise out of Defendant's failure to train its employees. *See Squeeze Me Once, LLC v. SunTrust Bank*, No. CV 19-787-JWD-RLB, 2020 WL 12968001, at *10 (M.D. La. Aug. 3, 2020) (deGravelles, J.) (concluding that negligent claims arising out of failure to train employees on fraud and take reasonable investigative action were *not* preempted as they did not fall squarely within Article 4A's ambit).

Trustee's Objection to CFSB's Motion to Dismiss, ECF No. 79

25.  CFSB has no argument that the Trustee's common law tort claims are about the funds transfer process, *i.e.*, presentment and payment of checks. To start, McClain's fiduciary duties to the Debtors, and CFSB's knowing participation in breach of those fiduciary duties, are independent of the funds transfer process. So too is CFSB's participation in a civil conspiracy with HTLF, Mechanics, and Rabo in furtherance of McClain's Ponzi scheme. As set out above, CFSB joined that civil conspiracy to mitigate the risk of losses from McClain family defaults on their personal debts to CFSB. Likewise, CFSB's professionally negligent choice to deliberately ignore many years' worth of internal check kiting and suspicious activity reports (and the massive red flags that were apparent from such reports) was made outside the funds transfer process. Finally, CFSB's conscious—and deliberate—institutional decision to engage in McClain's check kiting and Ponzi scheme is one basis for the Trustee's request for punitive damages, and that purposeful institutional decision has no relationship with the funds transfer process governed by the UCC.

# Trustee's tort claims are not preempted by the UCC

SMO also alleges other conduct by SunTrust that it alleges amounts to negligence, including:

- Negligently failing, prior to the fraudulent withdrawal(s), to take reasonable actions to investigate the circumstances at issue here, which demonstrated fraudulent activity;

- Negligently failing to train and instruct employees and staff to properly administer wire transfers with names and addresses that do not match the account information;

- Negligently failing to train and instruct employees and staff to refuse any withdrawal requests under circumstances such as the present exhibiting clear fraud upon or after being put on notice of said fraud;

- Negligently failing to implement policies and procedures to prevent this specific type of fraud after being put on notice of the Mississippi Action.

…[B]ecause these claims do not squarely fall within the UCC's ambit and are not inconsistent with the UCC, the Court finds that these negligence claims are not preempted by Article 4A.

*Squeeze Me Once, LLC v. SunTrust Bank*, No. CV 19-787-JWD-RLB, 2020 WL 12968001, at *10 (M.D. La. Aug. 3, 2020)

- …That point is underscored by the charts of Debtors' banking activity in Paragraphs 42-46 above, which show massive and pervasive overdrafts on Debtors' accounts at CFSB…for the duration of McClain's long-running Ponzi scheme. Any competent bank would have investigated those overdrafts and discovered McClain's fraud.  Par. 126

- CFSB…allowed the Debtors to thwart acceptable banking practices by improperly floating hundreds of millions of dollars of checks and blithely ignoring numerous red flags including …and all of the automated, internal alerts, such as check kiting and suspicious activity reports, designed to detect and compel the investigation of the Debtors' and McClain's finances and operations. Par. 7

- …CFSB had the same compelling reasons to turn a blind eye and perpetuate McClain's scheme as Mechanics Bank and HTLF..[.] Par. 89

- Had CFSB…bothered to inquire or cursorily examine the Debtors' financial records, they would have discovered…McClain was running a Ponzi scheme. But none bothered—even though they were repeatedly alerted to the suspect nature of Debtors' transactions via their internal, automated check kiting reports. These banks also ignored or violated their policies and procedures. Par. 91

- Defendants knew they were participating in McClain's breach of fiduciary duties to Debtors. Par. 125

# CFSB fails to investigate before and after consistent and substantial negative balances- EX E to Am. Compl.



| McClain Farms Inc | CFSB | CFSB - 3786 | 9/8/2020 | Tuesday | $ | (317,947.47) |
|---|---|---|---|---|---|---|
| McClain Farms Inc | CFSB | CFSB - 3786 | 11/25/2020 | Wednesday | $ | (9,654.07) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 11/26/2020 | Thursday | $ | (9,654.07) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 11/30/2020 | Monday | $ | (1,860,443.33) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/10/2021 | Wednesday | $ | (306,964.56) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/16/2021 | Tuesday | $ | (885,873.77) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 5/5/2021 | Wednesday | $ | (7,142.90) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 5/12/2021 | Wednesday | $ | (1,160,438.79) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/25/2021 | Friday | $ | (5,031.89) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/13/2021 | Friday | $ | (2,214,536.93) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/16/2021 | Monday | $ | (1,789,497.62) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/18/2021 | Wednesday | $ | (3,007,863.58) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/19/2021 | Thursday | $ | (1,018,375.23) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/20/2021 | Friday | $ | (624,619.32) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/24/2021 | Tuesday | $ | (737,204.57) |

CLIENTIMP 1970 - McClain Feed Yard, Inc., et al\Analysis\Bank Activity Summary-EOD (rNegatives (CFSB)                 1 of 2

