IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 23-20084-swe7** |
|  | ) |  |
| MCCLAIN FEED YARD, INC., | ) | Dallas, Texas |
|  | ) | October 14, 2025 |
| Debtor. | ) | 9:30 a.m. Docket |
|  | ) |  |
|  | ) |  |
| AGTEXAS FARM CREDIT | ) | **Adversary Proc. 24-2007-swe** |
| SERVICES, et al., | ) |  |
|  | ) |  |
| Plaintiffs, | ) | MOTION TO DISMISS ADVERSARY |
|  | ) | PROCEEDING FILED BY DEFENDANT |
| v. | ) | MECHANICS BANK (238) |
|  | ) |  |
| RABO AGRIFINANCE, LLC, | ) |  |
| et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SCOTT W. EVERETT,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| For Kent Ries, Trustee: | Alan Dabdoub |
|---|---|
|  | Steven G. Gersten |
|  | Chris Akin |
|  | Campbell Sode |
|  | LYNN PINKER HURST & SCHWEGMANN, LLP |
|  | 2100 Ross Avenue, Suite 2700 |
|  | Dallas, TX  75201 |
|  | (214) 981-3800 |

| For Kent Ries, Trustee: | Hudson M. Jobe |
|---|---|
|  | JOBE LAW, PLLC |
|  | 6060 North Central Expressway, Suite 500 |
|  | Dallas, TX  75206 |
|  | (214) 807-0563 |

APPEARANCES, cont'd.:

For Mechanics Bank:              Javon Johnson
                                 Buffey E. Klein
                                 HUSCH BLACKWELL
                                 1900 N. Pearl Street, Suite 1800
                                 Dallas, TX  75201
                                 (214) 999-6100

For Community Financial          Aaron Michael Kaufman
Services Bank:                   GRAY REED & MCGRAW, LLP
                                 1601 Elm Street, Suite 4600
                                 Dallas, TX  75201
                                 (214) 954-4135

For Community Financial          Keith J. Larson
Services Bank:                   MORGAN POTTINGER MCGARVEY
                                 401 South Fourth Street,
                                   Suite 1200
                                 Louisville, KY  40202
                                 (502) 560-6758

Recorded by:                     Sara Ferrufino
                                 UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
                                 (214) 753-2088

Transcribed by:                  Kathy Rehling
                                 311 Paradise Cove
                                 Shady Shores, TX  76208
                                 (972) 786-3063

          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

DALLAS, TEXAS - OCTOBER 14, 2025 - 9:33 A.M.

THE CLERK:  All rise.

THE COURT:  Thank you.  Please be seated.

Good morning.  We're here on the 9:30 docket.  We have one matter set in Adversary 24-2007 and/or 25-2005.  These are the related adversary proceedings in the McClain bankruptcy case. I'll go ahead and start with appearances in the courtroom.

MR. JOHNSON:  Javon Johnson on behalf of Defendant Mechanics Bank.  And who will also be joining be shortly, my colleague Buffey Klein.

THE COURT:  All right.  Good morning.

MR. JOHNSON:  Good morning, Your Honor.

MR. DABDOUB:  Good morning, Judge.  Alan Dabdoub on behalf of the Trustee.  Also present with me is Hudson Jobe, my co-counsel.  And I believe present online as my co-counsel is Steven Gersten, Chris Aiken, and Campbell Sode.

THE COURT:  All right.  Good morning.

MR. DABDOUB:  Good morning.

MR. KAUFMAN:  Good morning, Your Honor.  Just observing.  Aaron Kaufman for Community Financial Services Bank.  And I see that my colleague, Keith Larson, is also on the line.

THE COURT:  All right. Good morning.

MR. KAUFMAN:  Good morning.

THE COURT:  All right.  I'll go ahead and take

remaining attorney appearances on WebEx. Any takers, or did I get them all?

Is Ms. Klein in the building, or is she appearing remotely?

MR. JOHNSON: I apologize, Your Honor. She is in the building. She intends to appear in person.

THE COURT: Okay.

MR. JOHNSON: If I could just have a --

THE COURT: It looks like you're being flagged here.

MR. JOHNSON: Okay.

SECURITY OFFICER: Your Honor?

THE COURT: Yes, sir?

SECURITY OFFICER: I have an attorney out here who was trying to identify. She doesn't have a driver's license. And she is to be arguing this case before you today.

THE COURT: Ms. Klein?

SECURITY OFFICER: Yes.

THE COURT: Yes. I'll vouch for her.

SECURITY OFFICER: But I don't have a -- can your clerk or someone identify her right quick?

THE COURT: Sure.

SECURITY OFFICER: Okay. Thank you, Your Honor.

THE COURT: All right. Thanks for your help.

MR. JOHNSON: Thank you, Your Honor.

THE COURT: Sure.

So for those of you on WebEx, we'll be starting in just a couple minutes.  It sounds like Ms. Klein is making her way through security.

(Pause.)

THE COURT:  Good morning.

MS. KLEIN:  Good morning, Your Honor.

THE COURT:  We heard there was an imposter in the building.

MS. KLEIN:  Yes.

THE COURT:  We had to send out Mr. Kaufman to verify your identity.

MS. KLEIN:  To verify my identity, yes.  I apologize.  I came in late last night and I guess when I went through TSA my driver's license stayed.

THE COURT:  Oh.  I'm sorry to hear that.

MS. KLEIN:  So, yeah, I appreciate it.  If you'll just give me a moment to get my notepad out.

THE COURT:  Sure.  If you'll make your appearances, and then --

MS. KLEIN:  Yes.  Buffey Klein on behalf of Mechanics Bank.

THE COURT:  All right.

MS. KLEIN:  I have with me Javon Johnson, who I'm sure already made his appearance.

THE COURT:  All right.  Very good.

MS. KLEIN:  Thank you.  I appreciate --

THE COURT:  Sure.  Sure.

(Pause.)

MR. JOHNSON:  Your Honor, would you like a paper copy of the live deck?

THE COURT:  Sure.

MR. JOHNSON:  May I approach?

THE COURT:  Sure.  And then at some point, you don't have to do it right now, any PowerPoints or demonstratives in a hearing ultimately will have to be filed on the docket.  You can call it your Notice of Demonstrative for the hearing. That way, anybody going back can look and see what I was looking at as you're going through --

MS. KLEIN:  Sure.

THE COURT:  -- your presentation.

MS. KLEIN:  We filed it this morning, Your Honor.

THE COURT:  Oh, you did?  Okay.

MS. KLEIN:  So that, yeah, before we came in.

THE COURT:  All right.

MS. KLEIN:  So just for that, so that everybody would have it.

THE COURT:  All right.  So, welcome, everybody.

MS. KLEIN:  Thank you.

THE COURT:  Just a couple opening remarks, and then I'll turn it over to Ms. Klein.

I think I had mentioned this at one or more of the prior hearings.  I have this confluence of a lot of my largest cases all having things happening at once.  So I'm digging out of a little bit of a hole for under-advisements.  The good news is I'm making progress, and we have spent some time working on the CFSB motion to dismiss.

One thing I would like the parties to address, both sides, whenever you want to as part of your arguments, are this thing about incorporating the arguments of the other Defendants.  So we've had a hearing on CFSB's motion already.  The Mechanics motion incorporates the arguments made by all of the Defendants.  And so we have Rabo and HTLF.  I think those are in the briefing stage.  Maybe the parties can confirm.  I know there's a lot out there on the docket.  I don't believe Rabo's or HTLF's motions are yet set.

If they're not set, one of the things I'm wondering, as I read Mechanics' papers and the Trustee's reply, I was having a little bit of déjà vu because I know there's a lot of overlap with some of the arguments that CFSB has made, Mechanics has made.  For example, one of the arguments that you're a depository bank, something that we heard in CFSB's motion.  And part of me is thinking, should I have set all these at the same time, and how do I rule on all of your arguments if you're incorporating arguments in briefs that haven't been set for hearing yet?

So that's just something to address, for all parties to address at your convenience.

So, with that said, I'll turn it over to you, Ms. Klein.

MS. KLEIN:  Thank you, Your Honor.  And I think, obviously, these are -- it's a result of the way that the complaint reads.  They are very intertwined.  And a lot of the allegations, as we'll get into in more detail, are substantially similar and very intertwined.

Also, there have been multiple iterations of these motions, both the complaint and the motions to dismiss previously, that were mooted by an amended complaint, which obviously also complicates some of the briefing as well.

But I think that there are certain aspects of each of these -- you know, with each of these Defendants, and I think that some of the what we've -- what we deem to be, you know, major issues with the complaint are going to be very similar across the board for all the Defendants.  You know, I think that what we all have noted, and I think that we all -- that each of the motions to dismiss -- and not to argue anyone else's for them here today -- but, you know, there is a lack of specificity as to each of the Defendants, such that it makes it very difficult on the Defendants' side to address the allegations in the complaint specifically.

So I think that one of the issues that I believe is across the board is that the complaint seeks to lump all the

Defendants into one bucket.  And as we point out in our motion and as we'll get into today, Mechanics Bank is significantly different than the other Defendants, perhaps more in line with the other depository bank in the case, which is CFSB.  But regardless, each of the Defendants should have specific allegations that it -- of its own conduct apparent in the complaint.

And I think that's what is missing.  Much of the complaint deals with very general allegations on conduct without specifically identifying the individual Defendants' conduct. And so I think that that's one refrain that's going to be heard throughout by all of these Defendants.

But the other piece of this is also the plausibility factor, where there's not -- there are allegations in here, but they're not really linked up to the claim.  And so the allegations in the claim, it's possible that there's conduct there, but there's not enough specificity, really, to give the Defendants that type of -- the type of notice required.

So I think that those are some things that are going to be very similar across the board.  And I think that, from there, we're certainly happy to get into more specific issues as we get into the argument, but those are some of the similarities. And I think you're going to feel a bit like you're in an echo chamber, I believe, because some of the claims that have been made are really across the board as to all the Defendants,

without really getting into what did each of them in fact do. And that's something that we believe is fatal to the complaint that's been brought.

THE COURT:  And so just one quick follow-up and then I'll stop interrupting, I'll let you get through the PowerPoint.

MS. KLEIN:  My pleasure, Your Honor.

THE COURT:  For example, CFSB has already a preemption issue that they say the UCC preempts certain of the claims and they cite Kentucky law.  I think the position of CFSB is that it doesn't really matter whether it's Texas or Kentucky, that the same arguments apply.  But they've cited to specific Kentucky Supreme Court case law.  And I don't have that type of briefing for Mechanics.  It's just that was one of the things that I had in mind that, by incorporating that argument, it hasn't been fleshed out quite the same way as CFSB's motion was, because even though at the end of the day I think Mr. Kaufman took the position that it doesn't matter, Kentucky or Texas, they're substantially -- they're close enough that they preempt certain of the claims of the Trustee, but I don't have that type of granular argument for Mechanics. But I understand some of your other points.  So, with that said, I'll let you --

MS. KLEIN:  Well, I will address that.  I think that Mechanics, we do not take the position that Kentucky law, as

to our claims, would be appropriate. Certainly not. I think the argument with regard to the UCC preempting some of the claims, we certainly agree with the arguments made by CFSB within that vein.

What we do get into in our case is that we do believe that the customer agreements and that the policies of the Bank are specific to that relationship. And this is a contractual relationship. And so I think, in order to get to a tort-like claim, there's -- you've got to get -- you have to have that -- you have to meet that 9(b) burden. You know, this is a -- this is an even greater burden, in my opinion, because this is a -- it was a customer and there is a contract between the customer and Mechanics Bank.

And so, you know, if they believe that there was a breach there, we believe that it would sound in that contract, and the UCC and the actual agreement with the customer is what's going to drive those obligations of the parties.

THE COURT: I promised I wouldn't keep interrupting, but now I've got this on my mind. I didn't really focus in your brief what state UCC law would apply to Mechanics. I know, for CFSB, the competing statutes appear to have been Kentucky versus Texas. And CFSB's position was, as between the Kentucky version of the UCC and the Texas version of the UCC, they're close enough, there are no material differences for purposes of the arguments that they made, that they ran

either way.  Is it --

MS. KLEIN:  We believe that it would be Texas, would be the most appropriate statute here, because these are Texas Debtors.  We were banking -- our client was banking -- it's a California bank, but banking Texas debtors.  We think that the UCC itself is not -- between California and Texas, we believe that it would be more applicable to utilize the Texas UCC provisions.

THE COURT:  All right.  So now I'll turn it over to you.  Go ahead.

MS. KLEIN:  That's -- yeah, I think that we -- and we didn't really get into the choice of law, because, you know, again, we didn't really dive into the choice of law provisions and the appropriate choice of law within our motion to dismiss.  I'm not certain that it would make -- you know, we didn't believe that that was going to be a driving factor in what would result in the motion to dismiss.

I know, *in pari delicto*, we recognize that -- and I'm jumping ahead on my argument, but I just wanted to address sort of the choice of law and the *in pari delicto* issues that had come up in the prior hearing, and obviously it's been briefed.

We believe that that certainly is going to be a driving factor for this Court to address.  I'm not certain, at the motion to dismiss, if it's going to eliminate those claims,

but certainly -- you know, at this stage of it.  But I think it certainly is an important factor to consider, ultimately.

So I'll just leave it there, but I think that that -- I understand that the choice of law is probably -- was a certainly important factor when you're looking at Kentucky versus Texas, not as much of a driving factor for us because, you know, we were banking to actual Texas entities in Texas.

So, with that, Your Honor, I'll go ahead and get started, and I'm happy to stop at any point to answer questions as we get along into the argument.

THE COURT:  All right.

MS. KLEIN:  And I'll just echo what I've already -- what I already started off with, is we just don't believe that this complaint, that the Trustee's second amended complaint does enough to satisfy his pleading burden.

Mechanics Bank, as you may be aware, maintained the Debtors' depository accounts for three -- it actually had three accounts at the Bank that were depository accounts.  It never at any point acted as a lender to the Debtor entities or participated in any alleged misconduct involving the Debtors with regard to any type of a lending relationship.

Trustee's claims against Mechanics are based, really, on conclusory allegations that we see here and what is clearly group pleading, as I noted a few minutes ago.  And by approaching it that way, the Trustee has simply failed to

provide fair notice to Mechanics, together with plausible facts to support the claims that are being made.

Throughout this complaint, the Trustee frequently improperly imputes conduct of other parties onto Mechanics Bank by simply grouping it into a sentence without specifically providing exactly what conduct can be imputed directly to Mechanics Bank.  Absolutely no examples of anything in this complaint that would specify what activities were undertaken, what conduct was undertaken by Mechanics that would result in the harm that's being alleged in this complaint.

