IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)


                                     .   Case No.: 23-20084-SWE-7
IN RE:                               .
                                     .
MCCLAIN FEED YARD, INC.,             .
                                     .
          Debtor.                    .
. . . . . . . . . . . . . . . . .    .
                                     .
AGTEXAS FARM CREDIT SERVICES,        .   Adv.  No.  24-02007-SWE
ET AL.,                              .
                                     .
          Plaintiffs,                .
                                     .
     v.                              .
                                     .
RABO AGRIFINANCE, LLC,               .
ET AL.,                              .
                                     .
          Defendants.                .   Thursday, June 12, 2025
. . . . . . . . . . . . . . . . .        2:01 P.M.




                    TRANSCRIPT OF MOTIONS HEARING
            **BEFORE THE HONORABLE SCOTT W. EVERETT**
            **UNITED STATES BANKRUPTCY COURT JUDGE**




APPEARANCES ON THE NEXT PAGE.

Audio Recorder:          Sara Ferrufino
                         Earle Cabell Federal Building
                         1100 Commerce Street, Room 1254
                         Dallas, Texas 75242

Transcription Service: Liberty Transcripts
                         9107 Topridge Drive
                         Austin, Texas 78750
                         (847) 848-4907
                         DBPATEL1180@GMAIL.COM
                         www.libertytranscripts.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

For Plaintiffs, AGTexas Farm Credit Services and AgTexas PCA:

                    Naman, Howell, Smith & Lee, PLLC
                    BY: MICHAEL S. DUNCAN, ESQUIRE
                    8310 North Capital of Texas Highway
                    Suite 490
                    Austin, Texas 78731
                    (512) 807-2465
                    mduncan@namanhowell.com

                    Naman, Howell, Smith & Lee, PLLC
                    BY: DAVID L. LeBAS, ESQUIRE
                    8310 North Capital of Texas Highway
                    Suite 490
                    Austin, Texas 78731
                    (512) 479-0300
                    dlebas@namanhowell.com

For Plaintiff HTLF Bank, Successor-in-Interest to First Bank & Trust:

                    Mullin Hoard & Brown LLP
                    BY: MATTHEW S. MERRIOTT, ESQUIRE
                    500 South Taylor, Suite 800, LB#213
                    Amarillo, Texas 79101
                    (806) 371-5050
                    mmerriott@mhba.com

For Defendant Rabo AgriFinance, LLC:

                    Ray Quinney & Nebeker P.C.
                    BY: MATTHEW M. CANNON, ESQUIRE
                    36 South State Street, Suite 1400
                    Salt Lake City, Utah 84111
                    (801) 532-1500
                    mcannon@rqn.com

                    Ray Quinney & Nebeker P.C.
                    BY: MICHAEL R. JOHNSON, ESQUIRE
                    36 South State Street, Suite 1400
                    Salt Lake City, Utah 84111
                    (801) 532-1500
                    mjohnson@rqn.com

APPEARANCES (CONTINUED):

For Defendants 2B Farms, a General Texas Partnership, Terry
Robinson, and Rebecca Robinson:

                    McWhorter Cobb & Johnson LLP
                    BY: TODD JEFFREY JOHNSTON, ESQUIRE
                    1722 Broadway
                    Lubbock, Texas 79401
                    (806) 762-0214
                    tjohnston@mcjllp.com

                    McWhorter Cobb & Johnson LLP
                    BY: TIMOTHY PRIDMORE, ESQUIRE
                    1722 Broadway
                    Lubbock, Texas 79401
                    (806) 762-0214
                    tpridmore@mcjllp.com

For Defendant Mechanics Bank:

                    Husch Blackwell LLP
                    BY: BUFFEY KLEIN, ESQUIRE
                    1900 North Pearl Street, Suite 1800
                    Dallas, Texas 75201
                    (214) 999-6100
                    buffey.klein@huschblackwell.com

For Defendant Shawn Ragland:

                    Crawford, Wishnew & Lang PLLC
                    BY: MATTHEW S. MUCKLEROY, ESQUIRE
                    1700 Pacific Avenue, Suite 2390
                    Dallas, Texas 75201
                    (214) 817-4519
                    mmuckleroy@cwl.law

For the Chapter 7 Trustee, Kent Ries:

                    Lynn Pinker Hurst & Schwegmann, LLP
                    BY: ALAN DABDOUB, ESQUIRE
                    2100 Ross Avenue, Suite 2700
                    Dallas, Texas 75201
                    (214) 981-3800
                    adabdoub@lynnllp.com

APPEARANCES (CONTINUED):

For the Chapter 7 Trustee, Kent Ries:

        Lynn Pinker Hurst & Schwegmann, LLP
        BY: FARSHEED FOUZOUNI, ESQUIRE
        2100 Ross Avenue, Suite 2700
        Dallas, Texas 75201
        (214) 981-3800
        ffouzouni@lynnllp.com

        Lynn Pinker Hurst & Schwegmann, LLP
        BY: STEVEN G. GERSTEN, ESQUIRE
        2100 Ross Avenue, Suite 2700
        Dallas, Texas 75201
        (214) 981-3800
        sgersten@lynnllp.com

        Jobe Law PLLC
        BY: HUDSON M. JOBE, ESQUIRE
        6060 North Central Expressway, Suite 500
        Dallas, Texas 75206
        (214) 807-0563
        hjobe@jovelawpllc.com

For Various Plaintiff-Intervenors:

        Sprouse Shrader Smith PLLC
        BY: JOSHUA D. KUNDERT, ESQUIRE
        701 South Taylor Street, Suite 500
        Amarillo, Texas 79101
        (806) 468-3300
        josh.kundert@sprouselaw.com

        Simmons & Brown PLLC
        BY: ABEL LEAL, ESQUIRE
        400 13th Street, P.O. Box 180
        Canyon, Texas 79015
        (806) 476-5090
        abel@ssbtxlaw.com

5

INDEX

Page

MATTERS HEARD

Motion to continue (160)

**Court's Ruling - Granted**                                    **58**

Joinder filed by Counter-Claimants (165)

**Court's Ruling - Continued**                                  **58**

ARGUMENTS

By: Mr. LeBas                                                     9
By: Mr. Leal                                                     14
By: Mr. Weldon                                                   18
By: Ms. Miller                                                   19
By: Mr. Pridmore                                                 20
By: Mr. Jobe                                                     23
By: Mr. Johnson                                                  32
By: Ms. Klein                                                    39

(Proceedings commenced at 2:01 p.m.)

THE CLERK:  All rise.

THE COURT:  Thank you.  Please be seated.

All right.  Good afternoon.  We're here on the 2:00 docket.  We have a motion to continue in the AGTexas Farm Credit vs. Rabo Adversary 24-2007.  And we also have a joinder.  I'll go ahead and take appearances starting in the courtroom.

MR. LEAL:  Yes, Your Hono.  This is Abel Leal and I'm here on behalf of the Plaintiff-Intervenors.

THE COURT:  Good afternoon.

MR. LEAL:  Good afternoon, Your Honor.

MR. JOVE:  Good afternoon, Your Honor.

Hudson Jobe for Kent Ries, Chapter 7 Trustee.

THE COURT:  Good afternoon.

MR. DABDOUB:  Hi, Your Honor.

Alan Dabdoub here on behalf of Chapter 7 Trustee Kent Ries.  Also present in the courtroom are my colleagues Farsheed Fozouni, Steve Gersten.  Good to be --

THE COURT:  All right.  Good afternoon.

All right.  I'll take Webex appearances, please.

MR. LeBAS:  Your Honor, David LaBas here for two of the Plaintiffs, AGTexas and Thorlakson Diamond T Feeders.

THE COURT:  Good afternoon.

MR. LeBAS:  Good afternoon.

MR. PRIDMORE:  Your Honor, good afternoon.

Tim Pridmore and Todd Johnston on behalf of 2B Farms and Terry and Rebecca Robinson, Plaintiff-Intervenors.

THE COURT:  All right.  Good afternoon.

MR. PRIDMORE:  Thank you, sir.

MS. KLEIN:  Good afternoon, Your Honor.

Buffey Klein with Husch Blackwell on behalf of Mechanics Bank.

THE COURT:  Good afternoon.  Good afternoon, Your Honor.  Michael Johnson and Matthew Cannon on behalf of Rabo AgriFinance.

THE COURT:  All right.  Welcome.

MR. MERRIOTT:  Good afternoon, Your Honor.

Matthew Merriott on behalf of HTLF, and I expect to be just observing.

THE COURT:  All right.  Welcome.

MS. MILLER:  Your Honor, Amber Miller on behalf of Plaintiff-Intervenors, Ridgefeld Capital Asset Management, Robert Ellis, Drew Phillips, Barry Phillips, Richard Carraway, Carraway Cattle, and Big Seven Capital Partners.

THE COURT:  All right.  Good afternoon.

MR. MUCKLEROY:  Good afternoon, Your Honor.

Matt Muckleroy on behalf of Defendant Shawn Ragland.

THE COURT:  Good afternoon.

MR. KUNDERT:  Josh Kundert on behalf of Certain Intervenor-Plaintiffs.

THE COURT:  All right.  Good afternoon.

MR. WELDON:  Good afternoon, Your Honor.

Kyle Weldon on behalf of Priest Cattle Company and several other Plaintiff-Intervenors.

THE COURT:  Welcome.

(Pause)

THE COURT:  This is that awkward pause while I wait for any remaining appearances.

MR. DUNCAN:  Your Honor, Mike Duncan on behalf of AGTexas and Thorlakson.  I intend to just be observing.

