# Rabo's Slides for Oral Argument on Its Motion to Dismiss

## January 21, 2026

## Rabo's Motion to Dismiss the Trustee's Second Amended Complaint

McClain Consolidated Adversary Proceeding
Adversary No. 24-02007

In re McClain/2B Farms Jointly Administered Cases
Case No. 23-20084-swe7

1

# Roadmap for Oral Argument

We respectfully request the Court's permission for Mr. Cannon to argue the "Non-Core Claims" and Mr. Johnson to argue the "Core Claims." Unless the Court directs otherwise, Rabo's oral argument will generally proceed as follows:

1. Background

2. Claims at Issue

3. Grounds for Dismissing Non-Core Claim

4. Grounds for Dismissing Core Claims

5. Conclusion

We are happy to answer the Court's questions at any time.

# Background - Debtors

- The Debtors in the underlying bankruptcy case—McClain Farms, Inc., 7M Cattle Feeders, Inc. and McClain Feedyard, Inc. ("Debtors")—were engaged in the cattle business and were owned and operated by Brian McClain ("Mr. McClain" and, together with Debtors, "McClain").

- Primary business was to acquire and aggregate cattle from numerous sources throughout Kentucky, Texas, Oklahoma, and the Southeast to fulfill purchase orders (Cactus Feeders and Riley Livestock/Friona).

- Acquired cattle would be transported to Debtors' operations in Kentucky or Texas to be acclimated, fed, vaccinated, etc. ("straightened out") and then subsequently delivered to the buyers.

# Background – Rabo

- Rabo was the commercial lender for McClain's multi-state cattle operations.

- The loans are all evidenced and controlled by certain loan and security documents, with the loans being secured by essentially all of McClain's assets, including all of the Debtors' accounts, contract rights, cattle, proceeds, etc.

4

# Background – Rabo

- The lending relationship started in 2018 with a $332,500 loan, and subsequently involved additional loans.

2.       Along with the execution of the MCA, the Borrowers executed and delivered to Rabo (a) that certain Real Estate Term Loan 1 Note, dated May 11, 2018, in the principal amount of $332,500.00, executed by MFY in favor of Rabo, (b) that certain Real Estate Term Loan 2 Note, dated July 24, 2019, in the principal amount of $625,000.00, executed by 7M in favor of Rabo, (c) that certain Real Estate Term Loan 3 Note, dated August 27, 2021, in the principal amount of $1,019,800.00 executed by McClain in favor of Rabo, and (d) that certain Operating Line of Credit 3 Note, dated January 13, 2023, in the principal amount of $54,000,000.00, executed by MFY, MFI and 7M in favor of Rabo. Each Note was accompanied by those certain Facility Sheets, of various dates, by and between the Borrowers and/or Crystal D. McClain ("C. McClain") in favor of Rabo. The Real Estate Term Loan Note 1, Real Estate Term Loan Note 2, Real Estate Term Loan Note 3, Operating Line of Credit 3 Note, and accompanying Facility Sheets are collectively referred to herein as the "Notes."

(Rabo's Proof of Claim (Claim 52) Case 23-20086-7)

5

# Background



# Background

- When Rabo conducted a physical inspection at McClain's Texas facilities in February 2023, investigators found far fewer cattle on the premises than what was being reported to Rabo by McClain on borrowing base reports.

- The response from McClain was that the rest of the cattle were at other locations or were in transit.

- Follow up investigations revealed McClain had fewer than 10,000 cattle in their possession, not the over 70,000 claimed.

7

# Background – Rabo

- McClain was in default under the loans, and Rabo and McClain entered into the Forbearance Agreement.

5.      On or about April 11, 2023, Rabo and the Borrowers entered into that certain *Amended and Restated Forbearance Agreement* as amended by that certain *First Amendment to Amended and Restated Forbearance Agreement,* dated April 12, 2023 (collectively, the "**Forbearance Agreement**") wherein the McClain Defendants acknowledged the various Events of Default under the Loans, and Rabo agreed to forbear from exercising its rights and remedies under the Loan Documents. Also, Chelsea Marie McClain (McClain's wife at the

(Rabo's Proof of Claim (Claim 52) Case 23-20086-7)

8

# Background

- In early April 2023, Rabo insisted that McClain retain a chief restructuring officer (CRO).

