# Hearing on Rabo's & HTLF's MTDs the Trustee's Complaint

Alan Dabdoub

Special Counsel to the Trustee

January 21, 2026

1

# Plausible Allegations Suffice

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"

- Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully."

- Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009)

2

# Greater pleading liberality in adversary complaints brought by trustees

Bankruptcy courts have afforded greater pleading liberality in adversary complaints brought by trustees, because a trustee comes to the action as a "third party outsider to the fraudulent transaction, that must plead fraud on second-hand knowledge for the benefit of the estate and all of its creditors" . . . . The "relaxed Rule 9(b) standard" . . . applie[s] here because the Plaintiff is a liquidation trustee who has the difficult chore of pleading fraud based on knowledge obtained from documents and other second-hand sources.



In re Nat'l Realty Inv. Advisors, LLC, 2025 WL 3779086, (Bankr. D.N.J. Dec. 31, 2025)

3

# This Court Is The Proper Forum

- Rabo seeks to enforce a forum selection clause in the Debtors' Loan Agreements, placing venue in Iowa.

- Court must consider relevant "public interest factors."

- Public Interest Factors:

    1. Administrative difficulties flowing from court congestion

    2. Local courts for local disputes

    3. Court at home with applicable law

    4. *Centralizing bankruptcy proceedings*

    5. *Strong presumption of maintaining adversary proceedings where the main case is pending*

    6. *Creditors' interests in light of limited estate funds*

    7. *Trustee's duties and circumstance / associated litigation cost*



4

*In re Schouten*, 657 B.R. 531 (N.D.T.X. Bankr. 2024)

# This Court Is The Proper Forum



- *In re Schouten* involves <u>non-core</u> claims, not core claims

- Nevertheless, Judge Jones did not enforce forum selection clause

This proceeding falls squarely within the policy of centralizing all proceedings in the court where the case is pending. It is a chapter 7 liquidation case with an appointed trustee who is obligated to administer *541 the estate assets as expeditiously as possible for the benefit of creditors of the bankruptcy estate. The Trustee has thirty-plus creditors with filed claims aggregating over $58 million. (The Trustee said that there is duplication of claims that would cause the total amount of claims to be around $30 million.)

As with most chapter 7 cases, the messy aspects of the case are foisted on the trustee. Lawsuits are expensive; the Trustee has no readily available funds to cover the additional expenses of a trial in Illinois. For the Trustee, trial is far simpler in Amarillo, Texas than in Chicago, Illinois. The GEA defendants recognized the primacy of the bankruptcy here by invoking it to gain federal court jurisdiction.

5

# This Court Is The Proper Forum



- *In re Schouten* involves <u>non-core</u> claims, not core claims

- Nevertheless, Judge Jones did not enforce forum selection clause

In deciding whether to transfer venue of a bankruptcy-related proceeding, the Court considers as paramount the economical and efficient administration of the bankruptcy estate. *See In re Commonwealth Oil Ref. Co.*, 596 F.2d 1239, 1247 (5th Cir. 1979). This case and this proceeding bring to the forefront the public policy and public interest factors that are critically important in bankruptcy. The Court cannot conceive of a stronger statement of public policy and public interests than Congress's enactment of "uniform Laws on the subject of [b]ankruptcies," U.S. CONST. art. I, § 8, cl. 4, in the form of the United States Bankruptcy Code and the accompanying rules and supporting statutory scheme that regulate all aspects of a bankruptcy case and the variety of proceedings that can arise in a bankruptcy case. This lawsuit, though labeled a non-core proceeding, is *the* asset of the bankruptcy estate that might generate some recovery for its creditors. This goes to the heart of the administration of this case. The Court concludes that such considerations present the very set of circumstances that outweigh the deference accorded the forum selection clause at issue here. The motion to transfer venue will be denied.

6

# This Court Is The Proper Forum

- **This is not a chapter 11 case with a confirmed plan.** *Cf.* <u>In re Manchester, Inc.</u>, 417 B.R. 377 (2009) (policy of centralizing bankruptcy litigation weakened after confirmed chapter 11 plan).

- **This is akin to a core matter; the Trustee's claims against Rabo are core matters vis-à-vis their nature as counterclaims against Rabo's proofs of claim.** *See In re Welded Constr., L.P., 609 B.R. 101, 124 (Bankr. D. Del. 2019).*

> 17  As the Court discussed above, the causes of action that Welded alleges against Transco are core matters vis-à-vis their nature as counterclaims against Transco's proofs of claim. 28 U.S.C. § 157(b)(2)(C). So, too, are Welded's objections to Transco's proofs of claim. 28 U.S.C. § 157(b)(2)(B). To the extent Williams Partners and Williams Co. are joined as co-defendants, and regarding the cause of action alleged only against Williams Partners and Williams Co. for tortious interference with contractual relationships, those actions are non-core, related to matters. 28 U.S.C. § 157(c)(1); *TTS, Inc. v. Stackfleth (Matter of Total Tech. Servs. Inc.),* 142 B.R. 96, 99 (Bankr. D. Del. 1992) ("A proceeding is 'related' if 'the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.' ") (quoting *Pacor, Inc., v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984)). Thus, because the Court finds that Welded's claims against Transco are core matters, the forum selection clause found in the Contract between Welded and Transco is unenforceable in this proceeding as to Debtor's claims against Transco.



*In re Welded Constr., L.P.,* 609 B.R. 101, 124 (Bankr. D. Del. 2019)

7

"The issues presented in the adversary proceeding will necessarily have to be resolved as part of the claims resolution process and will ultimately have an impact on the Debtor's estate and its creditors. *Policies favoring centralization of bankruptcy matters along with judicial efficiency overwhelm in this circumstance.*"

In re Welded Constr., L.P., 609 B.R. 101, 124 (Bankr. D. Del. 2019)

8

(2) Core proceedings include, but are not limited to--

. . .

