# Plaintiffs' and Intervenors (collectively "Plaintiffs") Response to Banks' 12(b)(6) Motions

Hearing February 17, 2026
Complaint at Dkt. 213
Motions at Dkt. 259, 264, 280; Response at Dkt. 316

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *1*

---

# Order of Argument

- Background
  - David LeBas
- Fraud claims (Counts 2, 10, 11)
  - Abel Leal
- Negligence claims (Counts 3, 5, 6)
  - Elizabeth Geary
- Conversion, Tortious Interference, Fiduciary, and Contract claims (Counts 1, 8, 9, 12, 15)
  - David LeBas and Michael Duncan
- RICO claims (Counts 13, 14)
  - John Massouh

*(Not at issue: Counts 4, 7, 16)*

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *2*

## Order of Argument

- **Background**
  - **David LeBas**
- Fraud claims (Counts 2, 10, 11)
  - Abel Leal
- Negligence claims (Counts 3, 5, 6)
  - Elizabeth Geary
- Conversion, Tortious Interference, Fiduciary, and Contract claims (Counts 1, 8, 9, 12, 15)
  - David LeBas and Michael Duncan
- RICO claims (Counts 13, 14)
  - John Massouh

*(Not at issue:  Counts 4, 7, 16)*

*2/17/2026*    *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*    *3*

# 12(b)(6) Standard

*2/17/2026*    *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*    *4*

# Rule 12(b)(6) Standard: Plausibility

- Plausibility standard:  "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable"
  - *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)

- Motions to dismiss are disfavored.
  - *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)

# Rule 12(b)(6) Facts and Inferences

- All pleaded facts are true
  - *Turner v. Pleasant*, 663 F.3d 770, 778 (5th Cir. 2011)

- All reasonable inferences are made in favor of Plaintiffs
  - *Jones v. City of Houston*, 756 Fed. Appx. 341 (5th Cir. 2018)

- Defendants have not denied/contested any Plaintiff facts, nor can they at 12(b)(6) stage
  - That comes in Answer; none of Defendants have filed answer yet
  - Anything they have to say that doesn't appear in *Plaintiff's* complaint **<u>cannot be considered</u>**

# 9(b) Standard

## Rule 9(b): Standard

- Particularity only necessary for *circumstances* of the fraud
- Intent, knowledge, other mens rea "may be alleged generally"
  - Rule 9(b)

- "[A] pleading is sufficient under Rule 9(b) if it identifies 'the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'"
  - *Askanase v. Fatjo*, 148 F.R.D. 570, 574 (S.D. Tex. 1993)

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 5 of 100

2/17/2026

# Dealer Trust Act

# The Dealer Trust Act

- "All livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers."  7 USC § 217b(a)(1)

- The DTA protects livestock sellers who perfect their claims, compared to the UCC rules that treat unpaid sellers as unsecured creditors of an insolvent dealer

# Dealer Trust Act Not Relevant for 12(b)(6)

- "Facts" about USDA preliminary findings are not part of Plaintiffs' Amended Complaint and therefore do not affect this hearing.
- But the statute helps explain why Rabo did not shut McClain down on February 28, 2023
- Sellers have 30 days to perfect. If they do, they have trust and disgorgement claims. Disgorgement claims relate back to the time the bank first learned its customer was operating out of trust
- Rabo knew McClain was not honoring his obligations under the trust for months or years, but at least by Feb. 28, 2023, but did not shut him down until mid-April 2023
- Sellers didn't know about problems, so didn't file trust claims, so lost out on access to trust assets on hand and lost out of disgorgement

# Standing

- Mechanics' (p. 8) and Rabo's (p. 39) Motions raise standing
- The Court previously ruled on this issue against Mechanics and Rabo's contentions [Dkt. 100, Order Dated July 29, 2025]
- Since that ruling, Plaintiffs have dropped the claims the Court determined they did not have standing to pursue and have pleaded with more particularity the remainder of their claims

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 7 of 100

2/17/2026

# Timeline Of Events

## McClain Cattle Fraud Scheme

---

# 2006-2017: Early History

| **Dec 2017** | Rabo's initial inspection reveals serious deficiencies - DECLINES credit (¶79-80) |

| **Dec 2017** | Despite rejection, Lawson & Dunn push to overturn - 'Golden Goose' (¶81-82) |

 **December 2017: Critical Red Flags Identified**
• MFY maintained no accurate general ledger or trial balance
• Two separate sets of books (later retracted)
• Inspector categorized as 'high information risk'
• Rabo concluded MFY was NOT creditworthy → DECLINED credit

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 8 of 100

2/17/2026

## 2018: Approval Despite Red Flags

| | |
|---|---|
| **Mid-2018** | Despite all red flags, McClain's loan APPROVED by Rabo (¶82) |
| **May 2018** | Mechanics Bank begins operating McClain's accounts with DACAs (¶86) |
| **May 2018** | Account overdrawn $178,547.79 from outset - Rabo approves MORE credit (¶87-88) |
| **Jul 31, 2018** | BBC claims 9,971 head (332% of capacity) (¶112) |
| **Oct 2018** | Overdrawn $216,000 - begins years-long pattern (¶120) |
| **From 2018** | Both Rabo and Mechanics have full knowledge of insolvency (¶118) |

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *15*

## 2019: Escalating Overdrafts



| Jan | May | Aug | Oct 23 | Oct 28 | Nov 1 | Nov 22 | Dec |
|---|---|---|---|---|---|---|---|
| $96K | $12M Credit | $5M to 7M | $2.5M | $2.1M | $4.3M | $5.2M | $4.8M + SSS |
| ¶121 | ¶83 | ¶100 | ¶122 | ¶123 | ¶124 | ¶124 | ¶125 |

**Key Events:**
- Dec 2019: Rabo files 'Something Seems Strange' report noting check-kiting (¶125)
- Dec 23: Rabo and Mechanics arrange joint meeting for Jan 2020 (¶127)

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *16*

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 9 of 100

2/17/2026

## 2020-21: Expansion Despite Warnings

### 2020
- Jan: Joint Rabo-Mechanics-McClain meeting (¶128)
- Credit exposure increases to ~$24M (¶100)
- Oct 15: Manager sees 'no issues' due to $12M profits (¶97)
- Ragland already using pre-signed blank checks (¶160)

### 2021
- Jan: Thorlakson begins placing cattle (¶15)
- Feb: MFY posts $3M gross loss, $4.5M net loss (¶129)
- Rabo consolidates into $45M loan package (¶101)
- Pre-Funding Report confirms BBCs 'riddled with inaccuracies' - Rabo APPROVES anyway (¶101)

**By August 2021: Rabo Knows 30% Custom Fed (¶98)**

Rabo has actual knowledge that at least 30% of cattle in McClain's yards owned by outside parties (custom feeders), including Plaintiffs and Intervenors. Custom feeders have no awareness of McClain's precarious financial condition.

## 2018-22: Borrowing Base Certificates Report Over-Capacity

| BBC Date | Head Claimed at McClain Feed Yard | % Capacity |
|---|---|---|
| 4/30/2018 | 8,651 | 288% |
| 7/31/2018 | 9,971 | 332% |
| 7/31/2019 | 15,514 | 517% |
| 7/31/2020 | 21,191 | 706% |
| 7/31/2021 | 25,219 | 841% |
| 7/31/2022 | 31,927 | 1064% |
| 12/31/2022 | 37,924 | 1264% |

*Table 1: McClain Feed Yard had a permitted capacity of 3,000 head according to its Texas Commission on Environmental Quality permit, of which Rabo had knowledge. Purportedly, additional pens leased nearby brought that capacity up to 9,800, but even if the additional capacity existed, over-capacity BBCs were submitted by summer 2018.*

- **Total does not include Third-Party Cattle**

Dkt. 213 ¶112

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 10 of 100

2/17/2026

# 2022: Foundation Cracks

| | |
|---|---|
| **Mar** | $7.2M from victims in single month (¶107) |
| **May** | Rabo chief inspector notes large head count of third party cattle (¶ 105)<br><br>McClain's largest customer, feedyard Friona Industries, is lost - 'what we hung our hat on' (¶102)<br><br>$3.4M understatement, $250K hidden liabilities (¶103)<br>**Rabo's inspector testifies that if she had known about the customer cattle and concerns about credit, she would have performed a more thorough inspection and "I would have blown it up then" (¶ 149)** |
| **Jul 31** | BBC: 31,927 head (1064% of capacity) (¶112) |
| **Oct 11** | Dunn: 'Brian is in more cash trouble than we think' (¶132) |
| **Late '22** | Rabo decides to wind down involvement (¶145) |
| **Dec** | BBC claims 87,000+ head (impossible) (¶114) |

---

# FEB. 2023: HOUSE OF CARDS FALLS

**Early January 2023: Rabo increases credit from $48M to $55M despite acknowledging impossible cattle claims (¶114)**

**February 28, 2023: Emergency Inspection Completed (¶146)**

*First actual physical count in OVER FOUR YEARS (¶115, ¶146)*

| CLAIMED | ACTUAL |
|---|---|
| **80,000** | **8,000** |
| head of cattle | cattle (not even owned by McClain) |

Inspector's Conclusions (¶¶ 146, 148):

***"This is basically a worst-case scenario" and a "Possible Fraud Case"***
***"This house of cards has pretty well crashed"***

Aftermath: Stockett's memo rejected by top Rabo officials. Rabo NEVER stops operations, continues accepting funds during March 2023. (¶150)

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 11 of 100

2/17/2026

## 3/2023: Rabo and Mechanics Allow Schemes to continue knowing the Jig is Up

*Despite February 28 inspection proving fraud, multiple victims sent millions to Rabo/Mechanics in March 2023 (¶156-157)*

- Thorlakson alone paid McClain more than $2,800,000.00 to purchase cattle between March 12 and March 18, 2023, long after Stockett's February 28 inspection reported at least 60,000 missing cattle

- This money went straight to Rabo and Mechanics. The money was supposed to be held in trust

*2/17/2026*    *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*    *21*

## Payments to Rabo and Mechanics After March 1, 2023 ~ $12,800,000

| Party | Date Money Sent | Amount |
|---|---|---|
| Arnold Braun Trust | March 3, 2023 | $526,205.17 |
| Brian Blackman | March 6, 2023 | $661,956.48 |
| Dora Blackman | March 15, 2023 | $53,651.36 |
| Robert Braun | March 3, 2023 | $345,547.65 |
| Buss family Trust | March 29, 2023 | $77,289.48 |
| Dennis Buss | March 6, 2023 | $158,170.34 |
| Robert Gray | March 6, 2023 | $150,039.98 |
| Jimmy Greer | March 20, 2023 | $354,918.73 |
| Jordan Lesh | March 6 and 15, 2023 | $315,238.95 |
| Janice Lawhorn | March 29, 2023 | $149,488.75 |
| Lesh Family Trust | March 15, 2023 | $212,957.94 |
| Jan and Gary Lesh | March 15, 2023 | $84,036.99 |
| Jared Lesh | April 3, 2023 | $500,341.56 |
| Charles Lockwood | March 23 and April 5, 2023 | $1,471,737.11 |
| Nikki Lockwood | March 31, 2023 | $390,739.21 |
| Cole Lockwood | March 31, 2023 | $576,533.01 |
| Sherle Lockwood | March 31, 2023 | $766,041.83 |
| Morrison Café | March 1, 2023 | $489,540.42 |
| Craig and Amy Sutton | March 8, 2023 | $200,109.56 |
| Scarlett and Black Cattle, LLC | March 2,16,17,30, 31, 2023 | $2,538,999.44 |
| Big Seven | March 13, 2023 | $173,225.05 |
| Carraway Cattle | March 30, 2023 | $250,725.27 |
| Richard Carraway | March 13, 2023 | $67,320.34 |
| | | |

*2/17/2026*    *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*    **22**

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 12 of 100

2/17/2026



# APRIL 2023: Banks Pull the Plug

- Accounts hold deposits exceeding $22 MILLION - only then frozen (¶137)
- Rabo coordinates bankruptcy filing of McClain (¶154)
- Rabo ships off cattle and seizes business records (¶154)
- 2B Farms files Chapter 12 after $16M loss (¶163)

## TIMELINE SUMMARY

| 2017 | 2018 | 2019 | 2021 | 2023 |
|------|------|------|------|------|
| Rabo declines credit | Approved despite warnings | Escalating overdrafts | $45M package | Collapse |

**KEY TAKEAWAY**

Rabo knew from December 2017 that McClain was not creditworthy. Despite repeated red flags, inspections revealing fraud indicators, and knowledge that 30% of cattle belonged to victims, Rabo expanded credit from $0 to $55M over 5 years, enabling a massive fraud scheme that defrauded cattle producers of tens of millions of dollars.

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *23*



# Simultaneous Check Kite

Mechanics (McClain)

$ → McClain / Goad

Instructions on amounts for McClain check and 2B wire →

HTLF Ragland (2B Farms)

Same-Day Wire

2B Farms

Fills Out Pre-Signed McClain Check Deposits with Immediate Credit

➤ **$246 million in Feb-April 2023**

➤ **~246,000 head of cattle**
[¶¶ 158-166]

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *24*

## Order of Argument

- Background
  - David LeBas
- **Fraud claims (Counts 2, 10, 11)**
  - **Abel Leal**
- Negligence claims (Counts 3, 5, 6)
  - Elizabeth Geary
- Conversion, Tortious Interference, Fiduciary, and Contract claims (Counts 1, 8, 9, 12, 15)
  - David LeBas and Michael Duncan
- RICO claims (Counts 13, 14)
  - John Massouh

*(Not at issue:  Counts 4, 7, 16)*

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *25*

---

COUNT TWO

# FRAUD

Rabo, Mechanics Bank, and HTLF

21

## Defendants Cannot Escape By Blaming McClain Alone

- "We do not agree that these suits are not in any way about the financial institutions. . . certainly, the financial institutions play a pivotal role in the stories the Plaintiffs will tell the jury.

- …the fall of Enron is not about one person, or even a few people; it is the story of a host of actors.

- **Asking the jury…to look only at the primary defendants is like asking someone to look only at the eye of the hurricane and to ignore the furor surrounding it. Neither is an accurate picture**."

*In re Arthur Andersen LLP, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding)*

27

## Defendants Cannot Escape Liability By Blaming McClain Alone

- Defendants argue this case is only about McClain. But the pleadings allege a chain of conduct involving multiple actors.
- Each bank defendant — Rabo, Mechanics, and HTLF — played a role in creating the storm. Focusing only on McClain ignores what made the collapse inevitable.
- The collapse did not occur in isolation. Each participant's conduct is part of the sequence.

*"Asking the jury…to look only at the primary defendants is like asking someone to look only at the eye of the hurricane and to ignore the furor surrounding it. Neither is an accurate picture." In re Arthur Andersen LLP, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding)*



28

## Rule 9(b) Standard

- Rule 9(b) permits mental states to be alleged generally: *"[i]n alleging fraud or mistake, . . . must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."* Fed. R. Civ. P. 9(b)

- "[A] pleading is sufficient under Rule 9(b) if it identifies 'the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'" *Askanase v. Fatjo,* 148 F.R.D. 570, 574 (S.D. Tex. 1993).

- Where check-kiting is alleged as the basis of the fraud, "[a]llegations of the Debtors' intent to hinder, delay or defraud creditors . . . Are not required in this instance where the check-kiting scheme allows the Court to infer fraudulent intent." *Faulkner v. AimBank (In re Ragor-Dykes Motors),* Nos. 18-50214-RLJ-11, 2021 Bankr. *LEXIS 800 at *28-29.* T

29

## The Court Has Rejected Defendants' Arguments

**This Court already addressed Defendants' arguments and rejected them:**

"The described kiting scheme is itself a fraudulent enterprise. Rabo alleges facts—the irregular practice of using signed-but-otherwise blank checks for the benefit of the 2B Parties and [HTLF]—that potentially implicate [HTLF] in the scheme. **A kiting scheme is a different kind of fraud, but it still reveals a pattern of misrepresentations within the scheme.** The Court cannot fathom how a party [] could plead it in way that identifies precisely how much of the losses covered by the practice drained the McClain Borrowers' accounts."

Dkt. 100, Order (denying HTLF's motion to dismiss Rabo's third-party complaint).

