# Rabo's Slides for Oral Argument on Motion to Dismiss 2B Farms' Third Amended Third-Party Complaint

## March 10, 2026

McClain Consolidated Adversary Proceeding
Adversary No. 24-02007

In re McClain/2B Farms Jointly Administered Cases
Case No. 23-20084-swe7

# Parties – Rabo

Rabo was the commercial lender for McClain/Debtors' multi-state cattle operations. The loans are all evidenced and controlled by certain loan and security documents, with the loans being secured by essentially all of Debtors' assets, including all of the Debtors' accounts, contract rights, cattle, proceeds, etc.



# Parties – 2B Farms

- The plaintiffs are 2B Farms, a Texas General Partnership, and its partners Terry M. Robinson and Rebecca A. Robinson (collectively "2B Farms" or "Plaintiffs").

- Rabo and 2B Farms have no contractual, business, or other relationship.

- 2B Farms "had ongoing business transactions with Brian McClain and his entities" which "included buying and selling of cattle, including having cattle owned by Plaintiffs that were delivered to one or more of McClain's facilities for growing and health care before they were ready for shipment to a finishing feedyard." (TAC ¶ 9.)

# Parties – 2B Farms

| billed to | wire date | hd cnt | wire amount | difference between check to wire | check amount | check date | check number | name written to |
|---|---|---|---|---|---|---|---|---|
| Bo Robinson | 2/1/2023 | 1,506 | $ 1,449,531.62 | $ 38,044.90 | $ 1,487,576.52 | 2/1/2023 | 4700 | 2B Farms |
| Bo Robinson | 2/2/2023 | 1,511 | $ 1,455,713.30 | $ 36,394.52 | $ 1,492,107.82 | 2/2/2023 | 4701 | 2B Farms |
| Bo Robinson | 2/3/2023 | 1,773 | $ 1,711,129.61 | $ 50,885.81 | $ 1,762,015.42 | 2/3/2023 | 4702 | 2B Farms |
| Bo Robinson | 2/7/2023 | 2,671 | $ 2,567,485.55 | $ 70,640.86 | $ 2,638,126.41 | 2/7/2023 | 4812 | 2B Farms |
| Bo Robinson | 2/8/2023 | 2,587 | $ 2,483,397.26 | $ 65,228.97 | $ 2,548,626.23 | 2/8/2023 | 4813 | 2B Farms |
| Bo Robinson | 2/9/2023 | 2,550 | $ 2,466,389.42 | $ 64,196.17 | $ 2,530,585.59 | 2/9/2023 | 4957 | 2B Farms |
| Bo Robinson | 2/10/2023 | 2,565 | $ 2,476,055.65 | $ 66,992.26 | $ 2,543,047.91 | 2/10/2023 | 4958 | 2B Farms |
| Bo Robinson | 2/13/2023 | 2,568 | $ 2,488,153.48 | $ 66,230.07 | $ 2,554,383.55 | 2/13/2023 | 4959 | 2B Farms |
| Bo Robinson | 2/14/2023 | 2,551 | $ 2,476,408.84 | $ 64,410.88 | $ 2,540,819.72 | 2/14/2023 | 4960 | 2B Farms |
| Bo Robinson | 2/15/2023 | 2,391 | $ 2,470,546.70 | $ 64,385.94 | $ 2,535,932.64 | 2/15/2023 | 4961 | 2B Farms |
| Bo Robinson | 2/16/2023 | 1,524 | $ 1,469,317.32 | $ 37,177.51 | $ 1,506,494.83 | 2/16/2023 | 4962 | 2B Farms |
| Bo Robinson | 2/17/2023 | 3,888 | $ 3,760,119.53 | $ 97,037.49 | $ 3,857,157.02 | 2/17/2023 | #4963 | 2B Farms |
| Bo Robinson | 2/21/2023 | 2,569 | $ 2,498,739.31 | $ 67,370.31 | $ 2,566,109.62 | 2/21/2023 | #4964 | 2B Farms |
| Bo Robinson | 2/22/2023 | 2,544 | $ 2,462,946.82 | $ 63,672.75 | $ 2,526,619.57 | 2/22/2023 | #4965 | 2B Farms |
| Bo Robinson | 2/23/2023 | 2,564 | $ 2,495,962.99 | $ 65,102.98 | $ 2,561,065.97 | 2/23/2023 | #4966 | 2B Farms |
| Bo Robinson | 2/24/2023 | 2,530 | $ 2,472,932.73 | $ 63,494.81 | $ 2,536,427.54 | 2/24/2023 | #4967 | 2B Farms |
| Bo Robinson | 2/27/2023 | 2,535 | $ 2,490,851.63 | $ 65,953.78 | $ 2,556,805.41 | 2/27/2023 | #4968 | 2B Farms |

