

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 27, 2026**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **McClain Feed Yard, Inc., et al.,** | § | **Case No. 23-20084-swe-7** |
| | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | |
| | § | |
| **In re:** | § | |
| | § | |
| | § | |
| **2B Farms, a Texas General Partnership, et al.,** | § | **Case No. 23-50096-swe-12** |
| | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | |
| | § | |
| **AgTexas Farm Credit Services et al.,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Adv. No. 24-2007-swe** |
| | § | **Consolidated Adversary** |
| **Rabo AgriFinance, LLC et al.,** | § | **Proceeding** |
| | § | |
| | § | |
| **Defendants.** | § | |

1

---

***Memorandum Opinion and Order Dismissing***
***Common-Law Claims Based on the Affirmative***
***Defense of In Pari Delicto***

---

### I.  Introduction

Brian McClain formed, owned, and operated the Debtors, which he used for various functions in the cattle industry. McClain Feed Yard, Inc. ("**MFY**") bought and sold cattle or held and grew them for customers primarily in Texas. McClain Farms, Inc. ("**McClain Farms**") did the same type of business primarily in Kentucky and the southeast United States. 7M Cattle Feeders, Inc. ("**7M**") owned and operated the feedyards for the cattle owned or held by the other Debtors.

The Debtors operated their businesses for several years, but then creditors discovered the Debtors owned or held only a fraction of the number of cattle the Debtors previously claimed. Brian McClain took his own life shortly thereafter, and the Debtors tumbled into bankruptcy, leaving creditors of all sorts unpaid and angry at the fraud.

Kent Ries, the Chapter 7 trustee for the Debtors (the "**Trustee**" or the "**Plaintiff**"), filed an adversary proceeding against the four Defendants: Community Financial Services Bank ("**CFSB**") and Mechanics Bank ("**Mechanics**"), the Debtors' depositary banks; Rabo AgriFinance, LLC ("**Rabo**"), the Debtors' primary lender; and HTLF Bank ("**HTLF**"), the depositary bank for 2B Farms and its owner Terry "Bo" Robinson, who were significant contract-counterparties with the Debtors. According to the Trustee, CFSB, Mechanics, Rabo, and HTLF (the "**Defendants**") permitted, enabled, facilitated, and participated in the Debtors' giant Ponzi scheme and check-kiting scheme. The Trustee asserts common-law claims, claims for avoidable transfers under both the Bankruptcy Code and state law, and claims for equitable subordination, claim disallowance, and lien-priority determination.

The Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, raising several arguments, including the affirmative defense of *in pari delicto* as to the common-law claims. For the reasons described below, that defense is meritorious, so the Court will dismiss the common-law claims. The Court will address by separate orders the Defendants' requests to dismiss the remaining claims.

## II.  Jurisdiction and Venue

This Court has subject-matter jurisdiction over this adversary proceeding under 28 U.S.C. sections 157 and 1334. This proceeding involves either core matters or noncore, related-to matters as to which the parties have, with one exception, consented to this Court's entry of final orders and judgments. Rabo generally consented to this Court's entry of final orders and judgments, but it preserved the right to argue inappropriate venue based on forum non conveniens as to any state-law, non-Chapter 5 claims. Adv. No. 24-2007, Docket Nos. 206, 215.

In its motion to dismiss and related brief, Rabo argues that its various loan and security documents with the Debtors require disputes to be determined under Iowa law in a state or federal court in Iowa; hence the Trustee must satisfy a heavy burden of demonstrating that enforcement of the forum-selection clause would be unreasonable. *See CapRock Milling & Crushing, LLC v. Perdue Agribusiness LLC*, No. 2:24-CV-G38-Z, 2024 WL 4582903, at *6 (N.D. Tex. 2024). The Trustee satisfied that burden.

Although forum-selection clauses are easier to enforce for noncore matters, this lawsuit involves both core and noncore matters with significant overlapping facts. Moreover, this is not a two-party dispute. As explained below, the Trustee has sued four Defendants, alleging—among other claims—a conspiracy among all of them. It would be wasteful, and there would be a significant risk of inconsistent rulings, if two courts were to review the same alleged conspiracy and common defenses, such as *in pari delicto*. It makes much more sense for all matters to be tried in this Court, which is better suited to resolve the core matters.

## III.  Procedural History

On April 28, 2023, the three Debtors filed their individual Chapter 7 voluntary petitions. The Court ordered the cases jointly administered under the lead case of McClain Feed Yard, Inc. Order Consolidating, Case No. 23-20084, Docket No. 66. Kent Ries was appointed Chapter 7 trustee.

On March 14, 2025, the Trustee filed a 56-page complaint (not including attachments) against the Defendants, initiating adversary proceeding number 25-2005. Trustee's Original Adversary Compl., Adv. No. 25-2005, Docket No. 1 (the "**Original Complaint**"). The Original

3

Complaint asserted fifteen counts against the Defendants, including common-law tort claims. In response, the Defendants filed Rule 12(b)(6) motions to dismiss and related briefs, raising various arguments about why the Original Complaint should be dismissed, including that the defense of *in pari delicto* was apparent on the face of the Original Complaint. Adv. No. 25-2005, Docket Nos. 21–24, 26–28, 31–32.

After the Defendants filed their motions to dismiss, the Trustee filed a 70-page first amended complaint on June 16, 2025, asserting substantially the same fifteen counts against the Defendants,[1] but with more detail. Trustee's First Am. Adversary Compl., Adv. No. 25-2005, Docket No. 39. The Trustee filed a response to CFSB's original motion to dismiss, Adv. No. 25-2005, Docket No. 40, 42 (amended), then shortly thereafter stipulated with CFSB to file a second amended complaint. Adv. No. 25-2005, Docket No. 46.

The Trustee then filed the 80-page second amended complaint (the "**Second Amended Complaint**") against the Defendants on July 2, 2025, asserting substantially the same[2] fifteen counts against the Defendants, with yet more detail. Trustee's Second Am. Adversary Compl., Adv. No. 25-2005, Docket No. 48.

The Court later ordered adversary proceeding number 25-2005 consolidated into adversary proceeding number 24-2007, in which various creditors allege direct claims against these same Defendants. Order Consolidating, Adv. No. 25-2005, Docket No. 97.

