

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 8, 2026**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| McClain Feed Yard, Inc., et al., | § | Case No. 23-20084-swe-7 |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | |
| In re: | § | |
| | § | |
| 2B Farms, a Texas General Partnership, et al., | § | Case No. 23-50096-swe-12 |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | |
| AgTexas Farm Credit Services et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 24-2007-swe |
| | § | Consolidated Adversary |
| Rabo AgriFinance, LLC et al., | § | Proceeding |
| | § | |
| Defendants. | § | |

1

### *Corrected Order Dismissing Bankruptcy and Avoidance-Related Claims Against CFSB*

## I.  Introduction

Brian McClain formed, owned, and operated the Debtors, which he used for various functions in the cattle industry. McClain Feed Yard, Inc. ("**MFY**") bought and sold cattle or held and grew them for customers primarily in Texas. McClain Farms, Inc. ("**MFI**") did the same type of business primarily in Kentucky and the southeast United States. 7M Cattle Feeders, Inc. ("**7M**") owned and operated the feedyards for the cattle owned or held by the other Debtors.

The Debtors operated their businesses for several years, but then creditors discovered the Debtors owned or held only a fraction of the number of cattle the Debtors previously claimed. Brian McClain took his own life shortly thereafter, and the Debtors tumbled into bankruptcy, leaving creditors of all sorts unpaid and angry at the fraud.

The Plaintiff, Chapter 7 trustee for the Debtors (the "**Trustee**"), filed an adversary proceeding against the four Defendants: Community Financial Services Bank ("**CFSB**") and Mechanics Bank ("**Mechanics**"), the Debtors' depositary banks; Rabo AgriFinance, LLC ("**Rabo**"), the Debtors' primary lender; and HTLF Bank ("**HTLF**"), the depositary bank for 2B Farms and its owner Terry "Bo" Robinson, who were significant contract-counterparties with the Debtors. According to the Trustee, CFSB, Mechanics, Rabo, and HTLF (the "**Defendants**") permitted, enabled, facilitated, and participated in the Debtors' giant Ponzi scheme and check-kiting scheme. The complaint alleges common-law claims, claims for avoidable transfers under both the Bankruptcy Code and state law, and claims for equitable subordination, claim disallowance, and lien-priority determination.

The Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. By separate order entered on March 27, 2026, the Court dismissed the Trustee's common-law claims against all Defendants. The only claims remaining against CFSB are for actual and constructive fraudulent transfers. For the reasons stated below, the Court will dismiss with prejudice the constructive-fraudulent-transfer

2

claims that require a lack of reasonably equivalent value and will dismiss without prejudice the actual-fraudulent-transfer claims and the constructive-fraudulent-transfer claim for an antecedent debt paid to an insider.[1]

## II.  Jurisdiction and Venue

This Court has subject-matter jurisdiction over this adversary proceeding under 28 U.S.C. Sections 157 and 1334. This proceeding involves either core matters or noncore, related-to matters as to which CFSB has consented to this Court's entry of final orders and judgments. Adv. No. 25-2005, Docket No. 57.

## III.  Procedural History

On April 28, 2023, the three Debtors filed their individual Chapter 7 voluntary petitions. The Court ordered the cases jointly administered under the lead case of MFY. Order Consolidating, Case No. 23-20084, Docket No. 66. Kent Ries was appointed Chapter 7 trustee.

On March 14, 2025, the Trustee filed a 56-page complaint (not including attachments) against the Defendants, initiating adversary proceeding number 25-2005. Trustee's Original Adversary Compl., Adv. No. 25-2005, Docket No. 1 (the "**Original Complaint**"). The Original Complaint asserted fifteen counts against the Defendants, including common-law tort claims. In response, the Defendants filed Rule 12(b)(6) motions to dismiss and related briefs, raising various arguments about why the Original Complaint should be dismissed. Adv. No. 25-2005, Docket Nos. 21–24, 26–28, 31–32.

After the Defendants filed their motions to dismiss, the Trustee filed a 70-page first amended complaint on June 16, 2025, asserting substantially the same fifteen counts against the Defendants,[2] but with more detail. Trustee's First Am. Adversary Compl., Adv. No. 25-2005, Docket No. 39. The Trustee filed a response to CFSB's original motion to dismiss, Adv. No. 25-2005, Docket No. 40, 42 (amended), then shortly

---

[1] This Order supersedes and replaces in its entirety the order at Docket No. 410.