McClain Feed Yard Inc. et al - CFSB Negative Activity

| Entity | Bank | Account | Date | Day of Week | Amount |
|---|---|---|---|---|---|
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/25/2021 | Wednesday | $ (278,818.55) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/26/2021 | Thursday | $ (471,948.92) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/27/2021 | Friday | $ (953,160.02) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/1/2021 | Wednesday | $ (111,559.37) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/3/2021 | Friday | $ (42,349.43) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/6/2021 | Monday | $ (42,349.43) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/8/2021 | Wednesday | $ (46,780.57) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/13/2021 | Monday | $ (802,148.03) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/16/2021 | Thursday | $ (1,135,469.55) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/20/2021 | Monday | $ (162,112.85) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/22/2021 | Wednesday | $ (1,206,593.00) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/5/2022 | Wednesday | $ (1,091,866.38) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/3/2022 | Thursday | $ (721,430.79) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/16/2022 | Wednesday | $ (49,532.99) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 4/11/2022 | Monday | $ (1,095,875.98) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/2/2022 | Thursday | $ (1,032.22) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/10/2022 | Friday | $ (979,658.68) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/15/2022 | Wednesday | $ (979,703.68) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/16/2022 | Thursday | $ (22.22) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/17/2022 | Friday | $ (87.17) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/20/2022 | Monday | $ (87.17) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 7/6/2022 | Wednesday | $ (822,801.09) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/2/2022 | Tuesday | $ (734.14) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 9/12/2022 | Monday | $ (340,760.48) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 11/28/2022 | Monday | $ (320,213.79) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/5/2023 | Thursday | $ (278.13) |
| | | | | | $ (33,277,959.91) |

# Trustee's tort claims are based on CFSB misconduct before/after funds transfers

- Defendants further breached their duties of ordinary care by allowing hundreds of millions of dollars to be transferred between the Debtors' bank accounts at CFSB and Mechanics Bank on a monthly basis with no apparent, legitimate purpose—a basic red flag for fraudulent activity…any competent bank would have taken notice of—and investigated—that highly suspicious activity. Par. 166

- Defendants never conducted necessary due diligence on Debtors' financial condition, capitalization, or operations…CFSB…likewise ignored the many warning signs (e.g. from constant overdrafts to the complete absence of basic paperwork) that demanded each of them put an end to the scheme. Instead, they permitted and partook in it. Par. 152

- All four of these sophisticated, commercial banks with preexisting fraud detection software, decades of experience (including, in CFSB's case, with McClain and the Debtors specifically), and specialized training did not all fail to intervene and stop McClain's scheme because they were all hood-winked…And CFSB had an even greater reason to be suspicious of the Debtors' legitimacy given they were not comfortable with the Debtors' growth long before the Debtors ever began the kiting and Ponzi scheme. Rather, they did not intervene because they each had their own counter-incentives not to do so. Par. 157

- CFSB…violated their own policies and procedures for fraud review and analysis (and their internal controls for verification of deposits received) and ignored federal and state laws regarding money laundering and other such fraudulent schemes to grease the wheels of McClain's Ponzi scheme… Par. 147

Under Choice of Law Analysis, Texas Law Would Apply To Trustee's Claims

8.      The Debtors filed for Chapter 7 bankruptcy on April 28, 2023 (the "**Petition Date**"). McClain Farms and MFY are incorporated in Kentucky, while 7M is incorporated in Texas. McClain Farms' primary place of business was Kentucky, while MFY's and 7M's principal places of business were in Texas, with their respective feed yards in Hereford, Deaf Smith County, Texas and in Friona, Texas, respectively. 7M was incorporated for the purpose of buying the Texas feed yard.

16.    Prior to 2017, McClain Farms' and MFY's primary business was to acquire and aggregate cattle from many different sources across Texas, Kentucky, Oklahoma, and the Southeast United States to fulfill large purchase orders for two of their primary buyers, both of whom were located in Texas: Cactus Feeders and Riley/Friona. With respect to Riley/Friona, during certain periods, the Debtors operated as essentially a subcontractor for Riley Livestock, Inc. in acquiring cattle for its fulfillment of large purchase orders for Friona Industries, Inc., and at other times the Debtors acquired cattle independently from various small sources to fulfill large purchase orders to Riley Livestock, Inc.

17.      With respect to the livestock acquired in Kentucky and the Southeast, including Florida, the Debtors would transport the cattle to their locations in Kentucky for "straightening out," whereby the cattle would be evaluated for health, size, and other issues, then sorted and placed in the yard, where they were fed and cared for while they gained weight. The cattle would then be transported to the Debtors' Texas facilities or to one of the Debtors' Texas buyers. Similarly, with respect to the livestock acquired in Texas and Oklahoma, the Debtors would take possession of the cattle and transport that cattle to and between the Debtors' Texas locations—where the cattle would be "straightened out" and delivered to the Debtors' Texas buyers. In summary, the Debtors would obtain, transport, hold, and deliver cattle to buyers within one to three months of acquisition, with a substantial portion of that business occurring within Texas.

Trustee Sufficiently Pleaded Knowing Participation in Breach of Fiduciary Duty

120. McClain was both a director and officer of Debtors, so he owed fiduciary duties of loyalty, care, and obedience to Debtors. *See Ritchie v. Rupe*, 443 S.W.3d 856, 858 (Tex. 2014) ("Directors, or those acting as directors, owe a fiduciary duty to the corporation in their directorial actions, and this duty includes the dedication of their uncorrupted business judgment for the sole benefit of the corporation."); *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 569-70 (N.D. Tex. 2024) (explaining

that the "fiduciary status" of corporate directors and officers "gives rise to three broad duties: the duty of due care, loyalty, and obedience" (cleaned up)).

121. Alternatively, McClain was an employee of Debtors and "owe[d] a fiduciary duty to [his] employer to act primarily for [his] employer's benefit." *Centennial*, 2024 WL 733649, at *15 (citing *Nat'l Plan Adm'rs Inc v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007)).

B. **Defendants knew McClain was a fiduciary of Debtors.**

122.    Defendants knew about McClain's fiduciary relationship with Debtors because Defendants dealt directly with McClain in his capacity as a director, officer, or employee of Debtors.

### C. McClain breached fiduciary duties to Debtors and their stakeholders.

123.    McClain breached his fiduciary duties to Debtors and their stakeholders by using Debtors to operate a billion-dollar Ponzi scheme for many years. That Ponzi scheme was accomplished primarily through execution of fraudulent Partnership Agreements between McClain and third-party investors. McClain induced his investors to sign those contracts under the false pretense that the subject cattle (some of which were apparently fictional) were already under contract for sale at a higher weight and price—and the investor would receive two-thirds of all sale profits, with the balance going to McClain. In reality, McClain used funds from new investors and further extensions of credit by HTLF, CFSB, and Mechanics Bank (when they honored NSF checks) as well as Rabo (via extended credit facilities) to pay off old investors. This Ponzi scheme eventually spiraled out of control to such an extent that McClain committed suicide just days after relinquishing his remaining control over Debtors via the amended forbearance agreement, and the Debtors were forced to declare Chapter 7 bankruptcy, sparking this litigation.