The Trustee alleges that Mechanics extended credit or paid for overdrafts, and that's really the substance of the complaint here, is that certain overdrafts -- actually, a phenomenal amount of overdrafts -- were covered by Mechanics Bank.  But there is really no specific facts or no actual transaction identified by Trustee that would support that allegation.

And in fact, the complaint completely fails to provide Mechanics sufficient detail to determine what parties, instruments, or transfers are at issue, because the comingled negative end-of-day balance is really not reflective of anything.  This is what we see and what we'll talk about, but in Exhibits D and F of the complaint, there's really no detail on what actual transfers are at issue or are actionable by the

Trustee.  So it just can't be the case that Trustee has satisfied 9(b) here at all.

As it gets into claims of fraud and conspiracy, that particularity requirement is very high.  And alleging this end-of-day balance, the negative end-of-day balances that were present in those account statements, is actually representative of who knows what, but they claim that it's representative of these multiplicity of transactions that -- and that they really just say that we'll parse that out later with that.  You know, the experts will get to it.  And that's really not appropriate, as we'll get into.

The lack of detail is simply not reasonable, and it's just not enough for these claims to survive on this.

So, with that, Your Honor, Mechanics only ever acted as a depository bank.  The allegations are conclusory.  Mechanics, there is no allegation or evidence in this motion, in the complaint, to support that Mechanics had control over the deposit accounts.  And there is no evidence or no allegation specifically that Mechanics covered insufficient funds checks. You know, they claim that overdrafts were covered, and so what they're trying to back into is that the fact that alleged overdrafts were covered, the deposits that would have kind of righted the ship, that would have made the accounts back to zero, were actually transfers to Mechanics Bank.  But there's nothing in the record, and there's not even a specific

allegation that shows when or how that might have happened or for what specific instrument that occurred with.

And I think that what we get, end of day, is that it looks like this huge number because they have just used one piece of information without actually identifying what transactions went in to create that alleged balance at the end of the day. So it simply is not enough for us to understand exactly what they're claiming our client, Mechanics Bank, actually did wrong with regards to those alleged transfers.

Getting back into exactly what Mechanics Bank did, Mechanics was the depository bank for Debtors' sweep accounts. So Debtors' accounts at Mechanics, they were what are known as zero balance accounts, and that's identified in the account statements as well.  These were daily account -- there were daily account reconcilement on each of these accounts.  So they were linked to -- these accounts were linked to the line of credit that was provided by Rabo Bank.  And the excess funds in the accounts went back on the line of credit, and then the line of credit was utilized to fund those accounts. So they would automatically advance funds from the line of credit to cover or to prevent overdraws.

Mechanics Bank itself never covered an overdraft or an NSF check that was presented.  There was --

THE COURT:  So, on that point, I understand your argument that they haven't alleged sufficient detail without

identifying when overdrafts might have been -- well, when the deposit might have been made to cover an overdraft. But on the other hand, can I determine on the face of the complaint that you never covered an overdraft?

MS. KLEIN: Well, --

THE COURT: I understand that's your position, but on the face of the complaint, can I determine that from the face of the complaint, that you never did, or is it simply that I can't tell from the face of the complaint one way or the other based on the lack of specificity?

MS. KLEIN: There is no -- in the -- within the complaint, within the evidence provided by the complaint, there is simply no evidence that an overdraft was ever covered. There's not --

THE COURT: But to their point, it's not the evidence stage, it's just the allegations. Are there --

MS. KLEIN: Well, there's not even a specific allegation, other than pointing to an end-of-day balance. So there's not -- there's no allegation of a transaction that was actually covered by Mechanics Bank. They're utilizing one piece of data on an account statement that is supposed to provide the support that an overdraft was covered at some point, but there's no allegation of what instrument was presented or what instrument was actually covered by Mechanics Bank to create this lending relationship.

Because the only way you get to a fraudulent transfer is if we're actually the transferee. And we'll get into actually the cases that support that. And if we're not, if Mechanics Bank is not controlling the funds and not in receipt of them to cover a debt that's owed, there's no transfer. And that's where we are, is that there's not an allegation of an instrument that was presented that Mechanics Bank paid itself and then received funds to cover that back, so that there was no -- there was no transfer. They were not the transferee recipient. And there's not any allegation to support any particular event that would have created that scenario where we would have been the recipient of a fraudulent transfer transaction.

Really, the complaint, what it does is it describes Mechanics performing depository services, allegations that are contrary to what they try to allege here.

Just to give you an idea of the timing here, the Debtors filed for Chapter 7 bankruptcy. This is in April of 2023. And this is -- April of 2023 is when, really, it became apparent that there was a problem with McClain, with the McClain Debtors, and this -- the filing on April 28th.

What we have is August of 2024 is the next really major event where the Court enters an order consolidating the case. And this is August. May, you'll see, is when we started discovery. May of 2024 is when we started serving responses

to requests under the Trustee's 2004 examination subpoena.

So, Your Honor, I guess what I want to just back into here is that, here we are in a situation where we have a very complex complaint.  For the last more than a year, Mechanics has been actively involved in discovery with the Trustee, providing documents, providing information, and we are still at a point where we don't have the level of specificity that you would expect.

I know we've heard we're not at the evidence stage, and, certainly, we're not trying to impute that, but what I am saying is that, for over a year, we have served on, you know, discovery, we've served discovery back to -- or produced documents to the Trustee, thousands of pages, tens of thousands of pages, that -- to identify -- you know, to provide them with the information that you would think would ultimately find its way into the second amended complaint. But we're still --

THE COURT:  Was that discovery provided only in response to 2004 requests, not discovery in the adversary, or --

MS. KLEIN:  That's correct.  Right.

THE COURT:  Okay.

MS. KLEIN:  These were 2004.  And we, in May of 2024, we began serving responses and objections to their examination subpoena.  And that process continued where, again, we were

producing tens of thousands of documents, including incoming/ outgoing wire details, account statements, electronic instruments, reports, account agreements, a number of -- you know, like, thousands of pages of documents were produced. And we still lack any type of real identification of what conduct supports the allegations that hundreds of millions of dollars were extended or received by our client.

So Trustee has had the benefit of years of investigation and thousands of pages of discovery.  Lots of this is -- you know, you've seen complaints that well predate Trustee's complaint.  Even so, we still lack plausible facts to support it.  And we believe that, notwithstanding the extensive information that's been provided to Trustee, we still just don't have the level necessary to support the claims that Mechanics acted wrongfully, or, really, what we see is the continued -- their continued efforts to impute alleged conduct of McClain and other Debtors onto Mechanics.

As you know, the Trustee must plead enough facts to state a claim, and that's under *Twombly*.  And I think that, not to belabor it, but we just don't believe that what we see here is going to be adequate to get there.

And again, we're not saying that this is at the evidence stage, but the Court doesn't have to accept as true the conclusory statements that are made within this complaint, which are -- it's rife with them.  And what we also see is

their effort to create deductions of fact from very sparse data that they presented.

So, Your Honor, the Trustee has alleged, really, that $176 million of fraudulent transfers were that Mechanics actually loaned to the Debtors and realized on the loan with subsequent deposits, as I said, but there's not a single example of that occurring within anywhere within this complaint.  And I think that that -- that really -- I want to focus on that first because that's really where we get to a number, the only real damages number that we've seen in this complaint.  And $176 million, without being able to identify specifically what supports that.

And if we look at, as this Court has, look at the exhibits that are attached to the complaint, they just are not -- they just don't even identify exactly what it is that Mechanics Bank did or when, to whom, or based on what.  So I think that these charts that are attached to the complaint just don't give the Court enough information for us to be able to proceed and show you exactly what happened, because they have not identified, really, for us, what it is they believe that we did or what we received in that -- within this complaint.  They don't really provide that level of specificity.

So now I'd like to turn, Your Honor, to the specific claims here.  And as I said, the conclusory allegations just simply don't suffice.  The Trustee, in a very conclusory

fashion, states that Mechanics Bank controlled these accounts. But there's really no evidence within the complaint -- not evidence, but no statements, allegations within this complaint to indicate how Mechanics exhibited control over these accounts.

There are conclusory allegations that check-kiting was occurring, but there's not really allegations within this complaint to infer the existence of a kiting scheme or to show that Mechanics Bank was somehow participating in this scheme.

And on top of that, these allegations simply don't show what was the harm to Debtor from these actions.

So we see a lot of allegations about alleged fraud -- alleged misconduct, breaches of fiduciary duty, but there's not a connection to actually what was, in fact, the harm to the Defendants.  Or to the Debtors, rather.  Who was left holding dishonored checks?  What information -- or, you know, there's just not enough -- there's not enough specificity.

And with regard to the check kite, the banks are typically the victims in those.  So it's not -- it's really difficult to see how and there's no allegation to support how in fact Mechanics Bank was involved in the check kiting, allegedly, this alleged check-kiting scheme, or that there was in fact any type of a benefit or damage to the Debtors as a result of that.

Not only are the statements within the complaint very

conclusory, but they're also highly inconsistent.  And I'd like to just walk you through some of the inconsistent allegations that we see throughout this complaint.  And on Page 11 is where I am of the slide deck, but you see here it says, Mechanics and Rabo.  And we see that throughout this complaint, where Trustee is trying to link Mechanics and Rabo.  Two completely independent institutions, but they're linking them regularly.  Mechanics and Rabo used their control over Debtors' bank accounts to make on-the-spot payments to investors who presented claims for payment on partnership agreements with McClain.  And this is in the second amended complaint at Paragraph 126.

We also see within the complaint, inconsistently, Rabo entered into a deposit account control agreement with Mechanics Bank and Debtors, giving Rabo ultimate control over the Debtors' Mechanics Bank depository accounts.  Rabo then seized Debtors' cattle and swept the funds from the Debtors' Mechanics Bank accounts.  And this is the second amended complaint, Paragraph 73.

Further, Rabo purported to have an all-encompassing security interest in large swaths of all the Debtors' property, including, by the end, their deposit accounts at Mechanics Bank via the DACA.  Debtors were reliant on Rabo's loans to extend their existence as outwardly-viable entities. Rabo was able to leverage the Debtors to do what Rabo wanted.

That's at Paragraph 92 of the complaint.

Rabo's domination of the Debtors was made indisputably manifest when it forced McClain out of his own companies. That's at Paragraph 93.

Then we see Rabo compelled Debtors and Mechanics Bank to execute the DACA, giving Rabo its purported lien on Debtors' deposit accounts.  This is at Paragraph 112.

It goes on, Your Honor.  Finally, stating that Rabo -- that the DACAs gave Rabo the ability to control Debtors' access to funds and outflows from Debtors' bank accounts. Paragraph 147.

It's this type of pleading where you have an allegation and then you've got wildly inconsistent allegations within the same complaint talking about actions that make it very -- you know, about as clear as mud to Mechanics as to what conduct it actually engaged in with regard to the purported scheme.

We can go on further.  There's the conclusory allegation, and this is on Page 12, CFSB and Mechanics similarly acted to perpetuate McClain's Ponzi scheme by permitting Debtors to run billions of dollars in transactions between their accounts at both institutions.

Inconsistently, we see that, in several instances, certain investors, or more confoundingly, their bankers, were provided blank pre-signed checks from the Debtors that the investors filled in on their own to more quickly facilitate the flow of

funds to and from the Debtors, which arrangement McClain took advantage of to kite checks.  This is at Paragraph 28.

Also, there's an allegation McClain also took advantage of the Debtors' three accounts at Mechanics to manufacture float via two billion in intercompany transfers over five years and conceal his fraud in the volume of chaotic transactions, at Paragraph 46.

So, again, we've got allegations here that say we've got third parties that were actively engaged in perpetuating this fraud, and yet we've got a conclusory statement that it was really CFSB and Mechanics that were doing it.  There's no evidence and no -- I mean, not evidence, but no allegations to support what actually was done by Mechanics Bank or CFSB to further or perpetuate McClain's Ponzi scheme.

Finally, there -- and these go on, I mean, really on and on.  We have a conclusory statement, and when you look within the complaint itself, multiple instances of inconsistent allegations that do not support the conclusions even that the Trustee is making.

So it really begs the imagination how Mechanics Bank or the Court could look at these statements and then look inside the complaint and see that there's any plausibility to them, because within the context of the document itself there is just rife inconsistencies with regards to looking at the conclusions and then looking at the actual allegations.

Here we see on Page 13 another instance:  It is clear the Debtors repaid investors with other investors' funds as well as from the proceeds of credit extensions granted by Rabo in the traditional sense of a loan or line of credit and Mechanics or CFSB in the form of the payment of insufficient funds checks.

Again, we see no actual information to support what those transactions were.  But again, inconsistently, McClain secured $70 million in loans or more from Rabo to facilitate the Debtors' too-good-to-be-true growth and purported profitability.  Rabo's extension of $70 million in credit provided McClain vast liquidity, which he predominantly used to massively expand his kiting and Ponzi scheme, to the detriment of the Debtors and their innocent investors and creditors.

But there is no evidence to show that mechanics or CFSB were aware of that.  Not evidence, but no allegation to show that at any point would Mechanics or CFSB be aware of McClain's actions.

And again, failure to identify any specific transaction or any even time frame or recipient or, you know, there's just nothing here where we can see that this is the transaction that's being claimed led to an increase in the Debtors' problems.

There are, additionally, allegations -- there's a

conclusory allegation at Paragraph 30:  Extensions of credit from Rabo, Mechanics, and CFSB.  There's no instance within this complaint where they actually identify extensions of credit by Mechanics Bank.  Inconsistently, again, they talk in great detail about the extensions of credit by Rabo and when and how that occurred, but they don't identify any single instance where Mechanics Bank, in fact, extended credit.

Your Honor, within the complaint, Mechanics Bank is -- there are one, two, three, four, five, six claims, six counts against Mechanics specifically, the first of which, Count I, is a knowing participation in a breach of fiduciary duty.  The second, civil conspiracy.  The third count against Mechanics is professional negligence.  The fourth is punitive damages, a request for punitive damages.  The fifth is the preferential payments.  And the fraudulent transfers make up the last bucket.

So within Count I, the knowing participation in a breach of a fiduciary duty, the complaint almost exclusively describes Mechanic's alleged control over Debtors' accounts in the context of the other Defendants' conduct.  It doesn't really provide any specific information about the control that Mechanics had over the accounts, and really does nothing more than describe Mechanic's role as a depository institution.

A similar situation, and different facts but, similarly, was addressed this year in the Western District of Texas by

Judge Parker in the *In re Chris Pettit & Associates* case, and that's at 670 B.R. 602.  That court looked at a situation where a similar claim was being made against the bank.  And in that instance, there were allegations, much like you have in our case, where the trustee said that the bank should have known, based on "red flags," that the debtor was operating a scheme.