THE COURT:  All right.  Thank you.

All right.  Last call for appearances.

MR. RIES:  This is Kent Ries, Chapter 7 Trustee.

THE COURT:  All right.  Good afternoon.

All right.  It sounds like we have all appearances.

Well, first of all, welcome, everybody, either virtually or in person.  We have a motion to continue.  I'll just tell the parties, before I saw the motion to continue, there was a fair chance you were going to be hearing from me this week anyway, because since I've been assigned some of the cases that were previously with Judge Jones, we spent a lot of time kind of reading, starting to play catch-up with all of you.

And I also was beginning to have some concerns about the overlap of some of the matters that are currently set on

the 30th.  We had some that were set on the 16th that got pushed to the 30th.  And I know Judge Jones previously denied, but without prejudice, the Trustee's motion to tee up some of the issues that are now teed up again on the 30th, now that we have a Trustee complaint, I guess, to compare side-by-side with some of the other complaints.

And so, anyway, my initial observation going in was that there appears to be some logic to figuring out who owns what before proceeding too much further.  But let me -- I'll hear from the parties on the motion to continue, but those are my kind of opening observations.  So I'll hear from the Movant.

MR. LEAL:  Yes, Your Honor.  In reading the room, would you like us to --

THE COURT:  The podium is fine.

MR. LEAL:  Your Honor, on our behalf, Mr. LeBas will begin our argument, and then I will follow that and a couple of other lawyers that are part of the emergency motion will also make some arguments.

THE COURT:  All right.  Thank you.

MR. LeBAS:  Your Honor, David LeBas, may it please the Court.

THE COURT:  All right.

MR. LeBAS:  We're inclined to follow the procedure that Your Honor just outlined and as noted in Judge Jones' order last year, Docket Number 1, actually, in this case,

August 19, '24.

And so before I get into what I'm going to proceed with today, I think my role here is going to be more trying to introduce the topic.  I know it's new to you and it sounds like you and your staff have started digging into the pleadings, but they're quite voluminous and the parties are numerous.  And I thought it might be helpful just to kind of go through what got us here so far.  And if you don't want to hear that, I'll move on to something else.

THE COURT:  No, that's fine.

MR. LeBAS:  This is public --

THE COURT:  I think it's good since we haven't spent a whole lot of time together yet.  I'm happy to take kind of opening comments and observations.

MR. LeBAS:  Yeah.  This is probably a five-minute overview of a very substantial dispute.  The Trustee estimates there was somewhere around a $2 billion check kite being operated in the year or two before the final death knell, if you will, occurred in April of 2023.  The litigation actually began with a lawsuit that I filed on behalf of the parties I represent in Deaf Smith County, Hereford, Deaf Smith County.  Many of the Intervenors joined in that case.  It was then removed as a result of the bankruptcy filing, and that's kind of why we're here.

The amounts involved, the check kite amount is huge,

but so are the claims.  We've got about $120 million in proofs of claims.  Probably half of that number, close to half of that number, is represented by counsel here today with respect to, I'm going to say, cattle claims.  And then we have a bank claim, roughly $53 million, Rabo.  There's an HTLF bank claim also in the range of $15 million.

So we've got staggering amounts of money that are involved, and it's high-stakes litigation for all of the parties.  Some of these are life-changing type events, and so we're all doing our best to try to advance our clients' interests and do so in a way that's both professional with the way that we address the Court and each other in our efforts to try to juggle the different interests of the parties and the schedules that all the lawyers in the case and the parties have got to deal with.

As the Court noted, there's numerous motions set for the 30th.  We've got a motion filed by Rabo to dismiss, Number 128.  Response is due next week.  Mechanics Bank filed a similar motion to dismiss the claims of the cattle parties, Docket 133, that's due June 17.  Ms. Goad filed at Docket 153.  Response is due 6/26.  And then there are two others that we have filed responses to, HTLF at 119 and Ragland at 114.  Those are all set, as I understand it, for June 30, and the question is whether the Court wishes to hear those motions to dismiss. Three of them we haven't responded yet, and we want to find out

do we need to respond, spend the money to respond or not, if we're not going to have a hearing on the 30th.

Our general position is that a threshold matter is presented by the Trustee's motion to intervene, and his motion to intervene is at Docket 140, filed on May 29 of this year. Judge Jones, as I already mentioned, filed his order, Docket 1 on 8/19, and he noted, this is at Page 9, just reading from the order, that "Rabo contends that the Court should, as a threshold matter, preemptively determine what asserted cause of action do belong to the McClain Debtors' bankruptcy estates."

And at the time there had not been, at the time of that order, there had not been a pleading by the Trustee seeking to determine that issue or asserting those claims.  And so our position was that until we know what the Trustee does or is going to file something or doesn't file something, how can we possibly decide what our response is going to be?  And so quite, I think, properly so, the judge said, this is at Page 11 of his opinion, "Unless and until the Trustee actually intervenes and asserts actions with overlapping facts on behalf of the estate, the Court cannot definitively determine the ownership and rightful party to pursue such actions."

So since that time, last August, the parties have certainly filed plenty of documents, plenty of pleadings, motions.  We've taken 11 depositions.  We've exchanged many thousands, probably hundreds of thousands of documents back and

forth.  But it's now come to a question of whether the Court is going to rule on this threshold issue or not first before we proceed further.  And we think it's certainly a watershed issue.  If the Trustee owns our claims, then what are we doing with them?  If the Trustee owns some of those claims and some not, then how do we proceed to get those resolved?

I don't think it affects discovery too much, but it certainly affects how the cases are presented, what defenses exist and legal defenses or claims exist.  And so we believe quite strongly that we have a threshold watershed issue on ownership of the claims, that we ought to proceed to hear that first, get some guidance from the Court about which direction this litigation is going to take.

And I'm not really going to argue the case.  Other attorneys for the Intervenors are going to discuss more the merits of it.  But I would note that this is -- this just occurred to me really as I was thinking about this getting ready for the hearing, that the assertion by the Trustee of these claims is really sort of backwards from the way that the Trustee normally works in a Chapter 7 case, which is to try to gather up assets for the benefit of the estate, which are creditors.

In this case, we are the creditors.  We're at least half of them, probably more than that after proofs of claim are winnowed down.  And in effect, what the Trustee would do would

be collect assets that would belong to us anyway, but extract fees and costs from that before it gets distributed.  So we see that as a very important issue for us to decide.  It's a watershed issue, and so I'll close with that unless the Court has remarks and ask Mr. Leal to step to the podium.

THE COURT:  All right.  Nothing for me right now. Thank you.

MR. LEAL:  Your Honor, may I approach?

THE COURT:  Sure.

MR. LEAL:  Your Honor, I was listening to Mr. LeBas' arguments and I was trying to parse down my points to make so I wouldn't be redundant in the arguments that he was making.  But one thing that I do want to reiterate is the motion, the emergency motion, is really the linchpin or at least the central issue is about judicial efficiency and the preservation of the parties' resources and for justice and to make sure that the threshold issue of standing and who actually owns the claims are decided first.

If we are obligated to, and the Court is also obligated to consider five motions to dismiss along with the Trustee's motion to intervene on June 30th, we anticipate that that would be about 9 or 10 hours of the parties' time.  So it's just impractical as it relates to having a hearing on all of the motions.

The motion to intervene is quite interesting.  The

Court made a comment about a complaint.  There has not been one yet filed here, just a motion to intervene.  But irrespective of that, there can be three outcomes, as Mr. LeBas stated.  If the Court grants the Trustee's motion to intervene, then our claims, we no longer have possession of those.  The motions to dismiss could be rendered moot.

If the Court grants the Trustee's motion to intervene partially, then the Court will decide who owns what claims and it will allow the parties to focus on the particular parts of the motion to dismiss that should be addressed by both the Plaintiff and the Plaintiff-Intervenors and the Court.  The other outcome, if the Court denies the motion to intervene, then this cloud about who owns what is removed and now the parties and the Court can move forward without that cloud and address the Defendants' motions to dismiss.

THE COURT:  You said the Trustee hasn't filed a complaint, but -- well, I'll let Mr. Jobe respond to that.

MR. LEAL:  Yeah.  In this matter, in this adversary proceeding --

THE COURT:  In this adversary, they have not.

MR. LEAL:  Yeah, right.

THE COURT:  I understand that.

MR. LEAL:  If the Court is referencing the complaint that we call the Bank case, then -- and I think that's what the motion to intervene is comparing the claims to, then that's a

complaint, but as it relates to this adversary proceeding, there has not been a complaint filed.

I think if you read Judge Jones' order, which is Doc Entry 52, that's what he was waiting for were claims to be asserted in this adversary proceeding, so he could see what overlaps and who owns what. And that was cited by Mr. LeBas. And so that is a bridge, Your Honor, to I know you inheriting this case where Judge Jones was wanting the Trustee, if he was going to intervene, to do it. And he didn't intervene until, I guess, nine-and-a-half months later after the Court entered that order.

And we point out in our emergency motion, we have taken quite a bit of discovery. Our clients have invested thousands of dollars in this case. And now the Trustee claims that he owns our claims. And so the substantial investment by our clients in this case also, I believe, merits the Court granting our emergency motion to extend the deadlines and to continue the hearing so that we can really look at and analyze the issues in the Trustee's motion to intervene.

The last thing I'll leave you with, Your Honor, is I don't know why this reminds me of The Shawshank Redemption. Have you seen the movie?

THE COURT: I have.