- On April 18, 2023, Mr. McClain died by suicide within days of the CRO taking over operations and beginning his financial investigation.

9

# Background – Trust Claims

- In the weeks following Mr. McClain's passing, dozens of individuals/entities filed dealer trust claims with the USDA claiming that they had not been paid for cattle that were purportedly sold to or by McClain.

# Background – Trust Claims

**Cattle Feeding Agreement**

Dated 7/12/2022

This agreement exists to identify the partnership of McClain Feedyard and AJ JACQUES LIVING TRUST whom are involved in a cattle feeding arrangement. The arrangement allows for AJ JACQUES LIVING TRUST to purchase the calves from McClain Feedyard in total. At the time of purchase the cattle have also been contracted for sale, at a pre-determined price, after pounds have been added to the cattle through McClain Feedyard feeding them at McClain Feedyard, Friona, TX. McClain Feedyard fattens the cattle by certain feed and ingredients that McClain Feedyard provides at its expense. McClain Feedyard is also responsible for providing processing, medicine, yardage, and trucking at its expense.

As the fattened cattle are delivered, McClain Feedyard will distribute the profit as follows:

Sales price of fattened cattle

Minus

Cost stated above that McClain Feedyard incurs

Minus

Original cost of calves, returned to AJ JACQUES LIVING TRUST

Equals profit

Profit divided 1/3 McClain Feedyard and 2/3 AJ JACQUES LIVING TRUST

This agreement is for 175 head of steers at a total weight of 103145 lbs at a price of 1.773 per pound. Total cost for this group of cattle is $182,876.09 which AJ JACQUES LIVING TRUST has paid to McClain Feedyard. Sales contract for 1.7238 @ 775.

AJ JACQUES LIVING TRUST

McClain Feedyard

MCCLAIN FEEDYARD INC.
824 MULLINS LANE
BENTON KY. 42025

BILL TO: A.J JACQUES LIVING TRUST DATED APRIL 21,2000 AS AMENDED AND RESTARTED

7/12/2022

| HEAD | SEX | WEIGHT | PRICE/LB | TOTAL COST |
|------|-----|--------|----------|------------|
| 175 | ST | 103145 | 1.773 | $182,876.09 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | $0.00 | |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| 175 | | | | $182,876.09 |

## PROJECTED CLOSE OUT

| | |
|------|------|
| HEAD | 175 |
| COST | 182876.09 |
| BOUGHT WEIGHT | 103145 |
| $ SOLD | 233784.44 |
| SELL WEIGHT | 135625 |
| COST/GAIN | 30856 |
| LBS GAINED | 32480 |
| PROFIT | 20052.35 SPLIT |

# Background



# Background – USDA Report

- The USDA engaged in a six-month-long investigation, analyzing Debtors' operations and the dealer trust claims.

- On June 9, 2023, with update on October 12, 2023, the USDA issued its *Investigative Report Synopsis* (the "USDA Report").
  - $122,295,867.46 in total trust claims filed
  - $2,930,940.33 were preliminarily deemed "valid"
  - $119,364,927.13 were preliminarily deemed "invalid"
  - The proceeds from the liquidation of Debtors' cattle inventory (plus other funds) provided $2,645,850.14 in potential "Trust Assets"

13

# Background – USDA Report



# Background – USDA Report

The USDA Report describes invalid claims as follows:

"Claims received from companies and individuals that had unsatisfied livestock feeding arrangements after purchasing livestock in total from McClain with either written or verbal promise of future sale gains equated to $119,364,927.13 of the trust claims received by USDA . . . These claims were alleged not subject to dealer trust provisions. USDA investigators discerned that the invalid claims were not timely, and/or were part of livestock feeding arrangements comprised of both feeding contracts and/or a fraudulent livestock financial scheme as purported, all of which were not defined as dealer activity subject to the trust." (USDA Report at 4-6.)

# Background – Bankruptcy and Discovery

- In May 2023, the Debtors filed their Chapter 7 Bankruptcy cases (the "McClain Bankruptcy").

- The discovery and investigations over the following months, started to shed light on the business operations of McClain.

- Thousands of communications, bank records, and other documents were produced and reviewed.

- The financial records obtained reveal that it was commonplace for Debtors to send the "profit" payments to investors *on the same day* as they received the investment.