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) *counterclaims by the estate against persons filing claims against the estate;*

28 U.S.C. § 157

9

# Rabo's "Release" Should Be Avoided

- Rabo argues the Debtors' released all state law claims against Rabo in an April 12, 2023 Forbearance Agreement

- Forbearance Agreement should be avoided as preferential and fraudulent transfer

- Elements:

  1. Obligation incurred by the Debtors

  2. Within 90 days / 2 years of the Petition Date

  3. Debtors received less than reasonably equivalent value

  4. Debtors were insolvent

- All elements easily apply to the "Release"



10

In re Schouten, 657 B.R. 531 (N.D.T.X. Bankr. 2024)

# *In Pari Delicto* Does Not Mandate Dismissal

- All defendants have argued *in pari delicto* bars the Trustee's suit

- Nearly all Texas bankruptcy courts that have recently considered this question have held to the contrary

- In re Chris Pettitt & Associates, P.C., 670 B.R. 602 (W.D.T.X. Bankr. 2025)

- In re Vantage Benefits Administrators, Inc., No. 18-31351-SGJ-7, 2024 WL 3842796 (Bankr. N.D. Tex. Aug. 14, 2024)

- Janvey v. Adams * Reese, LLP (N.D. Tex. 2013)

- In re Today's Destiny, Inc., 388 B.R. 737 (S.D. Tex. 2008)

In fact, there is no summary evidence that allowing the Trustee to pursue his tort claims against the Matrix Defendants would benefit the wrongdoers here, such as evidence that Vantage's equity holders – the Richies – would receive any of the recoveries the Trustee may realize on his tort claims. Under *Lewis*, a court must answer the "question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other." In this Adversary Proceeding, the bankruptcy court can easily conclude, based on the summary judgment evidence, that barring the Trustee's tort claims against the Matrix Defendants based on their *in pari delicto* defense would *not* outweigh the overall policy of not inflicting additional harm on the innocent victims of the Richies' fraudulent scheme (here, the creditors of the Vantage bankruptcy estate). Thus, there is no disputed fact issue here that would need to be determined at trial, as part of a *Lewis* policy analysis. The bankruptcy court not only recommends denial of the Matrix Defendants' summary judgment on their affirmative defense of *in pari delicto* with respect to the Trustee's tort claims, but also recommends granting summary judgment on this issue in favor of the Trustee. Although the Trustee did not file a cross-motion for summary judgment, the court may enter summary judgment against the movant even if the nonmovant did not file a cross-motion. See *U.S. Cellular Corp. v. City of Wichita Falls, Texas*, 364 F.3d 250, 255 n.6 (5th Cir. 2004) ("[A] district court may grant summary judgment against a movant even if the non-movant has not filed a cross-motion.") (citing *Benchmark*, 343 F.3d at 730; *Landry v. G.B.A.*, 762 F.2d 462, 464 (5th Cir. 1985)).

In re Vantage Benefits Administrators, Inc., 2024 WL 3842796, at *38 (Bankr. N.D. Tex. Aug. 14, 2024)

11

# Rabo's Argument Iowa Law Applies Is Waived

- Rabo argues for the first time in its reply brief that Iowa law applies.

- Rabo waived its choice of law argument for Rule 12(b)(6) purposes by failing to raise it in its Motion to Dismiss or Brief in Support.

- Even if Iowa law applied, *in pari delicto* does not doom the Trustee's complaint.

> **"Some courts consider application of [*in pari delicto*] discretionary, refusing to apply it even when the parties are in pari delicto if, in a particular case, the court believes the public interest is best served by awarding relief to the wrongdoer."**
>
> Gen. Car & Truck Leasing Sys., Inc. v. Lane & Waterman, 557 N.W.2d 274, 279 (Iowa 1996)

12

# The Trustee's State-Law Claims Alleged Proximate Causation

- Rabo argues the Debtors' failed to allege Rabo caused the Debtors' damages (Br. at 19)

- Rabo's other pleadings reveal the folly in Rabo's argument

- Rabo elsewhere argued the Debtors' creditors' injuries "flow from the Debtors' inability and failure to 'repay' [investors] for funds/investments provided to Debtors."

- Trustee's claims assert Rabo depleted the Debtor's assets by tortiously extending credit despite the obvious fraud

**II.  PLAINTIFFS LACK THE CAPACITY TO ASSERT THEIR CLAIMS BECAUSE THE CLAIMS ARE GROUNDED IN PLAINTIFFS' INJURIES STEMMING FROM THE DEPLETION OF DEBTORS' ASSETS.**

Plaintiffs' claims are derivative—stemming from the depletion of Debtors' assets—as evidenced by the face of Plaintiffs' Complaint and the documents in the Appendix, and as further evidenced by the allegations in the Trustee's Complaint against the same Defendants.

**A.    Plaintiffs' Injuries Flow from Debtors' Inability and Failure to "Repay" Plaintiffs for Funds (Investments) Provided Shortly Before Debtors' Downfall.**

_ECF No. 187 (Rabo's Response to P&I's Capacity/Claim Ownership_

138.    Defendants' breaches of their fiduciary duties inflicted several hundred million dollars of losses on Debtors. But for Defendants' check kiting—and Rabo's unrestrained loan extensions and line of credit increases to Debtors to fund resulting overdrafts— McClain's years-long Ponzi scheme would have collapsed sooner, saving Debtors and their creditors substantial sums in misappropriated funds. To be sure, Lawson testified that Rabo could have, but did not, stop McClain's fraud in its tracks. And Lawson's colleague, Stockett, testified they did not because they did not want to derail the paper profits they were booking from their loans to Debtors.

139.    And such damages to Debtors and their creditors were a foreseeable consequence of Defendants' kiting and loans in connection with McClain's Ponzi scheme.

_Second Amended Complaint_

13

# "Knowing Participation" Rule 9(b) Does Not Apply

## III. Aiding and Abetting Breach of Fiduciary Duty.

A claim of aiding and abetting breach of fiduciary is similar to a claim of aiding and abetting fraud but requires an additional element: "that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2002) (citations omitted). The heightened pleading standard of Rule 9(b) "generally does not apply to the state law claims of ... aiding and abetting breach of fiduciary duty." *In re NorVergence, Inc.*, 405 B.R. at 746 (citing *In re Inacom Corp.*, 2001 WL 1819987, at *2 (D. Del. Aug. 7, 2001)).



In re Nat'l Realty Inv. Advisors, LLC, 2025 WL 3779086, (Bankr. D.N.J. Dec. 31, 2025)

14

# The Trustee Sufficiently Pleaded "Knowing Participation"

*9  Next, the Court must consider whether the pleadings provide enough information for the Court to infer substantial assistance in the fraud. The following factors are used to determine whether conduct is substantial assistance: "(1) the amount of assistance given by the defendant, (2) [its] presence or absence at the time of the tort, (3) [its] relation to the other [party], and (4) [its] state of mind." *Monson*, 579 F.2d at 800. It has been recognized that a bank providing "essential banking services that allowed the Ponzi scheme to continue over a period of time" is sufficient to establish substantial assistance at the pleading stage if the bank knew these services were aiding the customer in committing fraud. *Mansor v. JPMorgan Chase Bank, N.A.*, 183 F.Supp.3d 250, 268-69 (D. Mass. 2016) ("[T]he factual allegations surrounding [the bank employee's] lifting of the [account] restraints is sufficient to establish substantial assistance.") (citation omitted). Whether the Bank employees' actions can be imputed to the Bank is a question of fact to be resolved upon further development of the record. *Mansor*, 183 F.Supp.3d at 269.