30

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 16 of 100

2/17/2026

## Fraud Elements

The elements of fraud:

(1) a material representation was made;

(2) the representation was false;

(3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;

(4) the speaker made the representation with the intent that the other party should act upon it;

(5) the party acted in reliance on the representation; and

(6) the party thereby suffered injury.

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 337 (Tex. 2011)*

31

## Third-Party Fraud Liability Under Texas Law

- **Third-party fraud liability arises when a party knowingly participates in a fraudulent scheme, even without making direct representations to the plaintiff.** *In re Arthur Anderson LLP,* 121 S.W.3d 471, 481 (Tex.App.—Houston [14th Dist.] 2003, orig. proceeding).

- **A party may be held directly liable for fraud based on knowing participation where a party: (1) had knowledge of the material misrepresentations underlying fraud; and (2) profited from the fraud.** *Kinnie Ma Individual Ret. Account v. Ascendant Capital, LLC*, 2021 US. Dist. LEXIS 269178, at \*76-79 (W.D. Tex. Aug. 25, 2021); *In re NE 40 Partners,* 411 B.R. at 360-61.

- **A party may be held directly liable for fraud by mere silent acquiescence when it benefited from the fraud.** *In re NE 40 Partners,* 411 B.R. at 360-61.

- **Each party to a fraudulent scheme is responsible for the acts of other participants done in furtherance of the scheme and liable for fraud.** *Skrepnek v. Shearson Lehman Bros., Inc.*,    889 S.W.2d 578, 580 (Tex. App.—Houston [14th Dist.] 1994, no    writ); *Corpus Christi Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 202 (Tex.App.—San Antonio 1991, no writ).

32

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 17 of 100

2/17/2026

**Plaintiffs Have Sufficiently Pleaded The Elements of Fraud**

Elements One and Two: Material Representations by McClain

33

## Elements One and Two: Material Misrepresentations

**Cattle Purchases: Solicited payment representing funds would be used to buy cattle**

- McClain solicited and accepted payment from Plaintiffs for the purchase of cattle, representing that their purchase money would be used to buy cattle on their behalf, when it was being used for other purposes. (¶¶ 2–3, 257)

- McClain misrepresented "almost everything related to the cattle transactions" he induced Plaintiffs into, both directly and through co-conspirator defendants, "recklessly without any knowledge of the truth and as a positive assertion." (¶¶ 198–199)

- Goad directed and controlled McClain's actions fraudulently: misrepresented the existence of cattle; sent false yard sheets so multiple customers were informed they owned the same cattle; used yard sheets, verbal reports, and inspections to report cattle were in McClain's possession when they were not; and kept proceeds for their own purposes. (¶ 243(a)–(d))

- Even after Rabo's February 2023 inspection confirmed fraud, Plaintiffs continued sending millions for cattle purchases — over $10 million wired after March 1, 2023 (detailed chart at ¶ 156); Thorlakson alone paid $2.8 million between March 12–18, 2023. (¶¶ 156–157)

Supporting Citations: ¶¶ 2–3, 156–157, 198–199, 243(a)–(d), 257

34

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 18 of 100

2/17/2026

---

**Elements One and Two: Material Misrepresentations**

**Invoices and Closeouts: Fraudulent documentation provided as if legitimate**

- McClain provided Plaintiffs with invoices, projected closeouts, lot numbers, and wire transfer instructions as if the transactions were legitimate cattle purchases. Each Plaintiff's individual transactions are described with specificity. (¶¶ 16–65)

- Goad's text messages with Brian McClain reflect awareness of and participation in backdating invoices, including her warning: "Stop back dating stuff . . . if they look into anything it's going to look suspicious." Goad guided McClain on how much invoices needed to be based on incoming third-party funds. (¶¶ 181–182)

- Goad executed Cattle Feeding Agreements and Borrowing Base Certificates to perpetuate the fraud, and "created and sent invoices to Plaintiffs in the course of the scheme for cattle that Plaintiffs were unable to locate after the scheme unraveled." (¶ 244)

- HTLF relied on "a simple invoice from McClain" — often prepared by Goad — to effectuate transactions. HTLF did not ask for any additional documents, such as a bill of sale or close out sheets, to confirm cattle were being purchased and sold. (¶¶ 243(b), 261–262)

Supporting Citations: ¶¶ 16–65, 181–182, 243(b), 244, 261–262

35

---

**Elements One and Two: Material Misrepresentations (cont.)**

**Physical Inspections: Misrepresented cattle shown at inspections**

- McClain misrepresented cattle at physical inspections by showing Plaintiffs or their representatives cattle that were not actually theirs, or showing the same cattle to multiple buyers. Three methods: (1) inducing purchases with written evidence; (2) misrepresenting cattle at physical inspections; (3) taking in cattle on the gain and misrepresenting Plaintiffs' cattle as Debtors' cattle. (¶¶ 199, 243(b)–(c)).

- Multiple Plaintiffs and their lenders personally inspected cattle at McClain facilities: Jared Lesh's representatives (¶ 30); Joel Brookshire personally — McClain identified and showed him "his cattle" (¶ 31); SBC's lender on four separate occasions plus personal owner visits (¶ 34); Lockwood intervenors' lender — Charles, Cole, Sherle, Nikki (¶¶ 45–48); Lyndal Van Buskirk's lender plus personal inspection (¶ 49).

- Thorlakson: AgTexas conducted formal third-party inspections on at least four occasions and Thorlakson received monthly inventory reports from McClain detailing number of head owned by Thorlakson. (¶ 15).

- In March 2023, a McClain customer inspecting cattle in Kentucky noticed trucks being loaded — the truckers said "the bank" was having them take cattle to a sale barn — demonstrating misrepresentation of cattle presence through the end of the scheme. (¶ 153).

Supporting Citations: ¶¶ 15, 30–31, 34, 38, 45–49, 153, 199, 243(b)–(c)

36

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 19 of 100

2/17/2026

**Elements One and Two: Material Misrepresentations (cont.) – Rabo's Direct Misrepresentations to Scarlet Black & Priest Cattle**

**Elements One and Two: Plaintiffs allegations give rise to a reasonable inference that Rabo made material misrepresentations to Scarlet & Black and Priest Cattle:**

- Rabo "communicated directly with SBC's lender and misrepresented McClain's financial condition, inducing SBC to continue doing business with McClain." (¶ 34).

- Rabo's employee Chip Lawson made false representations to Scarlet and Black Cattle's lender about McClain's financial health. (¶¶ 200, 268).

- Rabo induced Priest Cattle Company to enter a Letter of Understanding with representations that Rabo acknowledged and knew the cattle were owned by Priest and not by McClain—then seized and sold those cattle anyway. (¶¶ 377–380)

37

## Elements One and Two - Check-Kiting Scheme as Independent Evidence

- Blank, pre-signed checks sent to HTLF, filled in for amounts dictated by McClain, deposited with immediate credit, and funds wired back to McClain — often the same day (¶ 165).

- Over $231 million transferred from 2B Farms' HTLF account to McClain in just over two months; $246 million moving in the opposite direction (¶ 166).

- At ~$1,000/head, this represented ~246,000 head of cattle — "an astronomical number" that was plainly impossible (¶ 166).

- Daily transaction amounts nearly doubled from ~$1.4–1.5M to $2.5–3.5M starting Feb. 7, 2023, consistent with desperation to keep the scheme afloat (¶ 166).

38

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W    Page 20 of 100

2/17/2026

## Pattern Across Individual Plaintiffs

- Paragraphs 13–65 detail each Plaintiff's and Intervenor's relationship with McClain, following a consistent pattern of collecting money for cattle that were never accounted for.

- Each plaintiff wired funds pursuant to invoices and projected closeouts — "neither the cattle nor the proceeds were ever accounted for."

- Multiple customers simultaneously informed they owned the same cattle. (¶ 243(b)).

- The sheer number of victims and consistent pattern — negates any inference of isolated error and demonstrates a knowing scheme.

39

## "Uncontested" Nature & Multiple Methods of Fraud

- "It is uncontested that McClain misrepresented to Plaintiffs and Intervenors almost everything related to the cattle transactions McClain induced Plaintiffs and Intervenors into" (¶ 198).

- Three distinct methods of inducement: (1) inducing purchases with false written evidence of cattle; (2) misrepresenting cattle at physical inspections; (3) taking in cattle on the gain and misrepresenting Plaintiffs' cattle as his own (¶ 199).

- The variety and sophistication of these methods — across written documents, in-person inspections, and verbal reports — demonstrates conscious orchestration, not mere recklessness.

40

## Summary of Key Paragraphs

**Strongest Evidence**

- ¶¶ 112–114, 134 — Impossible BBCs & Feb. 2023 inspection
- ¶¶ 176–182 — Backdating texts & fraudulent invoicing
- ¶¶ 165–167, 261–263 — Check-kiting mechanics & $231M+ volume
- ¶¶ 243(a)–(g), 244 — False yard sheets & fictitious invoices
- ¶¶ 198–199, 257 — "Uncontested" fraud & intent to defraud

**Supporting Context**

- ¶¶ 2–4, 8–9 — Nature of the scheme itself
- ¶¶ 79–80 — Two sets of books
- ¶¶ 13–65 — Individual plaintiff pattern allegations
- ¶¶ 99, 105, 294 — Yard sheets, third-party cattle, & fund diversion

41

---

### Plaintiffs Have Sufficiently Pleaded The Elements of Fraud

Element Three: when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion. Representations Were False McClain

42

## The Scheme Itself Demonstrates Knowledge

- McClain "operated a sophisticated fraudulent enterprise that systematically stole cattle that belonged to his customers." (¶ 2).

- Cattle producers entrusted McClain with millions to purchase, feed, and sell cattle at market. Instead, funds were misappropriated for purposes having nothing to do with the cattle transactions (¶¶ 2–3).

- The Complaint characterizes this as an intentional scheme, not negligence or mismanagement. The systematic, repeating nature of the fraud across dozens of victims over multiple years negates any inference of innocent mistake (¶¶ 8–9).

43

## Misrepresentation of Cattle Existence & Ownership

- BBCs claimed cattle numbers exceeding feedyard capacity by extraordinary margins — 87,000 head claimed when facilities held at most 49,000 (¶ 114).

- MFY's environmental permit capped capacity at 3,000 head (leased pens to 9,800), yet BBCs showed 37,924 head at that location by December 2022 (¶¶ 112–113).

- February 2023 inspection found only 8,000 cattle instead of 80,000 claimed — and McClain did not even own those (¶ 134).

- False yard sheets sent to customers showing far fewer cattle than represented, "such that multiple customers were being informed they were owners of the same cattle" (¶ 243(b)).

- Yard sheets, verbal reports, and inspections used to report cattle in McClain's possession "when in fact they were not" (¶ 243(c)).

44

## Diversion of Purchase Funds

- McClain "solicited and accepted payment from Plaintiffs and Intervenors for the purchase of cattle with the intent to defraud." (¶ 257).

- McClain did not tell Plaintiffs that their purchase money was being used for payments other than cattle purchases. (¶ 257).

- Funds collected for cattle purchases were misappropriated and diverted to cover other obligations, sustain the check kite, and enrich McClain (¶ 294).

- The explicit allegation of "intent to defraud" establishes that McClain knew his representations about the use of funds were false.

45

## Fraudulent Invoicing & Backdating Scheme

- Goad had a "total target number of deposits she needed to collect for the day" — billing driven by cash needs, not actual cattle transactions (¶ 177).

- Goad's text messages with McClain reflect "awareness of and willing participation in McClain's backdating of invoices." (¶ 181).

- Goad texted Brian: "Stop back dating stuff . . . if they look into anything it's going to look suspicious as shut [sic]." Direct evidence of conscious knowledge of falsity (¶ 181).

- Amounts billed bore no relation to actual cattle — Goad determined how much to "try to get from different parties each day in order to cover McClain's expenses" (¶¶ 181–182, 243(f)–(g)).

- Goad created and sent invoices for cattle that Plaintiffs were unable to locate after the scheme unraveled (¶ 244).

46

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W    Page 24 of 100

2/17/2026

Plaintiffs Have Sufficiently Pleaded The Elements of Fraud

Element Four:the speaker made the representation with the intent that the other party should act upon it

47

## Express Intent Pleading & McClain's Direct Inducement

- ¶ 198 — Misrepresentations made "with the intention that they should be acted on by Plaintiffs and Intervenors," directly and through McClain.
- ¶ 199 — Three specific methods of inducement: fabricated purchase documents, misrepresented cattle at inspections, and misrepresenting Plaintiffs' cattle as Debtors' own.
- ¶ 190 — McClain sent invoices, purchase confirmations, health updates, and sales revenue to induce continued transactions.
- ¶ 257 — McClain "solicited and accepted payment…with the intent to defraud"; concealed that purchase money was diverted to non-cattle purposes.

48

## Rabo: Misrepresentations, Post-Discovery Conduct & Profit Motive

- ¶ 200 — Lawson told ANB that McClain's performance was "excellent" and he made a "boat load of money in 2021" — "in an effort to induce S&B…to continue to transact business with Debtors." ¶ 201: same representations relied on by Colton Long and AgTexas.
- ¶¶ 154–157 — After February 28, 2023 inspection confirmed fraud, defendants continued accepting deposits; over $10 million swept, including $2.8 million from Thorlakson (March 12–18, 2023).
- ¶ 192 — Rabo and Mechanics continued accepting deposits "in an effort to reduce overdrafts and reduce the line of credit as much as possible before the cat was out of the bag."
- ¶¶ 81–82 — Rabo officers overrode credit denial because McClain would be largest facility in the region, generating millions.
- ¶¶ 91, 97, 116 — Internal emails: advances would "allow us to earn interest"; "made like $12mln in profits last year"; 43% profit margin. Rabo "prioritized profit over policy."

49

## Check-Kiting Scheme & HTLF/Ragland

- ¶ 160 — Check kite created "artificial float and appearance of solvency" inducing Plaintiffs to continue transacting.
- ¶¶ 165–166 — Daily wire transfers totaling $231 million in three months created the illusion of a viable cattle operation.
- ¶ 359 — Closed-loop fraud system "allowed McClain's fraudulent operation to appear viable," deceiving Plaintiffs and Intervenors.
- ¶ 159 — Ragland's prior involvement in Reagor-Dykes check kite at AimBank established his knowledge of the scheme mechanics.
- ¶¶ 261–263 — HTLF filled in blank checks without requesting bills of sale or closeout sheets; transactions spiked to $2.5–$3 million daily, totaling ~$240 million.

50

## Goad's Intent

- ¶¶ 176–178 — Goad set daily deposit targets, determined collections from each party, overnighted blank checks to HTLF, and provided invoices to 2B Farms to keep the scheme running.
- ¶¶ 181–182 — Text messages show Goad backdated invoices and matched check amounts with incoming payments; scheme was "done to secure future agreements for McClain from which she and McClain would benefit."
- ¶ 243(a)–(h), 244 — Goad misrepresented cattle existence, sent false yard sheets, directed HTLF on check amounts, executed Cattle Feeding Agreements and BBCs "to perpetuate the cattle fraud," and sent invoices for cattle Plaintiffs could not locate.

51

## CFSB & Enterprise-Level Intent

- ¶¶ 174–175 — CFSB "chose to facilitate" rather than shut down the scheme, aiding and abetting McClain's fraud.
- ¶¶ 266–267 — CFSB processed hundreds of millions in unexplained transfers, providing "liquidity and cover" to perpetuate fraud; its inaction was "deliberate acquiescence."
- ¶ 303 — Enterprise prepared false inventory and borrowing base reports "in order to induce other lenders to provide funding" that could then be converted by Rabo.
- ¶ 313 — Rabo transmitted false borrowing base reports "with the intention of inducing" syndication participants to purchase a $20 million interest (Waggoner scheme).
- ¶ 316 — Focus falsely represented that customer funds could lawfully pay Rabo's debt; "with the inducement of Focus's false representations," McClain directed Mechanics to transfer customer funds.