| hd sold | wired in | difference | check written out | checks written out |
|---|---|---|---|---|
| 40,827 | $ 39,696,081.76 | $ 1,047,820.01 | $ 35,557,149.13 | 5,186,752.64 |
| | wires from Bo into McClain Fdyd | | checks to 2B from McClain Farms | checks to 2B from McClain Fdyd |

(TAC Ex. A; see also TAC ¶¶ 62, 70.)

# Key Allegations – Increased Banking Activity and February 2023 Email

- "In the months leading up to April 2023, a substantial volume of funds, totaling hundreds of millions of dollars, flowed in and out of McClain's three accounts with Mechanics Bank with remarkable frequency, including monies flowing in and out of HTLF for 2B Farms." (TAC ¶ 62.)

- "Mechanics had been monitoring the activity in McClain accounts" and on February 13, 2023, a Mechanics Bank employee sent an email to a Rabo employee:

> \Brian is wanting to deposit the attached checks and is asking us to increase his daily deposit limit form $5MM to $8MM. He has approximately $8MM in presentments.
>
> I don't feel comfortable with what he is doing. These cheks don't appear to have aythign to do with cattle.
>
> What are your thoughts?

(TAC ¶ 59 & Ex. B.)

# Key Allegations – February 28 Inspection and March 10 Report

- On February 28, 2023, a team of Rabo inspectors performed an inspection of certain loan collateral at three locations in Texas.

While onsite at the 3 locations in Texas, Inspection team including Sr. RM counted 8,916 cattle on hand at the individual yards. Below is the insert showing the discrepancy with numbers from January 31, 2023, to February 28, 2023, as client was not able to provide yardsheets that inspector was able to tieback to January counts:

|  |  | 2/28/23 counts | 1/31/23 BBC |
|---|---|---|---|
| McClain Fdyd - Hereford |  | 2,480 | 31,668 |
| 7M - Friona |  | 4,217 | 27,043 |
| Tommy's - Friona |  | 2,219 | 0 |
| McClain Farms - KY | (per Brian) | 20,000 | 21,631 |
|  |  | 28,916 | 80,342 |
| Change in Head Count |  | 51,426 |  |

Inspector has chosen to only include the cattle she saw and counted in TX (8,916) for the prepared BBC below. This is basically a worst-case scenario. She did request from the Client that she travel to KY on Monday, March 6, 2023, to count cattle there for the cohesiveness of the inspection, but he indicated this would not be possible because he would be in

(TAC Ex. A ; TAC ¶¶ 31-33.)

6

# Key Allegations – February 28 Inspection and March 10 Report

32.    In the words of Rabo's inspector, Michelle Stockett, she noted:

**"This is basically a worst-case scenario" and a "Possible Fraud Case. Recommendation to downgrade immediately and take control of cattle as soon as possible due to concerns related to cattle being owned by other parties."**

(TAC ¶ 32.)

**Significant Risks/Concerns noted**

*Large negative borrowing base after adjustments for cattle. Possible Fraud Case. Recommendation to Downgrade immediately and take control of cattle as soon as possible, due to concerns related to cattle being owned by other parties.*

(TAC Ex. A.)

Given the difference between the TX cattle reported by Debtors and the TX cattle counted, inspectors were naturally concerned about a possible fraud being perpetrated on Rabo by Debtors.

7

# Key Allegations – March 10 Report

**RECOMMENDATION RESPONSE**

Recommendations are defined in this report as either: (Green-Level 1) for information only and no specific action needs to take place, (Amber Level 2) CRT will need to present to Credit the resolution of the recommendation by next scheduled internal review (LSR, semi-annual review or annual review), or (Red Level 3) CRT will need to present to Credit the resolution of the recommendation within 45 days of the inspection report being issued. Recommendations will be entered into N-Cino, with a monthly report of outstanding recommendations sent to Credit by Head of AFCID.