In a nutshell, the Second Amended Complaint alleges the following:

- The Debtors operated a Ponzi scheme orchestrated by Brian McClain in which various "investors"[3] thought they were investing in real cattle, with an expected annualized profit of roughly 30% on each transaction based on specific, stated growth rates, future sale weights, and predetermined price per pound; instead,

---

[1] The Trustee removed CFSB from, and added HTLF to, Count II: Breach of Fiduciary Duty; the Trustee added HTLF to Count XI: Money Had and Money Received.

[2] The Trustee removed Mechanics from Count II: Breach of Fiduciary Duty.

[3] Throughout the bankruptcy case, the "investors" have bristled at the label, calling themselves either creditors or cattle sellers instead.

the Debtors used money from new investors and loans to pay off old investors until the scheme collapsed.

- The Debtors and the Defendants perpetrated a massive check-kiting scheme as additional means through which the Debtors obtained new, albeit fictitious, cash to cover payments owed to investors, vendors, or other creditors.
- Each of the Defendants knew or should have known about the Ponzi scheme and check-kiting scheme and helped perpetrate the schemes in different ways, including lending money to the Debtors to prop up the scheme (Rabo), and consistently using massive intercompany transfers between the Debtors' bank accounts (at CFSB and Mechanics), and between the Debtors' bank accounts and the bank accounts for 2B Farms and Bo Robinson (at HTLF), all to artificially inflate the value of those accounts and create float.
- The schemes collapsed precipitously when Rabo's senior executives in Europe shut down the loan renewals or increases that Rabo's U.S.-based employees previously rubberstamped, leading to a cattle inspection that showed the Debtors had only 8,000 cattle when they represented they had 80,000.
- Rabo executed a forbearance agreement shortly before the bankruptcy petition date that required the Debtors to turn control of their business over to a hand-picked "chief restructuring officer" (air quotes at ¶ 73) of Rabo's choosing; Rabo's atypical and inappropriate domination of the Debtors was made indisputably manifest by the coronation of its hand-picked chief restructuring officer.
- McClain committed suicide on April 18, 2023, just ten days before the bankruptcy petition date.

In the Second Amended Complaint, the Trustee asserts the following claims against the Defendants:

- Count I: Knowing participation in breach of fiduciary duties (against all Defendants)
- Count II: Breach of fiduciary duty (against Rabo and HTLF)
- Count III: Common-law civil conspiracy (against all Defendants)
- Count IV: Professional negligence (against all Defendants)
- Count V: Punitive damages (against all Defendants)

- Count VI: Determination of extent, validity, and priority of lien (against Rabo)
- Count VII: Avoidance of deposit account control agreement (against Rabo)
- Count VIII: Preferential payments (against Rabo)
- Count IX: Fraudulent transfer (against Rabo)
- Count X: Disallowance of claim (against Rabo)
- Count XI: Money had and received (against Rabo and CFSB)
- Count XII: Equitable subordination (against Rabo)
- Count XIII: Fraudulent transfer (against HTLF)[4]
- Count XIV: Preferential payments (against Mechanics)
- Count XV: Fraudulent transfer (against CFSB and Mechanics)

The Defendants then filed their respective motions to dismiss and related briefs, which were heard on different dates in September and October 2025 and January 2026. Adv. No. 25-2005, Docket Nos. 56–57 (together, the "**CFSB Motion**"); Adv. No. 25-2005, Docket Nos. 66–67 (together, the "**Mechanics Motion**");[5] Adv. No. 25-2005, Docket Nos. 70–71 (together, the "**HTLF Motion**");[6] and Adv. No. 25-2005, Docket Nos. 73–75 (together, the "**Rabo Motion**").[7] CFSB, Mechanics, and Rabo each raised the *in pari delicto* defense expressly as to the common-law claims (Counts I through V, and XI). HTLF raised an argument concerning the Debtors' self-inflicted injuries that the Trustee asserts is merely a relabeled *in pari delicto* argument, so the Court will treat it as such in this Memorandum Opinion and Order.

The Trustee responded to the motions, Adv. No. 25-2005, Docket Nos. 79, 82; Adv. No. 24-2007, Docket Nos. 235, 236, and the Defendants replied. Adv. No. 25-2005, Docket Nos. 87, 95; Adv. No. 24-2007, Docket Nos. 249, 248. The matter is fully briefed and argued.

---

[4] Although Count XIII is styled as a fraudulent-transfer count, it also seeks avoidance of alleged preferential transfers under section 547.

[5] Also filed in Adv. No. 24-2007, Docket Nos. 238, 240.

[6] Also filed in Adv. No. 24-2007, Docket Nos. 230–31.

[7] Also filed in Adv. No. 24-2007, Docket Nos. 232–34.

## IV.  Legal Standard

The general rules of pleading under Federal Rule of Civil Procedure 8 apply in an adversary proceeding. Fed. R. Bankr. P. 7008. Federal Civil Rule 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Rule 8(a) pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy this standard, the defendant may file a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also* Fed. R. Bankr. P. 7012 (incorporating Federal Civil Rule 12(b)–(i) into adversary proceedings).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Where a complaint contains facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation modified).

In reviewing a Rule 12(b)(6) motion, a court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court may not accept legal conclusions as true. *Iqbal*, 556 U.S. at 678–79. To avoid dismissal, pleadings must show specific, well-pleaded facts rather than conclusory allegations. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

A court ruling on a motion to dismiss "may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citation modified).

A claim may be dismissed under Rule 12(b)(6) if a successful affirmative defense appears clearly on the face of the pleadings. *See Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *In re Lehr Constr. Corp.*, 528 B.R. 598, 614 (Bankr. S.D.N.Y. 2015) (dismissing Chapter 11 trustee's common-law claim of faithless servant based on *in pari delicto* defense that was apparent on the face of the complaint). The Trustee initially argued that *in pari delicto* shouldn't be determined at the motion-to-dismiss stage, but when pressed by the Court to explain why not, the Trustee's counsel acknowledged that the Court can and should determine the defense now. The Court agrees. To avoid the *in pari delicto* defense, the Trustee makes the public-policy argument that he should not be bound by the Debtors' prior bad acts, and that innocent creditors will recover less if the defense bars his claims against the Defendants. That argument and those facts—revealed on the face of the Second Amended Complaint—are the same now as they will be at the summary-judgment stage or at a later trial on the merits. Now is the time to decide the issue.

## V.  Analysis

The Court first will address why the Trustee is subject to defenses that were available against the Debtors. Next the Court will discuss why the Debtors' claims that the Trustee asserts here are barred by the *in pari delicto* defense. Then the Court will explain why various arguments against applying *in pari delicto* to a bankruptcy trustee are unavailing. Finally, the Court will address why it is dismissing the claims with prejudice.