[2] The Trustee removed CFSB from, and added HTLF to, Count II: Breach of Fiduciary Duty; the Trustee added HTLF to Count XI: Money Had and Money Received.

thereafter stipulated with CFSB to file a second amended complaint. Adv. No. 25-2005, Docket No. 46.

The Trustee then filed the 80-page second amended complaint (the "**Second Amended Complaint**") against the Defendants on July 2, 2025, asserting substantially the same[3] fifteen counts against the Defendants, with yet more detail. Trustee's Second Am. Adversary Compl., Adv. No. 25-2005, Docket No. 48.

The Court later ordered adversary proceeding number 25-2005 consolidated into adversary proceeding number 24-2007, in which various creditors allege direct claims against these same Defendants. Order Consolidating, Adv. No. 25-2005, Docket No. 97.

The Second Amended Complaint primarily alleges the following against CFSB:

- Defendant CFSB is a corporation formed and existing under the laws of the State of Kentucky. Second Amended Complaint ¶ 10.
- CFSB was closely connected to the Debtors' businesses as it was the Debtors' long-term banking partner for many years. It was also the Debtors' secured lender until 2021. This close relationship eventually led to CFSB participating in and becoming a facilitator in the Ponzi scheme. *Id.* ¶ 62.
- The Debtors were engaged in a Ponzi scheme because they were repaying investors with other investors' funds. The Debtors also used artificial float to repay investors with the assistance of CFSB. For example, CFSB would pay insufficient-funds checks that the Debtors used to pay new investors. *Id.* ¶ 30.
- The Debtors processed more than $2 billion in intercompany transactions across the Debtors' accounts at Mechanics and CFSB. *Id.* ¶ 34.
- CFSB allowed the Debtors to thwart acceptable banking practices by improperly floating hundreds of millions of dollars of checks and blithely ignoring numerous red flags, including the evident kiting activity, regular, substantial overdrafts, multiple checks or wires that were dishonored or refused by CFSB due to insufficient funds,

---

[3] The Trustee removed Mechanics from Count II: Breach of Fiduciary Duty.

- hundreds of millions in intercompany transactions annually, blatant inconsistencies in the Debtors' financial statements, glaring inconsistencies in the Debtors' stated business model, and all of the automated, internal alerts, such as check-kiting and suspicious-activity reports, designed to detect and compel the investigation of the Debtors' and Brian McClain's finances and operations. *Id.* ¶ 77.
- The chief operating officer for Mechanics contemporaneously admitted to the Trustee that—for years—CFSB and HTLF "sent Mechanics Bank millions of dollars all day," and Mechanics would just send that money right back to CFSB and HTLF absent investigation. *Id.* ¶ 85.
- CFSB had compelling reasons to turn a blind eye and perpetuate the scheme—CFSB did not want to absorb the losses incurred because of the Debtors' scheme. Indeed, CFSB mostly achieved that result, as it was close to having a net-zero balance across the Debtors' accounts by the bankruptcy petition date. *Id.* ¶ 89.
- Moreover, while CFSB may not have had outstanding loans with any of the Debtors as of the bankruptcy petition date, CFSB did have outstanding loans with Brian McClain personally and McClain's immediate family members. Given the length of their relationship, CFSB understood that if the Debtors' businesses were shut down, Brian McClain would not be able to repay his personal loans. CFSB therefore had additional incentives to partake in the Debtors' scheme. *Id.* ¶ 90.
- Exhibit E to the Second Amended Complaint contains the account number, date, day of week, and dollar amount of daily overdrafts of MFI's account with CFSB. Each overdraft constituted a loan to MFI that was subsequently repaid by future, additional deposits by the Debtors. The overdrafts to CFSB repaid by the Debtors total $33,277,959.91. *Id.* ¶ 219.
- The transfers to CFSB to satisfy the overdrafts were done as part of the Debtors' Ponzi scheme and check-kiting scheme and in direct furtherance of the scheme, which was intended to buy time for the Debtors to cover fictitious profits to investors from new-investor contributions. *Id.* ¶ 221.

Based on these allegations and those detailed below in the Analysis section, the Trustee asserts the following causes of action against CFSB:

- Count I: Knowing Participation in Breach of Fiduciary Duties;
- Count III: Common-Law Civil Conspiracy;
- Count IV: Professional Negligence;
- Count V: Punitive Damages;
- Count XI: Money Had and Received; and
- Count XV: Fraudulent Transfer.

CFSB filed its motion to dismiss and related briefs, Adv. No. 25-2005, Docket Nos. 56–57 (together, the "**Motion**"). The Trustee responded to the Motion, Adv. No. 25-2005, Docket No. 79, and CFSB replied. Adv. No. 25-2005, Docket No. 87. The Court heard oral arguments on September 15, 2025.