ECF No. 48 ¶¶ 40, 46, 77, 88-91, 123, 125-127, 137, 157: CFSB Knowledge, Active Participation in, and Substantial Assistance to McClain's Breach of Fid. Rel.

Case 24-02012-swe   Doc 24   Filed 08/14/25   Entered 08/14/25 18:04:56   Main Document   Page 19 of 54

46.     Rabo, Mechanics, CFSB, and HTLF were lynchpins of McClain's kiting and Ponzi scheme, with Rabo at the nucleus. McClain, through the Debtors, ultimately secured $70 million in loans or more from Rabo to facilitate the Debtors' too-good-to-be-true growth and purported profitability. Rabo's extension of $70 million in credit provided McClain vast liquidity, which he predominantly used to massively expand his kiting and Ponzi scheme, to the detriment of the Debtors and their innocent investors and creditors. McClain consumed Rabo's credit extensions almost immediately in each instance—if not before they were officially authorized and documented. McClain also took advantage of the Debtors' three accounts at Mechanics (which originated as Rabobank, N.A.

accounts) and account at CFSB, McClain's longtime, hometown banking partner for personal and business needs, to manufacture float via $2 billion in intercompany transfers over five years and conceal his fraud in the volume of chaotic transactions. Perhaps most egregiously and confoundingly of all, HTLF—the banking partner of certain investors in McClain's scheme—held pre-signed, otherwise blank checks from the Debtors, which it would fill in at McClain's or his daughter's direction, deposit into investors' accounts and immediately send "new" investment funds back to the Debtors before the Debtors' bank(s) were presented with the checks, thereby creating still more float. From inception until conclusion, it is evident that McClain had fraudulent intent as to the use of Rabo's—and every other investors' and lender's—cash. And from inception until conclusion, it is evident that Defendants all knew or should have known of the fraud at hand and the critical roles they each played to perpetuate it.

ECF No. 48 ¶¶ 40, 46, 77, 88-91, 123, 125-127, 137, 157; CFSB Knowledge, Active Participation in, and Substantial Assistance to McClain's Breach of Fid. Rel.

Case 24-02002-swe   Doc 24   Filed 08/14/25   Entered 08/14/25 ...   Document   Page 20 of 54

**D. Defendants knowingly participated in McClain's breaches of his fiduciary duties to Debtors.**

125.    Defendants knew they were participating in McClain's breach of his fiduciary duties to Debtors. Even worse, Defendants took an active role in McClain's Ponzi scheme through cash and check kiting activity.

ECF No. 48 ¶¶ 40, 46, 77, 88-91, 123, 125-127, 137, 157: CFSB's Knowledge, Active Participation in, and Substantial Assistance to McClain's Breach of Fid. Rel.

Case 24-02017-dwc   Doc 24   Filed 08/14/25   Entered 08/14/25 11:03:48   Desc Main
Document   Page 21 of 54

126.    Mechanics and Rabo used their control over Debtors' bank accounts to make on-the-spot payments to investors who presented claims for payment on Partnership Agreements with McClain. When Debtors' accounts would go into overdraft, Mechanics consulted and coordinated with Rabo to obtain repayment, often through Rabo's further extensions of credit. In other instances, where McClain admittedly "lost track" of his cash position and substantially overdrew the Debtors' Mechanic accounts even more so than typical, Rabo would lead the discussion on how to move the Debtors' cash and incoming receivables around to address any exigent issues. Rabo would relax its internal controls, policies, and procedures, and approve extensions and increases to the credit faculties despite clear warnings and red flags that Debtors were unable to afford the debt. As a result, Rabo, and Mechanics loaned Debtors any account to perpetuate McClain's Ponzi scheme. Defendants' misconduct led to huge volumes of money moving in and out of the Debtors' accounts on a monthly basis. For example, Debtors' December 2022 statements from Mechanics Bank show $102 million in debits and $102 million in credits for the month. That point is underscored by the charts of Debtors' banking activity in Paragraphs 42–46 above, which show massive and pervasive overdrafts on Debtors' bank accounts at CFSB and Mechanics Bank for the duration of McClain's long-running Ponzi scheme. Any competent bank would have investigated those overdrafts and discovered McClain's fraud.

137.    At all times, Defendants knew—or should have known—about McClain's Ponzi scheme. Debtors' statements from Mechanics were replete with suspicious activity because they showed hundreds of millions of dollars passing through Debtors' bank accounts at CFSB and Mechanics on a regular basis. And Rabo's internal communications show coordination with Mechanics to fund these transactions through CFSB and Mechanics. As illustration, Debtors' December 2022 statements from Mechanics reflect $102 million in debits and $102 million in credits for the month. And Lawson testified during his deposition that Defendants were uniquely positioned such that they "should have" detected McClain's fraud well before his Ponzi scheme spiraled out of control. Instead, Defendants put their balance sheets before the Debtors'.

157.    Any one of the Defendants could have stopped the scheme at any time. But they did not. Instead, they put their own profits above all else. All four of these sophisticated, commercial banks with preexisting fraud detection software, decades of experience (including, in CFSB's case, with McClain and the Debtors specifically), and specialized training did not all fail to intervene and stop McClain's scheme because they were all hood-winked. Rabo's and Mechanics' employees have admitted they were often perturbed by various red flags in the Debtors' operations and documentation. And CFSB had an even greater reason to be suspicious of the Debtors' legitimacy given they were not comfortable with the Debtors' growth long before the Debtors ever began the kiting and Ponzi scheme. Rather, they did not intervene because they each had their own counter-incentives not to do so.