But the court said very specifically that merely alleging that the bank should have "known" based on red flags does not establish that the bank knowingly permitted the debtor to engage in suspicious transactions.  Knowing actually means knowing, is what the judge found in that case.  He -- it doesn't -- like, just because there might have been a red flag or there could have been conduct that might have raised a question, doesn't mean that -- doesn't establish that the bank was assisting in that conduct.  That if they -- if there is no allegation to support that the bank knew, then it doesn't meet the standard.  And that's what the court in the *Chris Pettit* case found.

And in that case, the judge dismissed the trustee's knowing participation and breach of fiduciary duty claim, finding that the allegation of red flags and unusual banking activity were insufficient to plead the knowing participation claim.

And I think, similarly, what we have here in this -- if

you look at the complaint that we have, there's really not even any specific -- they don't identify exactly what should have clued Mechanics Banks into there being a problem with these accounts.  There's just a very broad allegation that there were -- that the Bank should have known and that the Bank breached their duty.  It's not -- they don't really provide allegations to support what the Bank knew in fact or should have known in fact.  And that's just simply not enough to support that type of a claim.

The next count that is specific to Mechanics is the civil conspiracy.  And this one is even more problematic than the breach of fiduciary duty claim.  And I think that this is because we have, within this complaint, a real failure to even meet the 9(b) fraud standard with -- it's not pled with any particularity, and that on its own is fatal to a civil conspiracy claim.

But notwithstanding that, the complaint doesn't allege that Mechanics made any representations relied on by anyone to their detriment, let alone a misrepresentation.

Further, the Plaintiffs' failure to state -- you know, really, failure to provide any indication that there was a meeting of the minds among these parties is likewise fatal.  In order to get a claim for civil conspiracy, there must be pled -- not only must you meet the cause standard, but there also must be pled a meeting of the minds, a preconceived plan,

or a time and place at which the Defendants had a meeting of the minds regarding the object of the conspiracy.

And this is important, because as we see in the case that we've cited within our pleadings, *In re Artho*, the conspirators must have the specific intent to agree to accomplish an unlawful purpose or a lawful purpose by unlawful means. And that's a bankruptcy case here out of the Northern District, *In re Artho*, 587 B.R. 866, and that's a 2018 case. And proof of the conspirators' intent to engage in conduct that results in injury, without more, does not establish a civil conspiracy claim.

There has to have been a specific intent. And we see further in the *Chu v. Hong*, which is a Texas Supreme Court case, they explain that the alleged conspirator could only be liable for conspiracy if he agreed to the injury to be accomplished. Agreeing to conduct ultimately resulting in injury is not enough.

So civil conspiracy is a very high bar, and what we see here is just a dearth of allegations to support that there was a preconceived plan on the behalf of any of these Defendants, notwithstanding with the Debtor even, a preconceived plan or a time and place where Defendants had a meeting of the minds about an object of conspiracy. There's no allegation to support that.

That Mechanics was a joint participant in any agreement.

No allegation to support that.

Mechanics had a specific intent to cause the Debtors harm. Certainly, there is not an allegation within this complaint that would provide any notice of that.

Mechanics was aware of any harm or wrongful conduct at the inception of an alleged agreement. Again, we just don't have the allegations within the four corners of this complaint to support a civil conspiracy claim.

There's just no plausible meeting of the minds that -- even if reading this complaint and giving it every benefit of the doubt, there is nothing within here that would indicate that that ever occurred with any party and which Mechanics Bank was a party to.

THE COURT: So the Trustee says that the knowing participation claim supplies the underlying tort necessary for the civil conspiracy claim. So does it rise or fall with the knowing participation claim?

If I were to follow Judge Parker, is knowing -- or at least that's what I understand the argument to be, that even if there's not a fraud claim, that if they have adequately pled a knowing participation, a breach of fiduciary duty, that that could supply the underlying tort, assuming they then also satisfy the other elements of a civil conspiracy. Is that consistent with your argument?

MS. KLEIN: I think that, Your Honor, I would go one

step further and say that if you look at *Artho*, it has to go even further. There has to have been -- there has to have been an agreement at the beginning that that's the injury that would occur.

And I think that even if you were to somehow find that that there was a knowing participation and a breach of fiduciary duty, that still doesn't get you to a civil conspiracy. You still have to argue that there was a meeting of the minds and that there was an agreement that this is a plan, we're conspiring to affect this outcome.

And they still -- even if you get that knowing participation of breach of fiduciary duty, you don't -- there's no allegation as to when that actually began. There's no allegation as to what the agreement and the ultimate goal of the conspirators were. There is no -- there's not even, really, a support as to when -- well, as I said, I'll just repeat myself. But as I said, there's no real allegation as to when this conspiracy began.

And I think that that -- in order to get civil conspiracy, it's more than just having a tort. And it's more than even the conduct. It has to be that you actually -- that the conspirator can only be liable for conspiracy, and this is a Texas Supreme Court case, if he agreed to the injury at the outset.

So even if you were to have participated in a breach of

fiduciary duty, that doesn't necessarily mean that you agreed to the injury at the outset and that you agreed that the conduct was going to result in that.  In fact, agreeing to the conduct ultimately resulting in injury is not enough.  That's what the Texas Supreme Court says.  And that's in that *Chu v. Hong* case, which is at 249 S.W.3d 441.

And I think that -- so even if you have an instance where you may be able to shoehorn a knowing participation and a breach of fiduciary duty, it still doesn't get you to the civil conspiracy.  You still must satisfy those independent requirements, elements of a conspiracy.  And it has to be more than just agreeing to conduct, which is what that knowing participation is.  It has to be that you actually agreed to the injury at the outset, and that's simply not found within the four corners of this complaint.

Finally -- well, not finally, but I think that the next count we get to is professional negligence.  And in this count, Trustee alleges that CFSB and Mechanics Bank breached their duty of ordinary care to Debtors by engaging in cash and check-kiting activity for CFSB, and Mechanics Bank used their control over Debtors' accounts to make on-the-spot payments to investors.  And this allegation is at Paragraph 163.

Trustee further alleges that Defendants breached their duty of ordinary care by ignoring known and obvious red flags and acting to expand the Debtors' suspect operations.  This is

at Paragraph 167.

As we talked about earlier, Your Honor, Mechanics Bank -- and there's not an allegation to indicate that Mechanics Bank controlled the Debtors' accounts.  Under the UCC, a secured party has control of a deposit account if the debtor or secured party or bank have agreed in a signed record that the bank will comply with instructions originated by the secured party directing this disposition of the funds in the debtor's -- in the deposit account without further consent by the debtor.  That's what the UCC 9104(a)(2) says.

The Fifth Circuit has held that with regards to the Bankruptcy Code's fraudulent transfer provision, in order to be considered a transferee, so an entity must have dominion or control.  And that's in that -- over the disputed assets.  And that's in that *Rotstain v. Trustmark National Bank* case which is cited here.  And it also cites to the *In re Coutee* case, 984 F.2d 138.  That's also a Fifth Circuit 1993 case.

A recipient doesn't necessarily have dominion or control over assets if they're only holding the assets for the purposes of fulfilling an instruction to make the funds available to someone else.  And I think those are the allegations that we have in this complaint, is that Mechanics Bank was a depository institution and they were -- their control was limited to holding the assets for the purpose of fulfilling an instruction to make funds available.

The Texas Supreme Court in Texas, Texas has refused to create a standard of care of duty based upon -- and I think what we see here, not only have they failed to show that, you know, Mechanics Bank had actual control of these accounts other than as a depository institution, and that they've actually alleged nothing that Mechanics Bank did outside of its obligations to make those funds available and to comply with instructions with regard to those accounts.  There's been no allegations that anything Mechanics Bank did was outside of those requirements.

But what we get in the next -- in Paragraph 166 of the complaint is that they allege that Debtors further breached their duty of ordinary care by allowing hundreds of millions of dollars to be transferred between the bank accounts at CFSB and Mechanics Bank on a monthly basis with no apparent legitimate purpose.  So we get here to -- and it says:  Any competent bank would have investigated these overdrafts and discovered McClain's fraud.  This is the allegation of the Trustee in Paragraph 166.

And I point out that whether or not the duty exists is a question of law for this Court to determine.  And that's in the *Owens v. Comerica* case.  But in this instance, the Supreme Court here in Texas has refused to create a standard of care or duty based on internal policies and the failure to follow any alleged policies or otherwise.

And so what they found is that -- and this is in the *Comerica Bank* case, that Owens -- is that any failure to have followed -- even if such policies existed, any failure to have followed those, which is what they're alleging here -- any competent bank would have investigated -- doesn't necessarily give rise to a cause of action in favor of customers or others.

So I think that the problem that the Trustee has here is that they've not alleged that there is -- that there was professional negligence outside of -- they've not alleged what Mechanics Bank actually did that created that negligence. They're alleging that Mechanics Bank failed to do something, failed to have identified fraudulent conduct, failed to have further investigated, failed to have done what a competent bank in that same position would have done.

But what we see here is that the Supreme Court has said that we're not going to create a situation where, even if there are policies in place that may or may not have been followed, that's not going to give rise to a cause of action. That's not a negligence claim that's going to be supported in Texas. And so we simply don't have that type of standard of care or duty here.

Finally, and I think that we've kind of started off the conversation or the arguments today with regard to the preferential payments and the fraudulent transfer issues and

the problems that are rife throughout the complaint as simply the failure of the Trustee to identify these specific transactions that they claim make up the bulk of the damages that have been alleged against CFSB and Mechanics Bank. And I say that because they're lumped together in this Count XV, fraudulent transfer, against CFSB and Mechanics Bank.

In fact, in Paragraph 220, the overdrafts to Mechanics were paid by the Debtors total $176 million. $176 million and change. But they don't provide any detail to identify when, how, or to whom or from whom those transfers were received. No information for Mechanics Bank to really be able to actively defend against that type of claim.

What they provide are these Exhibits D and F, which are very -- without any type of detail. They simply provide a daily balance. They don't even -- they don't even allege, really, what that daily balance indicates, other than they believe it's an overdraft. But there's nothing to support that. There's nothing within there to identify exactly which transactions make up that daily balance number.

And in fact, as you heard, just because it's on a daily balance doesn't necessarily even mean that it's an overdraft. And so they're taking information from the account statements and making a conclusion for all of us that, in fact, that indicated it was a transfer. But just because it's on a daily balance doesn't even mean that it was an overdraft. It may

mean a number of things, but certainly it's not indicative of a transfer having been made, and certainly not one of which Mechanics Bank was the recipient.

And this is even -- you know, what you would anticipate seeing is what Debtor account was actually involved.  That's not apparent from the statement that -- or from the exhibits that we have.  Who was the transferor?  We don't really -- from this exhibit that they provided to the -- the exhibits that they provide in the complaint doesn't indicate who was the transferor.  Doesn't even indicate who was the transferee, in fact.  How was the overdraft covered?  It doesn't indicate when or how that was happening, either.  Who covered the overdraft?  When was the overdraft -- when it was covered.  And even what relevant check numbers or transactions would make up these alleged overdrafts that -- that, without creating a situation where you have an overdraft, in fact, it's very difficult to understand what transfer is in place. Simply don't detail that whatsoever.

Your Honor, Mechanics was not a transferee.  And what was -- what's required of the Trustee to actually plead that properly is explained in detail in the *Matter of Coutee*, which is a case that I cited earlier.  And that's at 984 F.2d [138]. And the *Matter of Coutee* explains that you have to utilize the dominion and control test, and a party that receives a transfer directly from a debtor will not be considered the

initial transferee unless that party gains actual dominion or control over the funds.  And there are just no allegations in this complaint to indicate that Mechanics did, in fact, was, in fact, the ultimate transferee.  And that's certainly not -- that's certainly something you would anticipate seeing, certainly something that you do see in an independent fraudulent transfer case.  And they just simply fail to provide any detail on these transfers.  Really, just getting a top line number that's shocking, but without the appropriate level of detail so that we can, in fact, identify and defend against what could or -- you know, may or may not be a fraudulent transfer.  There's just simply not enough information here for us to be able to address that in a meaningful way.

So, you know, and I think that the *Matter of Coutee*, as we quoted here:  Dominion or control means legal dominion or control, and the fact that the party accused of accepting a fraudulent transfer could have violated its fiduciary duty to the debtor by taking the money out of the trust account and spending it as it pleased would make no difference in the analysis.

And I think it's really important to note that there's just no -- there's no indication that Mechanics Bank had that ability to -- you know, was -- actually had dominion and exercised control over these accounts or that they applied

funds to their own balance or -- there's no allegations to support any of that.  And again, we've provided thousands and thousands of pages of documents in response to the 2004, which was a very detailed request, and going back to the beginning of 2024.

I think that the other -- you know, finally, the issue that we see, too, that is a really big obstacle for the Trustee is the failure to really identify the damages in a meaningful way for Mechanics Bank to be able to understand. And they make allegations with regard to an alleged check kite in the context of Mechanics Bank should have known that this was occurring and stopped it and so there is some damages there.

But they don't really identify how or what damages occurred as a result of this purported negligence on the part of Mechanics Bank.  Simply don't tie that together so that we can understand, okay, even if that were true, how did that harm?  It's a necessary element here that's completely lacking in the complaint for us to meaningfully understand what occurred as a result of that.

Damages from this alleged fraud that Mechanics Bank participated in or that Mechanics Bank is at fault for don't really identify what representations were made by Mechanics Bank and then what were the damages.  What was relied upon and what damages occurred as a result of this?  There's -- it's

completely deficient here on that fact.

Seeking -- you know, you simply just have very, very, very scant information on exactly what the damages were in here. The only thing we have, as I said, is this very shocking top-line number, without any detail to support it and without really tying it back to conduct and transactions. So we've got a lot of hyperbole. We've got a lot of information here that seems to cover conduct by multiple Defendants, without really getting into the granular detail required of such grievous allegations.

Ultimately, Your Honor, the Court should dismiss the Trustee's claims against Mechanics. I think what I would like for the Court to take away is that you're looking at a complaint that has a lot of group pleadings where you've got conduct that's trying to be asserted against a number of Defendants without really identifying what conduct the individual Defendants actually undertook.

We've seen a failure to plead plausibly any conduct by Mechanics besides the fact that it acted as a depository bank. That's the one thing that is -- allegation within the complaint that's supported. But there's nothing more within the four corners of this complaint to allege conduct specifically by Mechanics that would support the additional allegations.

There's failure to plausibly plead within this complaint

any indication that Mechanics loaned the Debtor money or ever advanced money itself to the Debtors.  In fact, we've got allegations that Rabo advanced funds to the Debtors, but there's not an allegation of any specific instance where Mechanics loaned them money.  And if Mechanics didn't actually loan funds to the Debtor, then it would -- it's missing a very important element of this fraudulent transfer claim.