MR. LEAL: When Brooks gets out of the Shawshank and he's going across the street and he sees cars everywhere and

he's writing his buddies Red and Dufresne a letter.  He said, when I was a kid, you know, I saw a car.  Now they're everywhere.  The world got itself in a big hurry.  And I think that's what the Defendants and the Trustee are trying to do here.

The Trustee waited nine months to file a motion to intervene in this case.  I don't know why we're in such a big hurry to decide seven motions on June 30th since this case has been filed.  So I think we need to step back, allow the Court and the parties to address the threshold issue as we discuss about standing.  And that's all I have unless you have any questions for me.

THE COURT:  I don't think so.  Didn't that character hang himself?  So I don't want to follow that analogy.

MR. LEAL:  I didn't want to go into that part, but yes, Your Honor.  That's --

THE COURT:  Okay.  Hopefully, we're not --

MR. LEAL:   The sad part of that.  But Red, his friend did not.  He went off and met Andy, I guess, on the beaches somewhere in Mexico.

THE COURT:  Okay.  All right.  I forget the character's name.

MR. LEAL:  And there was a good ending.

THE COURT:  All right.  Thank you very much.

MR. WELDON:  Your Honor, Kyle Weldon.  And I just had

a few comments to piggyback on from Mr. Leal.

THE COURT:  Sure.

MR. WELDON:  I represent a few of the Plaintiff-Intervenors in this case.  I just wanted to add comments and color on just the parties working together for the past two years.  This bankruptcy was filed late April of 2023.  And so for the past two years, all the counselors that are on this call and there in person have really been working together very well.  And from scheduling depositions to handling discovery matters to handling extensions and deadlines for other matters within this case.

And I really just want to make sure, again, as introducing you to this case, and as I think Mr. Johnson mentioned in his response that was filed earlier this morning, the parties, I think, have worked together well and generally everyone appreciates that.  And as Mr. Leal mentioned, it just appears that at almost the encouraging of Trustee's counsel that the extensions were not allowed this time based on a desire to move things in a very quick fashion to the detriment, in our opinion, of Plaintiffs and Intervenors.

And I wanted to again, just to mention that overall we've worked together very well and appreciate the ability to do that.  It's just unfortunately have had to file this emergency motion requesting relief from you.

THE COURT:  All right.  Thank you.

MS. MILLER:  Your Honor, Amber Miller.

I may be the last person who was listed on the emergency motion.  I, as mentioned earlier, represent a few of the Plaintiff-Intervenors in this matter.

Judge, with this many lawyers in the room and on the screen, we sure could use a little bit of logic, so I appreciate you commenting on that at the beginning.  It certainly is logical to think that the Trustee's motion should be considered first, candidly, Your Honor, not just for us but for you.  As you well know, any motion to dismiss is a very factually intensive analysis in and of itself when there's one Plaintiff and one Defendant.

And as you've seen and highlighted, there are multiple parties, multiple claims at issue here in the various adversary proceedings and the motions to dismiss of our particular adversary proceeding in front of you.  Those in and of themselves are going to take a while to not only unpack an oral argument but for you to take time to read the written responses and arguments of counsel here and really determine whether or not the adversary proceeding and the claims therein should move forward all or in part.

And when you mix with that the Trustee's motion now to intervene in that proceeding, you know, candidly, Judge, you need time to decide that threshold issue apart from the motions to dismiss and determine that threshold issue.  And as we look

forward, as litigants always do -- and you do too, Your Honor -- when we look at subsequent appeals, I think you're quite right that it makes the most sense for that threshold issue to be decided first and then the Trustee's motion to be handled first independent and separate from those motions to dismiss and the responses thereof.

So I would just urge the Court to continue in the line of thinking that you had when this hearing began and to handle that Trustee's motion separate and apart and grant the motions for continuance on the other motions to dismiss of those responses.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

MR. PRIDMORE:  Your Honor, if I may, Tim Pridmore on behalf of 2B Farms and Bo and Rebecca Robinson.  We are aligning and have joined in with the motion before the Court and we have filed our response accordingly.

We are a little bit different than some of the other Plaintiff-Intervenors because our clients are in a bankruptcy themselves that has been consolidated in with this matter.  But we are aligned on this motion and on many issues and have been participating with them in both the defense and prosecution of the claims herewith.  So I don't want to add on what everyone else has said, Your Honor.  You have a lot of people.  You've heard a lot of these issues.

But I do want to just stress what has been said, that

this is a seminal issue.  All these issues are going to take away claims or defenses of some party here.  And, Your Honor, I think your initial inclination was spot on.  We need to get this right because somebody is going to go away from these motions not very happy.  And there is no time requirement that all these issues be done on the 30th.  There is no judicial economy for it.  There is nothing to benefit doing them all at one time.  But, on the other hand, there is extreme detriment that could happen.

And so if we had the time to address the seminal issue that Mr. Ries and Jobe have put forth, address that, then we have a playbook, Your Honor.  Then we can know who are the players, who are on our scorecard.  Is it going to be Mr. Jobe presenting these?  Is it going to be the Plaintiff-Intervenors, which we would assert it would be?  But, Your Honor, those are issues we can address on the 30th.

And so, Your Honor, I think when you weigh everything, the potential prejudicial rights to the parties, the judicial economy of the case, and just to get it right, Judge, I think weighing all that in, it clearly lends itself to what, Your Honor, your first impression was.  Let's take our time.  Let's do it right.  We're talking about hundreds of millions of dollars on this case.  We're talking about the Plaintiffs and Intervenors and our clients, we're farmers and ranchers, Your Honor.  It's highly important for us.

Our clients have retained us to represent them.  They do not want to rely upon the Trustee to represent their cases.  And that's more in line for the intervention lawsuit.  But we have over 50 individual Plaintiffs in farming and ranching communities, Your Honor, companies.  And we're trying to do right by them.  And so we are respectfully requesting that this Court grant this motion, take its time to gather and read all these hundreds of pages.

As Mr. LeBas had said, our document management system lost count after several hundred thousand pages.  I mean, there's just hundreds of thousands of pages on this.  The motions before you, these motions to dismiss, most of them are over 50 pages each.  You know, there is just a significant amount of information out there that needs to be reviewed and properly responded to.

And with that, Your Honor, we would respectfully request that this motion be granted to give us time to address the Trustee's motion, which should be first in time.  Then, depending on how Your Honor rules at that time, then we can handle the respective individual motion to dismiss from the bank entities.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Anybody else that's in support of the motion want to speak before I go to the objecting parties?

(No audible response)

THE COURT:  All right.  Well, let me hear from the parties who are objecting.

MR. JOHNSON:  I don't know if Mr. Jobe wants to go first or if he would like me to go first, Your Honor.  Mr. Jobe is in courtroom.

THE COURT:  I don't have a preference.

MR. JOBE:  Your Honor, I'll take --

THE COURT:  Mr. Jobe, you're --

MR. JOBE:  -- I'll take the first shot if it's all the same.

THE COURT:  So you're not yet in this adversary, and you haven't filed a response probably because you're not in the adversary, but are you taking a position on the motion to continue?

MR. JOBE:  Yes, Your Honor.  We share the Court's desire to figure out who owns what on the most efficient and effective way possible.  We are here, as Your Honor pointed out, on a second attempt at this.

And, Judge, just to fill in a brief bit of history, this adversary proceeding is the combination of three other actions.  The Plaintiffs here are all some combination of passive investors of money or, in a very narrow few, partners with Mr. McClain with cattle.  We refer to these as investors or partners of McClain.

These parties have all filed claims against the major

constituents in the McClain case, McClain's primary secured lender, Rabo, McClain's depository institution, Mechanics, as well as a bank, HTLF, that we allege participated in essentially the Ponzi scheme by holding blank checks of McClain and filling them out and moving them around to facilitate the flow of funds to the various investors.

Judge, and I want to not get too far ahead of ourselves in front of the status conference.  I don't want to overly lump the investors together.  Several of the investors have been helpful, Judge, in this case, and some haven't.  One thing that you will see in virtually all of our pleadings in this case from day one is we had little to no records, and we've had to do a comprehensive lengthy forensic accounting and contested discovery with parties to recreate what happened and why and who was responsible.

The Movants today, Judge, for example, Mr. Leal's client and Mr. LeBas' client put us to a full contested one-day hearing to get their clients' documents for their investment and partnership participation in McClain.  That forensic accounting effort was ongoing and significant.  Judge Jones was fully aware of it.  You'll see that it's one of the major reference points in the motions that were filed last summer.

And, Judge, just some context there, some of these investors had filed a state court action, a state court action including on what we allege are estate claims against these

major constituents that they had little, in many cases, zero direct dealings with.  That case was removed and largely on ice in an adversary position in front of this Court.  And what prompted some action on this, Judge, last summer, and we have designated these documents, Your Honor.  We'd ask the Court to take judicial notice of Docket 22, and this was back in April of 2024.

But the investors represented by Mr. LeBas moved to remand those claims back to state court.  And, Judge, among other things, we couldn't have creditors running amok in state court outside the control of the bankruptcy judge until we sorted out who owns what.  So that motion for remand prompted some action.  And at Docket 37 through 52, Judge, including the order that you've noted, those were all pleadings designed to buy time while we completed our forensic accounting and used the additional time that we had.  And also to make sure that parties were put on notice that there was a significant dispute as to who owns what on these claims.

So any notion that today is a surprise or they have been tricked into spending money is just not fair, Judge. These issues were squarely put in front of the Court last summer.  Judge Jones denied that without prejudice to allow us to complete our forensic accounting and then come back and allege our own claims and more thoughtfully look at whose claims are what.