- Remarkably (i.e., unbelievably) the partnerships obtained the exact "projected profits" for every single lot of calves allegedly "grown" and then "sold" under the agreements.

16

# Background



# Background

As alleged by the Trustee in his original Complaint against Rabo, the demise of McClain's Ponzi scheme occurred when:

(i) Rabo performed onsite inspections and confirmed that the reported head of cattle on hand grossly exceeded actual cattle on hand;

(ii) Rabo then insisted that McClain hire an independent CRO; and

(iii) McClain's passing on April 18, 2023, within days of the CRO beginning his financial investigation.

18

# Background – Bankruptcy Claims

- In the McClain Bankruptcy, Rabo has asserted a Claim for approximately $53 million.

- The approximately 100 investors have asserted Claims in the McClain Bankruptcy for over $100 million.

  – The amount of each investor's Claim generally coincides with the amount of the respective dealer trust claim.

19

# Background – Claims/Injuries



# Background – Trustee v. Investors

- The Trustee initiated an Adversary Proceeding against approximately 100 investors (and a few other parties), wherein the Trustee asserts claims for preference, fraudulent transfer, disallowance, subordination, etc. (Adv. 25-02003.)

- The Trustee alleges in that case that the "Debtors were running a Ponzi scheme" and that the Debtors' cash activity was also a massive check kiting scheme.

- The alleged preferential transfers to these parties exceeds $250 million.

- The alleged fraudulent transfers exceed $750 million. Trustee seeks

# Background – Adversary Proceedings



# Trustee v. Rabo and Banks – SAC

1.  Knowing Participation in Breach of Fiduciary Duties (Count I)

2.  Breach of Fiduciary Duty (Count II)

3.  Civil Conspiracy (Count III)

4.  Professional Negligence (Count IV)

5.  Extent, Validity, and Priority of Lien (Count VI)

6.  Avoidance of DACA (Count VII)

7.  Preferential Payments (Count VIII)

8.  Fraudulent Transfer (Count IX)

9.  Disallowance of Claim (Count X)

10. Money Had and Received (Count XI)

11. Equitable Subordination (Count XII)

# General Grounds for Dismissal
## Non-Core Claims

1.  Debtors' Release of Claims
2.  Forum Selection Clause
3.  *In Pari Delicto*
4.  No Proximate Cause of Damages
5.  No Knowledge or Knowing Participation
6.  Do Duties or Breach
7.  Other Pleading Deficiencies

# Controlling Agreements

- The Court can and should consider the written agreements as part of the SAC and MTD, and the Trustee does not argue otherwise.

# Controlling Agreements

## Forbearance Agreement Release

- <u>Release and Waiver of Claims.</u>  THE LOAN PARTIES, JOINTLY AND SEVERALLY, BOTH FOR THEMSELVES AND FOR ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER THEM, HEREBY WAIVE, RELEASE AND FULLY DISCHARGE RAF, AND RAF'S PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS, ATTORNEYS, EMPLOYEES AND REPRESENTATIVES (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS, LIABILITIES, CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS, EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT ANY OF THEM HAVE OR MAY HAVE OR CLAIM AGAINST THE RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE CLOSING DATE, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY TO THE LOANS, THE LOAN DOCUMENTS, THE RABO COLLATERAL, THE RAF INDEBTEDNESS, OR THE NEGOTIATIONS RELATING TO THIS AMENDMENT AND THE OTHER DOCUMENTS EXECUTED IN CONNECTION WITH THIS AMENDMENT OR THE FORBEARANCE AGREEMENT AND ANY OTHER INSTRUMENTS AND AGREEMENTS EXECUTED BY ANY LOAN PARTY IN CONNECTION WITH EITHER THE LOAN DOCUMENTS, THE FORBEARANCE AGREEMENT OR THIS AMENDMENT, OR ANY OTHER ACT OR OMISSION THAT HAS OCCURRED PRIOR TO THE CLOSING DATE, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION. (App. 211.)

# Controlling Agreements
## Forbearance Agreement Release

- The broad, clear, and unambiguous release covers all known and unknown claims from the beginning of time until April 12, 2023—a date after all of Rabo's alleged conduct purportedly supporting the Trustee's claims.