As set forth in the previous section, the Plaintiff alleges that there were points in the relationship when the Bank gave NRIA's accounts special scrutiny. The Bank had access to the PPMs, Pre-Fund LLC operating agreements, and account activity. [ECF No. 1, ¶ 256]. With this information, it is reasonable to infer that the Bank learned that NRIA was moving funds from one entity to another in violation of its duties to its Investors. Also, the Plaintiff has plead that the Bank may have been aware of NRIA's breach of

*10  The Plaintiff has also plead that the Bank substantially assisted or encouraged NRIA's breach of fiduciary duty. The allegations regarding the Bank's substantial assistance of NRIA's fraud, as described above, also demonstrates the Bank's substantial assistance of NRIA's breach of fiduciary duty. For these reasons, the Plaintiff sufficiently pled aiding and abetting breach of fiduciary duty. Count III will not be dismissed.

15

In re Nat'l Realty Inv. Advisors, LLC, 2025 WL 3779086, (Bankr. D.N.J. Dec. 31, 2025)

# Knowledge of Check Kite By 2022

68.     Rabo approved extensions of Debtors' line of credit despite internal misgivings. In 2020, Rabo listed the Debtors as a "Client of Key Concern" because the Debtors' financial projections "seem[ed] too good to be true." Worse, Rabo sidelined the credit manager who had consistently voiced concerns about the Debtors, with Lawson (the Debtors' relationship manager) "making sure [the resistant credit manager] doesn't try to get on the credit committee and kill it there." Other evidence from Rabo's internal communications reflect Rabo turning a blind eye to the Debtors' ongoing Ponzi scheme:

   a)    Disbelief at the Debtors' ability to fund cattle feed ("I still can't grasp how he feeds all that cattle, and his feed costs are $5 [million] through 6 months")[9];

   b)    Concern over the Debtors' cash flow ("I think Brian [the Debtors] is in more cash trouble than we think . . .");

16

# Knowledge of Check Kite By 2022

100.    Simultaneously with Rabo's rapidly increasing loans to the Debtors, Rabo knew that the Debtors were making hundreds of intercompany transfers that served no apparent legitimate purpose, and which are a readily identified as suspect transactions by any commercial bank, including through software designed to identify and flag such transactions. Indeed, the Debtors' appeared on Mechanics' check kite report on a near daily basis. Per Lawson, Rabo knew the Debtors were "robb[ing] Peter to pay Paul" such that Rabo "ha[d] no idea who owes who and how much."

101.    In October of 2022, the Debtors' overdrafts had reached the point where Dunn told Lawson that "[m]aybe wires were received and then used to cover other checks that had been written [but] never did come in. I think Brian is in more cash trouble than we think." Stated differently, Rabo indisputably knew the Debtors had become mired in an inescapable check kiting and Ponzi scheme thanks to Rabo's funding.

17

# Rabo calls Mechanics in 2022 to discuss the suspected check kiting and fraud

103.    Notwithstanding Rabo's failure to take corrective action, Lawson testified that Rabo had an obligation to notify Mechanics about the Debtors' check kiting. Lawson further testified that, between October and December of 2022, he had multiple discussions with Jamie Rabatin ("Rabatin") and other Mechanics personnel about the Debtors' suspected check kiting and fraudulent activity.

18

# The Trustee Sufficiently Pleaded "Knowing Participation"

72.    It was only after it was ordered by its parent to do heed the risks that Rabo delved into the Debtors' operations with more than a fleeting drive-by. Only then did Rabo inspect the collateral for the Debtors' supersized line of credit (though the collateral inspectors claimed to have done so annually starting before the loan was granted). That inspection substantiated the pre-lending concerns raised internally by Rabo employees opposed to loaning the Debtors money. Rabo's belated investigation further revealed that the Debtors had been giving Rabo false reports about the number of cattle allegedly held by them. Despite the Debtors' claims that they possessed approximately 80,000 head of cattle, Rabo's too little, too late collateral inspection revealed that only *8,000* cattle were present at the Debtors' facilities in Texas. Rabo's inspection also revealed the cattle in these facilities were subject to claims of third parties and not subject to Rabo's security interest.

110.    When Rabo finally deemed its exposure to Debtors to outweigh the potential profits, Rabo actually audited the Debtors' operation on or around February 28, 2023. Rabo's audit revealed that the Debtors had 72,000 **_less_** cattle on hand than what was being represented to Rabo. Instead of the reported 80,000 cattle, the Debtors had just 8,000 on hand.

19

# Rabo Continued With The Scheme

111.     Following Rabo's 2023 inspection, Stockkett circulated an internal recommendation that Rabo write off a majority of Debtors' loan balance and foreclose on the security agreement given the obvious fraud. Yet, despite the undeniable fraud at this point in time, Stockkett faced intense push back from some senior analysts and/or customer relationship team members, challenging her judgment. Ultimately, though, sanity finally prevailed. In a March 9, 2023, email chain, Frank Oliver, a top Rabo North America executive, conceded that the Debtors were involved in a check kiting fraud. The individuals copied on that email chain included Chris Olson, Rabo's second-in-command for North America. But it took Rabo over five weeks to stop the movement of funds through the Debtors' depository accounts at CFSB and Mechanics Bank following the audit.

20

# The Trustee Sufficiently Pleaded "Knowing Participation" from when the loan was initially approved in 2018

61. . . . Within two to three weeks, however, the entire credit line had already been consumed, and the Debtors were again overdrawing their accounts daily and requesting more financing. In response, at least one diligent Rabo employee attempted to pump the breaks on the relationship, noting McClain "appears to operate his business from day to day without prior planning" and suggesting "this whole app needs to come back to the loan committee for a review of the entire credit" because she was "concerned that Brian's business has grown significantly " and he did not appear capable of managing it. Nevertheless, she granted a temporary credit increase . . . .