52

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 27 of 100

2/17/2026

Plaintiffs Have Sufficiently Pleaded The Elements of Fraud

Element Five:the party acted in reliance on the representation

53

Wire Transfers to McClain Accounts at Mechanics Bank

- ¶ 16 — Dennis Buss wired funds per invoice/closeout; owed $1,216,660.59.
- ¶¶ 19–21 — Robert E. Gray ($234,663), Ronnie Gray ($200,450), and Gray Brothers ($436,534) each wired funds per invoice/closeout; Gray Brothers' wire indicated "Purchase Livestock."
- ¶ 22 — Craig & Amy Sutton wired funds; wire specified head count, cattle type, weight, and price per pound; owed $400,110.
- ¶¶ 26–27 — Leah Gungoll ($150,852) and Morrison Café ($789,452) wired funds per invoice/closeout.
- ¶ 32 — Gene Brookshire Family LP wired funds; wire referenced invoice, lot numbers, or cattle purchase; owed $6,529,888.
- ¶¶ 33, 35–36 — Douglas Finley ($99,921), Janice Lawhon ($149,489), and Jordan Lesh, LLC ($315,239) wired funds per invoice/closeout.
- ¶ 37 — Bryan Blackman wired funds to Mechanics Bank per invoice/closeout.
- ¶¶ 45–47 — Charles Lockwood ($1,948,697), Cole Lockwood ($576,533), and Sherle Lockwood wired funds. Charles Lockwood's last check for $655,790 was returned NSF after Rabo/Mechanics converted proceeds.
- ¶ 53 — Dustin Johnson wired funds; wire indicated "Purchase Cattle"; owed $201,447.
- ¶ 24 — AJ Jacques Living Trust wired funds to Mechanics Bank per invoice/closeout.

54

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 28 of 100

2/17/2026

## Wires to Multiple Banks, Checks & Cattle Feeding Agreements

- ¶¶ 23, 31 — Steve Ryan ($251,609) and Joel Brookshire ($315,000) wired funds to Mechanics Bank or CFSB per invoice/closeout.
- ¶ 30 — Jared Lesh wired funds to Rabobank or Mechanics Bank, and at times wrote checks; owed $7,699,133.
- ¶ 29 — Gary & Jan Lesh at times wired to Mechanics Bank or CFSB, at times delivered handwritten checks; owed $330,335.
- ¶ 28 — Lesh Family Trust issued checks deposited into Mechanics Bank or CFSB; owed $776,745.
- ¶¶ 42–44 — Jim Rininger ($240,778), Robert Spring ($160,797), and Michael & Miranda Evans ($200,812) wrote checks deposited into Mechanics Bank per invoice/closeout.
- ¶ 52 — Jimmy Greer wrote checks deposited into Mechanics Bank; owed $354,919.
- ¶ 34 — Scarlet & Black Cattle wired funds to Mechanics Bank; SBC's lender inspected cattle at McClain yards four times; entered Forward Contract Agreements; owed $3,707,040.
- ¶ 15, 370 — Thorlakson shipped and purchased thousands of cattle from/to McClain; AgTexas financed those operations; total loss $9.8 million.
- ¶¶ 57–58 — Big Seven Capital Partners and Carraway Cattle entered written Cattle Feeding Agreements; entrusted cattle to McClain for feeding/care at Texas yards.

55

## Post-Discovery Payments: Funds Sent After March 1, 2023 (¶ 156)

| Party | Date | Amount | Party | Date | Amount |
|---|---|---|---|---|---|
| Arnold Braun Trust | Mar 3 | $526,205 | Jared Lesh | Apr 3 | $500,342 |
| Brian Blackman | Mar 6 | $661,956 | Charles Lockwood | Mar 23, Apr 5 | $1,471,737 |
| Dora Blackman | Mar 15 | $53,651 | Nikki Lockwood | Mar 31 | $390,739 |
| Robert Braun | Mar 3 | $345,548 | Cole Lockwood | Mar 31 | $576,533 |
| Buss Family Trust | Mar 29 | $77,289 | Sherle Lockwood | Mar 31 | $766,042 |
| Dennis Buss | Mar 6 | $158,170 | Morrison Café | Mar 1 | $489,540 |
| Robert Gray | Mar 6 | $150,040 | Craig & Amy Sutton | Mar 8 | $200,110 |
| Jimmy Greer | Mar 20 | $354,919 | Scarlett & Black Cattle | Mar 2–31 | $2,538,999 |
| Jordan Lesh | Mar 6, 15 | $315,239 | Big Seven | Mar 13 | $173,225 |
| Janice Lawhorn | Mar 29 | $149,489 | Carraway Cattle | Mar 30 | $250,725 |
| Lesh Family Trust | Mar 15 | $212,958 | Richard Carraway | Mar 13 | $67,320 |
| Jan & Gary Lesh | Mar 15 | $84,037 | Thorlakson (¶ 157) | Mar 12–18 | $2,800,000+ |

*After Rabo's February 28, 2023 inspection confirmed fraud, Rabo swept these deposits to reduce its own exposure. ¶ 192.*

56

## Rabo Identified Plaintiff Wires as Overdraft Cure (¶¶ 92, 94)

- ¶ 92 — Rabo's relationship manager routinely cited incoming Plaintiff wires to justify overdraft approvals: "I request payment of the overdraft. Cure is coming from inbound wires of 1,447,315.14 from 2B Farms, 764,744.10 from Sherle Lockwood and 1,145,310.41 from Riley Livestock."
- ¶ 92 — Additional examples: "Cure is as follows; 1. 671K In [McClain's account]; 2. 595K from Susan Van Buskirk; 3. 1.5M 2B Farms; 4. 2.2M MAP enterprises."
- ¶ 92 — "I request approval of this overdraft. The source of cure is 1.3M wire from 2B farms and 1.6M from Lockwood Cattle."
- ¶ 94 — Rabo's relationship manager "often" cited sums incoming from Plaintiffs and Intervenors to justify overdraft approvals — confirming that defendants knew Plaintiffs were sending funds and used those funds to sustain the scheme.
- ¶ 93 — Overdrafts were so large they elicited "Holy CRAP!" from bankers and required higher approval for being "outside of materiality" — yet both banks continued approving them using Plaintiff deposits as the cure.

57

## Specific Reliance: S&B, Thorlakson & AgTexas (¶¶ 200, 370)

- ¶ 200 — S&B's lender ANB spoke directly with Rabo's Lawson, who represented McClain's finances were "excellent" and disclosed no negative information. Based on those statements, S&B continued transacting with McClain and increased its line of credit.
- ¶ 34 — S&B's lender visited the McClain Texas yards to inspect cattle on four separate occasions; SBC owners also personally visited. S&B entered Forward Contract Agreements clearly identifying cattle as purchased through a third party.
- ¶ 370 — AgTexas and Thorlakson reasonably relied on defendants' representations — Thorlakson by shipping and purchasing thousands of cattle, AgTexas by financing those operations.
- ¶ 74 — Business relationships spanning two to ten-plus years; McClain consistently performed, creating a track record that gave Plaintiffs reasonable grounds to rely on his representations about fund segregation and cattle handling.

58

## Complaint Paragraphs Containing "Reliance," "Relied," or "Rely"

- ¶ 74 — Plaintiffs "reasonably relied" on McClain's representations that prepaid funds and cattle would be held in trust.
- ¶ 75 — Years-long track record gave Plaintiffs "reasonable grounds to rely upon McClain's representations."
- ¶ 117 — Rabo's enabling caused harm to "unsuspecting creditors who relied on the integrity of McClain's operations."
- ¶¶ 197, 241 — Recite Element 5 legal standard: "the other party took action in reliance upon the misrepresentation" (Counts Six and Seven).
- ¶ 198 — "Plaintiffs and Intervenors in fact relied upon those misrepresentations"; "the misrepresentations and reliance so described were a proximate cause of injury."
- ¶ 201 — Colton Long, individually and as representative of S&B and AgTexas, "relied on the same misrepresentations made by Rabo."
- ¶ 213 — Rabo continued financing despite red flags, "to the detriment of Plaintiffs and Intervenors who relied on McClain's apparent legitimacy."
- ¶ 262 — Robinson testified "HTLF relied on a simple invoice from McClain" to effectuate transactions.
- ¶ 336 — "In reliance on Redden's representations, Phillips deposited" the $10.3 million CJ prepayment into its operating account.
- ¶ 370 — "AgTexas and Thorlakson reasonably relied" — Thorlakson by shipping cattle, AgTexas by financing.
- ¶ 378 — "Priest reasonably relied on those representations by shipping hundreds of cattle to McClain."

59

## Plaintiffs Have Sufficiently Pleaded The Elements of Fraud

## Element Six: The Party Thereby Suffered An Injury

60

Element Six – Suffered an Injury

R.    DAMAGES.

384.    The facts and allegations stated above are incorporated herein by reference.

385.    The Defendants' acts, omissions, conduct, and breaches were, and continue to be, a proximate and/or producing cause of damages to Plaintiffs and Intervenors, and the Defendants have been unjustly enriched by their actions.

386.    Defendants acts include breaches of fiduciary duty for which Plaintiffs and Intervenors are entitled to disgorgement.

387.    To the extent that Defendants have received funds or property in which the Plaintiffs and Intervenors have superior rights, Plaintiffs and Intervenors seek recovery of their damages from Defendants, either directly or by way of disgorgement.

125

Case 24-02007-swe    Doc 213    Filed 08/19/25    Entered 08/19/25 23:20:25    Desc Main
Document    Page 126 of 129

388.    Plaintiffs and Intervenors will respectfully request the Court to determine the amount of Plaintiffs' and Intervenors' damages. Plaintiffs and Intervenors seek recovery of their damages proximately caused by any responsible party, including, without limitation, all damages caused by the Defendants, both actual and punitive.

61

---

Plaintiffs Have Sufficiently Pleaded The Elements For Third-Party Fraud Liability Against The Banks

Third-party fraud liability arises when a party knowingly participates in a fraudulent scheme, even without making direct representations to the plaintiff.

A party may be held directly liable for fraud based on knowing participation where a party: (1) had knowledge of the material misrepresentations underlying fraud; and
(2) profited from the fraud.

A party has been held liable for the fraudulent misrepresentations of a third party by mere silent acquiescence when he benefitted from the fraud.

62

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 32 of 100

2/17/2026

## Knowing Participation

- *See supra.* at Fraud, Element 3 Slides

63

## Knowing Participation: Rabo - Internal Documentation of Fraud

- In December 2019, Rabo's Regional Credit Officer filed an internal "Something Seems Strange" (SSS) report explicitly noting check-kiting activity in McClain's accounts. (¶¶ 119, 125)

- Rabo's credit analyst Doug Williams issued a separate SSS report identifying signs of kiting. Rabo's management disregarded these internal warnings and allowed McClain's activities to continue unchecked. (¶¶ 206, 214)

- On October 11, 2022, Rabo's financial analyst Jason Dunn admitted in writing that it was "very likely" wires from third parties like Plaintiffs were being diverted to cover prior checks. (¶ 132)

- By February 2023, Rabo's own collateral inspection report explicitly identified McClain's activities as a "Possible Fraud Case." (¶ 205)

64

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 33 of 100

2/17/2026

## Knowing Participation: Rabo - Review of Bank Statements & Inspections

- In May 2022, Rabo's inspector reviewed McClain's March 2022 bank statements — in coordination with Mechanics Bank — showing $7.2 million in wire transfers from third parties for "cattle." (¶¶ 106–108, 122)

- During the same joint inspection, Rabo's inspector identified that McClain's receivables ledger showed massive amounts owed to third parties for cattle supposedly sold on their behalf. (¶¶ 109–111)

- Rabo repeatedly approved borrowing base certificates claiming McClain held 87,000 head of cattle when his facilities had a maximum capacity of only 49,000 head. (¶¶ 112–117)

- On March 4, 2023, Rabo admitted it had not conducted a full inspection of McClain's operations in over four years, despite approving hundreds of millions of dollars in credit. (¶ 120)

65

## Knowing Participation: Rabo - Rabo: Employee Knowledge and Internal Reactions

- On October 23, 2019, when MFY was overdrawn by $2.5 million, Rabo's own financial analyst responded: "$2.5 million!? WTF...." Rabo still approved the funds to cover it. (¶ 122)

- Five days later, October 28, MFY was overdrawn by $2.1 million. A Regional Credit Officer approved covering it, noting a "significant cash management issue" and "growing concern." No corrective action was taken. (¶ 123)

- Overdrafts ballooned to $4.3 million on November 1, then $5.2 million by November 22, 2019. Internal emails reveal frustration, but the only "solution" was for Rabo and Mechanics to shift funds. (¶ 124)

- As early as 2022, Rabo's front-line employees Chip Lawson and Jason Dunn acknowledged that check-kites were occurring. (¶¶ 206, 214)

66

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 34 of 100

2/17/2026

## Knowing Participation: Rabo - Powerful Financial Motivation

- Rabo earned a 43% profit margin on its relationship with McClain, creating powerful incentives to perpetuate the fraud rather than shut it down. (¶ 137)

- A December 2019 email noted that funding an overdraft through an overline advance would "allow[] us to earn interest on th[e] amount." (¶ 91)

- An October 15, 2020 email from a Senior Relationship Manager admitted seeing "no issues" with the accounts because they had "made like $12mln in profits last year." (¶ 97)

- Every month the fraud continued, Rabo collected substantial fees and interest. Every victim deposit that flowed through Rabo's controlled accounts paid down McClain's debt to Rabo. (¶¶ 111–116, 125)

67

## Knowing Participation: Rabo - Post-Discovery Conduct (Feb–Apr 2023)

- On February 28, 2023, Rabo's inspection confirmed McClain had reported at least 80,000 cattle that did not exist. Inspector Michelle Stockett recommended immediate downgrade; senior management rejected these recommendations. (¶¶ 134, 146–150)

- Between March 1 and April 5, 2023 — after confirmed fraud — victims continued to wire money, and Rabo swept over $10 million in victim funds to satisfy McClain's debt. (¶¶ 154–157)

- Specific post-discovery victims include: Arnold Braun Trust ($526,205), Brian Blackman ($661,956), Robert Braun ($345,547), Charles Lockwood ($1,471,737), and Scarlett and Black Cattle ($2,538,999). (¶ 156)

- Thorlakson alone paid McClain more than $2.8 million between March 12–18, 2023, long after the inspection proved fraud. This money went straight to Rabo's controlled account. (¶ 157)

68

## Knowing Participation: Mechanics Bank - Coordination & Actual Knowledge

- In October 2022, representatives from both Rabo and Mechanics Bank communicated about McClain's operations, openly using the word "kite" to describe what McClain was doing. (¶ 131)

- In December 2019, when Rabo alerted Mechanics that 7M was $4.8 million overdrawn, Mechanics responded with detailed proposals on how to move funds so the overdraft could be concealed. (¶ 126)

- Mechanics and Rabo engaged in daily coordination to manage massive, recurring overdrafts exceeding $2 million. Mechanics employees expressed shock and recognized check-kiting patterns. (¶¶ 122–128, 136)

- In February 2023, when Mechanics raised concerns about fraudulent deposits, Rabo provided reassurances — and Mechanics continued facilitating transactions. (¶ 133)

69

## Knowing Participation: Mechanics Bank: Active Facilitation of Fraud

- Mechanics engaged in "proactive solution engineering" — actively working to keep troubled accounts operational rather than shutting them down or reporting to authorities. (¶ 126)

- On December 23, 2019, Rabo and Mechanics arranged a joint meeting with McClain. The agenda — overdrafts, remote deposits, sweep accounts, cattle logistics, credit renewals — went far beyond the typical role of a depository bank. (¶ 127)

- Rabo had deposit account control agreements (DACAs) giving it authority over Mechanics' accounts. Account statements were co-branded "Rabo AgriFinance Powered by Mechanics Bank." (¶ 135)

- After February 2023 inspection confirmed fraud, Mechanics continued executing sweeps transferring victim deposits to Rabo for five more weeks, knowing these were customer funds stolen through fraud. (¶¶ 154–157)

70

## Knowing Participation: Mechanics Bank: Corporate Connection & Profit Motive

- Rabo and Mechanics were sister companies owned by the same Dutch banking conglomerate, Coöperative Rabobank U.A. The Cooperative retained 9.9% ownership of Mechanics Bank. (¶¶ 296–299)

- Mechanics acquired RaboBank, N.A. — a Rabo sister company that pled guilty to felony money laundering for Mexican drug cartels. (¶¶ 296–297)

- Mechanics generated substantial fee income from processing hundreds of millions of dollars in daily transactions through McClain's accounts. (¶¶ 136–143)