**2. Recommendation (Outstanding Checks): Individual Area of Concern**

**Action**: Lender to work with Client to properly report outstanding checks.

**3. Recommendation (Accounts Payable): Individual Area of Concern**

**Action**: Lender should work with Client to properly report all accounts payable.

**4. Recommendation (Cattle Inventory): Individual Area of Concern**

**Action**: Recommend Lender investigate hiring a forensic accountant to see what has happened to the cattle headcount. Also, to find out what has happened to the money from cattle sales which should have paid down the RLOC.

(TAC Ex. A ; TAC ¶¶ 31-33.)

# Key Allegations – DACAs, Default and April 5 Freeze of Accounts

- Three DACAs (for each of Debtors' accounts) were executed on March 23, 2023. (TAC ¶ 72 and Ex. C.)
  - No allegation of deposits or withdrawals being "frozen" or rejected between March 23 and April 4, which is consistent with paragraph 5(a) of the DACAs. (Ex. C at 5(a).)

- On April 5, 2023, and based on certain defaults by Debtors, a freeze was placed on Debtors' accounts.
  (TAC ¶ 73 & Ex. D.)
  - Funds could continue to be deposited into the accounts as is typical for an account freeze and consistent with the language in the April 5 Letter. (Ex. D.)

# Key Allegations – April 4-6 Transactions

| Wire Out Date | Recipient | Amount | # Cattle Intended to Purchase from McClain |
|---|---|---|---|
| April 4, 2023 | McClain Feedyard, Inc. | $2,473,847.58 | 2205 hd |
| April 5, 2023 | McClain Feedyard, Inc. | $2,499,037.72 | 2222 hd |
| April 6, 2023 | McClain Feedyard, Inc. | $2,486,071.62 | 2219 hd |
| | TOTAL: | $7,458,956.92 | 6,646 hd |

(TAC ¶ 82)

| Check | Date of Check | Amount of Check |
|---|---|---|
| McClain Farms Inc. Check # 7331 | April 4, 2023 | $2,530,920.39 |
| McClain Farms Inc. Check # 7620 | April 5, 2023 | $2,559,407.02 |
| McClain Farms Inc. Check # 7621 | April 6, 2023 | $2,510,991.45 |
| | TOTAL: | $7,601,318.86 |

(TAC ¶ 81)

10

# Key Allegations – April 4-6 Transactions

- The three wires from 2B Farms (the "Wire Funds") were accepted into the McClain Feedyard Inc. account.

- The three checks (the "Three Checks") from the McClain Farms Inc. account to 2B Farms were not honored.

(TAC ¶¶ 36, 74, 81, 82.)

# Timeline



# 2B Farms' Claims Against Rabo

- Common Law Fraud (Count I) & Aiding/Abetting-Knowing Participation in Fraud (Count VI)

- Conversion (Count I)

- Negligent Undertaking (Count III)

- Tortious Interference with Contract (Count V)

- Civil Conspiracy (Count VII)

- Knowing Participation – Breach of Fiduciary Duty (Count VIII)

- Fraudulent Transfer – TUFTA (Count IV)

- Core Claims (Counts IX, X, XI)

13

# Three Major "Theories" Underlying Claims

- Rabo knew about the McClain Debtors' fraudulent scheme.

- Rabo improperly waited "months" to freeze the accounts, which freeze was improper.

- Rabo received the funds from the April 4-6 transactions.


- All three theories are unsupported and/or belied by Plaintiffs' own exhibits and filings.

# No Facts Showing Knowledge

- Allegations of purported "red flags" concerning accounting, financial, and operational problems fall far short of evidencing Rabo's knowledge of Debtors' fraud. (TAC ¶¶ 13-30.)

  – Also, as alleged by 2B Farms, Rabo increased Debtors' line of credit by approximately $6 million in January 2023. (TAC ¶ 41.)

- As confirmed in 2B Farms' own allegation/exhibit, Rabo did not have access/visibility to the McClain bank accounts.



**Sent:** Wednesday, April 5, 2023 6:33 PM
**To:** O'Neal, J (Jacqueline) <Jene.ONeal@raboag.com>
**Cc:** Hanson, J (Jeffrey) <Jeff.Hanson@rabo.com>; nico.didonato@mechanicsbank.com
**Subject:** RE: Rabo AgriFinance/McClain Farms, Inc., McClain Feed Yard, Inc. and 7M Cattle Feeders, Inc.; Demand for Freeze of Borrower Accounts SECURE

This message was sent securely by Mechanics Bank

Hi Jene-

The accounts are frozen. I have the wire instructions provided in the letter notifying us of the default.