### A.    The Trustee is subject to defenses that were available against the Debtors

Property of a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Those interests include a debtor's causes of action. *Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp.*

8

*Health Tr.),* 25 F.3d 1281, 1284 (5th Cir. 1994). A trustee, as the bankruptcy estate representative, succeeds to the debtor's rights and has standing to bring claims that the debtor could have pursued outside of bankruptcy. *Stanley v. Trinchard*, 500 F.3d 411, 418–19 (5th Cir. 2007); 11 U.S.C. § 323.

But does that same trustee take the debtor's common-law claims subject to defenses that were available against the debtor on the bankruptcy petition date?  By limiting property of the estate to legal and equitable interests "of the debtor," and by further limiting those interests to "as of the commencement of the case," section 541 of the Bankruptcy Code forecloses any interpretation that would give a trustee greater rights in common-law claims than the debtor had as of the bankruptcy filing. 11 U.S.C. § 541(a)(1); *see also In re Moody,* 77 B.R. 566, 580 (S.D. Tex. 1987) ("To the extent a legal or equitable interest of a debtor in property is limited in the debtor's hands, it is equally limited in the hands of the trustee. . . ."). To take common-law claims free of applicable defenses would give a trustee greater rights than the debtor had as of the bankruptcy filing.

Even if the plain text of section 541 were somehow ambiguous on this point, the legislative history of section 541(a) is clear:

> Though this paragraph will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had.

S. Rep. No. 95-989, at 82 (1978).

Congress knows how to give a trustee additional powers when it wants to improve upon a debtor's prebankruptcy rights. For example, sections 547, 548, and 550 of the Bankruptcy Code allow a trustee to avoid and recover for the benefit of the estate certain preferential and fraudulent transfers that deprived the debtor of property interests as of the petition date. And section 544(a) of the Bankruptcy Code gives a trustee,

"without regard to any knowledge of the trustee or of any creditor," the rights and avoidance powers of hypothetical state-law creditors and real-property purchasers. Congress gave no such power to trustees to take a debtor's common-law claims free and clear of applicable defenses. Congress instead lets a trustee take that property of the estate as he finds it. *See Butner v. United States*, 440 U.S. 48, 55 (1978) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

The Bankruptcy Code is replete with other examples where a trustee—unless the Bankruptcy Code creates an exception—takes property of the estate as he finds it. For example, if a debtor was a party to an executory contract or unexpired lease that the debtor inadvertently allowed to expire by its own terms prior to bankruptcy, the Bankruptcy Code doesn't revive it, even if such an agreement would be beneficial to the trustee and innocent creditors. 3 Collier on Bankruptcy ¶ 365.06 (16th ed. 2026). On the other hand, if a debtor—as of the bankruptcy petition date—had only one day remaining under its agreement or lease to cure a prepetition default before termination for cause, section 108(b) of the Bankruptcy Code extends that cure period automatically to give the trustee a breathing spell the debtor was not otherwise entitled to under state law.

Another example: If a trustee wishes to assume an executory contract of the debtor under section 365(a) of the Bankruptcy Code, the trustee generally must "assume the entire contract, *cum onere*—the [trustee] accepts both the obligations and the benefits of the executory contract." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000). Thus, if the debtor was feckless financially and didn't pay rent under a lease for months before the bankruptcy filing, the trustee has to cure—or provide adequate assurance that he will promptly cure—that prebankruptcy default to assume it, 11 U.S.C. § 365(b)(1), even though innocent creditors may recover less if the landlord recovers more. In contrast, the Bankruptcy Code gives a trustee limited but special cure rights by excusing any requirement to cure defaults for breaches related to the debtor's financial condition or bankruptcy filing. 11 U.S.C. § 365(b)(2).

10

A pattern is apparent in these examples: A trustee takes property of the estate as he finds it on the bankruptcy petition date, unless the Bankruptcy Code provides an exception. In this case, the Trustee succeeds the Debtors and is given standing to bring their common-law claims against the Defendants subject to the same rights the Debtors had as of the petition date. And because the Bankruptcy Code does not specifically grant additional rights for these common-law claims, it necessarily follows that the Trustee is subject to the same defenses that were available against the Debtors.

### B.      The affirmative defense of *in pari delicto* bars the Debtors' common-law claims

The Defendants here assert the affirmative defense of *in pari delicto*, which means "equally at fault." *In pari delicto*, Black's Law Dictionary (12th ed. 2024). It is an equitable doctrine that derives from the Latin, *in pari delicto potior est conditio defendentis*, which means "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (quoting Black's Law Dictionary 711 (5th ed. 1979)). The defense is "grounded on two premises:  first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.* (citation omitted).

*"In pari delicto* is an equitable, affirmative defense, which is controlled by state common law." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 965 (5th Cir. 2012). But which state common law governs here? The Trustee asserts alternative common-law counts under both Texas and Kentucky law, arguing primarily that Texas law governs the claims and defenses of the parties. In contrast, CFSB believes Kentucky law governs (pointing to its formation there, its bank branches there, and the Debtors' and McClain's activities there); Rabo asserts Iowa law governs (noting Iowa law governs its loan and security documents with the Debtors); and Mechanics and HTLF argue Texas law on the merits and don't suggest any other state law applies.

Ordinarily a choice-of-law analysis is inappropriate at the motion-to-dismiss stage given the factual disputes concerning which law governs. But identifying which state's law applies to each claim is only necessary if the laws actually conflict. *See MC Asset Recovery LLC v. Commerzbank*

11

*A.G.*, 675 F.3d 530, 536–37 (5th Cir. 2012). Here, the Court can find no conflict regarding the *in pari delicto* defense under Texas, Kentucky, or Iowa law.

In all three states, *in pari delicto* bars a plaintiff's claim when the claim arises from an illegal, fraudulent, or wrongful act or transaction in which the plaintiff participated, and the plaintiff's fault is at least substantially equal to (or greater than) the defendant's fault. *See Lewis v. Davis,* 199 S.W.2d 146, 151 (Tex. 1947) (describing the general rule that *in pari delicto* bars a party from relief when that party is of equal or greater fault than the defendant); *see also Neblett v. Brothers,* 325 F. Supp. 3d 797, 810–11 (E.D. Ky. 2018) (same under Kentucky law); *General Car & Truck Leasing Sys. v. Lane & Waterman,* 557 N.W.2d 274, 279 (Iowa 1996) (same under Iowa law).