On March 27, 2026, the Court entered a memorandum opinion and order that dismissed the Trustee's common-law claims against CFSB and the other Defendants based on the affirmative defense of *in pari delicto*. Docket No. 405.

Because the Court has already dismissed Counts I, III, IV, V, and XI, the only remaining Count against CFSB is Count XV, which seeks to avoid and recover for the benefit of the estate actual or constructive fraudulent transfers under sections 544, 548, and 550 of the Bankruptcy Code, sections 24.005 and .0006 of the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"), and sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act ("**KUVTA**"). The matter is fully briefed and argued.

## IV.  Legal Standard

The general rules of pleading under Federal Rule of Civil Procedure 8 apply in an adversary proceeding. Fed. R. Bankr. P. 7008. Federal Civil Rule 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy this standard, the defendant may file a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also* Fed. R. Bankr. P.

6

7012 (incorporating Federal Civil Rule 12(b)–(i) into adversary proceedings).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility standard is not akin to a "probability requirement," but it demands "more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). Where a complaint contains facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court may not accept legal conclusions as true. *Iqbal*, 556 U.S. at 678–79. To avoid dismissal, pleadings must show specific, well-pleaded facts rather than conclusory allegations. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

A court ruling on a motion to dismiss "may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citation modified).

Count XV against CFSB is a fraudulent-transfer count. To survive the Motion, the Trustee needs to allege a fraudulent transfer occurred consistent with applicable pleading standards. Courts vary in how much detail they require for pleading fraudulent-transfer claims and preference claims. *In re Reagor-Dykes Motors, LP*, Adversary No. 20-05002, 2020 WL 4939180 at *7–8 (Bankr. N.D. Tex. 2020) (compiling cases). The court in *Reagor-Dykes* identified three lines of thinking: (1) Rule 8 requires pleading only a description of the types of transfers to be

7

avoided;[4] (2) Rule 8 requires a plaintiff to plead each transfer by date, amount, transferor, and transferee;[5] and (3) the heightened Rule 9 standard applies to actual-fraudulent-transfer claims.[6] *Id.* at \*5–8.

This Court concludes that Rule 8 requires a plaintiff to plead, at the very least, each transfer by date, amount, transferor, and transferee. The text of Bankruptcy Code section 548, and the statutory counterparts in Texas and Kentucky, all support this conclusion because they describe the elements of a singular "transfer" that may be avoided. *Cf. Janvey v. Golf*

---

[4] *See, e.g., In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 114 (Bankr. S.D.N.Y. 2011) ("Defendants have notice of the Trustee's allegations that the Defendants provided insufficient value for the Six Year Aggregations at a time that BLMIS was insolvent. As such, the allegations contain sufficient information for Defendants to prepare for litigation on the merits, satisfying Rule 8(a)."); *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 617 F.Supp.2d 700, 722 (S.D. Ohio 2009) ("Though the complaint fails to specify the exact dates and amounts of the dividend payments, this claim is subject to Rule 8's liberal pleading standard . . . ."); *In re Cellular Exp. of Ariz., Inc.*, 275 B.R. 357, 363 (Bankr. D. Ariz. 2002) ("It may not be necessary for an initial complaint to identify each transfer by check number, date and amount, but at minimum there must be some description of the *types* of transfers sought to be avoided . . . .") (emphasis in the original).

[5] *See, e.g., In re Valley Media, Inc.*, 288 B.R. 189, 192 (Bankr. D. Del. 2003) ("[T]he following information must be included in a complaint to avoid preferential transfers in order to survive a motion to dismiss: (a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer."); *In re AmerLink, Ltd.*, No. 09-01055-8-JRL, 2011 WL 864953, at \*3 (Bankr. E.D.N.C. 2011) ("Mere conclusory statements that the transfers were made on account of an antecedent debt owed by the transferor are insufficient."); *In re Motorwerks, Inc.*, 371 B.R. 281, 294 (Bankr. S.D. Ohio 2007) ("[T]he Trustee fails to identify, by date or amount, even one actual transfer from the Debtor to State Bank that is to be avoided.")