# ECF No. 48 ¶¶ 77, 87-91: CFSB Knowledge, Active Participation in, and Substantial Assistance to McClain's Breach of Fid. Rel.

90.    Moreover, while CFSB may not have had outstanding loans with any of the Debtors as of the Petition Date, CFSB did have outstanding loans with Brian McClain personally and McClain's immediate family members. Given the length of their relationship, CFSB understood that if the Debtors' businesses were shut down, McClain would not be able to repay his personal loans. CFSB therefore had additional incentives to partake in McClain's scheme.

89.     While CFSB may claim to be a victim of McClain's kiting activity, and not a co-conspirator in it, CFSB had the same compelling reasons to turn a blind eye and perpetuate McClain's scheme as Mechanics Bank and HTLF—CFSB did not want to absorb the losses incurred as a result of McClain's scheme. Indeed, CFSB mostly achieved that result, as it was close to having a net zero balance across the Debtors' accounts by the Petition Date.

Trustee Sufficiently Pleaded Civil Conspiracy

A. **McClain and Defendants formed an illegal conspiracy to operate a check kiting scheme and Ponzi scheme.**

146.     McClain and Defendants engaged in joint action in furtherance of a civil conspiracy against Debtors.

147.     CFSB, HTLF, and Mechanics violated their own policies and procedures for fraud review and analysis (and their internal controls for verification of deposits received) and ignored federal and state laws regarding money laundering and other such fraudulent schemes to grease the wheels of McClain's Ponzi scheme, to the detriment of the Debtors. By the same token, Rabo deviated from its policies, procedures, and internal controls to bend over backwards to approve, extend, and increase its lending facilities to Debtors despite clear red flags and alarm bells sounding due to Debtors' precarious financial situation. Moreover, Mechanics executed the DACA with Rabo that gave Rabo the ability to control Debtors' access to funds, and outflows from Debtors' bank accounts at CFSB and Mechanics.

**B.  The object of this conspiracy was to operate a Ponzi scheme.**

151.    The object of the conspiracy between McClain and Defendants was to perpetuate the check kite scheme and thereby, a billion-dollar Ponzi scheme.

152.    Through a coordinated policy of disregarding applicable bank policies, procedures, and controls, as well as ignoring state and federal laws, Defendants facilitated over a billion dollars in transactions with little to no oversight to authenticate or verify the funds despite flashing lights and sirens. In so doing, Defendants aided in McClain's concerted effort to prioritize windfalls for McClain at the expense of the Debtors. Defendants never conducted necessary due diligence on Debtors' financial condition, capitalization, or operations. Nor did they ever scrutinize McClain's ability, as guarantor, to repay Rabo's loans or cover the Debtors' hundreds of millions of dollars in wire transfers. Worse, Rabo ignored the many warning signs revealed through the minimal reviews it did conduct, which signaled Debtors' lack of creditworthiness for a loan worth less than two-percent of the ultimate credit Rabo nevertheless extended to the Debtors. CFSB, Mechanics, and HTLF likewise ignored the many warning signs (*e.g.*, from constant overdrafts to the complete absence of basic paperwork) that demanded each of them put an end to the scheme. Instead, they permitted and partook in it.

# ECF No. 48; ¶¶ 34, 38, 46, 55, 62, 63, 74, 77, 80, 84-91, 113, 123, 126, 137, 147-157, 166: An Object to be Accomplished

**G.** **CFSB AND MECHANICS ALSO PARTICIPATE IN THE KITING AND PONZI SCHEME.**

84.    Much like HTLF, CFSB and Mechanics, which housed the Debtors' depository accounts by virtue of its acquisition of Rabobank, N.A., similarly acted to perpetuate McClain's Ponzi scheme by permitting Debtors to run *billions of dollars in transactions*, many of which were kiting transactions, between their accounts at both institutions.

85.    Mechanics' COO contemporaneously admitted to the Trustee that—for years—CFSB and HTLF "sent Mechanics Bank millions of dollars all day," and Mechanics Bank would just send that money right back to CFSB and HTLF absent investigation. Based on that freely flowing money, Mechanics Bank "knew it was in the middle of a check kiting operation" with CFSB, HTLF, and Rabo.

86.    Given Mechanics' admitted knowledge of the kiting scheme, Mechanics knew or should have known that Debtors were running a Ponzi scheme given the exorbitant volume of intercompany transfers, the frequency and evident pattern of those transfers, the large amounts that were being transferred back and forth for no apparent, legitimate reason; and the frequency with which the Debtors overdrew their Mechanics account(s) (491 days), in many instances by more than a million dollars, despite purportedly turning significant profit with each supposed 30-90 day buy-sell cycle of new cattle, which should have resulted in excess cash flows. Mechanics, which was still "powering Rabo" and working hand-in-hand with it as it did before it was spun off from Rabo, agreed to permit, facilitate, and execute on the check kite scheme, as Rabo would continually fund additional loans to cover overdrafts in the Mechanics accounts. In addition, Mechanics was motivated by its desire to be the last bank with a chair when the music stopped, so it perpetuated the scheme despite all indications it should not do so, so that the music would never end.

**C.** **McClain and Defendants had the requisite meeting of the minds, as shown by their overt acts in furtherance of the Ponzi scheme.**

153.    McClain and Defendants had the meeting of the minds on the object of operating a fraudulent Ponzi scheme. That four sophisticated, commercial financial institutions—two of whom had been one and the same just a year prior—all, for years, not only ignored countless red flags but enabled and partook in the same broad check kiting scheme speaks louder than the Trustee's factual allegations or Defendants' present denials ever could.[15] It was not a once-in-a-lifetime coincidence.