And finally, getting to that, if you look at Exhibits D and F of the complaint, there's just nothing to indicate that Mechanics realized on any antecedent debt covered by a subsequent deposit.  That's the allegation that's made, but these exhibits that is attached don't support that.  And they certainly don't provide us with any information for us to be able to discern what transactions are really at issue here.

And finally, as pointed out, there's really not a cognizable theory of damages that Mechanics Bank can rely upon to then mount a defense.  And I think that's really what we're getting at, is that the complaint as it is -- as drafted, its second iteration, really fails to specifically plead allegations against Mechanics Bank to support the counts that have been made, and certainly doesn't give us a fair notice of what it is that Mechanics allegedly did to support the claims that have been made against it.

So, Your Honor, with that, we would ask the Court to dismiss this.  We don't believe that it's appropriate to give

another opportunity to re-plead this.  Certainly, we believe the Trustee has been -- has had adequate time and information to at least provide a pleading that's got adequate notice to the Defendants, and they have -- they failed to do that.  We don't believe that there is instance where they can properly do that.

So, with that, we'd ask that the Court dismiss those claims.

THE COURT:  All right.  Thank you.

Why don't we take a short break, and then I'll come back --

MR. DABDOUB:  Okay.

THE COURT:  -- for the reply.

MR. DABDOUB:  Thank you.

MS. O'NEIL:  Thank you, Your Honor.

THE CLERK:  All rise.

(A recess ensued from 10:47 a.m. until 10:59 a.m.)

THE CLERK:  All rise.

THE COURT:  Thank you.  Please be seated.

All right.  We're back on the record in -- I say 25-2005. I notice things, papers are still being filed in 25-2005.  But I guess, going forward, given the administrative consolidation of the two adversaries, that it ought to be 2007 going forward, right?

Anyway, I'll turn it over to the Trustee.  And I guess at

your convenience you can also address the issue I raised about incorporation. I know you've addressed it, you thought it was inappropriate, but I didn't know if you -- even if they could incorporate, you've also incorporated your response. So, without Rabo and HTLF, I don't know if they're watching, they haven't said, don't decide these until we get to weigh in on any common issues. Any position of the Trustee on whether I should decide all these together, or not? I guess that's something that occurred to me as I was getting ready for this hearing.

MR. DABDOUB: Yes, Your Honor. So I will first address your question that you raised this morning, which is can Mechanics incorporate the arguments -- an example you gave was preemption -- into its motion to dismiss?

The Trustee's position is that Mechanics cannot do that. There is Rule 10(c), Federal Rules of Civil Procedure. And there's a case called *Wilson v. Pauling* case, the citation there is 457 F.Supp.3d [965]. It's a District of Colorado case. And that case stands for the proposition that no authority extends Rule 10(c) to incorporation of a party's prior motion into a later motion, or, relevant to the Court's question here, the incorporation of another party's motion into one's own motion.

So each party needs to file its own motion to dismiss and incorporate the arguments that it believes appropriately

applies to the Plaintiff, the Trustee here's amended complaint. And Mechanics has not done that, and so the Court should consider Mechanics' motion to dismiss on the basis of the arguments in that motion and not on the motions of the other Defendants.

THE COURT: All right.

MR. DABDOUB: Your Honor, if I could first address just high-level, big-picture kinds of things, because --

THE COURT: I guess I should follow up. Even without the incorporation, there are certain things that I've seen so far. I have not read the Rabo and HTLF papers yet. Are they set for hearing yet? We took a quick peek. I don't think they've been set yet. I don't know if the reply has been filed, or if they have, I'm not aware of it. Are those two motions set?

MR. DABDOUB: I'm not aware of Rabo's motion to dismiss having been set yet, --

THE COURT: Okay.

MR. DABDOUB: -- or HTLF.

THE COURT: Okay. So I don't know if they raise the same issues, but at least you have CFSB and Mechanics, for example, do raise the common issue about the charges that are attached to your complaint. And we went over this a little bit in the hearing on Mr. Kaufman's client, on whether that is sufficient. And I was pushing back a little bit, thinking

that I'm not sure that it is sufficient.  That's a type of common issue, even without incorporating other parties' papers, is that something that I should hear from all parties on before I rule?

MR. DABDOUB:  I think that's a fair question.  I think that's a common issue.  They -- I think they have similar arguments.  I think they -- the Defendants that we've heard from so far articulate the arguments a little bit differently.  But our response to that, those arguments, are -- and I will get to them in more detail in just a few minutes, Your Honor -- that these are the Banks making those arguments.  These are their records.

There are allegations made by the Trustee in the complaint that those numbers, those negative overdrafts in those charts, are fraudulent transfers.  And there are specific allegations as to CFSB and as to Mechanics Bank that those overdrafts are loans that were provided by the Banks to the Debtors that were subsequently paid back.

The Court, drawing all reasonable inferences in favor of the Trustee, can determine that, based on those documents, those are loans, those are overdrafts, and for purposes of Rule 12(b)(6), the cause of action for fraudulent transfer has been sufficiently pleaded.

There will be time for experts to weigh in with their expert reports, for depositions, for documents, and there will

be a time for dispositive motions.  But for the purposes of the Rule 12(b)(6) standard, the arguments are similar that the Trustee would make in response to the arguments that we've heard so far from CFSB and from Mechanics, which, as the Court has fairly pointed out, they make similar arguments, that those charts are not enough.

THE COURT:  But you're asking me to, you said, make the reasonable inference based on the allegation that there were overdrafts.  It sounds like the inference you want me to make is that every single overdraft in every single instance is a fraudulent transfer, and I don't know that that's a reasonable inference.  They can't all be, right?  The argument that every overdraft, without considering timing or anything else, is a fraudulent transfer or is made in connection with a fraudulent transfer, I'm just not sure that that is a reasonable inference without the specifics.

MR. DABDOUB:  Your Honor, we can certainly plead -- we can attach every bank statement and we can attach every check to our amended complaint.  You know, I do understand and respect the Court's position that, in the initial hearing with CFSB, the Court made a comment such as there are two trains of thoughts about some courts require more specifics, some other courts don't require as much specifics.  And I believe you made the comment, Your Honor, which I respect, which is you were of the camp, generally speaking, that you prefer a little

bit more specifics.

So we can certainly do that.  We can certainly re-plead and attach the bank statements, identify all the checks, all of the, you know, multiday overdrafts.  We can do that, certainly, Your Honor.  And we believe there will be a cause of action there.

Now, to your point, which is a fair point, Judge, which is, okay, of the $176 million with respect to Mechanics, of the $33 million with respect to CFSB, which ones are going to be recoverable, right, by the Trustee after we've gone through discovery, after dispositive motions?  Should the matter go to trial, what damages is the Trustee going to recover?  That's a fair question.

We can more specifically, as much as we can, try to identify that right now.

My point, Your Honor, on behalf of the Trustee, is we believe we've sufficiently pleaded that, of those overdrafts on the chart, there are fraudulent transfers.

If the Court were to look at the consecutive overdrafts, you know, there is an argument that's been made by CFSB, and Mechanics has made in its brief as well, which is there is -- their argument is there's no overdraft that could be considered a fraudulent transfer unless the Bank -- unless there has been a negative balance after the midnight rule of the second day.  They make that argument.

If the Court were to look at the Exhibits D, right, F, and G, the Court can infer and see that there are dates of overdrafts for two consecutive days, for three consecutive days. We believe that that is enough to plead those items are fraudulent transfers under 12(b)(6).

Now, --

THE COURT: With money going in and out, that's not necessarily the case, is it? Consecutive days of overdrafts? I'm not sure -- well, go ahead.

MR. DABDOUB: Sure. And I'll walk -- in just a few minutes, I'll walk the Court through a specific example that I believe is inferred by the charts that we've attached.

But going to your point, Your Honor, we can certainly plead that with more specificity if the Court, after considering the arguments and the briefing, we can certainly do that. And we believe we can do that.

Now, I will tell the Court, I don't know if that will ultimately result in a damages claim for $176 million that would ultimately be recoverable at a trial, or a damages claim for $33 million that would ultimately be recoverable at a trial. We're not putting the cart before the horse here. However, for purposes of pleading plausible facts which indicate the Trustee has claims for fraudulent transfers for those overdrafts, we believe we have sufficiently pleaded those. If the Court feels otherwise, we can certainly plead

with specificity.

THE COURT:  Because it's not just a damages issue. It's the threshold, has there been a transfer, right?  Has there been a transfer?  And is there an antecedent debt?  So, anyway, I'm still leaning towards the I think you need more, but we'll continue to look at that as I --

MR. DABDOUB:  Sure.  Judge, I certainly understand. And we believe we can meet that.  We certainly believe we can meet that.

Now, this is a complicated case.  There's a lot of documents.  The Trustee has other claims against other Defendants in a different adversary.  So we have worked, we've worked diligently, Your Honor, to sufficiently allege our claims against every Bank Defendant here, and we will do -- if the Court requires more specificity, we will certainly plead with more specificity.

And we believe that there certainly are some transfers here.  I am -- I cannot say right now exactly, is it going to ultimately add up to $176 million?  Is it ultimately going to add up to $33 million?  Probably not those numbers.

But we do have an argument, too, Your Honor, that -- I'll give you an example.  If Mr. McClain, the Debtors, right, he's the principal, he's got three Debtor companies, he has different -- three -- there were three different depository accounts at Mechanics.  Okay?  If one of the Debtors deposits

a check that's drawn on an account of another Debtor, you know, let's call the account of the other Debtor Bank A.  If one of the Debtors deposits a check drawn on Bank A for a million dollars, but Bank A only has $10, and that check is deposited in Bank B, but Bank B gives immediate credit for a million dollars, and Mr. McClain then takes and wires a million dollars to an early investor and deposits the next day a float-a-check for a million from Bank C to cover that wire, on the bank statement, if that statement shows the million dollars is back in the positive because he received the credit, but it's a floated check, we believe arguably that's a fraudulent transfer, although the bank statement may show that that daylight draft was covered the next day.  It's this cycle of robbing Peter to pay Paul that is the heart of the issue here.

So, anyway, that -- I want the Court to think about that. And I think, as I walk through an example, I think, Judge, you'll be able to see that with clarity.

So, Judge, before I move on, do you have any more questions on that issue?

THE COURT:  No, not right now.

MR. DABDOUB:  Okay.

THE COURT:  I'll try to interrupt you as few times as possible, but if things come to mind, I'll let you know.  But that covers my opening question, so thank you.

MR. DABDOUB:  Sure, Judge.  And please feel free to interrupt me anytime.  I'm happy to answer whatever questions you have that are going through your head.

I would like to start sort of big-picture, which is what's the standard here.  And we talk about fraudulent transfer claims, but let me address now what's the big picture with respect to the arguments that have been made from Mechanics and CFSB in their original motion as to what the standard is.

Putting aside the fraudulent transfer claims, and I think what the Court has heard and what I've heard this morning is arguments.  You know, the word evidence has been used a few times, there's no evidence in the complaint, there's no evidence in the complaint.  And I think that might be the result of just subconsciously looking at the complaint -- Mechanics, for example -- and saying, that's not ultimately going to bear out for the fact-finder, which that's not the standard on a motion to dismiss, 12(b)(6).  The standard is the Court is to resolve all factual disputes in favor of the Trustee's allegations.

What I'm going to cover in just a few minutes is there is absolutely facts that are pleaded in the amended complaint that show actual knowledge on the part of Mechanics Bank as early as 2019 about knowledge of a check-kiting scheme.  And this went on in 2020, 2021, all the way to 2023.  In spite of that knowledge, and you'll see the facts that have been

pleaded in the complaint, Mechanics did nothing.

Now, Your Honor, I don't want to get ahead of myself and argue summary judgment standards and ultimately what it would be for a fact-finder at trial.  But we have been as diligent as we can be in pleading in our complaint deposition testimony from a relationship manager at Rabo named Chip Lawson.  Chip Lawson was asked in his deposition in 24-2007, before the consolidation, Do you feel like you had an obligation to let people know about a check-kiting scheme?  And he said yes.  And then he also testified, and we refer to this -- I'm not saying it because it's outside of the complaint; we refer to this in our amended complaint.

And we describe the testimony that's been provided by Mr. Lawson about how he had a conversation as early as 2022 with a Senior VP of Mechanics Bank, Jamie Rabatin, R-A-B-A-T-I-N, in which they discussed unusual checking activity, and Ms. Rabatin said, I don't know what to do.  Checks are coming in.  And for his part, Mr. Lawson says, Just follow your policies and procedures and you'll be okay.  And then the context of the conversation was, and we do refer to this in our complaint, the context of the conversation was, so that would mean checks would need to be returned if you followed your policies and procedures, was the direct inference.

And this Court, as well as any fact-finder, could certainly conclude, based on that discussion, which I will

show in a few minutes, that Mechanics believed at that point that it was exposed to losing a lot of money if it cut the cord then.  So it had no choice, basically, but to continue participating or facilitating in this fraud.

This is a fraud that doesn't happen every day.  This is a massive fraud.  And there's been testimony that we cited to in our amended complaint.  There have been documents that we incorporate by reference in our amended complaint, which absolutely, at minimum, on a 12(b)(6) standard, show a fact issue.  We believe we would prevail at a trial.

THE COURT:  A fact issue?

MR. DABDOUB:  A fact issue.  Because they deny it. They --

THE COURT:  As a summary judgment type comment, right?

MR. DABDOUB:  Yes, that's -- Your Honor, fair point. I think it's a he-said/she-said, based on -- the argument was, there's no -- there are no allegations in the amended complaint.  The Trustee's response is yes, we do, we do have specific allegations.

So let me -- let me just go through the elements of the Trustee's claims against Mechanics Bank, Judge Everett.  So we have these elements.  And for the Court's consideration for -- in terms of deciding the motion to dismiss filed by Mechanics on the Trustee's claims of knowing participation and breach of

fiduciary duty, civil conspiracy, professional negligence, and then the fraudulent transfers and the preference claims, Your Honor, the evidence is -- or, the allegations of the evidence are germane to each one of those actions.

So I will start with the Trustee sufficiently pleading the elements of knowing participation and breach of fiduciary duty.  So these are the three elements on the screen. Existence of a fiduciary relationship.  Defendant knew of the fiduciary relationship.  That's number two.  Number three, Defendant was aware it was participating in a breach of the fiduciary relationship.

And, Judge, I'll try to walk through these.  Some of these I'll spend more time, some of the elements of the causes of action I'll spend more time on.  But on the ones that I don't think are controversial, I will try to be brief.