Judge, that is the additional context.  The issue of how can we best figure out who owns what claims?  Judge, what we want to do is put the most tools in front of you to sort out who owns what because this is critically important.  The Trustee cannot conduct a meaningful mediation with Rabo, its secured lender; HTLF, another lender and depository institution; or Mechanics Bank, the Debtors' depository institution, if these three parties are also being sued by various known and unknown investors.

The Trustee's goal here, Judge, is to maximize recovery and distribution for all creditors, not the half that are trying to pursue their own claims, but the other half also that are silent and relying upon the distribution in this bankruptcy case.

Judge, with respect to this June 30th hearing, what we've attempted to do is corral these pending motions to the extent that there is overlap and it makes sense and it better enables you to sort this out together, whether it's one or more hearings.  But this is the issue, Judge, is that knowing that this standing issue is circulating, some of these investors and partners of McClain, they may have thrown in a two-sentence purported personal direct claim against a party that they never -- against our secured lender or our depository institution.

Judge, what we want to do is arm you with both the tools available on our motion to intervene, but also the

plausibility standard of Rule 12(b).  Rule 12(b) and that plausibility standard will allow you to look at these claims and the position of the parties, or lack thereof, and test, is it really plausible that you have this two- or three-sentence vague direct conversion claim, given that by all accounts, based upon your proof of claim and your pleadings to date, you were just an investor or partner with McClain.

So, Judge, what we ultimately want to do is arm you with the most tools possible.  Additionally, Judge, and you can argue this kind of both ways, we only need to seek standing or we only need to flush out standing on the claims that are going to survive.  There's an argument to be made, Judge, that you should do 12(b) first and figure out what claims these parties really have after testing them on a Rule 12 basis.  Then we can talk about standing.

Whether it's one or the other, Judge, we believe that you're best suited having both those tools available because the arguments and analysis are not going to take any more time.  What I think you're --

THE COURT:  But if -- I guess I misunderstood your papers then because I thought you were going to say you want to be there making the arguments as opposed to the parties presently in the adversary proceeding on the 12(b) motions.

MR. JOBE:  I'm sorry, Judge, could you say that again?

THE COURT:  Well, go ahead and finish.  It's not clear to me on your motion to intervene, you've asked for alternative relief.  You've asked to intervene and then you asked to enforce the automatic stay.  This is a related issue. Which one of those is your preference?  Are you trying to intervene if you have your first choice?

If at the end of the day I determine that some of these cause of action belong to the estate, are you intending to pursue those claims in this adversary proceeding or are you intending to enforce the stay, require the existing parties to dismiss the claims that belong to the estate and pursue them in the adversary proceeding that you've already prepared?  Your motion to intervene kind of already lays out a chart saying here's the comparable claims that we've asserted in this other adversary, right?

MR. JOBE:  Yes, Your Honor.

THE COURT:  But I thought you just said maybe we should hear the motions to dismiss first in this adversary proceeding.  I'm not following that.

MR. JOBE:  Your Honor, just that there's only a standing issue to the extent that these parties have live claims and not all of their claims may survive Rule 12.  So you may be deciding standing issues on claims that could not survive Rule 12 scrutiny.

THE COURT:  I understand, but you've presently taken

the position that you own some of those claims, right?

MR. JOBE: Yes, Your Honor.

THE COURT: All right. And if you're not a party to this lawsuit, you wouldn't be arguing that at the hearing on the 30th, right?

MR. JOBE: Your Honor, the best shortest answer for your question is depending upon the claim, we may prefer to intervene and substitute in this party. Depending on the claim, we may already have that one pled in our other case and we just dismiss it out of here. It would depend on how you shake out on each claim and party, basically.

THE COURT: Okay. All right, go ahead.

MR. JOBE: Your Honor, again, we think what you're going to hear from the respondents to the motions to dismiss are based upon the relative positioning of the parties and their dealings, these parties do not plausibly have direct claims against us. They only have claims against the misuse of funds and property by the claim that may have allegedly involved us. We think you're going to hear that argument both in connection with our motion as well as the standing issues and lack of specifics that have been raised by the motion to dismiss Movants.

Judge, with respect to the importance of this, this is critical because we have now had the opportunity to complete our forensic accounting. As you've seen, we filed our bank

lawsuit.  It's very thorough.  And we are ready to move forward on, Judge, among other things, mediation with those parties, based upon the benefit of our investigation and discovery thus far.  We do need it to be sorted out who owns what.

We are open to ideas on the best way to get there, but, Judge, from our perspective, the best way for us to give you the most tools possible is to have both motions under consideration at the same time.

THE COURT:  All right.  So you do want them to go forward on the 30th, as well?

MR. JOBE:  Your Honor, we would like those both to go forward in front of you, whether it's the 30th or another day.  But we do believe that you need both those in front of you to have the most options available to sort out who owns what and who really has plausible direct claims based upon their relationship with the McClain Debtors.

THE COURT:  All right.  By chance, have the parties gotten together yet to talk about whether there's agreement on any of the counts, whether they belong to the Trustee or not, whether they belong to the other parties or not?  Have you guys had that discussion yet?

MR. JOBE:  Yes, Your Honor.  So we've got -- great question.  We've got some parties who are only Plaintiffs on suspicious claims. That's the investors and these partners.  We've got one party, Mechanics Bank, who is only a Defendant on

suspicious claims.  Rabo and 2B, they're both kind of in the middle because they're both being sued on claims that are arguable estate claims and they're also making claims that are arguable estate claims.

What I think you'll hear from, say, for instance, Mechanics is we absolutely agree that these are estate claims.  There's no plausible basis that these investors would have a direct claim against the Debtors' depository bank.

THE COURT:  I wasn't thinking so much of them, but the parties that are asserting competing ownership of the cause of action, have you sat down and had a discussion?

MR. JOBE:  Yes, Your Honor.  We have.

THE COURT:  Okay.

MR. JOBE:  And what we hear loud and clear from the parties in the middle that are both kind of being sued on suspicious claims and bringing suspicious claims is they would like a consistent ruling, both on the claims against them and on the claims they're trying to bring.  They could understand it either way, which is I think a better or maybe a less committal way of saying, we are okay losing our claims if the claims against us are lost, as well.

The group of Plaintiffs, Judge, the investors, partners that have been trying to, among other things, sue on these outside of bankruptcy and state court, we have not been able to hook up on really any sort of agreement with them.

THE COURT:  All right.

MR. JOBE:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Who would like to go next?

MR. JOHNSON:  Thank you, Your Honor.  I'll go next.
This is Mr. Johnson.  I represent Rabo.  And Rabo contends,
actually, that it is the largest victim of this massive fraud.
It's got a $53 million claim against the McClain Estates.  And
our client did object to the motion.  And let me give you, and
I won't spend too much time, but let me give you three things
to think about and three reasons why I think you may want to
hold the hearing on all motions together.

First of all, the Trustee is not the only one who has
raised lack of standing as an argument for dismissal with
respect to most, but not all, of the claims that are being
asserted in this case.  My client, Rabo, has asserted that
many, but not all, of the claims that are being asserted in
this consolidated adversary proceeding, the parties asserting
those claims lack standing.  Mechanics Bank has also raised
lack of standing in its motion to dismiss.  So has HTLF Bank,
and so has Meagan Goad.

So you have those four parties who have independently
raised in their motions to dismiss lack of standing.  And so it
seems to make sense to me, if we're going to be talking about
the Trustee's motion to enforce the stay, I just want to allege

lack of standing, that it likewise makes sense to let us argue our motion to dismiss with respect to lack of standing.

THE COURT: And you're more up to speed on all of those pleadings. I'm slowly catching up to all of you. Is the only standing issue that has been raised the same one that we're talking about, that the Trustee owns the cause of action as opposed to somebody else, or are there other standing arguments that are raised because I'm --

MR. JOHNSON: Well, that would generally be the only standing argument that -- and again, at least I didn't go back and check HTLF Bank or Ms. Goad or Mechanics Bank's pleadings.

Rabo does not take the position that every single claim in the consolidated adversary proceeding belongs to the bankruptcy estate. But it does take the position that the majority of them do. For example, the negligent lending, conspiracy, aiding and abetting breach of fiduciary duty. Those types of state law claims, we contend and I believe the other Defendants contend, that the parties asserting those claims lack standing, that they belong to Mr. Ries and can only be asserted by Mr. Ries. So that would be one argument.

One reason is you've got parties who filed their own motion to dismiss raising the same issue, so why not have the motions to dismiss all heard at the same time? The second argument is the one I just alluded to, which is, at least with respect to the claims asserted against Rabo and Rabo's motion

to dismiss, there are claims that I believe, and I don't know whether the Trustee would agree with me, but I certainly believe there are claims that do not belong to the Trustee. Let me give you some examples.

In the complaint filed by, I guess, in the operative complaint filed by the investor parties represented by Mr. LeBas and others, there's a breach of contract claim filed against Rabo by Thorlakson and AgTexas, and there's also a breach of contract claim filed by Priest Cattle Company against Rabo. Also, in the 2B Parties' operative complaint, there are Chapter 5 avoidance claims that have been asserted against both Rabo and Mechanics Bank.

I think those are clearly claims belonging to the parties who are asserting those and not to Mr. Ries. And so therefore, the Court's resolution of standing will presumably have no impact on those independent claims, but those claims have now been pending for about two years, and we moved to dismiss them twice. The Court has never considered whether -- and we've moved to dismiss those claims on grounds that are independent of standing, plausibility, Twombley/Iqbal, failure to satisfy plain Rule 8 pleading standards.