- "[A] trustee receives causes of action subject to [any] defenses that could have been raised against the debtor" pre-petition. *Reed v. City of Arlington*, 650 F.3d 571, 575 (5th Cir. 2011).

- Because the Trustee is bound by the Debtors' pre-petition release and waiver, his state law claims as alleged in the SAC necessarily fail.

# Controlling Agreements
## Forbearance Agreement Release

- The Trustee's only argument in response to the release is that he has asserted a claim in the SAC to avoid the forbearance agreement, and that the claim is not time barred because it relates back to the date of the original, timely complaint.

- The Trustee's argument fails, and the claim is untimely as a matter of law.

28

# Controlling Agreements
## Forbearance Agreement Release

- When the two-year limitation period for Section 546(a) claims has run, a subsequently filed claim could relate back to a timely filed original complaint *only* if the limitation period is equitably tolled. *See , e.g., In re United Ins. Management, Inc.*, 14 F.3d 1380, 1385 (9th Cir. 1994).

- A statute of limitations should only be equitably tolled where a party "remains in ignorance of [a wrong] without any fault or want of diligence or care on his part[.]" *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991) (cleaned up).

29

# Controlling Agreements
## Forbearance Agreement Release

- The Trustee makes no attempt to argue or demonstrate that equitable tolling should apply, which is unsurprising given the following:

  - The Forbearance Agreement was specifically addressed in Rabo's Proof of Claim filed on September 13, 2023 (more than a year and a half before the Section 546(a) deadline)

  - The Forbearance Agreement was produced to the Trustee and other parties in the Bankruptcy Cases no later than September 27, 2024 (more than six months before the deadline)

30

# Controlling Agreements

## Forum Selection

- **41.**     <u>**JURISDICTION AND VENUE**</u>  GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF THE BENEFICIARY, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA. GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE. (MSAs, App. 53, 100-01 & 127.)

- The Master Credit Agreement also contains an express jurisdiction and venue provision for Iowa. (MCA, App. 17.)

31

# Controlling Agreements
## Forum Selection

- The US Supreme Court has instructed that "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause" and "[o]nly under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied." *Atl. Marine Const. Co., Inc. v. U.S. Dist. C. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013).

- The party acting in violation of the forum-selection clause "must bear the burden of showing that public-interest factors *overwhelmingly* disfavor a transfer." *Id.* at 62 (emphasis added.)

32

# Controlling Agreements
## Forum Selection

- In an attempt to meet his heavy burden, the Trustee primarily points to *In re Schouten* and the "centralization" policy.

- *In re Schouten* is unpersuasive for numerous.

  - Forum selection clauses at issue are in stark contrast.
  - The Trustee's claim against Rabo is not "*the* major potential asset in [this] case." *Schouten* at 535; *see Trustee v. Investors*, Adv. 25-02003. Furthermore, Rabo is a creditor owed over $50 million.

33

# Controlling Agreements
## Forum Selection

- With respect to non-core claims, the centralization policy "is lessened if not entirely absent." *CapRock Milling*, 2024 WL 4582903, at *6.

- Because Congress has rendered bankruptcy courts' jurisdiction over non-core claims original, but not exclusive, the public policy favoring the enforcement of contracts wins out over the centralization policy. *See* 28 U.S.C. § 1334(b); *see also CapRock Milling*, at *6 (citing cases in accord).

# Controlling Agreements

## Forum Selection

- Trustee's other arguments are likewise unpersuasive.
  - The Trustee's "overlapping claims" and "party convenience" arguments go to the "parties' interest" factor that is outside the scope of proper consideration as the parties have already repeatedly identified the exclusive venue in their agreements.
  - In any event, if the investors had cognizable claims, they could only assert claims for direct injury to them and not for injuries derivative of Debtors' injuries.
  - As to the potential recovery to creditors, the Trustee has failed to explain why litigating the claims in the venue expressly agreed to by Debtors would limit that potential recovery.

  The Trustee has failed to meet his burden.

35

# *In Pari Delicto*

- The defense of *in pari delicto* can and should be addressed now, and the defense dictates dismissal of the Trustee's non-core claims.