21

# The Trustee Sufficiently Pleaded "Knowing Participation"

68. Rabo approved extensions of Debtors' line of credit despite internal misgivings . . . .

c)    Fear that the Debtors were not being forthright about who actually owned the cattle ("*He is now changing his story on customer cattle.*")

22

# The Trustee Sufficiently Pleaded "Knowing Participation"

68. Rabo approved extensions of Debtors' line of credit despite internal misgivings . . . .

d) Worry that Rabo had not conducted a cattle headcount in years ("*It has come to my attention that a full headcount/inspection has not been done for over 4 yrs.*");

e) Uncertainty about the Debtors' accounting of the cattle in the Debtors' possession ("*[I]f the cattle were sold, where is the money? If they bought new cattle, where are they?*")

23

# The Trustee Sufficiently Pleaded "Knowing Participation"

- Rabo initially denied the loan due to "high information risk."

- Rabo reverses course, acknowledging McClain would need a lot of coaching to ensure health of loan.

- Rabo does not count the cattle for years, despite the purported headcount exceeding feedyard capacity by the tens of thousands.

- Rabo recognized the inherit implausibility of McClain's growing debt in spite of his purported guaranteed cash profits: "Where is the money? Where is the cattle?"

24

# The Trustee Sufficiently Pleaded "Knowing Participation"

- The Trustee's allegations give rise to reasonable inference Rabo knew of the schemes:

  1. Rabo initially denied the Debtors credit application

  2. Denial based, in part, on "HIGH INFORMATION RISK":

     1. Debtors misidentified their lenders/banks

     2. McClain gave contrary statements about feed invoices

     3. No documentation explaining numerous intercompany transfers

     4. Books and records kept by hand and not available for review

     5. Debtors' bookkeeper admitted books never set up properly

     6. McClain's and bookkeeper's books did not reconcile and not even sufficiently balanced to obtain trial balance

56.     Prior to making a final determination on whether to extend the loan, Rabo sent Michelle Stockett, a collateral inspector, to the Debtors' Texas location to inspect the operation. Stockett's pre-funding collateral report noted McClain had initially said one bank was financing the Texas operations, but onsite Rabo learned it was really a different bank that McClain had just switched to that was financing the operations. It noted many other irregularities too. For instance, McClain had said Friona pays monthly for feed, as it is billed, but onsite McClain said he never invoices Friona; there was no documentation explaining the rationale for any of the many intercompany transfers; McClain kept all books and records by hand, but the books were also not available for review; the Debtors' bookkeeper admitted the financial accounting had never been set up properly; and McClain's and his bookkeeper's two sets of books did not reconcile and were not sufficiently balanced to even obtain a trial balance, among other things. Stockett thus concluded in her report that the Debtors' application presented a "high information risk" and that McClain would "need extensive coaching for several months" by the customer relationship team to become a viable borrowing candidate.

25

# The Trustee Sufficiently Pleaded "Knowing Participation"

- The Trustee's allegations give rise to reasonable inference Rabo knew of the schemes:

  o Rabo's CRM, Chip Lawson, had not originated a loan in "a while"

  o Legitimate fear he would lose his job

  o Reacted angrily to anyone expressing negative sentiment

  o Worked with others internally to overcome denial despite no improvement in Debtors' records

> 57.    Upon receiving the report, Lawson exclaimed in an email rant to his colleague, Jason Dunn, that he would quit if the loan was denied and that Dunn should call McClain to tell him "to be damn sure to have all his numbers correct at month end." Others within Rabo, however, reacted quite differently, noting the report listed "many red flags" that were "concerning," while others suggested Rabo did not even understand the basics of the deal and the Debtors' operations, such that the loan application should never have been submitted in the first place. All of this email chatter only further enraged Lawson, who told Dunn that he would just deny the Debtors application because he did not "have the energy to fuck with it any further . . . Between me and you, I'm about done with new cattle deals. Too much trouble and stressful."

26

# The Trustee Sufficiently Pleaded "Knowing Participation"

- The Trustee's allegations give rise to reasonable inference Rabo knew of the schemes:

  - Rabo's CRM, Chip Lawson, had not originated a loan in "a while"

  - Legitimate fear he would lose his job

  - Reacted angrily to anyone expressing negative sentiment

  - Worked with others internally to overcome denial despite no improvement in Debtors' records

> 59.    Upon learning the news, Lawson expressed anger toward those who officially rejected the application, dismissing one manager's suggestion that there was "too much information risk and in 6 months [Rabo] would have a problem" as speculative fortune telling, rhetorically asking if she would place a $1,000 bet with him since she could see the future. And in a separate email, Lawson remarked that the denial of the Debtors' application seemed irreconcilable with Rabo's CEO's recent message that in 2018, Rabo "will keep moving forward with [its] plans to grow the business." Lawson and Dunn then began working feverishly to reverse that rejection of Debtors' application, with Lawson declaring "Credit has gone far too long simply saying no without discussion on what can be done to bring a deal to an approvable status."

27

# The Trustee Sufficiently Pleaded a "Breach of Fiduciary Duty" Claim

- Rabo argues the Trustee failed to plead Rabo owed the Debtors fiduciary duties.

- Rabo was not a typical lender but one which exercised excessive control:

  - **Rabo forced McClain to resign from managing his own, solely owned business.**

- Coupled with the Trustee's allegations that Rabo knew of the fraud, the Trustee has alleged Rabo tortiously continued to extend the Debtors credit when they were not creditworthy.

28

# Trustee Sufficiently Pleads Excessive Control

106.    In early 2023, the Debtors still did not have a CFO, and, in Lawson's own words, "the cattle count was huge." Lawson asked McClain about what prompted the seemingly "infinite growth" in the Debtors' operation. Lawson also told McClain that he needed to "slow the growth down." Despite that resounding alarm bell, Rabo, at Lawson's request if not insistence, inexplicably lent the Debtors an additional $4.5 million to cover existing overdrafts in Debtors' depository accounts.