- This corporate relationship created aligned incentives: Mechanics earned fee revenue from processing fraudulent transactions while Rabo earned interest on over-line advances used to cover overdrafts. (¶¶ 91, 94, 136–143)

71

## Knowing Participation: Mechanics Bank - Active Facilitation of Fraud

- McClain or Megan Goad would send blank, pre-signed checks on McClain's Mechanics Bank accounts to HTLF, where Ragland or employees held them until it was time to "close out" a transaction. (¶ 165)

- HTLF completed blank checks for amounts provided by McClain, deposited them into 2B Farms' account with immediate provisional credit, and allowed 2B Farms to wire uncollected funds directly back to McClain — often the same day. (¶ 165)

- This was not a one-time occurrence but "standard operating procedure" ongoing since before HTLF's acquisition of AIM Bank in 2020. (¶ 160)

- HTLF processed over $50 million in transactions through 2B Farms' account in a single month, and over $240 million in total between January and mid-April 2023. (¶¶ 215, 263)

72

## Knowing Participation:HTLF - Systematic Facilitation of Check-Kiting

- McClain or Megan Goad would send blank, pre-signed checks on McClain's Mechanics Bank accounts to HTLF, where Ragland or employees held them until it was time to "close out" a transaction. (¶ 165)

- HTLF completed blank checks for amounts provided by McClain, deposited them into 2B Farms' account with immediate provisional credit, and allowed 2B Farms to wire uncollected funds directly back to McClain — often the same day. (¶ 165)

- This was not a one-time occurrence but "standard operating procedure" ongoing since before HTLF's acquisition of AIM Bank in 2020. (¶ 160)

- HTLF processed over $50 million in transactions through 2B Farms' account in a single month, and over $240 million in total between January and mid-April 2023. (¶¶ 215, 263)

73

## Knowing Participation: HTLF -  Impossible Transaction Volumes & Ragland's Knowledge

- Between January 30 and April 6, 2023, over $231 million transferred from 2B Farms' HTLF account to McClain's Mechanics Bank accounts, with over $246 million moving in the opposite direction — representing ~246,000 head of cattle. (¶ 166)

- Ragland served as 2B Farms' loan officer for years, "knew them all their lives," and had intimate knowledge that 2B Farms did not feed 246,000 head of cattle. (¶ 167)

- Daily transaction amounts nearly doubled in February 2023, rising from approximately $1.4–1.5 million to $2.5–3.5 million. (¶ 166)

- Ragland was centrally involved in the Reagor-Dykes Auto Group fraud — the largest auto-dealer fraud in U.S. history — which employed a sophisticated check-kiting scheme, giving him the knowledge and blueprint to recognize and facilitate McClain's fraud. (¶ 159)

74

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 38 of 100

2/17/2026

## Knowing Particpation: HTLF - Goad's Role & AimBank Predecessor History

- Goad participated by signing and providing blank pre-signed checks to HTLF and Ragland, directing how and when checks should be completed, generating fraudulent invoices, and identifying amounts needed to keep the kite afloat. (¶ 276)

- Goad's testimony confirms her role coordinating daily deposit targets and the necessity of high-number wire transfers from 2B Farms due to bank limits on check deposits. (¶¶ 177, 179, 181)

- HTLF's predecessor, AimBank, was the subject of prior litigation alleging similar misconduct in connection with fraudulent check-kiting and improper banking practices in the Reagor-Dykes matter. (¶ 360)

- The convergence of Ragland's specialized knowledge, operational similarities between the schemes, and his active role compels the conclusion that Ragland and HTLF knowingly participated in and enabled McClain's check-kiting operation. (¶ 162)

75

## All Defendants: Coordinated Conspiracy

- Defendants had an agreement and/or understanding among them to commit and cover up the course of action inflicting damages on Plaintiffs. The check kite was a course of action agreed upon by the parties in furtherance of the fraudulent enterprise. (¶¶ 275–276)

- Rabo, Mechanics Bank, and CFSB actively conspired with each other, with HTLF, and with McClain and Goad to conceal McClain's financial instability and divert funds that should have been held in trust for Plaintiffs. (¶ 277)

- HTLF, Ragland, and Goad actively conspired with each other and with McClain to float an ever-growing fraudulent check kite, knowingly providing the paper and process that disguised the misuse of Plaintiffs' funds. (¶ 278)

- The object of the conspiracy was the continued apparent viability of McClain's fraudulent operations, benefitting the banks in fees, interest income, and profits. (¶ 279)

76

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 39 of 100

2/17/2026

## All Defendants: Complementary Roles in the Fraud

- As a non-bank lender, Rabo could not provide depository accounts — without Mechanics providing banking services, Rabo had no way to access customer trust money. (¶ 301)

- Rabo provided: the lending relationship, leverage over borrowers, installed management (Focus), false financial reports, and ultimate control through DACAs. (¶¶ 86–87, 308)

- Mechanics provided: depository accounts, transfer mechanisms, immediate credit availability, and the appearance of normal banking operations. (¶¶ 136–143)

- HTLF provided: the check-kiting mechanism through blank checks, immediate provisional credit, and same-day wire transfers of uncollected funds back to McClain. (¶¶ 160–165)

77

## Profited From Fraud

- Rabo's refusal to challenge McClain's fabricated BBCs was a calculated decision. The motive was financial: McClain's account generated an extraordinary 43% *profit* margin for Rabo. That *profit* gave Rabo every incentive to keep extending credit despite the obvious signs of fraud. (¶ 116)

- Rabo's own internal inspections repeatedly raised "red flags" about McClain's inadequate accounting systems, unreliable financial reporting, and impossible cattle inventory claims. Yet rather than exercise the prudent oversight required by industry standards and its own policies, Rabo chose to look the other way—motivated by the 43% *profit* margin it earned on McClain's account. (¶ 3)

- The object of the conspiracy was the continued apparent viability of McClain's fraudulent operations, which benefitted the banks in the form of fees, interest income, and *profits*, and benefitted the individual defendants in the form of compensation and influence. (¶ 279)

78

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 40 of 100

2/17/2026

Individual Responsibility

"Texas case law has held that each party to a fraudulent scheme is responsible for the acts of the other participants done in furtherance of the scheme and liable for fraud." *In re Arthur Anderson LLP*, 121 S.W.3d at 481 *(citing Skrepnek v. Shearson Lehman Bros., Inc.*, 889 S.W.2d 578, 580 (Tex. App.--Houston [14th Dist.] 1994, no writ); *Corpus Christi Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 202 [**24]  (Tex. App.--San Antonio 1991, no writ).

79

# COUNT TEN

**AIDING AND ABETTING OR KNOWING PARTICIPATION IN FRAUD**

Rabo, Mechanics Bank, and HTLF

21
80

40

Plaintiffs Have Sufficiently Pleaded The Elements of Aiding and Abetting or Knowing Participation in Fraud

81

## Aiding & Abetting — Rabo's Knowledge of Fraud

- In December 2019, Rabo's Regional Credit Officer filed an internal "Something Seems Strange" (SSS) report explicitly noting check-kiting activity. (¶¶ 119, 125)
- In October 2022, Rabo's financial analyst Jason Dunn admitted in writing that it was "very likely" wires from third parties were being diverted to cover prior checks. (¶ 132)
- By February 2023, Rabo's own collateral inspection report explicitly identified McClain's activities as a "Possible Fraud Case." (¶ 205)

82

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 42 of 100

2/17/2026

## Aiding & Abetting — Rabo's Knowledge (cont.)

- Rabo repeatedly approved borrowing base certificates claiming 87,000 head when facilities had maximum capacity of only 49,000 head. (¶¶ 112–117)
- In May 2022, Rabo's inspector reviewed bank statements showing $7.2 million in third-party wire transfers for "cattle" and identified massive third-party receivables. (¶¶ 106–111)
- When MFY was overdrawn by $2.5 million, Rabo's analyst responded: "$2.5 million!? WTF...." Rabo still approved the overdraft. (¶ 122)

83

## Aiding & Abetting — Mechanics Bank's Knowledge

- In October 2022, representatives from both Rabo and Mechanics openly used the word "kite" to describe McClain's operations. (¶ 131)
- In December 2019, when 7M was $4.8 million overdrawn, Mechanics responded with detailed proposals on how to move funds to conceal the overdraft. (¶ 126)
- In February 2023, Mechanics' SVP raised concerns about deposits that "don't appear to have anything to do with cattle." Rabo provided reassurances; Mechanics continued facilitating. (¶ 133)

84

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 43 of 100

2/17/2026

## Aiding & Abetting — HTLF & Ragland's Knowledge

- Ragland was centrally involved in the Reagor-Dykes fraud—the largest auto-dealer fraud in U.S. history—which employed a sophisticated check-kiting scheme, giving him the blueprint to recognize McClain's fraud. (¶ 159)
- Over $231 million transferred from 2B Farms' HTLF account between January and April 2023, representing ~246,000 head. Ragland "knew them all their lives" and knew they did not feed 246,000 head. (¶¶ 166–167)
- The blank check completion was "standard operating procedure" since before HTLF's acquisition of AIM Bank in 2020. (¶ 160)

85

## Aiding & Abetting — Substantial Assistance

- Rabo approved hundreds of millions in overdrafts despite knowing McClain's operations were unsustainable, and increased his credit line from $48M to $55M in January 2023. (¶¶ 118–119, 126)
- HTLF completed blank, pre-signed checks for amounts provided by McClain, deposited them with immediate provisional credit, and allowed same-day wires of uncollected funds back to McClain. (¶ 165)
- Rabo and Mechanics established DACAs giving Rabo authority over Mechanics accounts, with automatic sweep provisions transferring funds without borrower authorization.

86

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 44 of 100

2/17/2026

## Aiding & Abetting — Substantial Assistance (cont.)

- Rabo's Customer Relationship Manager identified by name which victims' money would be misappropriated: "source of cure is 1.3M wire from 2B farms and 1.6M from Lockwood Cattle." (¶ 92)
- On December 23, 2019, Rabo and Mechanics arranged a joint meeting with McClain covering overdrafts, remote deposits, sweep accounts, cattle logistics, and credit renewals. (¶ 127)
- After confirming fraud in February 2023, Rabo and Mechanics allowed victim deposits to continue flowing in and Rabo swept over $10 million to satisfy McClain's debt. (¶¶ 154–157)

87

## Aiding & Abetting — Profited From Fraud

- Rabo's refusal to challenge McClain's fabricated BBCs was a calculated decision. McClain's account generated an extraordinary 43% *profit* margin for Rabo. That *profit* gave Rabo every incentive to keep extending credit despite the obvious signs of fraud. (¶ 116)
- An October 2020 email admitted "no issues" because the accounts had "made like $12mln in *profits* last year." (¶ 97)
- HTLF processed over $50 million in transactions in a single month and over $240 million total between January and mid-April 2023, generating substantial fee income. (¶¶ 215, 263)

88

## Aiding & Abetting — Post-Discovery Conduct

- On February 28, 2023, Rabo's inspection confirmed at least 80,000 non-existent cattle. Inspector recommended immediate downgrade; senior management rejected it. (¶¶ 134, 146–150)
- March 1 – April 5, 2023: After confirmed fraud, Rabo swept over $10 million in victim deposits to satisfy McClain's debt rather than freeze accounts or notify victims. (¶¶ 154–157)
- Post-discovery victims include: Arnold Braun Trust ($526K), Brian Blackman ($662K), Charles Lockwood ($1.47M), Scarlett & Black Cattle ($2.54M), Thorlakson ($2.8M). (¶¶ 156–157)

89

---

## COUNT ELEVEN

### CIVIL CONSPIRACY

Rabo, Mechanics Bank, and HTLF

21
90

Plaintiffs Have Sufficiently Pleaded The Elements of Civil
Conspiracy

91

Elements of Civil Conspiracy

Claims for civil conspiracy arise when there are:

- (1) two or more persons;
- (2) an object to be accomplished;
- (3) a meeting of minds on the object or course of action;
- (4) one or more unlawful, overt acts; and
- (5) damages as the proximate result.

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019).

92

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W    Page 47 of 100

2/17/2026

## Civil Conspiracy — Object & Agreement

- The object of the conspiracy was the continued apparent viability of McClain's fraudulent operations, benefitting the banks in fees, interest income, and *profits*, and the individual defendants in compensation and influence. (¶ 279)
- Defendants had an agreement and/or understanding to commit and to cover up the course of action inflicting damages on Plaintiffs and Intervenors. (¶ 275)
- The check kite perpetuated by McClain and Defendants was a course of action agreed upon by the parties in furtherance of the fraudulent enterprise. (¶ 276)

93

## Civil Conspiracy — Explicit Coordination

- October 2022: Representatives from both Rabo and Mechanics openly discussed "kiting"—explicit acknowledgment followed by a decision to continue. (¶ 131; Dkt. 316 ¶ 236)
- February 2023: Mechanics' SVP raised concerns about suspicious deposits; Rabo provided reassurances allowing Mechanics to continue with plausible deniability. (¶ 133; Dkt. 316 ¶ 237)
- February 2021: Both banks agreed to temporarily tolerate a $9 million borrowing base deficiency while monitoring incoming deposits. (¶¶ 129, 369; Dkt. 316 ¶ 238)

94

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W     Page 48 of 100

2/17/2026

## Civil Conspiracy — Structural Coordination

- Formal DACAs and co-branded account statements ("Rabo AgriFinance Powered by Mechanics Bank") established a coordinated control arrangement beyond typical banking. (¶ 135; Dkt. 316 ¶ 238)
- December 23, 2019 joint meeting: overdrafts, remote deposits, sweep accounts, cattle logistics, credit renewals— unified management of the enterprise. (¶ 127; Dkt. 316 ¶ 314)
- Rabo and Mechanics were sister companies owned by the same Dutch conglomerate, Coöperative Rabobank U.A. The Cooperative retained 9.9% ownership of Mechanics. (¶¶ 296– 299)

95

## Civil Conspiracy — Parallel Conduct

- Three financial institutions with check-kiting detection systems simultaneously and continuously facilitated the same massive fraud while communicating with each other about it. (Dkt. 316 ¶ 268)
- After the February 2023 inspection confirmed fraud, the Banks coordinated a wind-down to maximize Rabo's recovery rather than notifying victims or freezing accounts. (¶¶ 146–157; Dkt. 316 ¶ 240)
- During this post-discovery period, HTLF increased its daily wire to Mechanics from ~$1.5 million to over $2.5 million. (Dkt. 316 ¶ 240)

96

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 49 of 100

2/17/2026

## Civil Conspiracy — Complementary Roles

- Rabo and Mechanics participated by ignoring their own check-kiting reports, approving multimillion-dollar overdrafts, and facilitating transfers that kept McClain's operations afloat. (¶ 276)
- HTLF and Ragland participated by holding blank pre-signed checks, completing them, depositing them, and immediately crediting millions in uncollected funds. (¶ 276)
- Goad participated by signing and providing blank pre-signed checks, directing how and when checks should be completed, and identifying amounts needed to keep the kite afloat. (¶ 276)

97

## Civil Conspiracy — Unlawful Overt Acts

- Rabo: Approved overdrafts despite knowledge of fraud; approved impossible BBCs; filed SSS reports yet expanded credit; swept over $10M in victim deposits post-February 2023. (¶¶ 87–89, 111–119, 156–157; Dkt. 316 ¶ 244)
- Mechanics: Processed hundreds of millions in transactions despite check-kiting reports; coordinated with Rabo on overdraft management; continued processing victim deposits after February 2023. (¶¶ 134–136, 158; Dkt. 316 ¶ 245)
- HTLF/Ragland: Received and held blank checks, completed and deposited them, immediately credited multimillion-dollar checks, and facilitated daily fund flows. (Dkt. 316 ¶ 246)

98

## Civil Conspiracy — Damages & Conclusion

- Plaintiffs and Intervenors have suffered over $50 million in damages as a direct and proximate result of the conspiracy. (¶ 281; Dkt. 316 ¶ 247)
- Rabo, Mechanics, and CFSB conspired with HTLF, McClain, and Goad to conceal McClain's financial instability and divert funds held in trust for Plaintiffs. (¶ 277)
- HTLF, Ragland, and Goad conspired with McClain to float an ever-growing fraudulent check kite, knowingly providing the paper and process that disguised the misuse of Plaintiffs' funds. (¶ 278)

99

## Order of Argument

- Background
  - David LeBas
- Fraud claims (Counts 2, 10, 11)
  - Abel Leal
- **Negligence claims (Counts 3, 5, 6)**
  - **Elizabeth Geary**
- Conversion, Tortious Interference, Fiduciary, and Contract claims (Counts 1, 8, 9, 12, 15)
  - David LeBas and Michael Duncan
- RICO claims (Counts 13, 14)
  - John Massouh

*(Not at issue: Counts 4, 7, 16)*

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 51 of 100

2/17/2026

# Count 3:  Negligence; Gross Negligence in Lending

Rabo
Mechanics Bank
HTLF

## Negligence:  Elements

1.  Duty or standard of care,

2.  Breach of that duty or standard,

3.  Proximate causation, and

4.  Damages or injury.

*Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 515 (5th Cir. 2018).