We will review the accounts daily and wire all collected funds as directed.

I have a question – the letter requested that we provide "read only" access to online Banking to the Lender. Are you able to let me know who needs access? I will arrange to get them set up and trained.

(TAC ¶ 76.)

# No Facts Showing Knowledge

- The alleged discrepancy between the number of cattle reported by Debtors and the capacity of facilities not only fails to demonstrate Rabo's knowledge of Debtors' fraudulent scheme but is misleading and belied by the actual documents attached to the TAC.

40.    McClain operated two feedlots in Texas, and one he allegedly leased from a third party, with a combined maximum capacity of approximately 59,000 head of cattle.[5] Despite this clear, physical limitation, in its January 2022 BBC, McClain reported ownership of 75,529 head of cattle, **exceeding the feedlots' capacity by more than 16,000 head**. This discrepancy should

| | 2/28/23 counts | 1/31/23 BBC |
|---|---|---|
| McClain Fdyd - Hereford | 2,480 | 31,668 |
| 7M - Friona | 4,217 | 27,043 |
| Tommy's - Friona | 2,219 | 0 |
| McClain Farms - KY (per Brian) | 20,000 | 21,631 |
| | 28,916 | 80,342 |
| Change in Head Count | | 51,426 |

(TAC Ex. A )

The 59K cattle capacity in TX alleged in TAC ¶ 40  is consistent with Debtors' January 2023 BBC representing about 59K in the TX locations. 2B Farms' allegations improperly ignore Debtors' KY facility.

# No Facts Showing Knowledge

- February 28 inspection and March 10 report do not evidence that Rabo knew about Debtors' fraudulent scheme.

  – Reported as a "Possible Fraud Case," which "possible" fraud was against Rabo.  (TAC Ex. A .)

  – Report also contained the following:

**EXECUTIVE SUMMARY**

The Agricultural Field and Collateral Inspection Department (AFCID) was engaged to perform a standard inspection of the collateral to secure the existing loan to McClain Farms, Inc. ("McClain" the "Company" or the "Borrower"). The collateral inspection was completed by a team of inspectors on February 28, 2023, at the Company's headquarters located in Hereford, TX. The primary Company contact was owner Brian McClain. The Inspector spoke with RCO Schindler for account clarity before the inspection. Conversations were also held prior with Sr Chip Lawson as well as in person since Lawson attended the inspection in Texas.  A closeout review was held with the Client before leaving the operation to discuss the observations made during the inspection.  Regarding the discrepancy with the headcount, Client indicated he had cattle in KY and cattle were on the road to TX.  He also mentioned that since feeder cattle prices have become so high recently, his overall numbers would be impacted and would be lower than January numbers on 2/28/23.

(TAC Ex. A .)

# No Facts Showing Knowledge

- Report recommended that within the next 45 days, Rabo further investigate the situation, including the possible retention of a forensic accountant.

**Action**: Recommend Lender investigate hiring a forensic accountant to see what has happened to the cattle headcount. Also, to find out what has happened to the money from cattle sales which should have paid down the RLOC.

(TAC Ex. A .)

- As referenced by 2B Farms, a CRO was retained by Debtors (on April 7) to investigate, manage, and operate Debtors' businesses.
(TAC ¶ 33.)

- (And as this Court has seen in the pleadings/filings in these consolidated proceedings, investigators, accountants, the USDA, and numerous others spent many, many months working to uncover and understand Debtors' fraud.)

18

# No Facts Showing Knowledge

- 2B Farms' reliance on the table in the March 10 Report showing February transactions between 2B Farms and Debtors is unhelpful.



- The table shows that 2B Farms *netted* over $1 Million from these transactions with Debtors.  (TAC Ex. A .)

# No Facts Showing Knowledge

- Furthermore, the Rabo Inspection Team provided the following comments concerning this table of transactions:

Comments regarding this chart from the Inspection Team would be that 1) Texas has had some rain, but not enough to sustain that amount of cattle on wheat for any length of time 2) all cattle bought were 590# heifers which would have been difficult to buy in current market conditions and 3) why the difference in what was wired in and checks written out? Inspector does understand that McClain's business model is moving cattle and making deals, but in the case of Bo Robinson, he is not a Client that McClain mentioned as a "deal" client when Inspection Team was onsite.  Typically in these types of deals, you do not see a customer price the cattle back on the same day they are bought.  In the case where McClain has sold cattle to Robinson and is buying back cattle which have been on pasture for a period of time, there are still questions about

- In other words, these transactions raised questions that Rabo believed merited further investigation, and Rabo quickly moved forward with those investigations through the forensic accountants and the CRO retained by Debtors in April 2023.