And in all three states, the *in pari delicto* doctrine considers public policy as part of the analysis. *Lewis,* 199 S.W.2d at 151 ("There is often involved, in reaching a decision as to granting or withholding relief [under *in pari delicto*], the question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other."); *Forbes v. City of Ashland*, 55 S.W.2d 917, 920 (Ky. 1932) ("[E]ven though the parties may be said to be *in pari delicto* it has been held that the courts may grant relief to one of them when public policy requires such intervention.") (quoting 15 American and English Encyclopedia of Law 1007 (2d ed.)); *Mlynarik v. Bergantzel*, 675 N.W.2d 584, 587–88 (Iowa 2004) ("Even where the contracting parties are *in pari delicto*, the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him.") (quoting *In re Sylvester's Estate*, 192 N.W. 442 (1923)).

The *in pari delicto* analysis under Texas, Kentucky, and Iowa law thus requires the Court to consider both the relative fault of the parties and public policy.

The plaintiff here is the Trustee, who did not participate in the alleged wrongful conduct. But for purposes of this analysis, the Trustee necessarily steps into the Debtors' shoes under section 541 of the Bankruptcy Code to pursue their claims and acquires no greater rights than the Debtors had. *See, e.g., Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir.

12

1996) ("When asserting claims under the authority of 11 U.S.C. § 541 . . . the trustee stands in the shoes of the debtor and 'can take no greater rights than the debtor himself had.'") (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 368, reprinted in 1978 U.S.C.C.A.N. 5963, 6323.). "In other words, though this case is brought by a bankruptcy trustee who gains his authority to sue from the United States Bankruptcy Code, [a trustee's] success or failure on the merits is determined *as if the debtor entity itself brought the claims at issue* under the applicable law." *Id.* (emphasis added).

Therefore, to determine the success or failure on the merits, the Court must apply *in pari delicto*—considering both the relative fault of the parties and public policy—as if the Debtors themselves brought the common-law claims.

The Trustee's Second Amended Complaint makes abundantly clear that while Brian McClain controlled the Debtors, they were at least equally at fault with the Defendants during the alleged check-kiting and Ponzi schemes because the Debtors masterminded and orchestrated the schemes while the Defendants participated in and helped the schemes in different ways. *See, e.g.,* Second Amended Complaint ¶¶ 3, 19–34, 38–45 (describing schemes orchestrated by the Debtors with Brian McClain at the helm);[8] ¶¶ 5, 46–91 (describing Defendants' conduct participating in and helping the schemes). *In pari delicto* thus bars the Debtors' claims unless public policy requires a different result.

The Trustee's counsel argued that the chief restructuring officer who was appointed shortly before the bankruptcy filing was akin to a receiver and had sufficiently rehabilitated the Debtors prior to

---

[8] This is not a case that would warrant application of the adverse-interest exception to bar imputation of Brian McClain's conduct to the Debtors. *See Baena v. KPMG LLC,* 453 F.3d 1, 7–8 (1st Cir. 2001) (the adverse-interest exception is the theory that the bad acts of a company's management should not be imputed to the company if the bad acts were adverse to the company's interest). Nor has the Trustee raised this issue. Therefore, *the Debtors are the wrongdoers*. The Court rejects the suggestion that because Brian McClain is no longer at the helm, "no wrongdoer" will benefit from pursuit of the Debtors' common-law claims. Transcript of Hearing Held Jan. 21, 2026, at 155 [Docket No. 387]. As the Court repeats throughout this document, because of section 541 of the Bankruptcy Code, success or failure on the merits is determined as if the Debtors themselves—the wrongdoers—brought and would recover from the claims at issue.

bankruptcy; according to that public-policy argument, the Trustee, inheriting the Debtors' causes of action on the petition date, took the claims free and clear of *in pari delicto*. Transcript of Hearing Held Jan. 21, 2026, at 155 [Docket No. 387]. As explained below, that short-lived change in the Debtors' management doesn't help the Trustee.

First, a chief restructuring officer appointed outside of any court proceeding is not the equivalent of a court-appointed receiver, which in some states is allowed to act for creditors and avoid the defense of *in pari delicto* even when he brings a claim that belongs to the corporate receivership entity.[9] *See, e.g., Jones*, 666 F.3d at 966. Therefore, a chief restructuring officer, who is a private member of management, does not enjoy the same powers as a court-appointed receiver.

Second, the Second Amended Complaint is devoid of allegations about prepetition rehabilitation, and the Court cannot reasonably infer such rehabilitation given the Trustee's extensive allegations of Rabo's control over the Debtors for nefarious purposes shortly before the bankruptcy petition date. For example, according to the Second Amended Complaint: (i) Rabo exerted an atypical and inappropriate level of control over the Debtors; (ii) the Debtors and Rabo executed forbearance agreements shortly before the bankruptcy petition date that required the Debtors to turn control of their business over to a hand-picked chief restructuring officer of Rabo's choosing; (iii) Rabo compelled the Debtors to execute releases in favor of Rabo; (iv) Rabo obtained deposit account control agreements shortly before the bankruptcy that gave Rabo the ability to claim a lien over and control the Debtors' access to funds, and outflows from the Debtors' bank accounts at Mechanics; and (iv) Rabo's domination of the Debtors was made indisputably manifest by the coronation of its hand-picked chief restructuring officer. *E.g.,* Second Amended Complaint ¶¶ 73, 92–93, 112, 132, 154.

The turnover of power here from one alleged co-conspirator to another alleged co-conspirator's hand-picked chief restructuring officer on the eve of bankruptcy is a sharp contrast from the turnover of power in *In*

---

[9] Sometimes bankruptcy courts approve the retention of chief restructuring officers in bankruptcy cases—entitling them to potential protections, such as "gatekeeping" protection under confirmed Chapter 11 plans, or protection under the *Barton* doctrine, *see In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 439 (5th Cir. 2022)—but nothing of the kind has occurred here.