[6] *See, e.g., In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 733 (Bankr. S.D. Tex. 2020) ("Rule 9 applies whenever fraud is an essential part of the claim. In an *actual* fraudulent transfer case, fraud is an essential element.") (emphasis in the original); *In re Crescent Res., LLC*, No. 09-11507-CAG, 2012 WL 195528, at \*3 n.5 (Bankr. W.D. Tex. 2012) ("[T]he Court sees no reason to consider the [Litigation] Trust's argument that a Trustee should not be held to the Rule 9(b) standard."); *In re James River Coal Co.*, 360 B.R. 139, 162 (Bankr. E.D. Va. 2007) ("If a fraudulent transfer claim details the transfers alleged to be fraudulent, the reasons the transfers are fraudulent, and the roles of the defendants in the transfers, it has been pled with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).").

*Channel, Inc.*, 487 S.W.3d 560, 580 (Tex. 2016) (citing *Finn v. All. Bank*, 860 N.W.2d 638, 647 (Minn. 2015)) (state fraudulent-transfer statutes require a "transfer-by-transfer" inquiry). The Trustee must allege why *each* such transfer is avoidable. And (as explained below) because this case involves application of the midnight-deadline rule to many large transfers into and out of the Debtors' bank accounts, the precise date and time of each alleged transfer is critical, both to show that a transfer occurred and to allow the Defendants to prepare any defenses to each alleged fraudulent transfer.

The Court need not decide whether the heightened pleading standard under Rule 9(b) applies here because, for the reasons explained below, the Second Amended Complaint fails to allege any transfers occurred even under Rule 8's more lenient pleading requirements. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 118 (5th Cir. 2019) (noting, but not answering, the "vexing" question of whether an actual-fraudulent-transfer claim is subject to Rule 9(b)'s heightened pleading require-ments).

## V.  Analysis

The Court first will address why the Trustee has failed to adequately allege a transfer. Then the Court will address why, assuming transfers were adequately alleged, the Second Amended Complaint fails to allege a constructive fraudulent transfer. Finally, the Court will address why it will allow the Trustee to replead only the actual-fraudulent-transfer claims and not the constructive-fraudulent-transfer claims.

### A.    The Trustee has not adequately alleged a transfer oc-curred under Federal, Texas, or Kentucky law

The Trustee seeks to avoid deposits into MFI's bank account at CFSB as actual or constructive fraudulent transfers under Bankruptcy Code sec-tions 548 and 544, TUFTA sections 24.005 and 24.006, and KUVTA sec-tions 378A.040 and 378A.050. *See also* Tex. Bus. & Com. Code § 24.008 (remedies, including avoidance); Ky. Rev. Stat. § 378A.070 (same). The Trustee also seeks recovery under section 550 of the Bankruptcy Code.

Bankruptcy Code section 548 provides in relevant part that a trustee (subject to certain defenses) may avoid a transfer of an interest of the debtor in property made within two years of the bankruptcy petition date if the debtor made the transfer with actual fraudulent intent, or if

9

a financially strapped debtor received less than reasonably equivalent value for such transfer—that is, if the transfer was constructively fraudulent. *See* 11 U.S.C. § 548(a)(1)(A) (actual fraudulent transfer), (a)(1)(B) (constructive fraudulent transfer).

Similarly, Bankruptcy Code section 544(b) allows a bankruptcy trustee to avoid a transfer of an interest of the debtor in property that is avoidable under applicable state law by an actual unsecured creditor of the debtor. 11 U.S.C. § 544(b)(1). Both TUFTA and KUVTA in turn permit a creditor (subject to certain defenses) to avoid an actual fraudulent transfer or constructive fraudulent transfer by the debtor, using tests like those in section 548, but with a potentially longer, four-year lookback period. *See* Tex. Bus. & Com. Code §§ 24.005(a)(1) (actual fraudulent transfer), 24.006(a), (b) and 24.005(a)(2) (constructive fraudulent transfer), 24.010 (extinguishment after certain periods); Ky. Rev. Stat. §§ 378A.040(1)(a) (actual fraudulent transfer), 378A.040(1)(b) and 378A.050(1),(2) (constructive fraudulent transfer), 378A.090 (extinguishment after certain periods).

Finally, to the extent a transfer is avoided under sections 548 and 544, section 550 of the Bankruptcy Code allows a trustee (subject to certain defenses and limitations) to recover, for the benefit of the estate, either the property transferred or—if the court permits—the value of such property from the initial transferee, from the party for whose benefit the transfer was made, or from subsequent transferees. 11 U.S.C. § 550.

Thus a threshold requirement for avoidance and recovery under the Bankruptcy Code and Texas and Kentucky law is that there must have been a transfer of the debtor's property.[7] Section 101(54) of the Bankruptcy Code defines the term "transfer" to include each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property. "Transfer" is defined almost identically under TUFTA section 24.002(12) and KUVTA section 378A.010.