154.     To be sure, Defendants' meeting of the minds also manifested through several overt acts. *First*, McClain housed all of Debtors' bank accounts at CFSB and Mechanics and utilized Rabo as a lending facility for Debtors' operations. *Second*, Rabo lent the Debtors $70 million to facilitate "growth" of McClain's fraudulent Ponzi scheme, including, in part, to pay off Debtors' loans with other Defendants. *Third*, despite repeated and extended overdrafts in the millions of dollars, CFSB, Mechanics, and HTLF continued to honor the Debtors' NSF checks, both as payor and payee, when their ordinary policies and procedures (if not the law) demanded otherwise. *Fourth*, Rabo, via its credit facilities, and CFSB and Mechanics, both via their payment of NSF checks and continued automatic crediting of checks despite repeated prior overdrafts, lent Debtors any fund shortfalls caused by overdrafts on Debtors' bank accounts at CFSB and Mechanics to perpetuate the fraudulent Ponzi scheme. *Fifth*, CFSB and Mechanics accepted deposits for new Partnership Agreements when they knew such funds were the "new investments" required to prop up a Ponzi scheme. *Sixth*, HTLF controlled pre-signed blank checks drawn on one or more of the Debtors' accounts, which HTLF would complete and deposit without endorsement on Debtors' behalf (instead of demanding, as a prudent bank would, that Debtors deliver completed checks or wire the funds). *Seventh*, HTLF took the further step of creating "float" for the Debtors by immediately crediting the corresponding customer's account in full for the check and immediately returning some or all of the floated funds back to the Debtors, repeating the circular transactions so many times it was evident the transactions

154. To be sure, Defendants' meeting of the minds also manifested through several overt acts. *First*, McClain housed all of Debtors' bank accounts at CFSB and Mechanics and utilized Rabo as a lending facility for Debtors' operations. *Second*, Rabo lent the Debtors $70 million to facilitate "growth" of McClain's fraudulent Ponzi scheme, including, in part, to pay off Debtors' loans with other Defendants. *Third*, despite repeated and extended overdrafts in the millions of dollars, CFSB, Mechanics, and HTLF continued to honor the Debtors' NSF checks, both as payor and payee, when their ordinary policies and procedures (if not the law) demanded otherwise. *Fourth*, Rabo, via its credit facilities, and CFSB and Mechanics, both via their payment of NSF checks and continued automatic crediting of checks despite repeated prior overdrafts, lent Debtors any fund shortfalls caused by overdrafts on Debtors' bank accounts at CFSB and Mechanics to perpetuate the fraudulent Ponzi scheme. *Fifth*, CFSB and Mechanics accepted deposits for new Partnership Agreements when they knew such funds were the "new investments" required to prop up a Ponzi scheme. *Sixth*, HTLF controlled pre-signed blank checks drawn on one or more of the Debtors' accounts, which HTLF would complete and deposit without endorsement on Debtors' behalf (instead of demanding, as a prudent bank would, that Debtors deliver completed checks or wire the funds). *Seventh*, HTLF took the further step of creating "float" for the Debtors by immediately crediting the corresponding customer's account in full for the check and immediately returning some or all of the floated funds back to the Debtors, repeating the circular transactions so many times it was evident the transactions could only have illicit motivations. *Eighth*, in another "coincidence," in the days and weeks before the Petition Date, Rabo and Mechanics initiated transfers of the Debtors' deposits to CFSB to zero out Debtors' accounts at CFSB. *Ninth*, in yet another fortune of timing, mere days before forcing McClain out of the business for Rabo's handpicked replacement, and just weeks before Debtors filed their Petitions, Mechanics executed Deposit Account Control Agreements with Rabo that gave Rabo the ability to claim a lien over and control Debtors' access to funds, and outflows from Debtors' bank accounts at Mechanics. *Tenth*, Rabo extracted purported waivers and releases from the Debtors in the amended forbearance agreement signed just days before the Petition Date. *Eleventh*, McClain, at Rabo's direction, retained an external CPA firm to prepare quarterly and annual consolidated financials to give the financials an air of legitimacy, even though the preamble to each reflected various deviations from generally accepted accounting principles and neither Rabo nor Mechanics nor CFSB cared to scrutinize them with any care or diligence.

E.   **CFSB AND OTHERS ALSO AFFORDED THEMSELVES SELF-HELP UPON THE DEBTORS'
DEMISE.**

74.    Further, in the days leading up to McClain's death, several parties took improper self-help action. Two of the Debtors' largest investors worked with CFSB to improperly reverse prior deposits into the Debtors' bank accounts. Exhibit G hereto details deposits that were made into the McClain Feed Yard bank account #0197 at Mechanics Bank by MAP Enterprises and Wildforest Cattle. The deposits (all made by check – 47 by MAP / 28 by Wildforest) were made by "Remote Deposit" on April 3-5, 2023 (Monday through Wednesday). All the checks that were written by MAP & Wildforest were on their individual accounts at CFSB.

75.    Late in the day on Wednesday April 5, 2023, Rabo froze the Debtors' bank accounts and informed McClain on Thursday afternoon, April 6, that the Debtors' Mechanics accounts had been frozen.

76.    On information and belief, McClain informed the principals of both MAP and Wildforest of the freezing of the Mechanics Bank accounts, and he also either informed CFSB directly, or CFSB was informed by the investors. This led to both MAP and Wildforest clawing back the deposits they made on April 3-5, 2023, with the assistance of CFSB. Exhibit H hereto shows that MAP clawed back approximately $20.4 million in deposits, and Wildforest clawed back approximately $10.6 million in deposits, for a total of approximately $31 million. The MAP & Wildforest clawbacks put the 3 accounts (combined) in a negative position of approximately $31 million.

D. **The conspiracy between McClain and Defendants directly and proximately inflicted $200 million in losses on Debtors.**

158.   The above overt acts directly and proximately damaged Debtors. The Ponzi scheme perpetuated by McClain and Defendants caused Debtors and their creditors to lose nearly $200 million. When Defendants conspired to commit the Ponzi scheme, they should have foreseen the fraud would collapse, leaving Debtors and their creditors with massive financial losses.