So, the first element, fiduciary relationship, Mr. McClain owed fiduciary duties to the Debtors.  I don't think that that is controversial, and we plead that, the Trustee pleads that in Paragraphs 120 to 121.

THE COURT:  Don't they contest that?  This seems like a lesser issue, but I could swear I read Mechanics saying that there's not evidence -- I'm sorry, not evidence, that's not the right word.  Did you allege enough to show that they knew there was a fiduciary relationship?

I think your response said, well, he was acting in his

capacity, we've alleged that he was acting as the officer and director of the Debtors.  I don't recall from the complaint whether you specifically allege that he signed, for example, an agreement on behalf of the Debtors in his capacity as president.  I don't know if they're really disputing that they knew or didn't know that he was an officer, but I thought, although I could be wrong, that they were contesting sufficient allegations on this.

MR. DABDOUB:  Yeah, I don't think they're -- Judge, that's the second element.  I don't think they're --

THE COURT:  I'm sorry, the second element.

MR. DABDOUB:  Yeah.

THE COURT:  Not that there was a fiduciary, but whether they knew.  Sorry.

MR. DABDOUB:  That's right, Your Honor.  So I think there's no debate about Mr. McClain owing fiduciary duties to the Debtors.  As to the allegation of that, I should say.

And then Mechanics' knowledge of the fiduciary relationships, you know, their argument is, well, we didn't sufficiently plead that Mechanics knew about the fiduciary relationship between Brian McClain and the Debtors.  We believe we have.  It's in Paragraph 122.  We -- and it's throughout the complaint, where they dealt with all of the three Debtors who Mr. McClain was the principal of for years. They had the three depository accounts on his behalf.

Defendants dealt directly with Mr. McClain in his capacity as a director, officer, or employee of Debtors.  That is in Paragraph 122.

With respect to knowledge of the breach of fiduciary duty, Your Honor, I will -- what I'm going to argue here for the next few minutes, I'd like the Court to just understand the context, because I think it will shorten my presentation, that these allegations that are in our amended complaint apply not only to the knowledge -- to the breach of fiduciary duty, knowing participation and breach of fiduciary duty, but also with respect to the civil conspiracy and with respect to the professional negligence.

So let me first address -- I'm back on the element of knowing participation -- knowledge of breach of fiduciary duty.  So, in our amended complaint, we have here at Paragraph 85, which I believe, Judge, for purposes of a trustee bringing claims on behalf of debtors, the allegation in Paragraph 85 is an unusual fact, because I don't believe that this happens very often, where you have a trustee that is able to speak to -- not at that point in time, Mechanics was not a defendant -- but a chief operating officer of a bank who, according to the allegation, which the Court must accept as true, admitted to the Trustee that Mechanics knew it was in the middle of a check-kiting operations.

The conversation allegedly involved discussions about CFSB

sending Mechanics Bank millions of dollars all day.  I think the records bear some of that out.  And then Mechanics Bank would just send the money right back to CFSB and HTLF, absent investigation.

I don't believe that latter part was part of that conversation, Your Honor.  That is our allegation that we pleaded there.  Based on that free-flowing money, Mechanics knew it was in the middle of a check-kiting operation.  That, to my understanding, was what was indicated to Mr. Ries, and we specifically pleaded that.

Now, that allegation is extremely important because it shows actual knowledge -- again, the Court accepting the allegation as true -- it shows actual knowledge on the part of Mechanics Bank of a check-kiting operation.

THE COURT:  So I don't have the rest of the complaint up.  From the paragraph there, can you tell when it knew?  Could that be you actually filing the complaint?  Did it know earlier?  I can't quite tell from Paragraph 85 when the knowledge --

MR. DABDOUB:  Sure.

THE COURT:  -- allegedly was acquired.

MR. DABDOUB:  Great question, Judge.  And I'll answer that right now with my next slide.

So, Paragraph 96 of our complaint, we have Chip Lawson, testified that in December -- and this was in a deposition --

that in December of 2019, internal Rabo documents showed that the Debtor, 7M, was overdrawn on the Rabo loans by $4.8 million and had $1.1 million in inbound funds, a deficit of more than $3-1/2 million.

Mechanics bought Rabo Bank, N.A. in 2019.  And in the deposition testimony here, you will see at the top of Page 135 that when that email was sent, Rabo was Mechanics Bank by then.

We do reference the documents in our amended complaint, Your Honor.  And we looked at this in drafting the complaint, and what the document says -- this is an email in December 20 -- December of 2019.  December 20th, 2019.  Going to your question about when did Mechanics know about this, about the scheme.

So here in this email, you'll see down at the very bottom Mechanics personnel, Cheryl Stumpf, emailing Rabo, Chip Lawson and Jason Dunn at Rabo, and she's telling them, I'm including the screen shot from McClain checking activity.  If we apply all of McClain's funds to the 7M account, the overdraft is reduced to $3.2 million.

Then, at the very top, this is an admission, a startling admission by a regional credit officer with a Rabo email address.  He indicates, December 20th, 2019, and the subject line is Overdraft 7M Cattle Feeders, Inc.  In the second paragraph, Your Honor, he indicates, Mr. McClain has roughly

6,000 head waiting to be shipped, and another thousand head that shipped today.  Roughly US$7 million in inventory.  Well, that's a problem.  It's exacerbated by the fact that he hasn't stopped purchasing cattle.  He's been transferring funds over the last ten days or so to cover the funds, and it came to a head with the US$5.8 million overdraft yesterday.  I'm not requesting approval.  I'm apprising you of the situation.  I'm not sure that Chip will present as a request.  I have filed a SSS regarding check-kiting.

This is in 2019.

He was asked in his deposition what does SSS mean.  He says he didn't know.  But I have filed a document at some point regarding check-kiting.  This is Mechanics Bank in 2019. We plead this in our amended complaint.

So this is -- Your Honor, this next slide is the second page of that document.  It just shows the numbers here.  7M is a Debtor.  It's $4.8 million overdrawn as of December of 2019. There's check-kiting reports that have been issued.  And so as of 2019 -- I'll stop there and then I'll go into another allegation that the Trustee has pleaded in his complaint as to Mechanics.

So we have in 2019 -- certainly, this is not a trial, but there is an allegation in our complaint, which the Court must accept as true, of knowledge of Mechanics of the check-kiting scheme as of 2019 by reference to deposition testimony and

documents.

Going further, a little bit further down in the complaint to Paragraphs 103 and 104, this is additional allegations that the Trustee makes in his complaint about Chip Lawson's conversation with a senior vice president at Mechanics named Jamie Rabatin.  It -- we do allege specifics, Your Honor, in Paragraphs 103 and 104 about that sworn testimony from Mr. Lawson in his deposition.

He testified that between October and December of 2022, he had multiple discussions with Jamie Rabatin and other Mechanics personnel about the Debtors' suspected check-kiting and fraud.

Ms. Rabatin told Lawson that Mechanics was concerned about the Debtor's unusual activity because checks were coming in as they're being covered.  You know, our allegation in Paragraph 104, Mechanics knew it was facilitating the Debtors' ongoing check-kiting activity, which is certainly a reasonable, strong inference one can make.  We are pleading that on behalf of the Trustee.

Rabatin also told Lawson that the Debtor's check-kiting was happening daily, such that Ms. Rabatin didn't think anything was right with the Debtor's Mechanics account.

And the last sentence of Paragraph 105 of our second amended complaint:  And, finally, Ms. Rabatin told Chip Lawson at Rabo, I don't know what to do about the Debtor's check-

kiting.  Which, again, any reasonable -- a reasonable inference from that is she didn't have adequate training from Rabo, Rabo did not provide her the adequate training to put a stop to the fraud or to escalate the fraud or to close the account to prevent further damage from happening thereafter, or as early as 2019.

We then allege in our -- in the last sentence at Paragraph 104, Mechanics Bank failed to do anything to stop the fraudulent activity.

And Your Honor, we --

THE COURT:  Could you go back to that slide for one second?

MR. DABDOUB:  Yes, sir.

(Pause.)

THE COURT:  All right.  Go ahead.

MR. DABDOUB:  So we, the Trustee, in his amended complaint, incorporates Mr. Lawson's deposition testimony. Relies on that to allege the causes of action against Mechanics.

And so on the 13th slide here, this is Mr. Lawson's deposition testimony, which he's asked at the top of Page 160, Do you think you have an obligation to notify anyone about the existence of a check-kiting?  Mr. Lawson says yes.  Who would you need to tell?  Talk to Mechanics Bank.

One could wonder -- I'll just stop right here -- one could

wonder why, if there's no conspiracy, or if there's no meeting of the minds, or if there's no understanding, would someone at Rabo, a separate company, testify under oath he has an obligation to tell Mechanics Bank?  Right?

Then he's asked, Do you remember who you talked to at Mechanics Bank?  I'll give you one name that we've seen. Jamie.  Jamie Rabatin.  Was that a telephone call?  Yes, it was.  Next page.  I don't recall who called who, but we had a discussion.  What do you remember the discussion -- what do you remember about that discussion?  And he says, okay, I remember this.  She explained that we have some concerns. Then Mr. Lawson testifies he told her checks are coming in, they're being covered, but I don't see them.  Mr. Lawson then tells her, I'm not downgrading your concerns.  Inference:  You have every right to be concerned.

And then Mr. Lawson continues in his testimony.  And I distinctly remember saying, follow your policies and procedures.  You can't go wrong by following your policies and procedures.

Then he says, Well, some could go back.  And then the follow-up question, Some could go back, meaning checks might get turned back?  And answer, That's what could happen.  Yes, sir.  And the question, If Mechanics decided to close the account because a check-kite was going on, that checks might get returned?  Sure.  And then Mr. Lawson testifies, The

context of the conversation was not paying the checks presented.

Now, after this conversation, right, he has another conversation. And Mr. Lawson asks -- is asked, did she tell you, did Ms. Rabatin tell you that Mechanics Bank had decided what to do? She didn't tell me. And then he says, interestingly enough, They got paid. The checks got paid.

Again, Your Honor, I wouldn't argue my case right now. This is not a trial. However, I think you could see the argument there, which is actual knowledge. Policy and procedure would say don't pay them; they got paid. That's what's been pleaded.

THE COURT: So I know on a motion to dismiss I can consider documents that are referred to in the complaint. I don't remember quite this much. You did quote parts of this, right? All the pages that you've highlighted, were all of those attached to the complaint, or are you just -- is this part of your -- the PowerPoint that I'm looking at now, is it a supplement to your response that I'm supposed to consider all of the testimony in those deposition transcripts? Because all I remember from reading the complaint were much smaller snippets, but I could be wrong.

MR. DABDOUB: We did not attach these deposition pages --

THE COURT: Okay.

MR. DABDOUB:  -- to our response.  This is the first time that I'm actually showing the Court his deposition testimony.

We do refer to his deposition testimony about the conversation he had with Ms. Rabatin.  And let me go back to that.  You see it at Paragraph 104?  We then plead Mechanics Bank failed to do anything to stop McClain's known fraudulent activity.

So we talk about, in Paragraphs 103 and 104, we specifically cite to some portions of his testimony, Mr. Lawson's testimony, which we use to then make the allegation: Mechanics Bank failed to do anything to stop McClain's known fraudulent activity.

But your --

THE COURT:  So the --

MR. DABDOUB:  But so our position is that, Your Honor, the Court, given that the Trustee has incorporated by reference Mr. Lawson's deposition testimony in a specific manner, citing -- citing or testifying under oath to Ms. Rabatin's deposition testimony, and also that that testimony is not only incorporated by reference in the Trustee's complaint, but it is integral to the Trustee's causes of action alleged in the complaint against Mechanics, that the Bank can consider the deposition testimony.

THE COURT:  So everything that you've highlighted in

the PowerPoint for today's hearing, snippets of it were either in the live complaint --

MR. DABDOUB:  Correct.

THE COURT:  In other words, there's no transcript that was not quoted at least in part in your live complaint; is that correct?

MR. DABDOUB:  That's not correct.  I mean, there were some things I read to you in here that are not quoted in the -- in our amended complaint.

THE COURT:  But it's the same transcript; is that right?  Or I'm just trying to figure out what do they --

MR. DABDOUB:  It's the same transcript.

THE COURT:  Because one of the arguments, though I think they made it in the papers, I didn't hear Ms. Klein address it in openings, was that they need more context, or it might have been in a footnote, don't give this a lot of weight because you're not given the context of what the communications were.  And so now I'm trying to figure out what -- have they had fair notice of what you're alleging?  If you're asking me to now consider transcripts that weren't cited somewhere in the complaint, how do I do that?

MR. DABDOUB:  I think, Judge, even these pages, the amended complaint without even these pages is plenty to show actual knowledge.  The Court can decide, I don't even need to consider any deposition pages.  We -- and I'll go back.  We

simply --

THE COURT:  Ms. Klein, I'll let you -- I'll give you a chance to reply, but this is one of the things I'm trying to figure out, is what exactly I'm allowed to consider.

MR. DABDOUB:  If the Court just considers -- we believe the Court can consider, okay, Paragraphs 103 and 104, if the Court would just consider those paragraphs.

You know, I heard during Mechanics' argument that there is no allegation of actual knowledge.  Again, I mean, one could -- you know, the Court can read the allegations at 103 and 104 about sworn testimony from Mr. Lawson saying he called, he had a -- or he had a conversation with Jamie Rabatin in which they discussed unusual activity because checks were coming in as they're being covered.  And Ms. Rabatin told Chip Lawson, the Debtor's check-kiting was happening daily.

The words check-kiting were not used in that discussion, but that's an allegation that the Trustee uses in its complaint.

But Rabatin -- Ms. Rabatin did tell Mr. Lawson, and we quote that in the -- in Paragraph 104, she didn't think anything was right with the Debtor's Mechanics accounts.  And that she also told Mr. Lawson, which is in our complaint, I don't know what to do about the Debtor's check-kiting.

So here you have -- you consider the reference to the document in the incorporation, where we have a quote in an

email, December of 2019, I've issued an SSS check-kiting report.  Then we have 2022, sworn testimony from Mechanics' relationship manager to an SVP at Mechanics.  Unusual activity.  I don't know what to do.  And Mechanics thereafter failed to do anything to stop that known fraudulent activity, which is what we plead.

Mechanics can certainly stand up here and say, that, we didn't do that, we don't -- that's not what it meant.  That's a battle for another day.  We're happy to go debate that. We're happy to let the fact-finder hear evidence on that.  And we believe we will show.  But for purposes of that they had actual direct knowledge, we plead it.  For purposes of 12(b)(6).