And as I said, those claims have been pending for over two years now, and no court has ever told us whether or not those are good claims or bad. And Mr. Leal did talk about what's the rush, and I agree with him in part. But again,

35

these are claims that have been pending for two years that we wanted a court to just weigh in on to tell us, are there claims there or not, or could there be claims there if there were some amendments that add a little flesh to the bone.

The third reason --

THE COURT:  And before you go to the third one, on the second point, so I'm kind of asking the same question I was probing Mr. Jobe with.  Would you be able to get together with Mr. Jobe and either come to an agreement or not on which of the counts the Trustee does not believe he owns?  Because if everybody's in agreement that there are counts that belong, at least as between you and the Trustee, believe that the Trustee owns them, I guess it might make more sense to hit them together.

I do have some concern.  I understand what you're saying about if there are claims, the Trustee will disavow and say we don't own them.  You've raised a couple.  I don't know what Mr. Jobe's position is on those.  If they can be heard separately, I do have a little bit of a concern also just with the amount of things that I will have to digest on the 30th.

The good news is that you know who your judge is now. I am getting up to speed.  My intent is not to push off rulings on motions to dismiss unnecessarily.  But I do have to -- there's only so much I can chew at one hearing.  And so I'm still thinking about what makes sense for me to hear on the

30th.  If there are matters that the Trustee disavows ownership of, it still might make sense to hear those later because I'm going to have my plate full already on the issues where there are contested issues of ownership of those claims.

MR. JOHNSON:  Well, I would say, Your Honor, at a minimum, since again, as I pointed out, Rabo, Mechanics Bank, and HTLF Bank and Ms. Goad have all independently raised in their own motions lack of standing, those four motions should be heard at the same time as the Trustee's motion, at least as they relate to the standing question.  I mean, we shouldn't have to have multiple standing arguments in this case.

With respect to claims -- and you asked me, I have a very good relationship with Mr. Jobe.  I have a good relationship with Plaintiffs' counsel.  I'm happy to get together with Mr. Jobe.  I don't know what the Trustee's position is on those claims I've highlighted.  I think there's kind of -- in my view anyways, there's kind of claims that, at least in my view, are pretty clearly claims that belong to Mr. Ries.

And this really goes to my third point.  There are claims, in my view, that pretty clearly do not belong to Mr. Ries.  And I highlighted in four of them, the Chapter 5 claims brought by the 2B Parties and the breach of contract claims brought by Thorlakson and by Priest Cattle.

And then you've got this gray area, and this is

really where the work is going to take place and why I think the motions to dismiss on non-standing grounds where they come into play is, for example, Mr. Jobe said, there's a sentence or two with complaints alleging that Rabo, for example, converted cattle or proceeds of cattle.  Well, if the Plaintiffs can satisfy Twombley and Iqbal with respect to those allegations, this many head of cattle belong to me, here's how I can show that they belong to me, you took them on this date, those are probably independent claims that belong to them.

But I don't think they can make that showing.  And if they can't make that showing and the reason I don't think they can make that showing is because there would have had to have been three or four hundred thousand cattle here to substantiate the type of claims that are being asserted here.  And there clearly weren't.  These were cattle that either did not exist or were purportedly sold on paper 10 or 12 times to various investors.  So we've moved to dismiss those types of claims on, for example, Twombley and Iqbal grounds.  You've got to put more meat on the bones.

It's not plausible just saying we took your cattle and we converted your cattle proceeds does not state a claim under Twombley/Iqbal.  They can come back and amend and say, well, yeah, let me put some meat on the bones and I'll lay out for you which cattle I'm talking about, when you took them, how much money you received, how I traced it, and then they have

independent claims.  Those claims may not belong to the Trustee.  But if they can't make that showing, then those are probably generalized claims that belong to the bankruptcy estate and not to the individual claim.  So that's why I think it makes sense to hear all these at the same time.

Now, several parties have raised the issue of, Judge, there's so much going on, it's not fair to have the hearing on June 30th.  I have, for Rabo anyways, we have no issue or concern giving parties whatever time they need to respond to all the pending motions.  And if that means that the Court can't have a hearing on the 30th of June but it has to be on the 30th of July or some other time, that's perfectly fine. We're not attempting to jam anybody up or to put them in a rush to respond to a bunch of motions in a very short time frame. Giving them time would certainly be appropriate.

And if the Court is inclined to hear all the motions either at the same time or close to one another, on behalf of Rabo anyways, I have no objection if the Court needs to push this off a little bit to give everybody sufficient time to properly prepare their briefings because this is a very important issue.  I agree with everybody on that.

THE COURT:  All right.  Anything else before I pass it off to the next person?

MR. JOHNSON:  Nothing for me, Your Honor.  Thank you.

THE COURT:  All right.  Anybody else on the objecting

party side?

MS. KLEIN:  Your Honor, Buffey Klein on behalf of Mechanics Bank.  We did not join in any of the opposition to the request for continuance, but I do want to raise one additional issue that was touched on by the moving parties that I think is critical to all of us.

As was noted by counsel, these claims have been out there for two years, and our clients have filed motions to dismiss because what we continue to believe are defective pleadings that have not stated a claim upon which we can effectively mount a defense.  And we've asked the Court repeatedly to take a position on these.  We've not yet gotten clarity on standing issues, on the issues of whether or not these are properly pled claims.  And as this has gone on, we have been subjected to expensive discovery.

And this is something that you heard from the Movants, that they've spent a lot of money and a lot of time.  But on the flip side of that, our clients have been subjected to discovery from parties who may not even be properly bringing these, properly positioned to bring the claims.  And we've not been able to really, with clarity, understand the claims that are being in fact raised against us so that we can mount our own and pursue discovery on our own behalf.

So I think that we certainly -- one of the reasons that we do believe that there needs to be some urgency, I don't

disagree with Mr. Johnson.  These are lengthy, very weighty motions that have been filed, and I understand the need for time to adequately address them.  But I think at least as to the standing issues, certainly the fact that those motions are not being heard should not prevent the other parties from at least arguing on their behalf the standing issues.

Additionally, I think it's appropriate during this pendency for the discovery to stop.  It's been ongoing.  It's constant.  And there's been three depositions in the last 30 days.  I wasn't noticed on those, but certainly they went forward.  And this has been -- it has been expensive.  It's been frustrating.  And I think that what you're hearing is some of that spilling over into this where we want some definitive answers on how we proceed and against whom we're proceeding on the various claims.

And so I think that while I completely agree with the Court that the volume of issues to be heard on the 30th is likely so unwieldy as to be futile, I do believe that it makes sense for us to have at least a portion of those issues heard or at least allow for the Defendants who have raised those issues to speak to them, to the Court, at the time that you're hearing that.

So I guess that would be Mechanics Bank's just for additional thought before the Court.  You know, I'm obviously happy to answer questions.  But one of our main concerns is

simply the length of time we've gone in this case where we've been subjected to very extensive discovery practice without really, not with the proper party in interest, we think.

MR. JOHNSON:  Your Honor, I'm sorry to butt back in here after ceding the floor, but Counselor for Mechanics Bank raises a point that's in my note that I forgot to talk to you about and it's exactly that issue.

My clients, five of my clients' employees have been deposed in this adversary proceeding by people -- on claims that we don't believe the people deposing them have standing to assert.  So if we're going to take up the issue of standing first, please at least stay discovery until you resolve that issue because it's unfair to make us sit through discovery and respond to written discovery requests to produce witnesses for depositions if the parties seeking that discovery don't even have standing to assert the claims.  Thank you.

THE COURT:  All right.  So I guess I didn't appreciate that issue.  Does anybody oppose staying discovery until the standing issue is decided?

MR. PRIDMORE:  Your Honor, Tim Pridmore for the 2B Entities and Parties.

I would to a point.  We have had several discovery disputes with Mechanics Bank and don't feel we have been given all the documents that we're entitled to.  We are working through with all counsel right now.  We are working through a

protective order that would allow that, but that's a prime example, Your Honor. We don't have all the bank account information and communications between Mechanics Bank and Rabo to allow us, to give us the information to provide whether it be Hudson's claims or the Plaintiffs' claims. We believe we do need information.

And so, Your Honor, at least on behalf of my part, if we wanted to hold off on additional depositions but for outstanding discovery, I think that is entitled. We are entitled to gain and gather that information.

THE COURT: All right. We'll come back to that.

So, Mr. LeBas --

MR. LEAL: Just a brief --

THE COURT: -- you could address something. So I guess there's potentially three buckets of claims, claims that maybe the parties can agree are more likely to be owned by the Trustee just on the face of them as currently pled, those that maybe are clearly or nearly clearly not owned by the Trustee as currently pled, and then maybe the third bucket of the gray area, where at least a couple attorneys here are arguing that until you plead with more specificity, maybe people can't tell whether you are asserting claims that are owned by the Trustee or claims that are not owned by the Trustee.

So where do we do that? If we get to the hearing on the 30th, and let's say I just were to hear just the motion to

intervene and to enforce the automatic stay, the most that I could do, I guess, at that hearing is rule on the claims that are, as pled, clearly owned by the Trustee and make a ruling on those.  Either the Trustee can intervene and control them, or you have to drop them and the Trustee can assert them elsewhere.

And as to the gray area, what do you propose we do with those?  Come back on another hearing on another motion to intervene and enforce after they've been repled if they need to be repled?

MR. LEAL:  No, Your Honor, there's another outcome.  It's a big web.  We believe, as you'll see in our response, and what I'm going to propose is maybe the Court issue a scheduling order, particularly and specifically with regard to the Trustee's motion to intervene.