- "[T]he application of affirmative defenses such as *in pari delicto* may [still] be determined at the pleading stage on a motion to dismiss"—so long as that determination can be made based "on the face of the complaint." *Brickley ex rel. CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 840 (Bankr. W.D. Tex. 2017); *see also Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986) ("Although dismissal under Rule 12(b)(6) is ordinarily determined by whether the facts alleged in the complaint, if true, give rise to a cause of action, a claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings.").

- The Trustee's SAC is founded on the alleged fraudulent scheme.

# *In Pari Delicto*

- Public policy exception does not apply.

- The Trustee steps into the shoes of the Debtors "as of the commencement of the case" and is subject to any defense that could have been raised in response to a claim by the Debtors. *See Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 967 (5th Cir. 2012) (citing cases).

- The argument that bankruptcy trustees are "innocent part[ies] seeking recovery" on behalf of "innocent creditors" is unreasonable because that would mean that *in pari delicto* can never be a defense to claims brought by a trustee standing in a debtor's shoes.

37

# *In Pari Delicto*

- The Trustee can not avoid application of the *in pari delicto* defense by arguing that Mr. McClain operated the scheme *through* Debtors.

- "A principal is liable for the fraudulent acts and misrepresentations of its authorized agent . . . ." *Koesler v. Beneficial Fin. I, Inc.*, 267 F. Supp. 3d 873, 887 (W.D. Tex. 2016) (cleaned up). This is so regardless of whether the principal had "knowledge of the fraud," "consent[ed] to it," or "derive[d] a benefit from it." *Id.* Where a company's agents are engaged in fraud, the company too is deemed "*in pari delicto* in the scheme through the acts of its agents." *See Rogers v. McDorman*, 521 F.3d 381, 395 (5th Cir. 2008).

# No Proximate Cause of Damages

- Rabo lending money to its borrowers, who then improperly and in breach of the loan agreements use some of that money to pay certain investors instead of purchasing or caring for cattle, does not damage the borrowers or make Rabo the "proximate cause" of claims by the investors. *Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 293 (Iowa 2001) (holding that the harm that befell the borrower came about from the acts of the manager, and the lender was not obligated to protect the company against his misfeasesance).

- The Trustee also ignores that the $170 million in alleged damages includes the $50 million that Rabo loaned to Debtors and is owed to Rabo. (SAC ¶¶ 140, 158, 167.)

# Knowing Participation in Breach of Fiduciary Duty

Three elements:

 (1) the existence of a fiduciary relationship;

 (2) that the third party knew of the fiduciary relationship; and

 (3) that the third party was aware that it was participating in the breach of that fiduciary relationship.

*Terry v. Texas Partners Bank (In re Chris Pettit & Assocs., P.C.)*, 2025 WL 1583366, at *5 (Bankr. W.D. Tex. June 4, 2025) (quoting *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)).

# Knowing Participation in Breach of Fiduciary Duty

- A knowing participation claim requires "*actual* awareness, at the time of the conduct." *7X Cattle Co. v. Brandstadt*, No. 6:22-CV-396-JDK-KNM, 2025 WL 852624, at *13 (E.D. Tex. Feb. 28, 2025) (cleaned up), *report and recommendation adopted* 2025 WL 848446 (E.D. Tex. Mar. 18, 2025).

- "Courts have made clear that a less culpable mental state, such as constructive knowledge, will not suffice." *Id*.

- Knowing means knowing.

41

# Knowing Participation in Breach of Fiduciary Duty

- "[A] knowing-participation claim is premised on the defendant's contribution to a breach of fiduciary duty and must involve the knowing participation in such breach." *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 574 (N.D. Tex. 2024).

  – While the Trustee's allegations claim that Rabo's failure to act sooner facilitated McClain's fraud, the SAC falls short of alleging facts that Rabo acted knowingly and affirmatively to "participat[e] in the breach" of fiduciary duty. *In re Chris Pettit*, 670 B.R. at 625.

# Knowing Participation in Breach of Fiduciary Duty

- The claim also fails because "[k]nowing participation in breach of fiduciary duty is a derivative claim." *7X Cattle Co.*, 2025 WL 852624, at *13.

  - Trustee required "to state a separate underlying claim"—i.e., for breach of fiduciary duty by McClain—"on which the court may grant relief." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007).

43

# Fiduciary Duty

- General rule is that there is no fiduciary duty in the lender-borrower relationship.