29

# Trustee Sufficiently Pleads Excessive Control

132.    Rabo exercised "excessive lender control" over Debtors by virtue of the leverage it obtained by consolidating its security interest over Debtors' property by paying off and consolidating old debt into its own credit facilities with Debtors by no later than 2021, such that it was for all intents and purposes, the Debtors' sole lender. As each of Rabo's loans with the Debtors were cross-defaulted and cross-collateralized, Rabo could have foreclosed on its security interests, thereby ending Debtors' business. To leave no doubt as to Rabo's control over Debtors, Rabo exercised its power to control Debtors when it compelled McClain to execute forbearance agreements shortly before the Petition Date, to grant purported releases to Rabo for all claims (other than Chapter 5 and other bankruptcy claims), and force McClain to turn management of the three companies he founded and managed for over a decade over to Rabo's handpicked successor. Lawson even admitted in his deposition that Rabo

Page 53

was controlling Debtors and McClain. Rabo's excessive control over Debtors, beginning by no later than 2021, gave rise to fiduciary duties owed by Rabo to Debtors. *See Wil-Raye Inv. Co. II v. Washington Mut. Bank, F/A*, 142 S.W.3d 393, 410 (Tex. App.—El Paso 2004, no pet.); *Martinez v. Capital One*, Civil Action No. H-22-2767, 2022 WL 17085938, at *4 (S.D. Tex. Nov. 18, 2022).

154.

the amended forbearance agreement signed just days before the Petition Date. **_Eleventh_**, McClain, at Rabo's direction, retained an external CPA firm to prepare quarterly and annual consolidated financials to give the financials an air of legitimacy, even though the preamble to each reflected various deviations from generally accepted accounting principles and neither Rabo nor Mechanics nor CFSB cared to scrutinize them with any care or diligence.

30

# Trustee Sufficiently Pleads Damages

138.    Defendants' breaches of their fiduciary duties inflicted several hundred million dollars of losses on Debtors. But for Defendants' check kiting—and Rabo's unrestrained loan extensions and

Page 55

line of credit increases to Debtors to fund resulting overdrafts— McClain's years-long Ponzi scheme would have collapsed sooner, saving Debtors and their creditors substantial sums in misappropriated funds. To be sure, Lawson testified that Rabo could have, but did not, stop McClain's fraud in its tracks. And Lawson's colleague, Stockett, testified they did not because they did not want to derail the paper profits they were booking from their loans to Debtors.

# Trustee Sufficiently Pleads Damages

140.    The Trustee quantifies Debtors' damages from Defendants' breaches of their fiduciary duties as exceeding $170 million, and that figure may increase as the Trustee gathers more information about the Debtors' operations. As explained above, more than 100 claimants have asserted claims exceeding $120 million for: (1) allegedly unpaid amounts for Cattle Purchases; (2) cattle that were dropped off for Feed Yard Services and sold without returns to their owners; (3) unpaid Partnership Agreement investments; and (4) other miscellaneous transactions.

# Trustee Sufficiently Pleads Damages

113.    Finally, Lawson testified under oath that Mechanics Bank and Rabo could—and should—have caught McClain's fraud before he ran up $70 million in loans from Rabo. According to Lawson, if Rabo and Mechanics Bank had done their jobs and caught McClain's fraud, his Ponzi scheme would have been far less damaging to the creditors that lost huge sums of money because of CFSB, HTLF, Mechanics Bank, and Rabo's lawless conduct.

33

# Rabo Proximately Caused Damages

- Rabo contends the Complaint does not sufficiently plead Rabo proximately caused the Debtors' damages.

- The Trustee contends Rabo's extensions of credit despite Rabo's knowledge of the schemes caused the Debtors to incur tens of millions of dollars in additional debt by perpetuating the Ponzi scheme by giving McClain access to cash he would not have otherwise had.

- Other courts have found such claims at least plausible.

Its contention that the Complaint does not sufficiently plead damages proximately caused by such breach is belied by the Complaint's allegations, which the Court finds plausible, that the dividends . . . And Tops' related incurrence of debt . . . "rendered Tops insolvent at the time of each of the dividends and led Tops to file for bankruptcy, leaving the Company's creditors with over $1 billion in losses."

In re Tops Holding II Corp., 646 B.R. 617, 714 (Bankr. S.D.N.Y. 2022)

34

# The Trustee Sufficiently Pleaded a "Civil Conspiracy" Claim

- Rabo argues the Trustee failed to meet heightened pleading standards of Rule 9(b).

- Rule 9(b) does not apply, as the conspiracy claim is based on a breach of fiduciary duty, not fraud.

- Rabo directed Mechanics and CFSB as to whether to honor checks despite the Debtors' insufficient funds, using its credit extensions to the Debtors as a backstop, is alone sufficient to establish a conspiracy.

- The intentional participation in the conspiracy is further evidenced by four sophisticated banks ignoring an obvious, "too good to be true" fraudulent enterprise, for years without even a hiccup.

35

# The DACA Should Be Avoided

- Rabo argues it has a perfected, secured "all assets" lien on the Debtors' property.

- Rabo's DACA is a preferential and fraudulent transfer and should be avoided.

- If the DACA is avoided, Rabo's loan is not secured, as it did not have a perfected security interest in Debtors' cash accounts.

36

# Trustee's Avoidance Claims Are Valid

- Rabo argues the Trustee's avoidance claims fail to state a claim on which relief can be granted.

- The Trustee alleged Rabo received numerous transfers from the Debtors within the preference and fraudulent transfer periods for less than reasonably equivalent value.

- Trustee has alleged the Debtors operated a Ponzi-scheme and were therefore always insolvent.

- Trustee does not have to anticipate all potential defenses Rabo might raise (e.g., new value defense). *Schulte v. Wood*, 47 F.3d 1427 (5th Cir. 1995)

- "Ordinary course" defense fails since the Debtors operated a Ponzi scheme. *In re Ramirez Rodriguez*, 209 B.R. 424 (Bankr. S.D. Tex. 1997)

- Don't need to allege specific fraudulent intent because alleged a Ponzi scheme.

37

# The Ponzi Scheme Presumption Applies

- Rabo's argues the Ponzi scheme presumption does not apply to itself, as a lender.

- But Rabo's cases apply the presumption.

PEARLMAN . . . would use the financing that he obtained to make payments on other bank loans or to investors who were victims of his other Ponzi scheme . . . . The Court thus finds it at least plausible that Pearlman's loan repayments to Integra kept credit flowing and stabilized Pearlman's fraudulent house of cards perhaps a bit longer.

In re Pearlman, 440 B.R. 569, 576 (Bankr. M.D. Fla. 2010), aff'd, 478 B.R. 448 (M.D. Fla. 2012)

38

# The Ponzi Scheme Presumption Applies

- Other courts have likewise applied the Ponzi scheme presumption to lenders.