## Do the banks owe a duty to Plaintiffs?

The Fifth Circuit has recognized that a bank may owe a duty to a non-customer where:

*"a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation."*

*MidwestFeeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 518 (5th Cir. 2018) (quoting *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094–95 (11th Cir. 2017)).

103

## Factors Determining Duty

"[I]n determining whether a duty exists, a court must consider factors such as

• *risk,*

• *foreseeability,*

• *conduct,*

• *the magnitude of the burden of guarding against the injury, and*

• *the consequences of placing the burden on the defendant."*

*Owens v. Comerica Bank*, 229 S.W.3d 544, 547(Tex. App. – Dallas 2007).

104

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 53 of 100

2/17/2026

# Foreseeability is the "dominant consideration"

- actual control over accounts containing Plaintiffs' funds,
- actual knowledge that those funds were being misappropriated,
- actual knowledge that Plaintiffs' property was at risk, and
- actual coordination in using Plaintiffs' funds for unauthorized purposes.
- The complaint alleges that these banks made deliberate decisions to keep the fraud operational despite overwhelming evidence of what was happening.

105

# Factual Allegations showing Rabo owed a duty to the Plaintiffs.

- Rabo was aware of the nature of McClain's business involving payments from the Plaintiffs - cattle collateral accounted for over 95% of borrowing base
- Rabo did not conduct industry-standard head counts for over 4 years.
- Cattle at the feedyard exceeded capacity by as much as 1,264%
- Overdrafts for as much as $4.8 million were covered for five years
- Rabo placed profits over well-founded policies that should have served the purpose of protecting against fraud schemes
- Allowed a continual check kiting scheme to cover overdrafts after discovering the fraud in the Spring of 2023.
- Dkt. 213 ¶¶ 77-85, 98, 115-16, 145-57.

106

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 54 of 100

2/17/2026

## Rabo's knowledge of the cattle collateral

| BBC Date | Head Claimed at McClain Feed Yard | % Capacity |
|---|---|---|
| 4/30/2018 | 8,651 | 288% |
| 7/31/2018 | 9,971 | 332% |
| 7/31/2019 | 15,514 | 517% |
| 7/31/2020 | 21,191 | 706% |
| 7/31/2021 | 25,219 | 841% |
| 7/31/2022 | 31,927 | 1064% |
| 12/31/2022 | 37,924 | 1264% |

*Table 1: McClain Feed Yard had a permitted capacity of 3,000 head according to its Texas Commission on Environmental Quality permit, of which Rabo had knowledge. Purportedly, additional pens leased nearby brought that capacity up to 9,800, but even if the additional capacity existed, over-capacity BBCs were submitted by summer 2018.*

Dkt. 213 ¶ 112.

107

## Factual Allegations showing Mechanics owed a duty to the Plaintiffs

- Exercised joint control with Rabo over three deposit accounts of McClain
- Allowed and was aware of overdrafts in the millions.
- Allowed and encouraged a check kiting scheme by covering multi-million dollar overdrafts regularly, creating artificial liquidity
- Aware of the source of its deposits – Plaintiffs' funds
- Overdrafts since 2018 of multi-millions ($2.1 MM, $4.3 MM, $4.8 MM, $5.2 MM)
- Dkt. 213, ¶ 118-44.

108

## Factual Allegations showing HTLF owed a duty to the Plaintiffs

- Bank for 2B Farms – entity engaged in check kiting with McClain
- Created an artificial float essential to enabling McClain's fraud
- Allowed an escalation of check kiting to levels of $50 million per month
- Accepted blank, pre-signed checks from McClain and completed based on oral instructions to cover millions in overdrafts
- Branch president, Ragland, had previously been implicated in a massive check-kiting scheme involving Reagor-Dykes and processed $50 million in a month in check kiting for McClain/2B
- Dkt. 213, ¶ 158-69.

109

## Gross Negligence is adequately alleged

- Texas law defines gross negligence as conduct involving an extreme degree of risk with actual, subjective awareness but conscious indifference. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (citing *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001)); Tex. Civ. Prac. & Rem. Code § 41.011(11).
- The banks' employees completed written reports acknowledging the extreme degree of risk and red flags associated with McClain and 2B Farms.

110

# Count 5: Negligence; Gross Negligence in Hiring or Supervision and Management of Personnel

Rabo
Mechanics Bank
HTLF

# Do the banks owe a duty to Plaintiffs?

**Texas courts have recognized that an employer can be held liable for negligent hiring, supervision, or retention when the employer owed a legal duty to protect third parties from the employee's actions and the third party sustained damages proximately caused by the employer's breach of that duty.**

*Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 655 (Tex. App.—Houston [14th Dist.] 2002).

**Such duties exist where the nature of the employee's work creates foreseeable risks to third parties and the employer knows or should know of the employee's unfitness.**

*TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 240 (Tex. 2010).

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 57 of 100

2/17/2026

## Factors Determining Duty

"[I]n determining whether a duty exists, a court must consider factors such as

- *risk,*
- *foreseeability,*
- *conduct,*
- *the magnitude of the burden of guarding against the injury, and*
- *the consequences of placing the burden on the defendant."*

*Owens v. Comerica Bank*, 229 S.W.3d 544, 547(Tex. App. – Dallas 2007).

## Factual Allegations regarding Rabo:

- Rabo's inspector Michelle Stockett did not perform regular on-site inspections of the cattle at the McClain Texas yards and testified that when she did visit the facilities, she relied on handwritten yard sheets provided by McClain himself and she only spot-checked pens that McClain drove her to. [Dkt. 213 ¶ 224]

- Rabo's Chip Lawson and Jason Dunn aggressively pushed to secure the initial loan for McClain, and then, despite repeated overdrafts and glaring warning signs, kept McClain's operations afloat by increasing more than $50 million in working capital to McClain. [Dkt. 213 ¶ 81-84]

# Factual Allegations regarding Mechanics:

- Mechanics employees converted customer funds by coordinating their application to unauthorized overdrafts.
- Mechanics employees participated in fraud by knowingly facilitating check-kiting. Mechanics employees were grossly negligent in handling accounts they knew contained customer funds.
- Mechanics owed duties to properly supervise these employees because the employees were handling customer funds. When a bank's employees are managing accounts containing third-party property, the bank owes a duty to ensure those employees are properly trained on handling such property and are adequately supervised. Mechanics' failure to provide such training and supervision enabled the misappropriation of Plaintiffs' funds.
- Dkt. 213, ¶ 118-144.

# Factual Allegations regarding HTLF:

- HTLF's Branch president, Ragland, had previously been implicated in a massive check-kiting scheme involving Reagor-Dykes. Under HTLF's control and supervision, here, Ragland and/or other employees at the bank would accept batches of blank checks from McClain and then would fill out the checks and deposit the check (processed $50 million in a month in check kiting for McClain/2B)
- HTLF failed in retention—keeping an employee with check-kiting history in a position where he could facilitate more check-kiting.
- HTLF failed in supervision—allowing Ragland to process these massive, suspicious transactions without oversight or verification.
- HTLF failed in training—not ensuring Ragland understood his obligations to detect and prevent check-kiting given his history.
- HTLF had every reason to know that inadequate supervision of Ragland could enable fraud, and that is exactly what happened. The underlying tort is also clear. Ragland facilitated check-kiting, which is fraud. The check-kiting enabled McClain's broader fraud against Plaintiffs. HTLF's failure to properly supervise Ragland directly caused Plaintiffs' losses by enabling the check-kiting scheme that was essential to McClain's operations.
- Dkt. 213, ¶ 158-169

## Gross Negligence is adequately alleged

- Texas law defines gross negligence as conduct involving an extreme degree of risk with actual, subjective awareness but conscious indifference. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (citing *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001)).

- <u>Extreme degree of risk</u>: the employees were handling tens of millions of dollars. They were dealing with customer property and customer funds.

- <u>Subjective awareness</u>:
  - Rabo management knew Stockett's inspection methods were inadequate because employees were complaining about lack of access. Rabo management knew Lawson was making representations to other lenders. Rabo management knew its employees were filing warnings that were being ignored.
  - Mechanics management knew its employees were coordinating overdraft coverage using customer deposits. Mechanics management knew its employees were recognizing suspicious activity patterns.
  - HTLF management knew Ragland's check-kiting history. HTLF management could not have missed the explosion in transaction volumes under Ragland's supervision.

- The conscious indifference is shown by the deliberate decisions not to act.

117

# Count 6: Negligent Undertaking

Rabo
Mechanics Bank
HTLF

118

# Elements of Negligent Undertaking

(1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection;

(2) the defendant failed to exercise reasonable care in performing those services; and either

   (a) the plaintiff relied upon the defendant's performance, or

   (b) the defendant's performance increased the plaintiff's risk of harm.

*Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013).

# Rabo's Negligent Undertaking

- As McClain's primary lender, Rabo held a unique and privileged position with superior knowledge of the transactions and collateral.
- Rabo implemented monthly borrowing base certificates and assigned an inspector to verify collateral. It failed to do so for 4 years.
- Rabo implemented internal reporting systems requiring employees to flag problems. Rabo created "SSS" report mechanisms for suspicious activity.
- Despite its undertaking of these checks for fraud, it wholly failed to actually perform.
- Dkt. 213 ¶¶ 77-85, 96-143, 145-57.

# Mechanics Bank Negligent Undertaking

- Mechanics Bank was intimately aware of McClain's pattern of frequent overdrafts—occurring multiple times per week—that were consistently cured using Plaintiffs' and Intervenors' funds.

- Mechanics entered into join control agreements with Rabo wherein it voluntarily agreed to coordinate daily on account management. It failed to do so.

- Mechanics implemented monitoring systems to spot check-kiting. It cannot now claim ignorance when the systems were designed to identify and prevent the very harm to Plaintiffs.

- Dkt. 213 ¶¶ 106-110

121

# HTLF's Negligent Undertaking

- Monitoring for check kiting is standard practice in the banking industry and one that HTLF is alleged to have implemented.

- Instead of monitoring for check kiting, it facilitated check kiting by applying Plaintiffs' funds to overdrafts and completed blank checks of McClain.

- HTLF never investigated why transaction volumes had exploded. HTLF never implemented enhanced monitoring despite Ragland's check-kiting history.

- Dkt. 213 ¶¶ 158-169

122

## Order of Argument

- Background
  - David LeBas
- Fraud claims (Counts 2, 10, 11)
  - Abel Leal
- Negligence claims (Counts 3, 5, 6)
  - Elizabeth Geary
- **Conversion, Tortious Interference, Fiduciary, and Contract claims (Counts 1, 8, 9, 12, 15)**
  - **David LeBas** and Michael Duncan
- RICO claims (Counts 13, 14)
  - John Massouh

*(Not at issue:  Counts 4, 7, 16)*

*2/17/2026*        *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*        ***123***

# Count 1:  Conversion

Rabo

Mechanics

*2/17/2026*        *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*        ***124***

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 63 of 100

2/17/2026

# Conversion:  Elements

1.  Plaintiff owned or had a right to possession of the property;
2.  Defendant exercised dominion and control over the property (inconsistent with plaintiff's rights); and
3.  Defendant refused plaintiff's demand for return

- *Edge Petrol. Operating Co. v. GPR Holdings, LLC (In re TXNB Internal Case)*, 483 F.3d 292, 306 (5th Cir. 2007)

# Conversion:  Ownership by Plaintiffs

- Cattle owned by Plaintiffs:

> 190.   In every instance, Plaintiffs' and Intervenors' agreements with McClain for the care of cattle was for the care of the cattle that belonged to Plaintiffs and Intervenors. Plaintiffs and Intervenors purchased the cattle. McClain sent invoices detailed the cattle purchased.  Plaintiffs

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W    Page 64 of 100

2/17/2026

# Conversion:  Ownership by Plaintiffs (cont'd)

- Rabo and Mechanics knew about the ownership:



95.    For longer-term resolution of the ongoing overdraft problems and to service McClain's debt, Rabo's Customer Relationship Manager wrote to his supervisor on December 11, 2022, that McClain intended to pursue additional customer cattle relationships to bring in more revenue.

106.    Even more alarming, Rabo's own inspector acknowledged that she had reviewed McClain's March 2022 bank statements in coordination with Mechanics Bank. Those records revealed significant inflows from third parties. The statements made plain that Plaintiffs and Intervenors were wiring McClain substantial sums of money under the belief they were purchasing cattle, when in reality those funds were being funneled into a fraudulent operation that Rabo and Mechanics were already monitoring:

---

# Conversion:  Defendant dominion and control

- Rabo seized and sold or destroyed the remaining cattle, including Plaintiffs' cattle.
  - [Complaint ¶¶ 151 (below)-153, 189].



serve as the Chief Restructuring Officer. Plans were quickly arranged for Rabo to take possession of and auction off the cattle in McClain's yards, despite knowing that third parties owned these cattle and not subject to Rabo's lending or security agreements with McClain. Rabo did not make any attempt to determine or contact the rightful owners of the cattle before the cattle were liquidated by Rabo. The next several weeks were essential to Rabo and they needed to keep their

## Conversion: Defendant dominion and control (cont'd)

- Rabo and Mechanics applied proceeds to McClain's overdrafts and line of credit.
  - [Complaint ¶¶ 151-153, 190 (below)].

> feedyards.  Rabo took and applied proceeds towards McClain's loans and Mechanics took proceeds and applied them towards McClain's overdrafts.

## Conversion: Defendant dominion and control (cont'd)

- Rabo and Mechanics also accepted millions more in deposits from Plaintiffs after February inspection.
  - [Complaint ¶¶ 154-157, 192 (below), 193]

> 192.    In addition, as set forth in the chart above in Paragraph 156, Rabo and Mechanics continued to accept deposits into the accounts from Plaintiffs and Intervenors in an effort to reduce overdrafts and reduce the line of credit as much as possible before the cat was out of the bag. Finally, in early April 2023, Rabo and Mechanics Bank realized that they finally had to end the scheme, shut down accounts, swept accounts, and returned checks to Plaintiff's and Intervenors.

## Conversion:  Refusal to return converted property/proceeds

- Rabo and Mechanics refused Plaintiffs' demands to return the cattle and proceeds ¶ 193

- Rabo and Mechanics further seized the money paid in for purchase of cattle after the February inspection, knowing cattle had not been purchased with the funds ¶ 193

> 193.    Despite Plaintiffs' and Intervenors' demands to return the cattle, and then to return the sales proceeds to them, Defendants have refused. In addition, Rabo seized funds in the Mechanics Bank accounts that represent funds delivered to McClain for the purchase of cattle, when Defendants knew McClain failed to purchase new cattle with those funds.

---

## Money paid for specific purpose and proceeds from specific property are "specific"

- "Money need not be in the form of 'collectible coins' or 'a stack of specific bills' to be 'specific'—it must simply be identifiable. 'When a person has designated a particular use for proceeds from a check,' for example, 'those proceeds count as specific money, capable of identification.'
  - *Branch Banking & Tr. Co. v. Healthgrowth Credit, LLC*, No. 1:18-CV-783-RP, 2019 U.S. Dist. LEXIS 139450, at *14 (W.D. Tex. 2019) (holding that proceeds from converted accounts receivable were also subject to conversion claim under Texas law) (citing *Sw. Indus. Inv. Co., Inc. v. Berkeley House Inv'rs*, 695 S.W.2d 615, 617 (Tex. App.—Dallas 1985, writ ref'd n.r.e.))