- Plaintiffs' suggestion that Rabo should have first reached out to them is perplexing given that the table shows them netting over $1 million from Debtors from these transactions—transactions that Plaintiffs are alleging evidence fraudulent conduct. (TAC ¶ 62.)

# No Improper Delay or Freeze

- Pointing to the March 10 Report, 2B Farms alleges the following:

71. With this specific information of faudulent activity in hand, most federally regulated and ethical financial institutions would have immediately taken action to stop the fraud by freezing the accounts (both for withdrawals and deposits) and alerted the authorities, regulators and innocent parties caught in the scheme. At the very least, Rabo and Mechanics Bank, with this information in hand about McClain's specific transactions with 2B Farms in their report could have reached out to 2B Farms to warn it that their customer was a fraud. Inspector Stockett even testified to this as to 2B Farms. Instead, Rabo and Mechanics Bank allowed the fraud to continue for several more months while Rabo continued to sweep the McClain account and work to put a strategy in place with Mechanics Bank to minimize **their** potential losses at the expense of 2B Farms and others.

21

# No Improper Delay or Freeze



# No Improper Delay or Freeze

- The April 5 notice and freeze was the first day that Rabo could declare a default based on Debtors' failure to pay down the line of credit:

McClain had an accident in the summer of 2022 which required him to be hospitalized and unable to run his businesses for several months during the summer. His daughter Meghan was in charge while McClain was unable to perform his usual activities due to the injury, and money got away from her because she did not understand how to watch her cash flow in relationship to her RLOC usage. The loan became overdrawn and overline for months at a time. In early 2023, RAF approved a short-term line increase to cover this problem with the stipulation that McClain have the line paid back down to his original limit of $48,000,000 by April 1, 2023. ★ When asked how McClain would get back down to the $48 million, he indicated he would continue buying cattle and then the last week of the month prior to the payment being due he would sell $6,000,000 worth of cattle.

(TAC Ex. A .)

(★The loan documents expressly outline when such a default could be noticed, which worked out here to be April 5.)

# No Improper Delay or Freeze

- 2B Farms' theory/argument that the freeze was improper because it did what freeze's do and "allowed" deposits, is misplaced.

  – No allegation that freeze was unauthorized under the loan.

  – Not typical for an account freeze to impact deposits.

  – 2B Farms' argument ignores that one of the primary purposes of a freeze is to preserve and maximize funds for creditors, which obviously involves continuing to accept accounts receivable and all other deposits into the account. (Indeed, Defendants would have most certainly faced a legion of legal claims from Debtors' creditors had deposits been denied.)

  – Ignores that Rabo did not know about Debtors' fraudulent scheme against investors when requesting the freeze.

24

# No Receipt of Funds

- Despite acknowledging access to bank records (which records have been available to all parties for well over a year), 2B Farms continues to make conclusory allegations/implications concerning Rabo's alleged receipt of the funds from the April 4-6 transactions.

146. Rabo and/or Mechanics Bank is either the initial transferee or the immediate transferee of such initial transferee.

147. As of the date hereof, Rabo and/or Mechanics Bank have not returned any such transfer to 2B Farms.

148. Rabo and/or Mechanics Bank did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

98. Plaintiffs are entitled to and seek recovery of judgment for conversion against Defendants to the extent that Rabo and/or Mechanics Bank acquired, or attempts to acquire, cattle or proceeds belonging to Plaintiffs.

153. Rabo and/or Mechanics Bank was the initial transferee of the Avoided Transfers or the immediate transferee of such initial transferee or the person for whose benefit the Avoided Transfers were made.

160. Rabo has not paid the amount of the Avoidable Transfers, or turned over such property, for which Rabo is liable under 11 U.S.C. § 550. Pursuant to 11 U.S.C. § 502(d), any and all claims of Rabo's or its assignees, against Debtors' bankruptcy estates must be disallowed until such time as Rabo pays to 2B Farms an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

"Rabo contends it did not receive any of 2B Farms' funds. However, Mechanics Bank has alluded to the fact that it did and further discovery is needed to confirm same." (Pl's Opp. at 30.)