*re Palm Beach Finance Partners, L.P.*, 588 B.R. 633 (Bankr. S.D. Fla. 2018). There, the debtors' former management—who made false representations to investors in a giant Ponzi scheme—were removed from control in 2008 and replaced with a steering committee of defrauded investors, who later retained a chief restructuring officer for the company. Because the court determined the debtors were "cleansed" of the bad actors "long before" the November 2009 bankruptcy filing, the debtors were not subject to *in pari delicto* on the bankruptcy petition date, so neither was the trustee. *Id.* at 647; Voluntary Petition, Case No. 09-36379 (Bankr. S.D. Fla., Nov. 30, 2009) [Docket No. 1].[10]

Even if *Palm Beach Finance Partners* is correct that the *in pari delicto* defense fails when defrauded investors, followed by a chief restructuring officer, replace bad management "long" before bankruptcy and undertake rehabilitative measures for creditors, those facts aren't alleged in the Second Amended Complaint. Despite exhaustive research, the Court has been unable to find any case law (in Texas, Kentucky, Iowa, or anywhere else for that matter) suggesting that debtors who were very recently involved in a massive fraud should be freed of the *in pari delicto* defense on public-policy grounds because they have turned control of the debtors over to a chief restructuring officer of a co-conspirator's choosing shortly before bankruptcy, thus cementing the co-conspirator's control of the debtors.

Because the Debtors were at least equally at fault with the Defendants in the alleged check-kiting and Ponzi schemes, and because public-policy considerations don't favor the Debtors as of the petition date, the Debtors' common-law claims asserted by the Trustee are barred by the Defendants' *in pari delicto* defense.

---

[10] The Court does not believe that a prebankruptcy change in management—whether a court-appointed receiver or chief restructuring officer—can "cleanse" a company from the *in pari delicto* defense in a subsequent bankruptcy filing. More persuasive authority dispels this notion of cleansing. *See Kelley v. BMO Harris Bank Nat'l Ass'n*, 115 F.4th 901, 905–06 (8th Cir. 2024) (rejecting bankruptcy trustee's suggestion that short-lived receivership prior to bankruptcy "cleansed" the debtor free of *in pari delicto* defense; appointment of receiver merely changed management and did not change the company itself, which remained a bad actor subject to the defense; special privilege of the receiver to take free of the defense no longer applied outside of the receivership), *cert. denied*, 145 S. Ct. 2731 (2025). In any event, the Second Amended Complaint does not allege cleansing or rehabilitation.

15

**C.   Arguments against applying *in pari delicto* to a bankruptcy trustee are unavailing, especially given Fifth Circuit guidance on this precise issue**

To resuscitate his common-law claims, the Trustee argues that he—not any wrongdoer—now controls the Debtors, and that innocent creditors will suffer if *in pari delicto* is applied against him. The Court will address those distinct but overlapping postpetition public-policy arguments in turn and will then discuss how nine circuit courts of appeal, including the Fifth Circuit, have rejected those very arguments outright or in strongly worded dicta.

To start, the Court struggles to see how a change in control from the Debtors to the bankruptcy Trustee changes anything legally. The only reason the Trustee can sue the Defendants in the first place is because section 541 of the Bankruptcy Code creates an estate comprised of the Debtors' rights. Sections 541 and 323 of the Bankruptcy Code endow the Trustee with the power and standing to act as if he were the Debtors; the Trustee can step into the Debtors' shoes to pursue the Debtors' claims. And as the Court observed at the outset of this analysis, the Trustee takes the Debtors' common-law claims as he found them, without extra powers or rights. The Trustee unquestionably would get better rights than the Debtors had if he were allowed to conveniently remove the shoes now that it's time to reckon with defenses that applied to the Debtors. As discussed above in section A, the text and legislative history of section 541 foreclose that argument, whether the defense is a legal one or an equitable one.

For example, if the statute of limitations passed on a corporate debtor's cause of action prior to bankruptcy because the debtor miscalendared the filing deadline, nobody would seriously argue that—in the face of a limitations defense—the bankruptcy trustee could still pursue the claim because *he's* now in control of the debtor and is much more diligent than the debtor was. That claim belonged to the debtor, and because the debtor allowed the claim to lapse, the debtor's claim is time-barred. Under section 541, the trustee is treated *as if he were the debtor*, and the defense applies *as if he were the debtor*. The Trustee is not suing on his own claim, and he gets no better rights simply because the less-than-diligent party is no longer in control.

16

*In pari delicto* should not be treated differently simply because it's an equitable defense. Although this Court is a court of equity, the same legal construct that barred the legal defense of limitations applies here. The Debtors engaged in conduct that under state law would bar them from pursuing their common-law claims. Under section 541, the Trustee is treated *as if he were the Debtors*, and the defense applies *as if he were the Debtors*. In other words, section 541 limits the Court's equitable powers and requires the Court to engage in a hypothetical analysis applying defenses to common-law claims *as though the Debtors themselves brought the claims*. To hold otherwise would mean a trustee takes a debtor's common-law claims free and clear of applicable defenses, obtaining greater rights than the Debtors had as of the petition date.

The Trustee's next public-policy argument—that innocent creditors will receive less if *in pari delicto* applies—is similarly unpersuasive here. The Trustee argues that the Court would be applying an equitable defense inequitably and would be harming the creditors by applying *in pari delicto*. Although there is an equitable tug to that argument, section 541 again forecloses it. First, if creditors have direct claims against the Defendants for injuries that are unique to those creditors, they are free to pursue those claims notwithstanding *in pari delicto*.[11] Second, if creditors are expecting a recovery from the Defendants because they believe the Debtors were injured, then any injury to the creditors is *entirely derivative* of injury to the Debtors. In other words, creditors would not be entitled to a dime for the Defendants' alleged misconduct unless the Debtors themselves are entitled to recover on their common-law claims against the Defendants. *See In re Buccaneer Res., L.L.C.,* 912 F.3d 291, 293 (5th Cir. 2019). And under section 541 of the Bankruptcy Code, the Debtors are not entitled to recover on those common-law claims if the Defendants have valid defenses. To say that innocent creditors will be harmed if *in pari delicto* applies is to assume the very point in controversy: Whether the Debtors are in fact entitled to recover.[12] They are not.

---

[11] In fact, in this very adversary proceeding, creditors have filed against these same Defendants alleged direct-injury claims, which the Court has not yet resolved.