The problem here is that the Second Amended Complaint doesn't identify a single transfer with any particularity. Instead, the Trustee first

---

[7] The statutes also permit the avoidance of fraudulently incurred obligations, but none are alleged here.

points to Exhibit E to the complaint, which shows "the relevant Debtor entity, account number, date, day of week, and dollar amount of daily overdrafts of the Debtors' accounts with CFSB." Second Amended Complaint ¶ 219. The Second Amended Complaint then alleges that "[e]ach overdraft constituted a loan to the Debtors that was subsequently repaid" by additional deposits by the Debtors at some indefinite, unstated date in the future. *Id.* The alleged overdrafts "repaid by the Debtors" total $33,277,959.91. *Id.*

Why the lack of specificity for each alleged transfer is problematic becomes clear after considering the Uniform Commercial Code's "midnight-deadline rule," which sets a strict time limit for a payor bank (the bank on which a check is drawn) to decide whether to pay or dishonor a check that has been presented for payment.

When the payor bank's customer issues a check to a payee and that payee deposits the check in the payee's bank account, the check makes its way back to the payor bank through a presentment process that results in the payor bank's customer receiving a provisional debit for the full amount of the check on the day the check is presented to the payor bank. If the amount of the check presented and provisionally debited is greater than the amount of funds then on deposit in the customer's account, the account will reflect a negative balance at the end of the banking day—that is, the account is now in a not-sufficient-funds ("**NSF**") position.[8]

The payor bank then has until midnight of the next banking day (the "midnight deadline") to decide whether to honor the check or return (dishonor) it. Whether the NSF position develops into an actual overdraft (an actual extension of credit by the payor bank to its customer) depends on what happens by the midnight deadline. If the payor bank's customer covers the check with good funds (by deposits or transfers) before the midnight deadline, the payor bank allows the midnight deadline to pass, and the provisional debit becomes final.

If the customer does not cover the check with good funds, and if the customer does not stop payment on the check, the payor bank then has a

---

[8] The "Amount" column in Exhibit E appears to reflect this negative—or NSF—balance on various dates.

11

choice. If the payor bank doesn't want to take the credit risk, it may dishonor the check, in which case the provisional debit is reversed, and there is no true overdraft. On the other hand, if the bank allows the midnight deadline to pass without taking action, the bank becomes accountable for the full amount of the check, and the overdraft is considered a loan from the payor bank to its customer. *See e.g.,* UCC §§ 4-104(10), 4-212, 4-213, 4-214, 4-215, 4-301, 4-302, 4-303 and related Official Comments (substantially same under Texas and Kentucky statutes); *and see generally In re AppOnline.com, Inc.*, 296 B.R. 602, 608–10 (Bankr. E.D.N.Y. 2003) (explaining midnight-deadline rule in detail). The midnight-deadline rule is in place to permit the ready negotiability of checks and other instruments along the highway of commerce. *AppOnline.com, Inc.*, 296 B.R. at 619.

The Second Amended Complaint fails to meet the Rule 8 standard because, as an initial matter, it fails to specify the dates of the subsequent deposits, each of which is alleged to be a fraudulent transfer. The chart included as Exhibit E to the Second Amended Complaint appears to reflect all days from January 8, 2018, through January 5, 2023, where MFI's end-of-day balance was in an NSF position. By the Court's count there are 87 entries in the chart that show NSF end-of-day balances, including some days with consecutive NSF end-of-day balances.

For example, on Monday, January 22, 2018, MFI's account at CFSB had a negative balance of ($70,716.53). On January 23, 2018, that negative balance was ($283,710.16). The Trustee asserts a transfer occurred every time an NSF balance was followed by a deposit. The Court is unable to make this inference. The Trustee fails to specify the requisite details, and most importantly, the timing of the subsequent deposits. The midnight-deadline rule makes clear that the dates of subsequent deposits are critical to determining whether an NSF account position ever resulted in a true overdraft, and therefore, whether subsequent deposits were repayment transfers subject to avoidance. Any covering deposit made on these NSF positions prior to the midnight deadline would not be a transfer.