# Trustee Sufficiently Pleaded Professional Negligence

A.     **Defendants owed a legal duty of care to Debtors.**

162.    CFSB, Mechanics Bank, and Rabo owed a duty of ordinary care to Debtors at all relevant times. "The Uniform Commercial Code (the UCC) … regulates a bank's relationship with its Texas customers, and imposes a duty of ordinary care on a bank with regard to various situations, such as" bank deposits and collections, fund transfers, and negotiable instruments. *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 873 n.5 (Tex. App.—El Paso 2021, no pet.) (citations omitted). Because Debtors were customers of Defendants, Texas law imposes a duty of due care on Defendants in their dealings with Debtors. Rabo's, Mechanics', and CFSB's account agreements with the Debtors also independently impose duties of care on the Defendants as to the Debtors. HTLF, as an agent of the Debtors vis-à-vis Ragland and Ferndandez, likewise owed Debtors a duty of care.

166.    Defendants further breached their duties of ordinary care by allowing hundreds of millions of dollars to be transferred between the Debtors' bank accounts at CFSB and Mechanics Bank on a monthly basis with no apparent, legitimate purpose—a basic red flag for fraudulent activity. Lawson's deposition testimony confirms that any competent bank would have taken notice of—and investigated—that highly suspicious activity. That point is underscored by the charts of Debtors' banking activity in Paragraphs 39–44 above, which show massive and pervasive overdrafts on Debtors' bank accounts at CFSB and Mechanics Bank for the duration of McClain's long-running Ponzi scheme. Any competent bank would have investigated those overdrafts and discovered McClain's fraud. Of course, had Rabo simply abided by its policies and stuck with its initial determination that the Debtors were not creditworthy, any Ponzi scheme that had already begun or subsequently ensued would have been exponentially smaller.

C. **Defendants' professional negligence proximately caused significant damage to Debtors.**

167.    As previously elaborated, Defendants breached their duty of ordinary care by ignoring known and obvious red flags and acting to expand the Debtors' suspect operations, instead of stopping them or, at minimum, refusing to participate in the suspect transactions. By continuing to extend credit in the form of both dollars and a fictitious float, Defendants directly and proximately damaged Debtors by enabling them to incur nearly $200 million in debt—when Rabo had initially determined years earlier that the Debtors were not qualified for a less than $2 million loan. At the outset, Defendants should have foreseen that their unlawful actions would cause Debtors and their other creditors to lose untold sums of money, with losses increasing with each passing day. By the time the scheme came to an end, those damages grew to exceed $170M, as evidenced by the volume of claims asserted by creditors against the Debtors in this bankruptcy proceeding.

# Trustee Sufficiently Pleaded Money Had and Received Claim

## COUNT XI: MONEY HAD AND RECEIVED
### (AGAINST RABO AND CFSB)

198.   The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

199.   Given the circumstances of this case, including Rabo's and CFSB's active and intentional facilitation of McClain's Ponzi scheme, it would be inequitable under either Texas or Kentucky law to allow Rabo to either retain or receive any profits on top of the principal it extended to the Debtors. It would be similarly inequitable to allow CFSB to retain the transfers of the Debtors' funds it received leading up to the Petition Date, which were intended to zero out the CFSB accounts and pay off CFSB to the detriment of all other unsecured creditors.

# Trustee Sufficiently Pleaded Fraudulent Transfer

219.    Exhibit E hereto details the relevant Debtor entity, account number, date, day of week, and dollar amount of daily overdrafts of the Debtors' accounts with CFSB. Each overdraft constituted a loan to the Debtors that was subsequently repaid by future, additional deposits by the Debtors. The overdrafts to CFSB repaid by the Debtors totals $33,277,959.91.

221.    Each of the transfers to CFSB and Mechanics to satisfy the overdrafts were done as part of the Debtors' Ponzi scheme and check kiting scheme and in direct furtherance of the scheme, which was intended to buy time for the Debtors to cover fictitious profits to investors from new investor contributions.

Upon a review of plaintiffs' complaint, the Court can hardly fathom a pleading that could make the charges any clearer. The bank's request is based on the heightened pleading requirements of Rule 9 for fraud charges. But Ponzi and kiting schemes—this very action—allow for a presumption of fraud. *Sec. & Exch. Comm'n. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that [the transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("This court has held that transfers from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.'") (quoting *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012)); *In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *9 (Bankr. N.D. Tex. July 13, 2022) ("A trustee can avoid the burden of proving actual fraudulent intent—or laboriously establishing different badges of fraud—in one situation identified by the Fifth Circuit: when there was a Ponzi scheme (the 'Ponzi-Scheme Presumption').").

45.     As reflected below, the Debtors' intercompany transfers totaled millions of dollars per month, and $2 billion over five years, thus illustrating the sheer volume of transfers and cash required to, among other things, fund the Debtors' check kiting scheme, and thereby, its Ponzi scheme.