THE COURT:  For purposes of considering things that are referred to in the complaint, ordinarily, if you want me to see all the stuff that you're putting up on the PowerPoint now, it should be attached to the complaint, I think.  Because you're asking me to consider things that are referred to in the complaint but you didn't attach them to the complaint.

So aren't I limited to the things that you've just quoted in the live complaint, as opposed to entire pages of transcripts that aren't attached to the complaint?  They might be referred to in the complaint.  But this is something that you can each address:  Can you supplement your --

MR. DABDOUB:  Yes.

THE COURT:  -- complaint at this hearing with more information that's not attached to the complaint?  That's a little unusual.

MR. DABDOUB:  You're -- Judge, you're limited to the complaint.  You can see these allegations in the complaint.  If the Court would like us to supplement and add these pages of the deposition transcript, we can do that.

THE COURT:  I'm not asking for it.  I'm just --

MR. DABDOUB:  Okay.  Okay.

THE COURT:  This is a real -- I don't know the answer off the top of my head.  I know I can consider matters that are referred to in the complaint, but I don't recall an instance, at least since I've been on the bench, where things that are referred to in the complaint aren't attached to the complaint.

And so if you're just giving me snippets in the complaint -- this is an honest question because I don't know the answer -- can you supplement on the fly at the hearing with additional pages that weren't attached?  I don't know the answer to that question.

MR. DABDOUB:  Your Honor, I don't want the Court to consider those pages, because they were not attached to our complaint.  I am simply using them as a demonstrative because we do refer specifically to evidence --

THE COURT:  Well, it can't be a demonstrative, right?

Deposition transcripts with additional testimony, they're not a demonstrative.  Right?

MR. DABDOUB:  Well, it's -- it's not attached to our complaint.  The purpose of me showing that as part of the hearing this morning is it is identical, we certainly refer to it in our amended complaint, and parts of that deposition transcript -- we didn't quote every piece of testimony from there.  We couldn't.  We're not going to -- we're not going to do that.

We believe we've sufficiently pleaded -- we quoted parts of the conversation from that testimony.  We were very specific about those quotes.  And the Court can see in the deposition transcript that I've just showed that it's very consistent with what we have just addressed in the amended complaint.  It's not part of our complaint.  To answer your question, I don't think the Court, in reaching a decision here on the motion to dismiss, should consider the deposition pages.  It's not part of the record.

If the Court allows the Trustee to supplement and allows Mechanics Bank to respond to it, I'm happy to submit those pages as part of a supplemental record, if the Court thinks that that would be helpful.

THE COURT:  I'll let Ms. Klein address that before I make any decisions on that point.

MR. DABDOUB:  Okay.  So, Your Honor, this is -- if

you just go by what we've alleged in our amended complaint, Mechanics cited *Perlman v. Wells Fargo Bank*, and we think this case actually -- it's an Eleventh Circuit case.  It's not a Fifth Circuit case.  But we think this case actually helps the Trustee and defeats their motion to dismiss, because one of the issues in that case that the Court was confronted with was does the Court allow a proposed second amended complaint. Does the Court allow the Plaintiff to -- leave to re-plead there?

In our amended complaint, we have the things pleaded, such as actual knowledge, that the Court saw in the proposed amended complaint in the *Pearlman* case, and the court stated that one of the investigators, named Engstrom there, testified that within a short time after her investigation of the accounts at issue were assigned to her, she concluded that there was unusual activity occurring in those accounts, such that it raised the hair on the back of her neck.  And that's -- that is a snippet from that *Perlman* case.

The court then went to discuss further that there was a Bart Hodges of the Wells Fargo Loss Management Department who concluded in a written entry that he was restraining all involved accounts pending further investigation.

Nonetheless, Wells Fargo, as we have pleaded Mechanics did here, kept the accounts open after that knowledge.  And Judge Everett, in the *Perlman* case, the court concluded those

allegations in the proposed amended -- second amended complaint in the *Perlman* case that I just went through, that are similar to the allegations we have pleaded in our second amended complaint as to Mechanics Bank, the *Perlman* court indicated those allegations could support a plausible inference of actual knowledge by Wells Fargo of a Ponzi scheme, which it then aided and abetted by permitting the fraud to continue through the use of its accounts after it had actual knowledge of the scheme.

The court continues:  The same plausible inference of actual knowledge would also foreclose dismissal of the proposed second amended complaint's fraudulent transfer claims on the basis of Wells Fargo's mere conduit affirmative defense.

THE COURT:  Was hair being raised on the back of the neck a red flag?

MR. DABDOUB:  No.  It's knowledge.  It's not a red flag; it's knowledge.  What we have pleaded against Mechanics Bank here is you've got deposition testimony from Chip Lawson, a document that we reference in 2019, phone conversations from October of 2022 with Jamie Rabatin in which they discuss unusual activity.  The same language used in the *Perlman* case.

But moreover, even more so in our case, we talk about the check-kiting reports that have put Mechanics Bank on notice. I have check-kiting reports.  They're part of my slides.

Again, they were not attached to our amended complaint.  But they show -- and this is in our complaint -- they show that Mechanics Bank was aware, many times, many, many times, of massive large overdrafts that were being alerted.  I mean, this check-kite alert was blinking daily, almost.

And so what happens within the Bank, to my understanding, Judge Everett, based on our retention of a banking expert, is that that gets escalated.  The daily alerts gets escalated. There are individuals assigned within the Bank to look into that to determine whether or not a further investigation is warranted.  And it moves up the chain of command.

Here -- and, you know, we have a banking expert. Mechanics is going to have a banking expert.  You know, they're going to talk about industry standards and those sorts of things.  We've not yet received, to my knowledge, internal communications from Mechanics in discovery.

We have also asked, and this was just a few weeks ago, Mr. Jobe had asked Mechanics' counsel whether or not they produced certain documentation.  And if you give me a minute -- I'll just tell the Court, it's, apparently, it's related to a suspense account.  Did you all produce -- the question, to my understanding, was by email.  Did Mechanics product certain transactional information about a suspense account, under the Rule 2004?  We've not received a response to that yet.

THE COURT:  This sounds like a summary judgment-type

point you're making.

MR. DABDOUB:  I'm not -- Judge, my intent is not to make a summary judgment point.  I think that's a fair question you have.  I just think that the -- I think the argument by Mechanics to start the morning out was they produced all of these documents.  And we've not received all of the documents, to my understanding.

Moreover, those documents were in response to a Rule 2004 document request.  We have drafted right now that will go out in the next several days discovery requests to Mechanics Bank with respect to this adversary.

So, and then we haven't taken any depositions of any Mechanics Bank personnel yet.  Or any depositions in this particular adversary.

THE COURT:  So I was thinking it, but I don't think I told Ms. Klein the same thing when she mentioned the discovery that was produced.  Again, that sounds like a point that you would make in a summary judgment hearing as opposed to a motion to dismiss.  So I'm not sure what to do with the competing volleys on what was or was not produced in discovery, when it's not really addressed on the face of the complaint, is it?

MR. DABDOUB:  It's not addressed on the face of the complaint.  I think -- it's relevant to the issue -- I only -- I don't believe that the Court needs to get to that question,

given our specific allegations as to Mechanics.  But I think it will be relevant, Judge, to the question of granting the Trustee leave to re-plead.  You know, what information the Trustee can use to re-plead any specifics in the allegations.  Does the Trustee have the information?  I think it's -- I think it's relevant to that question, if the Court were to get to that question.

But you're right.  In terms of deciding, you know, based on the sufficiency of what's pleaded before me, you're right, I mean, what's in discovery and what's not been produced, I mean, it's not directly relevant to that particular analysis, you know, when you look at the allegations and decide if they're sufficiently pleaded, the specific causes of action against Mechanics.

Your Honor, also, throughout the complaint, in addition to direct -- allegations of facts that are direct evidence as to Mechanics' actual knowledge, we also plead in the complaint, throughout the complaint, the many different types of transactions that would give rise to Mechanics having such knowledge, such as, I mean, hundreds of millions of dollars per year in intercompany transfers.  The near-daily nature of intercompany transfers.  I mean, these are -- these are things that, on their face, just scream that there is fraud afoot here.

You know, going further, this is a chart from our

complaint.  You know, just in the year 2019, you have intercompany transfers of, between the Debtors, $448 million. You know, withdrawal of $447 million.  We pleaded Rabo's -- these are facts -- Rabo's history of misconduct in 2018. Rabo, the Bank, and four of its executives pleaded guilty to intentionally suppressing reports.  Mechanics bought Rabo in 2019.  So Mechanics would have inherited the accounts that Rabo had, which one of them would have been the Debtor's accounts.

And so Mechanics, when it's purchasing this bank, it needs to conduct its own due diligence as to the customers.  It needs to look into the specific accounts.  What is the business?  Know your customer.  All those -- the bank industry standards that will be the subject of expert reports and expert deposition testimony.  But these are the things that are in our complaint that we plead that show that this is not just a depository bank account.

We've come out and we've pleaded directly, they actually knew this Ponzi scheme, their records show they're -- this Ponzi scheme.  Or that they knew of the check-kiting scheme. You know, why didn't they do anything about it?  Why let it continue?  And I think the answer to that, Your Honor, is because, had they stopped it, they would have been either exposed to negative overdrafts.  They had to continue.  There was no way out.  There was not an easy way out.  And in our

complaint, we allege that Ms. Rabatin had the same sentiment. I don't know what to do, is what she indicated to Mr. Lawson.

So that segues into the elements of a civil conspiracy, which I have them, those elements up on the screen now.  I have, you know, just the basic element outline here.  Two or more persons, the first element.  Object to be accomplished, the second.  Meeting of the minds, the third.  Fourth, one or more unlawful overt acts.  And fifth, the damages proximately caused thereby.

So I think the law is clear that if we have a sufficiently pleaded knowing participation and breach of fiduciary duty, Your Honor, that that can serve as the underlying tort for a civil conspiracy claim.  I believe we've clearly met the standards to sufficiently plead knowing participation and breach of fiduciary duty.

Civil conspiracy, the elements that we've alleged in our amended complaint are two or more persons.  I don't think Mechanics challenges that element.  Second element, the object to be accomplished.  Mechanics seems to acknowledge the Trustee alleged the object of the conspiracy was to facilitate the Ponzi scheme through cash and check-kiting.  And Mechanics, in its argument, and we're not -- it sounded to me like their argument was there is no evidence of this meeting of the minds or this object to be accomplished, or there's no evidence of an actual check-kiting scheme or any harm to the

Debtors.  And I believe that's from their response.

But I've heard the phrase no evidence today during Mechanics' argument this morning.  Those challenges are misplaced on a motion to dismiss.  The Trustee at this stage doesn't need to present evidence to survive the motion to dismiss.  We just simply need to make the allegations.  And we do include the allegation that Mechanics had insulated itself from being the victim of a check-kiting scheme by working with Rabo to ensure that the overdrafts that Mechanics allowed to occur would be covered.

And we allege those sorts -- we allege that fact through different allegations in our complaint.  One, Rabo working closely with Mechanics.  Why would Rabo call Mechanics Bank and have a conversation with an SVP about, hey, do you realize there are checks being covered?  Are you going to do anything about it?  Just follow your policies and procedures.

And Mechanics -- you would think that Mechanics' policies and procedures would be, if you see fraudulent activity, escalate it, and eventually, if it was investigated, that would stop.  But it didn't stop.  Otherwise, we -- I don't think we would be here, Judge.

And so there is more than just three different actors, you know, just for purposes of this motion to dismiss.  Mechanics Bank in its separate swindling, with no evidence or no allegation of working with Rabo, knowing that there was a

problem, realizing that allowing this check-kiting scheme to continue would mean that checks would be covered, checks that were part of a check-kiting scheme would be covered, where somebody, whether it's an investor, whether it's a bank, is going to be left holding the bag on that.

And so we plead enough facts in our complaint to have the meeting of the minds, to have a sufficient claim that the purpose behind this was to ensure that Mechanics wasn't the one that was hurt; rather, other people. The Debtors. If they're left holding the bag, fine. And that's under the 12(b)(6) standard, Judge. I think you can draw a reasonable inference of that.

Whether we have to prove that civil conspiracy now, that's not the standard. We'd have to have depositions, fact-finding. And Judge, we'd have to -- Your Honor, you'd have to hear testimony, weigh the credibility of the witnesses. But for purposes of 12(b)(6), we certainly sufficiently allege a civil conspiracy.

As for the purpose of or the element of unlawful overt acts, that is in Paragraph -- we talk about that in Paragraphs 86, 126, 153, and 154. You know, we have many facts that the Trustee has alleged about Mechanics' specific overt acts that it agreed to engage in. You know, continuing to permit the Debtors to use those kited checks, continuing to provide the Debtors provisional credits on checks, ensuring that

overdrafts would be covered by coordinating with Rabo whether to pay NSF checks, initiating wire transfers to zero out the Debtors' negative balance at CFSB, executing a deposit account control agreement giving Rabo control over the Debtors' accounts.

If the argument from Mechanics is, well, that's not the case, that's true, that's just an incorrect fact, they certainly will have the opportunity to prove that. But for purposes of the 12(b)(6) motion and the standard that the Court is to apply in determining the motion, the facts as alleged are to be accepted as true.

Your Honor, I'll address the point of damages. So the Trustee has alleged damages that are evidenced, and we specifically plead the number of claims that have been filed in the bankruptcy court against the Debtors' estates, representing substantial harm and debt that the Debtors incurred because of this continued facilitation by Mechanics in the check-kiting scheme and the Ponzi scheme at issue.

You know, to my understanding, the U.S. financial system is set up in a way where there's guardrails, there's regulations, there are specific items that banks, which need to be regulated, need to observe and undertake in order to protect the integrity of financial institutions and of our system.

When the bank doesn't do that, right, not only do you have

investors, customers, parties that rely on transactions with customers of banks, as well as payor banks, that all eventually could be harmed, there's a reason why those regulations are in place.  And what has occurred here, Your Honor, are many, many, many, many investors who claim that they have been harmed.  They filed proofs of claim.  We allege that.

We also allege in our amended complaint that the Debtors were allowed to grow -- it was a bubble that kept on growing by leaps and bounds year by year because of this kiting that facilitated additional debt incurred by the Debtors, additional recruitment of investors.

So what started out as a small circle -- you know, as my co-counsel, Hudson Jobe says, we have a baseball and we have a basketball.  What started out as a baseball grew and grew and grew to a basketball.  And that would not have had happened, that damage would not have happened without the knowing participation in these breaches of fiduciary duty that we pleaded in our complaint.

And what's the result of that?  We're in bankruptcy court.  The Trustee has pleaded claims in order to maximize recovery for the creditors who have submitted proofs of claim for $135 million-plus.  Rabo's got a proof of claim for $53 million, which are subject of -- which is the subject of part of this adversary proceeding.