But the other outcome is that he doesn't own any of them because he lacks standing because Brian McClain -- who was the sole shareholder of all of the Debtors that are of the estate, the bankruptcy estates -- was the one that was actually perpetrating fraudulent activity and conspired with Rabo and others to continue that.  And there's a doctrine that says whenever the entity is involved and conspires in fraudulent activity, the Trustee lacks standing to assert claims on behalf of the creditors.

And what I urge the Court to look at is the Trustee's

motion or the Trustee's complaint against the banks.  And there is an admission that Brian McClain conducted fraudulent activity since at least 2018.  Now, we disagree about whether or not there was a Ponzi scheme, but there definitely was fraudulent activity that's taken place.

And here's how important this issue is.  If you look at the motions to dismiss in that case, particularly Rabo's, you'll see some very strong defenses that Rabo is asserting.  One of them, and I'm from West Texas, I'm from Muleshoe, went to school at Tech.  I'm not sure if I'm going to pronounce this right, but it's *in pari delicto* defense.  And we cite these defenses where they say, you stand in the shoes of the estate.

Can you hear me?  I'm sorry, I think somebody was -- but there are several defenses that are very strong defenses.  There's also a waiver and release that's in there.  They also claim, Rabo claims that actually these claims should be actually transferred to Ohio, I believe.

And so we feel like how important this motion is, is this.  If the Court says for some reason that the Trustee is entitled to pursue the creditors' claims, like we're farmers and ranchers.  I mean, our set of clients have been damaged to the tune of $50 million.  Then they may be dead on arrival because of all the defenses that are being asserted because Brian McClain conducted fraudulent activity for several years.

So the outcome that we are going to ask, and I didn't

mean to get into this because I think it's beyond the current motion, is because the only shareholder involved in the fraudulent activity was Brian McClain, there might have been others, you can't separate the entities and Brian McClain's activities.  He acted as the agent.

And I won't go through all of it, but I will certainly commend HTLF's motion to dismiss in Adversary Proceeding Number 25-2005, which is Docket 24.  And in it he says, or HTLF says, the Trustee, because the damages are directly the victims of the fraudulent activity were our clients, those damages are direct, the Trustee lacks standing. So there's a lot of issues going on there that impact this case and our clients' rights to sue and pursue claims by those that created unlawful actions and that caused our clients' damages.

THE COURT:  So I'm not ruling on the merits on that issue.

MR. LEAL:  Right.

THE COURT:  I'm somewhat familiar with that issue. But setting that one aside, set that issue aside, address the other arguments about the gray area.

MR. LEAL:  I'm not clear about the gray area or what exactly they were talking about, like claims that are gray that may be dismissed on a 12(b) motion or on standing issues?

THE COURT:  As I understood, again, maybe that's just how I'm describing it, the three buckets.  Claims that the

Trustee says are clearly owned by the estate, fraudulent transfer counts, for example.  I'm pretty sure I saw one of those in the state court complaint.  At least he says he owns them.  Other counts for breach of contract, for example, that maybe fall on the other line.

I don't know who was it that used the term "gray area."  Maybe it wasn't Mr. Jobe.  But the argument is that there are certain counts, and I have not -- again, I'm not as familiar with the underlying pleadings yet as you all are.  But the suggestion is, I don't know if it's true or not, but at least the suggestion is as pled, they can't really tell whether you're asserting a claim that would belong to your client or to the Trustee.

And so if there are such claims -- I'm not saying there are, I'm not saying there aren't.

MR. LEAL:  Right.

THE COURT:  But let's go down that decision tree.  If there are counts where you can't really tell whether, just based on the lack of specificity, who owns it, what do we do with those?  Do we --

MR. LEAL:  I think I have an answer.

THE COURT:  All right.

MR. LEAL:  And counsel on my side, y'all need to start looking at these dockets.  But I think there was an order already by Judge Jones that addressed a motion to dismiss on 2B

Farms, I believe it was a 2B Farms complaint. I may be wrong, but there's an order that says that the allegations, which were virtually identical to the ones that we've asserted, were sufficient to survive a motion to dismiss. And I believe, and I may be wrong, but I think there's already an order out there on that issue.

But if there is a question about a pleading defect, we would have to come back and we would be given the right to replead that issue. But I don't think it helps any. And I think the standing issue should be decided first because if the Trustee can intervene and doesn't, because of the issues that we address in our response, then we can move forward. And he doesn't own any of the claims, we can move forward. And if there needs to be more specificity in our pleadings, then we can address that in the motions to dismiss.

To me, that makes sense because you have, obviously, different legal standards. The Court's going to be addressing 12(b) motions, standing. And standing is a threshold issue, right? You either have it or you don't. Forget about the pleadings. If you don't have them, if you don't have standing, you're out. If you do, you do. And so that's why --

THE COURT: You do, right, but that's if they're pled with enough specificity, right? Normally, I don't have both attorneys at the podium. But, Mr. Jobe, can you come back up? As long as you promise not to have fisticuffs up at the podium.

MR. LEAL:  I'll invite him over, Your Honor.  I'm too old to fight.

THE COURT:  Again, I'm playing catch-up with all of you all.  But did I misunderstand your prior argument?  At least one of your arguments is that until the claims are fleshed out, you don't know if they're owned by the Trustee, or am I simplifying it too much?

MR. JOBE:  No, you said it 10 times better than I did, Judge.  We absolutely have a category of claims that we can't tell.  Mr. Johnson alluded to an example, the breach of contract claim.  So there was one or two investors that happened to have an intercreditor agreement with Rabo as to lien priority.  That investor, they are very unhappy with what happened with the money they gave McClain and cattle that McClain was supposed to buy with that money.  They've thrown in a breach of contract of that intercreditor agreement.

As you know, Judge, the standing issue focuses on what is the harm being alleged.  What are you saying happened, and what was the harm?  Who was harmed?  Was it the Debtor, or was it you directly?  That's a great example of a claim that -- well, it's not clear in the claim.  There's not enough specifics to tell.  And applying the 12(b) plausibility standard, it is very implausible that that investor has a legit breach of contract beef with Rabo over a lien priority intercreditor agreement when their actual beef is what happened

with their money through McClain.

THE COURT: All right, well, I don't know. There's different ways to sequence this. Either way, there's potential delay one way or the other.

MR. LEAL: Your Honor, the --

THE COURT: So anyway, final words?

MR. LEAL: Yeah, the last thing I'll say is I think the standing issue that Rabo brought up is in Doc 129 in this case, and it's Section 4, it's Page 25, and it's the same argument relating to what the motion to intervene addresses. But other than that, there is no other that I saw standing issue that is separate and apart from the same one that's addressed there.

But, again, piecemeal in that motion to dismiss, I mean, if you grant whatever the outcome is on the motion to intervene will take care of that section. It doesn't really matter. But to take up the entire motion and have us address different standards and make decisions, I mean, it confuses me now, and it can be very confusing if both of those things are taken up, because if we have to come back, if the Court decides we haven't pled with sufficient specificity, re-plead, then I'll decide the motion to intervene, I mean, I think there's going to have to be a process here.

And that's how come I proposed whatever the judge decides, whatever the Court decides needs to be addressed

first, whether it's the 12(b) motions or the standing motion. What I recommend is just the Court give us a briefing schedule and scheduling order on whatever motions it wants to address first. But I do think there has to be a systematic approach, and you can't -- I recommend it they can't address the motion to intervene and the motions to dismiss all at once.

THE COURT: So what about -- and I'll just tell you the way I'm leaning. I'm leaning towards having a hearing on the 30th on all issues related to standing. It would be the Trustee's motion together with the items in the other motions that clearly relate to the same issue of ownership of the cause of action.

Mr. Jobe, I understand what you're saying about the gray area, or whoever came up with the gray area. Was that --

MR. JOBE: I think that was Mr. Johnson.

THE COURT: Mr. Johnson, all right. I understand, I guess, that concept that until the pleadings are further crystallized, you can't tell who owns what. But I guess for now, the hearing on the 30th would be a hearing based on the current pleadings. If you think they have alleged a cause of action that you own, we would determine that on the 30th, together with any motions by any other party on that same issue.

I think that's -- I understand there's going to be some delay. That might mean coming back and having to have

another round of motions to intervene, because if I decide that some counts belong to the Trustee, some don't, and later we have a hearing on the 12(b) motions to dismiss, and I make you replead some of them, and if you then replead, and then that triggers Mr. Jobe to come again with another motion to intervene, I think that's probably how it's going to have to play out.

I don't have a -- I'm trying to figure out the least bad way to proceed with these issues, and right now the least bad way seems to me to have the preliminary hearing addressing the standing and ownership issues based on the counts as they're currently pled.

MR. LEAL:  Thank you for your thoughtful consideration, Your Honor.  May I be excused?

THE COURT:  Well, hang out.  We're still --

MR. LEAL:  Oh, okay.  I wasn't for sure if anybody else wanted to -- okay, yeah.

THE COURT:  So --

MR. PRIDMORE:  Your Honor, Tim Pridmore for 2B Farms. May I make one possible suggestion to what you're inclined to do?

THE COURT:  Sure.  But before you do that, can somebody remind me, was there a request to stay discovery in any of the motions?  I don't recall that.

MR. LEAL:  There was not.

THE COURT:  Okay.

MS. KLEIN:  There was not, Your Honor.

THE COURT:  All right.  All right, go ahead.

MR. PRIDMORE:  Yes, Your Honor; Mr. Pridmore.

Your Honor, one option -- if you're inclined to hear all standing issues, presently I believe that will take some of the heavy lifting for all the Plaintiff group, but it's still a significant amount left.  Could we respectfully request an additional seven days to respond to those issues instead of this upcoming Tuesday the 17th, move that to the 24th?