  - *Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 293 (Iowa 2001)

  - *Houle v. Casillas*, 594 S.W.3d 524 (Tex. Ct. App. 2019) (stating that a fiduciary relationship does not exist in an ordinary lender-borrower relationship)

  - *Jones v. Thompson*, 338 S.W.3d 573, 583 (Tex. Ct. App. 2010) (recognizing that "no fiduciary relationship exists between a lender and a borrower")

44

# Fiduciary Duty

- Trustee's reliance on the "excessive control" exception is belied by his own allegations and is otherwise misplaced.

- The case *Beaumont Lamar Apartments, LLC v. Wallis Bank*, cited by the Trustee, *supports* dismissal of the claim. Civil No. 4:23-cv-00341, 2024 WL 455343 (N.D. Tex. Feb. 6, 2024).

- The bank in *Beaumont* was alleged to have: inserted itself in project phasing decisions; directly interfered with business decisions; required and directed borrower to obtain a bond from the entity who operated as both the third-party inspection and trust funds manager; directed payments for third-parties to the bank and wrongfully kept a portion of the funds; assumed the role of the broker in addition to lender; interjected itself into plaintiff's business in ways that expert witness testified far exceeded normal bank activity; requested changes to construction and construction plans; etc.

- Here, there are no such allegations of excessive control.

45

# Conspiracy

- The Trustee's reliance on the underlying tort of "breach of fiduciary duty" is fatal to his conspiracy claim given that he has failed to allege a cognizable claim for breach of fiduciary duty, including no allegations evidencing that a duty existed.

46

# Conspiracy

- Furthermore, the SAC is devoid of allegations supporting a meeting of the minds on the object and unlawful overt acts.

- The Trustee's continued reliance on the following is simply insufficient:

- "That McClain, Rabo, CFSB, HTLF, and Mechanics conspired together to further the scheme is evident from the fact that four separate, sophisticated banks and lenders for years ignored countless red flags, massive overdrafts, and exploding debts when McClain's business models should have generated substantial profits and excess cash."

# Conspiracy

- The absence of allegations supporting a conspiracy (or any intentional tort) is wholly unsurprising given the fraudulent scheme in question and the fact that Rabo's inspections and insistence on a CRO being appointed brought Debtors' fraudulent scheme to an end.

# Negligence

- Rabo's relationship with Debtors is governed by the negotiated loan documents and Rabo owed no duty supporting this claim.

  *Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 293 (Iowa 2001)

# Negligence

- The Trustee's reliance on *Strobach* and the Texas UCC are misplaced.

- *Strobach* cannot be read to establish an ordinary duty of care giving rise to a common law negligence claim against a lender. *See Benchellal v. Okonite Co., Inc.*, No. 4:22-CV-4435, 2024 WL 1057475, at *7 (S.D. Tex. Mar. 11, 2024) (explaining that § 3.406 is not "a general-purpose negligence statute").

- Further, the UCC provisions the Trustee cites relate to bank deposit and collection practices. Rabo is a lender, not a bank.

50

# Negligence

- The claim is also barred by the economic loss doctrine. *In re Chris Pettit & Assocs., P.C.*, 2025 WL 1583366, at \*12 (Bankr. W.D. Tex. June 4, 2025)

# Trustee's Core Claims

1. Extent, Validity, and Priority of Lien (Count VI)

2. Avoidance of DACA (Count VII)

3. Preferential Payments (Count VIII)

4. Fraudulent Transfer (Count IX)

5. Disallowance of Claim (Count X)

6. Money Had and Received (Count XI)

7. Equitable Subordination (Count XII)

# Grounds for Dismissal
## Core Claims

- A fatal flaw underlying the Trustee's core claims is the Trustee's failure to account for Rabo's undisputed (1) lender-borrower relationship with Debtors and (2) security interest in Debtors' assets.

# Grounds for Dismissal
# Rabo's Security Interest

- The MSA provided Rabo with a security interest in "Collateral" including (among many other forms and types of property) all of the Debtors' "accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, and deposit accounts…[and] all proceeds, products, rents and profits of any Collateral . . . ." (MSA, App. 145.)

- In other words, *any and all proceeds* the Debtors received in connection with accounts, a contract, from payment intangibles or any other Debtor asset were and are part of Rabo's Collateral.