Here, the Plaintiff alleges that the fraudulent transfers . . . to the Bank include banking and management fees . . . . The Plaintiff states that these transfers of fees . . . were made in furtherance of the Ponzi scheme. Because it is alleged . . . that the fees paid to the Bank were in furtherance of the Ponzi scheme, the Ponzi scheme presumption applies.

In re Nat'l Realty Inv. Advisors, LLC, 2025 WL 3779033, (Bankr. D.N.J. Dec. 31, 2025)

Upon a review of plaintiffs' complaint, the Court can hardly fathom a pleading that could make the charges any clearer. The bank's request is based on the heightened pleading requirements of Rule 9 for fraud charges. *But Ponzi and kiting schemes—this very action—allow for a presumption of fraud.*

ECF No. 92 (citing *Sec. & Exch. Comm'n. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013); *In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *9 (Bankr. N.D. Tex. July 13, 2022).

# Trustee's Equitable Subordination Claim Is Valid

- Rabo argues the Trustee's equitable subordination claim fails on multiple grounds.

- Rabo is wrong on all accounts:

    o Rabo claims the Trustee does not argue it would be unfairly advantaged without subordination because it also lost $50 million. But the Court cannot take Rabo's factual assertions as true at this stage.

    o The Trustee plainly alleged if Rabo's lien is not subordinated, all other creditors will be disadvantaged, as Rabo will receive almost all, if not every single penny, of any estate funds ultimately distributed.

    o The Trustee's allegations against Rabo include breaches of fiduciary duties and exercising control over the Debtors to the disadvantage of other creditors. Both allegations allow for subordination.

41

# Rabo's Relation-Back Argument is Barred

- Rabo raises argument in reply that Trustee's avoidance claims don't relate back to the Original Complaint and are therefore time barred.

- Rabo's argument is improperly raised in a reply. Since Rabo did not raise in its Motion to Dismiss, it waived the argument.

- Rabo's argument also fails on the merits:

  - FRCP 15(a): Claims arising out of the same conduct, occurrence, or transaction timely pleaded relate back to the original complaint. *See, e.g.*, Ultraflo Corp. v. Pelican Tank Parts, Inc., 926 F. Supp. 2d 935 (S.D. Tex. 2013)

  - *In re Texas E&P Operating, Inc.* (N.D. Tex. 2023): Transfers newly identified in amended complaint relate back to original complaint because the original complaint adequately identified the course of conduct from which the transfers arose and signaled an ongoing investigation.

42

# The Starting Line:
# Pre-Signed, Fill-In-The-Blank Checks

- HTLF seeks to characterize its transactions with the Debtors as "not an illegitimate action" but rather "regular bank activity"

- This was ***not*** regular banking activity.

- The Debtors were not customers of HTLF. But HTLF held pre-signed, fill-in-the-blank checks made out on the Debtors' accounts.

- HTLF filled in the blanks at the Debtors' direction.

- HTLF deposited these checks into its own customers' accounts and immediately granted full credit against them despite not being presented for payment.

- HTLF wired all or nearly all of the money right back to the Debtors.

- That is not only irregular; there is no plausibly legitimate reason to do this over and over and over again.

43

# The Trustee Owns His Claims

- HTLF moved to dismiss the Plaintiff-Intervenor and 2B fraudulent transfer claims because they belong to Trustee.

- Those claims include, among others, transfers that led to creditors having claims against the Debtors.

- No different that what is asserted in Trustee's state-law claims: HTLF perpetuated and extended the scheme, leading to Debtors incurring debts they otherwise could not have incurred.

**HTLF'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AND INTERVENORS' ORIGINAL FEDERAL COMPLAINT AS TO HTLF**

27.    Plaintiffs explicitly seek to assert fraudulent transfer claims under the Texas Uniform Fraudulent Transfer Act as to transfers from McClain to Defendants. Such claims are the property of the McClain Estates. *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983). Plaintiffs therefore lack standing to assert such claims and fail to state a claim for which relief can be granted to Plaintiffs. Further, as to Plaintiffs, the Court lacks jurisdiction over such claims because of the lack of standing, warranting dismissal under Rule 12(b)(1). Count Four should therefore be dismissed as to HTLF.

44

# The Trustee Owns His Claims

- HTLF's tortious actions enabled McClain to extend and grow his schemes.

- This caused Debtors to suffer increasing debts and pay more and more phantom profits to investors than they otherwise could have.

- These are direct injuries to the Debtors.

- Even HTLF agrees!

Its contention that the Complaint does not sufficiently plead damages proximately caused by such breach is belied by the Complaint's allegations, which the Court finds plausible, that the dividends . . . And Tops' related incurrence of debt . . . "rendered Tops insolvent at the time of each of the dividends and led Tops to file for bankruptcy, leaving the Company's creditors with over $1 billion in losses."

In re Tops Holding II Corp., 646 B.R. 617, 714 (Bankr. S.D.N.Y. 2022)

45

# Renaming *In Pari Delicto* "Vicarious Liability" Does Not Revive the Defense

- HTLF argues the Trustee's claims fail because the Debtors' injuries were self-inflicted.

- HTLF's argument is simply a re-named *in pari delicto* defense.

- *In pari delicto* defense does not warrant dismissal at the 12(b)(6) stage according to nearly all bankruptcy courts to consider it under Texas law.

46

# IPD Fails At 12(b)

- The Fifth Circuit has never decided whether the *in pari delicto* defense can be asserted against claims made by a bankruptcy trustee.

- Judge Jernigan predicts the Fifth Circuit will join other circuits and hold the *in pari delicto* defense can be asserted where applicable.

- But, that is only the beginning of the analysis; the Court must then determine how the defense applies in the facts and circumstances of the case.

[E]ven if the fraud . . . of the Richies would be imputed to Vantage, the Trustee is an innocent party seeking recovery from the Matrix Defendants that will benefit innocent creditors . . . . In fact, there is no summary evidence that allowing the Trustee to pursue his tort claims . . . would benefit the wrongdoers here, such as evidence that Vantage's equity holders – the Richies – would receive any of the recoveries the Trustee may realize on his tort claims. Under *Lewis*, a court must answer the "question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other." . . . the bankruptcy court can easily conclude . . . that barring the Trustee's tort claims against the Matrix Defendants based on their *in pari delicto* defense would **_not_** outweigh the overall policy of not inflicting additional harm on the innocent victims of the Richies' fraudulent scheme (here, the creditors of the Vantage bankruptcy estate) . . . . The bankruptcy court . . . recommends granting summary judgment on this issue in favor of the Trustee.