# Money and proceeds alleged here are "specific"

- Cattle were specific and held for a specific purpose, and the proceeds therefore are specific
- Money paid to McClain by Plaintiffs while Rabo and Mechanics were winding down the enterprise was for specific purpose

# Debunking Rabo and Mechanics' argument re Unlawful Retention of Proceeds

- Cases cited do not support dismissal here

  - *United States v. Boardwalk Motor Sports, Ltd.*, 692 F.3d 378, 381 (5th Cir. 2012) (Plaintiff never owned or had right to possess the automobile from which it claimed conversion of proceeds, therefore no conversion)
  - *Campbell v. Fort Worth & W. R.R.*, No. 4:09-CV-037-Y, 2010 U.S. Dist. LEXIS 161794, at *14 (N.D. Tex. 2010) (Plaintiff never had right to the funds in the first place, therefore no conversion)
  - *Lawyers Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 720 (Tex. App.—Dallas 2014) (fact issue existed as to whether defendant exercised dominion or control)

## Debunking Rabo and Mechanics' argument re Unlawful Retention of Proceeds (cont'd)

- Cases cited do not support dismissal here

  - *Mitchell Energy Corp. v. Samson Res.*, 80 F.3d 976, 984 (5th Cir. 1996) (no conversion because "a co-tenant has the legal right to extract and sell minerals from the common property")
  - *Edge Petrol. Operating Co. v. GPR Holdings, LLC (In re TXNB Internal Case)*, 483 F.3d 292, 306 (5th Cir. 2007) (summary judgment denied because there was no enforceable security interest to be converted)

*2/17/2026*　　*24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*　　**135**

135

# Counts 8 and 9:  Tortious Interference with a Contract; Conspiracy to Tortiously Interfere

Rabo

Mechanics

*2/17/2026*　　*24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*　　**136**

136

## Tortious Interference:  Elements

1. an existing contract subject to interference,
2. willful and intentional act of interference with the contract, that
3. proximately caused the actual damages or loss to plaintiffs
   - *Peykoff v. Cawley*, No. 24-10186, 2025 WL 1380070, at *6 (5th Cir. May 13, 2025)

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *137*

## Tortious Interference:  Existing Contract

- Plaintiffs had valid agreements with McClain to:
  - Purchase cattle
  - Place cattle on feed at McClain's yards
  - Have McClain sell cattle and remit net proceeds
- Complaint alleges:
  - Ownership of cattle remained with Plaintiffs
  - Proceeds from cattle sales were to be remitted to them under these agreements

[e.g. Dkt. 213 ¶¶ 15-65, 73-76, 190, 250]

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *138*

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 70 of 100

2/17/2026

## Tortious Interference:  Existing Contract (cont'd)

- Agreements with McClain pleaded throughout complaint
  - [e.g. Dkt. 213 ¶¶ 15-65, 73-76, 190, 250]



## Tortious Interference:  Willful Interference

- Knew of Plaintiffs' agreements with McClain (Thorlakson Agreement January 2021) [Dkt. 213 ¶¶ 95, 105, 149, 190, 316, 366]
- May 2022 Inspection Report shows large feed purchases for third-party owned cattle [¶ 105]
- Rabo expressly acknowledged several of these agreements [Dkt. 213 ¶¶ 15, 62, 366-67, 377]
- Mechanics collaborated with Rabo regarding Plaintiffs' payments [Dkt. 213 ¶¶ 119, 132]
- Mechanics and Rabo further collaborated under DACAs, co-branding as "Rabo Agrifinance Powered by Mechanics Bank" [Dkt. 213 ¶ 135]

Case 24-02007-swe   Doc 371-1   Filed 02/17/26   Entered 02/17/26 08:44:00   Desc
Exhibit Plaintiffs PPT Slides B&W   Page 71 of 100

2/17/2026

## Tortious Interference:  Willful Interference (cont'd)

- Interfered with Plaintiffs rights under agreements with McClain by
  - February 2023 Report: "Recommendation to downgrade immediately and take control of cattle as soon as possible due to concerns related to cattle being owned by other parties" [Dkt. 213 ¶ 148]

  - Taking Plaintiffs' cattle while acknowledging they did so "whether they are truly theirs or not" [Dkt. 213 ¶¶ 151-153]

  - Taking proceeds from Plaintiffs' cattle seized by Rabo [Dkt. 213 ¶¶ 151-153, 190-191]

  - Taking payments from Plaintiffs meant to purchase additional cattle [Dkt. 213 ¶¶ 154-157, 192-193]

  - Applied proceeds and additional payments to overdrafts/loans [Dkt. 213 ¶¶ 151-157, 192-193]

## Tortious Interference:  Damages

- Plaintiffs were damaged by interference in, among other damages:

  - Loss of proceeds from cattle seized/sold [Dkt. 213 ¶ 151-154]

  - Loss of money paid for purchase of new cattle that went straight to Rabo/Mechanics' coffers [Dkt. 213 ¶¶ 156-157]

# Rabo's purported security interest is inapplicable or junior to Plaintiffs' interests

- Rabo in its motion purports to have a security interest over "all assets" held by McClain.  Dkt. 265 at 31.
- Court limited to allegations in Complaint; not Rabo's description.
- Complaint describes only an inapplicable or junior interest, if any
  - Dkt. 213 ¶¶ 147,  366, 377.







*2/17/2026*

*143*

143

# Conspiracy to Tortiously Interfere:  Elements

1. two or more persons;
2. an object to be accomplished;
3. a meeting of minds on the object or course of action;
4. one or more unlawful, overt acts; and
5. damages from the underlying tort
   - *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019)

144

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 73 of 100

2/17/2026

# Conspiracy to Tortiously Interfere:  Pleaded

- Parties: Rabo and Mechanics

- Object:  Protect banks' own financial interests by diverting Plaintiffs' cattle / contract proceeds [Dkt. 213 ¶ 251, 253]

145

# Conspiracy to Tortiously Interfere:  Pleaded

- Meeting of minds plausibly inferred from pattern of coordinated, collaborative conduct:
  - Joint meeting (Jan. 2020: Mechanics and Rabo at McClain facility) [¶¶ 127-130]
  - Internal communications about "check-kiting" increasing in October 2022
  - DACAs and sweep arrangements giving Rabo control over Mechanics accounts
  - Daily/regular coordination on overdrafts, application of incoming wires, and management of shortfalls
  - Feb. 2023, Mechanics raising concerns about certain deposits that "don't appear to have anything to do with cattle" and relying on Rabo's reassurances
  - [ Dkt. 213 ¶¶ 86–92, 118–137, 190-191, 249–254, 272–280]
    - *See Wackman v. Rubsaman*, 602 F.3d 391, 409 (5th Cir. 2010) (intent to conspire "can be proven by circumstantial evidence and reasonable inference")

146

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 74 of 100

2/17/2026

## Conspiracy to Tortiously Interfere:  Pleaded (cont'd)

- Overt acts / Tortious Acts:
  - Participated in check-kite and exchanged emails about it by fall 2022 at latest [Dkt. 213 ¶ 131]
  - Seizing third-party cattle and applying proceeds to overdrafts (Mechanics) and line of credit (Rabo)
  - Accepting and sweeping March–April 2023 wires/checks from named Plaintiffs to cover McClain overdrafts/line of credit
  - Processing victim deposits after February 2023 "Possible Fraud" findings [Dkt. 213 ¶¶ 148–150, 154–157]
- Damages:
  - Plaintiffs deprived of cattle and contractually owed proceeds
  - Funds paid in
  - Aggregate losses exceeding $50 million for cattle producers
    - [¶¶ 281, 385–387]

*2/17/2026*    *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*    **147**

# Count 15: AgTexas and Thorlakson Claims Based on Intercreditor Agreement

Rabo

*2/17/2026*    *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*    **148**

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 75 of 100

2/17/2026

## Intercreditor Agreement





E.    AgTexas, RAF and McClain desire to enter this Agreement to set forth the relative priority of the security interests, liens and other interests relating to cattle and related assets subject to the Cattle Feeding Agreements and the underlying transactions between McClain and Thorlakson LP.

*Highlighted text is quoted at ¶ 366 of complaint.*

---

# Intercreditor Agreement

- *Dated January 27, 2021*
- *Parties are Rabo, AgTexas, McClain, Thorlakson*
- Intercreditor Agreement provides:
    - ¶1(i) Disclaimer of partnership between McClain and Thorlakson
    - ¶1(ii) Agreement that McClain has no ownership of cattle subject to a Cattle Feeding Agreement ("CFA")
    - ¶1(iii) Agreement that all cattle subject to a CFA are owned *by Thorlakson*
    - ¶1(iv) Agreement that the AgTexas lien on Thorlakson cattle is subject to McClain's agister's lien
    - ¶1(v) Agreement that RAF and McClain disclaim a lien on cattle of Thorlakson, except for McClain's agister's lien
    - ¶1(vi) Agreement that AgTexas disclaims a lien on cattle owned by McClain
    - ¶ 3 Agreement that Rabo would hold sales proceeds "in trust" for Thorlakson and AgTexas

*Description above at ¶ 367 of complaint.*

# Intercreditor Agreement

Highlighted text of intercreditor agreement quoted at Dkt. 213 ¶ 286:

> 3.     If either Party obtains possession of any proceeds of cattle that are subject to a Cattle Feeding Agreement in violation of or contrary to the terms of this Agreement, such Party will hold said proceeds in trust for the benefit of the other Party or Parties, will promptly notify the other Party or Parties of such fact, and will promptly deliver such proceeds to the other Party or Parties.

151

# Causes of Action

- Complaint at paragraph 374 alleges claims against Rabo to the extent that Rabo acquired cattle or proceeds belonging to Plaintiffs arising out of the Intercreditor Agreement for:
  - fraud,
  - conversion,
  - breach of contract, and
  - breach of fiduciary duty

- 

152

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 77 of 100

2/17/2026

# Facts Known to Rabo When Intercreditor Agreement Was Negotiated and Performed

- Complaint at paragraph 125 says: "In December 2019, when 7M was overdrawn by $4.8 million, Rabo's Regional Credit Officer filed a report entitled "Something Seems Strange" (SSS), explicitly noting check-kiting. Even then, Rabo and Mechanics continued to cover overdrafts and extend credit, further embedding itself in the scheme."
- On February 18, 2021, Rabo's Financial Analyst wrote a report that said McClain Farms had lost $4.5 million in 2020, that he had "major concerns," that the sales prices reported by McClain made "zero sense to me," and that because McClain was transferring so much money between his entities, "we have no idea who owes who and how much."
- Complaint para. 200 - 201: In early 2022, Rabo's Chip Lawson told Colton Long's lender, Amarillo National Bank, that McClain's "financial performance is excellent" and that Debtors "made a 'boat load' of money in 2021." He also made misrepresentations about the strength of McClain's borrowing base and equity. Rabo made no disclosure of any negative information or qualification about doing business with McClain.
- Colton Long was AgTexas' relationship manager for the Thorlakson loan
- Rabo did not relay the true facts to AgTexas and Thorlakson or retract the misrepresentations.
- Had they known what Rabo knew, they would not have suffered their $9.8 million loss.

# Order of Argument

- Background
  - David LeBas
- Fraud claims (Counts 2, 10, 11)
  - Abel Leal
- Negligence claims (Counts 3, 5, 6)
  - Elizabeth Geary
- Conversion, Tortious Interference, **Fiduciary**, and Contract claims (Counts 1, 8, 9, **12**, 15)
  - David LeBas and **Michael Duncan**
- RICO claims (Counts 13, 14)
  - John Massouh

*(Not at issue:  Counts 4, 7, 16)*

# Count 12:  Breach of Fiduciary Duty / Aiding and Abetting / Knowing Participation in Breach of Fiduciary Duty

Rabo

Mechanics

# Fiduciary Claims:  Elements

- Breach of Fiduciary Duty
  - Existence of Duty
  - Breach of Duty
  - Injury to plaintiff *or* benefit to defendant
    - *See First United Pentecostal Ch. V. Parker*, 514 S.W.3d 214, 220 (Tex. 2017)
- Knowing Participation in Breach / Aiding and Abetting Breach
  - Knowledge of Fiduciary Duty owed by another party
  - Knowledgeable participation in / Substantial assistance in breach
    - *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (knowing participation)
    - *Floyd v. Hefner*, 556 F. Supp. 2d 617, 655 (S.D. Tex. 2008) (aiding and abetting)

# Fiduciary Claims:  Existence of Duties

- Rabo & Mechanics' direct duties owed to Plaintiffs:
  - Common Law:  "if a bank knows that deposits by a debtor in his own name are in fact held by him in a fiduciary capacity, then the bank may not apply such funds to the individual indebtedness of the debtor."  [Dkt. 213 ¶ 285]
    - *S. Cent. Livestock Dealers, Inc. v. Sec. State Bank*, 551 F.2d 1346, 1349 (5th Cir. 1977)
- Rabo and McClain's duties to AgTexas/Thorlakson Plaintiffs:
  - Contract:  Rabo and McClain agreed to hold proceeds from Thorlakson cattle in trust for Thorlakson/AgTexas [Dkt. 213 ¶ 286]
- McClain's duties owed to Plaintiffs:
  - Statutory:  Dealer Trust Act.  7 U.S.C. 217b [Dkt. 213 ¶ 286]

# Fiduciary Claims:  Existence of Duties (cont'd)

- *S. Cent. Livestock Dealers, Inc. v. Sec. State Bank*, 551 F.2d 1346, 1349 (5th Cir. 1977):
  - Relies on *Steere v. Stockyards National Bank*, 256 S.W. 586, 589-92 (Tex.Com.App.1923, opinion adopted)
- In *Steere:*
  - Where a bank seeks to "benefit from a fund held in trust by a depositor," "the bank becomes a party to the action of the trustee and stands as any other person dealing with one holding property in a fiduciary capacity."
  - Bank was precluded from applying proceeds known to be from a consignment sale to the bank customer's overdraft.

# Fiduciary Claims:  Knowledge 12(b) Standard

- Pleading facts that give rise to inference of banks' actual knowledge of wrongdoing satisfies pleading standard
  - *Letidas Logistics, LLC v. Citibank,* 789 F. Supp. 3d 1121, *1128-29 (S.D. Fla. 2025)
- In *Letidas*, plaintiff pleaded facts that (1) the bank had long been aware of potential fraud in the wrongdoer's account, including questionable deposits and withdrawals of ever-increasing size, (2) the bank was aware of a forgery in the account, and (3) that plaintiff and potential plaintiff funds were immediately depleted by withdrawals from the account.
- Reasonable inferences required denial of 12(b) motion ("While the evidence may throw very different light upon these elements after discovery is conducted, at this stage of the litigation and under the [12(b)(6)] governing standard of review these claims survive")

# Fiduciary Claims:  Rabo Knowledge

- Knew ~1/3 of yard cattle were "custom feeders'" cattle, including Plaintiffs by May 2022 [Dkt. 213 ¶¶ 98, 105, 115–116]





- Knew of trust/priority agreements for specific customers (Priest, Thorlakson/AgTexas) and nonetheless asserted "priority lien ... whether they are truly theirs or not" [¶¶ 62–65, 150–152, 377–381]
- Reassured Mechanics that deposits from custom feeders were cattle-related [¶ 133]

# Fiduciary Claims:  Mechanics Knowledge

- Saw wire descriptions and deposit sources from Plaintiffs indicating cattle purchases [¶¶ 16–36, 107, 155–157, 235–236]
- Joint meeting (Jan. 2020: Mechanics and Rabo at McClain facility) [¶¶ 127-130]
- Mechanics Sr. VP satisfied that money deposited to cover Feb. 2023 $3 million overdraft was for cattle purchases after raising issue to Rabo.  [¶ 133]
- Received daily/weekly check-kiting reports flagging McClain accounts, consistently appearing at top of lists [¶¶ 143, 235–236]

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          **161**

# Fiduciary Claims:  Banks' Direct Breaches

- Both Mechanics and Rabo applied cattle proceeds/funds to McClain's overdrafts/loan [Dkt. 213 ¶¶ 151-157, 192-193]
  - *See S. Cent. Livestock Dealers, Inc. v. Sec. State Bank*, 551 F.2d 1346, 1349 (5th Cir. 1977)
- Both knew they were applying money for new purchases to overdrafts [¶ 131-32]

> 131.    By the fall of 2022, even Rabo's Senior Relationship Manager and Mechanics' Senior Vice President were using the word "kite" in their conversations about McClain's accounts. Yet instead of stopping the activity, Rabo advised Mechanics simply to "follow protocols." Nothing was done.
>
> 132.    On October 11, 2022, Rabo's financial analyst Jason Dunn admitted in writing it was "very likely" that wires McClain promised would cover overdrafts—often funds from third-party customers like Plaintiffs and Intervenors—were being diverted to cover prior checks. Dunn concluded: "I think Brian is in more cash trouble than we think."