25

# No Receipt of Funds

- 2B Farms, however, has provided an "undisputed fact" to the Court in a sister case expressly admitting Rabo did not receive any such funds:

  "Mechanics Bank ultimately did not turn over any funds during this April 2023 time period to Rabo despite the Deposit Account Control Agreements in place and correspondence as further described below, but instead delivered $1,414,714.60, the final net balance on the McClain Accounts that it had on hand, to the McClain Chapter 7 Trustee on May 30, 2023. See McClain Chapter 7 Trustee's Notice of USDA Approved Trust Claims, Bankr. Case No. 23-20084-swe7, Dkt. No. 126, p. 4 . . . ."

  (2B Farm's Mot. Partial SJ, SOMF ¶ 9, ECF No. 299.)

  (2B Farms has also received a sworn declaration from Rabo confirming the same.)

# Flawed Theories are Fatal to Claims

- Not only does the TAC fail to allege facts showing that Rabo knew about Debtors' fraudulent scheme, facilitated an improper/untimely freeze, or received any of "2B Farms' funds," but the TAC exhibits and 2B Farms' other filings affirmatively demonstrate the opposite—no knowledge, proper freeze, no receipt of funds.

- This reality is fatal to Plaintiffs' claims.

- The claims fail for yet additional reasons.

# No Fraud

- Plaintiffs include in the TAC the elements for their fraud claim, which is purportedly based on a material misrepresentation:

> 102.    To succeed on a claim for fraud under Texas law, a plaintiff must prove: (1) a material misrepresentation was made; (2) the representation was false; (3) the one who made the representation either knew the representation was false or made it recklessly without any knowledge of its truth; (4) the representation was made with the intent to induce action; (5) the other party actually and justifiably relied on the false representation; and (6) the reliance on the false representation caused injury.

- Plaintiffs, however, fail to allege a single misrepresentation made by Rabo to Plaintiffs, let alone factual allegations supporting the other required elements of the claim.

# No Vicarious Liability for Fraud

- Plaintiffs fail to point to allegations showing that Rabo knew of Debtors' fraud, which is fatal to this claim.

- Furthermore, Plaintiffs have not and cannot point to any factual allegations showing that Rabo acted with "mutual understanding or in furtherance of [a] common plan" to defraud Plaintiffs. *See Foix v. Moeller*, 159 S.W. 1048, 1052 (Tex. Ct. App. 1913); *Terry v. Tex. Partners Bank*, 670 B.R. 602, 628-29 (W.D. Tex. 2025).

29

# No Conversion

- Plaintiffs have admitted that Rabo never received the funds from the April 4-6 transactions.

- In any event, the Wire Funds and Three Checks are not "chattel" capable of being converted. *See Edge Petrol. Operating Co., Inc. v. GPR Holdings, LLC (In re TXNB Internal Case)*, 483 F.3d 292, 308 (5th Cir. 2007).

- No allegations that Wire Funds were "delivered [to Rabo or anybody else] for safekeeping" with the intention that the funds remain "segregated" and an "intact fund." *See id.*

- Plaintiffs concede that the funds were deposited in, and that the subject checks authorized withdrawals from, bank accounts held generally for the McClain entities' use. (*See* Opp'n 11.)

30

# Negligent Undertaking - Elements

(1)   Defendant undertakes to render services;

(2)   Services are recognizable as necessary for the protection of Plaintiff's person or things; and

(3)   Defendant failed to use reasonable care, resulting in physical harm where:

    (a)   Failure to use care increased risk of harm; or

    (b)   Harm was suffered because of reliance on the undertaking.

*Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000); RESTATEMENT (Second) of Torts § 323 (1965).

Example: Maintaining a bridge or attempting to rescue someone who is drowning

# No Negligent Undertaking

- Here, Plaintiffs point to the freeze of the accounts as the basis for the claim.

- Claim fails because a negligent undertaking is limited to physical injury to plaintiff. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000); RESTATEMENT (Second) of Torts § 323 (1965).

- In any event, there are no allegations supporting that Rabo undertook to protect Plaintiffs, that Rabo undertook to perform services for Plaintiffs, or that Rabo's undertaking was for the benefit of Plaintiffs. (*See generally* TAC.)

# No Tortious Interference

- No allegations showing that Rabo "knowingly induced [Debtors] to breach [their] obligations under a contract." *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. Ct. App. 2011).