[12] Similarly, the mantra, "But creditors will be better off if the court reaches this result!" met its demise when the Supreme Court held that nonconsensual third-party

17

The significant majority of courts have found these public-policy arguments unpersuasive under similar circumstances. Eight federal circuit courts of appeal have applied the *in pari delicto* defense to bar bankruptcy trustees, or other assignees standing in the shoes of the debtor (such as a creditors' committee), from pursuing state common-law claims—or in one case, federal RICO claims—against third parties who have allegedly participated in or facilitated wrongful conduct.[13] The courts of appeal did so even though public policy is considered in every single governing law—11 states and federal RICO law—supplying the *in pari delicto* defenses that defeated the bankruptcy trustees or

---

releases in bankruptcy plans are impermissible under the plain language of the Bankruptcy Code even though innocent creditors would benefit from larger and more favorable settlements from insiders if such releases were allowed. *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 220 (2024); *contra* 603 U.S. at 230 (Kavanaugh, J., dissenting) ("With the current plan now gone and non-debtor releases categorically prohibited, the consequences will be severe. . . Without releases, there will be no $5.5 to $6 billion settlement payment to the estate, and there will be no viable path to any victim recovery. . . . And without the plan's substantial funding to prevent and treat opioid addiction, the victims and creditors bluntly described further repercussions: more people will die without this Plan.") (citation modified).

[13] *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir. 2006) (applying federal RICO law; not addressing Georgia law); *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 841–42 (8th Cir. 2005) (applying California, Oregon, and Nevada law); *Kelley v. BMO Harris Bank National Association*, 115 F.4th 901, 906–07 (8th Cir. 2024) (applying Minnesota law); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356–57 (3rd Cir. 2001) (applying Pennsylvania law); *Terlecky v. Hurd (In re Dublin Sec. Inc.)*, 133 F.3d 377, 381 (6th Cir. 1997) (applying Ohio law); *Sender v. Buchanan (In re Hedged–Inv. Associates)*, 84 F.3d 1281, 1285–86 (10th Cir. 1996) (applying Colorado law); *Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1277–78 (10th Cir. 2008) (applying Utah law); *Baena v. KPMG LLP*, 453 F.3d 1, 7–10 (1st Cir. 2006) (applying Massachusetts law); *Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Cap. LLC)*, 716 F.3d 355, 366–69 (4th Cir. 2013) (applying South Carolina law); *Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP,* 322 F.3d 147, 158–66 (2d Cir. 2003) (applying Texas law to defeat breach of fiduciary duty claim brought by estate representative). In an earlier case, the Second Circuit addressed whether a trustee—stepping into the shoes of a wrongdoer-debtor—could successfully assert claims based on the same conduct that the wrongdoer was engaged in. *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 116 (2d Cir. 1991). There, the court focused on the trustee's standing (or lack of standing) under New York law to bring the claims in the first instance. *Id.* at 118. This is known as the "Wagoner Doctrine" and is similar to, but distinct from, the *in pari delicto* affirmative defense under New York common law.

18

assignees.[14] And the courts of appeal did so even though innocent creditors would potentially recover more money if the trustees took the common-law claims free of applicable defenses such as *in pari delicto*.

---

[14] *See Tri-Q, Inc. v. Sta-Hi Corp.*, 404 P.2d 486, 498 (Cal. 1965) ("In each such [*in pari delicto*] case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved.") (citation omitted); *McElwee v. McElwee*, 138 P.2d 208, 210 (Or. 1943) ("The maxim being one founded on public policy, public policy may require its relaxation.  Even when the parties have been found to be *in pari delicto*, relief has at times been awarded on the ground that in the particular case public policy has been found to be best conserved by that course.") (citation omitted); *In re Amerco Derivative Litig.*, 252 P.3d 681, 696 (Nev. 2011) ("[T]he courts should not be so enamored with the latin phrase '*in pari delicto*' that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, [1] the public cannot be protected because the transaction has been completed, [2] where no serious moral turpitude is involved, [3] where the defendant is the one guilty of the greatest moral fault, and [4] where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied. . . . Other courts have similarly noted that there are public policy grounds for not applying *in pari delicto* as a bar to an action among wrongdoers.") (citation modified); *State by Head v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972) ("We do not forecast an uncritical application of [*in pari delicto*], for it is not without exception. A paramount public interest in the enforcement of some statutes may call for judicial intervention in favor of one wrongdoer against the other in order to effectuate the enforcement of a public policy which overrides considerations of a benefit inuring to a wrongdoer."); *Official Committee of Unsecured Creditors of Alleghany Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 330 (Penn. 2010) ("Nevertheless, the [*in pari delicto*] doctrine is subject to appropriate and necessary limits. As the United States Supreme Court has observed, the traditional or classic treatment of *in pari delicto* permits matters of public policy to be taken into consideration in determining the defense's availability in any given set of circumstances."); *Dahms v. Swinburne,* 167 N.E. 486, 487 (Ohio Ct. App. 1929) ("Even where the contracting parties are *in pari delicto*, the courts may interfere from motives of public policy.") (citation omitted);  *Branham v. Stallings*, 40 P. 396, 397 (Col. 1895) ("The exceptions [for *in pari delicto*] cover cases of usurious contracts, marriage brokerage contracts, and the like, where the transactions are prohibited for the sake of protecting one set of men from another, the one from their condition or situation being liable to be imposed upon by the other, as in such cases the parties are not *in pari delicto*, and it is assumed that public policy will best be advanced by granting relief."); *Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1946) ("It has been said that even where the parties are *in pari delicto* relief will sometimes be granted if public policy demands it."); *Gorringe v. Read*, 63 P. 902, 904 (Utah 1901) ("It is no doubt true, as a general proposition, that a court of equity, acting on the maxim, *[i]n pari delicto potior est conditio defendents et possidentis*, will not interpose to aid parties who are concerned in unlawful transactions or agreements; but where public policy requires relief to be given, and when the parties, though in delicto, or great inequality of condition or age existed, and acted involuntarily, the maxim does

These circuit courts concluded that under section 541 of the Bankruptcy Code, a bankruptcy trustee only succeeds to the claims and rights that the debtor had on the bankruptcy petition date. In other words, the trustee steps into the debtor's shoes. The debtor's common-law claims brought by the trustee are subject to the very defenses that could have been asserted against the debtor, and the defense is applied *as if the trustee were the debtor.*

In *Jones*, the Fifth Circuit distinguished the snapshot nature of section 541 of the Bankruptcy Code, which requires a court to apply *in pari delicto* differently in a bankruptcy case than in a receivership case. *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 967–68 (5th Cir. 2012). There, the Fifth Circuit refused to apply *in pari delicto* to a company's receiver appointed by a federal district court in an SEC enforcement action. Although a receiver generally has no greater rights than a corporation as of the date of receivership, the Fifth Circuit held that when a receiver acts to protect innocent creditors, he can maintain an action done in fraud of creditors even if the company would not be permitted to do so. *Id.* at 966 (quoting *Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E Court, Inc.*, No. 03-02-00714-CV, 2003 Tex. App. LEXIS 3966, 2003 WL 21025030, at *5 (Tex. App.—Austin 2003)). The defendant in *Jones*, who was asserting *in pari delicto* against the plaintiff receiver, pointed by analogy to the federal circuit courts of appeal that have applied the doctrine against bankruptcy trustees.