Moreover, the Trustee has alleged that the Debtors processed more than $2 billion in intercompany transactions across the Debtors' accounts at Mechanics and CFSB over five years. Second Amended Complaint ¶ 34. With the vast number of transactions occurring daily and with no facts alleged about the timing of subsequent deposits, the Court cannot draw

a reasonable inference that each end-of-day NSF position identified in Exhibit E resulted in a true overdraft (that is, an NSF position followed by a deposit made after the midnight deadline). Even if the Trustee is right that there are true overdrafts, followed by transfers, lurking somewhere in the vicinity of Exhibit E, the Court cannot find them given the variable end-of-day NSF balances, given the alleged voluminous and large account transactions, and given the lack of information about subsequent deposits.[9]

Therefore, Count XV of the Second Amended Complaint must be dismissed because the Trustee has failed to adequately plead any transfers.[10]

## B. The Trustee has not adequately alleged a constructive fraudulent transfer occurred under Federal, Texas, or Kentucky law

Even if the Trustee adequately alleged a transfer, the Trustee has failed to adequately plead all required elements of a constructive fraudulent transfer.[11] Importantly, a constructive fraudulent transfer occurs only if a debtor receives less than reasonably equivalent value in exchange for the transfer. 11 U.S.C. § 548(a)(1)(B)(i); Tex. Bus. & Com. Code

---

[9] Had Exhibit E reflected consecutive banking days of *identical* end-of-day NSF balances, the Court could arguably infer that a debt was created with at least one true overdraft, but the Court still would not be able to identify a transfer without details of a subsequent deposit made after the midnight deadline.

[10] The briefing from CFSB and the Trustee doesn't specifically address TUFTA section 24.006(b) and KUVTA section 378A.050(2), involving payment of an antecedent debt of an insider when the debtor is insolvent and the insider had reasonable cause to believe that the debtor was insolvent (for convenience, an "**Insider Constructive Fraudulent Transfer**"). But the Court construes CFSB's Motion as seeking dismissal of *all* claims for actual and constructive fraudulent transfers based on the lack of a transfer. The Court thus grants CFSB's Motion to dismiss Count XV on that basis.

[11] The Court is referring to the more commonly discussed constructive fraudulent transfer that requires a lack of reasonably equivalent value, and not to an Insider Constructive Fraudulent Transfer, which contains no such requirement. Even though the Second Amended Complaint does not adequately plead an Insider Constructive Fraudulent Transfer as to CFSB, that Defendant (unlike Mechanics) has not moved to dismiss on that specific ground, perhaps because the Second Amended Complaint refers to TUFTA section 24.006 and KUVTA section 378.050, without referring to subsections and without mentioning the word "insider" when discussing those statutes. Because CFSB has not moved specifically on the insider issue, the Court does not dismiss Count XV on that specific ground.

§§ 24.005(a)(2), 24.006(a); Ky. Rev. Stat. §§ 378A.040(1)(b), 378A.050(1).
"Value" includes satisfaction or securing of a present or antecedent debt
of the debtor. 11 U.S.C. § 548(d)(2); Tex. Bus. & Com. Code § 24.004; Ky.
Rev. Stat. § 378A.030. Therefore, dollar-for-dollar repayments of true
overdrafts (that is, loans) constitute reasonably equivalent value. *In re
Louisiana Pellets, Inc.*, 838 Fed. App'x 45, 50 (5th Cir. 2020); *see also In
re Se. Waffles, LLC*, 702 F.3d 850, 857 (6th Cir. 2012) ("[Plaintiff] cannot
state a claim for avoidance of payments that necessarily resulted in a
dollar-for-dollar reduction in the penalties due."); *In re Colliau*, 584 B.R.
812, 815 (Bankr. W.D. Tex. 2017) ("If an estimated tax payment is a
payment of an antecedent or present debt, then the transfer in satisfac-
tion of the tax debt would be a dollar-for-dollar exchange, and would be
for a reasonably equivalent value.").

The Trustee alleges in paragraph 219 of the Second Amended Complaint
that "[e]ach overdraft constituted a loan to the Debtors that was subse-
quently repaid by future, additional deposits by the Debtors." This alle-
gation makes clear, assuming avoidable transfers occurred, that those
transfers cannot have been constructively fraudulent because the Debt-
ors repaid loans dollar-for-dollar.

Notwithstanding that dollar-for-dollar exchange, the Trustee contends
that, as a matter of law, all transfers made in furtherance of a Ponzi or
Ponzi-like scheme cannot be in exchange for reasonably equivalent
value, thus rendering the reasonably-equivalent-value inquiry irrele-
vant and the reasonably-equivalent-value allegations unnecessary.
Docket No. 79 ¶ 89 (citing *In re Reagor-Dykes Motors, LP*, Adversary No.
20-05039, 2021 WL 1219537, at *9 (Bankr. N.D. Tex. 2021)). In related
briefing involving Mechanics on the exact same issue, the Trustee al-
leges this is "[s]ettled Fifth Circuit law . . . ." Docket No. 82 ¶ 38. The
Trustee overstates his case and the settled law.