**McClain Feed Yard Inc. et al - Intercompany Receipts & Withdrawals**

| Sum of Amount | Column Labels | |
|---|---|---|
| Row Labels | 1 - Receipt | 2 - Withdrawal |
| **2018** | **$ 28,799,906.85** | **$ (42,578,079.08)** |
| Mar | | $ (120,606.18) |
| Apr | | $ (1,102,234.18) |
| May | $ 146,573.79 | $ (1,048,273.03) |
| Jun | $ 1,275,971.53 | $ (3,188,532.73) |
| Jul | $ 2,562,453.77 | $ (5,464,406.33) |
| Aug | $ 1,675,873.37 | $ (3,245,090.82) |
| Sep | $ 2,753,048.17 | $ (4,083,191.72) |
| Oct | $ 5,830,610.41 | $ (8,956,661.89) |
| Nov | $ 6,016,724.16 | $ (6,023,534.01) |
| Dec | $ 8,538,651.65 | $ (9,345,548.19) |
| **2019** | **$ 448,755,804.77** | **$ (447,266,806.85)** |
| Jan | $ 11,406,551.72 | $ (10,214,012.52) |
| Feb | $ 9,035,585.37 | $ (9,958,011.42) |
| Mar | $ 13,507,255.16 | $ (13,366,797.87) |
| Apr | $ 9,528,393.61 | $ (9,245,315.75) |
| May | $ 14,190,456.11 | $ (14,884,104.41) |
| Jun | $ 12,067,530.22 | $ (10,475,451.61) |
| Jul | $ 32,560,973.94 | $ (32,020,103.42) |
| Aug | $ 31,788,005.91 | $ (32,253,124.89) |
| Sep | $ 33,039,934.10 | $ (32,664,003.90) |
| Oct | $ 69,584,908.77 | $ (67,146,406.24) |
| Nov | $ 95,485,372.06 | $ (92,906,363.95) |
| Dec | $ 116,560,837.80 | $ (122,133,110.87) |
| **2020** | **$ 173,132,814.32** | **$ (174,078,533.25)** |
| Jan | $ 14,398,853.35 | $ (15,904,950.35) |
| Feb | $ 14,288,131.35 | $ (14,118,523.03) |
| Mar | $ 4,766,643.68 | $ (4,655,972.80) |
| Apr | $ 8,193,392.90 | $ (8,473,672.10) |
| May | $ 11,028,095.69 | $ (9,295,385.58) |
| Jun | $ 7,249,828.82 | $ (8,358,770.56) |
| Jul | $ 13,849,616.14 | $ (13,872,438.72) |
| Aug | $ 18,141,555.45 | $ (17,826,752.34) |
| Sep | $ 8,486,514.39 | $ (9,197,216.08) |
| Oct | $ 18,138,808.75 | $ (18,163,254.64) |
| Nov | $ 18,320,750.78 | $ (18,501,352.10) |
| Dec | $ 36,270,623.02 | $ (35,710,244.95) |
| **2021** | **$ 416,025,913.53** | **$ (417,358,816.84)** |
| Jan | $ 26,537,170.61 | $ (26,348,992.02) |
| Feb | $ 26,685,832.35 | $ (26,754,845.44) |
| Mar | $ 41,131,031.22 | $ (40,472,278.10) |
| Apr | $ 38,548,390.25 | $ (37,372,100.97) |
| May | $ 33,596,805.59 | $ (36,028,391.68) |

**McClain Feed Yard Inc. et al - Intercompany Receipts & Withdrawals**

| Sum of Amount | Column Labels | |
|---|---|---|
| Row Labels | 1 - Receipt | 2 - Withdrawal |
| Jun | $ 59,539,625.14 | $ (55,696,330.24) |
| Jul | $ 54,110,182.17 | $ (53,445,359.37) |
| Aug | $ 46,069,823.40 | $ (50,443,529.31) |
| Sep | $ 23,296,228.75 | $ (24,511,755.05) |
| Oct | $ 24,952,921.47 | $ (23,918,897.87) |
| Nov | $ 17,222,070.58 | $ (17,079,197.03) |
| Dec | $ 24,335,832.00 | $ (25,287,139.76) |
| **2022** | **$ 435,475,256.98** | **$ (433,750,503.55)** |
| Jan | $ 25,886,808.85 | $ (26,368,590.70) |
| Feb | $ 25,274,613.19 | $ (24,020,306.10) |
| Mar | $ 12,120,432.21 | $ (12,095,222.16) |
| Apr | $ 17,466,813.62 | $ (17,492,023.67) |
| May | $ 25,845,302.81 | $ (25,845,302.81) |
| Jun | $ 29,948,402.76 | $ (29,948,402.76) |
| Jul | $ 28,330,608.91 | $ (28,330,608.91) |
| Aug | $ 17,636,490.02 | $ (17,636,490.02) |
| Sep | $ 34,651,502.15 | $ (34,662,976.75) |
| Oct | $ 30,052,862.40 | $ (30,052,862.40) |
| Nov | $ 81,358,824.75 | $ (81,358,824.75) |
| Dec | $ 106,902,595.31 | $ (105,938,892.52) |
| **2023** | **$ 551,667,798.99** | **$ (552,631,501.74)** |
| Jan | $ 106,266,784.61 | $ (107,230,487.40) |
| Feb | $ 189,891,717.00 | $ (189,891,717.00) |
| Mar | $ 228,932,748.79 | $ (228,932,748.79) |
| Apr | $ 26,576,548.55 | $ (26,576,548.55) |
| Jun | $ 0.04 | |
| **Grand Total** | **$ 2,053,857,495.44** | **$ (2,067,664,241.31)** |

115.    Additionally, with respect to limitations, innocent vendors and investors would not have had cause to know of the Debtors' fraudulent scheme and check kiting given, among other things, the fact that the Debtors' purported cattle investment activities involved cattle located in several states, the investors were geographically located across several states, and such parties would not have had access to the Debtors' banking records and other financial information (as opposed to the Debtors' banks, which did have access to such information). As a result, there are creditors of the Debtors that could take advantage of appliable discovery rule limitations extensions for purposes of the allowable time period to later avoid transfers to the banks, and the Trustee may utilize this extension under § 544(b).

222.    Accordingly, all of the transfers of the Debtors to CFSB and Mechanics were in violation of 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

223.     Pursuant to 11 U.S.C. §§544, 548(a)(I)(A), 548(a)(I)(B), 550, and 551, Texas Business and Commerce Code §§ 24.005 and 24.006, and/or Kentucky Uniform Voidable Transactions Act §§ 378A.040 and .050, the Trustee is entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof. The Trustee is further entitled to a judgment awarding his attorney's fees. Tex. Bus. & Com. Code Ann. § 24.013.