And so we all have to ferret this out and determine what's going to be the most just adjudication of these claims.  There will be another time and place for that, Judge Everett, but for purposes of what and whether we've pleaded sufficient claims against Mechanics, we certainly have with respect to damages.

Your Honor, I will move on now to professional negligence. So those are three elements: a legal duty, a breach of that duty, and the damages proximately caused by the breach of that duty.  So CFSB, Mechanics Bank, and Rabo owed a duty of ordinary care to the Debtors at all relevant times.  We plead that in Paragraph 162.  And --

THE COURT:  A duty of care under the UCC?  That's what that paragraph says, right?

MR. DABDOUB:  Yes.  The UCC regulates a bank's relationships with its Texas customers.  And it describes the duty as a duty of ordinary care on a bank with regard to various situations, such as bank deposits and collections, fund transfers, and negotiable instruments.

We allege that the Debtors were customers of the Defendants, and one of them being Mechanics Bank.  So Texas law imposes a duty of due care on Mechanics in their dealings with the Debtors.

We also allege that their -- that the Debtors' account agreements with the banks, including Mechanics, also

independently impose duties of care on the Defendants as to the Debtors.  So we allege duties in those specifics.

We allege a breach of the duty in our complaint.  And here I have a specific paragraph, 163, and my PowerPoint slide that Mechanics breached their duty of ordinary care to the Debtors by engaging in cash and check-kiting activity.  So if the Court were to look at the allegations about when did Mechanics know about the check-kiting, what did they do in response to it, okay, and I think this is important for the Court to consider this in terms of just, you know, which is the first point that I think the Court raised this morning, which is we have similar motions to dismiss, do I -- does the Court consider the arguments of CFSB and the motion to dismiss filed by Mechanics?

And so I think what's important for the Court to get its arms around with all of these motions is that the more the Court sees the allegations and considers the allegations is that this is not a case just about a lot of checks being presented for payment written by McClain or his daughter and the Bank honoring those checks.  This is a case in which there is a duty on the Bank's part, once you are aware of specific fraudulent activity going on, there is a duty to do something about it, right?  Not to -- irrespective of whether checks were honored or not.  Let's honor the checks.  It's going to happen.  The checks are honored.

However, there's something wrong here, there's something afoot that's going on, and we cannot allow our accounts that we have with this particular Debtor, our customer, to be used as a means to defraud and damage not only other investors but the Debtors themselves.

*In pari delicto* is an issue that the Court will need to consider at some point in time.  We believe the *Vantage* case is on point and discusses the policy reasons why *in pari delicto* should ultimately -- not at the 12(b)(6) stage, because I don't think *in pari delicto* is applicable at the 12(b)(6) stage -- but later on, why *in pari delicto* can't -- cannot defeat entirely a trustee, innocent trustee, standing in the shoes of debtor simply trying to recover for the benefit of innocent creditors who have been severely harmed.

But for purposes of the negligence, right, the duty, you cannot -- a bank cannot -- and this is a -- Your Honor, I agree, this is a -- it's a narrow type of negligence.  It's outside of the UCC.  The Bank simply cannot sit on its hands, have its head buried in the sand, in light of these specific allegations, and allow this to go on for years.

THE COURT:  So the reason I was asking about, when you had the paragraph up that talked about the duty under the UCC, I was thinking about the arguments that Mr. Kaufman made, that they're attempting to incorporate, about whether preemption applies.  So I'm not sure where I'm going to come

out yet on incorporating of the Bank's arguments, but anyway, that's why I asked that question.

MR. DABDOUB:  Yeah.  And I think it's a good question, and it's a fair question, because I think what you're thinking about, Judge, is, you know, with banks, they honor these checks, there's a lot of checks, okay, they honor these checks.  The allegation is there's a check-kiting scheme that occurred.  The Trustee has sued for -- for what exactly?  Honoring checks?

So your point, your question is, certainly not.  And I think the Court -- I believe that the Court, as I'm explaining it more through the allegations that I've talked about this morning, I think the Court can consider and I think the Court appreciates the systemic problem here, which is it's just not honoring checks, it is:  Did you do what you should have done?  Duty under the UCC, duty under anti-bank laundering, Bank Secrecy Act?  Did you do those things that you're required by law to do when you have knowledge that something is afoot?

We allege plausibly that the Banks did not do that.  They breached the duty, and that damaged the Debtors.  The Debtors have claims against them for over $150 million.  Investors have filed their own claims against the Bank, which, Judge, you heard standing issues on that a few, you know, a few months ago.

But we certainly have, I believe, given the Court enough

detail and enough factual information where the Court, for purposes of 12(b)(6), even if the Court has any doubt, the law requires the Court to give an indulgence in favor of the Trustee.

Discovery continues.  They certainly have dispositive motions on both sides.  And the Court can consider the evidence that's been developed through document discovery and depositions and make a more balanced and robust consideration of the merits at that point in time.

But for 12(b)(6), on the state law tort claims, we have argued and we believe that we have sufficiently pleaded sufficient allegations.

So, Judge, at this point, to give sort of a break and where I'm going next, that concludes my presentation on the state law tort claims.  I'd like to now address the preference and fraudulent transfer claims, and then I will conclude.

THE COURT:  All right.

MR. DABDOUB:  Okay.  So with respect to the preference and fraudulent transfer claims, Mechanics has been arguing basically it just can't determine what transactions the Trustee alleges were fraudulent transfers.  And Judge, for everybody's consideration as I'm talking through this, we have Exhibit D up on the screen.  This is the preference claims. This is the chart that we refer to in our amended complaint as to the Trustee's preference claims.  $55 million.  And it

shows, from left to right, the Bank, Mechanics.  The entity is all of the three Debtors.  We have the dates of the overdrafts.  Negative balances.  Then we have the days of the week.

So this is taken from Exhibit D.  We have April 7, 2023, April 10th and April 11th, we have Friday, that's a weekday, then we have Saturday, Sunday, which we don't count, then we have Monday and then we have Tuesday.  And we have a substantially large negative overdraft, you know, from $6.8 million to $8.1 million.  And now --

THE COURT:  So I see a snippet of a bank statement.  Same question as before.  They weren't attached to the complaint?

MR. DABDOUB:  That's correct.  They were not attached to the complaint.  So let me move -- and so they were not attached to the complaint, and I don't think that -- I think we incorporate them.  But, again, we can attach them in a re-pleading or we can attach them as a supplement.

But Judge, let me get to -- the same thing with the bank statements here.  So they were not attached to the complaint.  But I believe that Exhibit D, I mean, the source data of Exhibit D is -- are the bank statements.  And Exhibit F as well.  So we have Exhibit D and we have Exhibit F.

So Your Honor, as an example, right, we have the Trustee, who has alleged in Paragraph 212 of his complaint, this is on

Count 14, Preferential Payments against Mechanics Bank.  Each overdraft with CFSB and Mechanics Bank created a debt of the Debtors that was subsequently repaid by covered funds, usually from investors.

THE COURT:  Each.  The allegation is each.

MR. DABDOUB:  That was --

THE COURT:  I'm just scrolling through the complaint.  Apologies.  What paragraph did you refer to?

MR. DABDOUB:  212.

THE COURT:  Each overdraft created a debt.  That, on its face, is not -- I'm having trouble with that.  This is the same issue.  Isn't a little more information on overdrafts needed for me to determine whether or not there was an antecedent debt?

MR. DABDOUB:  Judge, I think you want more specifics.  I do.  I think you want more specifics.  I don't think that I am -- Exhibit D is like Exhibit F.  And if you look at the examples, Judge, and you sound like you want more specifics.  But if you look at 4, 12, 13, and 14, the very last entries of Exhibit D, you have negative $6.8 million there.  That was covered -- those are loans -- we allege those are loans that were provided by Mechanics Bank that were ultimately paid back.

Now, we're not saying that that's one transaction.  These are several checks that are coming through that are being

either provided provisional credit that are being honored that eventually get -- are not valid, they're kited checks, and they're resulting in negative balances on this example that weren't covered by midnight of the next day.  So, Your Honor, in my --

THE COURT:  But for the statement in Paragraph 212 to be true, that would have to mean that none of the overdrafts were covered by midnight of the next banking day, right?  Each overdraft created a debt that was subsequently repaid by covered funds, usually from investors.  The covering of prior overdraft constituted a transfer.  I guess I'm --

MR. DABDOUB:  So what we're alleging --

THE COURT:  -- struggling with the "each."  With the "each."  "Each" overdraft.

MR. DABDOUB:  And Your Honor, so we could specifically re-plead and attach all of the bank statements. We'd have to get all of the checks.

Your Honor, I understand your point.  I don't think that that is necessary, because I think we're -- I think -- Mechanics can certainly respond.  I mean, they're responding in their motion to dismiss.  They're saying, well, we're not -- there's no dominion and control, we're just a mere conduit, we never provided that loan.  They can certainly respond and in discovery say, produce all documents or information that indicate or that support your allegation that these were

overdrafts after the 48 hours, after midnight of the next day.
I mean, these are their records.

The *In re Reagor-Dykes* case, which was a Judge Jones case a few year back, I mean, in that opinion, which I cite to in our response and here in Slide 40 of our PowerPoint slide, that citation is 2020 WL 4939180, and the Court cites to some bankruptcy cases or the Court indicates some bankruptcy cases mimic the False Claims Act's relaxed pleading standard and thus don't require a strict identification of the transfers. And then it talks about the different lines of cases, the opinion in *Reagor-Dykes* does.

It says, one line of cases notes the complexity of the underlying transactions and requires that, if the plaintiff lumps transfers together, the aggregate sum must be pleaded, along with the amount received by the defendant.

I think we've done that.  We certainly have done that. And then there are citations to, in the *In re Reagor-Dykes* opinion, to the *Madoff* case with, you know, parentheticals. Indeed, courts have found that allegations aggregating transfers into lump sums without identifying the number of transfers, the dates, or the amount of any specific transfer will satisfy Rule 8(a) pleading requirements.

And then there's another citation there to the *JPMorgan Chase* case.  That's a Southern District of Ohio case, 2009. Though the complaint fails to specify the exact dates and

amounts of the dividend payments, this claim is subject to Rule 8's liberal pleading standard.  And so aggregating, providing the lump sum, and alleging that these are transfers, fraudulent transfers, there is -- you know, there are some courts out there that take a more relaxed approach to those allegations.  We certainly provide enough information, I think, and I think the Court should be -- should ultimately be guided by this question, which is:  Do we provide enough information to Mechanics so it can plead -- so it can either admit or deny -- I think they've denied our allegations -- but admit or deny for the purposes of answer?  And also, Judge Everett, provide their affirmative defenses.  I believe the answer to that question is yes.  While it's certainly not perfect and it's certainly not super-specific, it's not specific in a very, very detailed manner as to the specific check numbers that we have, we don't have check numbers, we believe it meets the fair notice standard and that should be enough.

If the Court -- I get it, Judge.  If the Court says, no, I want you to plead more specifics, we can do that.  I think we're going to need some time to do that because there are -- you know, these are large numbers, right, so there are check numbers that we have to -- all the -- I mean, we have to attach or reference all the check numbers in an amended pleading.

And so just thinking practically through this, we can do that, Judge, if that's ultimately your decision, but that'll be our burden to do in the case at some point anyway, and I think they have enough information to respond to it.  So I think, from a practical standpoint, getting through the next stage to the next stage, discovery, and then holding -- we're the Trustee, we have the burden.  There will be a time where we can specifically plead, here's our expert report, here are the specific check numbers and that -- those sorts of details.  But I understand the point that you bring right now.  I just would respectfully suggest to the Court that we've certainly done enough for them to answer and provide affirmative defenses.  And there will be a time where we as the Trustee have the obligation under the law, and the burden under the law to provide all of the specifics in terms of what we contend are the transfers that the Bankruptcy Code and the law allows us to recover, as well as TUFTA.

THE COURT:  So I haven't made any decisions yet, obviously, on which of those -- I've expressed an affinity for the cases that require more specificity.  I haven't decided that yet.  If I were to require more specificity, it sounds like you don't have everything that you need to re-plead without additional discovery, or do you?

MR. DABDOUB:  We've engaged a banking expert consultant who's undertaken that work, to look at the

transactions.  There are arguments, Judge, that we are considering and ferreting out.  And, you know, without revealing work product, that it's not as simple as -- again, and I think I gave an example earlier.  Because of the pervasiveness of the check-kiting and just the precision of the timing of this thing, right?  I mean, imagine being McClain, where he is, you know, he sends a check out -- he deposits a check, for example, a million and a half, it's written -- you know, it's drawn on a check that has hypothetically $10, so he's got to go race and go find money from either another account, floating a check from another account, to cover that balance provisionally, which how will that be reflected on that particular bank's statement?  Will it be reflected as, you know, a provisional credit?  Is it something that looks on paper like it's met the midnight rule but when you peel the layer back it really hasn't?

So that level of granularity, I think we are considering. I think we -- I don't think we have all of the checks, so that we would need to look, we would need to make sure we have all of the checks to be able to say check number, you know, to identify the specific check numbers.

But I think if the, you know, if the Court is going to take the approach which requires more specificity, I respectfully suggest, Judge, that the law doesn't require that and that we will be held to that burden in this case

regardless.  Let's just get to the merits.  But if the Court will require that, I need to make sure we have all of the checks, and I'm not sure at this point that we do.

THE COURT:  So, rough guesstimate on how long that would take to get what you need?

And again, I'm only asking these questions because I could see the decision tree and I don't know where I'm going to come out, but I'm trying to figure out if --

MR. DABDOUB:  Yeah.

THE COURT:  If they say you shouldn't have a chance to re-plead, that's another part of the decision tree.  So I'm trying to cover all the bases here.  I'm mixing metaphors.  But how long would you need to --

MR. DABDOUB:  Judge, I think a fair rough estimate would be 45 to 90 days.  I mean, I think that'd be a fairly rough estimate.  I mean, we'd get on it, of course.  We'd certainly get on it.  If there are discovery disputes that need to be raised with the Court, we feel confident that you would address those and help us move this along.  So I think that's a fair rough estimate.

THE COURT:  All right.  Thank you.

MR. DABDOUB:  So, Judge, I'll wrap up now.  Just three points on conclusion.  We have in our complaint facts that were pleaded showing actual knowledge on the part of Mechanics of the check-kiting, the Ponzi scheme.  That's

extremely important to sustaining the claims of knowing participation and breach of fiduciary duty, civil conspiracy, professional negligence.

We also pleaded we believe with enough specificity our fraudulent transfer and preference actions. It's not perfect, but we have pleaded with enough specificity for the Defendants to respond. They can challenge the merits of those as we proceed in discovery. So Mechanics' motion, based on what we pleaded in our allegations, should be dismissed.