THE COURT:  That's fine with me.  Does anybody have a problem with that?

MR. JOBE:  Your Honor, we're not the Movants, but I doubt the Movants would have a problem with that.

THE COURT:  All right.  So --

MR. LEAL:  That would be very helpful.

THE COURT:  -- you requested a scheduling order.  I don't know that we need a scheduling order.

MR. LEAL:  No, just a briefing schedule.  And maybe even -- I don't know if everybody's married to the June 30th hearing, but I mean there's a 53-page motion to intervene that we've been working on responding to, and even 10 days would be more helpful for us.  And maybe a hearing date a week or two after the 30th, maybe in July, would help because of the importance of the issues.

MR. PRIDMORE:  2B Farms would agree with that, Your Honor.

THE COURT:  All right.  So Judge Hale was fond of saying he's happy to let the inmates run the asylum as long as you guys don't go too crazy.  I don't care if you push off the hearing date from the 30th.  So do you want to pick that date now?  Do you all want to confer?

MR. LEAL:  I think it would be --

THE COURT:  I feel like I'm getting up to speed enough that I think I could probably be prepared on the 30th, even if you crammed all the briefing into that.  But if you need more time, if you guys need a few more weeks, I'm fine with that, as well.

MR. LEAL:  We need a few more weeks, Your Honor.  I mean, that was a huge brief that was filed with a lot of issues.  And so it would help just allow us to look at it more deeply, knowing that that's what the Court's going to do right now because we've kind of been working on both flanks on trying to get motions to dismiss drafted, and now we can focus on this response to the Trustee's motion to intervene.

THE COURT:  Okay.

MR. JOBE:  And, Your Honor, I'm sorry.  I thought they were asking for extensions on the motions to dismiss.  To the extent that we're limited to standing issues, we've all cleared the 30th.  We would be open to extensions, the

requested extension, to have that additional week, keep us on track for the 30th.

Again, if we're just limited to standing issues, again, that have been raised since not this last -- or since last summer, we'd like to stay on track for June 30th.  But if that just can't happen, we'll go back to herding all the cats, Judge.  But Judge, getting that June 30th nailed down was not a small feat with all the parties.

MR. LEAL:  We were not even conferred -- we didn't get -- nobody conferred with us on the 30th.  It was just set.

MR. LeBAS:  Your Honor, David LeBas.  Maybe the Court schedule might be a good place to look.  This is going to take certainly the better part of a day, maybe longer.  What would be available on the Court's calendar if it's not the 30th, but not weeks and months after that either?

MR. JOHNSON:  Your Honor, while you're looking, Rabo and my guess is other Defendants joined the Trustee's motion, and, of course, we would like the right to reply to whatever the Plaintiffs file in response.  So let's factor that in, as well.

THE COURT:  Give me a minute.  I'm looking at the calendar trying to figure out my trial week, the week of July 14th.  I don't know that we have any trials going forward in July.  I think we confirmed the other day that we don't, but let me double-check that.

(Pause)

THE COURT:  So we don't have anything set for our trial docket call, so it looks like we don't have any -- famous later words, we don't have any trials going forward the week of July 14th.  That would be a couple weeks out.

MR. LeBAS:  Just guessing here, then, if we set this motion -- standing motions for the 14th, then I'd ask Mr. Leal to discuss, he's taking the lead, on responding to the motions. If we get a deadline on that of, I don't know if you have a calendar in front of you, Abel, but --

MR. LEAL:  I do.  The 15th works on my calendar as far as a hearing date.  Does that sound good to the Court?  And then we can work backwards.

MR. LeBAS:  The 15th is a Tuesday.

MR. LEAL:  Or the 16th?  What's the Court's preference for that week?

THE COURT:  We're going to take a short recess.  I'm going to go back and talk with my team about the things that are set that week and make sure I'm not missing something, but I think we're fairly open on the 14th.  The 21st and 28th are also possibilities.

So while I am looking at my calendar back there, everybody be looking at the week of the 14th.  It looks like Monday, the 21st, is wide open, as is July 28th, other than I have trial docket call on July 28th for any matters that are

going to trial in August.  Anyway, start looking at those calendar days.  I'll take a brief recess, and then I'll be out in a few minutes.

MR. LEAL:  Thank you, Your Honor.

MR. PRIDMORE:  Thank you, Your Honor.

MR. LeBAS:  Your Honor, will the Webex stay live so we can talk among ourselves?

THE COURT:  Yes.  Yes, we'll leave everything on and you can chat.  I'll be out in a few minutes.

THE CLERK:  All rise.

(Recessed at 3:25 p.m./Reconvened at 3:43 p.m.)

THE CLERK:  All rise.

THE COURT:  Thank you.  Please be seated.

By chance, would July 15th, a Tuesday, work?

MR. JOBE:  Your Honor, that's really just about the only day that works.

THE COURT:  Really?

MR. JOBE:  Exactly.

THE COURT:  Okay, we weren't listening --

MR. LEAL:  It was meant to be.

THE COURT:  So I came up with that independently.

MR. JOBE:  No, we've worked it out if you have that date available.  And what we're thinking, Judge, is we're thinking we'll keep the June 30th status conference just to address some other main case issues.  Judge, we'll have this

hearing on the 15th, and then we've agreed on a June 27th or July 9th response and reply date in connection.

MR. LEAL:  June 27th and July 1st.  So, June 27th would be the deadline for our response brief, and then July 1st would be the reply brief.  Is that right, Mike?

MR. JOBE:  No, it's the 9th.

MR. JOHNSON:  No, July 9th.

MR. LEAL:  9th.  I'm sorry, the 9th.  So the 27th --

MR. LeBAS:  I thought we were saying if we moved it to the 15th, our response date would be the 30th.

MR. JOBE:  We came back to the 27th to leave time for the reply and then for the Court to have all the items to digest.  So it's June 27th and July 9th.

THE COURT:  Does that --

MR. LEAL:  Well, the 30th --

MR. LeBAS:  I can live with that.

MR. LEAL:  You would still have --

THE COURT:  Your briefing schedule, you guys can work out.  I don't care what your briefing schedule is.

MR. LEAL:  I mean, if we do the 30th, you still have 10 days if you're going to do the 9th.  So why don't we do the 30th?

MR. JOHNSON:  Well, I'm okay giving you the -- it's really a question for the judge and his staff.  I mean, Your Honor, can we file replies on the 11th for a hearing on the

15th?  If so, then I don't have any problem with them taking it to the 30th.

THE COURT:  That's fine.  I do it all the time. It'll be my weekend homework.

MR. LEAL:  Okay, so we have June 30th and then July 11th for the reply?

MR. JOHNSON:  Yes.

MR. LeBAS:  And then hearing July 15th.

MR. JOBE:  I'm sorry, Judge.  What time did you say for that hearing?

THE COURT:  How about 9:30?

MR. JOBE:  Perfect.  And we'll keep the June 30th, 10 a.m. status conference?

THE COURT:  Yes.  The one thing I'll say about that is one of the reasons I took a break is that I have been trying to figure out when my family's going on vacation.  The calendar is filling up throughout the summer, and the week of July 1st is a potential date where I might be gone.

If we do the status conference in the main case on the 30th, I might let you all know that it's going to be done remotely.  If it turns out that that's the week that I'm going to be out, I could do it from wherever I am if we end up going somewhere.  So with that understanding, that would be fine.

MR. JOBE:  And, Your Honor, this is kind of a semi-related housekeeping matter.  In our bank lawsuit, we

originally had a default scheduling order entered with Judge Jones that had a July 15th docket call.  We weren't sure if that made it onto your calendar or not, but we will be in touch to get that sorted out, also.

THE COURT:  I'm not seeing that.  Trial docket call on the 15th?

MR. JOBE:  Correct, Your Honor.  That was the original default scheduling order entered in that brand new bank lawsuit that we just filed?

THE COURT:  The 25-2005?

MR. JOBE:  Correct.

THE COURT:  Okay.

MR. JOBE:  We intend to get that sorted out, and we're not intending on having that docket call.  I didn't know if you had that possibly set for the 15th, also.

THE COURT:  It doesn't show up on my calendar for the 15th, so it apparently didn't make its way over.

MR. JOBE:  We'll get that addressed and cleaned up, Judge.

MR. LEAL:  And one more housekeeping matter.  So with regard to Rabo's motion to dismiss, I've identified at least -- and if Mike can confirm, I think it's Section 4 of Document Number 129 that they raised the same identical standing argument as raised in the motion to intervene.

And I was having a discussion with HTLF counsel.  If

we can get identified what sections that we need to respond to on the motions to dismiss so we can clear our basis in our response.  I understand I've got Rabo's, but I don't have HTLF's, Mechanics, Goad's.  I don't know the other ones.

MR. MERRIOTT:  You've already responded to HTLF's.

MR. LEAL:  Okay, so Section D, Document 120 is HTLF's, and I don't know the other ones.

THE COURT:  You're just trying to identify all the standing counts that --

MR. LEAL:  That's right, yeah.

THE COURT:  I don't know.  You can do that now or you can do it after the hearing, I guess, if you want to file -- if you all reach an agreement on identifying which of all the counts --

MR. LEAL:  And the motions to dismiss relate to standing?

THE COURT:  Yeah.

MR. LEAL:  We'll do that.

THE COURT:  Do you want to do that and file something sometime before the hearing, so I'll -- I'll be reading everything anyway, but if you all agree on what I should be focusing on, that would be fine, too.