- That would include funds Debtors received from investors under their contracts.  Thus, any payments made to Rabo were necessarily from funds that already constituted Rabo's collateral irrespective of the DACA.

54

# Grounds for Dismissal
# Rabo's Security Interest

- The money alleged to be in the Debtors' bank accounts and from which payments were made to Rabo appears to have come from three sources:

    (1) loans from Rabo;

    (2) legitimate sales of cattle; and

    (3) "investments" from parties with whom one of the Debtors entered into a contract—written or verbal.

- The Trustee does not specify any other source of funds in his SAC or Opposition, and Rabo is not aware of any other.

55

# Grounds for Dismissal
# Rabo's Security Interest

- Because Rabo was only transferred funds in which it had a valid security interest—funds which could not now be used to pay the Debtors' general creditors—the Trustee's preference and fraudulent transfer claims fail.

- The claim for declaratory relief regarding Rabo's lien also fails.

- His claim to avoid the DACA fails as moot because, even without the DACA, Rabo's lien attached to all of the Debtors' assets and any funds paid to Rabo were proceeds of the Debtors' assets.

- The Trustee's claim to disallow Rabo's claim also fails, as Rabo is not the "transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of [the Bankruptcy Code][.]" 11 U.S.C. § 502(d).

56

# Fraudulent Transfer

- Under both Section 548 of the Bankruptcy Code and state fraudulent transfer laws, "value" includes (but is not limited to) the satisfaction of an existing or antecedent debt. *See* 11 U.S.C. § 548(d)(2)(A); Tex. Bus. & Comm. Code § 24.004(a).

- Every time a payment was made on the loan, the Debtors partially satisfied their contractual obligations to Rabo.

# Fraudulent Transfer

- While transfers to an investor "in furtherance of" a Ponzi scheme may be presumed to have been made with actual intent to hinder delay or defraud, the transfers made to Rabo were not "in furtherance of" the Ponzi scheme because Rabo was not an investor. *See Perkins v. Haines,* 661 F.3d 623, 626 (11th Cir. 2011).

- Rabo was the Debtors' secured lender, not an investor. *See, e.g., Finn v. Alliance Bank*, 860 N.W.2d 638, 644-53 (Minn. 2015) (Ponzi presumption could not be used to support fraudulent transfer claims against banks and financial institutions who were not investors in the scheme).

# Fraudulent Transfer

- *In re Hedged-Investments Associates* is instructive.

- Noting that the bright line rule that § 547(c)(2) is never applicable in the case of a Ponzi scheme "developed solely from precedent which does not support it" and further finding no basis for the rule in the "legislative history[,]" the Tenth Circuit held that "none of the provisions of § 547(c)(2) preclude its application to transfers made to noninvestor-creditors in the ordinary course of business and according to ordinary business terms…Again, the purposes of § 547(c)(2) are to leave undisturbed normal financial relations…and to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." (475-76.)

# Equitable Subordination

- The Fifth Circuit has repeatedly made clear that it "typically only applies equitable subordination in three types of cases: (1) when a fiduciary of the debtor misuses the relationship to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *Matter of Life Partners Holdings, Incorporated*, 926 F.3d 103, 122 (5th Cir. 2019) (citing *Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 357 (5th Cir. 1997)).

- S*ee also Matter of U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994) and *Holt v. FDIC (In re CTS Truss, Inc.)*, 868 F.2d 146, 14849 (5th Cir. 1989) (each limiting equitable subordination to the same "three general paradigms").

# Disallowance

- Plaintiff's disallowance claim similarly ignores the commercial lender-borrower relationship at issue and attempts to lump Rabo in with the investors in Debtors' Ponzi scheme.

- Plaintiff's reliance on Section 502(d) for disallowing Rabo's claim is misplaced because this claim is dependent upon Plaintiff's preference and fraudulent transfer claims. Plaintiff has failed to assert plausible preference and fraudulent transfer claims against Rabo, so there is simply no basis to disallow Rabo's proofs of claim.

# Conclusion

- The SAC fails to assert any cognizable claims against Rabo
- Written agreements dictate dismissal of the claims
- *In pari delicto* bars the claims
- No proximate cause – damages
- No allegations demonstrating knowledge or knowing participation
- No allegations supporting duties or breach
- Core claims generally fail due to Rabo's security interest and lending relationship
- SAC should be dismissed with prejudice