47

*In re Vantage Benefits Administrators, Inc.,* 2024 WL 3842796 (Bankr. N.D. Tex. Aug. 14, 2024)

# HTLF's "No Knowledge" Defense Belied By Facts

- HTLF argues the Trustee's knowing participation claim fails because the Trustee did not allege HTLF had actual knowledge of the scheme.

- Trustee's allegations give rise to **_reasonable inference_** HTLF had actual knowledge.

- Trustee's allegations detail the extreme departure HTLF took from normal banking practices.

- HTLF employees acted as McClain's agent, holding blank, signed checks from the Debtors.

- HTLF wrote and deposited the Debtors' checks worth millions of dollars into investor accounts without supporting documentation and immediately wired most of it back to the Debtors without awaiting the checks to clear. **_Why not just have Debtors keep the money in the first place?_**

- The only possible reason anyone would need someone else's bank to write and deposit checks into their customers' account only to wire it back immediately is fraud.

48

# Trustee Sufficiently Pleads HTLF's Knowing Participation in the Ponzi Scheme

of all of those funds right back to the Debtors on the very same day or the day after.

79.    More specifically, HTLF housed the bank accounts of prominent investors (Bo Robinson and 2B Farms) who entrusted the Debtors with many millions of dollars. To facilitate McClain's Ponzi scheme, HTLF banker Shawn Ragland ("**Ragland**") accepted delivery of pre-signed blank checks from the Debtors that would be drawn on the Debtors' accounts at Mechanics. When

the Debtors' investors who housed their accounts at HTLF presented claims for payment, Ragland or his assistant, Rebecca Fernandez ("**Fernandez**") would undertake the following steps for the Debtors:

a)    Accept delivery of a falsified cattle statement directly from the Debtors that purportedly reflected cattle sales and profits earned on behalf of the Debtors' investors who banked at HTLF.

b)    Fill out the Debtors' pre-signed blank Mechanics Bank checks for the amounts owed to the Debtors' investors who banked at HTLF.

c)    Deposit those kited checks into the investors' accounts at HTLF without the required endorsements by the investors.

d)    Grant the investors immediate credit for those payments before the associated funds arrived via wire transfer from the Debtors' accounts at Mechanics Bank.

e)    Wire funds out of the investors' HTLF accounts to the Debtors' Mechanics Bank account before incoming funds from Mechanics Bank had cleared.

49

# HTLF's "No Knowledge" Defense Belied By Facts

- While partaking in the most irregular, pre-signed, fill-in-the-blank check kiting scheme, HTLF also knew the transactions were increasing exponentially in frequency and volume.

  - 2018: $4.6 million in payments

  - 2019: $9.8 million in payments

  - 2020: $10.6 million in payments

  - 2021: $16.125 million in payments

  - *2022: $94 million in payments*

  - *Jan. 1 – Apr. 4, 2023: $129.7 million in payments*



50

# HTLF's Knowledge

- Active participation in a fill-in-the-blank, cyclical check kite loop

- Knowledge of unrealistic payments for purportedly fattening calves:

  - By January 2023, the Debtors were purportedly flipping $1.5 million in cattle *per day* for just 2B Farms

  - 12 months earlier, $2.5 million was the total cattle flipped *per month.*

  - 4 years earlier, that was *half* the total cattle flipped *per year* for 2B.

**2018**

| | | | |
|---|---|---|---|
| 01/23/18 | 2546 | 2B FARMS | 301,541.78 |
| 02/01/18 | 2583 | 2B FARMS | 369,464.17 |
| 02/27/18 | 2649 | 2B FARMS | 288,151.39 |
| 03/20/18 | 2728 | 2B FARMS | 413,467.09 |
| 04/12/18 | 2827 | 2B FARMS | 88,570.49 |
| 04/25/18 | 2857 | 2B FARMS | 367,253.48 |
| 05/01/18 | 2878 | 2B FARMS | 276,379.11 |
| 06/08/18 | 21217 | 2B FARMS | 245,101.01 |
| 06/18/18 | 2996 | 2B FARMS | 265,860.84 |
| 07/02/18 | 3043 | 2B FARMS | 150,445.93 |
| 07/25/18 | 2997 | 2B FARMS | 237,746.54 |
| 10/17/18 | 21897 | 2B FARMS | 404,977.48 |
| 10/23/18 | 21926 | 2B FARMS | 503,004.31 |
| 11/08/18 | 22042 | 2B FARMS | 307,981.90 |
| 12/03/18 | 22180 | 2B FARMS | 18,901.17 |
| 12/03/18 | 22179 | 2B FARMS | 237,239.96 |
| 12/21/18 | 22280 | 2B FARMS | 128,206.25 |

**2022**

| | | | |
|---|---|---|---|
| 01/13/22 | 1697 | 2B FARMS | 1,091,005.49 |
| 01/13/22 | 1699 | TERRY BO ROBINSON - 2B FARM | 1,096,547.04 |
| 01/21/22 | 1700 | 2B FARMS | 425,850.72 |

**2023**

| | | | |
|---|---|---|---|
| 01/03/23 | 4259 | 2B FARMS | 1,482,798.49 |
| 01/04/23 | 4260 | 2B FARMS | 1,494,867.25 |
| 01/05/23 | 4261 | 2B FARMS | 1,484,312.50 |
| 01/06/23 | 4262 | 2B FARMS | 1,489,800.51 |
| 01/09/23 | 4263 | 2B FARMS | 1,537,184.04 |
| 01/10/23 | 4264 | 2B FARMS | 1,484,851.42 |
| 01/11/23 | 4265 | 2B FARMS | 1,363,653.43 |
| 01/12/23 | 4551 | 2B FARMS | 1,537,779.47 |
| 01/13/23 | 4552 | 2B FARMS | 1,483,325.84 |
| 01/17/23 | 4553 | 2B FARMS | 1,493,325.12 |
| 01/18/23 | 4554 | 2B FARMS | 1,540,395.78 |
| 01/19/23 | 4556 | 2B FARMS | 1,484,177.88 |
| 01/20/23 | 4557 | 2B FARMS | 1,493,105.54 |
| 01/24/23 | 4692 | 2B FARMS | 1,492,120.95 |
| 01/25/23 | 4693 | 2B FARMS | 1,483,715.41 |
| 01/26/23 | 4694 | 2B FARMS | 1,493,11?.?? |
| 01/27/23 | 4696 | 2B FARMS | 1,541,023.59 |
| 01/30/23 | 4697 | 2B FARMS | 1,484,703.12 |
| 01/31/23 | 4698 | 2B FARMS | 1,492,354.34 |

51

# Trustee Sufficiently Pleads Causation and Damages

82.      In summary, HTLF controlled pre-signed blank checks that it received directly from the Debtors; acted as Debtors' agent by completing and then kiting the blank checks; kited those checks by depositing them into and immediately crediting investor accounts absent endorsements before Debtors' bank(s) paid the checks; and loaned the Debtors significant sums of cash, in some cases in the millions of dollars, by wiring the unpaid float back to Debtors. Without this assistance from HTLF, the Debtors' Ponzi scheme would have collapsed earlier than it did. HTLF was therefore an essential component of and conspirator in the Debtors' massive and long-running Ponzi scheme.