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          **162**

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 82 of 100

2/17/2026

# Fiduciary Claims:  Banks' Direct Breaches

- Rabo's additional contractual breach
  - Applied proceeds from Thorlakson cattle it had agreed to hold in Trust for AgTexas/Thorlakson

# Fiduciary Claims:  Rabo's Substantial Assistance

- Continuously extended/expanded credit despite knowing BBCs and cattle counts were false and that significant portions of cattle belonged to customers [Dkt. 213 ¶¶ 79–85, 98, 111–117]
- Structured sweep/DACA arrangements so proceeds and prepaid funds were applied debt [¶¶ 86–89, 135–137, 190–192]
- Took control of yards, seized/sold Plaintiff cattle, with proceeds to McClain's debts, rather than to owners [¶¶ 145–154, 190–192, 281]
- "Whether the[ cattle] are truly theirs or not, we have a priority lien" [¶ 150] shows conscious disregard third-party ownership and trust obligations

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 83 of 100

2/17/2026

## Fiduciary Claims:  Mechanics' Substantial Assistance

- Routine multi-million-dollar overdrafts cured with Plaintiffs' deposits instead of being held in trust [¶¶ 107, 118–144, 156–157, 190–192, 235–236]
- Continued processing victim deposits and sweeps after February 2023 fraud confirmation [¶¶ 145–157]
- Not mere passive depository bank
  - Sweep/DACA arrangements
  - Co-branded "Rabo AgriFinance Powered by Mechanics Bank" [Dkt. 213 ¶¶ 86, 135–137]
  - Daily coordination with Rabo on overdrafts and application of incoming deposits [¶¶ 89–92, 118–137]

*2/17/2026*     *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*     *165*

## Order of Argument

- Background
  - David LeBas
- Fraud claims (Counts 2, 10, 11)
  - Abel Leal
- Negligence claims (Counts 3, 5, 6)
  - Elizabeth Geary
- Conversion, Tortious Interference, Fiduciary, and Contract claims (Counts 1, 8, 9, 12, 15)
  - David LeBas and Michael Duncan
- **RICO claims (Counts 13, 14)**
  - **John Massouh**

*(Not at issue:  Counts 4, 7, 16)*

*2/17/2026*     *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*     *166*

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 84 of 100

2/17/2026

# Counts 13 and 14: Racketeer Influenced and Corrupt Organizations (RICO) Act

Rabo / Mechanics

HTLF / Ragland

## RICO: Elements

**18 U.S.C. § 1962(c):**

**"[I]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."**

| Element | Standard |
|---|---|
| Person | Capable of holding legal/beneficial interest in property |
| Enterprise | Association-in-fact: purpose, relationships, and longevity |
| Pattern | Two+ predicate acts with relatedness & continuity |
| Conduct | Direct/exercise managerial role through racketeering. |
| Commerce | Activity or predicate acts affect interstate commerce |
| Causation | Proximate causation - Violation led directly to injuries |
| Injury | Violation caused injury to business or property |

# Count XIII
# Rabo/Mechanics Enterprise

169

## RICO: Elements Summary

| Element | Count XIII (Rabo/Mechanics) | Count XIV (HTLF/Ragland) |
|---|---|---|
| Person | **Rabo & Mechanics are distinct entities** [Dkt. 213 ¶¶ 66-68] | **HTLF, Ragland, and Goad distinct entities** [Dkt. 213 ¶¶ 69-70] |
| Enterprise | **Purpose: Convert customer assets.** [Dkt. 213 ¶¶ 3, 79-82, 86-87, 92, 116, 119-144, 166, 300, 308, 310-315, 316-318, 336-338, 340-344, 150-152, 154-157] **9-year operation** | **Purpose: Perpetuate check-kiting** [Dkt. 213 ¶¶ 157, 165-166, 177-178, 243(f), 261, 359] **Closed-loop fraud 7+ years (2016-2023)** [Dkt. 213 ¶¶ 159-160, 225, 360-361] |
| Pattern | **Wire/mail/bank frauds** [Dkt. 213 ¶¶ 24, 45, 86-87, 92, 107, 137-138, 152, 154, 156, 165-166, 177, 178, 310-318, 326-329, 334-338, 346-347, 380] **3 major schemes** [Dkt. 213 ¶¶ 310-315, 73-157, 316-318, 319-351, 344] **50+ victims from 2014-2023** [Dkt. 213 ¶¶ 316-65, 311, 317, 347] | **Check-kiting; $100M+ transactions** [Dkt. 213 ¶¶ 157, 165-166, 177-178, 243(f), 261, 359] **Reagor-Dykes precedent** [Dkt. 213 ¶¶ 159-160, 225] |
| Conduct | **Rabo: strategic decisions** **Focus installation** [Dkt. 213 ¶¶ 308, 318, 350] **Mechanics provided proactive engineering** [Dkt. 213 ¶¶ 90-93] | **Ragland: blank checks, immediate processing** [Dkt. 213 ¶¶ 71, 152, 160, 165-166, 178, 261, 380] **Goad: invoices, coordination** [Dkt. 213 ¶¶ 165, 177-181, 243(f)-(g), 261-263, 265, 359] |
| Commerce | **interstate wires/mails** [Dkt. 213 ¶¶ 92, 334-335] **Victims in 9 states** [Dkt. 213 ¶¶ 16-65, 92, 166, 311, 317, 319-351, 334-335, 347] | **Interstate wires/mails** [Dkt. 213 ¶¶ 16-65, 165-166] |
| Causation | **Direct: Dec 2019 call → $7.248M loss** [Dkt. 213 ¶¶ 334-337] **Post-discovery of theft scheme → $10M+** [Dkt. 213 ¶¶ 86-87, 154-157] | **Direct: Check-kiting → customer losses** [Dkt. 213 ¶¶ 2-3, 73, 157, 160, 165-166, 178, 257, 261-262, 359] |
| Injury | **CJ: $12.4M; Jared Lesh: $7.7M** [Dkt. 213 ¶¶ 16-65, 352] **50+ victims: tens of millions** [Dkt. 213 ¶¶ 16-65, 310-311, 317, 352] | **Substantial losses to Plaintiffs/Intervenors** [Dkt. 213 ¶ 16-65, 317, 362] |

170

85

# RICO: Enterprise Summary

**"Any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity" 18 U.S.C. § 1961(4)**

- **Association-in-Fact Requirements: Must have Purpose, Relationships, and Longevity.**

## Two Distinct RICO Enterprises

| Element | Count XIII (Rabo/Mechanics Enterprise) | Count XIV (HTLF/Ragland Enterprise) |
|---|---|---|
| **Duration** | 2014-2023 (9 years) | 2016-2023 (7+ years) |
| **Purpose** | Systematically convert customer assets to satisfy imprudent loans | Perpetuate and enable fraud through check-kiting |
| **Operations** | Waggoner, McClain, Phillips (3 major) Rabo money laundering | McClain check-kite via 2B Farms RD check-kite through sight drafts |
| **Wire Fraud** | $250M+ check-kiting, $10M+ victim deposits | Hundreds of millions of dollars in reciprocal checks/wires daily |
| **Mail Fraud** | Dishonored checks across state lines | Blank checks overnighted to HTLF; sight drafts mailed to financial institutions |
| **Bank Fraud** | 4+ FDIC institutions defrauded | 4+ FDIC institutions defrauded |
| **Victims** | 50+ cattle producers, 4+ banks | 50+ cattle producers, 1,000 dealership customers, 10+ banks |

# RICO: Person

18 U.S.C. § 1961(3)
"Any individual or entity capable of holding a legal or beneficial interest in property"

Count XIII (Rabo/Mechanics Enterprise)
    Rabo AgriFinance LLC  [Dkt. 213 ¶ 66]
    Rabo Diversified Services, LLC (Delaware) [Dkt. 213 ¶ 67]
    Mechanics Bank (California stock corporation) [Dkt. 213 ¶ 68]

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 87 of 100

2/17/2026

# RICO: Enterprise - Purpose

## Count XIII (Rabo/Mechanics)

**Purpose: Systematically convert customer assets to satisfy Rabo's imprudent loans and Mechanics' overdrafts**

**Methodology Applied Across All Operations**

1. Make Imprudent Loan: McClain "not creditworthy" yet approved for 43% profit margin [Dkt. 213 ¶¶ 79-82, 116]
2. Establish Control: DACAs & sweeps gave Rabo control over customer funds [Dkt. 213 ¶¶ 86-87]
3. Facilitate Kite: $477M+ circular transactions, daily Rabo/Mechanics coordination [Dkt. 213 ¶¶ 92, 119-144, 166]
4. Install Fixer: Focus Management for direct operational control [Dkt. 213 ¶¶ 308, 316]
5. Loot Trust Accounts: False assurances customer funds could pay Rabo [Dkt. 213 ¶¶ 308-316, 336-338]
6. Conceal Fraud: False reports, monitoring, "keep it quiet" [Dkt. 213 ¶¶ 338, 340-344]
7. Final Liquidation: Even after fraud discovered Feb 28, 2023, took $10M+ more [Dkt. 213 ¶¶ 150-152, 154-157]

# RICO: Enterprise - Purpose

## Count XIII (Rabo/Mechanics)

**Three Major Operations**

| Operation | Period | Key Allegations |
|---|---|---|
| **Waggoner** [Dkt. 213 ¶¶ 310-315] | **2014-2018+** | • **$31M+ loan to Cliff Hanger** [Dkt. 213 ¶¶ 310-315]<br>• **Utrecht directors ordered "syndicate at all costs"** [Dkt. 213 ¶ 312]<br>• **False borrowing base reports to syndicate** [Dkt. 213 ¶¶ 310-315]<br>• **Converted Lone Star Bank collateral** [Dkt. 213 ¶¶ 310-315] |
| **McClain** [Dkt. 213 ¶¶ 73-157] | **2018-2023 (5 years)** | • **Approved despite "not creditworthy" determination** [Dkt. 213 ¶ 122]<br>• **$477M+ check-kiting** [Dkt. 213 ¶ 166]<br>• **Feb 28, 2023: Inspection revealed 72K cattle shortfall** [Dkt. 213 ¶ 342]<br>• **Continued 5 weeks, took $10M+ more** [Dkt. 213 ¶¶ 154-157]<br>• **50+ producers, 9 states victimized** [Dkt. 213 ¶¶ 16-65, 310-311, 317, 352] |
| **Phillips** [Dkt. 213 ¶¶ 319-351] | **2012-2023 (11 years)** | • **CJ: $12M+ total loss** [Dkt. 213 ¶ 352]<br>• **Dec 31, 2019: Redden call, $7.2M wire fraud** [Dkt. 213 ¶¶ 334-337]<br>• **Phillips account overdrawn $577,882** [Dkt. 213 ¶ 344]<br>• **"Keep it quiet" - active concealment** [Dkt. 213 ¶ 338] |

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 88 of 100

2/17/2026

# RICO: Enterprise - Relationships

## Count XIII (Rabo/Mechanics)

**Requirement: Defined relationships among those associated with the enterprise that exceed normal commerce**

**Daily Coordination**
- Dec 2019: Rabo instructed Mechanics to cover McCain overdraft through over-line advance because "it allows us to earn interest on this amount" [Dkt. 213 ¶¶ 90, 94]
- Dec 13, 2019: Rabo approved $2.5 million overdraft: "source of cure is 1.3M from 2B farms and 1.6M from Lockwood" [Dkt. 213 ¶ 92]
- Apr 2022: Despite "$2.5 million!? WTF", filed SSS report noting "check-kiting" yet continued [Dkt. 213 ¶¶ 5, 122]
- Dec 23, 2019: Rabo, Mechanics, and McClaim meet to discuss "overdrafts, remote deposits, sweep accounts" [Dkt. 213 ¶ 127]

**Corporate Connection**
- Sister companies owned by Coöperative Rabobank U.A. [Dkt. 213 ¶¶ 298-299]. Co-branded accounts "Rabo AgriFinance Powered by Mechanics Bank" [Dkt. 213 ¶ 135]. Aligned: Mechanics earned fees, Rabo earned interest on over-line advances [Dkt. 213 ¶¶ 91, 94, 136-143]

**Complementary Roles - Neither Could Act Alone**
- Rabo: Lending relationship, installed Focus, created false docs, controlled via DACAs [Dkt. 213 ¶ 81-82, 86-87, 308, 318, 338, 340-344, 350]
- Mechanics: Depository accounts, executed sweeps, processed $477M+ check-kiting [Dkt. 213 ¶ 86, 90, 166, 318-319]
- Without Rabo's control, Mechanics had no mechanism to direct transfers, and without Mechanics' infrastructure, Rabo had no access to customer funds [Dkt. 213 ¶ 319]

# RICO: Conducting Enterprise Affairs

## Count XIII (Rabo/Mechanics)

Standard: Persons liable for conducting or participating in conducting affairs of enterprise are those who direct or exercise managerial role in affairs of enterprise through pattern of racketeering activity.

Requirements: Defendant must conduct enterprise's affairs, not merely its own affairs. May be shown if group bands together to commit pattern of racketeering that they could not accomplish on their own.

**Rabo: Strategic Decision-Making at Highest Levels -** decisions by senior leadership to pursue profit over prudence [Dkt. 213 ¶¶ 81, 312]

**Rabo: Control of Accounts -** exercised direct control over borrowers' Mechanics Bank accounts; auto "sweep" provisions allowed transfer of funds without borrower authorization [Dkt. 213 ¶¶ 86-87, 92, 95-96, 200, 268, 299, 308, 313, 318, 350]

**Rabo: Installation of Management -** installed Focus with authority to direct operations and authorize fund transfers. [Dkt. 213 ¶¶ 308, 316]

**Rabo: Creation of False Documents -** created false borrowing base reports to defraud Lone Star Bank. [Dkt. 213 ¶¶ 338, 340-344]

**Mechanics: Proactive Engineering of Solutions -** actively coordinated with Rabo to engineer solutions maintaining fraud. [Dkt. 213 ¶¶ 90, 92]

**Mechanics: Coordinated Approval Process -** would "contact Rabo to ask how they should proceed, then the two banks would work together to keep the kite afloat" [Dkt. 213 ¶ 92]

**Mechanics: Active Role in Post-Discovery Theft -** knew customer funds stolen through fraud, yet continued executing sweeps transferring victim deposits to Rabo for five more weeks [Dkt. 213 ¶¶ 86, 154-157]

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 89 of 100

2/17/2026

# RICO: Conducting Enterprise Affairs

## Count XIII (Rabo/Mechanics)

Accomplishing Together What Neither Could Do Alone

- Rabo's Limitations
  - As non-bank lender, Rabo cannot provide depository accounts
  - It can make loans, take security interests, even install management—but it cannot receive, hold, and transfer victim funds
  - Without Mechanics providing banking services, Rabo had no way to access customer trust money
- Mechanics' Limitations
  - As depository bank without lending relationship, Mechanics had no leverage over borrowers
  - Could not pressure misuse of customer funds, install Focus, or create false borrowing base reports
  - Without Rabo's lending relationship and operational control, Mechanics had no mechanism to direct fraudulent transfers

# RICO: Conducting Enterprise Affairs

## Count XIII (Rabo/Mechanics)

Accomplishing Together What Neither Could Do Alone (cont.)

- Complementary Capabilities
  - Mechanics provided:
    - Depository accounts
    - Transfer mechanisms
    - Immediate credit availability
    - Appearance of normal banking operations
  - Focus provided:
    - On-site direction
    - Specific transfer instructions
    - False assurances of legality
    - Each needed the others to complete circle of fraud

# RICO: Conducting Enterprise Affairs

## Count XIII (Rabo/Mechanics)

Accomplishing Together What Neither Could Do Alone (cont.)