- No allegations showing that Rabo "[knew] of the existence of a contract between the plaintiff and a third party," let alone a "willful and intentional act of interference." *CPM Consulting LLC v. Capsugel US, LLC*, No. 3:17-CV-3059-S, 2019 WL 3769651, at *2 (N.D. Tex. Aug. 9, 2019) (cleaned up).; *Mr. W Fireworks, Inc. v. NRZ Inv. Grp., LLC*, 677 S.W.3d 11, 26 (Tex. Ct. App. 2023).

- No allegations showing that the freeze was improper, or that Rabo was the proximate cause of damages. *Mr. W Fireworks, Inc. v. NRZ Inv. Grp., LLC*, 677 S.W.3d 11, 26 (Tex. Ct. App. 2023).

33

# No Conspiracy

- "Proof of intent to participate in the conspiracy is necessary to [establish] the meeting of the minds element" of a civil conspiracy claim. *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010).

- Texas law "requires specific intent," i.e., "the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement." *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996); *see also Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995).

- Furthermore, even a "joint intent to engage in the conduct that resulted in the injury is not sufficient." *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)

- Here, no facts showing knowledge, let alone facts showing intent to participate.

34

# No Conspiracy

– Furthermore, without knowledge of the scheme, there can be no awareness of the "harm or wrongful conduct."

– Without knowledge of the scheme, there can be no meeting of the minds.

– Without knowledge of the scheme, there can be no "object" to be accomplished.

– Without knowledge of the scheme, there can be no unlawful acts in furtherance of the scheme. *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010).

# No Knowing Participation in Breach of Fiduciary Duty

- A knowing participation claim requires "actual awareness, at the time of the conduct." *7X Cattle Co. v. Brandstadt*, No. 6:22-CV-396-JDK-KNM, 2025 WL 852624, at *13 (E.D. Tex. Feb. 28, 2025) (cleaned up), *report and recommendation adopted* 2025 WL 848446 (E.D. Tex. Mar. 18, 2025).

- "Courts have made clear that a less culpable mental state, such as constructive knowledge, will not suffice." *Id.*

- "[A] knowing-participation claim is premised on the defendant's contribution to a breach of fiduciary duty and must involve the knowing participation in such breach." *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 574 (N.D. Tex. 2024).

- TAC fails to allege facts satisfying these requirements.

36

# No Transfer, Let Alone Fraudulent Transfer

- Plaintiffs have failed to allege facts demonstrating any transfer to Rabo that could give rise to a fraudulent transfer claim. (*See generally* TAC.)

- As outlined herein, there are no facts showing a transfer of funds to Rabo, and Plaintiffs have represented no such transfer occurred.

- Furthermore, any transfers from the McClain accounts were transfers of McClain Debtor funds, not 2B Farms funds, because 2B Farms' money went into a general operating account owned by McClain Debtors.

37

# The Three Checks

- As to the Three Checks, Rabo cannot be subject to any Chapter 5 liability because Plaintiffs never held an interest in the Three Checks.

  - "A check or other draft does not of itself operate as an assignment of funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until the drawee accepts it." Tex. Bus. & Comm. Code 3.408.; *see also In re Bowen Indus., Inc.* 48 B.R. 3, 5 (Bankr. W.D. Tex. 1984).

  - The funds represented by the Three Checks were never Plaintiffs' property.

38

# The Wire Funds

- Even if funds had been sent to Rabo (which did not happen), such money would have been sent for reasonably equivalent value given the outstanding loan debt.

- Furthermore, Rabo was not an initial transferee of the Wire Funds and section 550 of the Bankruptcy Code requires a plaintiff to first bring a successful suit against the initial transferee before recovering the transfer or its value from the subsequent transferee. *See, e.g., Weinman v. Simons (In re Slack-Horner Foundries Co.*), 971 F.2d 577, 580 (10th Cir. 1992).

39

# No Avoidable Transfers = No Core Claims

- Plaintiffs' other purported core claims are based on Rabo's alleged failure to "pa[y] the amount of the Avoidable Transfers, or turn[] over such property, for which Rabo is liable under 11 U.S.C. 550." (TAC 160.)

- Because there was no avoidable transfer, Plaintiffs' other core claims fail as a matter of law.

# Conclusion

- The TAC fails to allege facts supporting any cognizable claim against Rabo.

- And because Plaintiffs have already filed numerous amended complaints, had the benefit of two prior motions to dismiss, and had the benefit of over two years of discovery, the TAC should be dismissed WITH PREJUDICE.