---

not apply.") (citation modified); *Packard & Field v. Byrd,* 51 S.E. 678, 679 (S.C. 1905) ("[T]here are certain well-established exceptions to this general rule. . . these exceptions are grouped under five heads: '(1) Where public policy requires the intervention of the Court. . .") (citation omitted); *Merrimack College v. KPMG LLP,* 108 N.E.3d 430, 440 (Mass. 2018) ("Another exception involves 'cases where the public interest requires that [the courts] should, for the promotion of public policy, interpose, and the relief in such cases is given to the public through the party.'") (alteration in the original) (citation omitted). Not all of the circuit opinions expressly discuss the public-policy element of *in pari delicto*, but presumably the courts of appeal were aware of the general contours of such an important equitable defense.

The Fifth Circuit's response? "These cases, however, are *plainly distinguishable* because they rely upon Section 541(a) of the Bankruptcy Code, which limits the debtor estate to interests of the debtor 'as of the commencement of the case.'" *Id.* at 967 (emphasis added) (quoting 11 U.S.C. § 541(a)(1)). The Fifth Circuit then favorably quoted some of the sister-circuit opinions, including the Tenth Circuit, which—because of section 541—refused to adopt the reasoning of a Seventh Circuit receivership opinion (*Scholes*) in a bankruptcy case:

> "Though the Seventh Circuit's reasoning in *Scholes* enjoys a certain appeal, both from doctrinal and public policy perspectives, we cannot adopt it in this case. Put most simply, Mr. Sender is a bankruptcy trustee acting under 11 U.S.C. § 541, and bankruptcy law, apparently unlike the law of receivership, expressly prohibits [application of *Scholes*]." We therefore are not persuaded by Wells Fargo's analogy to bankruptcy trustees.

*Jones*, 666 F.3d at 967-68 (quoting *In re Hedged Inves. Assocs., Inc.*, 84 F.3d at 1285) (citation modified). This blunt retort strongly suggests that in the Fifth Circuit, and notwithstanding the effect on creditors, section 541 of the Bankruptcy Code severely impairs or eliminates the viability of a bankruptcy trustee's common-law claims when *in pari delicto* would bar the claim in the debtor's hands.

Stated differently, relying on section 541, the eight circuit courts barred each trustee's claim after applying the *in pari delicto* defense *as if the trustee were the debtor*. The Fifth Circuit in *Jones* found these cases were "plainly distinguishable" from receiverships, where a receiver faced with the *in pari delicto* defense is allowed to remove the debtor's shoes and act instead as a white knight, recovering for innocent creditors.

Thus, the Court must respectfully part ways with two bankruptcy court opinions in the Fifth Circuit that used the receivership method of applying *in pari delicto* rather than the section 541 snapshot method that the Fifth Circuit strongly suggested it would follow. In *Vantage* and *Today's Destiny*, the Chapter 7 trustees for companies that engaged in fraud prior to bankruptcy sued third parties (and in *Today's Destiny*, certain former insiders) who were alleged to be complicit in the fraudulent schemes. The third-party defendants raised *in pari delicto* as a defense at the Rule 12(b)(6) motion-to-dismiss stage (*Today's Destiny*) and the

21

summary-judgment stage (*Vantage*). *In re Vantage Benefits Adm'rs, Inc.*, No. 18-31351-SGJ-7, 2024 WL 3842796, at *5 (Bankr. N.D. Tex. 2024); *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737, 743 (Bankr. S.D. Tex. 2008).

Those courts first predicted that the Fifth Circuit would follow its sister circuits in concluding that bankruptcy trustees *are* subject to the *in pari delicto* defense. *Vantage*, 2024 WL 3842796 at *25; *Today's Destiny*, 388 B.R. at 748. The Court agrees with that conclusion. But the Court disagrees with what they did next. The court in *Today's Destiny* determined that at the Rule 12(b)(6) stage—as to the aiding-and-abetting claims— it couldn't decide *in pari delicto* under governing Texas law because discovery might demonstrate that the trustee is recovering only for innocent creditors and not any wrongdoers; if so, the trustee potentially would be exempt from the doctrine based on the equities and public policy. *Today's Destiny*, 388 B.R. at 750. In other words, the court was *not* going to apply the defense as if the trustee were the debtor on the petition date. Instead, even though the trustee necessarily stepped into the debtor's shoes to pursue the debtor's Texas common-law tort claims— shoes that were covered in the muck of the debtor's prebankruptcy misconduct—the court would allow the trustee to remove the mucky shoes when it came time to apply affirmative defenses.

Similarly, the *Vantage* court applied Texas *in pari delicto* law to the debtors' common-law tort claims and—in its proposed findings and conclusions to the district court—recommended granting summary judgment for the trustee on the public-policy ground that the trustee was an innocent party recovering for innocent creditors.[15] *Vantage*, 2024 WL 3842796 at *33–34. The court, like in *Today's Destiny*, *didn't* apply the defense as if the trustee were the debtors on the petition date. Instead, although the trustee stepped into the debtors' mucky shoes to pursue the Texas tort claims, the court let the trustee remove the mucky shoes now that it was time to apply affirmative defenses.

---

[15] The court applied New York law to the trustee's breach-of-contract claims and barred those claims under the New York *Wagoner* rule, which it called a "strong" version of *in pari delicto*. *Vantage*, 2024 WL 3842796, at *25–26.