There are two groups of cases from the Fifth Circuit discussing when
transfers in Ponzi schemes were or were not made for reasonably equiv-
alent value. The first group of cases involves payments to transferees
who provided no measurable economic value to the debtors in exchange.
In these cases, the Fifth Circuit held that when a Ponzi-scheme company
pays somebody (like a salesman who works on commission) to peddle the
scheme to investors, the fraudulent services of the salesman to the com-
pany are not reasonably equivalent value for the Ponzi-scheme com-
pany's payments to him as a matter of law. *See In re Life Partners*

14

*Holdings, Inc.*, 926 F.3d 103, 120-21 (5th Cir. 2019) (holding, as a matter of law, that payments to certain "Licensees" to solicit the purchase of life-insurance policies as part of the debtors' Ponzi scheme were transfers "in furtherance of" the scheme and thus not transfers made for reasonably equivalent value under TUFTA § 24.005(a)(2) and Bankruptcy Code § 548(a)(1)(B)); *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (Edith H. Jones, Chief Judge) (holding, as matter of law, that payments for "broker services" to secure investments in a debtor's Ponzi scheme were not made for reasonably equivalent value under Washington's adoption of the Uniform Fraudulent Transfer Act).

As Judge Edith Jones noted in *Warfield* about that type of exchange, "The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved. It takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefited from [the broker salesman's] efforts to extend the fraud by securing new investments." *Warfield*, 436 F.3d at 560 (citation omitted). This first group of cases specifically addresses avoiding transfers made for worthless services performed in furtherance of peddling a Ponzi scheme. In these cases, according to the Fifth Circuit, the transferor debtor's net worth is not preserved by the exchange of value because the debtor paid real dollars to the transferee, but the transferee provided no measurable value to the debtor in exchange.

The second group of cases involves payments to transferees who, in exchange, either provided measurable economic value to the debtors that preserved the debtor's net worth, or provided value that was objectively reasonable from a creditor's perspective at the time of the transaction. For example, in *Janvey v. Brown*, the investor defendants had valid fraud claims against the debtor for the tangible economic value they were duped into providing the debtor—that is, their principal investment. The Fifth Circuit held that principal payments made to investor-defendants were payments of antecedent debt—the investors' valid fraud claims—and thus were not recoverable as constructive fraudulent transfers. *Janvey v. Brown*, 767 F.3d 430, 443 (5th Cir. 2014). In other words, the investors had valid claims against the debtor when they were duped into providing their principal investments. When the debtor later paid those valid antecedent debts, the debtor received reasonably equivalent value because its net worth was preserved by the transaction—

15

that is, even though the debtor had less cash after the transfers, its valid liabilities were reduced dollar-for-dollar.

On the other hand, that court ruled interest payments beyond the principal investments were recoverable because the investor defendants had no valid claim for contractual interest from a Ponzi scheme and the debtor received nothing of value in the exchange that preserved its net worth. *Id.*; *cf. In re Hannover*, 310 F.3d 796, 802 (5th Cir. 2002) (Edith H. Jones, Circuit Judge) (Ponzi scheme debtor received value from defendant under § 548(c) defense for real-estate purchase-option payments made to defendant because the options had value from the transferee's perspective; concern about disparity in values exchanged is addressed in § 548(a)(1)(B), which requires a showing of reasonably equivalent value from the perspective of the transferor: "Did the transferor receive enough?") (citation modified).

In *Golf Channel*, the Texas Supreme Court held that payments by a Ponzi-scheme company for media-advertising services—services that indisputably had objective value from a creditor's perspective at the time of the transaction—were of reasonably equivalent value under TUFTA's nonstandard, nonexclusive definition of the term. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 570, 582 (Tex. 2016) ("[W]e discern nothing in TUFTA's text suggesting the Legislature intended a different value standard to apply in the Ponzi-scheme context.").

In the present case, assuming transfers occurred, these transfers more closely resemble those in this second line of cases. Any true overdrafts on MFI's account at CFSB were direct loans from CFSB to MFI in the amount of the overdrafts, and the subsequent deposits (if any) repaid those CFSB loans dollar-for-dollar, both preserving the transferor's net worth and providing objectively reasonable value at the time of each

transaction.[12] Dollar-for-dollar repayment is reasonably equivalent value, even when the payor is operating a Ponzi scheme.[13]

Should the outcome here change because CFSB is alleged to be complicit in the Ponzi scheme? No, because the Debtor received reasonably equivalent value when it repaid CFSB's alleged overdrafts dollar-for-dollar. The Trustee asserted separate claims against CFSB for its role in the alleged scheme, and the Court dismissed those claims with prejudice. If the Trustee can adequately plead an actual fraudulent transfer against CFSB, its purported knowledge of the scheme will be tested through its good-faith affirmative defenses under the Bankruptcy Code, TUFTA, and KUVTA. Those issues should not bleed over into a constructive-fraudulent-transfer analysis.