138.    Furthermore, a Debtor entity (McClain Farms Inc.) is listed in an "Entity" column, but it is unclear whether this is the entity that owns the listed bank account, is making an alleged transfer, is allegedly incurring an obligation, or whether it is something else. There is a "Date" column, but, again, the inclusion of this column in the Exhibit is wholly without context. CFSB cannot discern from Exhibit E whether the dates listed in the column represent: (a) the date of a payment made by the Debtors from their accounts at CFSB to some third party transferee (*i.e.*, not a transfer *to* CFSB, but rather a transfer *from* an account held at CFSB); (b) the date CFSB allegedly extended provisional credit to cover a check presented to CFSB for payment (*i.e.*, not a transfer *to* CFSB, or even a "transfer" under applicable law), (c) the date CFSB received cover from a third-party bank on its provisional credit (*i.e.*, not a transfer if received by the "midnight" deadline,[24] and not a transfer if simply received from the Debtors' accounts at a different banking institution), or (d) something else.

[11] *Compl.* ¶ 96.  As discussed *supra* note 5, the Trustee fails to specify which of the three Debtors actually maintained depository banks with CFSB.  The Trustee has actual knowledge that Debtor Feeders—*i.e.*, the only Debtor entity organized in Texas with any meaningful Texas connections—did *not* maintain depository banks at Kentucky-based CFSB.

# ECF No. 48-5 (Ex. E to Trustee's Second Amended Complaint); CFSB's Own Account Records for McClain Farms, Inc.

**McClain Feed Yard Inc. et al - CFSB Negative Activity**

| Entity | Bank | Account | Date | Day of Week | Amount |
|---|---|---|---|---|---|
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/8/2018 | Monday | $ (134,214.60) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/9/2018 | Tuesday | $ (15,142.73) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/11/2018 | Thursday | $ (51,929.97) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/16/2018 | Tuesday | $ (185,248.75) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/22/2018 | Monday | $ (70,716.53) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/23/2018 | Tuesday | $ (283,710.16) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/30/2018 | Tuesday | $ (397,971.52) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/31/2018 | Wednesday | $ (396,926.82) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/1/2018 | Thursday | $ (504,727.12) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/2/2018 | Friday | $ (153,134.99) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/12/2018 | Monday | $ (88,551.55) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/13/2018 | Tuesday | $ (282,510.74) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/14/2018 | Wednesday | $ (23,148.09) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/27/2018 | Tuesday | $ (90,876.75) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/6/2018 | Tuesday | $ (80,273.93) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/7/2018 | Wednesday | $ (120,842.80) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/8/2018 | Thursday | $ (196,783.25) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/12/2018 | Monday | $ (103,196.24) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/13/2018 | Tuesday | $ (147,456.86) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/14/2018 | Wednesday | $ (73,028.93) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/21/2018 | Wednesday | $ (73,072.83) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 4/2/2018 | Monday | $ (1,464.19) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 4/10/2018 | Tuesday | $ (33,030.34) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 4/11/2018 | Wednesday | $ (63,958.37) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 5/4/2018 | Friday | $ (64,720.66) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 5/11/2018 | Friday | $ (7,765.70) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/12/2018 | Tuesday | $ (245,893.40) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 6/26/2018 | Tuesday | $ (113,687.07) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 7/11/2018 | Wednesday | $ (219,164.33) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 7/19/2018 | Thursday | $ (26,447.63) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/7/2018 | Tuesday | $ (83,676.14) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/8/2018 | Wednesday | $ (163,492.42) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 8/14/2018 | Tuesday | $ (11,312.17) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 10/22/2018 | Monday | $ (57,167.57) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 11/14/2018 | Wednesday | $ (350,094.17) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 12/24/2018 | Monday | $ (374,910.61) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 12/25/2018 | Tuesday | $ (374,910.61) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/3/2019 | Thursday | $ (4,087.97) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 1/4/2019 | Friday | $ (257,315.75) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 3/1/2019 | Friday | $ (3,852.10) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 5/17/2019 | Friday | $ (31,240.17) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 11/19/2019 | Tuesday | $ (817,611.13) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 12/24/2019 | Tuesday | $ (222,740.15) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 12/25/2019 | Wednesday | $ (222,740.15) |
| McClain Farms Inc | CFSB | CFSB - 3786 | 2/5/2020 | Wednesday | $ (435,937.24) |



Date 12/31/19    Page    2
Primary Account    2103786
Enclosures    317

BUSINESS VALUE    2103786    (Continued)

### Deposits and Other Credits

| Date | Description | Amount |
|---|---|---|
| | 38C GROVE ST | |
| | RIDGEFIELD, CT, 06877 | |
| | 20191220I1Q73AGC001317 | |
| | 20191220QMGFNP62000948 | |
| | 12201026FT01 | |
| 12/20 | DEPOSIT | 1,778,429.33 |
| 12/23 | DEPOSIT | 475,190.45 |
| 12/23 | DEPOSIT | 1,174,811.13 |
| 12/26 | DEPOSIT | 251,239.45 |
| 12/26 | DEPOSIT | 1,339,214.13 |
| 12/27 | DEPOSIT | 179,691.78 |
| 12/27 | DEPOSIT | 631,456.76 |
| 12/30 | DEPOSIT | 3,138,711.92 |
| 12/31 | DEPOSIT | 15,181.32 |
| 12/31 | DEPOSIT | 1,506,097.00 |

- Choice of law ill suited for disposition at MTD stage

- Trustee plausibly pleads Texas law applies so MTD should be analyzed through lens of Texas law

- Trustee's common law claims not preempted by UCC

- Trustee plausibly pleads claims of knowing participation in breach of fiduciary duty, civil conspiracy, professional negligence, money had and received and fraudulent transfer against CFSB

- CFSB's motion to dismiss should be denied