If there was any part of Mechanics' motion, Judge, that you find, you know, this particular claim needs more specificity, we certainly should be entitled to the right to re-plead that. And we will do that if the Court decides that.

But on the basis of what we've pleaded, the allegations, the law, and the argument, we believe Mechanics' motion should be denied.

If you have any further questions, Judge, I'm happy to answer them right now.

THE COURT: All right. No more questions right now. Thank you.

MR. DABDOUB: Okay. Thank you, Judge.

MS. KLEIN: First, Your Honor, I'd like to initially respond to the presentation by -- and I apologize, I was a little bit more excited about the presentation made by Trustee. I think it was rife with information and material

that the Court cannot consider at this stage.

Certainly, there was an opportunity for the Trustee to have provided a well-pleaded complaint that contained the information that it felt necessary to support.  It's obvious by its inclusion of additional materials today and its presentation, including numerous instances of *extra vires*, *ultra vires*-type evidence that it didn't get it done in that amended complaint.  And certainly its attempts today to try to raise new and add and embellish arguments that potentially were referenced, and I think that's even arguable, but to the extent they were referenced, they certainly were not with the adequate level of detail that would put us, Mechanics Bank, on notice.

And I think the attempts today to provide information for the Court to review and to make argument that includes materials that are clearly not within the scope and the four corners of this complaint is improper and shouldn't be considered, you know, at any -- you know, for any purposes today.

Any misstatement I made in my argument referencing evidence, it was certainly allegations is what we're talking about.  And what the Trustee is required to do at this point is to provide sufficient allegations to support the claim.  And certainly, the Court is able to draw plausible inferences from the allegations contained in the complaint, but what the

Trustee is asking this Court to do is to take the very -- very basic references in the complaint and the muddled allegations that have been included that include multiple Defendants within statements and ask this Court to draw from that enough information to support the claim.  And Mechanics would submit to the Court that that's not the standard.

The standard is to plead it well so that it provides clear understanding of the claims being made and the allegations to support those claims.

So we do have very conclusory claims.  We have conclusory statements.  And as I pointed out, you know, throughout this complaint you have conclusory statements without consistent support throughout that indicate why Mechanics Bank should know or should understand the claims being made against it.

I think that just to go through them each, you know, you've got some things that have to have happened in order for the Trustee's complaint to be permitted in the state that it's in right now.  You have to be able to plausibly draw from the allegations made that Mechanics Bank actually lent the money to cover these purported negative -- and I think you can look from that exhibit -- negative activity, negative banking activity.  That's what Exhibit D says.

So you've got this Exhibit D that's been presented, and you've got to determine based on the allegations made within this complaint that Mechanics Bank actually advanced funds to

cover these different transactions.  Because in order to support a fraudulent transfer, there has to have been an antecedent debt for which funds were received.  There is no allegation anywhere within this complaint that Mechanics Bank actually made a loan to the Debtors.  There is not any information with regard to if in fact -- and I understand what Trustee is saying, is that in some cases we can lump together transfers without providing direct specific information about those transfers.  That's -- those are the cases, the *Madoff* case and other cases.  Those are transfers, though, that have been supported presumably by more information than what we have here.

Here you have Exhibit D, which is a summary chart that includes all accounts at Mechanics.  So it's a -- it takes all of the information and aggregates it, without identifying exactly whether or not these were, in fact, overdrafts.  It just presents negative activity in those accounts.

And so what the Trustee is saying is that eventually Mechanics Bank is going to have to do the work to try to figure out what we mean here, or we're going to have to do the work to do it in order to properly plead it.  I mean, that's basically what Trustee was saying.

And I think that the law requires that there be some allegation that is clearly -- that the Defendant is able to identify that there was a transaction, a transfer, for which

they have some liability for.  And that's just not apparent from the face of this complaint.  So Mechanics Bank absolutely submits to the Court that this has to be more detailed in its pleading.

The reason that the level of information that has been provided to this point has some relevance is that we're in -- over a year into this, and for us still to be trying to get a well-pled complaint is -- it certainly, I believe, should weigh in favor of they've had an opportunity to plead this right.  And so to continue the opportunity to re-plead and re-plead until they take the time to actually properly address it is really prejudicial to Mechanics Bank.

So to the extent that any type of previous investigation is relevant whatsoever, I think it should weigh on that issue, is that this has been an -- this opportunity has been in front of the Trustee for a long time.  If they have any information, they certainly had an opportunity.  They're trying to convince the Court that there is, out there, more information, and what I believe improperly trying to show the Court that, hey, we actually even have some more information that we could have used but we didn't.  So they didn't take the opportunity to provide the detail that they were trying to convince the Court exists, and I think that that is fatal to this situation.

I have here a copy of the *Pettit* case, if the Court would like a copy.  I have it for everyone.  But I think that that

talks about a couple of things that I believe to be important. And it really focuses, obviously, on the breach of fiduciary duty and the participation, knowing participation in the fraud issues. I mean, I think that case is in many ways analogous to what we're looking at today.

But it also says, you know, goes into what the Trustee's obligations are in pleading, and I think that that's important as well. So this case stands for a lot. And it actually came out during the time that all of these cases, you know, these motions were being filed. So I would just say that it really does get into the legal standard on the motion to dismiss, the ability to re-plead, and, really, the level of knowledge required for that breach to occur.

So I think that, in that case, the trustee argued that Pettit's success in defrauding his clients was made possible by the defendant's, which is the bank's, willingness to endorse and profit from the known abuse of various trust accounts.

So in that case, I don't know if you're familiar with it at all, but there was an attorney in San Antonio who was acting as a trustee for many different families in San Antonio, and there were many trust accounts. And that attorney was utilizing those trust accounts for his personal benefit and was -- and what the court notes is that the trustee had pled that the bank in that instance ignored

hundreds of financial wire transfers that should have stood out as "red flags," ignoring numerous overdrafting of accounts that should have stood out as red flags, ignoring numerous wire transfers from accounts that simply did not have the funds, and accepting Pettit's unsensible explanations for issues that the bank had identified, actively instructing Pettit on ways to disguise reportable events or use work-arounds to prevent any eyebrows from being raised while securing more funds.

Those were allegations that the trustee made in this *Pettit* case.  And the Court found in that that trustee's maintaining these arguments surrounding various "red flags" was simply not enough to reach the level that would be required to have a well-pleaded complaint.  And specifically, you know, the Court very clearly addresses the fact that in order for you to have a -- I'm trying to find the exact quote here for the Court.  But this case really clearly dives into when you've got a situation where there's banking activity and -- there's banking activity and, you know, these red flags, that there has to be more to show that there was actual knowledge and actual intent to participate.

I apologize.  I've lost my place.

And in that instance, the trustee didn't offer anything more than conclusory assertions to show that defendant had knowledge of Pettit's scheme, and merely alleging that

defendant should have known based on red flags that Pettit was operating a scheme does not establish that defendant knowingly permitted Pettit to engage in suspicious transactions. Knowing means knowing, as we said earlier. And if anything, defendant's emails with Pettit indicate that defendant was attempting to bring Pettit back into compliance and assist him in attaining loans. But these factual allegations do not show that defendant actually knew that something was necessarily amiss. More likely, defendant sought to give good customer service to bring a high-value client back into banking compliance standards.

And so I think that even if you -- so if you take the allegations that are here in the complaint against Mechanics, what you see based on the allegations that were there were concern, potentially. If you take the allegations that Rabo -- and again, you have to make sure that you're -- that you don't fall prey to what the Trustee is doing and just lumping together Mechanics and Rabo, because they're independent. And Trustee tries to get into conflating the two by indicating that Mechanics bought Rabo in 2019. Again, they're two independent entities that have been sued for different things. And so to conflate knowledge, to conflate information, to conflate the two would be improper.

And certainly, the allegations in the complaint itself with regard to Mechanics is that Mechanics was undertaking to

perform its duties as a depository institution.  To the extent it expressed concern over any type of banking activity doesn't necessarily indicate anything more than I'm seeing -- I'm seeing a red flag, I have a concern.  It doesn't indicate any knowledge or assistance or perpetrating of an ongoing scheme. And there's certainly no allegation that would allow the Court to plausibly infer that Mechanics Bank was in fact actively involved or knowingly participating in any type of fraudulent scheme, especially a Ponzi scheme or a check-kiting scheme.

And again, you know, I would encourage the Court that this case goes through a lot of detail.  I understand it's a Western District, but it certainly is somewhat instructive on where we are.

THE COURT:  So the Trustee's -- well, the specific, the parts of the conversation that are at least quoted in the complaint between the Trustee and the bank officer, you're saying that's just a red flag but not knowledge?  I asked Mr. Dabdoub if that was -- the hair on the back of the neck raising was from a case, but the same kind of issue:  Is that a red flag, or is it more than a red flag if you have a bank officer -- and I don't have the quote up from the complaint -- but whatever was exactly quoted in the complaint, since that's all I'm going to consider right now, is that more than a red flag, or is it -- what is it?

MS. KLEIN:  Well, I would -- the conversation that

was quoted with the bank officer in the complaint, if I understand the one that we're talking about -- with the Trustee?  The conversation with the Trustee?

THE COURT:  Yes.  The one that's quoted in the complaint, correct.

MS. KLEIN:  That occurred after the case had been filed.

THE COURT:  I get that.

MS. KLEIN:  Yeah.

THE COURT:  But then that's why I asked --

MS. KLEIN:  And --

THE COURT:  -- what is the relevant time frame?  He showed me something that showed more than I think what's in the complaint as far as the relevant time frame.

So, on the face of the complaint, you're saying it's your position that that alone is not enough to show that they knew then as opposed to after the petition date?

MS. KLEIN:  I think that's absolutely correct, Your Honor.  I think that acknowledging or even, you know, identifying red flags certainly -- certainly does not establish knowing participation in a fraudulent scheme, certainly doesn't support civil conspiracy to breach fiduciary duties and to, you know, commit fraud.  There is -- you know, even like -- well, you know, which you must, take those statements in the complaint as true, even then it's merely

acknowledging that's a red flag.  It's not saying that we were actively participating or had an intent to harm, which is what's required under a civil conspiracy.

It's not -- you know, again, as I addressed in my initial arguments, civil conspiracy, even if you are furthering the conduct that is allowing the conspiracy to proceed, I mean, this is the way the cases read, you have to actually be -- you have to actually have a meeting of the minds on the ultimate injury.  So even if you're participating in the conduct that furthers the conspiracy, you still have to be a conspirator.

And so I think that that's an important distinction in that civil conspiracy claim, is that there's nothing to indicate, even if you were to take everything in the complaint, the allegations as true, there's still nothing to indicate that Mechanics Bank undertook this customer relationship and continued the customer relationship in order to further this breach of fiduciary duty, participate in the breach of fiduciary duty, or fraud, check-kiting, or a Ponzi scheme.

There was an argument today by the Trustee that -- essentially alleging that they must have allowed it to continue so that they wouldn't be more harmed.  But certainly there's not even an allegation or any kind of specificity in the complaint as to how or when that decision or how or when that harm to Mechanics Bank might have occurred, should it

have been shut down.  There's no allegation in there to further indicate why Mechanics Bank would further a Ponzi scheme or check-kiting scheme.  There's just nothing in -- there is no allegation in there to support that.

The argument today was that they must have allowed it to continue so they wouldn't experience a shortfall, but certainly there's nothing in the complaint that would -- there's no allegation to support that argument in the complaint itself.

And I think today, I guess, you know, to sum it up, Your Honor, is that we've identified a number of deficiencies in this complaint, such that we believe that it's incurable. What we heard from the Trustee was an attempt to bring in a lot of information that's not within the four corners of the complaint to support the bare references, arguably, that are made within the complaint, saying that you should take this as enough to see we have all this other over here, potentially. But that's not proper at this point, and it's certainly -- you know, I don't believe anybody wants to turn this into a summary judgment at this point, but that certainly is not information that the Court can consider and it shouldn't even -- it shouldn't go into the decision tree, essentially, on whether or not they should get an opportunity to re-plead it. Because they had an opportunity to plead it properly, and they simply failed to do it for the second time.

And so, Your Honor, we believe that the deficiencies in the complaint are incurable to a great extent, notwithstanding Trustee's attempt today to bring in a lot of *ultra vires* information.  But what I would submit, that to the extent this Court would entertain allowing it, it certainly needs to be more specific, especially as to the fraudulent transfer claims.  And I think that's particularly important.

And the argument today that there should be some allowance of bulk pleading the transactions, certainly what they've done so far is certainly not enough.  I don't know to what extent they may try to fix it and to include more detail, but certainly what they've done at this point, which is providing simply aggregate negative daily balances, not even -- not even asserting that those are true overdrafts, but just providing aggregate daily balances, is not enough.

And Your Honor, I believe that, as we stated, I think simply the professional negligence claim is not supportable, and we don't believe that it's really in the context of the relationship we have here where the UCC does govern.  And I think that you heard from the Trustee that they don't disagree with that, that that duty of ordinary care, together with what the Supreme Court has said that when you are dealing with customers, failure to have potentially followed policies or procedures even is not going to give rise to a professional negligence type of a claim.

It's not clear what other type of -- based on the allegations in the complaint, it's not clear what other type of negligence Mechanics Bank could have, you know, could be responsible for in the context of its customer, whether -- other than within that customer relationship governed by that agreement.

And I think that, as the Texas Supreme Court has said, is that that's just not something that they're going to find is supported.

With that, Your Honor, again, we would ask that the complaint be dismissed.  And we don't believe that re-pleading it would be appropriate.  However, to the extent that the Court does believe that the fraudulent transfer and preference claims could be re-pleaded, we believe that there does need to be sufficient detail to put us on notice as to what transactions in fact are those that are being claimed and under what context Mechanics Bank could actually be a transferee.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Well, I'm going to take this under advisement. Like I said, I'm digging out of a little hole that I had, getting some other under advisements out the door.  We are working diligently on the CFSB motion and some other cases.  I have a few other cases.  And so all I can say is that I'll get

a ruling out on each of these matters as soon as we can.

MR. DABDOUB:  Okay.  Thank you very much, Judge.

THE COURT:  All right.  Thank you all.

MS. KLEIN:  Thank you, Your Honor.

THE COURT:  The Court will be in recess.

MR. DABDOUB:  Thank you.

THE CLERK:  All rise.

(Proceedings concluded at 12:56 p.m.)

--oOo--

CERTIFICATE

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling**                                    **10/16/2025**

_____    _____
Kathy Rehling, CETD-444                                Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS - *Taken Under Advisement*                         108

END OF PROCEEDINGS                                         109

INDEX                                                      110