MR. LEAL:  That would be helpful.  Yes, we'll do that, Your Honor.

THE COURT:  All right.  Anything else we can

accomplish today?

MR. JOB:  No, Your Honor.  I think we've got this fixed up.

MR. PRIDMORE:  Your Honor, I may ask -- and Hudson, I think maybe you asked for it, but the status conference on the 30th, do we know what that is about at this time?

MR. JOBE:  That's the status conference in the main case that's been set for 10 a.m.

MR. LEAL:  In the bankruptcy case?

MR. JOBE:  Uh-huh.

MR. JOHNSON:  Your Honor, one more item we talked about --

THE COURT:  Well, before we go to that, was that sufficient information?  I know it's a status conference in the main case.  I don't really know what all Mr. Jobe tends to talk about.  Did you need to know more for purposes of today's hearing?

MR. PRIDMORE:  Well, yes, Your Honor.  I don't think, unless I've missed something, I don't know that we know what that is about.  I think all parties would want to be prepared to respond accordingly or give any advice or counsel on our respective positions on any issues raised.

THE COURT:  Can you give us a 3,000-foot overview of what you want to talk about on the 30th?

MR. JOBE:  Sure, Your Honor.

Judge, in connection with the main case, I think there would be some important key kind of historical items to kind of point out and then kind of map out maybe for the Court where we're going in the future on those. We thought that that made sense given a changing of judge in this case.

I think that today's hearing was a good example of just kind of all the extraneous stuff that we can get into as opposed to just kind of a direct matter. Especially, I think it makes sense to sever off the standing hearing but still have us have another opportunity just for all the parties to visit with Your Honor about just kind of recapping where we are and where we think we will be going in the future.

THE COURT: In the main case or the -- are you going to be talking about the adversaries?

MR. JOBE: The main case, Judge.

THE COURT: Okay. All right.

MR. JOBE: And, Your Honor, we also, at the same time, we were also contacted by Your Honor's staff saying that you also wanted to set a status conference. So we also thought that we were setting that at your request, also.

THE COURT: No. I think you had filed a motion for a status -- you filed a couple of them. You filed one in the lawsuit against the banks, 25-2005. I denied that one without prejudice because for the reasons stated in the order in that adversary. It looked like the parties hadn't really conferred

a whole lot, so I was letting that one kind of bubble on.

You also filed a motion in the main case for a status conference, and I hadn't acted on that yet.  So when I reached out, I was really just letting you know, okay, now I'm ready. I've felt like I'm getting up to speed enough where a status conference will be helpful to me.  So it wasn't that I wanted one.  I was finally acting on your request for a status conference in the main case.  So I didn't have anything extra to talk about unless you did.

MR. JOBE:  Thank you, Your Honor.  That's helpful. We do think that --

THE COURT:  Didn't you file a motion for a status conference in the main case?

MR. JOBE:  Yes.

THE COURT:  Okay.

MR. JOBE:  You're exactly right about all that.  So we do think having just a little bit more discussion than we've had today of kind of the major moving pieces and the players in the main case would be helpful and help us make future hearings, like on the standing hearing, more efficient.

THE COURT:  So when you talk about the direction the main case is going to go, other than the litigation, which is in the adversaries, what are you going to be talking about?

MR. JOBE:  Sure, Your Honor.  It would be specifically the USDA claims that were filed, the discovery

that has previously been ordered and is still kind of ongoing

in connection with the main case on the USDA claims and with

respect to the investors and partners.  And then what we intend

to also possibly look at as far as sub-conning the three cases

and also not getting into what's pending in the adversary

proceedings, just maybe some of like the big ticket items that

we feel like need to get kind of figured out between now and

ultimately kind of closing the case and making a final

distribution.

THE COURT:  All right.  Well, I'll let you know if

that is going to be Webex only.  If I happen to be out that

week, I'll let you know, in which case we'll do it probably by

Webex only as opposed to having you all come to the courtroom.

Because if you come, I'll just be on the screen if I actually

get a vacation.

MR. JOBE:  Thank you, Your Honor.  That's helpful.

THE COURT:  All right.  Anything else for this

afternoon?

MR. JOHNSON:  Yes, Your Honor.  The question of

discovery, while you're considering this issue, I know I raised

it, counsel for Bank raised it, talked a little bit about it.

I wanted your guidance on what you thought should happen there.

THE COURT:  So there's no motion pending.  I'm a

little reluctant to just order a freeze on discovery.  Have you

guys conferred?  I'm a big proponent of face-to-face conferring

on discovery-related issues.  Have you all talked about whether --

MR. LEAL:  No, Your Honor.

THE COURT:  -- it makes sense?

MR. JOHNSON:  Right now, at least as it relates to Rabo, there are no written discovery requests pending and no currently scheduled depositions.  So it's not all that urgent. And I suppose if someone wants to take a deposition, I can have a meet and confer with them and tell them why I don't think that's a good idea.  So maybe that's the way to handle that.

THE COURT:  So, and tell me again, there's no currently scheduled depositions between now and July 15th?

MR. JOHNSON:  That's correct.

THE COURT:  And are there any pending written discovery requests that are not yet responded to that have due dates before July 15th?

MR. JOHNSON:  I believe there's a dispute between 2B and Mechanics Bank.

MR. PRIDMORE:  That is correct.  And Ms. Klein and I, I think we were talking about that, Judge.  We were discussing doing a global confidentiality agreement or something so that different parties are wanting documents to be produced between other parties.  And it would probably behoove everyone if they were to sign off on the confidentiality agreement.  But if not, we would be entering into one with Ms. Klein, with Mechanics

Bank, I believe, in the near future.

And then I believe, Ms. Klein, once that is done, we will get the production we requested.  I believe is correct. Is that right?

MS. KLEIN:  That's correct.

And I think, Your Honor, to your point, we've not conferred because I think our position was we would -- we were intending for this all to go forward on the 30th, but that would have been our preference and that would have obviated any need to stay discovery, since we're looking at a very fast turnaround here.  Going out further, we just didn't want there to be extensive discovery continuing while this very important issue remains to be decided.

Mr. Pridmore is correct.  Once we finalize this protective order, confidentiality agreement, I think we are prepared to produce documents to 2B.  We think it's important, obviously, to the extent that any of these documents are shared with other parties, I mean, they would need to also sign on to that protective order, because we believe these documents are confidential and should be able to be maintained as such.

So that's kind of where we are right now, and we're happy to confer on any additional discovery that may be requested in the interim.  But we believe that it's more appropriate for kind of people to put their swords down for a minute and let's get this decision in the can, and then we can

decide how we want to move forward.

THE COURT:  All right.  Well, I'll just encourage the parties to confer.  If there's reasonable request to pause discovery, if there's a good reason to pause, because you think it would be wasteful pending my decision on who owns what, hopefully you all can reach an agreement on that.

If not, you can -- I'll say this.  I don't always offer this, because the last time I did it, I regretted it.  But if the parties ever get to the stage where you want to tee up a specific discovery motion, if you think it's something that we can resolve with a discovery conference, I sometimes will entertain those in the effort to minimize the fees that are incurred in connection with a written motion and response.  But it's those type of discovery status conferences are most helpful, and they usually are successful when they're, I don't want to say easy, easy to tee up and chat about without extensive briefing behind them.  Does that make sense?

MR. PRIDMORE:  Yes, Your Honor.

THE COURT:  So, in other words, if you all get to a stage where you can't agree on whether there should be discovery pending July 15th, as long as you meet and confer beforehand, I don't mind teeing that up with a request for a discovery status conference as opposed to a formal motion and response.  Does that make sense?

MS. KLEIN:  Yes, Your Honor.  Thank you.  That made

sense, thank you.

MR. PRIDMORE:  Thank you, Your Honor.

THE COURT:  Okay.  It doesn't always work out because sometimes if it's a complicated issue, unless you tell me what we're having a discovery conference about in advance, it's hard for me to prepare.  But if it's a discrete issue like, hey, the thing we're talking about now, we could probably get that resolved without formal motions and responses.  But, again, I do encourage the parties to have face-to-face discussions first.  But I'll offer that if you need a discovery conference, just let us know.

MR. PRIDMORE:  Thank you.

MR. JOHNSON:  And I'm wondering, Your Honor, if you wanted somebody, maybe perhaps Mr. LeBas, to prepare an order just reflecting the new hearing date and the schedule, briefing schedule?

MR. LeBAS:  We can do that unless the court staff handles that matter.  We're not familiar with Your Honor's practices yet.

THE COURT:  My law clerks are busy with some under advisements, so if you guys don't mind putting together that schedule and an order, we would appreciate it.

MR. LeBAS:  We'll circulate something in the next couple of days.

THE COURT:  All right.  Very good.

All right.  Anything else for this afternoon?

MR. JOBE:  No, Your Honor.  Thank you.

UNIDENTIFIED SPEAKER:  No, Your Honor.

THE COURT:  All right.  Well, thank you for your patience with me.  I know things may seem like they've been moving slow on my end.  I can tell you I have been reading a lot.  Not all of it is stuck yet, but I'm slowly playing catch-up.  And hopefully we'll be moving things along soon after we tee up this initial who owns what hearing.  All right?

MR. JOBE:  Thank you, Your Honor.

MS. KLEIN:  Thank you, Your Honor.

THE COURT:  All right.

MR. LeBAS:  Thank you, Your Honor.

THE COURT:  Thank you all.  We'll be in recess.

THE CLERK:  All rise.

(Proceedings adjourned at 4:01 p.m.)

* * * * *

C E R T I F I C A T I O N

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts                    Date:  November 20, 2025