83.      Like Rabo, it appears HTLF viewed its own profits as more important than innocent parties' principal. The only reasonable explanation for why a sophisticated bank and its employees would engage in inherently suspect transactions over and over again is that it was making money each time. Here, on information and belief, HTLF would loan Bo Robinson and/or 2B Farms money to

52

# HTLF Was An Agent of the Debtors

- HTLF admits it could only legally fill-in-the-blank of Debtors' pre-signed checks , fill-in-the-blank checks at the direction of the Debtors. (Br. ¶ 46 ("The completion of an instrument requires that the completion b[e] authorized by the maker.").

- HTLF was an agent of the Debtors.

- In acting as an agent of the Debtors, HTLF conspired with McClain (and others) to enable McClain to access phantom cash in the millions of dollars to perpetuate his schemes and further indebt the Debtors.

- The breach of fiduciary duty is the very act of participating in the check kite to Debtors' detriment.

- But for the breach of fiduciary duty, Debtors would not have had access to millions of dollars they ultimately consumed in perpetuating the schemes and now owe to others.

53

# Check Kiting Is Enough

- HTLF argues even if it knew it was partaking in a check-kite, it did not know it was partaking in a Ponzi scheme and therefore the Trustee failed to plead knowing participation and conspiracy claims.

- Conspiring to further and knowingly participating in a check kite is enough.

- Breach of fiduciary duty is an underlying tort capable of supporting the knowing participation and conspiracy claims.

54

# HTLF Was A Transferee

- The Trustee has alleged facts, not contravened in HTLF's Motion, that give rise to the plausible inference that HTLF had sufficient control over the funds to be considered a transferee.

208.    Ultimately, the Debtors' bankruptcies forced 2B Farms and Terry Robinson to seek bankruptcy protection as well. To the extent that 2B Farms and/or Terry Robinson were insolvent and unable to repay the millions of dollars in overdrafts, it is HTLF that is left with the loss. As HTLF had liens over funds in the 2B Farms and Terry Robinson depository accounts, any payments into those accounts substantially benefitted HTLF, as HTLF had ultimate control over those funds and could and did use them to pay down 2B Farms' and Terry Robinson's credit facilities.

55

# HTLF Was A Transferee

- HTLF acknowledges precedent makes it a transferee where it used the transfers to pay down 2B's debt.

- HTLF seeks to dismiss the fraudulent transfer claims "to the extent the Trustee seeks to recover transfers that did not pay down the debt to HTLF." (Br. ¶ 51).

- HTLF does not identify which transfers were used to pay down 2B's debt, mooting its request for dismissal.

- All transfers pay down the debt:

  - First, HTLF loans 2B money.

  - Second, 2B sends the borrowed money to Debtors.

  - Third, Debtors send the money to HTLF.

  - Fourth, HTLF pays down 2B's debt.

  - Fifth, 2B borrows against the credit line and sends the money right back.

  - Sixth, repeat.

- While HTLF was receiving money, only 2B was sending money to the Debtors, defeating the need to account for payments back.

> 51.    In *Bonded*, the 7th Circuit held that a bank became a transferee when it applied the account balance to reduce its loan. *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988). The Trustee generally alleges that HTLF used the funds to pay down 2B Farms' loans. [Doc. 48, ¶ 208]. But he also alleges that the funds were immediately wired back as part of a check kite. [Doc. 48 ¶¶79-82]. Rather than seek recovery from HTLF to the extent that the funds paid down the debt, the Trustee seeks recovery of "all of the transfers of the Debtors to 2B Farms' and Terry Robinson's HTLF accounts." [Doc. 48 ¶ 209]. Count XIII should therefore be dismissed to the extent the Trustee seeks to recover transfers that did not pay down the debt to HTLF.

56

# Ponzi Scheme Presumption Applies

- HTLF has no authority for its proposition that the presumption does not apply because the Debtors had some legitimate cattle sales.

- Comprehensive body of Fifth Circuit precedent rejects the proposition.

- No need to allege badges of fraud.

"The likelihood that Vendetta Partners conducted some legitimate business operations does not counteract the existence of a Ponzi scheme because the distributions made to investors were nevertheless funded by other investors' money."

- S.E.C. v. Helms, 2015 WL 1040443 (W.D. Tex. Mar. 10, 2015)

"The fact the scheme may have contained some revenue-generating businesses is not sufficient to defeat a finding of fraudulent intent where the revenue-generating business could not have reasonably been expected to fund the operations."

- In re IFS Fin. Corp., 417 B.R. 419 (Bankr. S.D. Tex. 2009)

57

Upon a review of plaintiffs' complaint, the Court can hardly fathom a pleading that could make the charges any clearer. The bank's request is based on the heightened pleading requirements of Rule 9 for fraud charges. *But Ponzi and kiting schemes—this very action—allow for a presumption of fraud.*

ECF No. 92 (citing *Sec. & Exch. Comm'n. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013); *In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *9 (Bankr. N.D. Tex. July 13, 2022).

# Badges of Fraud

- Even without the Ponzi scheme presumption, the Trustee sufficiently alleged badges of fraud.

| Badge of Fraud | Alleged |
|---|---|
| Close relationship between Debtor and Transferee | HTLF was Debtors' agent |
| Concealment of the transfer | All transfers in scheme made to conceal and further scheme |
| Debtors' financial condition | Debtors' insolvent at all relevant times |
| Transfer occurred shortly before or after debt incurred | The transfers caused Debtors to incur debts to 2B (investments) and/or Mechanics/CFSB (overdrafts) |
| Chronology and cumulative effect of transfers | $265 million in fraudulent transactions |
| The pre-signed, fill-in-the-blank checks | Veneer of fraud standing alone. |

59