- Complementary Capabilities (cont.)
    - o Rabo provided:
        - o Lending relationship
        - o Leverage over borrowers
        - o Installed management (Focus)
        - o False financial reports
        - o Ultimate control through DACAs
- Together, Rabo and Mechanics accomplished what neither could do alone

---

# RICO: Pattern of Racketeering Activity

## Count XIII (Rabo/Mechanics)

Definition: Predicate criminal acts and the pattern of such acts

Requirements:
- At least two or more acts of racketeering activity
- Acts must be related to each other
- Acts must have continuity

Racketeering Activity Includes:
- Acts indictable as mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), or financial institution fraud (18 U.S.C. § 1344)

# RICO: Pattern of Racketeering Activity

## Count XIII (Rabo/Mechanics)

| Act | Examples & Scale | Paragraphs |
|---|---|---|
| Wire Fraud 18 U.S.C. § 1343 | Check-Kiting: $477M+ daily $2.5-3.5M checks/wires on fictitious invoices<br>Victim Deposits: CJ $10.3M Dec 31, 2019; $10M+ Mar-Apr 2023 post-discovery<br>Coordination: Interstate communications directing fraud | [Dkt. 213 ¶¶ 166, 326-329, 334-335 |
| Mail Fraud 18 U.S.C. § 1341 | Blank Checks: Goad overnighted batches to HTLF across state lines<br>Dishonored: Priest $709,680; AJ Jacques $26,997; Lockwood $655,789 | [Dkt. 213 ¶¶ 24, 45, 152, 178, 334-335 |
| Bank Fraud 18 U.S.C. § 1344 | Lone Star State Bank: False borrowing base reports Nov 2014<br>Amarillo National & AgTexas: Millions in collateral conversion<br>Farm Credit Southwest: Prevented payments via misappropriation | [Dkt. 213 ¶¶ 311-315, 316-318, 345-347 |

# RICO: Pattern of Racketeering Activity

## Count XIII (Rabo/Mechanics)

Predicate Acts – Relatedness

- Requirement: Predicate acts must be related to each other (*horizontal relatedness*) and to the enterprise (*vertical relatedness*)
- General Standard: Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events"

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 92 of 100

2/17/2026

# RICO: Pattern of Racketeering Activity

## Count XIII (Rabo/Mechanics)

**Horizontal Relatedness: Same purposes, methods, participants, victims**

• Common Purpose: Convert assets to satisfy Rabo's loans
• Common Methods: DACAs, sweeps, daily coordination, Focus installation, false reports, trust fund misreps
• Common Participants: Lawson, Dunn, Redden, Strouhal, Stockett, Mechanics, Focus
• Multiple Victims: 50+ cattle producers across 9 states, 4+ financial institutions

**Vertical Relatedness: Enterprise structure made crime possible**

Neither could accomplish frauds alone—each needed the others:
• DACAs gave Rabo access only through Mechanics' infrastructure
• False reports had impact only from Rabo's credibility as senior lender
• Focus directed specific transfers only via Mechanics' accounts
• Rabo provided: lending leverage, installed management, false docs, DACA control
• Mechanics provided: depository accounts, transfer mechanisms, immediate credit, appearance of normal banking

# RICO: Pattern of Racketeering Activity

## Count XIII (Rabo/Mechanics)

Predicate Acts – Continuity

Standard: Continuity established by "closed period" of repeated related predicate acts extending over "substantial period of time," or "open period" where past conduct projects into future with threat of repetition [¶ 298]

• Fifth Circuit Presumption: More than one year of racketeering acts constitutes "substantial period of time" for closed period. *D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.*, 94 F.4th 198, 205 (5th Cir. 2024)

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 93 of 100

2/17/2026

# RICO: Pattern of Racketeering Activity

## Count XIII (Rabo/Mechanics)

**Closed Period: 9 Years (2014-2023)**
- Nov 2014-2018+: Waggoner operation
- Dec 2017-Apr 2023: McClain operation (5+ years)
- 2012-Jul 2023: Phillips operation (11 years)
- McClain & Phillips overlapped 2019-2023 (simultaneous operations)

**Open-Ended Threat**
- Feb 28, 2023: Inspection proved fraud, yet Enterprise continued 5 more weeks
- Extracted $10M+ additional from victims with actual knowledge
- Systematic pattern across multiple borrowers demonstrates regular way of doing business
- Rabo & Mechanics still operating, institutional culture prioritizing profit over prudence
- Demonstrates not scheme winding down, but bad actors continuing until forced to stop

# RICO: Causation

## Count XIII (Rabo/Mechanics)

| Examples | Direct Causal Chain |
|---|---|
| **CJ/Phillips Dec 31, 2019** | Redden call → false rep (prepaid feed can pay Rabo) → Phillips relies → CJ wires $7.2M same day → Mechanics deposits/sweeps to Rabo → CJ loses $7.248M |
| **Post-Discovery Mar-Apr 2023** | Feb 28 inspection reveals 72K shortfall → Enterprise accepts $10M+ deposits with actual knowledge → victims believe paying for cattle → Mechanics sweeps to Rabo → direct taking |
| **Priest Cattle Apr 1, 2023** | 489 specific heifers (Lots 927/933) sold for $709,680 at Rabo's direction → check overnighted → Rabo freezes account → check dishonored → Rabo keeps proceeds |

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 94 of 100

2/17/2026

# Count XIV
# HTLF/Ragland Enterprise

187

## RICO: Elements Summary

| Element | Count XIII (Rabo/Mechanics) | Count XIV (HTLF/Ragland) |
|---|---|---|
| Person | **Rabo & Mechanics are distinct entities** [Dkt. 213 ¶¶ 66-68] | **HTLF, Ragland, and Goad distinct entities** [Dkt. 213 ¶¶ 69-70] |
| Enterprise | **Purpose: Convert customer assets.** [Dkt. 213 ¶¶ 3, 79-82, 86-87, 92, 116, 119-144, 166, 300, 308, 310-315, 316-318, 336-338, 340-344, 150-152, 154-157] **9-year operation** | **Purpose: Perpetuate check-kiting** [Dkt. 213 ¶¶ 157, 165-166, 177-178, 243(f), 261, 359] **Closed-loop fraud 7+ years (2016-2023)** [Dkt. 213 ¶¶ 159-160, 225, 360-361] |
| Pattern | **Wire/mail/bank frauds** [Dkt. 213 ¶¶ 45, 86-87, 92, 107, 137-138, 152, 154, 156, 165-166, 177, 178, 310-318, 334-338, 346-347, 380] **3 major schemes** [Dkt. 213 ¶¶ 310-315, 73-157, 316-318, 319-351, 344]    **50+ victims from 2014-2023** [Dkt. 213 ¶¶ 316-65, 311, 317, 347] | **Check-kiting; $100M+ transactions** [Dkt. 213 ¶¶ 157, 165-166, 177-178, 243(f), 261, 359] **Reagor-Dykes precedent** [Dkt. 213 ¶¶ 159-160, 225] |
| Conduct | **Rabo: strategic decisions** **Focus installation** [Dkt. 213 ¶¶ 308, 318, 350] **Mechanics provided proactive engineering** [Dkt. 213 ¶¶ 90-93] | **Ragland: blank checks, immediate processing** [Dkt. 213 ¶¶ 71, 152, 160, 165-166, 178, 261, 380] **Goad: invoices, coordination** [Dkt. 213 ¶¶ 165, 177-181, 243(f)-(g), 261-263, 265, 359] |
| Commerce | **interstate wires/mails** [Dkt. 213 ¶¶ 92, 334-335] **Victims in 9 states** [Dkt. 213 ¶¶ 16-65, 92, 166, 311, 317, 319-351, 334-335, 347] | **Interstate wires/mails** [Dkt. 213 ¶¶ 16-65, 165-166] |
| Causation | **Direct: Dec 2019 call → $7.248M loss** [Dkt. 213 ¶¶ 334-337] **Post-discovery of theft scheme → $10M+** [Dkt. 213 ¶¶ 86-87, 154-157] | **Direct: Check-kiting → customer losses** [Dkt. 213 ¶¶ 2-3, 73, 157, 160, 165-166, 178, 257, 261-262, 359] |
| Injury | **CJ: $12.4M; Jared Lesh: $7.7M** [Dkt. 213 ¶¶ 16-65, 352] **50+ victims: tens of millions** [Dkt. 213 ¶¶ 16-65, 310-311, 317, 352] | **Substantial losses to Plaintiffs/Intervenors** [Dkt. 213 ¶ 16-65, 317, 362] |

188

94

# RICO: Enterprise Summary

**"Any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity" 18 U.S.C. § 1961(4)**

- **Association-in-Fact Requirements: Must have Purpose, Relationships, and Longevity.**

## Two Distinct RICO Enterprises

| Element | Count XIII (Rabo/Mechanics Enterprise) | Count XIV (HTLF/Ragland Enterprise) |
|---|---|---|
| Duration | 2014-2023 (9 years) | 2016-2023 (7+ years) |
| Purpose | Systematically convert customer assets to satisfy imprudent loans | Perpetuate and enable fraud through check-kiting |
| Operations | Waggoner, McClain, Phillips (3 major) Rabo money laundering | McClain check-kite via 2B Farms RD check-kite through sight drafts |
| Wire Fraud | $250M+ check-kiting, $10M+ victim deposits | Hundreds of millions of dollars in reciprocal checks/wires daily |
| Mail Fraud | Dishonored checks across state lines | Blank checks overnighted to HTLF; sight drafts mailed to financial institutions |
| Bank Fraud | 4+ FDIC institutions defrauded | 4+ FDIC institutions defrauded |
| Victims | 50+ cattle producers (9 states), 4+ banks | 50+ cattle producers, 1,000 dealership customers, 10+ banks |

# RICO: Person

## Count XIV (HTLF/Ragland)

18 U.S.C. § 1961(3)
"Any individual or entity capable of holding a legal or beneficial interest in property"

Count XIV (HTLF/Ragland Enterprise)
HTLF Bank (Colorado corporation) [Dkt. 213 ¶ 69]
Shawn Ragland (individual) [Dkt. 213 ¶ 70]

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 96 of 100

2/17/2026

# RICO: Enterprise - Purpose

## Count XIV (HTLF/Ragland)

**Purpose: Perpetuate and conceal McClain's fraudulent cattle transactions through check-kiting, manipulation of banking procedures, and misappropriation of plaintiffs' and intervenors' funds**

**Methodology**
1. Goad overnight blank pre-signed checks to HTLF
2. Goad provides fictitious invoices with amounts
3. Ragland/HTLF complete checks for those amounts
4. HTLF deposits with immediate credit (uncollected)
5. 2B Farms wires funds back to McClain

# RICO: Enterprise – Relationships/Affairs

## Count XIV (HTLF/Ragland)

**Requirement: Defined relationships among those associated with the enterprise that exceed normal commerce**

| Member | Role | Activities |
|---|---|---|
| Meagan Goad (McClain's daughter) | Check & Invoice Provider | • Overnight blank pre-signed checks to HTLF<br>• Provided fictitious invoices with amounts<br>• Determined daily amounts needed to keep kite afloat<br>• "Instructions I transmitted" |
| HTLF Bank | Facilitation Infrastructure | • Completed checks based on Goad's instructions<br>• Provided immediate credit on uncollected funds<br>• $50M+ per month in fraudulent transactions<br>• Violated banking standards |
| Shawn Ragland (Branch President) | Operational Manager | • Filled in blank checks or authorized employees to do so<br>• Ensured immediate credit without verification<br>• Daily coordination with Goad and 2B Farms<br>• Prior check-kiting experience |

# RICO: Pattern of Racketeering Activity

**Count XIV (HTLF/Ragland)**

Definition: Predicate criminal acts and the pattern of such acts

Requirements:
- At least two or more acts of racketeering activity
- Acts must be related to each other
- Acts must have continuity

Racketeering Activity Includes:
- Acts indictable as mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), or financial institution fraud (18 U.S.C. § 1344)

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *193*

193

# RICO: Pattern of Racketeering Activity

**Count XIV (HTLF/Ragland)**

| Act | Examples & Scale | Paragraphs |
|-----|------------------|------------|
| Wire Fraud 18 U.S.C. § 1343 | Check-Kiting: $250M+ Jan-Apr 2023, daily $2.5-3.5M wires on fictitious invoices<br>Victim Deposits: CJ $10.3M Dec 31, 2019; $10M+ Mar-Apr 2023 post-discovery<br>Coordination: Interstate communications directing fraud | ¶¶ 166, 326-329, 334-335 |
| Mail Fraud 18 U.S.C. § 1341 | Blank Checks: Goad overnighted batches to HTLF across state lines<br>Dishonored: Priest $709,680; AJ Jacques $26,997; Lockwood $655,789 | ¶¶ 24, 45, 152, 178, 334-335 |

*2/17/2026*          *24-02007 - Plaintiffs' Response to Banks' 12(b)(6) Motions*          *194*

194

Case 24-02007-swe    Doc 371-1    Filed 02/17/26    Entered 02/17/26 08:44:00    Desc
Exhibit Plaintiffs PPT Slides B&W    Page 98 of 100

2/17/2026

# RICO: Pattern of Racketeering Activity

## Count XIV (HTLF/Ragland)

Predicate Acts – Relatedness

- Requirement: Predicate acts must be related to each other (*horizontal relatedness*) and to the enterprise (*vertical relatedness*)

- General Standard: Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events"

---

# RICO: Pattern of Racketeering Activity

## Count XIV (HTLF/Ragland)

**Horizontal Relatedness: Same purposes, methods, participants, victims**
- Common purpose - perpetuate and conceal McClain's fraudulent cattle transactions [¶¶ 356, 418]
- Common methods - Goad overnights blank checks and fictitious invoices [¶¶ 165, 178, 261, 419], provides Ragland with amount McClain needs, HTLF completes checks and provides immediate credit [¶¶ 165, 178, 261, 419], 2B Farms wires funds to McClain [¶¶ 165, 178, 261, 419])
- Common participants - HTLF, Ragland, Goad [¶¶ 165, 178, 261, 359, 420]
- Multiple victims - cattle producers across multiple states who lost cattle, funds, and proceeds [¶¶ 16-65, 362, 421]

**Vertical Relatedness: Enterprise structure made crime possible**
- Enterprise structure made fraud possible. Each member's role was essential
- Goad determined what amount was needed to keep McClain afloat
- Goad advised Ragland of the amount, wrote the checks and sent to Ragland/HTLF
- Goad fabricated invoices
- HTLF deposited the checks, provided immediate credit to McClain, and wired funds to McClain
- Ragland filled in the checks or authorized another to do so, authorized processing.
- Participants could not accomplish frauds alone—each needed the others.

# RICO: Pattern of Racketeering Activity

## Count XIV (HTLF/Ragland)

<u>Predicate Acts – Continuity</u>

<u>Standard</u>: Continuity established by "closed period" of repeated related predicate acts extending over "substantial period of time," or "open period" where past conduct projects into future with threat of repetition [¶ 298]

- <u>Fifth Circuit Presumption</u>: More than one year of racketeering acts constitutes "substantial period of time" for closed period. *D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.*, 94 F.4th 198, 205 (5th Cir. 2024)

# RICO: Pattern of Racketeering Activity

## Count XIV (HTLF/Ragland)

**Closed Period: 2016-2023 (7+ years) and Threat of Future Repetition**

- Racketeering activity period of over seven + years
- Heaviest activity occurring last three months January – April 2023
- Daily wire transfers and check deposits for over three months
- Enterprise's fraudulent check-kiting enabled McClain to defraud dozens of victims over time
- McClain and Goad ratcheted up amounts needed to keep fraud alive
- HTLF and Ragland ensured funds were wired as required by enterprise
- Operation with 2B Farms dates back prior to 2020
- Underlying fraudulent mechanism operating since at least 2016
- 50+ cattle producers across 9 states
- Potentially hundreds of wire transfers
- Both check-kiting scheme and broader fraud that it enabled
- Prior RDAG check-kiting scheme in which AimBank (HTLF's predecessor) and Ragland participated
- Demonstrates both longer temporal period and threat of future repetition

# RICO: Causation

### Count XIV (HTLF/Ragland)

| Example | Direct Causal Chain |
|---|---|
| **Thorlakson Mar 12-18, 2023** | Check-kiting scheme → created false appearance that McClain's operation was viable → Thorlakson paid McClain $2.8M to purchase cattle based on appearance of viability → Thorlakson loses $2.8M. |