22

The Court ultimately concludes that *Vantage* and *Today's Destiny* applied *in pari delicto* in a way the circuit courts of appeal did not, in a way the Fifth Circuit found was "plainly distinguishable" from the way it should be applied to bankruptcy trustees under section 541, and in a way that gives the trustee greater rights than the debtor had. Until the Fifth Circuit walks back its conclusion in *Jones* that receivership-style application of *in pari delicto* is "plainly distinguishable" from the way it should apply to bankruptcy trustees due to the operation of section 541, the Court will follow the Fifth Circuit's lead.[16]

---

[16] One commentator has suggested that *in pari delicto* is a fluid defense and that a court should consider postpetition reality—that is, a white knight pursuing claims for innocent creditors—when applying it to bankruptcy trustees:

> Consider the example of an unpaid account. A trustee can assert a claim for an unpaid account only if the debtor could have asserted the claim. Section 541 requires courts to consider the pre-petition world to determine if the debtor has a claim. If, pre-petition, the debtor sold goods to a customer and the customer did not pay, the debtor could assert a claim for the unpaid account. Under § 541, the trustee can assert this claim. If the [customer] paid half of what was owed on the account post-petition, the court does not ignore this payment and issue[] a judgment for the full amount that was owed pre-petition. The existence of the trustee's right to sue on the account was determined by pre-petition facts, but the actual application must take into account the post-petition reality. Nothing within § 541 limits a court's application of rights to pre-petition facts and reading such a limit into § 541 only leads to inequitable results that run counter to the purposes of the Bankruptcy Code.

Robert Bruner, *The Collapse of the* In Pari Delicto *Defense to Bankruptcy Trustee Claims: How the Fifth Circuit has Opened a New Door for Trustee Litigation*, 17 Tex. Wesleyan L. Rev. 91, 113 (2011). But there's no problem with considering the postpetition payment in this example because the debtor had a right to collect a certain amount of dollars (let's say $100), and the trustee had the same right on the petition date to collect $100. The trustee is not getting greater rights simply because the estate received $50 after the petition date; he's just half done collecting the debtor's prepetition account. A better hypothetical is this one: A customer owes the debtor $100 as of the petition date for a widget the customer purchased on credit. But the debtor also owes the customer a $50 refund as of the petition date for a previously sold, defective widget. Absent contract language specifying the parties' rights, does the trustee get to collect the $100 free and clear of the $50 setoff or recoupment claim simply because of the postpetition reality that he's a white knight collecting for innocent creditors? No. The Court is willing to consider postpetition events, but the Court is not willing to give a trustee greater rights than the debtor had given the text and legislative history of section 541 and the Fifth Circuit guidance in *Jones*.

The Fifth Circuit's *Kane* opinion is not inconsistent with application of *in pari delicto* to a bankruptcy trustee. *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380 (5th Cir. 2008). In *Kane*, the Chapter 7 debtors failed to disclose in their sworn bankruptcy schedules a prepetition personal-injury lawsuit against a defendant.  The nondisclosure by the debtors—who received a no-asset Chapter 7 discharge—harmed creditors, who received no recovery on account of the hidden asset. The Fifth Circuit rejected the defendant's argument that judicial estoppel barred both the debtors *and* the Chapter 7 trustee (who had moved to substitute in as the real party-in-interest) from pursuing the claims. It was the debtors, not the creditors, who were guilty of the nondisclosure, so it would be inequitable to harm the creditors yet again by precluding the trustee from pursuing the claim for their benefit.

*Kane* at a quick glance seems on point because it discusses how creditor interests can overcome an equitable defense that would bar a claim if pursued by the debtor. But a closer examination reveals that *Kane* isn't terribly helpful here. The personal-injury claim in *Kane* was *not* subject to any debilitating defenses as of the petition date that would have barred the claim if pursued by the debtors. The Chapter 7 trustee in *Kane* thus stepped into squeaky-clean shoes, and the Fifth Circuit was not about to let the debtors' *postpetition* nondisclosure hinder the trustee's efforts to monetize property of the estate (the claim) for creditors. *Kane* did not address the threshold issue the Court faces here: When a debtor's shoes are not squeaky clean on the petition date but instead are (allegedly) knee-deep in the muck of the debtor's prepetition misconduct, may the trustee step into the debtor's shoes to pursue a claim but conveniently remove the shoes when it's time to defeat an affirmative defense?

As *Jones* and the string of circuit court opinions make clear, the trustee does not acquire greater rights than the debtor had when asserting common-law claims subject to the defense of *in pari delicto*. The trustee is stuck in the debtor's shoes.

In this case, because the Trustee is subject to defenses that were available against the Debtors, because the affirmative defense of *in pari delicto* bars the Debtors' common-law claims asserted by the Trustee, and because arguments against applying *in pari delicto* to a bankruptcy trustee are unavailing, the Court will grant the Defendants' respective

24

requests to dismiss the common-law claims in the Second Amended Complaint.[17]

### D. The common-law claims are dismissed with prejudice because the Trustee has not demonstrated cause for leave to amend

After a party has amended a pleading as a matter of course, further amendments require the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2); Fed. R. Bankr. P. 7015. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The language of Federal Rule of Civil Procedure 15 shows a "bias in favor of granting leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Atheltic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (citation omitted). However, "[l]eave to amend may be denied for undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . and futility of the amendment." *N. Cypress Med. Center Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 477 (5th Cir. 2018) (citation modified).

While there is no evidence demonstrating "undue delay, bad faith or dilatory motive," this is now the Plaintiff's third attempt to file a complaint with common-law claims. The Plaintiff filed two of those complaints after the Defendants filed Rule 12(b)(6) motions raising *in pari delicto*. After several months and over 200 pages of complaints, the Second Amended Complaint contains substantially the same causes of action, theories of liability, and operative facts (albeit with more detail) as the previous iterations.

When a complaint has been amended twice and no additional facts or information will overcome the pleading standard, dismissal with prejudice is proper. *United States of Am. ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland, L.L.C.*, 157 F.4th 758, 765–66 (5th Cir. 2025).

The Defendants here have successfully raised *in pari delicto* as an affirmative, equitable defense. There are no additional facts the Trustee could assert that would overcome this defense, and the public-policy

---

[17] Because *in pari delicto* bars the common-law claims, the Court need not address the Defendants' other arguments in support of dismissing the claims.

argument is the same now as it will be in any subsequent pleading. Granting leave to amend the complaint would be futile. Therefore, the Court dismisses the common-law counts in the Trustee's Second Amended Complaint with prejudice.

## VI.  Conclusion

For the reasons stated above, the Court **ORDERS** as follows:

1. The CFSB Motion, the Mechanics Motion, the HTLF Motion, and the Rabo Motion are **GRANTED** in part as stated herein.
2. Counts I, III, IV, and V against all Defendants are dismissed with prejudice.
3. Count II against Rabo and HTLF is dismissed with prejudice.
4. Count XI against Rabo and CFSB is dismissed with prejudice.
5. The Court will address the Trustee's remaining claims in the Second Amended Complaint by separate orders.