For the reasons explained above, there are no allegations in the Second Amended Complaint supporting the conclusion that a transfer was made for less than reasonably equivalent value. Thus the Trustee has not adequately pleaded a claim for a constructive fraudulent transfer.

**C.  The Court grants the Motion with leave to amend the claims for actual fraudulent transfers and for Insider Constructive Fraudulent Transfers but not for constructive fraudulent transfers involving lack of reasonably equivalent value**

After a party has amended a pleading as a matter of course, further amendments require the opposing party's written consent or the court's

---

[12] In a single sentence in the opinion upon which the Trustee relies, the *Reagor-Dykes* court stated that allegations of lack of reasonably equivalent value were not required in that case because there was a Ponzi-like scheme and "any transfer in furtherance of such scheme 'does not confer reasonably equivalent value as a matter of law.'" *In re Reagor-Dykes Motors*, 2021 WL 1219537, at *9 (quoting *In re Life Partners*, 926 F.3d at 121). This Court believes that the *Life Partners* and *Warfield* opinions are more limited than they're given credit for. They do not, as the Trustee appears to suggest, mean that the Trustee automatically wins the reasonably-equivalent-value determination whenever a Ponzi scheme is involved. A trustee must still plead and eventually prove lack of reasonably equivalent value.

[13] Perhaps not coincidentally, the "value" of the transfers the Trustee seeks to recover from CFSB under Bankruptcy Code section 550 is exactly equal to the amount of the alleged overdraft loans shown on Exhibit E to the Second Amended Complaint. In other words, by measuring recovery based on the value of the alleged loans, the Trustee appears to have conceded the value of the loans is exactly equivalent to the value of the transfers.

leave. Fed. R. Civ. P. 15(a)(2); Fed. R. Bankr. P. 7015. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The language of Federal Rule of Civil Procedure 15 shows a "bias in favor of granting leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Atheltic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (citation omitted). However, "[l]eave to amend may be denied for undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . and futility of the amendment." *N. Cypress Med. Center Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 477 (5th Cir. 2018) (citation modified).

There is no evidence demonstrating "undue delay, bad faith or dilatory motive on the part of the movant." While this is now the Trustee's third attempt to file a complaint, there are apparent factual deficiencies that, if cured, would make a third amended complaint fruitful as to the claims for actual fraudulent transfers. Moreover, the Trustee's counsel indicated at oral argument that the Trustee *could* provide the required specificity if necessary. Transcript of Hearing Held Oct. 14, 2025, Docket No. 290 at 49-50. Finally, CFSB didn't specifically move on the insider issue. For these reasons, the Court dismisses Count XV in the Trustee's Second Amended Complaint without prejudice to refiling claims for actual fraudulent transfers and Insider Constructive Fraudulent Transfers.

On the other hand, repleading would not cure the deficiencies for the alleged constructive fraudulent transfers. When a complaint has been amended twice and no additional facts or information will overcome the pleading standard, dismissal with prejudice is proper. *United States of Am. ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland, L.L.C.*, 157 F.4th 758, 765–66 (5th Cir. 2025).

CFSB has argued here that, assuming transfers occurred, the Trustee has not pleaded any lack of reasonably equivalent value. The Court agrees. Dollar-for-dollar repayments of loans necessarily constitute reasonably equivalent value. There are no additional facts the Trustee could assert that would overcome this deficiency. Granting leave to amend the complaint to assert constructive fraudulent transfers would be futile. Therefore, the Court dismisses the claims for constructive fraudulent transfers with prejudice.

18

## VI.  Conclusion

For the reasons stated above, the Court **ORDERS** as follows:

1. The Motion is **GRANTED** in part as stated herein.
2. The claims against CFSB in Count XV for actual fraudulent transfers and Insider Constructive Fraudulent Transfers are dismissed without prejudice.
3. The claims against CFSB in Count XV for constructive fraudulent transfers involving lack of reasonably equivalent value are dismissed with prejudice.
4. The Trustee shall not replead until after the Court rules on the pending motions to dismiss filed by Mechanics, HTLF, and Rabo. After the Court rules on those motions, the Trustee and CFSB shall confer on an appropriate deadline to replead.